**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse 40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

Docket Number(s): 23-1185, 23-1225      Caption [use short title]

Motion for: Dismissal of Cross-Appeal

Flores v. The National Football League

Set forth below precise, complete statement of relief sought:

(1) dismissal of the cross-appeal in No. 23-1225

(2) stay of merits briefing pending a decision on this motion

(the request for a stay is unopposed)

MOVING PARTY: NFL, Miami Dolphins, Arizona Cardinals, and Tennessee Titans    OPPOSING PARTY: Steve Wilks, Ray Horton, Brian Flores

- [ ] Plaintiff
- [x] Defendant
- [ ] Appellant/Petitioner
- [x] Appellee/Respondent

MOVING ATTORNEY: Kannon K. Shanmugam    OPPOSING ATTORNEY: David E. Gottlieb

[name of attorney, with firm, address, phone number and e-mail]

Paul, Weiss, Rifkind, Wharton & Garrison LLP

2001 K Street, NW; Washington, DC 20006

kshanmugam@paulweiss.com; (202) 223-7300

Wigdor LLP

85 Fifth Avenue; New York, NY 10003

dgottlieb@wigdorlaw.com; (212) 257-6800

Court- Judge/ Agency appealed from: Southern District of New York (Caproni, J.)

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
- [x] Yes
- [ ] No (explain):

Opposing counsel's position on motion:
- [ ] Unopposed [x] Opposed [ ] Don't Know

Does opposing counsel intend to file a response:
- [x] Yes [ ] No [ ] Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has this request for relief been made below? [ ] Yes [ ] No

Has this relief been previously sought in this court? [ ] Yes [ ] No

Requested return date and explanation of emergency:

Is the oral argument on motion requested? [ ] Yes [x] No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set? [ ] Yes [x] No If yes, enter date:

Signature of Moving Attorney:

kshanmugam Digitally signed by kshanmugam Date: 2023.11.30 11:23:12 -05'00' Date: 11/30/2023    Service : [x] Electronic [ ] Other [Attach proof of service]

Form T-1080 (rev. 10-23)

# 23-1185(L)

## 23-1225 (CON)

### In the United States Court of Appeals
### for the Second Circuit

---

STEVE WILKS, RAY HORTON, BRIAN FLORES, AS A CLASS
REPRESENTATIVE, ON BEHALF OF HIMSELF AND ALL OTHERS
SIMILARLY SITUATED, PLAINTIFFS-APPELLEES-CROSS-APPELLANTS

*v.*

NEW YORK FOOTBALL GIANTS, INC.; HOUSTON NFL HOLDINGS, L.P., DBA
HOUSTON TEXANS; DENVER BRONCOS, DEFENDANTS-APPELLANTS

*v.*

NATIONAL FOOTBALL LEAGUE, MIAMI DOLPHINS, LTD.; ARIZONA
CARDINALS FOOTBALL CLUB LLC, DBA ARIZONA CARDINALS;
TENNESSEE TITANS ENTERTAINMENT, INC., DBA TENNESSEE TITANS,
DEFENDANTS-APPELLANTS-CROSS-APPELLEES

*v.*

JOHN DOE TEAMS 1 THROUGH 29; JOHN DOE TEAMS 1 THROUGH 26,
DEFENDANTS

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 22-871)*
*(THE HONORABLE VALERIE E. CAPRONI, J.)*

---

**MOTION OF CROSS-APPELLEES NATIONAL FOOTBALL LEAGUE,
MIAMI DOLPHINS, ARIZONA CARDINALS, AND TENNESSEE TITANS
TO DISMISS CROSS-APPEAL**

---

*(Counsel listed on inside cover)*

LORETTA E. LYNCH
BRAD S. KARP
LYNN B. BAYARD
BRETTE TANNENBAUM
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
    *1285 Avenue of the Americas*
    *New York, NY 10019*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
    *2001 K Street, N.W.*
    *Washington, DC 20006*
    *(202) 223-7300*
    *kshanmugam@paulweiss.com*

## CORPORATE DISCLOSURE STATEMENT

Appellant-cross-appellee National Football League is an unincorporated association.  It has no parent corporation, and no publicly held corporation owns a 10% or greater interest in it.

Cross-appellee Miami Dolphins, Ltd., is controlled by Fin Associates, LLC, which is controlled by Fin 2016, LLC.  No publicly held corporation owns a 10% or greater interest in Fin 2016, LLC.

Cross-appellee Arizona Cardinals Football Club LLC has no parent corporation, and no publicly held company owns a 10% or greater interest in it.

Cross-appellee Tennessee Football, LLC (incorrectly identified in the complaint as Tennessee Titans Entertainment, Inc.), is a wholly owned subsidiary of KSA Industries, Inc.  No publicly held corporation owns 10% or more of the stock of KSA Industries, Inc.

Appellant Denver Broncos Football Club is a wholly owned indirect subsidiary of Broncos Partners, LLC, which is controlled by Penner Sports Group, LLC.  No publicly held corporation owns a 10% or greater interest in Penner Sports Group, LLC.

Appellant New York Football Giants, Inc., has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Appellant Houston NFL Holdings, L.P., has no parent corporation, and no publicly held corporation owns a 10% or greater interest in it.

# TABLE OF CONTENTS

Page

Introduction.................................................................................1

Background ..................................................................................4

Argument...................................................................................10

Plaintiffs' cross-appeal does not fall within the Court's
pendent appellate jurisdiction..........................................10

A.   The issues in the cross-appeal are not 'inextricably
intertwined' with the issues in the lead appeal..............12

B.   Review in the cross-appeal is not necessary in order
to ensure meaningful review in the lead appeal ............18

C.   The cross-appeal involves parties that are not
part of the lead appeal ....................................................20

D.   Merits briefing should be stayed pending a decision
by the motions panel .......................................................22

Conclusion.................................................................................23

Appendix

# TABLE OF AUTHORITIES

## CASES

*American Express Co.* v. *Italian Colors Restaurant,*
570 U.S. 228 (2013)................................................................14

*Blue Ridge Investments, L.L.C.* v. *Republic of Argentina,*
735 F.3d 72 (2d Cir. 2013) ...........................................10, 17

*Bolmer* v. *Oliveira,* 594 F.3d 134 (2d Cir. 2010)....................10

*Catzin* v. *Thank You & Good Luck Corp.,*
899 F.3d 77 (2d Cir. 2018) .....................................................14

*CFTC* v. *Walsh,* 618 F.3d 218 (2d Cir. 2010).................16, 17

Page

Cases—continued:

*Gill* v. *Richmond Co-operative Association*,
34 N.E.2d 509 (Mass. 1941) ...................................................................14

*Hapag-Lloyd Aktiengesellschaft* v. *U.S. Oil Trading LLC*,
814 F.3d 146 (2d Cir. 2016) ...................................................................19

*Henry Schein, Inc.* v. *Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019)...............................................................................20

*Johnson* v. *Newburgh Enlarged School District*,
239 F.3d 246 (2d Cir. 2001) ...................................................................20

*Jones* v. *Parmley*, 465 F.3d 46 (2d Cir. 2006)...................................10, 11, 20, 21

*Kaluczky* v. *City of White Plains*, 57 F.3d 202 (2d Cir. 1995)....................20, 21

*MasterCard International Inc.* v. *Visa International
Service Association, Inc.*, 471 F.3d 377 (2d Cir. 2006)..................................19

*Merritt* v. *Shuttle, Inc.*, 187 F.3d 263 (2d Cir. 1999)...........................................19

*Morley* v. *Ciba-Geigy Corp.*, 66 F.3d 21 (2d Cir. 1995) ....................................21

*Munafo* v. *Metropolitan Transportation Authority*,
285 F.3d 201 (2d Cir. 2002) ...................................................................10

*Myers* v. *Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010)...................................*passim*

*NFL Management Council* v. *NFL Players Association*,
820 F.3d 527 (2d Cir. 2016) ...................................................................14

*Panzella* v. *Sposato*, 863 F.3d 210 (2d Cir. 2017) .........................................18, 20

*Rein* v. *Socialist People's Libyan Arab Jamahiriya*:

162 F.3d 748 (2d Cir. 1998) ...................................................................*passim*

995 F. Supp. 325 (E.D.N.Y. 1998) .................................................................15

iii

Page

Cases—continued:

*SEC* v. *Smith*, 710 F.3d 87 (2d Cir. 2013)..........................................................12, 15

*Stafford* v. *IBM Corp.*, 78 F.4th 62 (2d Cir. 2023)..................................................21

*Stolt-Nielsen SA* v. *Celanese AG*, 430 F.3d 567 (2d Cir. 2005)..............................12

*Swint* v. *Chambers County Commission*, 514 U.S. 35 (1995) .............10, 20, 21

*United States* v. *City of New York*, 717 F.3d 72 (2d Cir. 2013) ........................17

*United States* v. *Hoskins*, 902 F.3d 69 (2d Cir. 2018)........................................17

*Universal Builders, Inc.* v. *Moon Motor Lodge, Inc.*,
244 A.2d 10 (Pa. 1968)........................................................................14

## STATUTES

Federal Arbitration Act, 9 U.S.C. §§ 1-16 ...................................................*passim*

9 U.S.C. § 10 .....................................................................................................19

9 U.S.C. § 10(a)(2) ............................................................................................20

9 U.S.C. § 16 .....................................................................................................19

9 U.S.C. § 16(a)..................................................................................................9

9 U.S.C. § 16(b) ..................................................................................................9

28 U.S.C. § 1292(b)............................................................................................9

42 U.S.C. § 1981 ................................................................................................5

iv

## INTRODUCTION

Plaintiffs' cross-appeal of the district court's decision to compel arbitration—involving issues and multiple parties distinct from the lead appeal—falls far short of this Court's high hurdle for pendent appellate jurisdiction and should be dismissed.

This case involves claims by three current or former coaches in the National Football League (NFL) alleging employment discrimination by six different NFL member clubs and the NFL. Defendants moved to compel arbitration of all claims under the arbitration provisions in plaintiffs' various employment agreements and the NFL Constitution, which contains separate arbitration provisions. The district court granted defendants' motion with respect to plaintiffs' claims against three of the member-club defendants (as well as plaintiffs' related claims against the NFL). The court denied the motion with respect to one plaintiff's separate claims against three other member-club defendants (as well as the related claims against the NFL).

As the Federal Arbitration Act expressly authorizes, the four defendants required to proceed in court appealed the portion of the district court's order denying the motion to compel arbitration, raising two specific issues. The first issue is whether the district court erred by holding that plaintiff Brian Flores's employment agreement with the New England Patriots was illusory under Massachusetts law, because that agreement incorporated subsequent amendments to the NFL Constitution. The second is whether the

(1)

district court erred in declining to consider the effect of Mr. Flores's employment agreement with the Pittsburgh Steelers, because the copy of the Steelers agreement first submitted by defendants did not evidence the NFL Commissioner's approval of the agreement.

Under the Arbitration Act, plaintiffs have no right to appeal the portion of the district court's order granting defendants' motion to compel arbitration. Instead, plaintiffs ordinarily must seek post-award review of the portions of the order compelling arbitration. Plaintiffs filed a notice of cross-appeal anyway, purporting to invoke the Court's pendent appellate jurisdiction. But the law in this circuit is clear that the standard for pendent appellate jurisdiction is exceedingly strict. Such jurisdiction can be exercised only when the issues in the cross-appeal are "inextricably intertwined" with the issues in the lead appeal, or must be reviewed in order to ensure "meaningful review" in the lead appeal. Plaintiffs come nowhere close to meeting that standard here.

As an initial matter, in the cross-appeal, plaintiffs attempt to raise two issues related to alleged arbitrator bias that are not remotely intertwined with the issues raised in the lead appeal (and themselves are premature before arbitration is completed). Indeed, those issues are entirely discrete, involving fact-specific analyses and areas of law wholly distinct from the specific contractual and state-law issues underlying the lead appeal. In particular, the

purported issues of arbitrator bias in plaintiffs' cross-appeal will raise questions concerning the contract defense of unconscionability under Florida, Arizona, and Tennessee law, as well as the federal principle that arbitration agreements cannot prevent the "effective vindication" of federal statutory rights. By contrast, the lead appeal will involve questions concerning the Massachusetts law of contract consideration, the procedure due to parties under federal law when a federal court raises an issue on its own initiative, and the Pennsylvania law of contract formation. The Court can thus easily resolve the questions in the lead appeal without the need to address any of the issues in the cross-appeal.

For similar reasons, review of the cross-appeal is unnecessary to ensure "meaningful review" of the issues in the lead appeal. The Court need not address any purported issues of arbitrator bias in order to resolve the questions in the lead appeal concerning whether the district court erred in declining to enforce the arbitration provisions in the Patriots and Steelers agreements.

More still, the putative cross-appeal attempts to invoke not merely pendent appellate jurisdiction, but also pendent-*party* appellate jurisdiction, by introducing five additional parties, each litigating separate claims, to the case on appeal. As both the Supreme Court and this Court have made clear, pendent-party appellate jurisdiction is impermissible in these circumstances.

For those reasons, the cross-appeal should be dismissed. In order to preserve both party and judicial resources, cross-appellees respectfully submit that this motion should not be carried with the merits and that briefing in these consolidated appeals should be stayed after appellants in the lead appeal file their opening brief on December 5, until the motions panel rules on the motion to dismiss. Plaintiffs agree that a stay is appropriate.

## BACKGROUND

1.      Before the Court are two appeals—the lead appeal (No. 23-1185) and a cross-appeal (No. 23-1225)—from the district court's order granting in part and denying in part defendants' motion to compel arbitration and the court's order denying the parties' cross-motions for reconsideration. In the proceedings below, defendants were the NFL and 6 of its 32 member clubs: the Miami Dolphins, Arizona Cardinals, Tennessee Titans, Denver Broncos, New York Giants, and Houston Texans. D. Ct. Dkt. 22, at 11-13. Plaintiffs were three Black current or former NFL coaches: Brian Flores, Steve Wilks, and Ray Horton. *Id.* at 11. In the lead appeal, appellants are the NFL and the Broncos, Giants, and Texans; appellee is Mr. Flores. In the cross-appeal, cross-appellants are Mr. Flores, Mr. Wilks, and Mr. Horton; cross-appellees are the NFL and the Dolphins, Cardinals, and Titans.

2.      In April 2022, plaintiffs filed the operative class-action complaint, alleging that one or more of the NFL and its member clubs discriminated

against them on the basis of race in their employment as a head coach, in applying for a head-coaching position, or both. D. Ct. Dkt. 22, at 89-94. Plaintiffs alleged claims under 42 U.S.C. § 1981 and state and local law. *Id.* at 89-97.

In the complaint, each plaintiff asserted claims against his former employer: the Dolphins for Mr. Flores, the Cardinals for Mr. Wilks, and the Titans for Mr. Horton. Mr. Flores also asserted claims against three member clubs he interviewed with for head-coaching positions: the Broncos, Giants, and Texans. Plaintiffs asserted their claims not only against the relevant member-club defendants but also the NFL. D. Ct. Dkt. 22, at 75-83, 89-97. Plaintiffs further sought class treatment, proposing to proceed with a class consisting of every Black NFL head coach, offensive or defensive coordinator, quarterback coach, and general manager, as well as every Black applicant for those positions, during the applicable limitations period. *Id.* at 83.

3.     Defendants moved to compel arbitration of all claims. D. Ct. Dkt. 47, 48. As defendants explained, each plaintiff had entered into multiple written, comprehensive employment agreements that contained broad arbitration provisions requiring the arbitration of their claims. D. Ct. Dkt. 48, at 15-24. With respect to Mr. Flores, defendants invoked three of his employment agreements: his agreement with the Patriots, which was in force when Mr. Flores interviewed with the Broncos; his agreement with the Dolphins; and his agreement with the Pittsburgh Steelers, the member club that employed

5

Mr. Flores at the time defendants moved to compel arbitration. *Id.* at 15-20. As for Mr. Wilks and Mr. Horton, defendants invoked their employment agreements with the Cardinals and Titans, respectively. *Id.* at 20-21.

Defendants also invoked the obligation under plaintiffs' various employment agreements to comply with the NFL Constitution and its broad arbitration provisions. D. Ct. Dkt. 48, at 19-21. Under Article 8.3 of the NFL Constitution, the NFL Commissioner has "full, complete, and final jurisdiction and authority to arbitrate . . . [a]ny dispute between any . . . coach . . . and any member club or clubs," as well as "[a]ny dispute involving two or more members of the League." D. Ct. Dkt. 73-1, at 30. Plaintiffs each specifically acknowledged in their agreements that they "read the NFL Constitution . . . and underst[ood] [its] meaning." *E.g.*, D. Ct. Dkt. 73-3, at 5.

Plaintiffs opposed the motion to compel arbitration. D. Ct. Dkt. 62. Relevant here, plaintiffs argued that the arbitration provisions in their employment agreements were unconscionable because the provisions selected the NFL Commissioner, who was allegedly biased in favor of defendants, as arbitrator. *Id.* at 5-15. Plaintiffs also argued that the Commissioner's selection as arbitrator prevented them from effectively vindicating their federal statutory rights. *Id.* at 15-17.

4. The district court granted in part and denied in part defendants' motion to compel arbitration. App., *infra*, 1-30. The court concluded that Mr.

6

Flores, Mr. Wilks, and Mr. Horton were required to arbitrate their claims against the Dolphins, Cardinals, and Titans, respectively, as well as their related claims against the NFL, pursuant to the arbitration provisions in their employment agreements. *Id.* at 7-18, 29. The district court rejected plaintiffs' arguments concerning the NFL Commissioner's selection as arbitrator. *Id.* at 22-26.

By contrast, the district court declined to compel arbitration of Mr. Flores's claims against the Broncos, Giants, and Texans, as well as his related claims against the NFL. App., *infra*, 13-14, 20-22. As to the Broncos, the court concluded that the arbitration provisions in the NFL Constitution were illusory under Massachusetts law because Mr. Flores's agreement with the Patriots would have incorporated amendments to the NFL Constitution without notice to Mr. Flores if any such amendments had been made (although none in fact were)—a ground that Mr. Flores had not raised and the parties had not briefed. *Id.* at 21-22. As to the Giants and Texans, the court concluded that no valid arbitration agreement covered those claims. *Id.* at 13-14. In particular, the district court declined to consider the effect of Mr. Flores's agreement with the Steelers, because the agreement did not evidence the NFL Commissioner's approval, which the agreement required. *Id.* Again, Mr. Flores had not raised that argument, and the parties had not briefed it.

5.     After the district court entered its order, the parties filed cross-motions for reconsideration.  D. Ct. Dkt. 79, 81.  Relevant here, defendants moved for reconsideration with respect to both grounds on which the district court had denied their motion to compel arbitration.

With respect to the Broncos, defendants argued that the district court had misapplied Massachusetts law in determining that the Patriots agreement was illusory.  D. Ct. Dkt. 82, at 4-8.  Defendants further argued that, even if the incorporation of prospective amendments to the NFL Constitution rendered the arbitration agreement illusory, the provision should be severed from the rest of the agreement.  *Id.* at 8-10.  Finally, defendants argued that the Federal Arbitration Act would preempt any interpretation of Massachusetts law that applied principles of illusoriness in a targeted fashion to arbitration provisions.  *Id.* at 10-12.

With respect to the Giants and Texans, defendants argued that the district court had incorrectly set aside the Steelers agreement without briefing from the parties.  D. Ct. Dkt. 82, at 12.  Defendants explained that the NFL Commissioner had in fact approved the agreement, and they provided the court with the approved copy, the terms of which were identical to the earlier provided copy.  *Id.* at 13.  Defendants also argued that, even without the Commissioner's approval, the Steelers agreement was valid and binding.  *Id.* at 13-14.

8

The district court denied both motions for reconsideration. App., *infra*, 31-47. As to defendants, the court concluded that it had properly applied Massachusetts law to the Patriots agreement and that the agreement's modification provision was not severable. *Id.* at 36-42. With respect to the Steelers agreement, the court reasoned that the approved copy of the agreement submitted by defendants was "new evidence" and that the waiver argument was a "new legal theory," neither of which the court could consider on reconsideration. *Id.* at 34, 36.

6.   The NFL and the Broncos, Giants, and Texans filed a notice of interlocutory appeal under 9 U.S.C. § 16(a). App., *infra*, 48-49. The notice stated that those parties were appealing only the portions of the court's orders declining to compel arbitration of Mr. Flores's claims against the Broncos, Giants, and Texans, as well as his related claims against the NFL. *Id.*

In response, plaintiffs filed a motion for permission to appeal under 28 U.S.C. § 1292(b) from the same two orders. *See* D. Ct. Dkt. 119-120; *see also* 9 U.S.C. § 16(b). Plaintiffs then filed a notice of cross-appeal from those two orders "on the basis of pendent appellate jurisdiction." App., *infra*, 50-51. As of the filing of this motion, the district court has not yet ruled on the Section 1292(b) motion.

**ARGUMENT**

**PLAINTIFFS' CROSS-APPEAL DOES NOT FALL WITHIN THE COURT'S PENDENT APPELLATE JURISDICTION**

The doctrine of pendent appellate jurisdiction allows a court of appeals to review "related rulings that are otherwise unappealable." *Blue Ridge Investments, L.L.C.* v. *Republic of Argentina*, 735 F.3d 72, 81 (2d Cir. 2013). The Supreme Court has specifically "cautioned against the adoption of a 'flexible' or 'loose' approach in connection with the exercise of pendent appellate jurisdiction." *Munafo* v. *Metropolitan Transportation Authority*, 285 F.3d 201, 215 (2d Cir. 2002) (citing *Swint* v. *Chambers County Commission*, 514 U.S. 35, 45-50 (1995)). As this Court has accordingly made clear, "pendent appellate jurisdiction should be exercised sparingly, if ever." *Bolmer* v. *Oliveira*, 594 F.3d 134, 141 (2010) (citation omitted). Because of the "danger of abuse," it is used "only in exceptional circumstances." *Jones* v. *Parmley*, 465 F.3d 46, 65 (2d Cir. 2006) (citation omitted).

In keeping with the "narrow" nature of the doctrine, *see Myers* v. *Hertz Corp.*, 624 F.3d 537, 556 (2d Cir. 2010), pendent appellate jurisdiction does not lie over a non-appealable order "unless it is inextricably intertwined with, or—what is essentially the same thing—its review is necessary to ensure meaningful review of, the [appealable] issue." *Rein* v. *Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 758 (2d Cir. 1998). "[That] remains the case even

if considerations of efficiency argue for deciding [all of the] issues on interlocutory review." *Id.* at 758-759.

This Court has "stressed that the pendent appellate jurisdiction standard is not satisfied when [the court is] confronted with two similar, but independent, issues, and resolution of the non-appealable order would require [the court] to conduct an inquiry that is distinct from and broader than the inquiry required to resolve solely the issue over which [it] properly ha[s] appellate jurisdiction." *Myers*, 624 F.3d at 554-555 (internal quotation marks and citation omitted). In addition, "a claim involving a pendent *party*" generally "cannot be resolved under pendent jurisdiction." *Jones*, 465 F.3d at 65 (emphasis added; citation omitted).

Applied here, those principles demonstrate that the Court lacks pendent appellate jurisdiction over plaintiffs' cross-appeal. On their face, the issues in the cross-appeal are not "inextricably intertwined" with the issues in the lead appeal. Review of the issues in the cross-appeal is not necessary to ensure meaningful review of the issues in the lead appeal. And the cross-appeal introduces five new parties to the case on appeal. This Court should thus dismiss the cross-appeal. In order to avoid the potential waste of judicial and party resources, cross-appellees respectfully request that the motion not be carried with the merits and that merits briefing be stayed until the motions panel issues a ruling. Plaintiffs agree that a stay is appropriate.

11

## A. The Issues In The Cross-Appeal Are Not 'Inextricably Intertwined' With The Issues In The Lead Appeal

As this Court has explained, "[f]or two rulings to be inextricably intertwined" for purposes of pendent appellate jurisdiction, "the same specific question will underlie both the appealable order and the non-appealable order, such that" the court's decision in the lead appeal "will necessarily resolve" the pendent appeal. *Myers*, 624 F.3d at 553; *see Stolt-Nielsen SA* v. *Celanese AG*, 430 F.3d 567, 576 (2d Cir. 2005). An issue is thus subject to pendent appellate jurisdiction on that basis only where the court cannot resolve the lead appeal "without considering the additional appeal." *SEC* v. *Smith*, 710 F.3d 87, 97 (2d Cir. 2013). Plaintiffs' cross-appeal fails that standard.

1. In the lead appeal, defendants appealed only the portions of the district court's orders declining to compel arbitration of Mr. Flores's claims against the Broncos, Giants, and Texans (as well as the related claims against the NFL). *See* App., *infra*, 48-49. And that appeal raises only two issues. The first is whether the district court erred by holding that the arbitration provisions in the NFL Constitution, incorporated into Mr. Flores's agreement with the New England Patriots, were illusory under Massachusetts law, because the agreement also incorporated subsequent amendments to the NFL Constitution. *See* 23-1185 Dkt. 19, at B-1. The second is whether the district court erred by refusing to consider Mr. Flores's employment agreement with the

12

Pittsburgh Steelers, because the first copy of the agreement defendants provided did not evidence the NFL Commissioner's approval. *See id.*

Plaintiffs' cross-appeal raises entirely different and distinct issues. In the cross-appeal, plaintiffs are challenging the portions of the district court's orders granting the motion to compel arbitration of Mr. Flores's claims against the Dolphins, Mr. Wilks's claims against the Cardinals, and Mr. Horton's claims against the Titans (as well as the related claims against the NFL). App., *infra*, 50. And plaintiffs are raising two issues unrelated to those in the lead appeal. First, they will argue that the district court erred by holding that the selection of the NFL Commissioner as arbitrator did not render their arbitration agreements unconscionable. *See* 23-1225 Dkt. 27, at B-1. Second, they will argue that the "effective vindication" doctrine precludes the enforcement of their arbitration agreements, again because those agreements select the NFL Commissioner as arbitrator. *See id.*

The issues in the cross-appeal are unrelated to the issues in the lead appeal. The lead appeal will require the Court to consider the Massachusetts and Pennsylvania law of contracts and the federal procedural requirements applicable when a court raises an issue on its own initiative. *See* D. Ct. Dkt. 82, at 3-18. The cross-appeal will require the Court to consider the contract defense of unconscionability under Florida, Arizona, and Tennessee law; the federal "effective vindication" doctrine; and the enforceability of a delegation

13

provision unique to Mr. Wilks's agreement with the Cardinals. *See* D. Ct. Dkt. 62, at 5-17; D. Ct. Dkt. 80, at 3-15; *see also* D. Ct. Dkt. 64, at 1-7.

The issues in the lead appeal and cross-appeal do not involve similar inquiries and to a great extent do not even involve application of the same source of law. *See, e.g.*, *Gill* v. *Richmond Co-operative Association*, 34 N.E.2d 509, 514 (Mass. 1941) (establishing the circumstances under which a contract is illusory under Massachusetts law); *Universal Builders, Inc.* v. *Moon Motor Lodge, Inc.*, 244 A.2d 10, 17 (Pa. 1968) (discussing the waiver of contractual conditions under Pennsylvania law); *Catzin* v. *Thank You & Good Luck Corp.*, 899 F.3d 77, 82 (2d Cir. 2018) (setting forth the procedure a court must afford parties before deciding an issue on the court's own initiative); *NFL Management Council* v. *NFL Players Association*, 820 F.3d 527, 548 (2d Cir. 2016) (rejecting a bias-related challenge under federal law to the NFL Commissioner's service as arbitrator); *American Express Co.* v. *Italian Colors Restaurant*, 570 U.S. 228, 235 (2013) (discussing the "judge-made exception to the [Federal Arbitration Act] . . . allowing courts to invalidate agreements that prevent the 'effective vindication' of a federal statutory right"). There is no "degree of similarity" between the issues. *Myers*, 624 F.3d at 553.

It is thus clear that the "same specific questions" do not underlie both appeals. *Myers*, 624 F.3d at 553. Instead, the issues in the cross-appeal are

"independent" and "would require [the court] to conduct an inquiry that is distinct from and broader than the inquiry required to resolve solely" the lead appeal. *Id.* at 553-554. This Court would thus be able to resolve the lead appeal "without considering" the issues in the cross-appeal. *Smith*, 710 F.3d at 97. Accordingly, the issues in the two appeals are not inextricably intertwined for purposes of pendent appellate jurisdiction.

2.      This Court's precedents confirm that the issues in the cross-appeal are not intertwined with the issues in the lead appeal.

For example, in *Rein*, *supra*, a group of plaintiffs filed suit against the nation of Libya and others for involvement in a terrorist attack, and the defendants moved to dismiss the complaint on a number of grounds, including sovereign immunity, lack of personal jurisdiction, and failure to state a claim. *See* 162 F.3d at 754-755. The district court rejected all of those grounds in a single order. *See id.* at 755; *Rein* v. *Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325, 328-332 (E.D.N.Y. 1998). Defendants filed an interlocutory appeal. *See Rein*, 162 F.3d at 755.

On appeal, this Court held that it had appellate jurisdiction under the collateral-order doctrine only to review the portion of the district court's order denying the motion to dismiss on sovereign-immunity grounds. *See Rein*, 162

15

F.3d at 755-756. But the Court declined to exercise pendent appellate juris-
diction over the portions of the district court's order addressing personal ju-
risdiction and failure to state a claim. *Id*. at 756.

With respect to personal jurisdiction, the Court noted that the inquiry
into sovereign immunity differed from an inquiry into personal jurisdiction
"based on due process and the principle of minimum contacts." *Rein*, 162 F.3d
at 759. Defendants had also argued on appeal that a portion of the Foreign
Sovereign Immunities Act constituted a bill of attainder and violated the Ex
Post Facto Clause, but the Court noted that those provisions were potentially
relevant only to "the potential imposition of punitive damages" and not to sov-
ereign immunity. *Id*. at 761. Finally, the Court explained that the argument
for failure to state a claim was "manifestly separable" from the issue of sover-
eign immunity. *Id*. at 762. The Court thus concluded that the additional issues
defendants sought to raise on appeal were not inextricably intertwined with
the issue of sovereign immunity. *Id*. at 758-759, 764.

Other cases are to the same effect. In *Myers*, *supra*, the Court declined
to exercise pendent appellate jurisdiction over the district court's decision not
to certify a collective action under the Fair Labor Standards Act in an appeal
from the denial of class certification under Federal Rule of Civil Procedure 23.
624 F.3d at 555-556. And in *CFTC* v. *Walsh*, 618 F.3d 218 (2010), this Court

16

declined to exercise pendent appellate jurisdiction over a district court's issuance of a temporary restraining order, even though jurisdiction was proper over a later order converting the restraining order into a preliminary injunction. *Id.* at 222, 224-225 & n.3. In both cases, pendent appellate jurisdiction did not apply because the issues in the pendent appeal were "quite distinct" from the issues in the lead appeal. *Myers*, 624 F.3d at 556; *see Walsh*, 618 F.3d at 224-225 & n.3.

By contrast, this Court has used pendent appellate jurisdiction in the rare instances in which it was impossible to "determine conclusively" the issues in the lead appeal "without discussing, much less deciding," the issues in the pendent appeal. *Blue Ridge*, 735 F.3d at 82-83. For example, this Court invoked pendent appellate jurisdiction in an appeal of an injunction on a Title VII disparate-impact claim, where the district court "explicitly acknowledged" that the findings supporting the injunction were "influenced" by, if not "entirely" grounded on, the district court's earlier ruling on disparate-treatment liability. *United States* v. *City of New York*, 717 F.3d 72, 81 (2013). Similar reasoning justified the review of the denial of a motion in limine at the same time as the dismissal of an indictment: the lower court arrived at both conclusions "for the very same reasons." *United States* v. *Hoskins*, 902 F.3d 69, 76 (2d Cir. 2018) (citation omitted).

Here, the lead appeal and cross-appeal plainly lack any meaningful overlap, let alone the overlap necessary to be inextricably intertwined. The arguments in the lead appeal that the arbitration provision in the Flores-Patriots agreement was not illusory, and that the district court should have considered the Flores-Steelers agreement, are "manifestly separable" from the arguments in the cross-appeal concerning unconscionability and the effective-vindication doctrine as applied to the Flores-Dolphins agreement, the Wilks-Cardinals agreement, and the Horton-Titans agreement. *See Rein*, 162 F.3d at 762. Pendent appellate jurisdiction thus does not lie over the cross-appeal on the ground that the issues in it are inextricably intertwined with the issues in the lead appeal.

### B. Review In The Cross-Appeal Is Not Necessary In Order To Ensure Meaningful Review In The Lead Appeal

To the extent that it constitutes a separate basis for exercising pendent appellate jurisdiction, *cf. Myers*, 624 F.3d at 553 n.6, review of the issues in the cross-appeal is not "necessary to ensure meaningful review" of the issues in the lead appeal. *Panzella* v. *Sposato*, 863 F.3d 210, 217 (2d Cir. 2017) (citation omitted). This Court's cases exercising jurisdiction under that principle involve situations in which the Court would be unable to decide an issue properly before the Court absent review of an issue not otherwise before it. For example, the Court has reviewed a challenge to the district court's subject-matter jurisdiction in an appeal involving a separate issue, because "[t]he existence of

18

subject matter jurisdiction goes to the very power of the district court to issue the rulings" that were properly before the Court. *Merritt* v. *Shuttle, Inc.*, 187 F.3d 263, 269 (1999); *see also Hapag-Lloyd Aktiengesellschaft* v. *U.S. Oil Trading LLC*, 814 F.3d 146, 150 n.10 (2d Cir. 2016). In similar fashion, the Court has reviewed the question whether a party was necessary and indispensable to the action, as part of an appeal from the denial of a motion to intervene, on the ground that the party's status as necessary and indispensable would have destroyed diversity jurisdiction and required dismissal. *See MasterCard International Inc.* v. *Visa International Service Association, Inc.*, 471 F.3d 377, 384-385 (2006).

This case bears no resemblance to those cases. The cross-appeal does not raise questions of the district court's subject-matter jurisdiction or adjudicatory authority, and this Court is fully able to decide the issues in the lead appeal without first adjudicating the issues in the cross-appeal.

Indeed, because the Arbitration Act generally allows appeals from orders declining to compel arbitration but prohibits appeals from orders compelling arbitration, the accepted procedure for review of an order requiring arbitration as to some claims but not others is interlocutory review of the portions denying arbitration and post-award review of the portions compelling arbitration. *See* 9 U.S.C. §§ 10, 16; *cf. Henry Schein, Inc.* v. *Archer & White*

*Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (rejecting the argument that the availability of "back-end judicial review" of a question of arbitrability means that "the court at the front end should also be able to" address that question).  And as the district court correctly recognized, the Arbitration Act expressly provides it with "authority to review the Commissioner's decision and to vacate the Commissioner's award" if he were to show "evident partiality or corruption."  App., *infra*, 23 (citation omitted); *see* 9 U.S.C. § 10(a)(2).  Plaintiffs' arguments concerning arbitrator bias are thus premature.

In sum, review of the distinct issues raised by the cross-appeal is not "necessary to ensure meaningful review" of the issues in the lead appeal.  *Panzella*, 863 F.3d at 217 (citation omitted).  For that reason, too, the Court should decline to exercise pendent appellate jurisdiction over the cross-appeal.

## C.   The Cross-Appeal Involves Parties That Are Not Part Of The Lead Appeal

Pendent appellate jurisdiction is also improper because the cross-appeal involves five parties that are not parties to the lead appeal.  As this Court has recognized, "a claim involving a pendent party" usually involves issues "unrelated" to the lead appeal and thus "cannot be resolved under pendent jurisdiction."  *Kaluczky* v. *City of White Plains*, 57 F.3d 202, 207 (1995) (internal quotation marks and citation omitted); *see Jones*, 465 F.3d at 65; *Johnson* v. *Newburgh Enlarged School District*, 239 F.3d 246, 255 (2d Cir. 2001).  That rule

20

derives from the Supreme Court's decision in *Swint*, *supra*, where the Supreme Court held that, in connection with a qualified-immunity appeal by individual defendants in a Section 1983 action, pendent appellate jurisdiction did not lie over an appeal by a government entity concerning the issue of *respondeat superior*. 514 U.S. at 38-39, 43-51. The Supreme Court explained that the case involved "not merely pendent appellate jurisdiction, but pendent *party* appellate jurisdiction," because the governmental entity was not properly a party to the qualified-immunity appeal. *Id.* at 47 n.6. The Supreme Court held that "there is no 'pendent party' appellate jurisdiction of the kind" necessary to hear the governmental entity's appeal. *Id.* at 51.

Like the governmental entity's appeal in *Swint*, the cross-appeal here invokes not merely pendent appellate jurisdiction, but pendent-party appellate jurisdiction. Only Mr. Flores and the NFL are parties to both appeals; Mr. Wilks, Mr. Horton, the Dolphins, the Cardinals, and the Titans are all parties only to the cross-appeal. That provides additional reason for the Court not to entertain the cross-appeal. *See Jones*, 465 F.3d at 65; *Kaluczky*, 57 F.3d at 207.[*]

---

[*] To be sure, this Court exercised pendent-party appellate jurisdiction in one case decided shortly after *Swint*. *See Morley* v. *Ciba-Geigy Corp.*, 66 F.3d 21, 22 n.1 (1995). But that decision did not mention *Swint* at all, much less explain how the exercise of jurisdiction there was consistent with *Swint*. "[D]rive-by jurisdictional rulings of this sort have no precedential effect." *Stafford* v. *IBM Corp.*, 78 F.4th 62, 69 (2d Cir. 2023) (citation omitted).

**D.     Merits Briefing Should Be Stayed Pending A Decision By The Motions Panel**

The Court's decision on this motion will have a significant effect on the scope of the Court's review on appeal.  If the motion is granted, the parties will need to brief and argue only the two questions raised by the lead appeal, which concern only Mr. Flores's claims against the Broncos, Giants, and Texans (as well as his related claims against the NFL).  If the motion is denied, however, the Court will face the additional questions raised by the cross-appeal with respect to Mr. Flores's claims against the Dolphins, Mr. Wilks's claims against the Cardinals, and Mr. Horton's claims against the Titans (as well as the related claims against the NFL).  The outcome of this motion will thus have a significant effect on the number of issues the parties need to brief on appeal and the number of issues the merits panel will need to become familiar with in advance of oral argument.

For those reasons, cross-appellees respectfully submit that the most efficient way for the Court to proceed would be for a motions panel to decide this motion before the parties proceed to brief the issues raised by the cross-appeal.  Carrying this motion with the merits would impose additional and potentially unnecessary costs on both the parties and the Court.  Cross-appellees thus request that, after appellants in the lead appeal file their opening brief on December 5, 2023, the Court stay further briefing in these consolidated ap-

peals until a motions panel can issue a decision on this motion. Although plaintiffs oppose the dismissal of their cross-appeal, they do not oppose a stay of merits briefing pending a decision on the motion.

## CONCLUSION

The motion to dismiss the cross-appeal, No. 23-1225, should be granted. While the motion is pending, briefing in the consolidated appeals should be stayed after the appellants in the lead appeal, No. 23-1185, file their opening brief on December 5, 2023.

Respectfully submitted,

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*kshanmugam@paulweiss.com*

LORETTA E. LYNCH
BRAD S. KARP
LYNN B. BAYARD
BRETTE TANNENBAUM
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*

NOVEMBER 30, 2023

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for cross-appellees and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 27(d), that the foregoing motion is proportionately spaced, has a typeface of 14 points or more, and contains 5,188 words.

NOVEMBER 30, 2023

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

# APPENDIX

# TABLE OF CONTENTS

Page

District court opinion and order on defendants' motion
to compel arbitration, Mar. 1, 2023 ........................................................A-1

District court opinion and order on the parties' cross-motions
for reconsideration, July 24, 2023........................................................A-31

Notice of appeal, Aug. 21, 2023 ........................................................A-48

Notice of cross-appeal, Sep. 5, 2023................................................A-50

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  03/01/2023
```

-------------------------------------------------------------X

BRIAN FLORES, STEVE WILKS, and RAY     :
HORTON, as Class Representatives, on     :
behalf of themselves and all others similarly   :
situated,     :
    :
                       Plaintiffs,    :
         -against-     :
    :
THE NATIONAL FOOTBALL LEAGUE; NEW   :
YORK FOOTBALL GIANTS, INC. d/b/a NEW   :
YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a :          22-CV-0871 (VEC)
MIAMI DOLPHINS; DENVER BRONCOS     :
FOOTBALL CLUB d/b/a DENVER BRONCOS;   :        OPINION AND ORDER
HOUSTON NFL HOLDINGS, L.P. d/b/a     :
HOUSTON TEXANS; ARIZONA CARDINALS   :
FOOTBALL CLUB LLC d/b/a ARIZONA    :
CARDINALS; TENNESSEE TITANS     :
ENTERTAINMENT, INC. d/b/a TENNESSEE,   :
TITANS and JOHN DOE TEAMS 1 through 26,   :
    :
                      Defendants.   :

-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

This case shines an unflattering spotlight on the employment practices of National

Football League ("NFL") teams.  Although the clear majority of professional football players are

Black, only a tiny percentage of coaches are Black.  In 2002, to much hoopla, the NFL

announced that it was going to do something about the paucity of Black coaches.[1]  Its solution

was to adopt the so-called "Rooney Rule."  The Rooney Rule as originally adopted required any

NFL team looking to hire a head coach to interview at least one minority candidate.  The

---

[1]      *See* Gus Garcia-Roberts, *The Failed NFL Diversity 'Rule' Corporate America Loves*, Wash. Post (Oct. 4, 2022), https://www.washingtonpost.com/sports/interactive/2022/rooney-rule-nfl-black-coaches/; Dave Anderson, *Sports of The Times; Minority Candidates Should Get Fairer Shake*, N.Y. Times (Dec. 16, 2003), https://www.nytimes.com/2003/12/16/sports/sports-of-the-times-minority-candidates-should-get-fairer-shake.html?searchResultPosition=7.

**A-2**

Amended Complaint in this case alleges that, however laudable the intent, the Rooney Rule has

devolved into a cruel sham, with Black candidates being interviewed for positions that the team

has already decided will be filled by a white candidate and with Black coaches being treated

more harshly vis-à-vis employment decisions than similarly-situated white coaches.  *See* Am.

Compl., Dkt. 22.

Three Black men who are current or former NFL coaches have sued the NFL and several

member teams for racial discrimination in violation of 42 U.S.C. § 1981, the New York State

Human Rights Law, the New York City Human Rights Law, and the New Jersey Law Against

Discrimination.  *See* Am. Compl.  Defendants moved to compel arbitration and to stay the

current proceedings, Mot. to Compel Arbitration, Dkt. 47, and Plaintiffs opposed the motion, Pls.

Opp., Dkt. 62.  For the reasons discussed below, the motion to compel arbitration is GRANTED

except as to the Brian Flores's claims against the New York Giants, the Houston Texans, the

Denver Broncos, and his related claims against the NFL, as to which the motion is DENIED.

## BACKGROUND[2]

The NFL is an unincorporated association of thirty-two professional football clubs.  Defs.

Mem., Dkt. 48 at 4.  Although each club is a separate legal entity, the clubs are governed by a

shared set of NFL rules and policies, including the NFL Constitution.  *See generally* Second

DiBella Decl. Ex. 1 ("NFL Const. & Bylaws"), Dkt. 73.  The NFL is overseen by a

Commissioner, currently Roger Goodell, who is appointed by member teams.  *See* NFL Const. &

Bylaws Art. VIII; Pls. Opp. at 3.

---

[2]     Although not raised by the parties, recent case law seems to suggest that there is some disagreement among
courts in this circuit concerning the appropriate standard to apply on a pre-discovery motion to compel arbitration.
*Compare Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (applying a summary judgment standard) *with
Aleksanian v. Uber Techs. Inc.*, 524 F. Supp. 3d 251, 258 (S.D.N.Y. 2021) (applying a motion to dismiss standard).
Because the parties do not dispute the material facts relevant to the motion to compel arbitration, the Court need not
resolve this apparent conflict for the purposes of this motion.

**A-3**

## A. Plaintiffs' Allegations of Discrimination in the NFL

Brian Flores, Steve Wilks, and Ray Horton are Black men who allege that they have each been discriminated against when employed or when seeking to be employed as coaches for NFL teams. Am. Compl. ¶ 1. Messrs. Flores and Horton allege that several NFL teams interviewed them for head coaching positions solely to fulfill the so-called "Rooney Rule" without any intent of hiring them.[3] *See id.* at ¶¶ 185, 200–05, 271–73.

### 1. Brian Flores

Mr. Flores alleges that he was a victim of racial discrimination on four distinct occasions.

Mr. Flores first alleges that the Denver Broncos interviewed him in 2019 solely to satisfy the Rooney Rule without actually considering him for its head coach position. *Id.* ¶¶ 200–05.

Mr. Flores next alleges that when he was head coach of the Miami Dolphins, Dolphins owner Stephen Ross attempted to bribe him (i) to lose games so the Dolphins would get the first pick in the next year's draft and (ii) to recruit "a prominent quarterback in violation of League tampering rules." *Id.* ¶ 168; *see also id.* ¶¶ 161–63. When Mr. Flores refused both requests, he was stigmatized as an "angry black man" and ultimately fired. *Id.* ¶¶ 175, 177. Mr. Flores further alleges that the Dolphins provided him with an improper separation agreement, failed to pay him contractually-required severance pay in violation of his employment contract, and instituted arbitration proceedings against him to claw back his wages as retaliation for filing this lawsuit. *Id.* ¶¶ 220–26.

---

[3]     Of course, non-compliance with the Rooney Rule is not, itself, actionable. Nevertheless, Plaintiffs' allegations that teams conducted sham interviews, if proven, could undercut any defense predicated on the teams showing that Black candidates were "considered" for all open positions.

3

**A-4**

Mr. Flores further alleges that, in January 2022, the New York Giants invited him to interview for the position of head coach, but the Giants had already selected Brian Daboll.[4] *Id.* ¶¶ 182–88.

Finally, Mr. Flores claims that the Houston Texans removed him from consideration for their head coach position solely as retaliation for filing the instant lawsuit. *Id.* ¶¶ 207–13.

### 2. Steve Wilks

Steve Wilks alleges that the Arizona Cardinals hired him as a "bridge coach," meaning a coach "who is not given a meaningful opportunity to succeed and is simply 'keeping the seat warm' until . . . a new coach is brought in." *Id.* ¶ 233; *see also id.* ¶ 232. Mr. Wilks alleges that, despite a strong coaching performance "under extremely difficult circumstances" — including the arrest of Cardinals' General Manager Steve Keim, a weak roster featuring a rookie quarterback who had been drafted over Mr. Wilks's objection, and pressure to lose games to improve the Cardinals' position in the NFL draft — he was wrongfully terminated. *Id.* ¶ 247; *see also id.* ¶¶ 19, 240, 250. Mr. Wilks alleges that the Cardinals fired him as the "fall guy" for failures that were attributable in significant part to Mr. Keim, before hiring Kliff Kingsbury, a white man, as head coach. *See id.* ¶¶ 258–60.

### 3. Ray Horton

In January 2016, while he was the Tennessee Titans' defensive coordinator, Mr. Horton interviewed to be the Titans' head coach. *Id.* ¶¶ 266, 271–73. Mr. Horton alleges that the Titans only offered him the interview to comply with the Rooney Rule, as the Titans had already decided to hire Mike Mularkey, a white man, when they interviewed Mr. Horton. *Id.* ¶¶ 273–78.

---

[4]     Before Mr. Flores interviewed for the position he received a text from Bill Belichik, the New England Patriots' head coach, congratulating him for getting the job. Am. Compl., Dkt. 22 ¶¶ 186–87. Mr. Belichik appears to have confused Brian Daboll, who was hired as the Giants' head coach, with Brian Flores, who was not. *Id.*

**A-5**

In a 2020 interview, Mr. Mularkey stated that Amy Adams Strunk, the Titans' controlling owner, told him that he was going to be the head coach before they "went through the Rooney rule." *Id.* ¶ 280; *see also id.* ¶ 272. Mr. Horton further alleges that his unsuccessful interview with the Titans branded him as a "stale" candidate and interfered with him receiving additional interviews for head coach positions. *Id.* ¶ 284.

### B. Plaintiffs' Employment Contracts

Messrs. Flores, Wilks, and Horton each had an employment contract with each team he coached. *See* Pls. Opp. at 3; Defs. Mem. at 6. The NFL was not a party to those contracts. The NFL Commissioner was, however, required to approve each contract. *See* Defs. Mem. at 3, 21; *see also, e.g.*, Second DiBella Decl. Ex. 4 ("Flores-Steelers Agreement"), Dkt. 73 § 12. In each contract, each Plaintiff acknowledged that he had read the NFL Constitution and Bylaws and agreed to be bound by them. *See* Pls. Opp. at 9; *see also, e.g.*, Second DiBella Decl. Ex. 2 ("Flores-Dolphins Agreement"), Dkt. 73 § 7.1; Second DiBella Decl. Ex. 7 ("Horton-Titans Agreement"), Dkt. 73 § 6(a)–(c); Second DiBella Decl. Ex. 5 ("Wilks-Cardinals Agreement"), Dkt. 73 § 9(a).

While the exact text of those contracts varies, in relevant part each agreement provides that the NFL Commissioner will oversee an alternative dispute resolution process for all disputes arising between the parties. *See, e.g.*, Flores-Dolphins Agreement § 12.2; Horton-Titans Agreement § 6(a); Wilks-Cardinals Agreement § 10(a). Mr. Wilks's contract with the Cardinals also included a clause delegating any disputes regarding whether the contracts were "void or voidable" to the arbitrator. *See* Wilks-Cardinals Agreement § 10(e).

**A-6**

## LEGAL STANDARD

Pursuant to Section 2 of the Federal Arbitration Act ("FAA"), "agreements to arbitrate [are] 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"[5] *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). "[B]efore an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties. This question is determined by state contract law." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (citing *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)) (internal citation omitted).

If an arbitration agreement exists, the Court must also determine "whether the dispute falls within the scope of the arbitration agreement." *Meyer*, 868 F.3d at 74 (internal quotation omitted). Because of the "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). *See also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (Sotomayor, J.) ("[A]rbitration is indicated unless it can be said with positive assurance that an arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *Id.* (internal quotation omitted).). In light of the "liberal federal policy favoring arbitration agreements . . . arbitration agreements should be enforced according to their terms unless the FAA's mandate has been

---

[5] Plaintiffs do not dispute that the Federal Arbitration Act ("FAA") applies to the parties' agreement to arbitrate. Pls. Opp., Dkt. 62 at 5 (citing the FAA).

overridden by a contrary congressional command." *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 295 (2d Cir. 2013) (cleaned up).[6]

An agreement to arbitrate arbitrability is "an additional, antecedent agreement" that is also covered by the FAA. *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010)). Unlike other agreements to arbitrate, for which there is a presumption in favor of finding the parties agreed to arbitration, "the law reverses the presumption" for agreements to arbitrate arbitrability. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1955). Accordingly, "the issue of arbitrability may only be referred to the arbitrator if there is *clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002)).

## DISCUSSION

Plaintiffs acknowledge that they entered into employment agreements with several of the Defendant teams and that those agreements provide an alternative dispute resolution process. Plaintiffs argue, however, that the alternative dispute resolution agreements are invalid or do not encompass their claims, or, if they are valid and do encompass their claims, they are unenforceable. *See, e.g.*, Pls. Opp. at 4 n.2, 8–9, 15–16, 24. For the reasons discussed below, the Court finds that Mr. Flores's claims against the Dolphins, Mr. Wilks's claims against the

---

[6]     Section 1981 of the Civil Rights Act of 1866 does not indicate a Congressional intent to override the FAA's policy toward the enforcement of arbitration agreements. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 65, 67–68 (2010) (applying the FAA to plaintiff's section 1981 claim).

**A-8**

Cardinals, and Mr. Horton's claims against the Titans must be submitted to arbitration; Mr.

Flores may, however, litigate his claims against the Broncos, Giants, and Texans in federal court.

**I.      Plaintiffs' Claims, Except Those Against the Giants and Texans, Are
Covered by the Parties' Arbitration Agreements**

Each employment agreement selected the law of the state in which the team was based as

the governing law.[7]  *See* Defs. Mem. at 3 n.2.  Pursuant to the applicable state laws, the Court

finds that Plaintiffs' claims, except for Mr. Flores's claims against the Giants and Texans, fall

within the scope of the parties' arbitration agreements.[8]

**A.  Brian Flores**

Mr. Flores has sued four different football teams: the Denver Broncos, Miami Dolphins,

New York Giants, and Houston Texans.  From 2008 until February 3, 2019, Mr. Flores was a

coach for the New England Patriots.  Am. Compl. ¶ 157; Defs. Mem. at 5.  While under contract

to the Patriots, he interviewed for the Broncos' head coach position, but he was not hired.  Am.

Compl. ¶¶ 200–04.  From 2019 until January 10, 2022, Mr. Flores was the Dolphins' head coach.

*Id*. ¶¶ 158, 177.  After being fired by the Dolphins, Mr. Flores interviewed for the Giants' and

Texans' head coach position but was not hired by either team.  *Id*. ¶¶ 179, 184, 191, 207, 216.

This lawsuit was filed on February 1, 2022, Compl., Dkt. 1, and on February 18, 2022, the

---

[7]      The Court applies the law of the state selected by the applicable choice of law provisions in each contract.
The choice of law clauses are enforceable because each employment contract selects the law of the state in which
the Defendant team is based and in which each coach was employed; consequently, "the chosen law bears a
reasonable relationship to the parties or the transaction."  *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New
York*, 822 F.3d 620, 641 (2d Cir. 2016) (quoting *Welsbach Elec. Corp v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500
(2006)).

[8]      Mr. Flores's claims against the Broncos fall within the scope of the applicable arbitration agreement, but
the agreement is not enforceable for reasons discussed *infra*, section III(A).

**A-9**

Pittsburgh Steelers hired Mr. Flores as "the senior defensive assistant and linebackers coach," Defs. Mem. at 18; *see also* Flores-Steelers Agreement at 1.[9]

Defendants argue that, even though Mr. Flores never contracted with the Giants, Broncos, or Texans, his claims against those teams are nevertheless subject to arbitration pursuant to the NFL Constitution as incorporated into his contracts with the Patriots, Dolphins, and Steelers. *See* Defs. Mem. 18, 20 n.3. For the reasons explained below, the Court finds that only Mr. Flores's contract with the Dolphins and Patriots contain valid arbitration agreements relevant to his claims, and there is no binding arbitration agreement in Mr. Flores's contract with the Steelers.

### 1. Mr. Flores's Claims Against the Broncos

Mr. Flores alleges that the Denver Broncos discriminated against him because of his race when they failed to hire him. Mr. Flores argues that he is not required to arbitrate his claims against the Broncos because he never specifically agreed to arbitrate claims against the Broncos. *See* Pls. Opp. at 24. At the time Mr. Flores interviewed with the Broncos, he was under contract with the New England Patriots; in his contract with the Patriots, he expressly agreed to abide by the NFL Constitution, which was "made a part of th[e] Agreement." Second DiBella Decl. Ex. 3 ("Flores-Patriots Agreement"), Dkt. 73 § 15; *see also NSTAR Elec. Co. v. Dep't of Pub. Utilities*, 968 N.E.2d 895, 905–06 (Mass. 2012) (holding that a contract incorporates a document by reference where it "clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract," *id*. at 905 (internal quotation omitted)).

---

[9]     Mr. Flores now appears to be the Minnesota Vikings' defensive coordinator. *See* Craig Peters, *Vikings Hire Brian Flores as Defensive Coordinator*, Vikings.com (Feb. 6, 2023, 5:25 P.M.), https://www.vikings.com/news/brian-flores-defensive-coordinator-hired-2023.

**A-10**

Section 8.3 of the NFL Constitution contains an arbitration provision that is broader than the one contained in the employment contracts; it grants the NFL Commissioner "full, complete and final jurisdiction and authority to arbitrate" several types of disputes. As is relevant here, the NFL Commissioner has jurisdiction to arbitrate "[a]ny dispute between any . . . coach . . . and any member club or clubs." NFL Const. & Bylaws § 8.3(B).

Mr. Flores's claims against the Broncos plainly constitute a "dispute between any . . . coach . . . and any member club." *Id*. Mr. Flores's contract with the Patriots bound him to follow the NFL Constitution while he was employed by the Patriots, including its provision giving the Commissioner sole authority to arbitrate any dispute with an NFL team. *See* Flores-Patriots Agreement § 15; Pls. Opp. at 24 (acknowledging that Mr. Flores was under contract with the Patriots when he interviewed with the Broncos).

Defendants also argue that the arbitration agreement in the NFL Constitution, as incorporated into Mr. Flores's 2019 contract with the Miami Dolphins, retroactively applies to Mr. Flores's claims against the Broncos, which arose before he became the Dolphins' head coach. *See* Defs. Mem. at 18. Courts, however, have "refused to compel arbitration of claims arising from disputes which arose outside of the effective dates of arbitration agreements," unless the agreement expressly includes claims preceding the contract. *Klay v. All Defendants*, 389 F.3d 1191, 1203 (11th Cir. 2004); *see also Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1271 n.1 (11th Cir. 2017) (arbitration agreement that explicitly encompassed past claims could be interpreted to include disputes over plaintiff's "previous attempts at employment."); *Baptist Hosp. of Miami, Inc. v. Media Healthcare Plans, Inc.*, 376 F. Supp. 3d 1298, 1308–10 (S.D. Fla. 2019) (applying Florida law and collecting cases).[10]

---

[10]     Even if the NFL Constitution, as incorporated into Flores-Dolphins contract, could be interpreted to retroactively apply to claims against teams that arose before the contract's effective date, the arbitration agreement

**A-11**

Defendants finally argue that Mr. Flores must arbitrate his claims against the Broncos because the NFL's alleged systemic racism was already in full force while Mr. Flores was under contract to the Patriots.[11]  Defs. Mem. at 18–20.  The Court disagrees.

Despite the long historic narrative in the Amended Complaint reciting historical racism in the NFL, the gravamen of Mr. Flores's claim is not that the NFL is generally racist.  Rather, Mr. Flores claims that specific adverse employment decisions were driven by discriminatory animus harbored by the NFL and member teams.  Defendants' argument, taken to its logical extreme, would bind a coach forever to arbitration, even if he were never again employed by a team in the NFL, so long as the NFL had a practice of inflicting similar harm on other coaches while that coach was under contract.  Defendants cite no cases, and research has revealed none, that endorse the idea of an endless agreement to arbitrate future disputes with legally distinct entities.

### 2.  Mr. Flores's Claims Against the Miami Dolphins

Mr. Flores alleges that the Dolphins discriminated against him while he was employed by the Dolphins and shortly thereafter.  The employment contract between Mr. Flores and the Dolphins provides that "all matters in dispute" between Mr. Flores and the Dolphins "including, without limitation, any dispute arising from the terms of this Agreement, Employee's employment with the Club, or otherwise, shall be referred to the Commissioner of the NFL for

---

would be unenforceable for unconscionability under Florida law.  *See* Second DiBella Decl. Ex. 2 ("Flores-Dolphins Agreement"), Dkt. 73 § 19 (selecting Florida law).  Mr. Flores had no power to modify the NFL Constitution, and Defendants did not commit to providing Mr. Flores notice of any changes to the NFL Constitution.  *See* Flores-Dolphins Agreement § 7.1 ("Employee . . . agrees . . . to be bound by[] the Constitution, Bylaws, and the Rules and Regulations of the NFL (as they now exist or as they may be amended) . . . ."); Second DiBella Decl. Ex. 1 ("NFL Const. & Bylaws"), Dkt. 73 Art. 25 (setting forth the procedures for amendment of the NFL Constitution).  Courts applying Florida law have held that a contract is illusory, and thus, unenforceable, where one party can modify the terms of that contract without notifying the other party.  *See Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1382 (S.D. Fla. 2014) (collecting cases); *Centennial Bank v. ServisFirst Bank, Inc.*, 2022 WL 10219893, at *31 (M.D. Fla., Oct. 10, 2022) ("[A] contract once entered into may not thereafter be unilaterally modified as subsequent modifications require consent . . . ." *Id*. at *31 (citations omitted)).

[11]     Defendants make a similar argument with respect to Mr. Flores's claims against the Giants and the Texans, *see* Defs. Mem., Dkt. 48 at 18–20, which the Court rejects for the same reasons.

11

**A-12**

binding arbitration . . . ."  Flores-Dolphins Agreement § 12.2.  Mr. Flores does not dispute that

this agreement was binding or that his claims alleging discrimination while he was a coach and

when he was fired fall within the scope of his arbitration agreement with the Dolphins.  He

argues, however, that his claims regarding the Dolphins' retaliatory conduct after he was fired do

not fall within the scope of the contract's arbitration agreement.  Pls. Opp. at 25.

There is a "presumption in favor of postexpiration arbitration of matters . . . arising out of

the relation governed by the contract."  *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc.*

*v. N.L.R.B.*, 501 U.S. 190, 204 (1991) (internal citation omitted); *see also Doctors Assocs., Inc. v.*

*Thomas*, 898 So.2d 159, 162 (Fla. Dist. Ct. App. 2005) (arbitration agreements govern disputes

arising after the termination of a contract that does not explicitly exclude post-termination

disputes).

Mr. Flores's retaliation claim against the Dolphins is subject to arbitration because it

clearly arises from his employment with the club.  Florida courts have interpreted the "arising

from" requirement to require arbitration of an employee's claims where the "breach in question

was an immediate, foreseeable result of the performance of contractual duties."  *Doe v. Princess*

*Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011) (internal quotation omitted); *see also*

*Maglana v. Celebrity Cruises, Inc.*, No. 20-14206, 2022 WL 3134373, at *4–5 (11th Cir. Aug. 5,

2022); *Phillips v. NCL Corp. Ltd.*, 824 F. App'x 675, 679 (11th Cir. 2020)*.*

Disputes regarding the payment of wages or the terms of separation are "a fairly direct

result of the performance of contractual duties" in an employment relationship.  *Telecom Italia,*

*SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001) (noting that an

"intentional failure to perform the contract" is subject to arbitration).  Upon embarking on an

employment relationship, both employee and employer can anticipate that the employee may be

fired and that disputes may arise regarding an employee's wages or the employer's retaliatory conduct.

In *Milestone v. Citrus Specialty Grp., Inc.*, No. 19-CV-2341, 2019 WL 5887179, at *2 (M.D. Fla. Nov. 12, 2019), the court found that an employee's claims of discrimination and retaliation were arbitrable under Florida law because "the claims were dependent upon the plaintiffs' employment's status and could not be brought in the absence of the employment relationship governed by the agreements." *Id.* (quoting *McAdoo v. New Line Transp., LLC*, No. 16-CV-1917, 2017 WL 942114, at *4 (M.D. Fla. Mar. 9, 2017) (cleaned up); *see also Ravelo v. Shutts & Bowen, LLP*, No. 09-CV-865, 2009 WL 1587272, at *1–2 (M.D. Fla. July 11, 2009) (holding that plaintiffs' racial discrimination and retaliation claims were subject to arbitration).

### 3. Mr. Flores's Claims Against the Giants and Texans

Defendants argue that the arbitration clause in Mr. Flores's contract with the Steelers applies retroactively to any claims accrued against the NFL or member teams before he was hired by the Steelers. Defs. Mem. at 20 n.3. Even if the Defendants are correct on that point, Defendants have failed to establish that Mr. Flores entered into a valid arbitration agreement when he was hired by the Steelers.

The Flores-Steelers Agreement required the approval of the NFL Commissioner before it became effective. *See* Flores-Steelers Agreement § 12 ("This Agreement shall become valid and binding upon each party only when and if it shall be approved by the Commissioner of the NFL."). The version of the Flores-Steelers Agreement submitted to the Court never became binding upon Mr. Flores or the Steelers because the Commissioner never signed it. *See* Flores-Steelers Agreement at 7.

**A-14**

In their June 21, 2022, brief, Defendants noted that the contract was still awaiting the Commissioner's approval; more than a year after the contract's purported effective date, Defendants have failed to provide the Court with any evidence that the contract has been approved by Commissioner Goodell. *See* Defs. Mem. at 9. On February 1, 2023, the Court ordered Defendants to re-submit Plaintiffs' contracts due to omissions in the original submissions, *see* Order, Dkt. 70; Defendants once again submitted a version of the Flores-Steelers Agreement that lacked Commissioner Goodell's signature and attested that it was "a true and correct copy" of the Agreement, *see* Second DiBella Decl., Dkt. 73 ¶ 5; Flores-Steelers Agreement at 7.

"The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (collecting cases). Even where the party opposing arbitration admits that he is subject to an arbitration agreement, the moving party bears the burden of demonstrating that a valid arbitration agreement exists. *See Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*, 349 F. App'x 551, 552–53 (2d Cir. 2009). Defendants have failed to carry that burden with respect to Mr. Flores's claims against the Giants and Texans because they have failed to prove that an arbitration agreement was in effect when or after Mr. Flores was being considered for hire by those teams. *See id.* Accordingly, Mr. Flores may litigate his claims against the Giants and Texans, and his related claims against the NFL, in federal court.[12]

---

[12] Because the Court finds that at least some claims may proceed in federal court, it need not address whether the arbitration agreement requires arbitration on an individual basis, as Mr. Flores retains the ability to pursue a class action in federal court.

14

**A-15**

### B. Steve Wilks

Mr. Wilks signed an employment agreement with the Cardinals in which both the Cardinals and Mr. Wilks agreed to arbitrate "all disputes, claims or controversies that exist or that may arise between them."  Wilks-Cardinals Agreement § 10(a).  Mr. Wilks also agreed to arbitrate "any claim that all or any part of this Agreement is void or voidable."  *Id*. § 10(e).

Where, as here, the parties have agreed that the arbitrator will decide issues regarding whether the arbitration agreement is "void or voidable," they have "clearly and unmistakably" delegated to the arbitrator the power to determine whether their dispute is subject to arbitration. *See Rent-A-Center, West, Inc.*, 561 U.S. at 66, 69–70 (delegating arbitrability dispute where the delegation clause encompassed claims regarding whether the arbitration agreement was "void or voidable"); *see also Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 603 (S.D.N.Y. 2020) (same).  This includes the power to decide whether the arbitration agreement as a whole is unenforceable for unconscionability or any other applicable contract defense.  *See Rent-A-Center, West, Inc.*, 561 U.S. at 73–75.

Because neither party discussed the delegation clause in their original submissions, on February 1, 2023, the Court ordered supplemental briefing regarding the enforceability of the delegation provision.  *See* Order, Dkt. 70 at 2.  In response, Mr. Wilks argued that Defendants had waived their right to seek arbitration of the threshold question of arbitrability by failing to raise the issue in their moving papers or reply and that allowing the Commissioner to decide the threshold issue of arbitrability would be operationally problematic and unconscionable.  Pls. Supp. Br., Dkt. 75 at 1.  Defendants' failure to raise the issue does not constitute a waiver of their right to enforce the delegation clause, and neither of Plaintiffs' other arguments is persuasive.

**A-16**

The Supreme Court has recently made clear that federal courts should not condition waiver of the right to compel arbitration on a showing of prejudice; instead, the Court held that the focus must be on the defendants' conduct. *See Morgan v. Sundance*, 142 S. Ct. 1708, 1712–13 (2022). Following *Morgan*, the Second Circuit has held that delay alone — even a delay of nearly three years — is insufficient to constitute waiver when the parties had not engaged in substantive litigation before the defendant belatedly sought arbitration. *Nicosia v. Amazon.com, Inc.*, No. 21-2624, 2023 WL 309545, at *4 n.2 (2d Cir. Jan. 19, 2023).[13]

Consequently, the fact that Defendants failed to raise the issue of the delegation clause for nearly eight months after their opening brief was filed (and then only when prompted by the Court) does not waive their right to enforce the delegation clause when no other substantive litigation has occurred. "Mere silence, oversight or thoughtlessness . . . is insufficient to support an inference of waiver." *Herrera v. Manna 2nd Ave. LLC*, No. 20-CV-11026, 2022 WL 2819072, at *8 (S.D.N.Y. July 18, 2022); *see also Powell v. Vroom, Inc.*, No. 22-CV-302, 2022 WL 4096872, at *7 (N.D. Ala. Sept. 7, 2022) (holding that defendant did not waive its right to enforce the delegation clause in the parties' contract by initially submitting the threshold question of delegation to the court). Furthermore, "any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration," including "allegation of waiver . . . ." *Moses H. Cone Mem. Hosp.*, 460 U.S. at 24–25.

Plaintiffs finally argue that allowing Commissioner Goodell to arbitrate any threshold questions of arbitrability would be unconscionable because he will inevitably be biased. Pls.

---

[13] Plaintiffs contend that because the Wilks-Cardinals agreement selects Arizona law, Arizona law governs the question of waiver. *See* Second DiBella Decl. Ex. 5 ("Wilks-Cardinals Agreement"), Dkt. 73 § 23; Pls. Supp. Br., Dkt 75 at 1, 1 n.1. Plaintiffs are incorrect. Whether Defendants waived their right to compel arbitration is governed by federal waiver law, and, thus, the issue is controlled by the law of this circuit. *See Morgan v. Sundance*, 142 S. Ct. 1708, 1712–13 (2022).

16

**A-17**

Supp. Br. at 4. Plaintiffs have not pointed to a single case, and research has revealed none, that

applied Arizona law to find that an arbitration agreement was unenforceable because there was a

risk that the arbitrator the parties jointly selected may be biased.[14] Rather, Arizona courts have

focused on whether the arbitration provision is "fundamentally unfair" because it "grants one

party to the arbitration unilateral control over the pool of arbitrators." *Arnold v. Standard Pac. of*

*Ariz. Inc.*, No. 16-CV-452, 2016 WL 4259762, at *3 (D. Ariz. Aug. 12, 2016) (citing *McMullen*

*v. Meijer, Inc.*, 355 F.3d 485, 494 (6th Cir. 2004)) (cleaned up); *see also Gullet on behalf of*

*Estate of Gullet v. Kindred Nursing Ctrs. W., L.L.C.*, 390 P.3d 378, 359 (Ariz. Ct. App. 2017)

(holding that arbitration was not substantively unconscionable for lack of neutrality where, *inter*

*alia*, the employer did not have unilateral control over the arbitration selection process).

        Because arbitration is a matter of contract, Plaintiffs cannot ask the Court to provide them

with an arbitrator who is more neutral than the one to whom they agreed. *See Nat'l Football*

*League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir.

2016). Indeed, the Arizona legislature has only precluded individuals with "a known, direct and

material interest in the outcome of the arbitration proceeding" from serving as an arbitrator

where the agreement itself requires the arbitrator to be neutral. Ariz. Rev. Stat. § 12-3011(B).

### C. Ray Horton

        Mr. Horton's employment contract with the Tennessee Titans, which was in effect when

he interviewed for the Titans' head coach position, states: "all matters in dispute between [Mr.

---

[14]     Because the Court finds that it would not be unconscionable for Commissioner Goodell to serve as the
arbitrator, it follows that it is not "operationally problematic" to allow Commissioner Goodell to make the threshold
determination of whether arbitration of the dispute should be delegated to JAMS. Pls. Supp. Br., Dkt. 75 at 4–5.

17

Horton] and Titans shall be referred to the Commissioner . . . . " Horton-Titans Agreement § 6(a).[15]

Mr. Horton argues that clause is insufficient to constitute an arbitration agreement. Pls. Opp. at 4 n.2. It is, of course, black letter law that a contract does not have to use the word "arbitration" in order to be an arbitration agreement. *See McDonnell Douglas Fin. Corp v. Penn. Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988). The Second Circuit has held that an agreement that "manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution" is an arbitration agreement."[16] *Id.*; *see also Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 143 (2d Cir. 2013). Mr. Horton's contract with the Titans, bare bones though it may be, satisfies those requirements: the parties agreed to submit any disputes to the NFL Commissioner and that his decision would be binding. *See* Horton-Titans Agreement § 6(a).

Mr. Horton's claims against the Titans clearly fall within the scope of the arbitration agreement, which broadly encompasses "all matters in dispute" between Mr. Horton and the Titans. Horton-Titans Agreement § 6(a). Plaintiffs do not argue otherwise. Accordingly, there is a valid arbitration agreement applicable to Mr. Horton's claims against the Titans.

---

[15]    While Defendants assert that Mr. Horton is also subject to arbitration pursuant to the NFL Constitution as incorporated into the Horton-Titans Agreement, the only version of the NFL Constitution that is in the record did not go into effect until September 2016, after Mr. Horton was no longer employed by the Titans. *See* Second DiBella Decl., Dkt. 73 ¶ 2; Am. Compl. ¶ 266. Thus, there is no record evidence of an arbitration provision in the NFL Constitution would encompass Mr. Horton's claim against the Titans.

[16]    Although the applicable state law governs questions of contract formation, the Second Circuit has held that courts should apply federal common law in determining whether the form of alternative dispute resolution to which the parties have agreed is arbitration as contemplated by the FAA. *See Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 143 (2d Cir. 2013) ("[F]ederal common law provides the definition of 'arbitration' under the FAA."); *but see Portland Gen. Elec. Co. v. U.S. Bank Trust Nat. Ass'n as Tr. for Trust No. 1*, 218 F.3d 1085, 1086 (9th Cir. 2000) (courts should look to state law in defining arbitration).

## II.     The Arbitration Agreements Apply to Plaintiffs' Claims Against the NFL

Plaintiffs argue that their arbitration agreements with the hiring teams do not apply to

their disputes with the NFL because the arbitration agreements in the parties' contracts and the

NFL Constitution do not explicitly include claims against the NFL.  Pls. Opp. at 19.  The

applicable state laws, however, estop Plaintiffs from avoiding arbitration of their claims against

the NFL in light of their allegations that the NFL and the Defendant teams were jointly engaged

in the alleged discrimination and retaliation.  *See Doe v. Trump Corp.*, 6 F.4th 400, 412 n.8 (2d

Cir. 2021) ("[S]tate law governs whether a non-signatory may enforce an arbitration clause." *Id*.

(citation omitted)).[17]

The Amended Complaint not only alleges that the NFL is a joint employer with the

Defendant teams but that the discrimination experienced by Black players and coaches was a

product of collusion among NFL teams and the NFL.  *See* Am. Compl. ¶¶ 337–53; *cf. State ex*

*rel. Hewitt v. Kerr*, 461 S.W.3d 798, 814 (Mo. 2015) (en banc) (enforcing plaintiff's arbitration

agreement with the St. Louis Rams Partnership against non-signatories, including the St. Louis

Rams, L.L.C., when plaintiffs brought allegations against defendants collectively).  Throughout

the Amended Complaint, Plaintiffs treat the NFL and its member teams "as a single unit;" they

cannot now claim that the two entities are distinct in order to avoid arbitration.  *Smith/Enron*

*Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999)

---

[17]     Plaintiffs' reliance on *Doe v. Trump Corp.*, 6 F.4th 400 (2d Cir. 2021), is misplaced.  As an initial matter,
in refusing to grant the defendants' motion to compel arbitration, the *Doe* court relied heavily on the fact that the
third-party Trump defendants had not signed the relevant contracts; here, the NFL Commissioner signed the
contracts that will be enforced.  *See id*. at 412–13; *see also, e.g.*, Flores-Dolphins Agreement at 11.  Furthermore, the
Second Circuit explained that arbitration was generally appropriate against third parties that "had some sort of
*corporate* relationship to a signatory party," contrasting that situation to cases in which one signatory is unaware of
the relationship between the other signatory and the third party that is seeking to enforce the arbitration agreement.
*Doe*, 6 F.4th at 413; *see also id*. at 414.  The coaches were undoubtedly aware of the relationship between the NFL
and the teams.

**A-20**

(plaintiffs could not avoid arbitration with non-signatories where the complaint treated signatories and non-signatories alike).

"[C]ourts around the country have almost uniformly concluded" that a party to the contract is estopped from avoiding arbitration where a plaintiff brings claims against the other party and a nonparty who jointly controlled his employment and engaged in the alleged misconduct.[18] *Green v. Mission Health Cmtys., LLC*, 20-CV-439, 2020 WL 6702866, at *8 (M.D. Tenn. Nov. 13, 2020) (internal quotation omitted) (applying Tennessee law to find that an employee was equitably estopped from avoiding arbitration when she alleged that her joint employers engaged in misconduct); *see also Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1401, 1403 (S.D. Fla. 2014) (applying Florida law to compel arbitration of claims against non-signatories where plaintiff's claims arose from the joint misconduct of contractual party and non-signatory); *Kolsky v. Jackson Square, LLC*, 28 So.3d 965, 969 (Fla. Dist. Ct. App. 2010) (same); *Machado v. System4 LLC*, 28 N.E.3d 401, 409 (Mass. 2013) (plaintiffs were equitably estopped from avoiding arbitration when plaintiffs "lumped the two defendants together, asserting each claim in their complaint against [them] collectively," *id*. at 412).

### III. The Arbitration Agreements Are Enforceable Except as to Mr. Flores's Claims Against the Broncos

Plaintiffs argue that, even if they agreed to arbitrate their claims against the Defendant teams and the NFL, the agreements are unconscionable, particularly because Commissioner

---

[18]    Section 11(d) of the Horton-Titans Agreement selects Tennessee law.  Although Tennessee state courts have yet to apply the doctrine of equitable estoppel to cases in which the plaintiff alleges that a non-party engaged in misconduct with a party to the contract, at least one Tennessee appeals court has recognized the prevalence of this doctrine in other courts.  *See Blue Water Bay at Ctr. Hill, LLC v. Hasty*, 2017 WL 5665410, at *14 n.12 (Tenn. App. Ct. Nov. 27, 2017) (noting that "many courts" apply the doctrine of estoppel when the plaintiff alleges "concerted misconduct by a nonsignatory and one or more signatories to the contract").

**A-21**

Goodell would serve as the arbitrator and has the discretion to alter the arbitration rules.[19]  *See*

Pls. Opp. at 5.  For the reasons discussed below, the Court finds that all the applicable arbitration

agreements are enforceable except the arbitration agreement in the NFL Constitution as

incorporated in Mr. Flores's contract with the New England Patriots to the extent that it applies

to his claim that the Broncos' failure to hire him was discriminatory.

### A. Defendants Cannot Compel Mr. Flores to Arbitrate His Claims Against the Broncos

Mr. Flores's contract with the Patriots required him to comply with the NFL Constitution,

including its arbitration provision, in its "present form and as amended from time to time

hereafter."  *See* Flores-Patriot Agreement § 15.  Plaintiffs argue that the arbitration agreement in

the NFL Constitution is unenforceable because the NFL is not required to provide Plaintiffs

notice of any changes that it may make to the NFL Constitution.[20]  *See* Pls. Opp. at 9.  The Court

agrees.

The NFL and its member clubs have the unilateral ability to modify the terms of the NFL

Constitution.  *See* NFL Const. & Bylaws Art. 25 (setting forth the procedures for amendment of

the NFL Constitution).  Under Massachusetts law, which applies to Mr. Flores's contract with

the Patriots, *see* Flores-Patriots Agreement § 21, if "the party seeking to enforce the arbitration

provision retain[s] the unilateral discretion to alter its terms, without notice, the agreement to

---

[19]     Defendants suggest that, pursuant to the NFL's arbitration rules, at least some of Plaintiffs' claims may be arbitrated by JAMS.  Defs. Mem. at 8.  Plaintiffs argue that the instant disputes are not eligible to be referred to JAMS under JAMS's rules.  Pls. Opp. at 17.  The Court need not address this argument because delegation to JAMS appears to be discretionary, and thus, whether it is available is of no moment.  *See* Flores-Dolphins Agreement Ex. A ("NFL Dispute Resolution Procedural Guidelines"), Dkt. 73 ¶ 1.7.

[20]     The Court does not address this argument for Plaintiffs' other claims.  Defendants need to rely on the NFL Constitution only for Mr. Flores's claims against the Broncos, as all other claims for which there is a valid arbitration agreement are also subject to arbitration pursuant to the arbitration agreements contained in the Plaintiffs' contracts with the Defendant teams.  *See supra*, section I–II.

arbitrate is illusory and unenforceable," *Fawcett v. Citizens Bank, N.A.*, 297 F. Supp. 3d 213, 221 (D. Mass. 2018) (internal quotation omitted) (collecting cases).  *See also Jackson v. Action for Boston Cmty. Dev., Inc.*, 525 N.E.2d 411, 415 (Mass. 1988) (the unilateral right to amend arbitration rules without notice renders any "'offer' made by the defendant . . . illusory"); *Bekele v. Lyft, Inc.*, 918 F.3d 181, 189–90 (1st Cir. 2019) (enforcing contract modifiable by Lyft because Lyft was required to provide users notice and an opportunity to reject the contract).

Because there is no enforceable arbitration agreement governing Mr. Flores's claims against the Denver Broncos and his related claims against the NFL, Mr. Flores may litigate those claims in federal court.

### B.  Possible Arbitrator Bias Does Not Invalidate the Arbitration Agreements

Plaintiffs argue that Mr. Goodell could not possibly serve as a neutral arbitrator because "Mr. Goodell, as the Commissioner, *is the NFL* in all regards."  Pls. Opp. at 6.  As evidence of Mr. Goodell's bias, Plaintiffs rely heavily on a statement released by the NFL on the day that Mr. Flores filed his complaint, in which the NFL stated that Mr. Flores's claims were "without merit."  *See* Am. Compl. ¶ 3; Wigdor Decl. Ex. 2, Dkt. 63.

"[A]rbitration is a matter of contract, and consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen."  *Nat'l Football League Mgmt. Council*, 820 F.3d at 548.  In the context of litigation arising out of allegations that the Patriots underinflated the balls used they used in the American Football Conference Championship Game against the Indianapolis Colts in 2015, the Second Circuit rejected the argument that, as a matter of law, the NFL Commissioner cannot fairly arbitrate claims regarding the NFL's conduct.  *See id*. at 532–33, 548.  As the Court noted, the parties contracted to arbitrate claims before the NFL Commissioner "knowing full well . . . that the Commissioner would have a stake both in the underlying discipline and in every arbitration brought."  *Id*. at

548.  Accordingly, the Second Circuit declined to indulge allegations that the NFL Commissioner could not "adjudicate the propriety of his own conduct."  *Id.*

The Court acknowledges that this structure creates a risk of biased adjudication and that the NFL statement on the day the case was filed is worrisome.  Plaintiffs' descriptions of their experiences of racial discrimination — which allegedly are only the most recent chapter in the NFL's long history of systematic discrimination toward Black players, coaches, and managers — are incredibly troubling.  Am. Compl. ¶ 4.  Given the number of Black men who play and coach football, it is difficult to understand how it could be that, at the time Plaintiffs initiated this lawsuit, "the NFL had only one Black Head Coach." [21]  *Id.* ¶ 6.

Nevertheless, the FAA cautions against judicial intervention at this early stage when Plaintiffs have, as here, agreed to a particular arbitration structure, including a specific arbitrator. Courts must avoid presupposing that the selected arbitrator will not serve as a conscientious and impartial arbitrator.  *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) ("We decline to indulge the presumption that the parties and arbitrable body conducting a proceeding will be unable or unwilling to retain . . . impartial arbitrators."  *Id.* (cleaned up));  *Nat'l Football League Mgmt. Council*, 820 F.3d at 548.  If the NFL Commissioner is, indeed, improperly biased, and that bias prevents him from fairly adjudicating Plaintiffs' claims, Plaintiffs have a recourse: this Court retains the authority to review the Commissioner's decision and to vacate the Commissioner's award.  *See* 9 U.S.C. § 10(a)(2) (permitting courts to overturn arbitration decisions where there is "evident partiality or corruption").

---

[21]     In both the NFL and the National Basketball Association ("NBA"), "about 70% of the players are Black." Scott Neuman, *Why a 20-Year Effort by the NFL Hasn't Led to More Minorities in Top Coaching Jobs*, NPR (Feb. 3, 2022), https://www.npr.org/2022/02/03/1075520411/rooney-rule-nfl.  When Mr. Flores filed the Complaint, thirteen of the thirty head coaches in the NBA were Black; at that same time, only one of the thirty-two head coaches in the NFL was Black.  *See id.*  Thus, at the time this lawsuit was filed, the percentage of NBA Black head coaches (43%) was more than thirteen times than the percentage of NFL Black head coaches (3.1%).

**A-24**

Plaintiffs also argue that Commissioner Goodell's alleged bias would prevent them from effectively vindicating their claim in a forum in which he is the arbitrator. *See* Pls. Opp. at 15–17. The effective vindication doctrine is "a judge-made exception to the FAA" that "finds its origins in the desire to prevent prospective waiver of a party's *right to pursue* statutory remedies." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235–236 (2013) (internal quotation omitted).

The Supreme Court has recognized two types of arbitration agreements to which this doctrine may apply: an agreement "forbidding the assertion of certain statutory rights" and an agreement imposing arbitration fees "so high as to make access to the forum impracticable." *Id.* at 236; *see also Reyes v. Gracefully, Inc.*, 2018 WL 2209486, at *7 (S.D.N.Y. May 11, 2018) (holding that an arbitration agreement could not shorten the statute of limitations for FLSA claims). Alleged structural bias falls into neither category.[22] Moreover, the Supreme Court has noted that while several Supreme Court "cases have . . . asserted the existence of an 'effective vindication' exception," these cases have simultaneously "declined to apply it to invalidate the arbitration agreement at issue." *Am. Express Co.*, 570 U.S. at 235.[23]

Plaintiffs also argue that the risk that Commissioner Goodell will be biased renders the arbitration agreements unconscionable as a matter of state contract law. To support this

---

[22]    *Cole v. Burns International Security Services, et al.*, 105 F.3d 1465 (D.C. Cir. 1997), is not to the contrary. Although the court noted that access to neutral arbitrators was one of several factors relevant to assessing whether plaintiffs could effectively vindicate their claims, *see id.* at 1482, the parties had agreed to use a neutral arbitrator, *see id.* at 1480. The *Cole* court gave no indication that lack of access to a neutral arbitrator was dispositive when the parties had agreed to a specific arbitrator. And although the Sixth Circuit in *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306 (6th Cir. 2000), expressed concern that bias in the makeup of the arbitral panel would preclude the effective vindication of plaintiffs' claims, it expressly did not resolve that question because it found that the arbitration agreement was illusory. *See id.* at 314–15.

[23]    *See Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 242 (2013) (Kagan, J. dissenting) (warning that the Supreme Court's limited application of the effective vindication doctrine to arbitration agreements that "operate to" bar federal claims enables companies to "appoint as an arbitrator an obviously biased person — say, the CEO. . . .").

24

argument, Plaintiffs rely heavily on *Hooters of America v. Phillips*, 173 F.3d 933 (4th Cir. 1999), and related cases in the Sixth Circuit. Pls. Opp. at 11–14. Those cases are, however, inapposite as they all concerned arbitration agreements with unfair selection procedures that, *inter alia*, granted the employer improper control over the pool of arbitrators.

The *Hooters* court refused to enforce an arbitration agreement that required all arbitrators to be selected from a list prepared by Hooters and thereby granted it "unrestricted control" over the selection of arbitrators. *See id.* at 939. And in *McMullen v. Meijier, Inc.*, 355 F.3d 485 (6th Cir. 2004), the court refused to enforce the parties' arbitration agreement based on "procedural unfairness inherent in an arbitration agreement," while noting that the "preferred method of challenging allegations of bias is to pursue the underlying claims through the arbitration process and then seek review . . . ." *Id.* at 494 n.7; *see also id.* at 488 (noting that the employer had "the right to unilaterally select a pool of . . . potential arbitrators"). By contrast, Plaintiffs' arbitration agreements grant Defendants no discretion over the choice of the arbitrator: it must be the NFL Commissioner.[24]

The applicable state contract laws of Florida and Tennessee do not compel a different conclusion.[25] In *Garcia v. Church of Scientology Flag Service Organization, Inc.*, No. 18-13452, 2021 WL 5074465, at *12 (11th Cir. Nov. 2, 2021), the Eleventh Circuit held that an

---

[24]    Similarly, in *Pokorny v. Quixtar, Inc.*, 601 F.3d 987 (9th Cir. 2010), the Ninth Circuit found that an arbitration agreement requiring plaintiffs to pay a fee if they selected an arbitrator who had not gone through defendants' "training," which was "designed to produce a very favorable view of [defendants]," unconscionably used the threat of financial hardship to give defendants control over the arbitrator selection process. *Id.* at 1003 (internal quotation omitted).

[25]    Several cases, on state law grounds, have declined to enforce an arbitration agreement appointing the commissioner of a sports league as the arbitrator due to concerns of impropriety or bias. *See* Order, *Nostalgic Partners LLC v. New York Yankees P'ship*, No. 656724/2020, at 2 (N.Y. Sup. Ct. Dec. 17, 2021); *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 813–14 (Mo. 2015) (en banc); *Gruden v. The Nat'l Football League, et al.*, No. A-21-844043-B, at 13–14 (Nev. Dist. Ct. Clark Cty. Oct. 12, 2022). Because none of the applicable contracts selects Missouri, New York, or Nevada law, those cases are interesting but not controlling.

arbitration clause that required plaintiffs to arbitrate their claims against the Church of Scientology before individuals "in good standing" with the church was not unconscionable under Florida law — even in the face of the lead arbitrator making "various comments . . . reflecting bias in favor of the church." *Id*. at \*12 (citing *Nat'l Football League Mgmt. Council*, 820 F.3d at 548); *see also id*. at \*8–9 (applying Florida law).

In *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370 (6th Cir. 2005), the Sixth Circuit, applying Tennessee law, declined to enforce the arbitration agreement because the "arbitrator-selection process itself [was] fundamentally unfair," while making clear the general rule that pre-arbitration challenges to an allegedly biased arbitration panel will not stand. *Id.* at 385 ("[A] party cannot avoid the arbitration process simply by alleging that the arbitration panel will be biased."); *see also Iysheh v. Cellular Sales of Tenn., LLC*, No. 17-CV-542, 2018 WL 2207122, at \*8 (E.D. Tenn. May 14, 2018) (arbitration agreement was not unconscionable where, *inter alia*, both parties had an opportunity to participate in arbitrator selection).

In short, Plaintiffs' concern about the Commissioner's ability to decide fairly their claims is insufficient reason not to enforce the arbitration agreements.

### C. Possible Discovery Limitations Do Not Render the Agreements Unconscionable

Plaintiffs also complain that they will not be able to take robust discovery if they are compelled to arbitrate their disputes. The fact that the NFL Commissioner may limit the amount of discovery Plaintiffs can take, however, is also not grounds for refusing to enforce the various arbitration agreements. *See Gilmer*, 500 U.S. at 31 (limited discovery did not bar arbitration of plaintiff's age discrimination claims). While the Second Circuit has "recognized that a provision that deprived a claimant of a meaningful opportunity to present her claim might well be unenforceable," plaintiffs bear the burden of demonstrating that the arbitration rules will in fact

deprive them of a chance to prove their claims. *Lohnn v. Int'l Bus. Machs. Corp.*, No. 21-CV-6379, 2022 WL 36420, at *11 (S.D.N.Y. Jan. 4, 2022) (cleaned up) (quoting *Guyden v. Aetna, Inc.*, 544 F.3d 376, 386–87 (2d Cir. 2008)).

Plaintiffs have not carried that burden because they rely solely on speculation that Commissioner Goodell may interpret the arbitration rules in a manner that will improperly and unfairly limit the scope of discovery. *See* Pls. Opp. at 6–7; *see also PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406–07 (2003) (holding that courts should not decline to enforce arbitration agreements "on the basis of mere speculation" that the arbitrator may interpret the arbitration agreement in a manner that will render it unenforceable, *id.* (internal quotation omitted)); *AT&T Mobility LLC*, 563 U.S. at 342 (cautioning that limitations on discovery should not be considered substantively unconscionable because that "rule would have a disproportionate impact on arbitration agreements").[26] If Plaintiffs are "unable to vindicate [their] rights in the arbitral forum, [they] will have recourse to the Court." *Howard v. Anderson*, 36 F. Supp. 2d 183, 187 (S.D.N.Y. 1999) (collecting cases); *see also* 9 U.S.C. § 10(a)(3) (permitting courts to vacate arbitration awards where the arbitrator "refus[es] to hear evidence pertinent and material to the controversy").

### D. The Horton-Titans Agreement Is Sufficiently Definite To Enforce

Plaintiffs argue that the arbitration agreement between Mr. Horton and the Titans is unenforceable because it fails to set forth the essential terms of the arbitration process. Pls. Opp. at 4 n.2. Mr. Horton's arbitration agreement with the Titans provides, in its entirety: "You and the Titans agree that all matters in dispute between You and Titans shall be referred to the

---

[26]     Discovery in arbitration is not typically as extensive as federal court discovery; that reality is, of course, one reason many prefer arbitration over litigation. Nevertheless, the Court takes the NFL at its word that it is committed to combating racism, Defs. Reply, Dkt. 64 at 5, and is confident that the Defendants recognize that the Plaintiffs have raised serious claims that may require more than minimal discovery to adjudicate fairly.

Commissioner and his decision shall be accepted as final, complete, conclusive, binding and unappealable by You and Titans." Horton-Titans Agreement § 6(a).

Tennessee courts have held that "for a contract to be enforceable, it must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties," and "any agreement which leaves unanswered . . . critical questions" is not enforceable. *Higgins v. Oil, Chemical and Atomic Workers Int'l Union, Local No. 3-677*, 811 S.W.2d 875, 880 (Tenn. 1991) (quoting *Soar v. Nat'l Football League Players' Ass'n*, 550 F.2d 1287, 1290 (1st Cir. 1977) (holding that the NFL Commissioner's oral promise retroactively to provide pension benefits to retired NFL players was insufficiently definite)) (alterations omitted).

Although Mr. Horton's arbitration agreement with the Titans is admittedly quite succinct, it is sufficiently definite to enforce. Courts applying Tennessee law have found that a reference to "binding arbitration to resolve all disputes that may arise out of the employment context" is adequate to state the essential terms of the agreement. *Hayward v. Trinity Christian Ctr. of Santa Ana*, No. 14-CV-2282, 2015 WL 1924552, at *3 (M.D. Tenn. Apr. 28, 2015).[27] Although the NFL Commissioner retains substantial discretion to set the arbitration procedures, the doctrines of good faith and fair dealing preclude the NFL from unilaterally adopting arbitration procedures that are "improper or oppressive." *Howell v. Rivergate Toyota, Inc.*, 144 F. App'x 475, 479 (6th Cir. 2005) (applying Tennessee law); *see also Brubaker v. Barrett*, 801 F. Supp. 2d

---

[27]  Although Tennessee courts have been skeptical of contracts that provide "little notice as to the procedure" for arbitration, those contracts appear to have either been even more succinct than the one at issue here or contracts of adhesion. For example, in *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 490 S.W.3d 800 (Tenn. Ct. App. Nov. 23, 2015), the contract did not indicate who the arbitrator would be or the "effect" of the arbitrator's decision, i.e., that it would be binding and final, *see id.* at 822–23. And while the court in *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731, 734 (Tenn. Ct. App. 2003), invalidated the parties' arbitration agreement in part because it did "not adequately explain how the arbitration procedure would work, except as who would administer it," *id.* at 734, Tennessee courts have subsequently limited *Howell*'s holding to contracts of adhesion, *see Wofford*, 490 S.W.3d at 817 n.13.

**A-29**

743, 753–55 (E.D. Tenn. 2011) (same).[28]  To the extent Commissioner Goodell adopts

procedures that are improper or oppressive, Plaintiffs will have recourse to this Court.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to compel arbitration is GRANTED

except that it is DENIED as to Brian Flores's claims against the Denver Broncos, New York

Giants, and the Houston Texans, and his related claims against the NFL.  Defendants' request to

stay the case is DENIED as to Flores's claims that may proceed to litigation and is GRANTED

as to all of the claims that must be arbitrated.  The Clerk of Court is respectfully directed to

terminate the open motion at docket entry 47.

The parties are ordered to appear for a pretrial conference on **Friday, March 24, 2023, at

10:00 A.M.** in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New

York, New York, 10007.  By **March 16, 2023**, the parties must submit a joint letter regarding the

status of the case, including:

a.  a statement of all existing deadlines, due dates, and/or cut-off dates;

b.  a statement describing the status of any settlement discussions and whether the parties
    would like a settlement conference;

c.  a statement of the anticipated length of trial and whether the case is to be tried to a
    jury;

d.  a statement regarding the anticipated schedule of arbitration;

e.  any contemplated motions;

---

[28]    *Floss v. Ryan's Family Steakhouse*, 211 F.3d 306 (6th Cir. 2000), is not to the contrary.  "In *Floss*, the
arbitration agreement was between employees and a third-party arbitration service, not the employer . . . . In other
words, the promise of the third party was too indefinite for legal enforcement." *Vision Healthcare Sys. (Int'l) Pty,
Ltd. v. Vision Software Techs. Inc.*, No. 15-CV-175, 2015 WL 2404089, at *3 (M.D. Tenn. May 20, 2015) (citing
*Floss*, 211 F.3d at 315–16) (upholding arbitration agreement that stated, in relevant part, "arbitration shall take place
in Nashville . . . before one arbitrator" without detailing further procedures, *id.* at *1).

**A-30**

f.  a proposed schedule for discovery, which must comply with the guidance set forth in the Court's model Civil Case Management Plan and Scheduling Order, available on the Court's website;

g.  any other issue that the parties would like to address at the pretrial conference; and

h.  any other information that the parties believe may assist the Court in advancing the case to settlement or trial.

**SO ORDERED.**

**Date:  March 1, 2023**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

BRIAN FLORES, STEVE WILKS, and RAY : 
HORTON, as Class Representatives, on :
behalf of themselves and all others similarly :
situated, :
:
Plaintiffs, :
:
-against- :
:
THE NATIONAL FOOTBALL LEAGUE; NEW :
YORK FOOTBALL GIANTS, INC. d/b/a NEW :
YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a :
MIAMI DOLPHINS; DENVER BRONCOS :
FOOTBALL CLUB d/b/a DENVER BRONCOS; :
HOUSTON NFL HOLDINGS, L.P. d/b/a :
HOUSTON TEXANS; ARIZONA CARDINALS :
FOOTBALL CLUB LLC d/b/a ARIZONA :
CARDINALS; TENNESSEE TITANS :
ENTERTAINMENT, INC. d/b/a TENNESSEE, :
TITANS and JOHN DOE TEAMS 1 through 26, :
:
Defendants. :

------------------------------------------------------------X

22-CV-0871 (VEC)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/25/2023

VALERIE CAPRONI, United States District Judge:

Plaintiffs, who are current and former coaches for NFL teams, have sued the NFL and

various member teams for racial discrimination and retaliation in violation of 42 U.S.C. § 1981

and several state laws.[1]  *See* Am. Compl., Dkt. 22.  The Court granted in part and denied in part

Defendants' motion to compel arbitration in an opinion dated March 1, 2023.  Op. ("Arbitration

Opinion"), Dkt. 76.  The Court compelled arbitration of the claims brought by Ray Horton

against the Tennessee Titans, Steve Wilks against the Arizona Cardinals, and Brian Flores

against the Miami Dolphins, as well as all related claims against the NFL; the Court denied the

---

[1]      These include the New York State Human Rights Law, the New York City Human Rights Law, the New
Jersey Law Against Discrimination, and the Florida Private Whistleblower Statute.  Am. Compl., Dkt. 22.

**A-32**

motion to compel arbitration of Mr. Flores's claims against the New York Giants, the Denver

Broncos, and the Houston Texans, as well as his related claims against the NFL. *Id.*

Plaintiffs moved for reconsideration of the portions of the Arbitration Opinion granting

the motion to compel arbitration, and Defendants cross-moved for reconsideration, seeking to

compel arbitration of the remaining claims.[2]  Pls. Mot., Dkt. 79; Defs. Mot., Dkt. 81.  Each party

opposed their adversary's motion.  *See* Defs. Opp., Dkt. 89; Pls. Opp., Dkt. 93.  For the reasons

discussed below, the motions for reconsideration are DENIED.

## DISCUSSION

### I.  Legal Standard

The standard under which courts evaluate a motion for reconsideration "is strict, and

reconsideration will generally be denied unless the moving party can point to controlling

decisions or data that the court overlooked . . . ."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257

(2d Cir. 1995).  A motion for reconsideration may be granted if the movant demonstrates "an

intervening change of controlling law, the availability of new evidence, or the need to correct a

clear error or prevent manifest injustice."  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956

F.2d 1245, 1255 (2d Cir. 1992) (quotation omitted); *see also Sigmon v. Goldman Sachs Mortg.*

*Co.*, 229 F. Supp. 3d 254, 257 (S.D.N.Y. 2017) ("[A] party moving for reconsideration must set

forth 'the matters or controlling decisions which counsel believes the Court has overlooked.'"

(quoting Local Civil Rule 6.3)).  Whether to grant a motion for reconsideration is a decision

within "the sound discretion of the district court . . . ."  *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir.

2009).

---

[2]      Defendants previously argued that Mr. Flores's arbitration agreement with the Miami Dolphins applied
retroactively to his claims against the Denver Broncos.  *See* Op., Dkt. 76 at 10.  The Court held that the arbitration
agreement could not be applied retroactively under Florida law, *see id.*, and Defendants do not seek reconsideration
of that portion of the Arbitration Opinion.

A motion for reconsideration is not a party's "opportunity to put forward evidence that he could have, but failed, to provide the Court when the Court initially considered the motion." *United States v. Posada*, 206 F. Supp. 3d 866, 868 (S.D.N.Y. 2016) (internal quotation omitted) (collecting cases). Additionally, "a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Schrader*, 70 F.3d at 257. "[N]ewly discovered evidence" can be a basis for reconsideration, but only if the evidence was not available prior to entry of the order at issue. *Marhone v. Cassel*, No. 16-CV-4733, 2021 WL 142278, at *2 (S.D.N.Y. Jan. 14, 2021). "These criteria are strictly construed against the moving party so as to avoid repetitive arguments on issues that have been considered fully by the court." *Griffin Indus., Inc. v. Petrojam, Ltd.*, 72 F. Supp. 2d 365, 368 (S.D.N.Y. 1999) (citation omitted).

## II.    Defendants' Motion for Reconsideration Is Denied

Defendants sought to compel arbitration of Mr. Flores's claims against the Denver Broncos, New York Giants, and Houston Texans arguing, *inter alia*, that the arbitration provisions in his recent contract with the Pittsburgh Steelers ("Flores-Steelers Agreement"), and the NFL Constitution incorporated therein, applied retroactively to claims against any NFL team. *See* Op. at 9. Defendants alternatively sought to compel arbitration of Mr. Flores's claims against the Denver Broncos because those claims arose when Mr. Flores was coaching for the New England Patriots. *See id*. His contract with the Patriots ("Flores-Patriots Agreement") had an arbitration agreement that applied to claims against any NFL team. *See id*.

The Court held that Mr. Flores did not have a valid arbitration agreement with the Steelers because Defendants had not proven that the arbitration agreement was part of a valid contract. *See id*. at 13. Section 12 of the Flores-Steelers Agreement states that the contract would "become valid and binding upon each party only when and if it shall be approved by the

Commissioner of the NFL;" in the version of the contract filed by Defendants in support of their motion to compel arbitration, the Commissioner's signature line was blank. *See* Second DiBella Decl. Ex. 4 ("Flores-Steelers Agreement"), Dkt. 73. Accordingly, the Flores-Steelers Agreement submitted by Defendants, by its own terms, was not "valid and binding." *Id.*; *see also* Op. at 13. The Court also held that the arbitration agreement contained in the NFL Constitution and incorporated into the Flores-Patriots Agreement was unenforceable because the NFL retained the unilateral right to modify the NFL Constitution and the arbitration agreement, rendering the arbitration agreement illusory according to Massachusetts state law. Op. at 21–22.

### A. The Flores-Steelers Agreement Is Not Binding

In their motion for reconsideration, Defendants ask the Court to reconsider its prior decision with respect to the Flores-Steelers Agreement based on a newly-filed version of the Flores-Steelers Agreement that contains the NFL Commissioner's signature. Defs. Mem., Dkt. 82 at 13. The signed contract, which is new evidence, cannot be considered on a motion for reconsideration because it was available to Defendants before the Court issued the Arbitration Opinion. *See Marhone*, 2021 WL 142278, at *2. Defendants acknowledge that they possessed a fully-signed version of the Flores-Steelers Agreement when the motion to compel arbitration was being briefed. *See* Defs. Mem. at 13 n.7; *see also* Smith Decl., Dkt. 98 ¶ 2 (stating that Commissioner Goodell approved the Flores-Steelers Agreement on June 17, 2022). The Court credits Defendants' statement of regret for "not having supplemented the record with a Commissioner-signed version of the agreement" during the eight months that the motion to compel arbitration was pending. Defs. Mem. at 13 n.7. But a motion for reconsideration is not a means to mend holes in the record with neglected evidence. *See Horsehead Res. Dev. Co., Inc. v. B.U.S. Envt'l Serv. Inc.*, 928 F. Supp. 287, 289 (S.D.N.Y. 1996) ("[A] motion for

reconsideration may not be used to plug gaps in an original argument or to argue in the alternative once a decision has been made." *Id.* (cleaned up).)

Defendants alternatively argue that the Flores-Steelers Agreement was valid and binding even without Commissioner Goodell's signature. Defs. Mem. at 14. The contract plainly states, however, that it is "valid and binding upon each party only when and if it shall be approved by the Commissioner of the NFL." Flores-Steelers Agreement § 12. "Courts do not assume a contract's language was chosen carelessly," and must give effect to the "clear and unequivocal" language of a contract. *Crawford Cent. Sch. Dist. v. Commonwealth*, 888 A.2d 616, 623 (Pa. 2005). The Flores-Steelers Agreement clearly establishes that it would not be binding on the parties until it was signed by Commissioner Goodell.

In sum, as the parties moving to compel arbitration, Defendants carried the burden of proving the existence of a written agreement binding the parties to arbitrate the present matter. *See* Op. at 14 (citing *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (collecting cases); *Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*, 349 F. App'x 551, 552–53 (2d Cir. 2009)). When Defendants moved to compel arbitration, they failed to do so.

Defendants argue that because Mr. Flores actually served as the Steelers' coach, there is an enforceable contract between the Steelers and Mr. Flores. *See* Defs. Mem. at 14. They posit that the Commissioner's signature was "[a]t most . . . a condition precedent to the parties' obligations to perform under the agreement, which was waived and excused when Mr. Flores performed, and accepted performance from the Steelers, under that very same agreement."[3] *Id*. Defendants failed to raise this argument as part of the underlying motion to compel arbitration,

---

[3]     Pennsylvania law, which governs the Flores-Steelers Agreement, *see* Flores-Steelers Agreement § 20, provides that "if a condition precedent is not satisfied, the obligations of the non-performing party are discharged." *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 620 (E.D. Pa. 1998).

**A-36**

and the Court will not consider it now.  Defendants' suggestion that the Court should now revise its prior decision based on this new legal theory because neither party previously briefed the issue flips the standard for motions for reconsideration on its head.  It is black letter law that, "[e]xcept where a movant is relying on new facts that could not have been previously discovered or newly promulgated law, additional facts or new legal theories cannot be asserted by way of a motion for reconsideration." *Bloomfield Inv. Res. Corp. v. Daniloff*, No. 17-CV-4181, 2021 WL 2310446, at *2 (S.D.N.Y. June 7, 2021) (internal quotation omitted).[4]

### B.  Flores-Patriots Contract

Defendants further dispute the Court's conclusion that the Flores-Patriots Agreement is illusory under Massachusetts law because Defendants retained the right unilaterally to modify the terms of the NFL Constitution, which contained the arbitration agreement applicable to Mr. Flores's disputes with other teams, without notice.  *See* Defs. Mem. at 1; Op. at 21.  Defendants alternatively argue that even if the agreement is unenforceable, the unilateral modification provision should be severed from the arbitration agreement.  *See* Defs. Mem. at 1–2.  For the reasons discussed in the Arbitration Opinion and further detailed below, Massachusetts law precludes enforcement of the arbitration agreement incorporated into the Flores-Patriots Agreement because the contract is illusory; because an illusory contract is no contract at all, severance is not possible.

---

[4]      Even if the Court were to consider Defendants' new argument, Defendants' motion would likely still fail. While some courts applying Pennsylvania law have excused compliance with conditions precedent when the parties accepted partial performance of the contract, *see McDermott*, 11 F. Supp. 2d at 622, Defendants did not previously, nor have they now, introduced evidence that might allow the Court to conclude, as a matter of law, that there was partial performance. *See MBR Constr. Servs., Inc. v. IBEW Local*, No. 14-CV-1694, 2016 WL 815566, at *7 (M.D. Pa. Mar. 2, 2016) (noting that Pennsylvania law requires the party seeking to compel performance of a contract to prove that any conditions precedent are satisfied).

A-37

### 1. Unilateral Modification Provision

In holding the Flores-Patriots Agreement illusory, the Court relied on *Jackson v. Action for Boston Community Development, Inc.*, 525 N.E.2d 411 (Mass. 1988), which held that a former employee could not contractually enforce the terms of her employment manual. The *Jackson* court considered several factors in finding that the employee manual did not constitute an enforceable contract, including the fact that the manual could be unilaterally modified by the employer. *See id*. at 414–15. Although the manual provided that employees would be notified of any changes, the *Jackson* court found it significant that the employer did not call "special attention" to the manual, such as reviewing the manual during orientation, and the plaintiff did not sign the manual or otherwise manifest assent to the terms of the manual. *See id*. at 416 (internal citations omitted). *Jackson* observed that the fact "that the defendant retained the right to modify unilaterally the personnel manual's term . . . tends to show that any 'offer' made by the defendant in distributing the manual was illusory." *Id*. at 415. The court also noted that it was significant that the record did not "reveal[] any negotiation over the terms of the personnel manual." *Id*.

*O'Brien v. New England Telephone & Telegraph Co.*, 664 N.E.2d 843, 847 (Mass. 1996), clarified the fact-intensive inquiry that courts must undertake in evaluating whether a document subject to unilateral modification is an enforceable contract while emphasizing that the "[p]rinciples stated in the *Jackson* opinion remain sound." *Id*. at 847. The *O'Brien* court refrained from "defin[ing] the extent to which management may effectively reserve its right to change or withdraw a manual" because the employer in that case had not expressly reserved the right to make unilateral changes, although it did distribute new policy manuals annually. *See id*. at 849; *see also id*. at 848 n.3. The court held that "the context of the manual's preparation and

7

**A-38**

distribution is, to us, the most persuasive proof that it would be almost inevitable for an employee to regard it as a binding commitment . . . ." *Id*. at 849 (internal quotation omitted).

*Buttrick v. Intercity Alarms, LLC*, 929 N.E.2d 357 (Mass. App. Ct. July 1, 2010),[5] applied *Jackson* and its progeny to find that the employee manual in that case was a binding contract. In *Buttrick*, the employer had required the employee to sign the manual, had distributed numerous copies of the manual, and had personally reviewed the manual's terms with the employees. *See id*. at *1–2. Given the "special attention" paid to the manual, *Buttrick* held that there was an enforceable contract, notwithstanding the employer's reservation of rights to make unilateral modifications. *Id*. at *1. The court reiterated, however, that "[w]hether an implied contract based upon the terms of the manual [existed] . . . was a fact-bound inquiry," while observing that "a number of factors weighed against the finding of a binding contract." *Id*.

Numerous courts have applied *Jackson* and its progeny to decline to enforce contracts that permit one party unilaterally to modify the terms without notifying the counterparty of any changes.[6] *See, e.g.*, *Douglas v. Johnson Real Est. Invs., LLC*, 470 F. App'x 823, 826 (11th Cir. 2012); *Fawcett v. Citizens Bank, N.A.*, 297 F. Supp. 3d 213, 221 (D. Mass. 2018) (collecting cases); *McNamara v. S.I. Logistics, Inc.*, No. 17-CV-12523, 2018 WL 6573125, at *3–4 (D. Mass. 2018) (collecting cases); *Wainblat v. Comcast Cable Comm'ns, LLC*, No. 19-10976, 2019 WL 5698446, at *4 (D. Mass. 2019); *Murray v. Grocery Delivery E-Servs. USA Inc.*, 460 F. Supp. 3d 93, 97–98 (D. Mass. 2020); *see also Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033,

---

[5]     *Buttrick v. Intercity Alarms, LLC*, 929 N.E.2d 357 (Mass. App. Ct. 2010), is a nonprecedential opinion that was issued with a caveat that it "may not fully address the facts of the case or the panel's decisional rationale," *id*. at *1.

[6]     *Ferguson v. Host International, Inc.*, 757 N.E.2d 267 (Mass. App. Ct. 2001), is not to the contrary. Although the employer retained the right to amend the manual without notice, the employer had in fact distributed the amended manual to employees, *id*. at 269. The *Ferguson* court noted that the employer's distribution of the manual conveyed to employees its importance as a binding document. *Id*. at 272.

1041 n.10 (Mass. 2021) (criticizing a terms of usage agreement permitting unilateral

modification without notice and noting that courts have held that such contracts are

unenforceable).[7]

Defendants have not demonstrated that they paid the type of "special attention" to the

NFL Constitution that is necessary to make its terms part of an implied contract under

Massachusetts state law.  Although Mr. Flores signed a contract that incorporated by reference

the NFL Constitution,[8] that does not automatically mean that the NFL Constitution is

enforceable.  The Supreme Judicial Court of Massachusetts has held that an employee's

signature on the manual itself would suggest, at most, that finding an implied contract exists

"may be justified."  *Weber v. Comm. Teamwork, Inc.*, 752 N.E.2d 700, 714 (Mass. 2001).

In the context of employee manuals, Massachusetts courts have made clear that "the

context of the preparation and distribution of the employment policies is the most persuasive

proof" in determining whether employment policies are implied contracts.  *LeMaitre v. Mass.*

---

[7]        While Defendants assert that these cases improperly single out arbitration agreements for application of the
unilateral modification rule, *see* Defs. Mem., Dkt. 82 at 11–12, Massachusetts courts find that contracts containing a
unilateral modification provision are illusory in a wide variety of contexts, including employee manuals, which, like
the NFL Constitution, set forth general policies governing the conduct of both employer and employee.  *See infra*
pp. 7–8*; see also Durbeck v. Suffolk Univ.*, 547 F. Supp. 3d 133, 147–48 (D. Mass. 2021) (applying *Jackson* to
academic catalogs).

        Defendants also attempt to analogize the instant case to *Gilbert v. Dell Technologies, Inc.*, 415 F. Supp. 3d
389 (S.D.N.Y. 2019), which applied *Jackson* to enforce an arbitration agreement provided to an employee in
conjunction with her employment agreement.  Defs. Mem. at 7–8.  In that case, the employer retained authority
unilaterally to modify the arbitration policies but not the arbitration agreement itself.  *See id*. at 393–94, 398.  Those
policies were, as here, incorporated into the employment agreement.  *See id*. at 393.  The employer in *Gilbert*,
however, had drawn special attention to the arbitration policies by placing the contractual clause that incorporated
the arbitration policies "prominently above the signature line."  *Id*. at 396; *see also id*. at 393.

[8]        One provision of the Flores-Patriots Agreement stated that Mr. Flores received a copy of the 124 NFL
Constitution and understood his obligations therein.  Flores-Patriots Agreement § 15; *see also* Second DiBella Decl.
Ex. 1 ("NFL Constitution"), Dkt. 73.  Mr. Flores disputes that he received a copy of the NFL Constitution at the
time of signing.  He has submitted no evidence to support that assertion, Pls. Opp. to Arb. Mem., Dkt. 62 at 9, and
Defendants submitted no evidence to show that he was given a copy of the constitution at that time.  Because the
Court finds that whether Mr. Flores received a copy of the NFL Constitution is not dispositive in light of the totality
of circumstances, the Court need not resolve this dispute.

**A-40**

*Turnpike Auth.*, 897 N.E.2d 1218, 1220 (Mass. 2008) (employment manual that was regularly distributed created contractual rights and obligations); *see also LeMaitre v. Mass. Turnpike Auth.*, 876 N.E.2d 888, 893 (Mass. Ct. App. 2007) (noting that the manual was "regularly distributed"). Mr. Flores argues, and Defendants do not dispute, that neither the NFL nor the Patriots reviewed with him the obligations of the NFL Constitution, required him to sign the NFL Constitution itself, or distributed to him subsequently-amended versions of the NFL Constitution. *See* Pls. Opp. to Arb. Mem., Dkt. 62 at 9; Pls. Opp. at 8; Defs. Reply, Dkt. 99 at 4. *See, e.g.*, *Buttrick*, 2010 WL 2609364, at *1–2. Nor could Mr. Flores have reasonably negotiated the terms of the NFL Constitution, which, by its terms, may only be amended by a vote of all NFL member clubs. *See Jackson*, 525 N.E.2d at 414–15 (considering lack of negotiation the terms of an employment manual as one factor in determining that a unilateral modification provision rendered the agreement illusory).

Finally, Defendants belatedly argue that the Court need not address the fact that the NFL has the unilateral power to modify the NFL Constitution because it may simply enforce the version of the NFL Constitution that was in force when the Flores-Patriots Agreement was signed.[9] *See* Defs. Mem. at 4 n.1; Defs. Reply at 3 n.1. Defendants forfeited this argument by failing to raise it in their briefs filed in conjunction with their motion to compel arbitration and by failing to submit the version of the NFL Constitution that was in effect when the Flores-Patriots Agreement was signed with their motion to compel arbitration. They offer no explanation for their oversight, and the Court will not consider this argument now.[10] *See*

---

[9]     Defendants point to a court filing in a class-action litigation in an out-of-district case regarding NFL players' concussion injuries that attached as an exhibit a prior version of the NFL Constitution as proof that the NFL did not amend the arbitration provision after the Flores-Patriots Agreement was executed. Defs. Mem. at 4 n.1.

[10]    Even if the Court were to consider this argument, however, serious questions would remain regarding the enforceability of the arbitration agreement in light of the NFL's ability unilaterally to modify the NFL Dispute Resolution Procedural Guidelines, which govern any arbitral proceeding between a coach and the NFL. *See Flores-*

*AlexSam, Inc. v. Aetna, Inc.*, No. 13-CV-1025, 2021 WL 3268853, at *9 n.8 (D. Conn. July 30, 2021) (noting that judicial notice of additional facts was inappropriate on a motion for reconsideration where the petitioner "has not explained any reason for failing to include [the additional facts] in its earlier filings").

### 2. Severability

Defendants finally argue that, even if the unilateral modification provision renders the arbitration agreement unenforceable, the Court should sever the unilateral modification provision and enforce the remainder of the parties' contract. *See* Defs. Mem. at 9–10. The Federal Arbitration Act ("FAA") requires courts to treat arbitration clauses "as severable from the contract in which it appears . . . unless the validity challenge is to the arbitration itself . . . ." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298–99 (2010). The fact that agreements to arbitrate are "severable does not mean that they are unassailable;" if the party seeking to avoid arbitration challenges the arbitration provision specifically, as Plaintiffs have, courts may appropriately consider whether the arbitration agreement is so defective that severance cannot save it. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010); *see also* Pls. Opp. to Arb. Mot. at 9.

The focus of *Jackson* and its progeny is whether, in the broader context of the contractual relationship, one party's ability unilaterally to change the terms of a contract renders that contract illusory.[11] *See Jackson*, 525 N.E.2d at 415; *see also O'Brien*, 664 N.E.2d at 848;

---

Patriots Agreement § 17; Second DiBella Decl. Ex. 2 at 13–17 ("NFL Dispute Resolution Procedural Guidelines"), Dkt. 73.

[11]  *Emmanuel v. Handy Technologies, Inc.*, 992 F.3d 1 (1st Cir. 2021), is not to the contrary; it did not address the plaintiff's argument that the unilateral modification provision rendered the contract illusory because, *inter alia*, plaintiff did not direct that argument to the arbitration agreement specifically, *see id*. at 10–11.

Similarly, *Joule, Inc. v. Simmons*, No. SUCV200904929A, 2011 WL 7090714 (Mass. Super. Ct. Dec. 5, 2011), did not opine on the issue of whether the employer's ability unilaterally to modify the arbitration procedures,

*Gilbert v. Dell Techs., Inc.*, 415 F. Supp. 3d 389, 398 (S.D.N.Y. 2019) ("Under Massachusetts law, an agreement to arbitrate can be illusory if the agreement can be modified unilaterally by one party."). Massachusetts courts view unilateral modification provisions as posing a challenge to contract formation because the fact that the offeror retains the right unilaterally and retroactively to alter the terms of the offer "tends to show that any 'offer' made . . . was illusory," such that there was no offer at all. *Jackson*, 525 N.E.2d at 415; *see also O'Brien*, 664 N.E.2d at 848. Thus, severance cannot be an appropriate remedy because there is no otherwise valid agreement from which the Court might sever invalid terms.

Defendants' "argument that any illusory provision of the contract could simply be severed and the remainder of the contract stand would require [the Court] to engage in an absurd process," essentially "reviving a contract [it] found was never formed for its lack of consideration, omitting the change-in-term provision clause that was fatal to the contract's proper formation, to therefore conclude a contract was formed." *Nat'l Fed. of the Blind v. The Container Store*, 904 F.3d 70, 87 (1st Cir. 2018); *see also McNamara*, 2018 WL 6573125, at *3 (collecting cases).[12]

---

but not the arbitration agreement, rendered the contract illusory, because, after remand from the Supreme Judicial Court, the only issue remaining for consideration was whether the contract was unconscionable. *See id.* at *2. In *Joule*, the employer had drawn special attention to the document containing arbitration procedures by appending it to the agreement "at the time that [the employee] signed it." *Id.* at *4. The Flores-Patriots Agreement states only that Mr. Flores had reviewed the document at an unspecified time, and the version of the Flores-Patriots Agreement in the record did not append the NFL's Constitution or Dispute Resolution Procedural Guidelines, which were both subject to the NFL's unilateral modification. *See supra*, page 10, note 10.

[12]     Even if the Court were to find that there was a valid agreement from which it could sever the unilateral modification provision in order to create a valid arbitration agreement, severance would still be inappropriate. The existence of a severance clause in a contract containing unenforceable terms "is not dispositive of the question whether those terms may in fact be severed" under Massachusetts law. *Machado v. System4 LLC*, 989 N.E.2d 464, 472 n.15 (Mass. 2013). Rather, courts must examine whether severance would alter the basic agreement to arbitrate, or the defect is so pervasive that severance would be inappropriate. *See Am. Fam. Life Assurance Co. of N.Y. v. Baker*, 848 F. App'x 11, 13 (2d Cir. 2021); *Feeney v. Dell Inc.*, 908 N.E.2d 753, 769 (Mass. 2009).

        Defendants argue that severance would be "especially straightforward" and merely require revising section 15 of the Flores-Patriots Agreement to delete the requirement that Mr. Flores adhere to the NFL Constitution "as amended from time to time hereafter." Defs. Reply, Dkt. 99 at 5 (internal quotation omitted). This assertion ignores

### III.    Plaintiffs' Motion for Reconsideration Is Denied

Plaintiffs' motion for reconsideration extensively relitigates their arguments that the

arbitration agreements are unconscionable and prevent effective vindication of Plaintiffs'

statutory claims, which the Court previously considered at length and rejected.  Without

rehashing the entirety of the Arbitration Opinion, the Court briefly explains why the arbitration

agreements contained in Mr. Flores's contract with the Miami Dolphins ("Flores-Dolphins

Agreement"), Mr. Wilks' contract with the Arizona Cardinals ("Wilks-Cardinals Agreement"),

and Mr. Horton's contract with the Tennessee Titans ("Horton-Titans Agreement") are

enforceable.

As in their opposition to the motion to compel arbitration, Plaintiffs primarily base their

arguments on their speculation that the NFL Commissioner will necessarily be biased as an

arbitrator.  *See, e.g.*, Pls. Mem., Dkt. 80 at 3–5.  The Second Circuit has already rejected the

argument that the NFL Commissioner cannot fairly "adjudicate the propriety of his own

conduct," even when he acts as the sole arbitrator.[13]  *Nat'l Football League Mgmt. Council v.*

*Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016); *see also* Op. at 22–23.

While Plaintiffs attempt to distinguish that case on the grounds that it involved a contract

that was the process of collective, rather than individual, bargaining and concerned a dispute

---

the fact that sections 16 and 17 of the Flores-Patriots Agreement also require Mr. Flores to adhere to subsequent amendments of NFL rules, including the NFL's Dispute Resolution Procedural Guidelines, which govern arbitration.  Furthermore, the NFL Constitution generally grants the NFL Commissioner the unilateral power to set and amend all NFL rules and regulations, including the NFL Dispute Resolution Procedural Guidelines, and to promulgate other arbitration-related rules in the future that would bind Mr. Flores.  *See* NFL Constitution § 8.5.  In sum, multiple portions of the parties' agreement grant the NFL unilateral authority to modify the contract; those provisions infect "fundamental elements of the arbitration regime" that cannot be severed from the whole.  *Feeney*, 908 N.E.2d at 769.

[13]    That case concerned "quarterback Tom Brady's involvement in a scheme to deflate footballs used during the 2015 American Football Conference Championship Game to a pressure below the permissible range."  *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 531 (2d Cir. 2016).

**A-44**

over player discipline instead of federal statutory rights, the Second Circuit relied on neither fact in reaching its decision. *See* Pls. Mem. at 5–6; *Nat'l Football League Mgmt. Council*, 820 F.3d 527 at 548. Furthermore, it is well-established that "[m]ere inequality in bargaining power . . . is not a sufficient reason" to invalidate arbitration agreements; "the FAA's purpose was to place arbitration agreements on the same footing as other contracts."[14] *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 33 (1991). As the Second Circuit emphasized in *National Football League Management Council*, "arbitration is a matter of contract, and consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen."[15] 820 F.3d at 548; *see also Garcia v. Church of Scientology Flag Serv. Org,, Inc.*, No. 18-13452, 2021 WL 5074465, at *12 (11th Cir. 2021) (holding that because the plaintiff "agreed to a method of arbitration with inherent partiality" it was bound to the results of the arbitration).

The FAA contemplates that federal courts should address issues of bias in the administration of arbitration by examining whether the arbitrator demonstrated "evident partiality" in presiding over the arbitration; if he did, the arbitration award may be overturned. *Gilmer*, 500 U.S. at 30; *see also* 9 U.S.C. § 10(a)(2). Plaintiffs argue that *Gilmer* limits this rule to cases in which neutral procedures govern arbitration. *See* Pls. Mem. at 7–8. While *Gilmer* noted that the existence of unbiased procedures favored enforcing the arbitration agreement at issue, that was not central to its holding. *See Gilmer*, 500 U.S. at 30. Rather, *Gilmer* held that the FAA already contemplates protection against bias by permitting courts to overturn arbitration

---

[14]     *Amici* law professors take issue with the trajectory of the Supreme Court's jurisprudence regarding the Federal Arbitration Act generally and suggest that *Gilmer* was wrongly decided. Amici Mem., Dkt. 88 at 6–7, 6 n.11. Whatever the merits of the learned professors' argument, this Court is, of course, bound by *Gilmer* and its progeny.

[15]     There are numerous reasons why Plaintiffs rationally could have consented to select the NFL Commissioner as arbitrator, including the fact that the Commissioner possesses unique subject-matter expertise on matters related to the NFL.

awards that are marred by evident partiality of the arbitrator.  The Court noted only in passing that "[i]n any event," the arbitration rules applicable to that dispute protected "against biased panels."  *Id*.  In short, "it is well established that a district court cannot entertain an attack upon the . . . partiality of arbitrators until after the conclusion of the arbitration and the rendition of the award."  *Aviall, Inc. v. Ryder Sys., Inc.*, 110 F.3d 892, 895 (2d Cir. 1997) (internal quotation omitted).

Plaintiffs alternatively ask the Court to find that the arbitration agreement is unenforceable because the alleged structural bias prevents Plaintiffs from effectively vindicating their statutory claims.  Pls. Mem. at 14–15.  As the Court previously explained in its Arbitration Opinion, the effective vindication doctrine is a highly circumscribed judge-made exception to the FAA.  *See Am. Express v. Italian Colors Rest.*, 570 U.S. 228, 235–36 (2013); Op. at 24.  The Supreme Court has never expanded it to encompass structural bias, and the nonbinding caselaw cited by Plaintiffs is unpersuasive for the reasons already discussed in the Arbitration Opinion.  *See* Op. at 24.  While Plaintiffs accuse the Court of breaking new ground in compelling arbitration of their claims and causing manifest injustice, this result was anticipated by Justice Kagan, who expressed concern that the Supreme Court's limitations on the effective vindication doctrine would permit companies to "appoint as an arbitrator an obviously biased person — say, the CEO . . . ."  *Am. Express*, 570 U.S. at 242 (Kagan, J. dissenting); Op. at 24 n.23.[16]

Finally, Plaintiffs once again argue that the arbitration agreements are unconscionable under the applicable state contract laws.  Pls. Mem. at 11–13.  Plaintiffs did not initially, nor do

---

[16]     Nothing in this Opinion should be read to suggest that the Undersigned harbors no concern about whether the process the NFL has apparently chosen to implement in this sort of dispute with coaches will be, and will be publicly perceived to be, fair.  The Court is ruling only that, given the current legal structure, it must await the outcome of the arbitration to decide whether Plaintiffs' fears of unfairness were warranted or whether the NFL Commissioner gave them a fair shake to prove their claims.

**A-46**

they now, cite any binding caselaw holding that arbitration agreements in which one party

consents to the appointment of the counterparty's representative as arbitrator are unconscionable.

While some courts have declined to enforce arbitration agreements in which the arbitrator

selection procedures were so one-sided as to render the agreement unconscionable under

applicable state law, those cases are inapplicable when the party seeking to avoid arbitration has

consented to resolving his dispute before a specific arbitrator.  *See* Op. at 24–25; *see also*

*Gainseville Health Care Ctr., Inc. v. Weston*, 857 So.2d 278, 286 (Fla. Dist. Ct. App. 2003)

(noting that Florida state courts "decline to indulge the presumption that the . . . arbitral body

conducting a proceeding will be unable or unwilling to retain competent, conscientious and

impartial arbitrators" in determining whether an arbitration agreement is unconscionable

(quoting *Gilmer*, 500 U.S. at 30)).

      Plaintiffs, in essence, ask the Court to fashion a specific rule out of whole cloth to protect

them from potential arbitrator bias that may never manifest itself.  To do so would be in direct

violation of the FAA's admonition against carving out rules disfavoring the enforcement of

arbitration agreements from generally applicable contract law.  *See Gilmer*, 500 U.S. at 24.

### CONCLUSION

      For the foregoing reasons, both Plaintiffs' and Defendants' motions for reconsideration

are DENIED.  The Clerk of Court is respectfully directed to terminate the open motions at

docket entries 79 and 81.

      The parties are ordered to appear for a pretrial conference on **Friday, August 4, 2023, at**

**10:00 A.M.** in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New

**A-47**

York, New York, 10007.  By **July 27, 2023**, the parties must submit a joint letter, the contents of which are described on pages 29 and 30 of the Arbitration Opinion.


**SO ORDERED.**

**Date:  July 25, 2023**
        **New York, NY**
                                                **VALERIE CAPRONI**
                                     **United States District Judge**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BRIAN FLORES, STEVE WILKS, and RAY
HORTON, as Class Representatives, on
behalf of themselves and all others similarly
situated,

                 Plaintiffs,

v.

THE NATIONAL FOOTBALL LEAGUE;
NEW YORK FOOTBALL GIANTS, INC.
d/b/a NEW YORK GIANTS; MIAMI
DOLPHINS, LTD. d/b/a MIAMI
DOLPHINS; DENVER BRONCOS
FOOTBALL CLUB d/b/a DENVER
BRONCOS; HOUSTON NFL HOLDINGS,
L.P. d/b/a HOUSTON TEXANS; ARIZONA
CARDINALS FOOTBALL CLUB LLC d/b/a
ARIZONA CARDINALS; TENNESSEE
TITANS ENTERTAINMENT, INC. d/b/a
TENNESSEE TITANS; and JOHN DOE
TEAMS 1 through 26,

                 Defendants.

Civil Action No.: 22-cv-00871 (VEC)

---

## NOTICE OF APPEAL

      Defendants the National Football League (NFL); New York Football Giants, Inc. (d/b/a

the New York Giants); Denver Broncos Football Club (d/b/a the Denver Broncos); and Houston

NFL Holdings, L.P. (d/b/a the Houston Texans) appeal to the United States Court of Appeals for

the Second Circuit from the portions of this Court's March 1, 2023 order (Dkt. 76) and July 25,

2023 order (Dkt. 102) declining to compel arbitration of plaintiff Brian Flores's claims against the

New York Giants, the Denver Broncos, and the Houston Texans, as well as his "related claims"

against the NFL, Dkt. 76, at 2. This notice of appeal is limited to those portions of the Court's

orders and does not apply to the portions of the Court's orders related to Flores's claims against

**A-49**

defendant Miami Dolphins, Ltd. (d/b/a the Miami Dolphins); plaintiff Steve Wilks's claims against defendant Arizona Cardinals Football Club LLC (d/b/a the Arizona Cardinals); plaintiff Ray Horton's claims against defendant Tennessee Titans Entertainment, Inc. (d/b/a Tennessee Titans); or the related claims filed by Flores, Wilks, and Horton against the NFL.

Dated:  New York, New York  
       August 21, 2023

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:  /s/ Loretta E. Lynch    
Loretta E. Lynch  
Brad S. Karp  
Lynn B. Bayard  
Brette Tannenbaum  
1285 Avenue of the Americas  
New York, New York 10019-6064  
Telephone: (212) 373-3000  
Fax: (212) 757-3900  
lelynch@paulweiss.com  
bkarp@paulweiss.com  
lbayard@paulweiss.com  
btannenbaum@paulweiss.com

*Attorneys for the National Football League, New York Giants, Denver Broncos, and Houston Texans*

**A-50**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
BRIAN FLORES, STEVE WILKS and RAY   :
HORTON, as Class Representatives, on behalf of  :
themselves and all others similarly situated,   :
                               :
             Plaintiffs,    :
                               :
      v.                      :
                               :
THE NATIONAL FOOTBALL LEAGUE; NEW   :   Civil Action No.: 22-cv-00871 (VEC)
YORK FOOTBALL GIANTS, INC. d/b/a NEW   :
YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a  :
MIAMI DOLPHINS; DENVER BRONCOS   :
FOOTBALL CLUB d/b/a DENVER BRONCOS;   :   **NOTICE OF APPEAL**
HOUSTON NFL HOLDINGS, L.P. d/b/a     :
HOUSTON TEXANS; ARIZONA CARDINALS  :
FOOTBALL CLUB LLC d/b/a ARIZONA    :
CARDINALS; TENNESSEE TITANS      :
ENTERTAINMENT, INC. d/b/a TENNESSEE  :
TITANS and JOHN DOE TEAMS 1 through 26,  :
                               :
             Defendants.   :
----------------------------------------------------------X

      **PLEASE TAKE NOTICE** that Plaintiffs Brian Flores, Steve Wilks and Ray Horton

hereby cross-appeal, on the basis of pendant appellate jurisdiction, to the United States Court of

Appeals for the Second Circuit from the portions of the Court's March 1, 2023, order (Dkt. 76)

and July 25, 2023 order (Dkt. 102) compelling arbitration.

**A-51**

Dated:  New York, New York
        September 5, 2023

Respectfully submitted,

**WIGDOR LLP**

By: _____
        Douglas H. Wigdor
        David E. Gottlieb
        Michael J. Willemin
        Marjorie Mesidor

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
dgottlieb@wigdorlaw.com
mwillemin@wigdorlaw.com
mmesidor@wigdorlaw.com

*Counsel for Plaintiffs*