# 23-1185(L)
## 23-1225 (CON)

# In the United States Court of Appeals
# for the Second Circuit

STEVE WILKS, RAY HORTON, BRIAN FLORES, AS A CLASS
REPRESENTATIVE, ON BEHALF OF HIMSELF AND ALL OTHERS
SIMILARLY SITUATED, PLAINTIFFS-APPELLEES-CROSS-APPELLANTS

*v.*

NEW YORK FOOTBALL GIANTS, INC.; HOUSTON NFL HOLDINGS, L.P., DBA
HOUSTON TEXANS; DENVER BRONCOS, DEFENDANTS-APPELLANTS

*v.*

NATIONAL FOOTBALL LEAGUE; MIAMI DOLPHINS, LTD.; ARIZONA
CARDINALS FOOTBALL CLUB LLC DBA ARIZONA CARDINALS;
TENNESSEE TITANS ENTERTAINMENT, INC., DBA TENNESSEE TITANS,
DEFENDANTS-APPELLANTS-CROSS-APPELLEES

*v.*

JOHN DOE TEAMS 1 THROUGH 29; JOHN DOE TEAMS 1 THROUGH 26,
DEFENDANTS

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 22-871)
(THE HONORABLE VALERIE E. CAPRONI, J.)*

---

**PAGE PROOF BRIEF OF THE NATIONAL FOOTBALL LEAGUE,
DENVER BRONCOS, NEW YORK GIANTS, AND HOUSTON TEXANS**

---

*(Counsel listed on inside cover)*

LORETTA E. LYNCH
BRAD S. KARP
LYNN B. BAYARD
BRETTE TANNENBAUM
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*kshanmugam@paulweiss.com*

# CORPORATE DISCLOSURE STATEMENT

Appellant-cross-appellee National Football League is an unincorporated association. It has no parent corporation, and no publicly held corporation owns a 10% or greater interest in it.

Cross-appellee Miami Dolphins, Ltd., is controlled by Fin Associates, LLC, which is controlled by Fin 2016, LLC. No publicly held corporation owns a 10% or greater interest in Fin 2016, LLC.

Cross-appellee Arizona Cardinals Football Club LLC has no parent corporation, and no publicly held company owns a 10% or greater interest in it.

Cross-appellee Tennessee Football, LLC (incorrectly identified in the complaint as Tennessee Titans Entertainment, Inc.), is a wholly owned subsidiary of KSA Industries, Inc. No publicly held corporation owns 10% or more of the stock of KSA Industries, Inc.

Appellant Denver Broncos Football Club is a wholly owned indirect subsidiary of Broncos Partners, LLC, which is controlled by Penner Sports Group, LLC. No publicly held corporation owns a 10% or greater interest in Penner Sports Group, LLC.

Appellant New York Football Giants, Inc., has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Appellant Houston NFL Holdings, L.P., has no parent corporation, and no publicly held corporation owns a 10% or greater interest in it.

(i)

## TABLE OF CONTENTS

Page

Introduction.................................................................................................1

Statement of jurisdiction...........................................................................4

Statement of the issues .............................................................................5

Statement of the case ................................................................................6

    A.    The National Football League .......................................7

    B.    Brian Flores and his arbitration agreements.................9

    C.    Procedural history ........................................................11

Summary of argument ............................................................................18

Standard of review...................................................................................21

Argument..................................................................................................22

    I.    The district court erred by holding that the arbitration provisions in the NFL Constitution are illusory under Massachusetts law ........................23

        A.    The arbitration provisions in the NFL Constitution are valid and enforceable and not illusory.................................................24

        B.    Severance would have been the appropriate remedy for the asserted defect in the arbitration agreement .................................................33

    II.    The district court erred by refusing to consider Mr. Flores's employment agreement with the Pittsburgh Steelers.................................................36

        A.    The district court should have considered the copy of the Steelers agreement approved by the NFL Commissioner.................................37

        B.    The Steelers agreement was enforceable under Pennsylvania law even before the NFL Commissioner's approval.................................43

Conclusion.................................................................................................48

ii

# TABLE OF AUTHORITIES

## CASES

Page

*650 Fifth Avenue & Related Properties, In re,*
830 F.3d 66 (2d Cir. 2016) ...............................................................39, 41

*AEP Energy Services Gas Holding Co. v. Bank of America, N.A.,*
626 F.3d 699 (2d Cir. 2010) ...............................................................22

*Allegheny Intermediate Unit v. East Allegheny School District,*
203 A.3d 371 (Pa. Commw. Ct. 2019).............................................44

*Anderson v. Comcast Corp.,* 500 F.3d 66 (1st Cir. 2007).................................34

*Bernstein v. W.B. Manufacturing Co.,* 131 N.E. 200 (Mass. 1921).................24

*Bulwer v. Mount Auburn Hospital,* 46 N.E.3d 24 (Mass. 2016) ....................26

*Buttrick v. Intercity Alarms, LLC,* 929 N.E.2d 357,
2010 WL 2609364 (Mass. App. Ct. 2010)......................................30

*Cadillac Automobile Co. v. Engeian,* 157 N.E.2d 657 (Mass. 1959)...............34

*Cannon v. Cannon,* 868 N.E.2d 636 (Mass. App. Ct. 2007) ..................24, 25, 28

*Catzin v. Thank You & Good Luck Corp.,*
899 F.3d 77 (2d Cir. 2018) ...............................................................37, 38

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ......................................41

*Contant v. AMA Capital, LLC,* 66 F.4th 59 (2d Cir. 2023)............................22

*Corbin v. Time Warner Entertainment-Advance/Newhouse
Partnership,* 821 F.3d 1069 (9th Cir. 2016) ....................................41

*Dillon v. BMO Harris Bank, N.A.,* 787 F.3d 707 (4th Cir. 2015) ...................42

*Doctor's Associates, Inc. v. Distajo,* 66 F.3d 438 (2d Cir. 1995)......................27

*Dreyfuss v. Etelecare Global Solitons-U.S. Inc.,*
349 Fed. Appx. 551 (2d Cir. 2009) .................................................40

iii

Page

Cases—continued:

*Dreyfuss* v. *Etelecare Global Solitons-U.S. Inc.*, Civ. No. 08-1115,
2008 WL 4974864 (S.D.N.Y. Nov. 19, 2008)......................................40

*Emmanuel* v. *Handy Technologies Inc.*,
442 F. Supp. 3d 385 (D. Mass. 2020),
*aff'd*, 992 F.3d 1 (1st Cir. 2021) ........................................................34

*Ethridge* v. *Bell*, 49 F.4th 674 (2d Cir. 2022) ..............................41, 45

*Fawcett* v. *Citizens Bank, N.A.*,
297 F. Supp. 3d 213 (D. Mass. 2018)..................................................33

*Ferguson* v. *Host International, Inc.*,
757 N.E.2d 267 (Mass. App. Ct. 2001)................................................30

*Force* v. *Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) ...........................46

*Garcia* v. *Steele*, 211 N.E.3d 602 (Mass. 2023) ............................25, 27

*Gilbert* v. *Dell Technologies, Inc.*,
415 F. Supp. 3d 389 (S.D.N.Y. 2019)..................................................34

*Gill* v. *Richmond Co-operative Association*,
34 N.E.2d 509 (Mass. 1941) ...............................................................24

*Graphic Arts Finishers, Inc.* v. *Boston Redevelopment
Authority*, 255 N.E.2d 793 (Mass. App. Ct. 1970) ............................24

*Hines* v. *Overstock.com, Inc.*:

380 Fed. Appx. 22 (2d Cir. 2010) ......................................................40

668 F. Supp. 2d 362 (E.D.N.Y. 2009) .................................................40

*ING Bank N.V.* v. *M/V TEMARA, IMO No. 9333929*,
892 F.3d 511 (2d Cir. 2018) ...........................................37, 39, 41, 45

*Jackson* v. *Action for Boston Community Development, Inc.*,
525 N.E.2d 411 (Mass. 1988) .........................................................*passim*

iv

Page

Cases—continued:

*Joule, Inc.* v. *Simmons*, No. SUCV200904929A,
   2011 WL 7090714 (Mass. Super. Ct. Dec. 5, 2011)........................................34

*Kauders* v. *Uber Technologies, Inc.*, 159 N.E.3d 1033 (Mass. 2021) ...............31

*Kindred Nursing Centers Limited Partnership* v. *Clark*,
   581 U.S. 246 (2017)........................................................................27

*LeMaitre* v. *Massachusetts Turnpike Authority*,
   876 N.E.2d 888 (Mass. App. Ct. 2007),
   *aff'd*, 897 N.E.2d 1218 (Mass. 2008)...............................................30

*Lugo* v. *Keane*, 15 F.3d 29 (2d Cir. 1994) ..........................................38

*Machado* v. *System4 LLC*, 28 N.E.3d 401 (Mass. 2015) ...................................35

*Marine Contractors Co.* v. *Hurley*, 310 N.E.2d 915 (Mass. 1974).............24, 26

*Mason* v. *Midland Funding LLC*, Civ. No. 16-2867,
   2021 WL 3017990 (N.D. Ga. Mar. 23, 2021)........................................42

*NSTAR Electric Co.* v. *Department of Public Utilities*,
   968 N.E.2d 895 (Mass. 2012) .......................................................26

*O'Brien* v. *New England Telephone & Telegraph Co.*,
   664 N.E.2d 843 (Mass. 1996) ...............................................*passim*

*Perez* v. *Ortiz*, 849 F.2d 793 (2d Cir. 1988)....................................38, 39

*Poch* v. *Equitable Life Assurance Society*, 22 A.2d 590 (Pa. 1941) .................44

*Rodgers-Rouzier* v. *American Queen Steamboat Operating Co.,
   LLC*, Civ. No. 20-4, 2023 WL 2742377 (S.D. Ind. Mar. 31, 2023)................42

*Snider* v. *Melindez*, 199 F.3d 108 (2d Cir. 1999) ...............................38, 40

*Trust Under Deed of Ott*, 271 A.3d 409 (Pa. Super. Ct. 2021) .........................43

*United States* v. *Sineneng-Smith*, 140 S. Ct. 1575 (2020)...............................38

Page

Cases—continued:

*Universal Builders, Inc.* v. *Moon Motor Lodge, Inc.*,
  244 A.2d 10 (Pa. 1968)..................................................................44

*Village Beer & Beverage, Inc.* v. *Vernon D. Cox & Co.*,
  475 A.2d 117 (Pa. Super. Ct. 1984).............................................44

*Weber* v. *Community Teamwork, Inc.*:

  752 N.E.2d 700 (Mass. 2001) ...............................................30, 32

  No. 9307123, 1998 WL 1181785
  (Mass. Super. Ct. June 25, 1998)............................................32

*Zachman* v. *Hudson Valley Federal Credit Union*,
  49 F.4th 95 (2d Cir. 2022)...........................................................22

## STATUTES

Federal Arbitration Act, 9 U.S.C. §§ 1-16 ............................16, 27, 42

  9 U.S.C. § 2 ....................................................................................25, 27

  9 U.S.C. § 16(a)................................................................................5, 39

28 U.S.C. § 1331 ......................................................................................5

28 U.S.C. § 1367 ......................................................................................5

42 U.S.C. § 1981 ....................................................................................12

## MISCELLANEOUS

Michael Baca, *NFL Owners Approve Rooney Rule Applying to
  Vacant QB Coach Positions*, NFL.com (May 24, 2022)
  <tinyurl.com/bacarooneyrule> ....................................................8

Richard A. Lord, *Williston on Contracts* (4th ed.)....................25, 44

Page

Miscellaneous—continued:

Andrew Mason, *Patriots Assistant Brian Flores Interviews with Broncos*, Denver Broncos News (Jan. 5, 2019) <tinyurl.com/floresbroncos> ...............................................................9

*NFL Makes Bold New Steps to Enhance Diversity*, NFL Football Operations (May 19, 2020) <tinyurl.com/nflnewsteps> ...............................................................9

*The Rooney Rule*, NFL Football Operations <tinyurl.com/nflrooneyrule> ...............................................................8

Craig Peters, *Vikings Hire Brian Flores as Defensive Coordinator*, Vikings.com (Feb. 6, 2023) <tinyurl.com/floresvikings>...............................................................10

Restatement (Second) of Contracts (1981) ...........................................24, 25, 44

Ben Shpigel, *Terribly Good*, N.Y. Times, Feb. 4, 2019 <tinyurl.com/patriotsLIII> ...............................................................9

**INTRODUCTION**

The district court's decision declining to compel arbitration of plaintiff's claims—eviscerating the broad arbitration agreements incorporated in plaintiff's binding employment contracts through a fundamental misapplication of state law—was erroneous and should be vacated.

Plaintiff Brian Flores and two other Black former or current coaches in the National Football League (NFL) filed this putative class action for alleged employment discrimination against the NFL and six NFL member clubs. Defendants moved to compel arbitration of all claims pursuant to broad arbitration provisions in plaintiffs' employment agreements and the separate arbitration provisions in the NFL Constitution, which plaintiffs acknowledged were expressly incorporated by reference into their comprehensive employment agreements. The district court correctly compelled arbitration of plaintiffs' claims against three of the member-club defendants (and their related claims against the NFL) under plaintiffs' employment agreements. But the district court incorrectly concluded, on grounds raised on the court's own initiative, that Mr. Flores's claims against the Denver Broncos, New York Giants, and Houston Texans (and his related claims against the NFL) were not subject to arbitration under the NFL Constitution. Defendants attempted to correct the court's errors by seeking reconsideration, but the court committed further errors instead.

As to the Broncos:  Mr. Flores alleges that the club discriminated against him when he interviewed for the club's head-coaching position while he was under contract with the New England Patriots.  The district court, relying on inapposite law relating to at-will employees, held that the arbitration provisions in the NFL Constitution, incorporated by reference into Mr. Flores's contract with the Patriots, were illusory because the contract would have prospectively incorporated amendments to them, without notice to Mr. Flores, even though no such amendments were made.

Under controlling law, the arbitration provisions were not illusory.  Mr. Flores had an express, written employment agreement that, by his acknowledgment, incorporated the NFL Constitution and its arbitration provisions as terms of the agreement.  That agreement was not illusory, because the Patriots could not change their contractual obligation to pay Mr. Flores's salary and benefits in exchange for his coaching services during the contract term.  The employment agreement as a whole was thus supported by mutual consideration, and there is no requirement that independent consideration support individual contractual provisions.  Accordingly, the Constitution's arbitration provisions are enforceable as incorporated terms of Mr. Flores's employment agreement, even if the agreement would have incorporated any amendments to the arbitration provisions (and no such amendments were in fact made).

2

The district court reached the contrary conclusion only by misapplying Massachusetts cases addressing whether, and if so, the circumstances under which, an employer's personnel manual constitutes an implied contract for an at-will employee—far from the case here, where Mr. Flores was party to a comprehensive employment agreement independently supported by mutual consideration. And even if the agreement's incorporation of subsequent amendments to the NFL Constitution were somehow legally impermissible, that language would be easily severable from the rest of the agreement.

As to the Giants and Texans: Mr. Flores alleged that the Giants and Texans discriminated against him when he interviewed with them for head-coaching positions in 2022. He was then hired by the Pittsburgh Steelers and agreed to be bound by the NFL Constitution in his contract with the club. The district court declined to enforce the NFL Constitution under the Steelers agreement on another ground raised on the court's own initiative: namely, because the original copy of the agreement submitted by defendants, which had been fully executed by the parties, did not reflect formal approval by the NFL Commissioner. It then declined to consider the approved copy of the identical Steelers agreement that defendants submitted on reconsideration.

That, too, was erroneous. After raising the issue on its own initiative, the district court was required to give defendants a fair opportunity to address the court's concerns, including by submission of the approved copy of the

3

agreement. The district court's refusal to consider the agreement was also a mere formality, as defendants can still file a renewed motion to compel arbitration based on the approved copy in any event. Even setting that aside, the district court erred by declining to enforce the unapproved copy of the agreement, because the parties performed under the contract in the customary period between signing and formal approval by the Commissioner.

For those reasons, the district court erred by declining to compel arbitration of Mr. Flores's interview-related claims against the Broncos, Giants, and Texans, as well as his related claims against the NFL. The district court's orders should be vacated in relevant part and the case remanded for further proceedings.

## STATEMENT OF JURISDICTION

The district court entered an order granting in part and denying in part defendants' motion to compel arbitration on March 1, 2023. S.A. 1-30. The parties filed timely cross-motions for reconsideration of the district court's order, and the district court denied those motions on July 25. S.A. 31-47; D. Ct. Dkt. 79, 81. Defendants-appellants National Football League, New York Giants, Denver Broncos, and Houston Texans filed a timely notice of appeal on August 21, limited to the portion of the district court's March 1 order declining to compel arbitration and July 25 order denying their motion for reconsideration. D. Ct. Dkt. 113. This Court docketed the appeal as No. 23-1185 and has

4

jurisdiction under 9 U.S.C. § 16(a). The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.

On September 5, 2023, Mr. Flores and plaintiffs Steve Wilks and Ray Horton filed a notice of cross-appeal from the portions of the district court's March 1 order compelling arbitration and July 25 order denying their motion for reconsideration. D. Ct. Dkt. 122. This Court docketed the cross-appeal as No. 23-1225 and consolidated it with the lead appeal in No. 23-1185. For the reasons explained in appellants' motion to dismiss filed on November 30, this Court lacks jurisdiction over the cross-appeal. *See* C.A. Dkt. 90.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred by holding that the arbitration provisions in the NFL Constitution, incorporated by reference into Mr. Flores's employment agreement with the New England Patriots, were illusory under Massachusetts law, because the Patriots agreement also would have incorporated subsequent amendments to the arbitration provisions, if there had been any.

2.      Whether the district court erred by refusing to consider Mr. Flores's employment agreement with the Pittsburgh Steelers.

a.      Whether the district court erred by refusing to consider the copy of the Steelers agreement evidencing the NFL Commissioner's approval, sub-

5

mitted on reconsideration, when the district court raised the issue of the missing approval on its own initiative in its order on defendants' motion to compel arbitration.

b.     Whether the district court erred by refusing to consider the earlier-submitted copy of the Steelers agreement, which did not evidence the Commissioner's approval, where the parties performed under the contract during the time between signing the contract and receiving the Commissioner's approval.

## STATEMENT OF THE CASE

Plaintiffs Brian Flores, Steve Wilks, and Ray Horton filed this action for alleged employment discrimination against the NFL and six NFL member clubs: the Miami Dolphins, Denver Broncos, New York Giants, Houston Texans, Arizona Cardinals, and Tennessee Titans. Mr. Flores asserts claims against the Dolphins, Broncos, Giants, and Texans; Mr. Wilks asserts claims against the Cardinals; and Mr. Horton asserts claims against the Titans. All plaintiffs allege their claims against the NFL in addition to the member clubs. The complaint also asserts claims against defendants and other unnamed member clubs on behalf of a putative class of every Black NFL head coach, offensive or defensive coordinator, quarterback coach, and general manager, as well as every Black applicant for those positions, during the applicable limitations period.

Defendants moved to compel arbitration of all claims pursuant to arbitration provisions in plaintiffs' employment agreements and the arbitration provisions in the NFL Constitution, which plaintiffs' employment agreements incorporated by reference. The district court (Caproni, J.) granted the motion as to Mr. Flores's claims against the Dolphins, Mr. Wilks's claims against the Cardinals, and Mr. Horton's claims against the Titans, as well as the related claims against the NFL; the court denied the motion as to Mr. Flores's claims against the Broncos, Giants, and Texans, and the related claims against the NFL. *See* S.A. 1-30; 2023 WL 2301575 (Mar. 1, 2023). The parties cross-moved for reconsideration, and the district court denied both motions. *See* S.A. 31-47; 2023 WL 4744191 (July 25, 2023). Both parties appealed the district court's orders. This brief concerns only the claims at issue in the lead appeal (No. 23-1185): namely, Mr. Flores's claims against the Broncos, Giants, and Texans.

## A. The National Football League

The NFL is the world's premier professional football league. It is structured as an unincorporated membership association consisting of 32 member clubs. D. Ct. Dkt. 22, at 11. The Broncos, Giants, and Texans are NFL member clubs.

The operations and structure of the NFL, and the relationship between the NFL, the member clubs, the clubs' employees, are governed by the NFL Constitution and Bylaws. *See* D. Ct. Dkt. 73-1. Under the NFL Constitution,

7

the NFL Commissioner is responsible for administering the day-to-day business affairs of the League. *Id.* at 30-38.

Diversity, equity, and inclusion are core NFL values. In furtherance of those values, the NFL has undertaken numerous initiatives to promote diversity in leadership positions in the League, including the hiring of head coaches by the member clubs. Among others, nearly two decades ago, the NFL implemented the "Rooney Rule" requiring clubs to interview minority candidates for any vacant head-coach position. D. Ct. Dkt. 22, at 29. The NFL has since expanded the Rooney Rule to apply to other leadership positions at member clubs, including assistant head coach, offensive coordinator, defensive coordinator, special teams coordinator, quarterback coach, general manager, and other front-office positions. *Id.*; *see The Rooney Rule*, NFL Football Operations <tinyurl.com/nflrooneyrule> (last visited December 5, 2023); Michael Baca, *NFL Owners Approve Rooney Rule Applying to Vacant QB Coach Positions*, NFL.com (May 24, 2022) <tinyurl.com/bacarooneyrule>. The Rooney Rule now also requires clubs to interview at least two minority candidates for any head-coach opening. D. Ct. Dkt. 22, at 29.

In recent years, the NFL has also undertaken other broad programs to increase employment and advancement opportunities for diverse candidates. Those initiatives include a reward of additional draft picks to clubs that de-

velop minority coaches and executives and the establishment of coaching fellowship programs across all 32 member clubs. In addition, the NFL maintains two longstanding fellowship programs focused on developing the pipeline for minority coaching and player personnel candidates. *See NFL Makes Bold New Steps to Enhance Diversity*, NFL Football Operations (May 19, 2020) <tinyurl.com/nflnewsteps>.

### B. Brian Flores And His Arbitration Agreements

1. Mr. Flores began his NFL coaching career with the New England Patriots in 2008. *See* D. Ct. Dkt. 22, at 45. He stayed with the club in various roles through February 3, 2019. *See id.*; Ben Shpigel, *Terribly Good*, N.Y. Times, Feb. 4, 2019, at D1 <tinyurl.com/patriotsLIII>. In January 2019, while Mr. Flores was still under contract with the Patriots, he interviewed to become the Broncos' head coach. D. Ct. Dkt. 22, at 53; *see* D. Ct. Dkt. 73-3, at 1; Andrew Mason, *Patriots Assistant Brian Flores Interviews with Broncos*, Denver Broncos News (Jan. 5, 2019) <tinyurl.com/floresbroncos>. Although he was not hired as head coach of the Broncos, he was hired the following month as the head coach of the Miami Dolphins. D. Ct. Dkt. 73-2, at 1.

Mr. Flores coached the Dolphins for three seasons. *See* D. Ct. Dkt. 22, at 45. He was discharged on January 10, 2022. *See id.* at 48. Shortly after his discharge, Mr. Flores interviewed for head-coaching positions with both the Giants and the Texans. He was not selected for either position. *Id.* at 48-51,

9

53-55. In February 2022, however, the Pittsburgh Steelers hired Mr. Flores to work as their senior defensive assistant and linebackers coach. *See* D. Ct. Dkt. 73-4, at 1. In February 2023, Mr. Flores was hired as the defensive coordinator of the Minnesota Vikings. *See* Craig Peters, *Vikings Hire Brian Flores as Defensive Coordinator*, Vikings.com (Feb. 6, 2023) <tinyurl.com/flores-vikings>.

2. Each time Mr. Flores accepted employment with a member club, he entered into an employment agreement that governed his relationship with the club and the NFL. Each of those employment agreements included an arbitration provision requiring Mr. Flores to arbitrate a broad category of disputes. For example, Mr. Flores's employment agreement with the Patriots provided that "Employee agrees that all matters in dispute between Employee and the Club, including without limitation any dispute arising from the terms of this Agreement, shall be referred to the NFL Commissioner for binding arbitration in accordance with the NFL's Dispute Resolution Procedural Guidelines." D. Ct. Dkt. 73-3, at 6; *see also* D. Ct. Dkt. 73-2, at 8; D. Ct. Dkt. 73-4, at 5-6.

Mr. Flores also agreed in each of his employment agreements "to comply at all times with, and to be bound by, the NFL Constitution," which was expressly "made a part of" those agreements. D. Ct. Dkt. 73-3, at 5; *see* D. Ct.

10

Dkt. 73-2, at 6, 8; D. Ct. Dkt. 73-4, at 5.  Under Article 8.3 of the NFL Constitution, the NFL Commissioner has "full, complete, and final jurisdiction and authority to arbitrate  .  .  .  [a]ny dispute between any  .  .  .  coach  .  .  . and any member club or clubs," as well as "[a]ny dispute involving two or more members of the League."  D. Ct. Dkt. 73-1, at 30.  Mr. Flores acknowledged in each of his employment agreements that he had "read the NFL Constitution .  .  .  and underst[ood] [its] meaning."  D. Ct. Dkt. 73-3, at 5; *see* D. Ct. Dkt. 73-2, at 6, 8; D. Ct. Dkt. 73-4, at 5.

The NFL Commissioner approved each of Mr. Flores's contracts, as the contracts require.  *See* D. Ct. Dkt. 73-2, at 11; D. Ct. Dkt. 73-3, at 6, 7; D. Ct. Dkt. 98-1, at 5, 7.  There is customarily some lag between the parties' signing a coaching contract and the Commissioner's formal approval.  *See, e.g.*,  D. Ct. Dkt. 73-2, at 1, 11; D. Ct. Dkt. 73-6, at 1, 13; D. Ct. Dkt. 73-7, at 9; D. Ct. Dkt. 98-1, at 1, 7.

### C.    Procedural History

1.    On February 1, 2022, Mr. Flores filed a putative class-action complaint against the NFL, and the Broncos, Giants, and Dolphins.  D. Ct. Dkt. 1. Mr. Flores later filed the operative amended complaint, which added claims by Mr. Flores against the Texans in addition to claims by two new plaintiffs, Steve Wilks and Ray Horton.  D. Ct. Dkt. 22, at 11-12, 53-55.  Both Mr. Wilks and Mr. Horton previously worked as NFL coaches and asserted claims

11

against the NFL and their former member-club employers (the Arizona Cardinals and the Tennessee Titans, respectively). *Id.* at 57-67.

As is relevant here, Mr. Flores alleged that his interviews for head-coaching positions with the Broncos in 2019 and the Giants in 2022 were shams designed only so that those clubs could formally comply with the Rooney Rule. D. Ct. Dkt. 22, at 48-53. Regarding the Texans, Mr. Flores alleged that the club retaliated against him for filing this lawsuit by hiring an experienced Black former head coach to serve as their head coach, after Mr. Flores interviewed for the position. *Id.* at 53-55.

More broadly, the complaint alleged that the "discretionary" and "subjective" employment practices used by all 32 different NFL member clubs result in a disparate impact in the hiring and retention of Black head coaches. *See* D. Ct. Dkt. 22, at 30-31. Plaintiffs sought class certification, proposing to proceed with a class consisting of every Black head coach, offensive or defensive coordinator, quarterback coach, and general manager, as well as every Black applicant for those positions, during the applicable limitations period. *See id.* at 83.

The complaint asserted claims under 42 U.S.C. § 1981 and state and local employment laws against not only the member clubs, but also the NFL, on the theory that the NFL was plaintiffs' "joint employer." D. Ct. Dkt. 22, at 75-83,

12

89-97. Plaintiffs sought both damages and various forms of injunctive relief. *Id.* at 97-99.

2. Defendants moved to compel arbitration of all claims. D. Ct. Dkt. 47, 48. As is relevant here, defendants argued that Mr. Flores's interview-related claims against the Broncos, Giants, and Texans, and the related claims against the NFL, were subject to arbitration under the NFL Constitution. With respect to the Broncos, defendants argued that Mr. Flores was bound by the arbitration provisions in the NFL Constitution pursuant to his employment agreement with the Patriots. With respect to the Giants and Texans, defendants argued, *inter alia,* that Mr. Flores was bound to comply with the NFL Constitution by virtue of his employment agreement with the Steelers, which he accepted while this action was pending. Finally, with respect to the NFL, defendants argued that the NFL was entitled to enforce plaintiffs' arbitration agreements pursuant to the doctrine of equitable estoppel. *See* D. Ct. Dkt. 48, at 12-25.

In connection with their motion, defendants submitted excerpted copies of plaintiffs' various employment agreements with their NFL member clubs. D. Ct. Dkt. 49, 49-1 to 49-7. The copy of Mr. Flores's agreement with the Steelers did not evidence the NFL Commissioner's approval, as the agreement required. *See, e.g.*, D. Ct. Dkt. 49-3, at 7; D. Ct. Dkt. 49-4, at 7.

13

While defendants' motion was pending, the district court ordered supplemental briefing on a question related to the claims filed by Mr. Wilks. D. Ct. Dkt. 70. In the same order, the court directed defendants to file "complete copies of the contracts attached as exhibits to the" previously filed declaration in support of their motion to compel arbitration. *Id.* at 2. Defendants complied with the court's request and filed complete copies of the versions of the contracts it had previously filed in excerpted form. D. Ct. Dkt. 73. Because defendants understood the court to have requested complete copies of the contracts as they were previously filed, defendants filed the copy of the Steelers contract executed by the parties but lacking the NFL Commissioner's approval. *See* D. Ct. Dkt. 73-4, at 7.

3. After the parties filed their supplemental briefs concerning Mr. Wilks's claims, the district court granted in part and denied in part the motion to compel arbitration. S.A. 1-30. The court concluded that Mr. Flores was required to arbitrate his claims against the Dolphins, as well as his related claims against the NFL. S.A. 7-8, 11-13, 22-27, 29. The court further concluded that Mr. Wilks and Mr. Horton were required to arbitrate all of their claims. S.A. 7-8, 15-21, 22-29. The court declined, however, to compel arbitration of Mr. Flores's claims against the Broncos, Giants, and Texans. S.A. 7-8, 13-14, 21-22, 29.

14

As to Mr. Flores's claims against the Broncos: the district court determined that those claims plainly fell within the scope of his arbitration agreement with the Patriots. S.A. 8-9. The court nevertheless refused to compel arbitration of the claims on the ground that the arbitration provisions in the NFL Constitution, incorporated into Mr. Flores' agreement with the Patriots, were illusory under Massachusetts law (which governs the agreement, *see* D. Ct. Dkt. 73-3, at 6).

The district court reasoned as follows. Under the NFL Constitution, the terms of the Constitution may be amended by a vote of three-fourths of the NFL member clubs. D. Ct. Dkt. 73-1, at 123. And the Patriots agreement incorporated the NFL Constitution "in [its] present form and as amended from time to time hereafter." D. Ct. Dkt. 73-3, at 5. The district court concluded that the authority of the member clubs to amend the Constitution without notice to Mr. Flores rendered the arbitration agreement illusory and unenforceable under Massachusetts law, even though the arbitration provisions had not been amended. S.A. 21-22.

As to Mr. Flores's claims against the Giants and Texans: the district court concluded that no arbitration agreement covered those claims. Relevant here, the court observed that Mr. Flores's agreement with the Steelers stated it would "become valid and binding upon each party only when and if it shall be approved by the Commissioner of the NFL." S.A. 13. The court further

15

noted that the copy of the agreement submitted by defendants did not evidence the Commissioner's approval. S.A. 13. Although neither party had raised or briefed the issue, the court concluded that Mr. Flores and the Steelers had never entered into a valid and binding agreement due to the missing approval. S.A. 13-14. The court denied the motion to compel arbitration of Mr. Flores's claims against the Giants and Texans on that basis.

4. The parties cross-moved for reconsideration of the district court's order. D. Ct. Dkt. 79 & 81. In their motion, defendants first argued that the district court had misapplied Massachusetts law by holding that the possibility of unilateral modification rendered the arbitration provisions in the NFL Constitution illusory. D. Ct. Dkt. 82, at 4-8. Defendants further argued that, even were that not true, the unilateral-modification language should be severed from the rest of the agreement. *Id.* at 8-10. Defendants further contended that the Federal Arbitration Act would preempt any interpretation of Massachusetts law that applied principles of illusoriness in a targeted fashion to arbitration provisions. *Id.* at 10-12.

Defendants separately argued that the district court had improperly resolved the validity of the Steelers agreement without briefing from the parties. D. Ct. Dkt. 82, at 12. Defendants explained that the Commissioner had in fact approved the agreement on June 17, 2022, and they provided the court with

16

the approved copy, which was otherwise identical to the copy previously sub-mitted to the court. *Id.* at 13; D. Ct. Dkt. 98, at 1; D. Ct. Dkt. 98-1, at 1-7. Defendants also argued that, even without the Commissioner's approval, the Steelers agreement was valid and binding because the parties had performed under the agreement. D. Ct. Dkt. 82, at 13-14. Under either approach, de-fendants argued that Mr. Flores was required to arbitrate his claims against the Giants and Texans under the Steelers agreement. *Id.* at 15-18. Notably, plaintiffs' response defended the district court's decisions on alternative grounds but did not dispute either that the Commissioner had approved the Steelers agreement or that the parties had performed under the agreement. D. Ct. Dkt. 93, at 14-25.

The district court denied both motions for reconsideration. S.A. 31-47. Relevant here, the court again declined to compel arbitration of Mr. Flores's claims against the Broncos, concluding that it had properly applied Massachu-setts law and that the relevant language in the Patriots agreement was not severable. S.A. 36-42. The court also refused to compel arbitration of Mr. Flores claims against the Giants and Texans. S.A. 34-36. The court reasoned that the otherwise-identical approved copy of the Steelers agreement was "new evidence" and that the performance argument was a "new legal theory," neither of which the court could consider on reconsideration. S.A. 34, 36.

17

## SUMMARY OF ARGUMENT

I.     The district court erred by holding, on its own initiative, that the arbitration provisions in the NFL Constitution, as incorporated by reference in Mr. Flores's employment agreement with the New England Patriots, were illusory.

A.     Under Massachusetts law, an agreement is illusory where the promises offered by one of the parties to a bilateral agreement does not actually require anything of the promising party.  Unless the contract provides otherwise, consideration is assessed across the entire contract and not on a provision-by-provision basis.

Here, the arbitration provisions in the NFL Constitution, expressly incorporated by reference into the Patriots agreement, are clearly supported by mutual consideration and not illusory.  The Patriots paid Mr. Flores a significant salary and provided him with additional employment benefits in exchange for coaching services under the terms and conditions set forth in the agreement, including compliance with the NFL Constitution and the arbitration agreement within it.  That bargained-for exchange supports all of the terms and conditions of the Patriots agreement, including the arbitration provisions incorporated by reference into the agreement.

The district court held that the arbitration provisions were illusory because the Constitution was subject to unilateral modification without notice to

18

Mr. Flores. But as a preliminary matter, the Constitution was not subject to "unilateral" modification by the Patriots; only a supermajority of the 32 NFL member clubs could enact amendments. The Patriots thus did not have unfettered discretion to determine whether to comply with the NFL Constitution vis-à-vis Mr. Flores (and no relevant amendments were made during the contract term in any event). Even setting that aside, the possibility of unilateral modification would not invalidate the arbitration provisions in the NFL Constitution. The Patriots were still contractually obligated to pay Mr. Flores salary plus benefits for his coaching services during the contract term. And in exchange for that indisputably valid consideration, Mr. Flores agreed to express terms and conditions of his employment, which included full compliance with the NFL Constitution, as amended. Those provisions include the arbitration provisions at issue here.

In holding those provisions to be unenforceable, the district court relied on the Massachusetts Supreme Judicial Court's decisions in *Jackson* v. *Action for Boston Community Development, Inc.*, 525 N.E.2d 411 (1988), and *O'Brien* v. *New England Telephone & Telegraph Co.*, 664 N.E.2d 843 (1996). But those decisions concern the distinct issue of whether, and if so, under which circumstances, an employer's personnel manual will constitute an implied contract for an otherwise-at-will employee. *Jackson* and *O'Brien* do not apply where, as here, the employer and employee entered into an express employment

19

agreement, supported by independent consideration, that expressly incorporated by reference an arbitration agreement. Because Mr. Flores entered into a written employment agreement with the Patriots that expressly reflected his agreement to comply with the NFL Constitution and all of its terms, there was no need for the district court to determine whether the NFL Constitution, standing alone, was supported by mutual consideration.

B.      The district court compounded its error by misanalyzing the issue of severability. The court reasoned that severability would be inappropriate if the agreement was illusory, because that would mean no contract was ever formed in the first place. But as just explained, the possibility of amendment of the NFL Constitution did not render the Patriots agreement illusory. At most, the possibility of modification would go to the contract defense of unconscionability. The arbitration agreement is not unconscionable, however, and even if it were, the appropriate remedy would be to sever the words "and as amended from time to time" from the provision of the Patriots agreement incorporating the NFL Constitution. After severance, the arbitration provisions of the version in force when the Patriots hired Mr. Flores would be enforceable.

II.      The district court further erred by concluding that the absence of the NFL Commissioner's approval on Mr. Flores's employment agreement with the Pittsburgh Steelers invalidated the agreement.

20

A.    The court raised the absence of the Commissioner's approval on the originally submitted version of the agreement on its own initiative, without first providing the parties with notice and an opportunity to be heard on the issue. That was erroneous. The court then compounded its error by refusing to consider the Commissioner-approved copy of the agreement submitted by defendants on reconsideration. The district court was required to give defendants an opportunity to be heard before resolving the issue against them.

B.    Even without the Commissioner's formal approval, Mr. Flores's employment agreement with the Steelers would be valid. The agreement evidences the parties' mutual assent; contains sufficiently definite terms; and is supported by mutual consideration. At most, the requirement for the Commissioner's approval was a contractual condition. Yet both parties performed and accepted performance under the agreement during the customary time between signing and approval by the Commissioner. None of the parties have disputed those points, and the district court offered no persuasive reason for holding that the absence of the Commissioner's immediate approval rendered the Steelers agreement unenforceable.

## STANDARD OF REVIEW

This Court reviews a district court's order denying a motion to compel arbitration de novo. *Zachman* v. *Hudson Valley Federal Credit Union*, 49

21

F.4th 95, 100 (2022). This Court reviews a district court's order denying a motion for reconsideration for abuse of discretion. *Contant* v. *AMA Capital, LLC*, 66 F.4th 59, 65 (2023). Where the district court considers the merits of an argument for the first time in the context of a motion for reconsideration, however, this Court reviews that issue de novo. *See AEP Energy Services Gas Holding Co.* v. *Bank of America, N.A.*, 626 F.3d 699, 739 n.21 (2010).

## ARGUMENT

In Mr. Flores's employment agreements with the Patriots and the Steelers, Mr. Flores agreed to comply with the NFL Constitution, which gives the NFL Commissioner "full, complete, and final jurisdiction and authority to arbitrate . . . [a]ny dispute between any . . . coach . . . and any member club or clubs," as well as "[a]ny dispute involving two or more members of the League." D. Ct. Dkt. 73-1, at 30. As the district court correctly recognized, those arbitration provisions plainly cover Mr. Flores's claims for employment discrimination against the Broncos. S.A. 10. They also clearly cover his similar claims against the Giants and the Texans.

In denying defendants' motion to compel arbitration in relevant part, the district court raised two issues on its own initiative without notice to the parties or the benefit of briefing. In particular, the court held that the arbitration provisions in the NFL Constitution, expressly incorporated by reference into the Patriots agreement, were illusory under Massachusetts law. It further

22

concluded that the Steelers agreement was unenforceable because the first copy of the agreement filed by defendants did not evidence the NFL Commissioner's approval. Those rulings were erroneous, and the district court declined to correct them on reconsideration. The district court's orders should thus be vacated in relevant part and the case remanded for further proceedings.

## I. THE DISTRICT COURT ERRED BY HOLDING THAT THE AR-BITRATION PROVISIONS IN THE NFL CONSTITUTION ARE ILLUSORY UNDER MASSACHUSSETS LAW

The district court declined to enforce Mr. Flores's obligation under the Patriots agreement to comply with the arbitration provisions in the NFL Constitution on the ground that the provisions were illusory. The district court observed that the Patriots agreement incorporates the NFL Constitution "as amended from time to time," D. Ct. Dkt. 73-3, at 5, and it reasoned that the "unilateral ability" of NFL member clubs to amend the Constitution "without notice" to Mr. Flores stripped the arbitration provisions of mutual consideration. S.A. 21 (citation omitted); *see* S.A. 36-41. Plaintiffs did not raise that argument; they stated only in passing that their employment agreements required compliance with the NFL Constitution "as it may be amended, but neither the teams nor the NFL have any obligation to provide notice of changes." D. Ct. Dkt. 62, at 9.

The district court erred. Massachusetts law provides no basis for setting aside a particular term in a contract otherwise fully supported by mutual consideration merely because that term is subject to unilateral modification. And even if unilateral modification were somehow objectionable, the appropriate remedy would have been to sever the modification language from the Patriots agreement.

## A. The Arbitration Provisions In The NFL Constitution Are Valid And Enforceable And Not Illusory

For a bilateral contract to be supported by mutual consideration, both parties must promise to provide a benefit to the other party or to give up something in exchange for receipt of the other party's promise to do the same. *See Bernstein* v. *W.B. Manufacturing Co.*, 131 N.E. 200, 201 (Mass. 1921); Restatement (Second) of Contracts § 71 (1981); *see also Marine Contractors Co.* v. *Hurley*, 310 N.E.2d 915, 919 (Mass. 1974). A contract is considered illusory where one of the promises offered for consideration "binds one to do nothing at all." *Graphic Arts Finishers, Inc.* v. *Boston Redevelopment Authority*, 255 N.E.2d 793, 796 (Mass. App. Ct. 1970); *see Gill* v. *Richmond Co-operative Association*, 34 N.E.2d 509, 513-514 (Mass. 1941). At the same time, "that a part of the consideration standing alone might have been illusory is no objection to the sufficiency of the consideration." *Cannon* v. *Cannon*, 868 N.E.2d 636, 642

24

(Mass. App. Ct. 2007) (citation and alterations omitted). "The law is not concerned with the adequacy of the consideration, as long as it is valuable." *Id.* (internal quotation marks and citation omitted).

In addition, "the law does not require every term of the contract to have a separately stated consideration." *Garcia* v. *Steele*, 211 N.E.3d 602, 611 (Mass. 2023) (citation omitted). "Rather, a single performance or return promise may furnish consideration for any number of promises." *Id.* (internal quotation marks, citation, and alterations omitted). "The fact that part of what is bargained for would not have been consideration if that part alone had been bargained for does not prevent the whole from being consideration." Restatement (Second) of Contracts § 80(2); *see* 3 Richard A. Lord, *Williston on Contracts* § 7:51, at 893-895 (4th ed. 2008).

Applied here, those principles demonstrate that the arbitration provisions in the NFL Constitution, incorporated by reference into the Patriots agreement, were supported by adequate consideration and were not illusory under Massachusetts law. The district court erred in holding otherwise.

1.      The arbitration provisions in the NFL Constitution were merely one of many terms in Mr. Flores's employment agreement with the Patriots. That agreement expressly states that Mr. Flores "agree[d] to comply at all times with, and to be bound by, the NFL Constitution," and that the Constitution was "made a part of th[e] [a]greement." D. Ct. Dkt. 73-3, at 5. As the

Massachusetts Supreme Judicial Court has recognized, "[i]ncorporation by reference is a common tool in the drafting of contracts," and such an incorporation will render the terms of the incorporated document enforceable as long as the contract "clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract." *NSTAR Electric Co.* v. *Department of Public Utilities*, 968 N.E.2d 895, 905 (2012) (citations omitted); *see, e.g.*, *Bulwer* v. *Mount Auburn Hospital*, 46 N.E.3d 24, 40 (Mass. 2016). Just so here.

As a term of the parties' broader contract, the arbitration provisions in the NFL Constitution were supported by the consideration exchanged by Mr. Flores and the Patriots in connection with the broader contract. Specifically, Mr. Flores promised to perform certain coaching duties and abide by a number of requirements, including compliance with the NFL Constitution, in exchange for the Patriots' promise to pay him a significant salary plus additional employment benefits. *See* D. Ct. Dkt. 73-3, at 1-2, add. A. The overall agreement was thus clearly supported by mutual consideration. *See Marine Contractors*, 310 N.E.2d at 919. Mr. Flores has never contended otherwise.

That consideration supported *all* of the terms of the parties' contractual relationship, including the arbitration provisions in the NFL Constitution. Under Massachusetts law, no separate consideration was necessary to support the terms of the NFL Constitution, as incorporated into the employment

26

agreement. *Garcia*, 211 N.E.3d at 611. And no such rule specific to arbitration agreements would be permissible, because "singl[ing] out arbitration agreements for disfavored treatment" violates the Federal Arbitration Act. *Kindred Nursing Centers Limited Partnership* v. *Clark*, 581 U.S. 246, 248 (2017); *see* 9 U.S.C. § 2; *Doctor's Associates, Inc.* v. *Distajo*, 66 F.3d 438, 453 (2d Cir. 1995). Accordingly, the arbitration agreement in the NFL Constitution, incorporated by reference into the Patriots agreement, is fully supported by mutual consideration and is not illusory.

2. The district court reached the contrary conclusion because "[t]he NFL and its member clubs have the unilateral ability to modify the terms of the NFL Constitution" without notice to Mr. Flores. S.A. 21-22; *see* S.A. 36. That was an impermissible basis for holding Mr. Flores's agreement to arbitrate to be illusory.

As a preliminary matter, the Patriots had no authority to modify the NFL Constitution. As the Constitution makes clear, its terms may be amended only by a three-fourths' vote of the 32 NFL member clubs. D. Ct. Dkt. 73-1, at 123. The Patriots cannot choose whether or not to comply with the Constitution; they were required to follow all of the provisions in force when they signed Mr. Flores, unless a supermajority of clubs amended a particular provision. For that reason, any promise by the Patriots to abide by the NFL Constitution implied in the Patriots agreement would not be illusory.

27

The arbitration provisions in the NFL Constitution were also never amended, making any potential harm from the possibility of amendment entirely hypothetical.

Even setting that aside, the arbitration provisions in the NFL Constitution would still have been supported by mutual consideration even if the Patriots had the ability to amend the Constitution unilaterally. As already noted, the broader contract between Mr. Flores and the Patriots was supported by mutual consideration. Even if the Patriots could have unilaterally amended the NFL Constitution, that would at most eliminate any promise by the Patriots to comply with the NFL Constitution from serving as consideration flowing to Mr. Flores. While that may reduce the value of the consideration Mr. Flores received, it is "no objection to the sufficiency of the consideration." *Cannon*, 868 N.E.2d at 642 (citation omitted). The Patriots still owed Mr. Flores his salary and benefits, and that consideration would have continued to support all of the terms in the employment agreement, including incorporated terms.

3. The district court's error arose primarily from its misapplication of the Massachusetts Supreme Judicial Court's decisions in *Jackson* v. *Action for Boston Community Development, Inc.*, 525 N.E.2d 411 (1988), and *O'Brien* v. *New England Telephone & Telegraph Co.*, 664 N.E.2d 843 (1996)—decisions that are inapposite here.

a.      *Jackson* and *O'Brien* addressed the question whether, and if so, under what circumstances, an employer's personnel manual is deemed an implied contract for an otherwise-at-will employee.  In *Jackson*, a terminated employee asserted breach-of-contract claims based on his former employer's alleged failure to follow the grievance procedures outlined in the employer's personnel manual.  525 N.E.2d at 412.  "No written employment contract was executed, and the plaintiff d[id] not argue that any oral express contract was formed."  *Id.* at 413.  Instead, the plaintiff argued that the personnel manual itself constituted an implied contract.  *Id.* at 412.

The Massachusetts Supreme Judicial Court declined to treat the manual as an implied contract.  *Jackson*, 525 N.E.2d at 415.  While "a personnel manual can be shown to form the basis of an express or implied contract," the court held that, "on review of all the circumstances," the personnel manual was not an implied contract.  *Id.*  Among the factors cited by the court was the fact that "the defendant retained the right to modify unilaterally the personnel manual's terms," which "tend[ed] to show that any 'offer' made by the defendant in distributing the manual was illusory."  *Id.*  The court also noted that the personnel manual did not state a term of employment; that the employer did not call any "special attention" to the manual; and that there was no evidence the plaintiff had "manifested his assent to it or acknowledged that he understood its terms."  *Id.* at 415-416.

29

*O'Brien* addressed a similar situation. There, too, a terminated employee without a written employment agreement sued for wrongful termination based on the terms of her employer's personnel manual. 664 N.E.2d at 844-846. In holding that the employee could not state a claim, the court reaffirmed the principle from *Jackson* that "the circumstances of a particular employment relationship could warrant a finding of an implied contract that includes the terms of a personnel manual." *Id.* at 847. The court also clarified that, while an employer's right "unilaterally to modify the terms of the manual" could make "any offer in the manual illusory," the implied contract would not be illusory if the employee "reasonably believed that the employer was offering to continue the employee's employment on the terms stated in the manual." *Id.* at 848. The court ultimately declined to address "the extent to which management may effectively reserve its right to change or withdraw a manual," because the manual at issue was not in fact subject to unilateral modification. *Id.* at 849.[1]

---

[1] All of the employment-related Massachusetts state-court decisions cited by the district court dealt with a similar fact pattern: namely, where an at-will employee sought to enforce the employer's employment policies as a contract. *See Weber* v. *Community Teamwork, Inc.*, 752 N.E.2d 700, 713-715 (Mass. 2001); *LeMaitre* v. *Massachusetts Turnpike Authority*, 876 N.E.2d 888, 894-895 (Mass. App. Ct. 2007), *aff'd*, 897 N.E.2d 1218 (Mass. 2008); *Ferguson* v. *Host International, Inc.*, 757 N.E.2d 267, 271-273 (Mass. App. Ct. 2001); *Buttrick* v. *Intercity Alarms, LLC*, 929 N.E.2d 357, 2010 WL 2609364, at *1-*2 (Mass. App. Ct. 2010) (unpublished table decision). The lone remaining

30

b.      This case is miles away from *Jackson* and *O'Brien*, because it involves an express written employment agreement independently supported by mutual consideration.  The problem with unilateral modification arose in *Jackson* and *O'Brien* because the personnel manual was alleged *itself* to constitute the parties' entire employment agreement.  The employer's ability to modify any term in that agreement would mean the employer had no binding obligations to the employee.  Such an contract would lack mutual consideration.

Here, by contrast, the parties entered an express contractual agreement supported by independent consideration.  Defendants are not arguing that the NFL Constitution is itself a contract that must be supported by independent consideration.  Defendants are arguing that the provisions of the NFL Constitution are enforceable as *terms of Mr. Flores's express employment agreement* because those provisions are incorporated into the agreement by reference.  Accordingly, even if the Patriots could have modified the NFL Constitution unilaterally, the Patriots would have remained contractually obligated to pay Mr. Flores his salary and benefits, ensuring that the incorporated provisions of the NFL Constitution, including its arbitration provisions, would always be supported by mutual consideration.

---

opinion addressed the analogous question whether certain consumer-facing terms and conditions for use of a mobile-device app constituted an implied contract.  *See Kauders* v. *Uber Technologies, Inc.*, 159 N.E.3d 1033, 1039, 1048-1059 (Mass. 2021).

31

The district court disagreed, stating the agreement's incorporation of the NFL Constitution "does not automatically mean that the NFL Constitution is enforceable." S.A. 39. But in support of that conclusion, the district court cited only the Massachusetts Supreme Judicial Court's decision in *Weber*, *supra*, which indicated that the existence of "an employee's signature" on an employment manual "would suggest, at most, that finding an implied contract exists 'may be justified.'" *Id.* (quoting *Weber*, 752 N.E.2d at 714). Like *Jackson* and *O'Brien*, *Weber* did not involve an express employment agreement. *See Weber* v. *Community Teamwork, Inc.*, No. 9307123, 1998 WL 1181785, at *15 (Mass. Super. Ct. June 25, 1998) (noting that "[a]s an employee-at-will Weber had no written employment contract with CTI unless the personnel guidelines altered that status").

That fact makes all the difference. Because a personnel manual does not purport itself to constitute a contract, the employee's signature on the manual does not alone prove assent to enter a contractual relationship. But where a separate document is validly incorporated by reference into an express written contract, the employee's signature on the contract demonstrates his assent to be bound by the contract's terms, including the terms validly incorporated by reference. The fact that Mr. Flores did not separately sign a copy of the NFL Constitution is thus irrelevant.[2]

---

[2] Some federal courts applying Massachusetts law have declined to enforce

32

### B. Severance Would Have Been The Appropriate Remedy For The Asserted Defect In The Arbitration Agreement

The district court's error in interpreting *Jackson* and *O'Brien* also affected its severability analysis. The district court declined to sever the language in the Patriots agreement incorporating subsequent amendments to the NFL Constitution, on the ground that severance cannot "reviv[e] a contract [that] was never formed for its lack of consideration." S.A. 42 (citation omitted). As already explained, however, the arbitration provision was never amended; the Patriots could not unilaterally amend the NFL Constitution; and even if they had, the arbitration agreement in the NFL Constitution would still have been supported by adequate consideration based on the consideration supporting the overall employment agreement. *See* pp. 26-27, *supra*.

At most, therefore, the ability of three-quarters of the NFL clubs to amend the NFL Constitution unilaterally goes to the contract defense of unconscionability, not the question of contract formation. *See, e.g., Joule, Inc.* v. *Simmons,* No. SUCV200904929A, 2011 WL 7090714, at *4-*5 (Mass. Super.

---

arbitration provisions in contracts that allowed one party unilaterally to modify the contract's terms. *See, e.g., Fawcett* v. *Citizens Bank, N.A.,* 297 F. Supp. 3d 213, 218, 221 (D. Mass. 2018) (citing cases); S.A. 38-39 (citing additional cases). But in those cases, the courts did not address whether the contract at issue was supported by any independent consideration. For example, a consumer contract of adhesion subject to unilateral modification would be illusory because the company would have no obligation to abide by any of the contractual terms *or even to continue to provide service to the customer.* Here, however, the Patriots were obligated to provide Mr. Flores with a salary and benefits under his employment agreement.

33

Ct. Dec. 5, 2011); *Gilbert* v. *Dell Technologies, Inc.*, 415 F. Supp. 3d 389, 398–399 (S.D.N.Y. 2019) (applying Massachusetts law). Of course, the district court did not conclude that the ability of NFL member clubs collectively to amend the NFL Constitution rendered the Patriots agreement unconscionable, and it does not. But even if it did, the appropriate remedy would be "simply [to] sever the offending provision and enforce" the version of the NFL Constitution in force when Mr. Flores signed his agreement with the Patriots, "including the arbitration provision[s]." *Emmanuel* v. *Handy Technologies, Inc.,* 442 F. Supp. 3d 385, 394 (D. Mass. 2020) (applying Massachusetts law), *aff'd*, 992 F.3d 1 (1st Cir. 2021); *accord Gilbert*, 415 F. Supp. 3d at 399. Under Massachusetts law, "it is well settled that if the part of a contract which is valid, can be separated from that which is void, and carried into effect, it may be done." *Cadillac Automobile Co.* v. *Engeian*, 157 N.E.2d 657, 660 (Mass. 1959) (internal quotation marks, citation, alteration, and ellipses omitted). Severance is especially appropriate here given that the Patriots agreement contains a severability provision, which "makes clear" that other provisions in the agreement are "severable." *Anderson* v. *Comcast Corp.*, 500 F.3d 66, 77 (1st Cir. 2007) (applying Massachusetts law); *see* D. Ct. Dkt. 73-3, at 6.

In this case, severance of the language incorporating amendments to the NFL Constitution would have been especially straightforward given that Mr. Flores identified "only one potentially unenforceable provision . . . , which

34

does not infect the arbitration [agreement] as a whole." *Machado* v. *System4 LLC*, 28 N.E.3d 401, 415-416 (Mass. 2015) (internal quotation marks and citation omitted). The Patriots agreement states that Mr. Flores "agree[d] to comply at all times with, and to be bound by, the NFL Constitution . . . in [its] present form *and as amended from time to time hereafter*." D. Ct. Dkt. 73-3, at 5 (emphasis added). Even if the district court had grounds to believe that Mr. Flores should not be required to comply with the most current version of the NFL Constitution, the simplest solution—and the one that would do least violence to the parties' agreement—would have been to strike the emphasized words above and enforce the remainder of the agreement as written. So modified, the provision would have required Mr. Flores to comply with the version of the NFL Constitution in effect when he signed the Patriots agreement. And because the arbitration provisions in the NFL Constitution have not been amended since Mr. Flores entered into that contract, *see* D. Ct. Dkt. 82, at 4 n.1, he would still be required to arbitrate his claims against the Broncos.

The district court declined to consider that argument, holding that defendants had forfeited it by failing to raise it in their briefing on their original motion to compel arbitration. *See* S.A. 40. But defendants had no reason to invoke the version of the NFL Constitution in force when the Patriots hired Mr. Flores until the district court raised the issue of unilateral modification on

35

its own initiative. It would be grossly inequitable to apply forfeiture in that circumstance. As explained below, pp. 37-39, the district court was required to provide defendants with a fair opportunity to respond before it finally adjudicated defendants' right to proceed in arbitration.

In sum, the district court erred by holding that the arbitration provisions in the NFL Constitution were illusory because NFL member clubs had the authority to amend the NFL Constitution without notice to Mr. Flores. The Patriots agreement was valid, making the provisions in the NFL Constitution enforceable as to Mr. Flores's claims against the Broncos. The district court erred by concluding otherwise.

## II. THE DISTRICT COURT ERRED BY REFUSING TO CONSIDER MR. FLORES'S EMPLOYMENT AGREEMENT WITH THE PITTSBURGH STEELERS

The district court separately concluded that the absence of the NFL Commissioner's approval on the copy of Mr. Flores's employment agreement with the Pittsburgh Steelers first submitted by defendants rendered the entire agreement, including Mr. Flores's obligation to comply with the NFL Constitution, invalid and unenforceable. That was the sole basis on which the court declined to enforce an otherwise clear commitment to arbitrate. The district court raised that issue on its own initiative and reached that conclusion without providing the parties with notice or an opportunity to be heard. When defendants identified the errors in the court's reasoning, the court wrongly

36

ignored the fact that the Commissioner approved an identical copy of the agreement. In so doing, the court violated well-settled rules of federal procedure and state contract law.

### A. The District Court Should Have Considered The Copy Of The Steelers Agreement Approved By The NFL Commissioner

After the district court partially denied defendants' motion to compel arbitration, defendants provided the court with the Commissioner-approved copy of the Steelers agreement and asked the court to revisit its earlier decision in light of that submission. The court improperly refused to do so. Having raised the issue of the missing approval on its own initiative, the district court was required to give defendants notice and an opportunity to be heard before resolving the issue.

1. As a general rule, a district court may not make a dispositive ruling on an issue not raised by the parties without first providing notice and an opportunity to be heard. *See, e.g.*, *Catzin* v. *Thank You & Good Luck Corp.*, 899 F.3d 77, 82 (2d Cir. 2018); *ING Bank N.V.* v. *M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 523-524 (2d Cir. 2018). Unless it is clear that the district court's decision was correct and there is no indication that the losing party could have introduced evidence that would have affected the court's decision, the failure to provide notice and an opportunity to be heard is reversible error. *See, e.g.*, *Catzin*, 899 F.3d at 82-83; *ING Bank*, 892 F.3d at 524.

That rule exists because notice and an opportunity to be heard are not "mere formalit[ies]" but rather serve several important purposes. *Catzin*, 899 F.3d at 82. To begin with, "[n]o principle is more fundamental to our system of judicial administration than that a person is entitled to notice [and an opportunity to be heard] before adverse judicial action is taken against him." *Lugo* v. *Keane*, 15 F.3d 29, 30 (2d Cir. 1994). Those procedural protections play "an important role in establishing the fairness" of the judicial process. *Snider* v. *Melindez*, 199 F.3d 108, 113 (2d Cir. 1999). In addition, judicial decisions made without any input from the parties "deviate from the traditions of the adversarial system." *Perez* v. *Ortiz*, 849 F.2d 793, 797 (2d Cir. 1988). Under the "principle of party presentation," courts "are essentially passive instruments of government" and are not supposed to "sally forth each day looking for wrongs to right." *United States* v. *Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (internal quotation marks, citations, and alterations omitted). But when a court raises and decides an issue entirely on its own, the judge becomes "a proponent rather than an independent entity." *Perez*, 849 F.2d at 797 (internal quotation marks and citation omitted).

What is more, the failure to provide notice and an opportunity to be heard undermines the reliability of judicial decisionmaking. *See Snider*, 199 F.3d at 113. Those safeguards help minimize the risk that a court "may over-

38

look valid answers" to perceived defects in a party's case, *id.*, such as purport-edly missing evidence. *See, e.g.*, *ING Bank*, 892 F.3d at 524-525; *In re 650 Fifth Avenue & Related Properties*, 830 F.3d 66, 96-97 (2d Cir. 2016). In that way, the requirements also help to conserve "judicial resources" by avoiding unnecessary "appeals and remands." *Perez*, 849 F.2d at 797.

All of those rationales apply equally to motions to compel arbitration. The denial of a motion to compel arbitration on a ground not addressed by the parties deprives the movant of notice and an opportunity to be heard; places the court in the position of a proponent rather than an independent entity; undermines the reliability of judicial decisionmaking; and can lead to unnecessary interlocutory appeals, *see* 9 U.S.C. § 16(a).

The district court's decision disregarded each of those well-settled principles. Mr. Flores is represented by sophisticated counsel who raised numerous other grounds for opposing arbitration, yet his counsel did not raise the missing approval as a basis for declining to compel arbitration. By raising and then deciding the issue anyway, the district court deprived defendants of notice or an opportunity to be heard on the issue and violated basic principles of procedural fairness and party presentation.

The court also decided the issue incorrectly. It is undisputed that the NFL Commissioner approved the Steelers agreement. D. Ct. Dkt. 98, at 1; D. Ct. Dkt. 98-1, at 7. The district court thus "overlook[ed] [a] valid answer[]" to

39

what the court perceived to be a defect in defendants' case. *Snider*, 199 F.3d at 113. The district court was required to consider the Commissioner-approved copy of the Steelers agreement, and it erred by refusing to do so.

2. The district court offered several reasons for raising the missing signature on its own initiative and then refusing to consider the signed agreement. None has merit.

In its initial order on the motion to compel arbitration, the district court justified its decision to raise the missing signature by citing two unpublished cases for the proposition that the party seeking to compel arbitration "bears the burden of demonstrating that a valid arbitration agreement exists." S.A. 14 (citing *Hines* v. *Overstock.com, Inc.*, 380 Fed. Appx. 22, 24 (2d Cir. 2010), and *Dreyfuss* v. *Etelecare Global Solitons-U.S. Inc.*, 349 Fed. Appx. 551, 553 (2d Cir. 2009)); *see also* S.A. 35 (similar). But neither of those non-binding decisions concerned an issue that a district court raised and decided on its own initiative without first giving the parties notice and an opportunity to be heard. Rather, in both cases, the parties had an opportunity to address the issue in the district court before a decision was made. *See Hines* v. *Overstock.com, Inc.*, 668 F. Supp. 2d 362, 365-367 (E.D.N.Y. 2009); *Dreyfuss* v. *eTelecare Global Solutions-US, Inc.*, Civ. No. 08-1115, 2008 WL 4974864, at *6-*8 (S.D.N.Y. Nov. 19, 2008). The cases therefore do not support the district

40

court's decision to raise the absence of the Commissioner's approval without giving the parties notice and an opportunity to be heard.

On reconsideration, the district court declined to consider the Commissioner-approved copy of the agreement, on the ground that the copy was "new evidence" the court could not consider. S.A. 34. But given that the district court raised its concerns about the Commissioner's approval for the first time in its denial of defendants' motion to compel arbitration, that rule was inapplicable. *See Ethridge* v. *Bell*, 49 F.4th 674, 688-689 (2d Cir. 2022); *ING Bank N.V.*, 892 F.3d at 525. Courts have the authority to resolve issues on their own initiative only "so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 326 (1986). If not, the party must be given an opportunity to be heard, including "an opportunity to present new evidence and a full and fair opportunity to ventilate the issues involved in the motion." *Corbin* v. *Time Warner Entertainment-Advance/Newhouse Partnership*, 821 F.3d 1069, 1083 (9th Cir. 2016) (internal quotation marks and citations omitted); *see also 650 Fifth Avenue*, 830 F.3d at 96-97.

The district court failed to provide any such notice here. The court suggested that defendants had notice by pointing to its earlier order directing defendants to "file complete copies of the contracts attached as exhibits" to their motion to compel arbitration, in lieu of the excerpted copies defendants had

41

first submitted. D. Ct. Dkt. 70, at 2. But in that order, the court made no mention of the missing approval, and plaintiffs had not raised the missing approval as a ground for refusing to enforce the agreement. Defendants thus reasonably interpreted the court's order to be asking for the same version of the Steelers agreement that had been attached to the previous declaration—just a complete rather than an excerpted copy. *See* Dkt. No. 82, at 13 n.7. In that order, the court provided no notice that it would find the agreement invalid as a result of the missing approval.

3. Regardless of the disposition of this appeal, the district court will have to consider the Commissioner-approved copy of the agreement on remand anyway. As the Fourth Circuit has explained, "no authority"—not the Federal Arbitration Act, the Federal Rules of Civil Procedure, or any other source of law—"limits a party to only one [motion to compel arbitration]." *Dillon* v. *BMO Harris Bank, N.A.*, 787 F.3d 707, 715 (2015); *see, e.g.*, *Rodgers-Rouzier* v. *American Queen Steamboat Operating Co., LLC*, Civ. No. 20-4, 2023 WL 2742377, at *7 (S.D. Ind. Mar. 31, 2023), *appeal pending*, No. 23-1812 (7th Cir.); *Mason* v. *Midland Funding LLC*, Civ. No. 16-2867, 2021 WL 3017990, at *4 n.5 (N.D. Ga. Mar. 23, 2021) (collecting cases). Accordingly, if the relevant portion of the district court's order is not vacated, defendants can still file a renewed motion to compel arbitration in the district court based on the Commissioner-approved version of the agreement.

42

There is no reason to lengthen the proceedings further by requiring defendants to leap through that unnecessary procedural hoop. The Court should vacate the district court's order in relevant part and direct the district court to consider the Commissioner-approved copy of the agreement on remand.

**B.    The Steelers Agreement Was Enforceable Under Pennsylvania Law Even Before The NFL Commissioner's Approval**

Even before the NFL Commissioner formally approved the Steelers agreement, the agreement was enforceable under Pennsylvania law because the parties performed under the agreement during the brief but customary period before signing and approval by the Commissioner. The district court erred when it refused to recognize as much.

1.    Mr. Flores and the Steelers clearly formed a valid contract under Pennsylvania law. In Pennsylvania, "[a]n agreement is a valid and binding contract if: the parties have manifested an intent to be bound by the agreement's terms; the terms are sufficiently definite; and there was consideration." *Trust Under Deed of Ott*, 271 A.3d 409, 416 (Pa. Super. Ct. 2021) (citation omitted). None of those elements are disputed here. The Steelers contract was thus valid without the Commissioner's signature.

At most, the Commissioner's approval was a condition to the parties' obligation to perform under the agreement. A contract condition "is an event, not certain to occur, which must occur, unless its non-occurrence is excused,"

43

before a contract comes into existence or a party must perform under it. *Allegheny Intermediate Unit* v. *East Allegheny School District*, 203 A.3d 371, 376 (Pa. Commw. Ct. 2019) (quoting Restatement (Second) of Contracts § 224); *see, e.g.*, *Village Beer & Beverage, Inc.* v. *Vernon D. Cox & Co.*, 475 A.2d 117, 122 (Pa. Super. Ct. 1984); 13 Richard A. Lord, *Williston on Contracts* §§ 38:4, 38:7, at 418-419, 435-439 (4th ed. 2013) (Williston).

As with other contractual requirements, a condition may be excused, *see Universal Builders, Inc.* v. *Moon Motor Lodge, Inc.*, 244 A.2d 10, 17 (Pa. 1968), including by "continuing to perform or accepting performance under the contract and receiving the benefit of it," even though the party knew or had reason to know of the non-occurrence of the condition. 13 Williston § 39:31, 39:34, at 697, 709-711; *see, e.g.*, *Poch* v. *Equitable Life Assurance Society*, 22 A.2d 590, 594-595 (Pa. 1941); Restatement (Second) of Contracts § 246(1). Indeed, "few principles of contract law" are "better established, or more uniformly acknowledged." 13 Williston § 39:31, at 698.

Here, there is no dispute that both parties continued to perform and accept performance under the agreement during the customary period between signing and approval by the Commissioner. Accordingly, under Pennsylvania law, Mr. Flores and the Steelers can be deemed to have bound themselves to the agreement's terms during that period. The district court erred by holding

44

that the absence of the Commissioner's immediate approval rendered the Steelers agreement unenforceable.

2.     The district court refused to consider the effect of the parties' performance, reasoning that such an argument would be a "new legal theory" that the defendants had failed to raise in their prior briefing. S.A. 36. But the defendants had no reason to raise that argument earlier in the proceedings, because Mr. Flores did not challenge the validity of the agreement based on the missing approval. It was only after the district court raised that "new legal theory" on its own that the issue of performance had any relevance. And once the court did so, it was required to give the parties an opportunity to be heard on that issue. It was erroneous for the court to deprive defendants of that opportunity by refusing to consider the performance argument. *See Ethridge*, 49 F.4th at 688-689; *ING Bank N.V.*, 892 F.3d at 525.

In a footnote, the district court also suggested that the argument would fail because defendants had not introduced evidence of the parties' performance. S.A. 36 n.4. But neither party ever disputed that there had been performance under the agreement—for instance, that Mr. Flores had provided his coaching services to the Steelers or that the Steelers had paid his compensation. In any event, the court *did* have evidence of the parties' performance: defendants submitted the approved copy of the agreement, which was identical to the previously submitted copy and had an effective date in February

45

2022. D. Ct. Dkt. 73-4. And in its initial decision on the motion to compel arbitration, the district court relied on a source stating that Mr. Flores had served as a coach for the Steelers for a season. S.A. 9 n.9; *see Force* v. *Facebook, Inc.*, 934 F.3d 53, 59 & n.5 (2d Cir. 2019) (taking judicial notice of a private company's website, the authenticity of which was not in question).

For those reasons, the district court should have given effect to the agreement under Pennsylvania law. The court thus erred by holding that the unapproved copy of the Steelers agreement was unenforceable, even after the court erroneously declined to consider the approved copy submitted by defendants after the court raised the approval issue on its own initiative.

*    *    *    *    *

Although the district court was correct to compel arbitration of plaintiffs' claims against the other NFL member clubs, the court erred by declining to compel arbitration of Mr. Flores's claims against the Broncos, Giants, and Texans, and his related claims against the NFL. The district court denied that portion of defendants' motion to compel arbitration only by raising two issues on its own initiative and then declining to give the parties a full and fair opportunity to respond to the court's concerns. Under a proper understanding of Massachusetts law, the arbitration provisions in the NFL Constitution were not illusory, and Mr. Flores was required to arbitrate his claims against the Broncos (and the related claims against the NFL) pursuant to his agreement

46

47

with the Patriots.  In addition, the district court erred by declining to enforce Mr. Flores's employment agreement with the Steelers, which required Mr. Flores to arbitrate his claims against the Giants and the Texans.  This Court should correct those errors and remand for further proceedings.

## CONCLUSION

The district court's order of March 1, 2023, denying in part appellants' motion to compel arbitration, and its order of July 25, 2023, denying appellants' motion for reconsideration, should be vacated in relevant part and the case remanded for further proceedings.

Respectfully submitted,

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

LORETTA E. LYNCH
BRAD S. KARP
LYNN B. BAYARD
BRETTE TANNENBAUM
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

DECEMBER 5, 2023

48

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1(a)(4), that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 10,785 words.

DECEMBER 5, 2023

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM

# SPECIAL APPENDIX

# TABLE OF CONTENTS

Page

District court opinion and order on defendants' motion
    to compel arbitration, Mar. 1, 2023..............................................................SA-1

District court opinion and order on the parties' cross-motions
    for reconsideration, July 25, 2023 ..............................................................SA-31

**SA-1**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

BRIAN FLORES, STEVE WILKS, and RAY    :
HORTON, as Class Representatives, on    :
behalf of themselves and all others similarly    :
situated,    :
   :
                      Plaintiffs,    :
      -against-    :
   :
THE NATIONAL FOOTBALL LEAGUE; NEW    :
YORK FOOTBALL GIANTS, INC. d/b/a NEW    :
YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a  :
MIAMI DOLPHINS; DENVER BRONCOS    :
FOOTBALL CLUB d/b/a DENVER BRONCOS;  :
HOUSTON NFL HOLDINGS, L.P. d/b/a    :
HOUSTON TEXANS; ARIZONA CARDINALS  :
FOOTBALL CLUB LLC d/b/a ARIZONA    :
CARDINALS; TENNESSEE TITANS    :
ENTERTAINMENT, INC. d/b/a TENNESSEE,  :
TITANS and JOHN DOE TEAMS 1 through 26,  :
   :
                   Defendants.   :

---------------------------------------------------------------X

22-CV-0871 (VEC)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/01/2023

VALERIE CAPRONI, United States District Judge:

This case shines an unflattering spotlight on the employment practices of National Football League ("NFL") teams. Although the clear majority of professional football players are Black, only a tiny percentage of coaches are Black. In 2002, to much hoopla, the NFL announced that it was going to do something about the paucity of Black coaches.[1] Its solution was to adopt the so-called "Rooney Rule." The Rooney Rule as originally adopted required any NFL team looking to hire a head coach to interview at least one minority candidate. The

---

[1] *See* Gus Garcia-Roberts, *The Failed NFL Diversity 'Rule' Corporate America Loves*, Wash. Post (Oct. 4, 2022), https://www.washingtonpost.com/sports/interactive/2022/rooney-rule-nfl-black-coaches/; Dave Anderson, *Sports of The Times; Minority Candidates Should Get Fairer Shake*, N.Y. Times (Dec. 16, 2003), https://www.nytimes.com/2003/12/16/sports/sports-of-the-times-minority-candidates-should-get-fairer-shake.html?searchResultPosition=7.

**SA-2**

Amended Complaint in this case alleges that, however laudable the intent, the Rooney Rule has devolved into a cruel sham, with Black candidates being interviewed for positions that the team has already decided will be filled by a white candidate and with Black coaches being treated more harshly vis-à-vis employment decisions than similarly-situated white coaches. *See* Am. Compl., Dkt. 22.

Three Black men who are current or former NFL coaches have sued the NFL and several member teams for racial discrimination in violation of 42 U.S.C. § 1981, the New York State Human Rights Law, the New York City Human Rights Law, and the New Jersey Law Against Discrimination. *See* Am. Compl. Defendants moved to compel arbitration and to stay the current proceedings, Mot. to Compel Arbitration, Dkt. 47, and Plaintiffs opposed the motion, Pls. Opp., Dkt. 62. For the reasons discussed below, the motion to compel arbitration is GRANTED except as to the Brian Flores's claims against the New York Giants, the Houston Texans, the Denver Broncos, and his related claims against the NFL, as to which the motion is DENIED.

## BACKGROUND[2]

The NFL is an unincorporated association of thirty-two professional football clubs. Defs. Mem., Dkt. 48 at 4. Although each club is a separate legal entity, the clubs are governed by a shared set of NFL rules and policies, including the NFL Constitution. *See generally* Second DiBella Decl. Ex. 1 ("NFL Const. & Bylaws"), Dkt. 73. The NFL is overseen by a Commissioner, currently Roger Goodell, who is appointed by member teams. *See* NFL Const. & Bylaws Art. VIII; Pls. Opp. at 3.

---

[2] Although not raised by the parties, recent case law seems to suggest that there is some disagreement among courts in this circuit concerning the appropriate standard to apply on a pre-discovery motion to compel arbitration. *Compare Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (applying a summary judgment standard) *with Aleksanian v. Uber Techs. Inc.*, 524 F. Supp. 3d 251, 258 (S.D.N.Y. 2021) (applying a motion to dismiss standard). Because the parties do not dispute the material facts relevant to the motion to compel arbitration, the Court need not resolve this apparent conflict for the purposes of this motion.

SA-3

## A. Plaintiffs' Allegations of Discrimination in the NFL

Brian Flores, Steve Wilks, and Ray Horton are Black men who allege that they have each been discriminated against when employed or when seeking to be employed as coaches for NFL teams. Am. Compl. ¶ 1. Messrs. Flores and Horton allege that several NFL teams interviewed them for head coaching positions solely to fulfill the so-called "Rooney Rule" without any intent of hiring them.[3] *See id.* at ¶¶ 185, 200–05, 271–73.

### 1. Brian Flores

Mr. Flores alleges that he was a victim of racial discrimination on four distinct occasions.

Mr. Flores first alleges that the Denver Broncos interviewed him in 2019 solely to satisfy the Rooney Rule without actually considering him for its head coach position. *Id.* ¶¶ 200–05.

Mr. Flores next alleges that when he was head coach of the Miami Dolphins, Dolphins owner Stephen Ross attempted to bribe him (i) to lose games so the Dolphins would get the first pick in the next year's draft and (ii) to recruit "a prominent quarterback in violation of League tampering rules." *Id.* ¶ 168; *see also id.* ¶¶ 161–63. When Mr. Flores refused both requests, he was stigmatized as an "angry black man" and ultimately fired. *Id.* ¶¶ 175, 177. Mr. Flores further alleges that the Dolphins provided him with an improper separation agreement, failed to pay him contractually-required severance pay in violation of his employment contract, and instituted arbitration proceedings against him to claw back his wages as retaliation for filing this lawsuit. *Id.* ¶¶ 220–26.

---

[3]     Of course, non-compliance with the Rooney Rule is not, itself, actionable. Nevertheless, Plaintiffs' allegations that teams conducted sham interviews, if proven, could undercut any defense predicated on the teams showing that Black candidates were "considered" for all open positions.

3

**SA-4**

Mr. Flores further alleges that, in January 2022, the New York Giants invited him to interview for the position of head coach, but the Giants had already selected Brian Daboll.[4]  *Id.* ¶¶ 182–88.

Finally, Mr. Flores claims that the Houston Texans removed him from consideration for their head coach position solely as retaliation for filing the instant lawsuit.  *Id.* ¶¶ 207–13.

### 2. Steve Wilks

Steve Wilks alleges that the Arizona Cardinals hired him as a "bridge coach," meaning a coach "who is not given a meaningful opportunity to succeed and is simply 'keeping the seat warm' until . . . a new coach is brought in."  *Id.* ¶ 233; *see also id.* ¶ 232.  Mr. Wilks alleges that, despite a strong coaching performance "under extremely difficult circumstances" — including the arrest of Cardinals' General Manager Steve Keim, a weak roster featuring a rookie quarterback who had been drafted over Mr. Wilks's objection, and pressure to lose games to improve the Cardinals' position in the NFL draft — he was wrongfully terminated.  *Id.* ¶ 247; *see also id.* ¶¶ 19, 240, 250.  Mr. Wilks alleges that the Cardinals fired him as the "fall guy" for failures that were attributable in significant part to Mr. Keim, before hiring Kliff Kingsbury, a white man, as head coach.  *See id.* ¶¶ 258–60.

### 3. Ray Horton

In January 2016, while he was the Tennessee Titans' defensive coordinator, Mr. Horton interviewed to be the Titans' head coach.  *Id.* ¶¶ 266, 271–73.  Mr. Horton alleges that the Titans only offered him the interview to comply with the Rooney Rule, as the Titans had already decided to hire Mike Mularkey, a white man, when they interviewed Mr. Horton.  *Id.* ¶¶ 273–78.

---

[4]    Before Mr. Flores interviewed for the position he received a text from Bill Belichik, the New England Patriots' head coach, congratulating him for getting the job.  Am. Compl., Dkt. 22 ¶¶ 186–87.  Mr. Belichik appears to have confused Brian Daboll, who was hired as the Giants' head coach, with Brian Flores, who was not.  *Id.*

4

SA-5

In a 2020 interview, Mr. Mularkey stated that Amy Adams Strunk, the Titans' controlling owner, told him that he was going to be the head coach before they "went through the Rooney rule." *Id.* ¶ 280; *see also id.* ¶ 272. Mr. Horton further alleges that his unsuccessful interview with the Titans branded him as a "stale" candidate and interfered with him receiving additional interviews for head coach positions. *Id.* ¶ 284.

## B. Plaintiffs' Employment Contracts

Messrs. Flores, Wilks, and Horton each had an employment contract with each team he coached. *See* Pls. Opp. at 3; Defs. Mem. at 6. The NFL was not a party to those contracts. The NFL Commissioner was, however, required to approve each contract. *See* Defs. Mem. at 3, 21; *see also, e.g.*, Second DiBella Decl. Ex. 4 ("Flores-Steelers Agreement"), Dkt. 73 § 12. In each contract, each Plaintiff acknowledged that he had read the NFL Constitution and Bylaws and agreed to be bound by them. *See* Pls. Opp. at 9; *see also, e.g.*, Second DiBella Decl. Ex. 2 ("Flores-Dolphins Agreement"), Dkt. 73 § 7.1; Second DiBella Decl. Ex. 7 ("Horton-Titans Agreement"), Dkt. 73 § 6(a)–(c); Second DiBella Decl. Ex. 5 ("Wilks-Cardinals Agreement"), Dkt. 73 § 9(a).

While the exact text of those contracts varies, in relevant part each agreement provides that the NFL Commissioner will oversee an alternative dispute resolution process for all disputes arising between the parties. *See, e.g.*, Flores-Dolphins Agreement § 12.2; Horton-Titans Agreement § 6(a); Wilks-Cardinals Agreement § 10(a). Mr. Wilks's contract with the Cardinals also included a clause delegating any disputes regarding whether the contracts were "void or voidable" to the arbitrator. *See* Wilks-Cardinals Agreement § 10(e).

5

**SA-6**

## LEGAL STANDARD

Pursuant to Section 2 of the Federal Arbitration Act ("FAA"), "agreements to arbitrate [are] 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"[5] *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). "[B]efore an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties. This question is determined by state contract law." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (citing *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)) (internal citation omitted).

If an arbitration agreement exists, the Court must also determine "whether the dispute falls within the scope of the arbitration agreement." *Meyer*, 868 F.3d at 74 (internal quotation omitted). Because of the "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). *See also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (Sotomayor, J.) ("[A]rbitration is indicated unless it can be said with positive assurance that an arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *Id.* (internal quotation omitted).). In light of the "liberal federal policy favoring arbitration agreements . . . arbitration agreements should be enforced according to their terms unless the FAA's mandate has been

---

[5]     Plaintiffs do not dispute that the Federal Arbitration Act ("FAA") applies to the parties' agreement to arbitrate. Pls. Opp., Dkt. 62 at 5 (citing the FAA).

6

overridden by a contrary congressional command." *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 295 (2d Cir. 2013) (cleaned up).[6]

An agreement to arbitrate arbitrability is "an additional, antecedent agreement" that is also covered by the FAA. *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010)). Unlike other agreements to arbitrate, for which there is a presumption in favor of finding the parties agreed to arbitration, "the law reverses the presumption" for agreements to arbitrate arbitrability. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1955). Accordingly, "the issue of arbitrability may only be referred to the arbitrator if there is *clear and unmistakable evidence* from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002)).

## DISCUSSION

Plaintiffs acknowledge that they entered into employment agreements with several of the Defendant teams and that those agreements provide an alternative dispute resolution process. Plaintiffs argue, however, that the alternative dispute resolution agreements are invalid or do not encompass their claims, or, if they are valid and do encompass their claims, they are unenforceable. *See, e.g.*, Pls. Opp. at 4 n.2, 8–9, 15–16, 24. For the reasons discussed below, the Court finds that Mr. Flores's claims against the Dolphins, Mr. Wilks's claims against the

---

[6] Section 1981 of the Civil Rights Act of 1866 does not indicate a Congressional intent to override the FAA's policy toward the enforcement of arbitration agreements. *See Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 65, 67–68 (2010) (applying the FAA to plaintiff's section 1981 claim).

Cardinals, and Mr. Horton's claims against the Titans must be submitted to arbitration; Mr.

Flores may, however, litigate his claims against the Broncos, Giants, and Texans in federal court.

## I. Plaintiffs' Claims, Except Those Against the Giants and Texans, Are Covered by the Parties' Arbitration Agreements

Each employment agreement selected the law of the state in which the team was based as

the governing law.[7]  *See* Defs. Mem. at 3 n.2.  Pursuant to the applicable state laws, the Court

finds that Plaintiffs' claims, except for Mr. Flores's claims against the Giants and Texans, fall

within the scope of the parties' arbitration agreements.[8]

### A. Brian Flores

Mr. Flores has sued four different football teams: the Denver Broncos, Miami Dolphins,

New York Giants, and Houston Texans.  From 2008 until February 3, 2019, Mr. Flores was a

coach for the New England Patriots.  Am. Compl. ¶ 157; Defs. Mem. at 5.  While under contract

to the Patriots, he interviewed for the Broncos' head coach position, but he was not hired.  Am.

Compl. ¶¶ 200–04.  From 2019 until January 10, 2022, Mr. Flores was the Dolphins' head coach.

*Id*. ¶¶ 158, 177.  After being fired by the Dolphins, Mr. Flores interviewed for the Giants' and

Texans' head coach position but was not hired by either team.  *Id*. ¶¶ 179, 184, 191, 207, 216.

This lawsuit was filed on February 1, 2022, Compl., Dkt. 1, and on February 18, 2022, the

---

[7]      The Court applies the law of the state selected by the applicable choice of law provisions in each contract. The choice of law clauses are enforceable because each employment contract selects the law of the state in which the Defendant team is based and in which each coach was employed; consequently, "the chosen law bears a reasonable relationship to the parties or the transaction."  *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 641 (2d Cir. 2016) (quoting *Welsbach Elec. Corp v. MasTec N. Am., Inc.*, 859 N.E.2d 498, 500 (2006)).

[8]      Mr. Flores's claims against the Broncos fall within the scope of the applicable arbitration agreement, but the agreement is not enforceable for reasons discussed *infra*, section III(A).

8

**SA-9**

Pittsburgh Steelers hired Mr. Flores as "the senior defensive assistant and linebackers coach,"

Defs. Mem. at 18; *see also* Flores-Steelers Agreement at 1.[9]

Defendants argue that, even though Mr. Flores never contracted with the Giants, Broncos, or Texans, his claims against those teams are nevertheless subject to arbitration pursuant to the NFL Constitution as incorporated into his contracts with the Patriots, Dolphins, and Steelers. *See* Defs. Mem. 18, 20 n.3. For the reasons explained below, the Court finds that only Mr. Flores's contract with the Dolphins and Patriots contain valid arbitration agreements relevant to his claims, and there is no binding arbitration agreement in Mr. Flores's contract with the Steelers.

### 1. Mr. Flores's Claims Against the Broncos

Mr. Flores alleges that the Denver Broncos discriminated against him because of his race when they failed to hire him. Mr. Flores argues that he is not required to arbitrate his claims against the Broncos because he never specifically agreed to arbitrate claims against the Broncos. *See* Pls. Opp. at 24. At the time Mr. Flores interviewed with the Broncos, he was under contract with the New England Patriots; in his contract with the Patriots, he expressly agreed to abide by the NFL Constitution, which was "made a part of th[e] Agreement." Second DiBella Decl. Ex. 3 ("Flores-Patriots Agreement"), Dkt. 73 § 15; *see also NSTAR Elec. Co. v. Dep't of Pub. Utilities*, 968 N.E.2d 895, 905–06 (Mass. 2012) (holding that a contract incorporates a document by reference where it "clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract," *id*. at 905 (internal quotation omitted)).

---

[9]    Mr. Flores now appears to be the Minnesota Vikings' defensive coordinator. *See* Craig Peters, *Vikings Hire Brian Flores as Defensive Coordinator*, Vikings.com (Feb. 6, 2023, 5:25 P.M.), https://www.vikings.com/news/brian-flores-defensive-coordinator-hired-2023.

Section 8.3 of the NFL Constitution contains an arbitration provision that is broader than the one contained in the employment contracts; it grants the NFL Commissioner "full, complete and final jurisdiction and authority to arbitrate" several types of disputes. As is relevant here, the NFL Commissioner has jurisdiction to arbitrate "[a]ny dispute between any . . . coach . . . and any member club or clubs." NFL Const. & Bylaws § 8.3(B).

Mr. Flores's claims against the Broncos plainly constitute a "dispute between any . . . coach . . . and any member club." *Id*. Mr. Flores's contract with the Patriots bound him to follow the NFL Constitution while he was employed by the Patriots, including its provision giving the Commissioner sole authority to arbitrate any dispute with an NFL team. *See* Flores-Patriots Agreement § 15; Pls. Opp. at 24 (acknowledging that Mr. Flores was under contract with the Patriots when he interviewed with the Broncos).

Defendants also argue that the arbitration agreement in the NFL Constitution, as incorporated into Mr. Flores's 2019 contract with the Miami Dolphins, retroactively applies to Mr. Flores's claims against the Broncos, which arose before he became the Dolphins' head coach. *See* Defs. Mem. at 18. Courts, however, have "refused to compel arbitration of claims arising from disputes which arose outside of the effective dates of arbitration agreements," unless the agreement expressly includes claims preceding the contract. *Klay v. All Defendants*, 389 F.3d 1191, 1203 (11th Cir. 2004); *see also Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1271 n.1 (11th Cir. 2017) (arbitration agreement that explicitly encompassed past claims could be interpreted to include disputes over plaintiff's "previous attempts at employment."); *Baptist Hosp. of Miami, Inc. v. Media Healthcare Plans, Inc.*, 376 F. Supp. 3d 1298, 1308–10 (S.D. Fla. 2019) (applying Florida law and collecting cases).[10]

---

[10]  Even if the NFL Constitution, as incorporated into Flores-Dolphins contract, could be interpreted to retroactively apply to claims against teams that arose before the contract's effective date, the arbitration agreement

SA-11

Defendants finally argue that Mr. Flores must arbitrate his claims against the Broncos because the NFL's alleged systemic racism was already in full force while Mr. Flores was under contract to the Patriots.[11]  Defs. Mem. at 18–20.  The Court disagrees.

Despite the long historic narrative in the Amended Complaint reciting historical racism in the NFL, the gravamen of Mr. Flores's claim is not that the NFL is generally racist.  Rather, Mr. Flores claims that specific adverse employment decisions were driven by discriminatory animus harbored by the NFL and member teams.  Defendants' argument, taken to its logical extreme, would bind a coach forever to arbitration, even if he were never again employed by a team in the NFL, so long as the NFL had a practice of inflicting similar harm on other coaches while that coach was under contract.  Defendants cite no cases, and research has revealed none, that endorse the idea of an endless agreement to arbitrate future disputes with legally distinct entities.

### 2.  Mr. Flores's Claims Against the Miami Dolphins

Mr. Flores alleges that the Dolphins discriminated against him while he was employed by the Dolphins and shortly thereafter.  The employment contract between Mr. Flores and the Dolphins provides that "all matters in dispute" between Mr. Flores and the Dolphins "including, without limitation, any dispute arising from the terms of this Agreement, Employee's employment with the Club, or otherwise, shall be referred to the Commissioner of the NFL for

---

would be unenforceable for unconscionability under Florida law.  *See* Second DiBella Decl. Ex. 2 ("Flores-Dolphins Agreement"), Dkt. 73 § 19 (selecting Florida law).  Mr. Flores had no power to modify the NFL Constitution, and Defendants did not commit to providing Mr. Flores notice of any changes to the NFL Constitution.  *See* Flores-Dolphins Agreement § 7.1 ("Employee . . . agrees . . . to be bound by[] the Constitution, Bylaws, and the Rules and Regulations of the NFL (as they now exist or as they may be amended) . . . ."); Second DiBella Decl. Ex. 1 ("NFL Const. & Bylaws"), Dkt. 73 Art. 25 (setting forth the procedures for amendment of the NFL Constitution).  Courts applying Florida law have held that a contract is illusory, and thus, unenforceable, where one party can modify the terms of that contract without notifying the other party.  *See Diverse Elements, Inc. v. Ecommerce, Inc.*, 5 F. Supp. 3d 1378, 1382 (S.D. Fla. 2014) (collecting cases); *Centennial Bank v. ServisFirst Bank, Inc.*, 2022 WL 10219893, at *31 (M.D. Fla., Oct. 10, 2022) ("[A] contract once entered into may not thereafter be unilaterally modified as subsequent modifications require consent . . . ."  *Id.* at *31 (citations omitted)).

[11]     Defendants make a similar argument with respect to Mr. Flores's claims against the Giants and the Texans, *see* Defs. Mem., Dkt. 48 at 18–20, which the Court rejects for the same reasons.

11

SA-12

binding arbitration . . . ." Flores-Dolphins Agreement § 12.2.  Mr. Flores does not dispute that this agreement was binding or that his claims alleging discrimination while he was a coach and when he was fired fall within the scope of his arbitration agreement with the Dolphins.  He argues, however, that his claims regarding the Dolphins' retaliatory conduct after he was fired do not fall within the scope of the contract's arbitration agreement.  Pls. Opp. at 25.

There is a "presumption in favor of postexpiration arbitration of matters . . . arising out of the relation governed by the contract." *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 204 (1991) (internal citation omitted); *see also Doctors Assocs., Inc. v. Thomas*, 898 So.2d 159, 162 (Fla. Dist. Ct. App. 2005) (arbitration agreements govern disputes arising after the termination of a contract that does not explicitly exclude post-termination disputes).

Mr. Flores's retaliation claim against the Dolphins is subject to arbitration because it clearly arises from his employment with the club.  Florida courts have interpreted the "arising from" requirement to require arbitration of an employee's claims where the "breach in question was an immediate, foreseeable result of the performance of contractual duties." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011) (internal quotation omitted); *see also Maglana v. Celebrity Cruises, Inc.*, No. 20-14206, 2022 WL 3134373, at *4–5 (11th Cir. Aug. 5, 2022); *Phillips v. NCL Corp. Ltd.*, 824 F. App'x 675, 679 (11th Cir. 2020).

Disputes regarding the payment of wages or the terms of separation are "a fairly direct result of the performance of contractual duties" in an employment relationship. *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001) (noting that an "intentional failure to perform the contract" is subject to arbitration).  Upon embarking on an employment relationship, both employee and employer can anticipate that the employee may be

12

fired and that disputes may arise regarding an employee's wages or the employer's retaliatory conduct.

In *Milestone v. Citrus Specialty Grp., Inc.*, No. 19-CV-2341, 2019 WL 5887179, at \*2 (M.D. Fla. Nov. 12, 2019), the court found that an employee's claims of discrimination and retaliation were arbitrable under Florida law because "the claims were dependent upon the plaintiffs' employment's status and could not be brought in the absence of the employment relationship governed by the agreements." *Id.* (quoting *McAdoo v. New Line Transp., LLC*, No. 16-CV-1917, 2017 WL 942114, at \*4 (M.D. Fla. Mar. 9, 2017) (cleaned up); *see also Ravelo v. Shutts & Bowen, LLP*, No. 09-CV-865, 2009 WL 1587272, at \*1–2 (M.D. Fla. July 11, 2009) (holding that plaintiffs' racial discrimination and retaliation claims were subject to arbitration).

### 3. Mr. Flores's Claims Against the Giants and Texans

Defendants argue that the arbitration clause in Mr. Flores's contract with the Steelers applies retroactively to any claims accrued against the NFL or member teams before he was hired by the Steelers. Defs. Mem. at 20 n.3. Even if the Defendants are correct on that point, Defendants have failed to establish that Mr. Flores entered into a valid arbitration agreement when he was hired by the Steelers.

The Flores-Steelers Agreement required the approval of the NFL Commissioner before it became effective. *See* Flores-Steelers Agreement § 12 ("This Agreement shall become valid and binding upon each party only when and if it shall be approved by the Commissioner of the NFL."). The version of the Flores-Steelers Agreement submitted to the Court never became binding upon Mr. Flores or the Steelers because the Commissioner never signed it. *See* Flores-Steelers Agreement at 7.

13

**SA-14**

In their June 21, 2022, brief, Defendants noted that the contract was still awaiting the Commissioner's approval; more than a year after the contract's purported effective date, Defendants have failed to provide the Court with any evidence that the contract has been approved by Commissioner Goodell. *See* Defs. Mem. at 9. On February 1, 2023, the Court ordered Defendants to re-submit Plaintiffs' contracts due to omissions in the original submissions, *see* Order, Dkt. 70; Defendants once again submitted a version of the Flores-Steelers Agreement that lacked Commissioner Goodell's signature and attested that it was "a true and correct copy" of the Agreement, *see* Second DiBella Decl., Dkt. 73 ¶ 5; Flores-Steelers Agreement at 7.

"The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (collecting cases). Even where the party opposing arbitration admits that he is subject to an arbitration agreement, the moving party bears the burden of demonstrating that a valid arbitration agreement exists. *See Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*, 349 F. App'x 551, 552–53 (2d Cir. 2009). Defendants have failed to carry that burden with respect to Mr. Flores's claims against the Giants and Texans because they have failed to prove that an arbitration agreement was in effect when or after Mr. Flores was being considered for hire by those teams. *See id.* Accordingly, Mr. Flores may litigate his claims against the Giants and Texans, and his related claims against the NFL, in federal court.[12]

---

[12] Because the Court finds that at least some claims may proceed in federal court, it need not address whether the arbitration agreement requires arbitration on an individual basis, as Mr. Flores retains the ability to pursue a class action in federal court.

14

SA-15

### B. Steve Wilks

Mr. Wilks signed an employment agreement with the Cardinals in which both the Cardinals and Mr. Wilks agreed to arbitrate "all disputes, claims or controversies that exist or that may arise between them." Wilks-Cardinals Agreement § 10(a). Mr. Wilks also agreed to arbitrate "any claim that all or any part of this Agreement is void or voidable." *Id.* § 10(e).

Where, as here, the parties have agreed that the arbitrator will decide issues regarding whether the arbitration agreement is "void or voidable," they have "clearly and unmistakably" delegated to the arbitrator the power to determine whether their dispute is subject to arbitration. *See Rent-A-Center, West, Inc.*, 561 U.S. at 66, 69–70 (delegating arbitrability dispute where the delegation clause encompassed claims regarding whether the arbitration agreement was "void or voidable"); *see also Ward v. Ernst & Young U.S. LLP*, 468 F. Supp. 3d 596, 603 (S.D.N.Y. 2020) (same). This includes the power to decide whether the arbitration agreement as a whole is unenforceable for unconscionability or any other applicable contract defense. *See Rent-A-Center, West, Inc.*, 561 U.S. at 73–75.

Because neither party discussed the delegation clause in their original submissions, on February 1, 2023, the Court ordered supplemental briefing regarding the enforceability of the delegation provision. *See* Order, Dkt. 70 at 2. In response, Mr. Wilks argued that Defendants had waived their right to seek arbitration of the threshold question of arbitrability by failing to raise the issue in their moving papers or reply and that allowing the Commissioner to decide the threshold issue of arbitrability would be operationally problematic and unconscionable. Pls. Supp. Br., Dkt. 75 at 1. Defendants' failure to raise the issue does not constitute a waiver of their right to enforce the delegation clause, and neither of Plaintiffs' other arguments is persuasive.

15

**SA-16**

The Supreme Court has recently made clear that federal courts should not condition waiver of the right to compel arbitration on a showing of prejudice; instead, the Court held that the focus must be on the defendants' conduct. *See Morgan v. Sundance*, 142 S. Ct. 1708, 1712–13 (2022). Following *Morgan*, the Second Circuit has held that delay alone — even a delay of nearly three years — is insufficient to constitute waiver when the parties had not engaged in substantive litigation before the defendant belatedly sought arbitration. *Nicosia v. Amazon.com, Inc.*, No. 21-2624, 2023 WL 309545, at *4 n.2 (2d Cir. Jan. 19, 2023).[13]

Consequently, the fact that Defendants failed to raise the issue of the delegation clause for nearly eight months after their opening brief was filed (and then only when prompted by the Court) does not waive their right to enforce the delegation clause when no other substantive litigation has occurred. "Mere silence, oversight or thoughtlessness . . . is insufficient to support an inference of waiver." *Herrera v. Manna 2nd Ave. LLC*, No. 20-CV-11026, 2022 WL 2819072, at *8 (S.D.N.Y. July 18, 2022); *see also Powell v. Vroom, Inc.*, No. 22-CV-302, 2022 WL 4096872, at *7 (N.D. Ala. Sept. 7, 2022) (holding that defendant did not waive its right to enforce the delegation clause in the parties' contract by initially submitting the threshold question of delegation to the court). Furthermore, "any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration," including "allegation of waiver . . . ." *Moses H. Cone Mem. Hosp.*, 460 U.S. at 24–25.

Plaintiffs finally argue that allowing Commissioner Goodell to arbitrate any threshold questions of arbitrability would be unconscionable because he will inevitably be biased. Pls.

---

[13] Plaintiffs contend that because the Wilks-Cardinals agreement selects Arizona law, Arizona law governs the question of waiver. *See* Second DiBella Decl. Ex. 5 ("Wilks-Cardinals Agreement"), Dkt. 73 § 23; Pls. Supp. Br., Dkt 75 at 1, 1 n.1. Plaintiffs are incorrect. Whether Defendants waived their right to compel arbitration is governed by federal waiver law, and, thus, the issue is controlled by the law of this circuit. *See Morgan v. Sundance*, 142 S. Ct. 1708, 1712–13 (2022).

16

Supp. Br. at 4.  Plaintiffs have not pointed to a single case, and research has revealed none, that

applied Arizona law to find that an arbitration agreement was unenforceable because there was a

risk that the arbitrator the parties jointly selected may be biased.[14]  Rather, Arizona courts have

focused on whether the arbitration provision is "fundamentally unfair" because it "grants one

party to the arbitration unilateral control over the pool of arbitrators."  *Arnold v. Standard Pac. of

Ariz. Inc.*, No. 16-CV-452, 2016 WL 4259762, at *3 (D. Ariz. Aug. 12, 2016) (citing *McMullen

v. Meijer, Inc.*, 355 F.3d 485, 494 (6th Cir. 2004)) (cleaned up); *see also Gullet on behalf of

Estate of Gullet v. Kindred Nursing Ctrs. W., L.L.C.*, 390 P.3d 378, 359 (Ariz. Ct. App. 2017)

(holding that arbitration was not substantively unconscionable for lack of neutrality where, *inter

alia*, the employer did not have unilateral control over the arbitration selection process).

Because arbitration is a matter of contract, Plaintiffs cannot ask the Court to provide them

with an arbitrator who is more neutral than the one to whom they agreed.  *See Nat'l Football

League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir.

2016).  Indeed, the Arizona legislature has only precluded individuals with "a known, direct and

material interest in the outcome of the arbitration proceeding" from serving as an arbitrator

where the agreement itself requires the arbitrator to be neutral.  Ariz. Rev. Stat. § 12-3011(B).

### C.  Ray Horton

Mr. Horton's employment contract with the Tennessee Titans, which was in effect when

he interviewed for the Titans' head coach position, states: "all matters in dispute between [Mr.

---

[14]     Because the Court finds that it would not be unconscionable for Commissioner Goodell to serve as the arbitrator, it follows that it is not "operationally problematic" to allow Commissioner Goodell to make the threshold determination of whether arbitration of the dispute should be delegated to JAMS.  Pls. Supp. Br., Dkt. 75 at 4–5.

SA-18

Horton] and Titans shall be referred to the Commissioner . . . . " Horton-Titans Agreement § 6(a).[15]

Mr. Horton argues that clause is insufficient to constitute an arbitration agreement. Pls. Opp. at 4 n.2. It is, of course, black letter law that a contract does not have to use the word "arbitration" in order to be an arbitration agreement. *See McDonnell Douglas Fin. Corp v. Penn. Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988). The Second Circuit has held that an agreement that "manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution" is an arbitration agreement."[16] *Id.*; *see also Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 143 (2d Cir. 2013). Mr. Horton's contract with the Titans, bare bones though it may be, satisfies those requirements: the parties agreed to submit any disputes to the NFL Commissioner and that his decision would be binding. *See* Horton-Titans Agreement § 6(a).

Mr. Horton's claims against the Titans clearly fall within the scope of the arbitration agreement, which broadly encompasses "all matters in dispute" between Mr. Horton and the Titans. Horton-Titans Agreement § 6(a). Plaintiffs do not argue otherwise. Accordingly, there is a valid arbitration agreement applicable to Mr. Horton's claims against the Titans.

---

[15] While Defendants assert that Mr. Horton is also subject to arbitration pursuant to the NFL Constitution as incorporated into the Horton-Titans Agreement, the only version of the NFL Constitution that is in the record did not go into effect until September 2016, after Mr. Horton was no longer employed by the Titans. *See* Second DiBella Decl., Dkt. 73 ¶ 2; Am. Compl. ¶ 266. Thus, there is no record evidence of an arbitration provision in the NFL Constitution would encompass Mr. Horton's claim against the Titans.

[16] Although the applicable state law governs questions of contract formation, the Second Circuit has held that courts should apply federal common law in determining whether the form of alternative dispute resolution to which the parties have agreed is arbitration as contemplated by the FAA. *See Bakoss v. Certain Underwriters at Lloyds of London Issuing Certificate No. 0510135*, 707 F.3d 140, 143 (2d Cir. 2013) ("[F]ederal common law provides the definition of 'arbitration' under the FAA."); *but see Portland Gen. Elec. Co. v. U.S. Bank Trust Nat. Ass'n as Tr. for Trust No. 1*, 218 F.3d 1085, 1086 (9th Cir. 2000) (courts should look to state law in defining arbitration).

18

## II.     The Arbitration Agreements Apply to Plaintiffs' Claims Against the NFL

Plaintiffs argue that their arbitration agreements with the hiring teams do not apply to their disputes with the NFL because the arbitration agreements in the parties' contracts and the NFL Constitution do not explicitly include claims against the NFL. Pls. Opp. at 19. The applicable state laws, however, estop Plaintiffs from avoiding arbitration of their claims against the NFL in light of their allegations that the NFL and the Defendant teams were jointly engaged in the alleged discrimination and retaliation. *See Doe v. Trump Corp.*, 6 F.4th 400, 412 n.8 (2d Cir. 2021) ("[S]tate law governs whether a non-signatory may enforce an arbitration clause." *Id*. (citation omitted)).[17]

The Amended Complaint not only alleges that the NFL is a joint employer with the Defendant teams but that the discrimination experienced by Black players and coaches was a product of collusion among NFL teams and the NFL. *See* Am. Compl. ¶¶ 337–53; *cf. State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 814 (Mo. 2015) (en banc) (enforcing plaintiff's arbitration agreement with the St. Louis Rams Partnership against non-signatories, including the St. Louis Rams, L.L.C., when plaintiffs brought allegations against defendants collectively). Throughout the Amended Complaint, Plaintiffs treat the NFL and its member teams "as a single unit;" they cannot now claim that the two entities are distinct in order to avoid arbitration. *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999)

---

[17]     Plaintiffs' reliance on *Doe v. Trump Corp.*, 6 F.4th 400 (2d Cir. 2021), is misplaced. As an initial matter, in refusing to grant the defendants' motion to compel arbitration, the *Doe* court relied heavily on the fact that the third-party Trump defendants had not signed the relevant contracts; here, the NFL Commissioner signed the contracts that will be enforced. *See id*. at 412–13; *see also, e.g.*, Flores-Dolphins Agreement at 11. Furthermore, the Second Circuit explained that arbitration was generally appropriate against third parties that "had some sort of *corporate* relationship to a signatory party," contrasting that situation to cases in which one signatory is unaware of the relationship between the other signatory and the third party that is seeking to enforce the arbitration agreement. *Doe*, 6 F.4th at 413; *see also id*. at 414. The coaches were undoubtedly aware of the relationship between the NFL and the teams.

SA-20

(plaintiffs could not avoid arbitration with non-signatories where the complaint treated signatories and non-signatories alike).

"[C]ourts around the country have almost uniformly concluded" that a party to the contract is estopped from avoiding arbitration where a plaintiff brings claims against the other party and a nonparty who jointly controlled his employment and engaged in the alleged misconduct.[18] *Green v. Mission Health Cmtys., LLC*, 20-CV-439, 2020 WL 6702866, at \*8 (M.D. Tenn. Nov. 13, 2020) (internal quotation omitted) (applying Tennessee law to find that an employee was equitably estopped from avoiding arbitration when she alleged that her joint employers engaged in misconduct); *see also Gunson v. BMO Harris Bank, N.A.*, 43 F. Supp. 3d 1396, 1401, 1403 (S.D. Fla. 2014) (applying Florida law to compel arbitration of claims against non-signatories where plaintiff's claims arose from the joint misconduct of contractual party and non-signatory); *Kolsky v. Jackson Square, LLC*, 28 So.3d 965, 969 (Fla. Dist. Ct. App. 2010) (same); *Machado v. System4 LLC*, 28 N.E.3d 401, 409 (Mass. 2013) (plaintiffs were equitably estopped from avoiding arbitration when plaintiffs "lumped the two defendants together, asserting each claim in their complaint against [them] collectively," *id*. at 412).

### III. The Arbitration Agreements Are Enforceable Except as to Mr. Flores's Claims Against the Broncos

Plaintiffs argue that, even if they agreed to arbitrate their claims against the Defendant teams and the NFL, the agreements are unconscionable, particularly because Commissioner

---

[18] Section 11(d) of the Horton-Titans Agreement selects Tennessee law. Although Tennessee state courts have yet to apply the doctrine of equitable estoppel to cases in which the plaintiff alleges that a non-party engaged in misconduct with a party to the contract, at least one Tennessee appeals court has recognized the prevalence of this doctrine in other courts. *See Blue Water Bay at Ctr. Hill, LLC v. Hasty*, 2017 WL 5665410, at \*14 n.12 (Tenn. App. Ct. Nov. 27, 2017) (noting that "many courts" apply the doctrine of estoppel when the plaintiff alleges "concerted misconduct by a nonsignatory and one or more signatories to the contract").

Goodell would serve as the arbitrator and has the discretion to alter the arbitration rules.[19]  *See*

Pls. Opp. at 5.  For the reasons discussed below, the Court finds that all the applicable arbitration

agreements are enforceable except the arbitration agreement in the NFL Constitution as

incorporated in Mr. Flores's contract with the New England Patriots to the extent that it applies

to his claim that the Broncos' failure to hire him was discriminatory.

### A. Defendants Cannot Compel Mr. Flores to Arbitrate His Claims Against the Broncos

Mr. Flores's contract with the Patriots required him to comply with the NFL Constitution,

including its arbitration provision, in its "present form and as amended from time to time

hereafter."  *See* Flores-Patriot Agreement § 15.  Plaintiffs argue that the arbitration agreement in

the NFL Constitution is unenforceable because the NFL is not required to provide Plaintiffs

notice of any changes that it may make to the NFL Constitution.[20]  *See* Pls. Opp. at 9.  The Court

agrees.

The NFL and its member clubs have the unilateral ability to modify the terms of the NFL

Constitution.  *See* NFL Const. & Bylaws Art. 25 (setting forth the procedures for amendment of

the NFL Constitution).  Under Massachusetts law, which applies to Mr. Flores's contract with

the Patriots, *see* Flores-Patriots Agreement § 21, if "the party seeking to enforce the arbitration

provision retain[s] the unilateral discretion to alter its terms, without notice, the agreement to

---

[19]    Defendants suggest that, pursuant to the NFL's arbitration rules, at least some of Plaintiffs' claims may be arbitrated by JAMS.  Defs. Mem. at 8.  Plaintiffs argue that the instant disputes are not eligible to be referred to JAMS under JAMS's rules.  Pls. Opp. at 17.  The Court need not address this argument because delegation to JAMS appears to be discretionary, and thus, whether it is available is of no moment.  *See* Flores-Dolphins Agreement Ex. A ("NFL Dispute Resolution Procedural Guidelines"), Dkt. 73 ¶ 1.7.

[20]    The Court does not address this argument for Plaintiffs' other claims.  Defendants need to rely on the NFL Constitution only for Mr. Flores's claims against the Broncos, as all other claims for which there is a valid arbitration agreement are also subject to arbitration pursuant to the arbitration agreements contained in the Plaintiffs' contracts with the Defendant teams.  *See supra*, section I–II.

SA-22

arbitrate is illusory and unenforceable," *Fawcett v. Citizens Bank, N.A.*, 297 F. Supp. 3d 213, 221 (D. Mass. 2018) (internal quotation omitted) (collecting cases). *See also Jackson v. Action for Boston Cmty. Dev., Inc.*, 525 N.E.2d 411, 415 (Mass. 1988) (the unilateral right to amend arbitration rules without notice renders any "'offer' made by the defendant . . . illusory"); *Bekele v. Lyft, Inc.*, 918 F.3d 181, 189–90 (1st Cir. 2019) (enforcing contract modifiable by Lyft because Lyft was required to provide users notice and an opportunity to reject the contract).

Because there is no enforceable arbitration agreement governing Mr. Flores's claims against the Denver Broncos and his related claims against the NFL, Mr. Flores may litigate those claims in federal court.

## B. Possible Arbitrator Bias Does Not Invalidate the Arbitration Agreements

Plaintiffs argue that Mr. Goodell could not possibly serve as a neutral arbitrator because "Mr. Goodell, as the Commissioner, *is the NFL* in all regards." Pls. Opp. at 6. As evidence of Mr. Goodell's bias, Plaintiffs rely heavily on a statement released by the NFL on the day that Mr. Flores filed his complaint, in which the NFL stated that Mr. Flores's claims were "without merit." *See* Am. Compl. ¶ 3; Wigdor Decl. Ex. 2, Dkt. 63.

"[A]rbitration is a matter of contract, and consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen." *Nat'l Football League Mgmt. Council*, 820 F.3d at 548. In the context of litigation arising out of allegations that the Patriots underinflated the balls used they used in the American Football Conference Championship Game against the Indianapolis Colts in 2015, the Second Circuit rejected the argument that, as a matter of law, the NFL Commissioner cannot fairly arbitrate claims regarding the NFL's conduct. *See id.* at 532–33, 548. As the Court noted, the parties contracted to arbitrate claims before the NFL Commissioner "knowing full well . . . that the Commissioner would have a stake both in the underlying discipline and in every arbitration brought." *Id.* at

22

**SA-23**

548. Accordingly, the Second Circuit declined to indulge allegations that the NFL Commissioner could not "adjudicate the propriety of his own conduct." *Id*.

The Court acknowledges that this structure creates a risk of biased adjudication and that the NFL statement on the day the case was filed is worrisome. Plaintiffs' descriptions of their experiences of racial discrimination — which allegedly are only the most recent chapter in the NFL's long history of systematic discrimination toward Black players, coaches, and managers — are incredibly troubling. Am. Compl. ¶ 4. Given the number of Black men who play and coach football, it is difficult to understand how it could be that, at the time Plaintiffs initiated this lawsuit, "the NFL had only one Black Head Coach." [21] *Id*. ¶ 6.

Nevertheless, the FAA cautions against judicial intervention at this early stage when Plaintiffs have, as here, agreed to a particular arbitration structure, including a specific arbitrator. Courts must avoid presupposing that the selected arbitrator will not serve as a conscientious and impartial arbitrator. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) ("We decline to indulge the presumption that the parties and arbitrable body conducting a proceeding will be unable or unwilling to retain . . . impartial arbitrators." *Id*. (cleaned up)); *Nat'l Football League Mgmt. Council*, 820 F.3d at 548. If the NFL Commissioner is, indeed, improperly biased, and that bias prevents him from fairly adjudicating Plaintiffs' claims, Plaintiffs have a recourse: this Court retains the authority to review the Commissioner's decision and to vacate the Commissioner's award. *See* 9 U.S.C. § 10(a)(2) (permitting courts to overturn arbitration decisions where there is "evident partiality or corruption").

---

[21] In both the NFL and the National Basketball Association ("NBA"), "about 70% of the players are Black." Scott Neuman, *Why a 20-Year Effort by the NFL Hasn't Led to More Minorities in Top Coaching Jobs*, NPR (Feb. 3, 2022), https://www.npr.org/2022/02/03/1075520411/rooney-rule-nfl. When Mr. Flores filed the Complaint, thirteen of the thirty head coaches in the NBA were Black; at that same time, only one of the thirty-two head coaches in the NFL was Black. *See id*. Thus, at the time this lawsuit was filed, the percentage of NBA Black head coaches (43%) was more than thirteen times than the percentage of NFL Black head coaches (3.1%).

SA-24

Plaintiffs also argue that Commissioner Goodell's alleged bias would prevent them from effectively vindicating their claim in a forum in which he is the arbitrator. *See* Pls. Opp. at 15–17. The effective vindication doctrine is "a judge-made exception to the FAA" that "finds its origins in the desire to prevent prospective waiver of a party's *right to pursue* statutory remedies." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235–236 (2013) (internal quotation omitted).

The Supreme Court has recognized two types of arbitration agreements to which this doctrine may apply: an agreement "forbidding the assertion of certain statutory rights" and an agreement imposing arbitration fees "so high as to make access to the forum impracticable." *Id.* at 236; *see also Reyes v. Gracefully, Inc.*, 2018 WL 2209486, at *7 (S.D.N.Y. May 11, 2018) (holding that an arbitration agreement could not shorten the statute of limitations for FLSA claims). Alleged structural bias falls into neither category.[22] Moreover, the Supreme Court has noted that while several Supreme Court "cases have . . . asserted the existence of an 'effective vindication' exception," these cases have simultaneously "declined to apply it to invalidate the arbitration agreement at issue." *Am. Express Co.*, 570 U.S. at 235.[23]

Plaintiffs also argue that the risk that Commissioner Goodell will be biased renders the arbitration agreements unconscionable as a matter of state contract law. To support this

---

[22]     *Cole v. Burns International Security Services, et al.*, 105 F.3d 1465 (D.C. Cir. 1997), is not to the contrary. Although the court noted that access to neutral arbitrators was one of several factors relevant to assessing whether plaintiffs could effectively vindicate their claims, *see id*. at 1482, the parties had agreed to use a neutral arbitrator, *see id*. at 1480. The *Cole* court gave no indication that lack of access to a neutral arbitrator was dispositive when the parties had agreed to a specific arbitrator. And although the Sixth Circuit in *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306 (6th Cir. 2000), expressed concern that bias in the makeup of the arbitral panel would preclude the effective vindication of plaintiffs' claims, it expressly did not resolve that question because it found that the arbitration agreement was illusory. *See id*. at 314–15.

[23]     *See Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 242 (2013) (Kagan, J. dissenting) (warning that the Supreme Court's limited application of the effective vindication doctrine to arbitration agreements that "operate to" bar federal claims enables companies to "appoint as an arbitrator an obviously biased person — say, the CEO. . . .").

24

argument, Plaintiffs rely heavily on *Hooters of America v. Phillips*, 173 F.3d 933 (4th Cir. 1999), and related cases in the Sixth Circuit. Pls. Opp. at 11–14. Those cases are, however, inapposite as they all concerned arbitration agreements with unfair selection procedures that, *inter alia*, granted the employer improper control over the pool of arbitrators.

The *Hooters* court refused to enforce an arbitration agreement that required all arbitrators to be selected from a list prepared by Hooters and thereby granted it "unrestricted control" over the selection of arbitrators. *See id.* at 939. And in *McMullen v. Meijier, Inc.*, 355 F.3d 485 (6th Cir. 2004), the court refused to enforce the parties' arbitration agreement based on "procedural unfairness inherent in an arbitration agreement," while noting that the "preferred method of challenging allegations of bias is to pursue the underlying claims through the arbitration process and then seek review . . . ." *Id.* at 494 n.7; *see also id.* at 488 (noting that the employer had "the right to unilaterally select a pool of . . . potential arbitrators"). By contrast, Plaintiffs' arbitration agreements grant Defendants no discretion over the choice of the arbitrator: it must be the NFL Commissioner.[24]

The applicable state contract laws of Florida and Tennessee do not compel a different conclusion.[25] In *Garcia v. Church of Scientology Flag Service Organization, Inc.*, No. 18-13452, 2021 WL 5074465, at *12 (11th Cir. Nov. 2, 2021), the Eleventh Circuit held that an

---

[24]  Similarly, in *Pokorny v. Quixtar, Inc.*, 601 F.3d 987 (9th Cir. 2010), the Ninth Circuit found that an arbitration agreement requiring plaintiffs to pay a fee if they selected an arbitrator who had not gone through defendants' "training," which was "designed to produce a very favorable view of [defendants]," unconscionably used the threat of financial hardship to give defendants control over the arbitrator selection process. *Id.* at 1003 (internal quotation omitted).

[25]  Several cases, on state law grounds, have declined to enforce an arbitration agreement appointing the commissioner of a sports league as the arbitrator due to concerns of impropriety or bias. *See* Order, *Nostalgic Partners LLC v. New York Yankees P'ship*, No. 656724/2020, at 2 (N.Y. Sup. Ct. Dec. 17, 2021); *State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 813–14 (Mo. 2015) (en banc); *Gruden v. The Nat'l Football League, et al.*, No. A-21-844043-B, at 13–14 (Nev. Dist. Ct. Clark Cty. Oct. 12, 2022). Because none of the applicable contracts selects Missouri, New York, or Nevada law, those cases are interesting but not controlling.

25

arbitration clause that required plaintiffs to arbitrate their claims against the Church of Scientology before individuals "in good standing" with the church was not unconscionable under Florida law — even in the face of the lead arbitrator making "various comments . . . reflecting bias in favor of the church." *Id*. at *12 (citing *Nat'l Football League Mgmt. Council*, 820 F.3d at 548); *see also id*. at *8–9 (applying Florida law).

In *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370 (6th Cir. 2005), the Sixth Circuit, applying Tennessee law, declined to enforce the arbitration agreement because the "arbitrator-selection process itself [was] fundamentally unfair," while making clear the general rule that pre-arbitration challenges to an allegedly biased arbitration panel will not stand. *Id.* at 385 ("[A] party cannot avoid the arbitration process simply by alleging that the arbitration panel will be biased."); *see also Iysheh v. Cellular Sales of Tenn., LLC*, No. 17-CV-542, 2018 WL 2207122, at *8 (E.D. Tenn. May 14, 2018) (arbitration agreement was not unconscionable where, *inter alia*, both parties had an opportunity to participate in arbitrator selection).

In short, Plaintiffs' concern about the Commissioner's ability to decide fairly their claims is insufficient reason not to enforce the arbitration agreements.

### C. Possible Discovery Limitations Do Not Render the Agreements Unconscionable

Plaintiffs also complain that they will not be able to take robust discovery if they are compelled to arbitrate their disputes. The fact that the NFL Commissioner may limit the amount of discovery Plaintiffs can take, however, is also not grounds for refusing to enforce the various arbitration agreements. *See Gilmer*, 500 U.S. at 31 (limited discovery did not bar arbitration of plaintiff's age discrimination claims). While the Second Circuit has "recognized that a provision that deprived a claimant of a meaningful opportunity to present her claim might well be unenforceable," plaintiffs bear the burden of demonstrating that the arbitration rules will in fact

26

deprive them of a chance to prove their claims. *Lohnn v. Int'l Bus. Machs. Corp.*, No. 21-CV-6379, 2022 WL 36420, at *11 (S.D.N.Y. Jan. 4, 2022) (cleaned up) (quoting *Guyden v. Aetna, Inc.*, 544 F.3d 376, 386–87 (2d Cir. 2008)).

Plaintiffs have not carried that burden because they rely solely on speculation that Commissioner Goodell may interpret the arbitration rules in a manner that will improperly and unfairly limit the scope of discovery. *See* Pls. Opp. at 6–7; *see also PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406–07 (2003) (holding that courts should not decline to enforce arbitration agreements "on the basis of mere speculation" that the arbitrator may interpret the arbitration agreement in a manner that will render it unenforceable, *id.* (internal quotation omitted)); *AT&T Mobility LLC*, 563 U.S. at 342 (cautioning that limitations on discovery should not be considered substantively unconscionable because that "rule would have a disproportionate impact on arbitration agreements").[26] If Plaintiffs are "unable to vindicate [their] rights in the arbitral forum, [they] will have recourse to the Court." *Howard v. Anderson*, 36 F. Supp. 2d 183, 187 (S.D.N.Y. 1999) (collecting cases); *see also* 9 U.S.C. § 10(a)(3) (permitting courts to vacate arbitration awards where the arbitrator "refus[es] to hear evidence pertinent and material to the controversy").

### D. The Horton-Titans Agreement Is Sufficiently Definite To Enforce

Plaintiffs argue that the arbitration agreement between Mr. Horton and the Titans is unenforceable because it fails to set forth the essential terms of the arbitration process. Pls. Opp. at 4 n.2. Mr. Horton's arbitration agreement with the Titans provides, in its entirety: "You and the Titans agree that all matters in dispute between You and Titans shall be referred to the

---

[26] Discovery in arbitration is not typically as extensive as federal court discovery; that reality is, of course, one reason many prefer arbitration over litigation. Nevertheless, the Court takes the NFL at its word that it is committed to combating racism, Defs. Reply, Dkt. 64 at 5, and is confident that the Defendants recognize that the Plaintiffs have raised serious claims that may require more than minimal discovery to adjudicate fairly.

27

SA-28

Commissioner and his decision shall be accepted as final, complete, conclusive, binding and unappealable by You and Titans." Horton-Titans Agreement § 6(a).

Tennessee courts have held that "for a contract to be enforceable, it must be of sufficient explicitness so that a court can perceive what are the respective obligations of the parties," and "any agreement which leaves unanswered . . . critical questions" is not enforceable. *Higgins v. Oil, Chemical and Atomic Workers Int'l Union, Local No. 3-677*, 811 S.W.2d 875, 880 (Tenn. 1991) (quoting *Soar v. Nat'l Football League Players' Ass'n*, 550 F.2d 1287, 1290 (1st Cir. 1977) (holding that the NFL Commissioner's oral promise retroactively to provide pension benefits to retired NFL players was insufficiently definite)) (alterations omitted).

Although Mr. Horton's arbitration agreement with the Titans is admittedly quite succinct, it is sufficiently definite to enforce. Courts applying Tennessee law have found that a reference to "binding arbitration to resolve all disputes that may arise out of the employment context" is adequate to state the essential terms of the agreement. *Hayward v. Trinity Christian Ctr. of Santa Ana*, No. 14-CV-2282, 2015 WL 1924552, at *3 (M.D. Tenn. Apr. 28, 2015).[27] Although the NFL Commissioner retains substantial discretion to set the arbitration procedures, the doctrines of good faith and fair dealing preclude the NFL from unilaterally adopting arbitration procedures that are "improper or oppressive." *Howell v. Rivergate Toyota, Inc.*, 144 F. App'x 475, 479 (6th Cir. 2005) (applying Tennessee law); *see also Brubaker v. Barrett*, 801 F. Supp. 2d

---

[27] Although Tennessee courts have been skeptical of contracts that provide "little notice as to the procedure" for arbitration, those contracts appear to have either been even more succinct than the one at issue here or contracts of adhesion. For example, in *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 490 S.W.3d 800 (Tenn. Ct. App. Nov. 23, 2015), the contract did not indicate who the arbitrator would be or the "effect" of the arbitrator's decision, i.e., that it would be binding and final, *see id.* at 822–23. And while the court in *Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731, 734 (Tenn. Ct. App. 2003), invalidated the parties' arbitration agreement in part because it did "not adequately explain how the arbitration procedure would work, except as who would administer it," *id.* at 734, Tennessee courts have subsequently limited *Howell*'s holding to contracts of adhesion, *see Wolfford*, 490 S.W.3d at 817 n.13.

28

**SA-29**

743, 753–55 (E.D. Tenn. 2011) (same).[28]  To the extent Commissioner Goodell adopts

procedures that are improper or oppressive, Plaintiffs will have recourse to this Court.

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration is GRANTED

except that it is DENIED as to Brian Flores's claims against the Denver Broncos, New York

Giants, and the Houston Texans, and his related claims against the NFL.  Defendants' request to

stay the case is DENIED as to Flores's claims that may proceed to litigation and is GRANTED

as to all of the claims that must be arbitrated.  The Clerk of Court is respectfully directed to

terminate the open motion at docket entry 47.

The parties are ordered to appear for a pretrial conference on **Friday, March 24, 2023, at

10:00 A.M.** in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New

York, New York, 10007.  By **March 16, 2023**, the parties must submit a joint letter regarding the

status of the case, including:

a.   a statement of all existing deadlines, due dates, and/or cut-off dates;

b.   a statement describing the status of any settlement discussions and whether the parties

would like a settlement conference;

c.   a statement of the anticipated length of trial and whether the case is to be tried to a

jury;

d.   a statement regarding the anticipated schedule of arbitration;

e.   any contemplated motions;

---

[28]      *Floss v. Ryan's Family Steakhouse*, 211 F.3d 306 (6th Cir. 2000), is not to the contrary.  "In *Floss*, the arbitration agreement was between employees and a third-party arbitration service, not the employer . . . . In other words, the promise of the third party was too indefinite for legal enforcement." *Vision Healthcare Sys. (Int'l) Pty, Ltd. v. Vision Software Techs. Inc.*, No. 15-CV-175, 2015 WL 2404089, at *3 (M.D. Tenn. May 20, 2015) (citing *Floss*, 211 F.3d at 315–16) (upholding arbitration agreement that stated, in relevant part, "arbitration shall take place in Nashville . . . before one arbitrator" without detailing further procedures, *id*. at *1).

**SA-30**

f.   a proposed schedule for discovery, which must comply with the guidance set forth in the Court's model Civil Case Management Plan and Scheduling Order, available on the Court's website;

g.   any other issue that the parties would like to address at the pretrial conference; and

h.   any other information that the parties believe may assist the Court in advancing the case to settlement or trial.

**SO ORDERED.**

Date:  March 1, 2023                                              VALERIE CAPRONI
New York, New York                                        United States District Judge

30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

BRIAN FLORES, STEVE WILKS, and RAY : 
HORTON, as Class Representatives, on : 
behalf of themselves and all others similarly : 
situated, : 
: 
                               Plaintiffs, : 
          -against- : 
: 
THE NATIONAL FOOTBALL LEAGUE; NEW : 
YORK FOOTBALL GIANTS, INC. d/b/a NEW : 
YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a : 
MIAMI DOLPHINS; DENVER BRONCOS : 
FOOTBALL CLUB d/b/a DENVER BRONCOS; : 
HOUSTON NFL HOLDINGS, L.P. d/b/a : 
HOUSTON TEXANS; ARIZONA CARDINALS : 
FOOTBALL CLUB LLC d/b/a ARIZONA : 
CARDINALS; TENNESSEE TITANS : 
ENTERTAINMENT, INC. d/b/a TENNESSEE, : 
TITANS and JOHN DOE TEAMS 1 through 26, : 
: 
                            Defendants. : 

------------------------------------------------------------------X

22-CV-0871 (VEC)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/25/2023

VALERIE CAPRONI, United States District Judge:

Plaintiffs, who are current and former coaches for NFL teams, have sued the NFL and various member teams for racial discrimination and retaliation in violation of 42 U.S.C. § 1981 and several state laws.[1] *See* Am. Compl., Dkt. 22. The Court granted in part and denied in part Defendants' motion to compel arbitration in an opinion dated March 1, 2023. Op. ("Arbitration Opinion"), Dkt. 76. The Court compelled arbitration of the claims brought by Ray Horton against the Tennessee Titans, Steve Wilks against the Arizona Cardinals, and Brian Flores against the Miami Dolphins, as well as all related claims against the NFL; the Court denied the

---

[1] These include the New York State Human Rights Law, the New York City Human Rights Law, the New Jersey Law Against Discrimination, and the Florida Private Whistleblower Statute. Am. Compl., Dkt. 22.

1

motion to compel arbitration of Mr. Flores's claims against the New York Giants, the Denver Broncos, and the Houston Texans, as well as his related claims against the NFL. *Id.*

Plaintiffs moved for reconsideration of the portions of the Arbitration Opinion granting the motion to compel arbitration, and Defendants cross-moved for reconsideration, seeking to compel arbitration of the remaining claims.[2] Pls. Mot., Dkt. 79; Defs. Mot., Dkt. 81. Each party opposed their adversary's motion. *See* Defs. Opp., Dkt. 89; Pls. Opp., Dkt. 93. For the reasons discussed below, the motions for reconsideration are DENIED.

## DISCUSSION

### I. Legal Standard

The standard under which courts evaluate a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked . . . ." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration may be granted if the movant demonstrates "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quotation omitted); *see also Sigmon v. Goldman Sachs Mortg. Co.*, 229 F. Supp. 3d 254, 257 (S.D.N.Y. 2017) ("[A] party moving for reconsideration must set forth 'the matters or controlling decisions which counsel believes the Court has overlooked.'" (quoting Local Civil Rule 6.3)). Whether to grant a motion for reconsideration is a decision within "the sound discretion of the district court . . . ." *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009).

---

[2] Defendants previously argued that Mr. Flores's arbitration agreement with the Miami Dolphins applied retroactively to his claims against the Denver Broncos. *See* Op., Dkt. 76 at 10. The Court held that the arbitration agreement could not be applied retroactively under Florida law, *see id.*, and Defendants do not seek reconsideration of that portion of the Arbitration Opinion.

**SA-33**

A motion for reconsideration is not a party's "opportunity to put forward evidence that he could have, but failed, to provide the Court when the Court initially considered the motion." *United States v. Posada*, 206 F. Supp. 3d 866, 868 (S.D.N.Y. 2016) (internal quotation omitted) (collecting cases). Additionally, "a motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Schrader*, 70 F.3d at 257. "[N]ewly discovered evidence" can be a basis for reconsideration, but only if the evidence was not available prior to entry of the order at issue. *Marhone v. Cassel*, No. 16-CV-4733, 2021 WL 142278, at *2 (S.D.N.Y. Jan. 14, 2021). "These criteria are strictly construed against the moving party so as to avoid repetitive arguments on issues that have been considered fully by the court." *Griffin Indus., Inc. v. Petrojam, Ltd.*, 72 F. Supp. 2d 365, 368 (S.D.N.Y. 1999) (citation omitted).

## II. Defendants' Motion for Reconsideration Is Denied

Defendants sought to compel arbitration of Mr. Flores's claims against the Denver Broncos, New York Giants, and Houston Texans arguing, *inter alia*, that the arbitration provisions in his recent contract with the Pittsburgh Steelers ("Flores-Steelers Agreement"), and the NFL Constitution incorporated therein, applied retroactively to claims against any NFL team. *See* Op. at 9. Defendants alternatively sought to compel arbitration of Mr. Flores's claims against the Denver Broncos because those claims arose when Mr. Flores was coaching for the New England Patriots. *See id*. His contract with the Patriots ("Flores-Patriots Agreement") had an arbitration agreement that applied to claims against any NFL team. *See id*.

The Court held that Mr. Flores did not have a valid arbitration agreement with the Steelers because Defendants had not proven that the arbitration agreement was part of a valid contract. *See id*. at 13. Section 12 of the Flores-Steelers Agreement states that the contract would "become valid and binding upon each party only when and if it shall be approved by the

3

Commissioner of the NFL;" in the version of the contract filed by Defendants in support of their motion to compel arbitration, the Commissioner's signature line was blank. *See* Second DiBella Decl. Ex. 4 ("Flores-Steelers Agreement"), Dkt. 73. Accordingly, the Flores-Steelers Agreement submitted by Defendants, by its own terms, was not "valid and binding." *Id*.; *see also* Op. at 13. The Court also held that the arbitration agreement contained in the NFL Constitution and incorporated into the Flores-Patriots Agreement was unenforceable because the NFL retained the unilateral right to modify the NFL Constitution and the arbitration agreement, rendering the arbitration agreement illusory according to Massachusetts state law. Op. at 21–22.

### A. The Flores-Steelers Agreement Is Not Binding

In their motion for reconsideration, Defendants ask the Court to reconsider its prior decision with respect to the Flores-Steelers Agreement based on a newly-filed version of the Flores-Steelers Agreement that contains the NFL Commissioner's signature. Defs. Mem., Dkt. 82 at 13. The signed contract, which is new evidence, cannot be considered on a motion for reconsideration because it was available to Defendants before the Court issued the Arbitration Opinion. *See Marhone*, 2021 WL 142278, at *2. Defendants acknowledge that they possessed a fully-signed version of the Flores-Steelers Agreement when the motion to compel arbitration was being briefed. *See* Defs. Mem. at 13 n.7; *see also* Smith Decl., Dkt. 98 ¶ 2 (stating that Commissioner Goodell approved the Flores-Steelers Agreement on June 17, 2022). The Court credits Defendants' statement of regret for "not having supplemented the record with a Commissioner-signed version of the agreement" during the eight months that the motion to compel arbitration was pending. Defs. Mem. at 13 n.7. But a motion for reconsideration is not a means to mend holes in the record with neglected evidence. *See Horsehead Res. Dev. Co., Inc. v. B.U.S. Envt'l Serv. Inc.*, 928 F. Supp. 287, 289 (S.D.N.Y. 1996) ("[A] motion for

reconsideration may not be used to plug gaps in an original argument or to argue in the alternative once a decision has been made." *Id.* (cleaned up).)

Defendants alternatively argue that the Flores-Steelers Agreement was valid and binding even without Commissioner Goodell's signature. Defs. Mem. at 14. The contract plainly states, however, that it is "valid and binding upon each party only when and if it shall be approved by the Commissioner of the NFL." Flores-Steelers Agreement § 12. "Courts do not assume a contract's language was chosen carelessly," and must give effect to the "clear and unequivocal" language of a contract. *Crawford Cent. Sch. Dist. v. Commonwealth*, 888 A.2d 616, 623 (Pa. 2005). The Flores-Steelers Agreement clearly establishes that it would not be binding on the parties until it was signed by Commissioner Goodell.

In sum, as the parties moving to compel arbitration, Defendants carried the burden of proving the existence of a written agreement binding the parties to arbitrate the present matter. *See* Op. at 14 (citing *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (collecting cases); *Dreyfuss v. Etelecare Glob. Sols.-U.S. Inc.*, 349 F. App'x 551, 552–53 (2d Cir. 2009)). When Defendants moved to compel arbitration, they failed to do so.

Defendants argue that because Mr. Flores actually served as the Steelers' coach, there is an enforceable contract between the Steelers and Mr. Flores. *See* Defs. Mem. at 14. They posit that the Commissioner's signature was "[a]t most . . . a condition precedent to the parties' obligations to perform under the agreement, which was waived and excused when Mr. Flores performed, and accepted performance from the Steelers, under that very same agreement."[3] *Id*. Defendants failed to raise this argument as part of the underlying motion to compel arbitration,

---

[3]     Pennsylvania law, which governs the Flores-Steelers Agreement, *see* Flores-Steelers Agreement § 20, provides that "if a condition precedent is not satisfied, the obligations of the non-performing party are discharged." *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 620 (E.D. Pa. 1998).

5

**SA-36**

and the Court will not consider it now.  Defendants' suggestion that the Court should now revise its prior decision based on this new legal theory because neither party previously briefed the issue flips the standard for motions for reconsideration on its head.  It is black letter law that, "[e]xcept where a movant is relying on new facts that could not have been previously discovered or newly promulgated law, additional facts or new legal theories cannot be asserted by way of a motion for reconsideration."  *Bloomfield Inv. Res. Corp. v. Daniloff*, No. 17-CV-4181, 2021 WL 2310446, at *2 (S.D.N.Y. June 7, 2021) (internal quotation omitted).[4]

### B.  Flores-Patriots Contract

Defendants further dispute the Court's conclusion that the Flores-Patriots Agreement is illusory under Massachusetts law because Defendants retained the right unilaterally to modify the terms of the NFL Constitution, which contained the arbitration agreement applicable to Mr. Flores's disputes with other teams, without notice.  *See* Defs. Mem. at 1; Op. at 21.  Defendants alternatively argue that even if the agreement is unenforceable, the unilateral modification provision should be severed from the arbitration agreement.  *See* Defs. Mem. at 1–2.  For the reasons discussed in the Arbitration Opinion and further detailed below, Massachusetts law precludes enforcement of the arbitration agreement incorporated into the Flores-Patriots Agreement because the contract is illusory; because an illusory contract is no contract at all, severance is not possible.

---

[4]  Even if the Court were to consider Defendants' new argument, Defendants' motion would likely still fail. While some courts applying Pennsylvania law have excused compliance with conditions precedent when the parties accepted partial performance of the contract, *see McDermott*, 11 F. Supp. 2d at 622, Defendants did not previously, nor have they now, introduced evidence that might allow the Court to conclude, as a matter of law, that there was partial performance.  *See MBR Constr. Servs., Inc. v. IBEW Local*, No. 14-CV-1694, 2016 WL 815566, at *7 (M.D. Pa. Mar. 2, 2016) (noting that Pennsylvania law requires the party seeking to compel performance of a contract to prove that any conditions precedent are satisfied).

### 1.   *Unilateral Modification Provision*

In holding the Flores-Patriots Agreement illusory, the Court relied on *Jackson v. Action for Boston Community Development, Inc.*, 525 N.E.2d 411 (Mass. 1988), which held that a former employee could not contractually enforce the terms of her employment manual.  The *Jackson* court considered several factors in finding that the employee manual did not constitute an enforceable contract, including the fact that the manual could be unilaterally modified by the employer.  *See id*. at 414–15.  Although the manual provided that employees would be notified of any changes, the *Jackson* court found it significant that the employer did not call "special attention" to the manual, such as reviewing the manual during orientation, and the plaintiff did not sign the manual or otherwise manifest assent to the terms of the manual.  *See id*. at 416 (internal citations omitted).  *Jackson* observed that the fact "that the defendant retained the right to modify unilaterally the personnel manual's term . . . tends to show that any 'offer' made by the defendant in distributing the manual was illusory."  *Id*. at 415.  The court also noted that it was significant that the record did not "reveal[] any negotiation over the terms of the personnel manual."  *Id*.

*O'Brien v. New England Telephone & Telegraph Co.*, 664 N.E.2d 843, 847 (Mass. 1996), clarified the fact-intensive inquiry that courts must undertake in evaluating whether a document subject to unilateral modification is an enforceable contract while emphasizing that the "[p]rinciples stated in the *Jackson* opinion remain sound."  *Id*. at 847.  The *O'Brien* court refrained from "defin[ing] the extent to which management may effectively reserve its right to change or withdraw a manual" because the employer in that case had not expressly reserved the right to make unilateral changes, although it did distribute new policy manuals annually.  *See id*. at 849; *see also id*. at 848 n.3.  The court held that "the context of the manual's preparation and

7

distribution is, to us, the most persuasive proof that it would be almost inevitable for an employee to regard it as a binding commitment . . . ." *Id*. at 849 (internal quotation omitted).

*Buttrick v. Intercity Alarms, LLC*, 929 N.E.2d 357 (Mass. App. Ct. July 1, 2010),[5] applied *Jackson* and its progeny to find that the employee manual in that case was a binding contract. In *Buttrick*, the employer had required the employee to sign the manual, had distributed numerous copies of the manual, and had personally reviewed the manual's terms with the employees. *See id*. at *1–2. Given the "special attention" paid to the manual, *Buttrick* held that there was an enforceable contract, notwithstanding the employer's reservation of rights to make unilateral modifications. *Id*. at *1. The court reiterated, however, that "[w]hether an implied contract based upon the terms of the manual [existed] . . . was a fact-bound inquiry," while observing that "a number of factors weighed against the finding of a binding contract." *Id*.

Numerous courts have applied *Jackson* and its progeny to decline to enforce contracts that permit one party unilaterally to modify the terms without notifying the counterparty of any changes.[6] *See, e.g.*, *Douglas v. Johnson Real Est. Invs., LLC*, 470 F. App'x 823, 826 (11th Cir. 2012); *Fawcett v. Citizens Bank, N.A.*, 297 F. Supp. 3d 213, 221 (D. Mass. 2018) (collecting cases); *McNamara v. S.I. Logistics, Inc.*, No. 17-CV-12523, 2018 WL 6573125, at *3–4 (D. Mass. 2018) (collecting cases); *Wainblat v. Comcast Cable Comm'ns, LLC*, No. 19-10976, 2019 WL 5698446, at *4 (D. Mass. 2019); *Murray v. Grocery Delivery E-Servs. USA Inc.*, 460 F. Supp. 3d 93, 97–98 (D. Mass. 2020); *see also Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033,

---

[5]    *Buttrick v. Intercity Alarms, LLC*, 929 N.E.2d 357 (Mass. App. Ct. 2010), is a nonprecedential opinion that was issued with a caveat that it "may not fully address the facts of the case or the panel's decisional rationale," *id*. at *1.

[6]    *Ferguson v. Host International, Inc.*, 757 N.E.2d 267 (Mass. App. Ct. 2001), is not to the contrary. Although the employer retained the right to amend the manual without notice, the employer had in fact distributed the amended manual to employees, *id*. at 269. The *Ferguson* court noted that the employer's distribution of the manual conveyed to employees its importance as a binding document. *Id*. at 272.

8

1041 n.10 (Mass. 2021) (criticizing a terms of usage agreement permitting unilateral

modification without notice and noting that courts have held that such contracts are

unenforceable).[7]

Defendants have not demonstrated that they paid the type of "special attention" to the

NFL Constitution that is necessary to make its terms part of an implied contract under

Massachusetts state law. Although Mr. Flores signed a contract that incorporated by reference

the NFL Constitution,[8] that does not automatically mean that the NFL Constitution is

enforceable. The Supreme Judicial Court of Massachusetts has held that an employee's

signature on the manual itself would suggest, at most, that finding an implied contract exists

"may be justified." *Weber v. Comm. Teamwork, Inc.*, 752 N.E.2d 700, 714 (Mass. 2001).

In the context of employee manuals, Massachusetts courts have made clear that "the

context of the preparation and distribution of the employment policies is the most persuasive

proof" in determining whether employment policies are implied contracts. *LeMaitre v. Mass.*

---

[7]     While Defendants assert that these cases improperly single out arbitration agreements for application of the unilateral modification rule, *see* Defs. Mem., Dkt. 82 at 11–12, Massachusetts courts find that contracts containing a unilateral modification provision are illusory in a wide variety of contexts, including employee manuals, which, like the NFL Constitution, set forth general policies governing the conduct of both employer and employee. *See infra* pp. 7–8*; see also Durbeck v. Suffolk Univ.*, 547 F. Supp. 3d 133, 147–48 (D. Mass. 2021) (applying *Jackson* to academic catalogs).

Defendants also attempt to analogize the instant case to *Gilbert v. Dell Technologies, Inc.*, 415 F. Supp. 3d 389 (S.D.N.Y. 2019), which applied *Jackson* to enforce an arbitration agreement provided to an employee in conjunction with her employment agreement. Defs. Mem. at 7–8. In that case, the employer retained authority unilaterally to modify the arbitration policies but not the arbitration agreement itself. *See id*. at 393–94, 398. Those policies were, as here, incorporated into the employment agreement. *See id*. at 393. The employer in *Gilbert*, however, had drawn special attention to the arbitration policies by placing the contractual clause that incorporated the arbitration policies "prominently above the signature line." *Id*. at 396; *see also id*. at 393.

[8]     One provision of the Flores-Patriots Agreement stated that Mr. Flores received a copy of the 124 NFL Constitution and understood his obligations therein. Flores-Patriots Agreement § 15; *see also* Second DiBella Decl. Ex. 1 ("NFL Constitution"), Dkt. 73. Mr. Flores disputes that he received a copy of the NFL Constitution at the time of signing. He has submitted no evidence to support that assertion, Pls. Opp. to Arb. Mem., Dkt. 62 at 9, and Defendants submitted no evidence to show that he was given a copy of the constitution at that time. Because the Court finds that whether Mr. Flores received a copy of the NFL Constitution is not dispositive in light of the totality of circumstances, the Court need not resolve this dispute.

9

*Turnpike Auth.*, 897 N.E.2d 1218, 1220 (Mass. 2008) (employment manual that was regularly distributed created contractual rights and obligations); *see also LeMaitre v. Mass. Turnpike Auth.*, 876 N.E.2d 888, 893 (Mass. Ct. App. 2007) (noting that the manual was "regularly distributed"). Mr. Flores argues, and Defendants do not dispute, that neither the NFL nor the Patriots reviewed with him the obligations of the NFL Constitution, required him to sign the NFL Constitution itself, or distributed to him subsequently-amended versions of the NFL Constitution. *See* Pls. Opp. to Arb. Mem., Dkt. 62 at 9; Pls. Opp. at 8; Defs. Reply, Dkt. 99 at 4. *See, e.g.*, *Buttrick*, 2010 WL 2609364, at *1–2. Nor could Mr. Flores have reasonably negotiated the terms of the NFL Constitution, which, by its terms, may only be amended by a vote of all NFL member clubs. *See Jackson*, 525 N.E.2d at 414–15 (considering lack of negotiation the terms of an employment manual as one factor in determining that a unilateral modification provision rendered the agreement illusory).

Finally, Defendants belatedly argue that the Court need not address the fact that the NFL has the unilateral power to modify the NFL Constitution because it may simply enforce the version of the NFL Constitution that was in force when the Flores-Patriots Agreement was signed.[9] *See* Defs. Mem. at 4 n.1; Defs. Reply at 3 n.1. Defendants forfeited this argument by failing to raise it in their briefs filed in conjunction with their motion to compel arbitration and by failing to submit the version of the NFL Constitution that was in effect when the Flores-Patriots Agreement was signed with their motion to compel arbitration. They offer no explanation for their oversight, and the Court will not consider this argument now.[10] *See*

---

[9] Defendants point to a court filing in a class-action litigation in an out-of-district case regarding NFL players' concussion injuries that attached as an exhibit a prior version of the NFL Constitution as proof that the NFL did not amend the arbitration provision after the Flores-Patriots Agreement was executed. Defs. Mem. at 4 n.1.

[10] Even if the Court were to consider this argument, however, serious questions would remain regarding the enforceability of the arbitration agreement in light of the NFL's ability unilaterally to modify the NFL Dispute Resolution Procedural Guidelines, which govern any arbitral proceeding between a coach and the NFL. *See* Flores-

**SA-41**

*AlexSam, Inc. v. Aetna, Inc.*, No. 13-CV-1025, 2021 WL 3268853, at *9 n.8 (D. Conn. July 30, 2021) (noting that judicial notice of additional facts was inappropriate on a motion for reconsideration where the petitioner "has not explained any reason for failing to include [the additional facts] in its earlier filings").

### 2. Severability

Defendants finally argue that, even if the unilateral modification provision renders the arbitration agreement unenforceable, the Court should sever the unilateral modification provision and enforce the remainder of the parties' contract. *See* Defs. Mem. at 9–10. The Federal Arbitration Act ("FAA") requires courts to treat arbitration clauses "as severable from the contract in which it appears . . . unless the validity challenge is to the arbitration itself . . . ." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298–99 (2010). The fact that agreements to arbitrate are "severable does not mean that they are unassailable;" if the party seeking to avoid arbitration challenges the arbitration provision specifically, as Plaintiffs have, courts may appropriately consider whether the arbitration agreement is so defective that severance cannot save it. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010); *see also* Pls. Opp. to Arb. Mot. at 9.

The focus of *Jackson* and its progeny is whether, in the broader context of the contractual relationship, one party's ability unilaterally to change the terms of a contract renders that contract illusory.[11] *See Jackson*, 525 N.E.2d at 415; *see also O'Brien*, 664 N.E.2d at 848;

---

Patriots Agreement § 17; Second DiBella Decl. Ex. 2 at 13–17 ("NFL Dispute Resolution Procedural Guidelines"), Dkt. 73.

[11] *Emmanuel v. Handy Technologies, Inc.*, 992 F.3d 1 (1st Cir. 2021), is not to the contrary; it did not address the plaintiff's argument that the unilateral modification provision rendered the contract illusory because, *inter alia*, plaintiff did not direct that argument to the arbitration agreement specifically, *see id*. at 10–11.

Similarly, *Joule, Inc. v. Simmons*, No. SUCV200904929A, 2011 WL 7090714 (Mass. Super. Ct. Dec. 5, 2011), did not opine on the issue of whether the employer's ability unilaterally to modify the arbitration procedures,

11

*Gilbert v. Dell Techs., Inc.*, 415 F. Supp. 3d 389, 398 (S.D.N.Y. 2019) ("Under Massachusetts law, an agreement to arbitrate can be illusory if the agreement can be modified unilaterally by one party."). Massachusetts courts view unilateral modification provisions as posing a challenge to contract formation because the fact that the offeror retains the right unilaterally and retroactively to alter the terms of the offer "tends to show that any 'offer' made . . . was illusory," such that there was no offer at all. *Jackson*, 525 N.E.2d at 415; *see also O'Brien*, 664 N.E.2d at 848. Thus, severance cannot be an appropriate remedy because there is no otherwise valid agreement from which the Court might sever invalid terms.

Defendants' "argument that any illusory provision of the contract could simply be severed and the remainder of the contract stand would require [the Court] to engage in an absurd process," essentially "reviving a contract [it] found was never formed for its lack of consideration, omitting the change-in-term provision clause that was fatal to the contract's proper formation, to therefore conclude a contract was formed." *Nat'l Fed. of the Blind v. The Container Store*, 904 F.3d 70, 87 (1st Cir. 2018); *see also McNamara*, 2018 WL 6573125, at *3 (collecting cases).[12]

---

but not the arbitration agreement, rendered the contract illusory because, after remand from the Supreme Judicial Court, the only issue remaining for consideration was whether the contract was unconscionable. *See id*. at *2. In *Joule*, the employer had drawn special attention to the document containing arbitration procedures by appending it to the agreement "at the time that [the employee] signed it." *Id*. at *4. The Flores-Patriots Agreement states only that Mr. Flores had reviewed the document at an unspecified time, and the version of the Flores-Patriots Agreement in the record did not append the NFL's Constitution or Dispute Resolution Procedural Guidelines, which were both subject to the NFL's unilateral modification. *See supra*, page 10, note 10.

[12]  Even if the Court were to find that there was a valid agreement from which it could sever the unilateral modification provision in order to create a valid arbitration agreement, severance would still be inappropriate. The existence of a severance clause in a contract containing unenforceable terms "is not dispositive of the question whether those terms may in fact be severed" under Massachusetts law. *Machado v. System4 LLC*, 989 N.E.2d 464, 472 n.15 (Mass. 2013). Rather, courts must examine whether severance would alter the basic agreement to arbitrate, or the defect is so pervasive that severance would be inappropriate. *See Am. Fam. Life Assurance Co. of N.Y. v. Baker*, 848 F. App'x 11, 13 (2d Cir. 2021); *Feeney v. Dell Inc.*, 908 N.E.2d 753, 769 (Mass. 2009).

Defendants argue that severance would be "especially straightforward" and merely require revising section 15 of the Flores-Patriots Agreement to delete the requirement that Mr. Flores adhere to the NFL Constitution "as amended from time to time hereafter." Defs. Reply, Dkt. 99 at 5 (internal quotation omitted). This assertion ignores

SA-43

### III.    Plaintiffs' Motion for Reconsideration Is Denied

Plaintiffs' motion for reconsideration extensively relitigates their arguments that the arbitration agreements are unconscionable and prevent effective vindication of Plaintiffs' statutory claims, which the Court previously considered at length and rejected.  Without rehashing the entirety of the Arbitration Opinion, the Court briefly explains why the arbitration agreements contained in Mr. Flores's contract with the Miami Dolphins ("Flores-Dolphins Agreement"), Mr. Wilks' contract with the Arizona Cardinals ("Wilks-Cardinals Agreement"), and Mr. Horton's contract with the Tennessee Titans ("Horton-Titans Agreement") are enforceable.

As in their opposition to the motion to compel arbitration, Plaintiffs primarily base their arguments on their speculation that the NFL Commissioner will necessarily be biased as an arbitrator.  *See, e.g.*, Pls. Mem., Dkt. 80 at 3–5.  The Second Circuit has already rejected the argument that the NFL Commissioner cannot fairly "adjudicate the propriety of his own conduct," even when he acts as the sole arbitrator.[13]  *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016); *see also* Op. at 22–23.

While Plaintiffs attempt to distinguish that case on the grounds that it involved a contract that was the process of collective, rather than individual, bargaining and concerned a dispute

---

the fact that sections 16 and 17 of the Flores-Patriots Agreement also require Mr. Flores to adhere to subsequent amendments of NFL rules, including the NFL's Dispute Resolution Procedural Guidelines, which govern arbitration.  Furthermore, the NFL Constitution generally grants the NFL Commissioner the unilateral power to set and amend all NFL rules and regulations, including the NFL Dispute Resolution Procedural Guidelines, and to promulgate other arbitration-related rules in the future that would bind Mr. Flores.  *See* NFL Constitution § 8.5.  In sum, multiple portions of the parties' agreement grant the NFL unilateral authority to modify the contract; those provisions infect "fundamental elements of the arbitration regime" that cannot be severed from the whole.  *Feeney*, 908 N.E.2d at 769.

[13]    That case concerned "quarterback Tom Brady's involvement in a scheme to deflate footballs used during the 2015 American Football Conference Championship Game to a pressure below the permissible range."  *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 531 (2d Cir. 2016).

SA-44

over player discipline instead of federal statutory rights, the Second Circuit relied on neither fact in reaching its decision. *See* Pls. Mem. at 5–6; *Nat'l Football League Mgmt. Council*, 820 F.3d 527 at 548. Furthermore, it is well-established that "[m]ere inequality in bargaining power . . . is not a sufficient reason" to invalidate arbitration agreements; "the FAA's purpose was to place arbitration agreements on the same footing as other contracts."[14] *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 33 (1991). As the Second Circuit emphasized in *National Football League Management Council*, "arbitration is a matter of contract, and consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen."[15] 820 F.3d at 548; *see also Garcia v. Church of Scientology Flag Serv. Org,, Inc.*, No. 18-13452, 2021 WL 5074465, at *12 (11th Cir. 2021) (holding that because the plaintiff "agreed to a method of arbitration with inherent partiality" it was bound to the results of the arbitration).

The FAA contemplates that federal courts should address issues of bias in the administration of arbitration by examining whether the arbitrator demonstrated "evident partiality" in presiding over the arbitration; if he did, the arbitration award may be overturned. *Gilmer*, 500 U.S. at 30; *see also* 9 U.S.C. § 10(a)(2). Plaintiffs argue that *Gilmer* limits this rule to cases in which neutral procedures govern arbitration. *See* Pls. Mem. at 7–8. While *Gilmer* noted that the existence of unbiased procedures favored enforcing the arbitration agreement at issue, that was not central to its holding. *See Gilmer*, 500 U.S. at 30. Rather, *Gilmer* held that the FAA already contemplates protection against bias by permitting courts to overturn arbitration

---

[14] *Amici* law professors take issue with the trajectory of the Supreme Court's jurisprudence regarding the Federal Arbitration Act generally and suggest that *Gilmer* was wrongly decided. Amici Mem., Dkt. 88 at 6–7, 6 n.11. Whatever the merits of the learned professors' argument, this Court is, of course, bound by *Gilmer* and its progeny.

[15] There are numerous reasons why Plaintiffs rationally could have consented to select the NFL Commissioner as arbitrator, including the fact that the Commissioner possesses unique subject-matter expertise on matters related to the NFL.

14

**SA-45**

awards that are marred by evident partiality of the arbitrator. The Court noted only in passing that "[i]n any event," the arbitration rules applicable to that dispute protected "against biased panels." *Id*. In short, "it is well established that a district court cannot entertain an attack upon the . . . partiality of arbitrators until after the conclusion of the arbitration and the rendition of the award." *Aviall, Inc. v. Ryder Sys., Inc.*, 110 F.3d 892, 895 (2d Cir. 1997) (internal quotation omitted).

Plaintiffs alternatively ask the Court to find that the arbitration agreement is unenforceable because the alleged structural bias prevents Plaintiffs from effectively vindicating their statutory claims. Pls. Mem. at 14–15. As the Court previously explained in its Arbitration Opinion, the effective vindication doctrine is a highly circumscribed judge-made exception to the FAA. *See Am. Express v. Italian Colors Rest.*, 570 U.S. 228, 235–36 (2013); Op. at 24. The Supreme Court has never expanded it to encompass structural bias, and the nonbinding caselaw cited by Plaintiffs is unpersuasive for the reasons already discussed in the Arbitration Opinion. *See* Op. at 24. While Plaintiffs accuse the Court of breaking new ground in compelling arbitration of their claims and causing manifest injustice, this result was anticipated by Justice Kagan, who expressed concern that the Supreme Court's limitations on the effective vindication doctrine would permit companies to "appoint as an arbitrator an obviously biased person — say, the CEO . . . ." *Am. Express*, 570 U.S. at 242 (Kagan, J. dissenting); Op. at 24 n.23.[16]

Finally, Plaintiffs once again argue that the arbitration agreements are unconscionable under the applicable state contract laws. Pls. Mem. at 11–13. Plaintiffs did not initially, nor do

---

[16] Nothing in this Opinion should be read to suggest that the Undersigned harbors no concern about whether the process the NFL has apparently chosen to implement in this sort of dispute with coaches will be, and will be publicly perceived to be, fair. The Court is ruling only that, given the current legal structure, it must await the outcome of the arbitration to decide whether Plaintiffs' fears of unfairness were warranted or whether the NFL Commissioner gave them a fair shake to prove their claims.

**SA-46**

they now, cite any binding caselaw holding that arbitration agreements in which one party consents to the appointment of the counterparty's representative as arbitrator are unconscionable. While some courts have declined to enforce arbitration agreements in which the arbitrator selection procedures were so one-sided as to render the agreement unconscionable under applicable state law, those cases are inapplicable when the party seeking to avoid arbitration has consented to resolving his dispute before a specific arbitrator. *See* Op. at 24–25; *see also Gainseville Health Care Ctr., Inc. v. Weston*, 857 So.2d 278, 286 (Fla. Dist. Ct. App. 2003) (noting that Florida state courts "decline to indulge the presumption that the . . . arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators" in determining whether an arbitration agreement is unconscionable (quoting *Gilmer*, 500 U.S. at 30)).

Plaintiffs, in essence, ask the Court to fashion a specific rule out of whole cloth to protect them from potential arbitrator bias that may never manifest itself. To do so would be in direct violation of the FAA's admonition against carving out rules disfavoring the enforcement of arbitration agreements from generally applicable contract law. *See Gilmer*, 500 U.S. at 24.

## CONCLUSION

For the foregoing reasons, both Plaintiffs' and Defendants' motions for reconsideration are DENIED. The Clerk of Court is respectfully directed to terminate the open motions at docket entries 79 and 81.

The parties are ordered to appear for a pretrial conference on **Friday, August 4, 2023, at 10:00 A.M.** in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New

**SA-47**

York, New York, 10007.  By **July 27, 2023**, the parties must submit a joint letter, the contents of

which are described on pages 29 and 30 of the Arbitration Opinion.


**SO ORDERED.**

Date:  **July 25, 2023**
         **New York, NY**                                    _____
                                                              **VALERIE CAPRONI**
                                                              **United States District Judge**

17