# 23-1185

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

BRIAN FLORES, AS A CLASS REPRESENTATIVE,
ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiff-Appellee,*

STEVE WILKS, RAY HORTON,

*Plaintiffs,*

—against—

NEW YORK FOOTBALL GIANTS, INC., HOUSTON NFL HOLDINGS, L.P., DBA
HOUSTON TEXANS, DENVER BRONCOS, NATIONAL FOOTBALL LEAGUE,

*Defendants-Appellants,*

JOHN DOE TEAMS 1 THROUGH 29, JOHN DOE TEAMS 1 THROUGH 26, MIAMI
DOLPHINS, LTD., ARIZONA CARDINALS FOOTBALL CLUB LLC, DBA ARIZONA
CARDINALS, TENNESSEE TITANS ENTERTAINMENT, INC., DBA TENNESSEE
TITANS,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLEE

KEVIN MINTZER
LAW OFFICE OF KEVIN MINTZER, P.C.
1350 Broadway, Suite 1410
New York, New York 10018
(646) 843-8180

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF *AMICI CURIAE* ...............................................................1

SUMMARY OF ARGUMENT ...............................................................1

ARGUMENT ........................................................................................3

I.     The Arbitration Community's Development of Procedural Fairness
       Standards in the Wake of *Gilmer* Helps Demonstrate the
       Unconscionability of the NFL's Arbitration Clause .......................................3

II.    The NFL's Designation of Commissioner Goodell as Arbitrator Is
       Contrary to the Procedural Fairness Standards Developed by the
       Arbitration Community ...........................................................................5

       A.     The NFL's Arbitration Clause Violates Fundamental Fairness
              Because the Clause Fails to Provide for the Joint and Meaningful
              Selection of an Arbitrator from a Diverse Roster ...............................5

       B.     The NFL's Designation of Commissioner Goodell as Arbitrator
              Violates Norms of Procedural Fairness..............................................9

III.   The Court's Ruling Could Undermine the Legitimacy and Fairness of
       Arbitration for Millions of Workers and Consumers ....................................10

CONCLUSION ....................................................................................14

# TABLE OF AUTHORITIES

CASES                                                                      Page(s)

*Adelstein v. Walmart Inc.*,
    2024 WL 1347043 (N.D. Ohio Mar. 30, 2024)...................................................11

*Cole v. Burns Int'l Sec. Servs.*,
    105 F.3d 1465 (D.C. Cir. 1997)...........................................................13

*Cross & Brown Co. v. Nelson*,
    167 N.Y.S.2d 573 (App. Div. 1st Dep't 1957).......................................13

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991) ........................................................ 1, 3, 4, 5, 8

*Hooters of Am., Inc. v. Phillips*,
    173 F.3d 933 (4th Cir. 1999) ..............................................................13

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ........................................................................13

*Walz v. Walmart Inc.*,
    2024 WL 2864230 (W.D. Wash. June 6, 2024)........................................... 11-12

STATUTES

Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021,
    Pub. L. No. 117-90, 136 Stat. 2 .............................................................3

Federal Arbitration Act, 9 U.S.C. §§ 1-16..................................................... 3, 4, 13

OTHER AUTHORITIES

Richard A. Bales, *The Employment Due Process Protocol at Ten: Twenty
    Unresolved Issues, and A Focus on Conflicts of Interest*, 21 OHIO ST. J. ON DISP.
    RESOL. 165 (2005) .............................................................................5

Alexander J.S. Colvin, Economic Policy Institute, *The Growing Use of Mandatory
    Arbitration* (2018) ......................................................................... 3, 11

Alexander J.S. Colvin, *The Relationship Between Employment Arbitration and Workplace Dispute Resolution Procedures*, 16 OHIO ST. J. ON DISP. RESOL. 643 (2001) ..................................................................................................3

MARTIN DOMKE ET AL.,
DOMKE ON COMMERCIAL ARBITRATION (Dec. 2022 update) ...............................6

Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship (1995) ............................................. *passim*

Dunlop Commission on the Future of Worker-Management Relations, Fact Finding Report (May 1994) ...................................................................................4

Dunlop Commission on the Future of Worker-Management Relations, Final Report (Dec. 1994) ...................................................................................................3, 8

Margaret M. Harding, *The Limits of the Due Process Protocols*, 19 OHIO ST. J. ON DISP. RESOL. 369 (2004) ..................................................................................4, 5

International Institute for Conflict Prevention and Resolution Due Process Protections ..........................................................................................................8

JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness (2009) ..........................................................................................8, 9

IAN R. MACNEIL ET AL., FEDERAL ARBITRATION LAW (1995) ..................................5

James Madison, Federalist No. 10 ..............................................................................9

National Academy of Arbitrators, Policy Statement on Employment Arbitration (2009) ..........................................................................................................8, 9

IMRE S. SZALAI, OUTSOURCING JUSTICE: THE RISE OF MODERN ARBITRATION LAWS IN AMERICA (2013) ..................................................................................................4

Imre S. Szalai, *The Prevalence of Consumer Arbitration Agreements by America's Top Companies*, 52 U.C. DAVIS L. REV. ONLINE 233 (2019) ............................11

Imre S. Szalai, The Emp. Rts. Advoc. Inst., *The Widespread Use of Workplace Arbitration Among America's Top 100 Companies* (Mar. 2018) ......................11

## INTEREST OF *AMICI CURIAE*

*Amici* are law professors and scholars who focus on dispute resolution.[1] *Amici* are concerned that the Court's potential ruling in this case may undermine the equitable administration of arbitration and erode public confidence in arbitration. *Amici* file this brief to provide additional context regarding the highly problematic designation of NFL Commissioner Roger Goodell as arbitrator for these civil rights disputes. All parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The Supreme Court's watershed decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), opened the door for employers to implement mandatory arbitration for statutory claims brought by individual, non-union workers. In the wake of *Gilmer*, concerns arose that employers were unilaterally imposing one-sided, unconscionable arbitration agreements on their workers. As a result, leaders throughout the arbitration community took initiative during the 1990s to develop protocols of procedural fairness to help govern the new, emerging field of employment arbitration.

---

[1] *Amici* file this brief in their individual capacities, not as representatives of any organizations with which they are affiliated, and no one, other than *amici*, authored this brief in whole or in part. Also, no person or entity made a monetary contribution to the preparation or submission of the brief, except for *amici* Professor Imre Stephen Szalai, who used his professorship funds from Loyola University New Orleans for the printing costs of this brief. The names, titles, and short biographies of *amici* appear in the attached appendix. Affiliation and membership with certain institutional organizations are set forth in the appendix for identification purposes only, and listing an organization does not represent the organization's support for this brief.

As explained in more detail below, the NFL's unilateral designation of Commissioner Goodell as arbitrator for these non-union disputes[2] is unconscionable and contrary to the norms of fundamental fairness developed by the arbitration community. Furthermore, if the Court finds the NFL's arbitration clause is enforceable in this non-union, employment dispute, other corporate parties may rewrite their arbitration clauses to imitate the NFL's provisions whereby a company representative is the sole, designated arbitrator for employment claims or even consumer claims against the company. This Court's ruling could undermine the legitimacy and fairness of arbitration for hundreds of millions of workers and consumers governed by arbitration agreements. Enforcement of the NFL's arbitration clause in connection with this case could transform arbitration as it has been practiced for decades and damage the credibility of arbitration as a viable form of dispute resolution. *Amici* respectfully ask the Court, as an alternative grounds for affirming the decision below, to hold that it is unconscionable for NFL Commissioner Roger Goodell to serve as the arbitrator for these civil rights claims.

---

[2] Section 8.3 of the NFL Constitution purports to give the NFL Commissioner "full, complete and final jurisdiction and authority to arbitrate" certain types of disputes, including the employment disputes that form the basis for this litigation.

# ARGUMENT

## I. The Arbitration Community's Development of Procedural Fairness Standards in the Wake of *Gilmer* Helps Demonstrate the Unconscionability of the NFL's Arbitration Clause

The Supreme Court's watershed decision in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), opened the door for employers to implement mandatory arbitration for statutory claims brought by individual, non-union workers.[3] *Gilmer* transformed the Federal Arbitration Act and "set in motion one of the most dramatic shifts in the governance of employment relations of recent times."[4] In the wake of *Gilmer*, complaints arose that employers were unilaterally imposing one-sided, unconscionable arbitration agreements that failed to satisfy basic norms of fairness.[5] Because of the unequal bargaining power often found in employment relationships, there was concern after *Gilmer* that employers could

---

[3] *Gilmer* is the governing law today, and under *Gilmer*, civil rights claims, employment claims, and virtually all types of claims are generally arbitrable under the Federal Arbitration Act. However, Congress recently adopted a notable exception involving sexual harassment and sexual assault claims arising after March 3, 2022. Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021, Pub. L. No. 117-90, 136 Stat. 2.

[4] Alexander J.S. Colvin, *The Relationship Between Employment Arbitration and Workplace Dispute Resolution Procedures*, 16 Ohio St. J. on Disp. Resol. 643, 643 (2001); *see also* Alexander J.S. Colvin, Economic Policy Institute, *The Growing Use of Mandatory Arbitration* (2018) ("the share of workers subject to mandatory arbitration had risen from just over 2 percent (in 1992) to almost a quarter of the workforce [by the early 2000s]" and by 2018, "now exceeds 55%").

[5] Dunlop Commission on the Future of Worker-Management Relations, Final Report 51, 52, 54-55, 73 (Dec. 1994).

dilute fundamental rights by drafting one-sided or harsh arbitration provisions in take-it-or-leave-it contracts.[6]

In this new frontier ushered in by *Gilmer,* when employers began imposing mandatory arbitration in the workplace during the 1990s,[7] procedural safeguards became necessary to protect workers. Leaders in the arbitration community responded by developing basic protocols or minimum standards of procedural fairness to govern the emerging field of employment arbitration. In 1994, a special task force was created to address these concerns. Members of this task force included leaders from the National Academy of Arbitrators, American Arbitration Association, American Bar Association, and the Federal Mediation and Conciliation Service, among other organizations.[8]

In 1995, the task force produced the Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship (hereinafter Due Process Protocol).[9] In drafting the Due Process Protocol, the

---

[6] Dunlop Commission on the Future of Worker-Management Relations, Fact Finding Report 118 (May 1994).

[7] *Gilmer* is a landmark case for approving of employment arbitration under the Federal Arbitration Act. Prior to *Gilmer*, the Federal Arbitration Act was understood as not applicable to employment claims. IMRE S. SZALAI, OUTSOURCING JUSTICE: THE RISE OF MODERN ARBITRATION LAWS IN AMERICA 191-92 (2013) (exploring the full history of the Federal Arbitration Act's enactment and demonstrating that the statute was not designed for employment disputes).

[8] Margaret M. Harding, *The Limits of the Due Process Protocols*, 19 OHIO ST. J. ON DISP. RESOL. 369, 390 (2004).

[9] Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship (1995), https://www.adr.org/sites/default/files/document_repository/Employment%20Due%20Process%20Protocol_0.pdf. For more history regarding the development of the Due Process Protocol, see

members of the task force were cognizant of employers who had unilaterally implemented dispute resolution plans that "constituted inequitable and oppressive efforts to tilt the result of such [arbitration] to the employer, while depriving employees of many rights usually associated with due process and fairness."[10] The Due Process Protocol, which was limited to statutory claims in the employment context, addressed a range of issues. These issues included an individual's right of representation, adequate pre-hearing discovery, and most relevant to this appeal, the qualifications and selection process of arbitrators.[11] As demonstrated below, enforcing the NFL's arbitration clause in connection with the employment claims raised in this case would violate these established, minimum standards of fairness.

## II. The NFL's Designation of Commissioner Goodell as Arbitrator Is Contrary to the Procedural Fairness Standards Developed by the Arbitration Community

### A. The NFL's Arbitration Clause Violates Fundamental Fairness Because the Clause Fails to Provide for the Joint and Meaningful Selection of an Arbitrator from a Diverse Roster

It is well established that the most important decision in connection with arbitration is the parties' choice of an arbitrator. 3 IAN R. MACNEIL ET AL., FEDERAL ARBITRATION LAW § 27.1 (1995) (selecting the arbitrator is "the most important

---

generally Harding, *supra* note 8 (describing a confluence of factors, including the *Gilmer* decision, leading to the creation of the Due Process Protocol); *see also* Richard A. Bales, *The Employment Due Process Protocol at Ten: Twenty Unresolved Issues, and A Focus on Conflicts of Interest*, 21 OHIO ST. J. ON DISP. RESOL. 165 (2005).

[10] Harding, *supra* note 8, at 391 (citation omitted).

[11] Due Process Protocol, *supra* note 9.

decision arbitrating parties can make," and "[i]n arbitration, to a great degree, the arbitrator *is* the process.") (emphasis in original); 2 MARTIN DOMKE ET AL., DOMKE ON COMMERCIAL ARBITRATION § 24:1 (Dec. 2022 update) ("The arbitrator is the decisive element in any arbitration.").

Because of the fundamental significance of selecting a neutral arbitrator, the landmark Due Process Protocol contains several provisions about arbitrator selection. For example, the Due Process Protocol provides for the development of a roster of independent, impartial arbitrators to hear statutory employment disputes.[12] Furthermore, arbitrators selected for membership on this roster "should have skill in the conduct of hearings, knowledge of the statutory issues at stake in the dispute, and familiarity with the workplace and employment environment."[13] Importantly, this roster of arbitrators for statutory disputes in the employment setting "should be established on a non-discriminatory basis, diverse by gender, ethnicity, background, experience, etc. to satisfy the parties that their interest and objectives will be respected and fully considered."[14] Additionally, the Due Process Protocol recognizes that arbitrators on this roster should go through mandatory training, including training regarding the substantive employment laws at issue.[15]

---

[12] *Id.* § C.1.
[13] *Id.*
[14] *Id.*
[15] *Id.* § C.2.

The Due Process Protocol also recognizes as a critical, minimum component of procedural fairness the right of both the employee and employer to participate in the joint selection of an arbitrator from this roster or list of arbitrators. For binding arbitration of employment disputes involving statutory rights, such as the rights at issue in this case, the Due Process Protocol emphasizes the following:

> We recognize the right of employers and employees to *jointly select* as mediator and/or arbitrator one in whom *both parties have requisite trust*. . . .[16]

Furthermore, to promote fairness and trust during this joint selection process, the Due Process Protocol provides for the use of a list procedure whereby the parties engage in alternate striking of names of potential arbitrators from the list, taken from the roster of diverse, qualified, trained arbitrators.[17]

In addition to the landmark Due Process Protocol, leading arbitration organizations have similarly recognized the key fairness principle that workers must have the right to participate meaningfully in the selection of an arbitrator:

● The National Academy of Arbitrators captured this fairness principle with the following analysis for employment disputes: "Did both parties have a

---

[16] *Id.* § C.1 (emphasis added).
[17] *Id.* § C.3.

meaningful [arbitrator] selection opportunity? A negative answer to this question should cause you to decline the case . . . ."[18]

● JAMS, another leading arbitration organization, recognized the following as a minimum standard of procedural fairness for employment disputes: "an employee must have the right to participate in the selection of the arbitrator(s)."[19]

● The International Institute for Conflict Prevention and Resolution, another leading arbitration organization, developed the following as part of its Due Process Protections for employment disputes: employees "shall have the right to nominate any person(s) for consideration as an arbitrator."[20]

Putting aside for the moment the identity of the chosen arbitrator in this case, the NFL's unilateral designation of *any arbitrator* on a take-it-or-leave-it basis, without the Plaintiff's meaningful participation, is, by itself, deeply troubling for these employment claims. Such a designation violates the norms of procedural

---

[18] National Academy of Arbitrators, Policy Statement on Employment Arbitration (2009), https://naarb.org/employment-arbitration-policy-and-guidelines.

[19] JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness (2009), Standard No. 2, https://www.jamsadr.com/employment-minimum-standards.

[20] International Institute for Conflict Prevention and Resolution Due Process Protections, https://static.cpradr.org/docs/Due%20Process%20Protections%205.9.22.pdf; *see also* Dunlop Final Report, *supra* note 5, at 57 (for fairness in employment arbitration in the wake of *Gilmer*, the Dunlop Commission recommends a selection process where both the employer and employee jointly participate in the selection of an arbitrator from a roster of qualified, trained, experienced arbitrators, and "[n]either party should be able to limit the roster unilaterally so as to risk the possibility that the arbitrator finally selected will be biased in favor of that side").

fairness developed by the arbitration community for the resolution of statutory employment claims.

**B.      The NFL's Designation of Commissioner Goodell as Arbitrator Violates Norms of Procedural Fairness**

To add insult to injury, the NFL not only stripped away Plaintiff's meaningful participation in the selection of an arbitrator, *which by itself contravenes procedural fairness*, but also unilaterally and specifically designated a highly problematic arbitrator: Commissioner Roger Goodell.  The Due Process Protocol and norms of fairness developed by the arbitration community require a neutral, impartial arbitrator,[21] and the designation of Commissioner Goodell violates these norms of fundamental fairness in several ways:

- First, Commissioner Goodell is the chief executive officer of the NFL, and the team owners employ him and set his compensation.  His interests are inextricably tied to Defendants.  Because he is inseparable from Defendants in this case, he cannot be viewed as a neutral and impartial arbitrator.[22]

- Second, within hours of the filing of this lawsuit, the NFL, which Commissioner Goodell oversees, immediately issued a public announcement

---

[21] *See supra* notes 12-20 and accompanying text; *see also* National Academy of Arbitrators, Policy Statement on Employment Arbitration (2009) (arbitrators "should scrupulously maintain both the reality and the appearance of impartiality"); JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness (2009), Standard No. 2 ("The arbitrator(s) must be neutral.").
[22] "No man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." James Madison, Federalist No. 10.

emphatically declaring that this lawsuit is "without merit." Arbitrators must avoid even the appearance of impropriety, and it is disqualifying for an arbitrator to prejudge a case or make such public statements about the case.

- Third, Commissioner Goodell is likely to be called as a witness in this case because the NFL, which he oversees, is a named defendant. As such, he is ineligible and cannot serve as a neutral and impartial arbitrator to hear these claims.

- Fourth, Commissioner Goodell is not an attorney; he is not legally trained to hear and make a determination on these highly-sensitive civil rights claims.

The NFL's unilateral designation of Commissioner Goodell as the arbitrator for these civil rights disputes, without any meaningful opportunity for employees to choose the arbitrator, is unconscionable and an egregious violation of fundamental standards of fairness.

## III. The Court's Ruling Could Undermine the Legitimacy and Fairness of Arbitration for Millions of Workers and Consumers

Arbitration agreements appear in all types of transactions throughout American society. Today, there are hundreds of millions of arbitration agreements governing workers and consumers. In the workplace, more than 60 million American workers are bound by arbitration agreements, and about 80% of America's

largest companies have used arbitration agreements for employment disputes.[23]  In the consumer setting, a 2018 study found that conservatively, there were more than 826 million consumer arbitration agreements in the United States.[24]  These figures are gargantuan when one considers that the entire population of the United States is about 336 million.[25]

With such massive numbers of employment and consumer arbitration agreements, the potential ramifications of this Court's ruling on the future of arbitration are considerable and extensive.  If the Court approves of Commissioner Goodell as the arbitrator for these employment claims, other major companies could rely on this case as a justification for amending their employment arbitration agreements and even consumer arbitration agreements to copy the NFL's provisions whereby the company's CEO is the sole arbitrator of all claims.

For example, Walmart, one of the largest companies in the world, currently uses arbitration clauses in connection with consumer and worker disputes.[26]

---

[23] Alexander J.S. Colvin, Economic Policy Institute, *The Growing Use of Mandatory Arbitration* (2018) (more than 60 million American workers are bound by arbitration agreements); Imre S. Szalai, The Emp. Rts. Advoc. Inst., *The Widespread Use of Workplace Arbitration Among America's Top 100 Companies* (Mar. 2018) (80% of America's largest companies have used arbitration agreements for employment disputes).

[24] Imre S. Szalai, *The Prevalence of Consumer Arbitration Agreements by America's Top Companies*, 52 U.C. DAVIS L. REV. ONLINE 233 (2019) (81% of America's largest companies have used arbitration agreements for consumer transactions, and by conservative estimates, there are more than 826 million consumer arbitration agreements in America).

[25] US Census Bureau, https://www.census.gov/popclock/.

[26] *See, e.g.*, *Adelstein v. Walmart Inc.*, No. 1:23-CV-00067, 2024 WL 1347043 (N.D. Ohio Mar. 30, 2024) (compelling arbitration of consumer's claims against Walmart); *Walz v. Walmart Inc.*,

Walmart's millions of customers who shop online or through Walmart's app are already bound by an arbitration clause requiring arbitration before the American Arbitration Association.[27] Walmart, based on the potential ruling in this case, could update its arbitration agreement for both consumers and workers to copy the NFL's arbitration provisions. Walmart could amend its arbitration agreement to drop the American Arbitration Association, a trusted organization with a large, independent, neutral roster of arbitrators and almost one-hundred years of experience in the administration of arbitration, and declare that the sole arbitrator with complete authority to issue a binding, final resolution of all disputes is Walmart's CEO or another Walmart executive.

If the NFL's arbitration clause is enforced in connection with these employment claims, nothing would legally stop Walmart and every other company from modifying their arbitration clauses so that all employment and consumer disputes must now be resolved through arbitration with the company's CEO, or another company executive, serving as the sole arbitrator. The negative consequences of such a flawed ruling enforcing the NFL's arbitration clause in this case would be extensive. Such a flawed ruling could undermine the legitimacy and

---

No. 3:23-CV-06083-BHS, 2024 WL 2864230 (W.D. Wash. June 6, 2024) (compelling arbitration of worker's claims against Walmart).

[27] Walmart.com's Terms of Use, https://www.walmart.com/help/article/walmart-com-terms-of-use/3b75080af40340d6bbd596f116fae5a0; *see also* The Beginner's Guide to Selling on Walmart Marketplace (observing that Walmart.com has 120 million monthly visitors), https://marketplace.walmart.com/guide-to-walmart-marketplace/.

fairness of arbitration for hundreds of millions of workers and consumers. Furthermore, such a ruling could transform arbitration as it has been practiced for decades and damage the credibility of arbitration as a viable form of dispute resolution. The Court, therefore, should take action to ensure procedural fairness and protect the traditional ability of parties to engage in a meaningful and joint selection of a competent, neutral arbitrator from a list or roster of qualified arbitrators.[28]

---

[28] The designation of Commissioner Goodell as the sole arbitrator for these civil rights claims in the non-union, employment setting is highly problematic and could be subject to nullification under multiple legal grounds. For example, one could analyze this designation as unconscionable for violating norms of fundamental fairness. One could also analyze this designation as violating a covenant of good faith and fair dealing. *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999) (arbitration agreement providing for the appointment of potentially biased arbitrators violates the contractual duty of good faith and fair dealing). An additional, independent legal ground for challenging the designation is the effective vindication doctrine; a worker could not effectively vindicate their rights in a dispute against a company if the sole arbitrator is the company's CEO where the company has already stated the case is without merit. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) (recognizing the effective vindication doctrine); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1482 (D.C. Cir. 1997) (a neutral arbitrator is a requirement for the effective vindication of one's rights). One could also argue that this unilateral, take-it-or-leave-it designation of Commissioner Goodell as the sole arbitrator for this employment dispute is so deeply flawed that this clause does not even qualify as or meet the definition of "arbitration" under the Federal Arbitration Act. *Cf. Cross & Brown Co. v. Nelson*, 167 N.Y.S.2d 573 (App. Div. 1st Dep't 1957) (when an arbitration agreement appoints a party to the dispute as the arbitrator, the agreement "becomes, not a contract to arbitrate, but an engagement to capitulate"). In sum, multiple legal theories exist to declare the invalidity of the NFL's arbitration clause.

## CONCLUSION

For the reasons set forth in the Plaintiff's appellate brief, the Court, as an alternative grounds for affirming, should find that it is a violation of procedural norms of fundamental fairness for NFL Commissioner Roger Goodell to arbitrate the Plaintiff's civil rights claims against the NFL teams.

Dated: July 18, 2024

New York, New York

By: _/s/ Kevin Mintzer_____
LAW OFFICE OF
KEVIN MINTZER, P.C.
Kevin Mintzer
1350 Broadway, Suite 1410
New York, New York 10018
646-843-8180
km@mintzerfirm.com
*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 3,325 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times Roman 14-point font.

Dated: July 18, 2024        Respectfully submitted,

        /s/ Kevin Mintzer
        _____

LAW OFFICE OF KEVIN MINTZER, P.C.
Kevin Mintzer
1350 Broadway, Suite 1410
New York, New York 10018
646-843-8180
km@mintzerfirm.com

*Attorneys for Amici Curiae*

# APPENDIX

## Appendix

### Biographies of *Amici*

**Gilat Juli Bachar** is an Assistant Professor of Law at Temple University Beasley School of Law, where she teaches Torts, Professional Responsibility, and a seminar in Dispute Resolution. She was previously a Visiting Assistant Professor at Villanova University School of Law, teaching Contracts and Dispute Resolution. Prior to Villanova, Gilat was a research fellow with the Stanford Center on the Legal Profession, and a Stanford Law School Public Interest Fellow at the Center for Justice & Accountability in San Francisco where she worked on social justice tort litigation in federal courts. Gilat graduated with a JSD from Stanford Law School in 2018, where her research won one national and two school-wide awards, as well as numerous research grants. Prior to coming to Stanford, she earned an LL.B. in Law and an M.B.A. in Business Administration, both summa cum laude, from the Hebrew University of Jerusalem. Her work, which has been published or is forthcoming in journals such as the Minnesota Law Review, Arizona State Law Journal, Cardozo Law Review, UC Law Journal, and Chicago Journal of International Law, investigates how disputants and lawyers perceive settlement-related legal concepts like accountability, confidentiality and deterrence and how these concepts ought to be applied.

**Rick Bales** is a faculty member at Ohio Northern University Law School. He teaches a wide variety of labor/employment and ADR courses, Torts, and Civil Procedure. He has published more than 100 scholarly articles and authored or co-authored 10 books on a variety of topics related to labor/employment/ADR. Rick also is a labor arbitrator. He is a member of the National Academy of Arbitrators and the College of Labor and Employment Lawyers, and he serves on FMCS, AAA, SERB (Ohio), MERC (Michigan), and Houston Police panels. In 2010, Rick served as a Fulbright Specialist providing dispute resolution training to labor judges in Malaysia. Three years later, he again served as a Fulbright Specialist, this time in Indonesia. His time in Malaysia led to his becoming familiar with the Cambodian Arbitration Council – a model for labor-arbitration design throughout Southeast Asia. That, in turn, led to several opportunities to work with the Solidarity Center to provide dispute-resolution training to garment workers in Myanmar. The goal – since disrupted by the 2021 military coup – was to provide tripartite (labor, management, neutrals) training there in labor dispute resolution.

**George A. Bermann** is a Professor of Law and director of Center for International Commercial and Investment Arbitration (CICIA), Columbia Law School; international commercial and investment arbitrator since 1980; founding member, Governing Board, ICC International Court of Arbitration; director of global board, New York International Arbitration Center (NYIAC); editor-in-chief, "American Review of International Arbitration;" patron, Chartered Institute of Arbitrators; president of board of Thai International Arbitration Center (Bangkok, Thailand); president of board of Center for International Investment and Commercial Arbitration (Lahore, Pakistan); professor, MIDS program in international dispute resolution (Geneva); Professor, Sciences Po LL.M. (Paris); Chief Reporter of ALI Restatement of the U.S . Law of International Commercial and Investment Arbitration; author of "Twilight Issues in International Arbitration," "International Arbitration and Private International Law" (Hague General Course in Private International Law); "Mandatory Law in International Arbitration," "Nutshell on International Commercial Arbitration," "Nutshell on Transnational Litigation;" Lifetime Achievement Award, American Society of Comparative Law; past president, International Academy of Comparative Law; past president, American Society of Comparative Law; honorary degrees, University of Fribourg (Switzerland), University of Versailles-St. Quentin (France); Nova University of Lisbon (Portugal); University Cesar Vallejo (Lima, Peru); founder and past editor-in-chief, "Columbia Journal of European Law;" founder and former director, European Legal Studies Center, Columbia Law School.

**Ylli Dautaj** currently teaches as visiting associate professor at Penn State Law. He was previously an academic at Brunel Law School and Durham Law School in the UK. Meanwhile, Dr Dautaj keeps a robust practice. He represents clients in both litigation and arbitration matters, domestic as well as international. He represents individuals, private enterprises, State-owned enterprises, and States in various litigation matters and international arbitrations, including matters incidental or ancillary to arbitration. Ylli has published extensively with various leading law journals, books, and book chapters; for example, with Kluwer International, Brill Research Perspectives, Northwestern Journal of International Law and Business, Fordham International Law Journal, Cornell International Law Journal, The International Lawyer, and Manchester Journal of International Law.

**Benjamin Davis** is Emeritus Professor of Law of the University of Toledo College of Law and a Visiting Professor of Law at Washington and Lee School of Law with 23 years experience in academia. He is a former Chair of the American Bar Association Section of Dispute Resolution. Some of the subjects he teaches are Alternative Dispute Resolution, International and Domestic Arbitration, and

Contracts.  Prior to entering academia, for ten years he was the American Legal Counsel at the Secretariat of the International Court of Arbitration of the International Chamber of Commerce in Paris, France, where he directly supervised around 1000 international commercial arbitrations and mediations.

**Michael Z. Green** has served as a full professor at Texas A&M University School of Law since its beginning in August 2013 and as the Director of its Workplace Law Program since 2015.  He has published several law review articles and book chapters in support of his scholarly agenda focused on workplace law issues and their intersection with dispute resolution and race.  He has also discussed his scholarly endeavors at many national and international venues.  As a member of the Labor Law Group, a collection of scholars engaged in producing quality casebooks for instruction in labor and employment law, he is a co-author of the Fourth Edition of <u>ADR in the Workplace</u> by West, published in 2020.  In September 2019, he was selected as a member of the National Academy of Arbitrators in recognition of his scholarly achievements and service as a labor arbitrator.

**Deborah Hensler** is the Judge John W. Ford Professor of Dispute Resolution at Stanford Law School, where she teaches courses on domestic, international and investor state arbitration and global litigation. She has written extensively on court-connected ADR and arbitration and conducted empirical research on the uses of arbitration.

**Ariana R. Levinson** is the Frost, Brown, Todd Professor of Law at the University of Louisville Louis D. Brandeis School of Law where she teaches Employment Law, Dispute Resolution, and Arbitration Practice.  Professor Levinson is also a fellow in the Rutgers School of Management & Labor Relations Institute for the Study of Employee Ownership & Profit Sharing.  Professor Levinson has published six law review articles about arbitration and is a co-author of the West Concise Hornbook Principles of Arbitration Law.  She is the faculty advisor for the Brandeis School of Law ABA Student Division Mock Arbitration Team and for the Wagner Moot Court Team.  Professor Levinson is admitted to practice in Indiana and California.  She graduated magna cum laude from the University of Michigan Law School.  During law school, she served as a contributing editor on the Michigan Law Review and was awarded the Robert S. Feldman Labor Law Award for the most outstanding work in that field.

**Alan B. Morrison** is the Lerner Family Associate Dean for Public Interest and Public Service Law at the George Washington University Law School, where he teaches civil procedure and constitutional law. Most relevant for this appeal, he is the author of *Can Mandatory Arbitration of Medical Malpractice Claims Be Fair? The Kaiser Permanente System*, 79 AAA Dispute Resolution Journal 35 (2015), in which he concluded that the system of selecting arbitrators there was fair and supported by lawyers for claimants as well the medical provider.

**Alexi Pfeffer-Gillett** is an Assistant Professor at the Washington and Lee University School of Law. His scholarship has been cited by courts as an authoritative source on arbitration, and his work has appeared in the University of Pennsylvania Law Review, the Minnesota Law Review, the Duke Law & Technology Review, and the California Law Review. He previously clerked for Judge Mary M. Schroeder on the United States Court of Appeals for the Ninth Circuit and practiced class-action securities litigation. Professor Pfeffer-Gillett earned his J.D. from the University of California, Berkeley, School of Law.

**Andrea Kupfer Schneider** is a Professor of Law and Director of the Kukin Program for Conflict Resolution at Cardozo School of Law. Professor Schneider was the previous director of the nationally ranked ADR program at Marquette University Law School in Wisconsin, where she taught ADR, Negotiation, Ethics and International Conflict Resolution for over two decades. In addition to overseeing the ADR program, Professor Schneider was the inaugural director of the university's Institute for Women's Leadership. Professor Schneider has published numerous articles on negotiation, plea bargaining, negotiation pedagogy, ethics, gender and international conflict. Her books include Discussions in Dispute Resolution: The Foundational Articles, edited with Art Hinshaw and Sarah Cole (Oxford University Press 2021) (winner of the 2022 CPR Book Award); and multiple textbooks in the field. She is a founding editor of Indisputably, the blog for ADR law faculty, and started the Dispute Resolution Works-in-Progress annual conferences in 2007. In 2016, she gave her first TEDx talk titled Women Don't Negotiate and Other Similar Nonsense. She was named the 2017 recipient of the ABA Section of Dispute Resolution Award for Outstanding Scholarly Work, the highest scholarly award given by the ABA in the field of dispute resolution.

**Imre Stephen Szalai** is the Judge John D. Wessel Distinguished Professor of Social Justice at Loyola University New Orleans College of Law. He is a graduate of Yale University, and he received his law degree from Columbia University, where he was named a Harlan Fiske Stone Scholar. His teaching and scholarly passion focus on dispute resolution, arbitration, and arbitration law. For two decades, he has

extensively studied the uses of arbitration and the development of arbitration law in the United States from the colonial period to the present, and he has written books, book chapters, and articles about the history and development of the FAA.  His scholarship has appeared in top journals of dispute resolution, and he maintains a blog focusing on arbitration law, www.arbitrationusa.com.  He also actively serves as a commercial arbitrator.