# 23-1185

## In the United States Court of Appeals for the Second Circuit

BRIAN FLORES, AS A CLASS REPRESENTATIVE,
ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,
PLAINTIFFS-APPELLEES,

STEVE WILKS, RAY HORTON, PLAINTIFFS

*v.*

NEW YORK FOOTBALL GIANTS, INC.; HOUSTON NFL HOLDINGS, L.P., DBA
HOUSTON TEXANS; DENVER BRONCOS; NATIONAL FOOTBALL LEAGUE,
DEFENDANTS-APPELLANTS,

JOHN DOE TEAMS 1 THROUGH 29; JOHN DOE TEAMS 1 THROUGH 26;
MIAMI DOLPHINS, LTD.; ARIZONA CARDINALS FOOTBALL  CLUB LLC,
DBA ARIZONA CARDINALS;  TENNESSEE TITANS
ENTERTAINMENT, INC., DBA TENNESSEE TITANS, DEFENDANTS

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 22-871)
(THE HONORABLE VALERIE E. CAPRONI, J.)*

**JOINT APPENDIX
VOLUME 1 OF 6 (PAGES J.A. 1 – J.A. 269)**

DOUGLAS H. WIGDOR
WIGDOR, LLP
*85 Fifth Avenue, 5th Floor
New York, New York, 10003
(212) 257-6800
dwigdor@wigdorlaw.com*

KANNON K. SHANMUGAM
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

# TABLE OF CONTENTS

Page

## Volume 1

List of district-court docket entries.................................................J.A. 1

Class Action Complaint,
　D. Ct. Dkt. 1 (Feb. 1, 2022) ...........................................J.A. 24

First Amended Class Action Complaint,
　D. Ct. Dkt. 22 (Apr. 7, 2022) ........................................J.A. 82

Order Regarding Briefing Schedule on Motion To Compel Arbitration,
　D. Ct. Dkt. 43 (May 2, 2022) .......................................J.A. 182

Notice of Defendants' Motion To Compel Arbitration and Stay Further
　Proceedings,
　D. Ct. Dkt. 47 (June 21, 2022)....................................J.A. 184

Memorandum of Law in Support of Defendants' Motion To Compel
　Arbitration and Stay Further Proceedings,
　D. Ct. Dkt. 48 (June 21, 2022).....................................J.A. 186

Flores-Steelers Agreement (Redacted),
　D. Ct. Dkt. 49-4 (June 21, 2022) .................................J.A. 217

Declaration of Dolores F. DiBella,
　D. Ct. Dkt. 50 (June 21, 2022)* ...................................J.A. 223

Letter from Douglas H. Wigdor to Judge Valerie E. Caproni,
　D. Ct. Dkt. 54 (July 1, 2022) .......................................J.A. 225

Letter from Douglas H. Wigdor to Loretta E. Lynch,
　D. Ct. Dkt. 54-1 (July 1, 2022) ...................................J.A. 231

Letter from Loretta E. Lynch to Douglas H. Wigdor,
　D. Ct. Dkt. 54-2 (July 1, 2022) ...................................J.A. 234

Transcript in *Flores, et al.,* v. *The National Football League, et al.,*
　Civ. No. 22-871 (S.D.N.Y. May 2, 2022),
　D. Ct. Dkt. 54-3 (July 1, 2022) ...................................J.A. 237

John Breech, *Roger Goodell's Astronomical Pay Revealed: NFL Commissioner Topped $125 Million Over Past Two Years Combined*, CBS Sports (June 29, 2022),
D. Ct. Dkt. 54-4 (July 1, 2022) ...............................................J.A. 252

Letter from Loretta E. Lynch to Judge Valerie E. Caproni,
D. Ct. Dkt. 55 (July 8, 2022) ..................................................J.A. 255

Opinion and Order Denying Discovery,
D. Ct. Dkt. 58 (August 4, 2022) .............................................J.A. 261

## Volume 2

Memorandum of Law in Opposition to Defendants' Motion To Compel Arbitration and Stay Further Proceedings,
D. Ct. Dkt. 62 (Aug. 31, 2022)................................................J.A. 270

Declaration of Douglas H. Wigdor,
D. Ct. Dkt. 63 (Aug. 31, 2022)................................................J.A. 301

NFL Communications, *NFL Statement on Brian Flores' Suit*,
D. Ct. Dkt. 63-2 (Aug. 31, 2022)............................................J.A. 305

Ken Belson, *Roger Goodell's Pay for Two Years Reached Nearly $128 Million*, N.Y. Times (Oct. 29, 2021)
D. Ct. Dkt. 63-3 (Aug. 31, 2022)............................................J.A. 307

Derek Saul, *NFL's Roger Goodell Reportedly Makes $63.9 Million Per Year — Here's How That Compares To Other Top Execs and Sports Commissioners*, Forbes (Oct. 29, 2021)
D. Ct. Dkt. 63-4 (Aug. 31, 2022)............................................J.A. 311

Ben Fischer and John Ourand, *More Time for Goodell?*, Sports Business Journal (Feb. 21, 2022)
D. Ct. Dkt. 63-5 (Aug. 31, 2022)............................................J.A. 315

Patrik Walker, *Roger Goodell Negotiating Contract Extension To Remain NFL Commissioner for Foreseeable Future, Per Report*, CBS Sports (Feb. 18, 2022)
D. Ct. Dkt. 63-6 (Aug. 31, 2022)............................................J.A. 320

Transcript in *Gruden* v. *The National Football League*, No. A-21-
844043-B (Nev. Dist. Ct., Clark Cty. May 25, 2022),
D. Ct. Dkt. 63-7 (Aug. 31, 2022)................................................J.A. 323

Order in *Nostalgic Partners, LLC* v. *New York Yankees
Partnership, et al.*, No. 656724/2020 (N.Y. Sup. Ct. Dec. 17, 2021),
D. Ct. Dkt. 63-8 (Aug. 31, 2022)................................................J.A. 375

Transcript in *Nostalgic Partners, LLC* v. *New York Yankees
Partnership, et al.*, No. 656724/2020 (N.Y. Sup. Ct. Dec. 17, 2021),
D. Ct. Dkt. 63-9 (Aug. 31, 2022)................................................J.A. 378

Arbitration Agreement in *McMullen* v. *Meijer, Inc.*, Civ. No. 99-71206
(E.D. Mich. Aug. 16, 2004),
D. Ct. Dkt. 63-10 (Aug. 31, 2022)..............................................J.A. 411

JAMS Comprehensive Arbitration Rules & Procedures,
D. Ct. Dkt. 63-11 (Aug. 31, 2022)..............................................J.A. 420

JAMS Employment Arbitration Rules & Procedures,
D. Ct. Dkt. 63-12 (Aug. 31, 2022)..............................................J.A. 445

JAMS Policy on Employment Arbitration Minimum Standards of
Procedural Fairness,
D. Ct. Dkt. 63-13 (Aug. 31, 2022)..............................................J.A. 466

Plaintiff's Sur-Reply in Further Opposition to Defendants' Motion To
Compel Arbitration and Stay Further Proceedings,
D. Ct. Dkt. 67 (Oct. 7, 2022) ....................................................J.A. 471

Order To Submit Supplemental Briefing,
D. Ct. Dkt. 70 (Feb. 1, 2023) ....................................................J.A. 486

Letter from Loretta E. Lynch to Judge Valerie E. Caproni,
D. Ct. Dkt. 71 (Feb. 3, 2023) ....................................................J.A. 488

iii

**Volume 3**

Flores-Dolphins Agreement (Redacted),
  D. Ct. Dkt. 72-2 (Feb. 3, 2023)....................................................J.A. 489

Flores-Patriots Agreement (Redacted),
  D. Ct. Dkt. 72-3 (Feb. 3, 2023)....................................................J.A. 506

Flores-Steelers Agreement (Redacted),
  D. Ct. Dkt. 72-4 (Feb. 3, 2023)....................................................J.A. 515

Wilks-Cardinals Agreement (Redacted),
  D. Ct. Dkt. 72-5 (Feb. 3, 2023)....................................................J.A. 523

Wilks-Panthers Agreement (Redacted),
  D. Ct. Dkt. 72-6 (Feb. 3, 2023)....................................................J.A. 542

Horton-Titans Agreement (Redacted),
  D. Ct. Dkt. 72-7 (Feb. 3, 2023)....................................................J.A. 558

Declaration of Dolores F. DiBella,
  D. Ct. Dkt. 73 (Feb. 2, 2023)[*]....................................................J.A. 568

Constitution and Bylaws of the National Football League,
  D. Ct. Dkt. 73-1 (Feb. 2, 2023)[*]..................................................J.A. 571

**Volume 4**

Constitution and Bylaws of the National Football League (continued),
  D. Ct. Dkt. 73-1 (Feb. 2, 2023)[*]..................................................J.A. 705

**Volume 5**

Constitution and Bylaws of the National Football League (continued),
  D. Ct. Dkt. 73-1 (Feb. 2, 2023)[*]..................................................J.A. 949

Plaintiffs' Notice of Motion for Partial Reconsideration,
  D. Ct. Dkt. 79 (Mar. 14, 2023)...................................................J.A. 1020

Plaintiffs' Memorandum of Law in Support of Motion for Partial
  Reconsideration,
  D. Ct. Dkt. 80 (Mar. 14, 2023)...................................................J.A. 1022

iv

Defendants' Notice of Motion for Partial Reconsideration,
D. Ct. Dkt. 81 (Mar. 15, 2023)................................................................J.A. 1043

Defendants' Memorandum of Law in Support of Motion for Partial Reconsideration,
D. Ct. Dkt. 82 (Mar. 15, 2023)................................................................J.A. 1045

Defendants' Opposition to Plaintiffs' Motion for Partial Reconsideration,
D. Ct. Dkt. 89 (Mar. 31, 2023)................................................................J.A. 1068

Letter from Michael J. Willemin to Judge Valerie E. Caproni,
D. Ct. Dkt. 92 (Apr. 11, 2023) ................................................................J.A. 1086

Declaration of Michael J. Willemin,
D. Ct. Dkt. 92-1 (Apr. 11, 2023)................................................................J.A. 1088

Plaintiffs' Opposition to Defendants' Motion for Partial Reconsideration,
D. Ct. Dkt. 93 (Apr. 11, 2023) ................................................................J.A. 1098

Order Granting Leave for Additional Filings,
D. Ct. Dkt. 94 (Apr. 12, 2023) ................................................................J.A. 1130

Declaration of Michael J. Willemin,
D. Ct. Dkt. 95 (Apr. 12, 2023) ................................................................J.A. 1132

Email from John Elefterakis to Omar Khan,
D. Ct. Dkt. 95-1 (Apr. 12, 2023)................................................................J.A. 1134

Letter from Douglas H. Wigdor to Roger Goodell,
D. Ct. Dkt. 95-2 (Apr. 12, 2023)................................................................J.A. 1137

Letter from Loretta E. Lynch to Judge Valerie E. Caproni,
D. Ct. Dkt. 96 (Apr. 13, 2023) ................................................................J.A. 1141

Flores-Steelers Agreement (Redacted),
D. Ct. Dkt. 97-1 (Apr. 13, 2023)................................................................J.A. 1142

Declaration of Andrew A. Smith,
   D. Ct. Dkt. 98 (Apr. 13, 2023)* .................................................J.A. 1150

Defendants' Reply Brief in Support of Motion for Partial
   Reconsideration,
   D. Ct. Dkt. 99 (Apr. 21, 2023) ..................................................J.A. 1152

Defendants' Notice of Interlocutory Appeal,
   D. Ct. Dkt. 113 (Aug. 21, 2023)................................................J.A. 1166

Opinion and Order Denying Motion to Certify Interlocutory Appeal,
   D. Ct. Dkt. 129 (Jan. 4, 2024)...................................................J.A. 1168

**Volume 6 (Sealed)**

Flores-Steelers Agreement,
   D. Ct. Dkt. 50-4 (June 21, 2022) ...............................................J.A. 1178

Flores-Dolphins Agreement,
   D. Ct. Dkt. 73-2 (Feb. 3, 2023)..................................................J.A. 1184

Flores-Patriots Agreement,
   D. Ct. Dkt. 73-3 (Feb. 3, 2023)..................................................J.A. 1201

Flores-Steelers Agreement,
   D. Ct. Dkt. 73-4 (Feb. 3, 2023)..................................................J.A. 1210

Wilks-Cardinals Agreement,
   D. Ct. Dkt. 73-5 (Feb. 3, 2023)..................................................J.A. 1218

Wilks-Panthers Agreement,
   D. Ct. Dkt. 73-6 (Feb. 3, 2023)..................................................J.A. 1237

Horton-Titans Agreement,
   D. Ct. Dkt. 73-7 (Feb. 3, 2023)..................................................J.A. 1253

---

* These docket entries are not publicly accessible on the district court docket, but the documents at issue were never sealed by the district court and were filed publicly at other docket entries. *See* D. Ct. Dkt. 53, at 1-3; D. Ct. Dkt. 70, at 1-2; D. Ct. Dkt. 96, at 1; *see also* D. Ct. Dkts. 49, 72, 72-1 & 97.

Flores-Steelers Agreement,
    D. Ct. Dkt. 98-1 (Apr. 13, 2023) ............................................................J.A. 1263

Query    Reports    Utilities    Help    Log Out

STAYED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00871-VEC

Flores v. The National Football League et al       Date Filed: 02/01/2022
Assigned to: Judge Valerie E. Caproni         Jury Demand: Plaintiff
Cause: 42:1981 Equal Rights Under the Law      Nature of Suit: 442 Civil Rights: Jobs
                                          Jurisdiction: Federal Question

**Plaintiff**

**Brian Flores**                represented by    **David Evan Gottlieb**
*as a Class Representative, on behalf of*            Wigdor LLP
*himself and all others similarly situated*          85 Fifth Avenue
                                          5th fl.
                                          New York, NY 10003
                                          (212)-257-6800
                                          Fax: (212)-257-6845
                                          Email: dgottlieb@wigdorlaw.com
                                          *ATTORNEY TO BE NOTICED*

                                          **John Elefterakis**
                                          Elefterakis & Elefterakis P.C.
                                          112 Madison Ave
                                          New York, NY 10016
                                          (212)-532-1116
                                          Fax: (212)-532-1176
                                          Email: john@elefterakislaw.com
                                          *ATTORNEY TO BE NOTICED*

                                          **Johnson Lassiter Atkinson**
                                          Elefterakis, Elefterakis & Panek
                                          80 Pine Street
                                          38th Floor
                                          Woodside, NY 10005
                                          212-532-1116
                                          Email: jatkinson@elefterakislaw.com
                                          *ATTORNEY TO BE NOTICED*

                                          **Marjorie Mesidor**
                                          Marjorie Mesidor Attorney at Law
                                          260 Madison Avenue
                                          8th Floor
                                          New York, NY 10016
                                          212-930-6010
                                          Email: mm@marjoriemesidor.com
                                          *TERMINATED: 04/05/2024*

Case 23-1185, Document 139, 08/30/2024, 3623080, Page10 of 277

**Michael John Willemin**
Wigdor LLP
85 Fifth Avenue
5th fl.
New York, NY 10003
(212) 257-6829
Fax: (212) 257-6845
Email: mwillemin@wigdorlaw.com
*ATTORNEY TO BE NOTICED*

**Douglas Holden Wigdor**
Wigdor LLP
85 Fifth Avenue
5th fl.
New York, NY 10003
212-239-9292
Fax: 212-239-9001
Email: dwigdor@wigdorlaw.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Steve Wilks         represented by   **David Evan Gottlieb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Elefterakis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Johnson Lassiter Atkinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marjorie Mesidor**
(See above for address)
*TERMINATED: 04/05/2024*

**Michael John Willemin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Douglas Holden Wigdor**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Ray Horton         represented by   **David Evan Gottlieb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Elefterakis**
(See above for address)
*ATTORNEY TO BE NOTICED*

Case 23-1185, Document 139, 08/30/2024, 3633080, Page11 of 277

**Johnson Lassiter Atkinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marjorie Mesidor**
(See above for address)
*TERMINATED: 04/05/2024*

**Michael John Willemin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Douglas Holden Wigdor**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The National Football League**              represented by **Brad Scott Karp**
Paul Weiss (NY)
1285 Avenue of the Americas
New York, NY 10019
212-373-2384
Fax: 212-373-2384
Email: bkarp@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brette Morgan Tannenbaum**
Paul Weiss (NY)
1285 Avenue of the Americas
New York, NY 10019
(212)-373-3852
Fax: (212)-492-0852
Email: btannenbaum@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Loretta Lynch**
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: lelynch@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn Beth Bayard**
Paul Weiss (NY)
1285 Avenue of the Americas
New York, NY 10019

Case 23-1185, Document 139, 08/30/2024, 3633089, Page12 of 277

212-373-3054
Fax: 212-373-2730
Email: lbayard@paulweiss.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maia Usui**
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Email: musui@paulweiss.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**New York Football Giants, Inc.**                represented by    **Brad Scott Karp**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brette Morgan Tannenbaum**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Loretta Lynch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn Beth Bayard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maia Usui**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Miami Dolphins, Ltd.**                represented by    **Brad Scott Karp**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brette Morgan Tannenbaum**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Loretta Lynch**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Lynn Beth Bayard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maia Usui**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Denver Broncos**                    represented by   **Brad Scott Karp**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brette Morgan Tannenbaum**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Loretta Lynch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn Beth Bayard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maia Usui**
(See above for address)
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**John Doe Teams 1 through 29**
*TERMINATED: 04/07/2022*

**<u>Defendant</u>**

**Houston NFL Holdings, L.P.**          represented by   **Brad Scott Karp**
*doing business as*                                     (See above for address)
Houston Texans                                          *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brette Morgan Tannenbaum**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Loretta Lynch**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Lynn Beth Bayard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maia Usui**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Arizona Cardinals Football Club LLC**       represented by   **Brad Scott Karp**
*doing business as*                                            (See above for address)
Arizona Cardinals                                             *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Brette Morgan Tannenbaum**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Loretta Lynch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn Beth Bayard**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maia Usui**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tennessee Titans Entertainment, Inc.**       represented by   **Brad Scott Karp**
*doing business as*                                            (See above for address)
Tennessee Titans                                              *LEAD ATTORNEY*
                                                              *ATTORNEY TO BE NOTICED*

**Brette Morgan Tannenbaum**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Loretta Lynch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lynn Beth Bayard**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Maia Usui**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Doe Teams 1 through 26**

**Amicus**

**Amici Curiae Law Professors**                  represented by **Kevin Todd Mintzer**
Law Office of Kevin Mintzer, P.C.
1350 Broadway
Suite 1410
New York, NY 10018
646-843-8180
Email: km@mintzerfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/01/2022 | 1 | COMPLAINT against Denver Broncos, John Doe Teams 1 through 29, Miami Dolphins, Ltd., New York Football Giants, Inc., The National Football League. (Filing Fee $ 402.00, Receipt Number ANYSDC-25668130)Document filed by Brian Flores..(Wigdor, Douglas) (Entered: 02/01/2022) |
| 02/01/2022 | 2 | CIVIL COVER SHEET filed..(Wigdor, Douglas) (Entered: 02/01/2022) |
| 02/01/2022 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to The National Football League, re: 1 Complaint,. Document filed by Brian Flores..(Wigdor, Douglas) (Entered: 02/01/2022) |
| 02/01/2022 | 4 | REQUEST FOR ISSUANCE OF SUMMONS as to New York Football Giants, Inc., re: 1 Complaint,. Document filed by Brian Flores..(Wigdor, Douglas) (Entered: 02/01/2022) |
| 02/01/2022 | 5 | REQUEST FOR ISSUANCE OF SUMMONS as to Miami Dolphins, Ltd., re: 1 Complaint,. Document filed by Brian Flores..(Wigdor, Douglas) (Entered: 02/01/2022) |
| 02/01/2022 | 6 | REQUEST FOR ISSUANCE OF SUMMONS as to Denver Broncos, re: 1 Complaint,. Document filed by Brian Flores..(Wigdor, Douglas) (Entered: 02/01/2022) |
| 02/01/2022 | 7 | NOTICE OF APPEARANCE by Michael John Willemin on behalf of Brian Flores.. (Willemin, Michael) (Entered: 02/01/2022) |
| 02/01/2022 | 8 | NOTICE OF APPEARANCE by David Evan Gottlieb on behalf of Brian Flores.. (Gottlieb, David) (Entered: 02/01/2022) |
| 02/02/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Valerie E. Caproni. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(sj) (Entered: 02/02/2022) |

| 02/02/2022 | | Magistrate Judge Sarah L. Cave is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (sj) (Entered: 02/02/2022) |
|---|---|---|
| 02/02/2022 | | Case Designated ECF. (sj) (Entered: 02/02/2022) |
| 02/02/2022 | 9 | ELECTRONIC SUMMONS ISSUED as to The National Football League. (sj) (Entered: 02/02/2022) |
| 02/02/2022 | 10 | ELECTRONIC SUMMONS ISSUED as to New York Football Giants, Inc.. (sj) (Entered: 02/02/2022) |
| 02/02/2022 | 11 | ELECTRONIC SUMMONS ISSUED as to Miami Dolphins, Ltd.. (sj) (Entered: 02/02/2022) |
| 02/02/2022 | 12 | ELECTRONIC SUMMONS ISSUED as to Denver Broncos. (sj) (Entered: 02/02/2022) |
| 02/02/2022 | 13 | NOTICE OF INITIAL PRETRIAL CONFERENCE: At the scheduled time, counsel for all parties should call 888-363-4749, Access code 3121171#, Security code 0871. Initial Conference set for 3/18/2022 at 03:00 PM before Judge Valerie E. Caproni. (Signed by Judge Valerie E. Caproni on 2/2/2022) (tg) (Entered: 02/02/2022) |
| 02/24/2022 | 14 | NOTICE OF APPEARANCE by Brad Scott Karp on behalf of Denver Broncos, Miami Dolphins, Ltd., New York Football Giants, Inc., The National Football League..(Karp, Brad) (Entered: 02/24/2022) |
| 02/24/2022 | 15 | NOTICE OF APPEARANCE by Loretta Lynch on behalf of Denver Broncos, Miami Dolphins, Ltd., New York Football Giants, Inc., The National Football League..(Lynch, Loretta) (Entered: 02/24/2022) |
| 02/24/2022 | 16 | NOTICE OF APPEARANCE by Lynn Beth Bayard on behalf of Denver Broncos, Miami Dolphins, Ltd., New York Football Giants, Inc., The National Football League..(Bayard, Lynn) (Entered: 02/24/2022) |
| 02/24/2022 | 17 | NOTICE OF APPEARANCE by Brette Morgan Tannenbaum on behalf of Denver Broncos, Miami Dolphins, Ltd., New York Football Giants, Inc., The National Football League..(Tannenbaum, Brette) (Entered: 02/24/2022) |
| 02/24/2022 | 18 | LETTER MOTION for Extension of Time to File *Answer or Otherwise Respond to the Complaint* addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated February 24, 2022. Document filed by Denver Broncos, Miami Dolphins, Ltd., New York Football Giants, Inc., The National Football League..(Lynch, Loretta) (Entered: 02/24/2022) |
| 02/24/2022 | 19 | ORDER: granting 18 Letter Motion for Extension of Time to File. Application GRANTED. SO ORDERED. (Signed by Judge Valerie E. Caproni on 2/24/2022) (ama) (Entered: 02/24/2022) |
| 02/24/2022 | | Set/Reset Deadlines: Denver Broncos answer due 4/11/2022; Miami Dolphins, Ltd. answer due 4/11/2022; New York Football Giants, Inc. answer due 4/11/2022; The National Football League answer due 4/11/2022. (ama) (Entered: 02/24/2022) |
| 03/04/2022 | 20 | JOINT LETTER MOTION to Adjourn Conference addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated March 4, 2022. Document filed by Brian Flores..(Wigdor, Douglas) (Entered: 03/04/2022) |
| 03/04/2022 | 21 | ORDER granting 20 Letter Motion to Adjourn Conference. Application GRANTED. The initial pretrial conference, currently scheduled for Friday, March 18, 2022 at 3:00 P.M., is adjourned to Friday, April 29, 2022 at 11:00 A.M. Pre-conference submissions are due no |

| | | |
|---|---|---|
| | | later than Thursday, April 21, 2022. For a description of the pre-conference submission requirements, the parties should consult the Court's Order at docket entry 13. The Court will decide whether to hold the conference in person or by teleconference once the Court has reviewed the parties' pre-conference submissions. Any amended complaint is due no later than Friday, April 8, 2022. After an amended complaint has been served on Defendants or they waive such service, the parties may file a joint stipulation for the Court's approval with a proposed deadline for Defendants to answer, move, or otherwise respond to the Amended Complaint. SO ORDERED. Initial Conference set for 4/29/2022 at 11:00 AM before Judge Valerie E. Caproni.. (Signed by Judge Valerie E. Caproni on 3/4/2022) (tg) (Entered: 03/04/2022) |
| 03/04/2022 | | Set/Reset Deadlines: Amended Pleadings due by 4/8/2022. (tg) (Entered: 03/04/2022) |
| 04/07/2022 | 22 | FIRST AMENDED COMPLAINT amending 1 Complaint, against Denver Broncos, Miami Dolphins, Ltd., New York Football Giants, Inc., The National Football League, Houston NFL Holdings, L.P., Arizona Cardinals Football Club LLC, Tennessee Titans Entertainment, Inc., John Doe Teams 1 through 26 with JURY DEMAND.Document filed by Brian Flores, Steve Wilks, Ray Horton. Related document: 1 Complaint,..(Wigdor, Douglas) (Entered: 04/07/2022) |
| 04/07/2022 | 23 | REQUEST FOR ISSUANCE OF SUMMONS as to Houston NFL Holdings, L.P., re: 22 Amended Complaint,. Document filed by Brian Flores, Ray Horton, Steve Wilks.. (Wigdor, Douglas) (Entered: 04/07/2022) |
| 04/07/2022 | 24 | REQUEST FOR ISSUANCE OF SUMMONS as to Tennessee Titans Entertainment, Inc., re: 22 Amended Complaint,. Document filed by Brian Flores, Ray Horton, Steve Wilks.. (Wigdor, Douglas) (Entered: 04/07/2022) |
| 04/07/2022 | 25 | REQUEST FOR ISSUANCE OF SUMMONS as to Arizona Cardinals Football Club LLC, re: 22 Amended Complaint,. Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 04/07/2022) |
| 04/07/2022 | 26 | ELECTRONIC SUMMONS ISSUED as to Houston NFL Holdings, L.P...(pc) (Entered: 04/07/2022) |
| 04/07/2022 | 27 | ELECTRONIC SUMMONS ISSUED as to Tennessee Titans Entertainment, Inc...(pc) (Entered: 04/07/2022) |
| 04/07/2022 | 28 | ELECTRONIC SUMMONS ISSUED as to Arizona Cardinals Football Club LLC..(pc) (Entered: 04/07/2022) |
| 04/18/2022 | 29 | NOTICE OF APPEARANCE by Brad Scott Karp on behalf of Arizona Cardinals Football Club LLC, Houston NFL Holdings, L.P., Tennessee Titans Entertainment, Inc... (Karp, Brad) (Entered: 04/18/2022) |
| 04/18/2022 | 30 | NOTICE OF APPEARANCE by Loretta Lynch on behalf of Arizona Cardinals Football Club LLC, Houston NFL Holdings, L.P., Tennessee Titans Entertainment, Inc...(Lynch, Loretta) (Entered: 04/18/2022) |
| 04/18/2022 | 31 | NOTICE OF APPEARANCE by Lynn Beth Bayard on behalf of Arizona Cardinals Football Club LLC, Houston NFL Holdings, L.P., Tennessee Titans Entertainment, Inc... (Bayard, Lynn) (Entered: 04/18/2022) |
| 04/18/2022 | 32 | NOTICE OF APPEARANCE by Brette Morgan Tannenbaum on behalf of Arizona Cardinals Football Club LLC, Houston NFL Holdings, L.P., Tennessee Titans Entertainment, Inc...(Tannenbaum, Brette) (Entered: 04/18/2022) |
| 04/18/2022 | 33 | LETTER addressed to Judge Valerie E. Caproni from Loretta Lynch dated April 18, 2022 re: Joint Stipulation and Proposed Order re Deadline for Defendants to Answer or |

Case 23-1185, Document 139, 08/30/2024, 3623089, Page18 of 277

| | | Otherwise Respond to Amended Complaint. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League. (Attachments: # 1 Joint Stipulation and [Proposed] Order).(Lynch, Loretta) (Entered: 04/18/2022) |
|---|---|---|
| 04/18/2022 | 34 | JOINT STIPULATION AND ORDER: The parties, by and through their undersigned attorneys, hereby stipulate andagree as follows: The time for Defendants to answer, move or otherwise respond to theAmended Complaint shall be extended from April 21, 2022 up to and including June 21, 2022. The parties shall confer regarding the briefing schedule for any motionfiled pursuant to paragraph 1. Memoranda of law in support of and in opposition to any motion made in response to the Amended Complaint may be up to 50 pages and reply memoranda may be up to 25 pages. Nothing herein shall be deemed to constitute a waiver of any claims or defenses in this matter. (Arizona Cardinals Football Club LLC answer due 6/21/2022; Denver Broncos answer due 6/21/2022; Houston NFL Holdings, L.P. answer due 6/21/2022; Miami Dolphins, Ltd. answer due 6/21/2022; New York Football Giants, Inc. answer due 6/21/2022; Tennessee Titans Entertainment, Inc. answer due 6/21/2022; The National Football League answer due 6/21/2022.) (Signed by Judge Valerie E. Caproni on 4/18/2022) (rro) (Entered: 04/18/2022) |
| 04/21/2022 | 35 | JOINT LETTER addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated April 21, 2022 re: Initial Pretrial Conference. Document filed by Brian Flores, Ray Horton, Steve Wilks. (Attachments: # 1 Text of Proposed Order Case Management Plan). (Wigdor, Douglas) (Entered: 04/21/2022) |
| 04/21/2022 | 36 | NOTICE OF APPEARANCE by John Elefterakis on behalf of Brian Flores, Ray Horton, Steve Wilks..(Elefterakis, John) (Entered: 04/21/2022) |
| 04/21/2022 | 37 | MEMO ENDORSEMENT on re: 35 Letter, filed by Brian Flores, Ray Horton, Steve Wilks. ENDORSEMENT: Due to a conflict in the Court's calendar, the initial pretrial conference, currently scheduled for Friday, April 29, 2022 at 11:00 A.M., is adjourned to Monday, May 2, 2022 at 11:00 A.M. The conference will be held in person in Courtroom 443 of the Thurgood Marshall United States Courthouse, located at 40 Foley Square, New York, New York 10007. Per the SDNY COVID-19 COURTHOUSE ENTRY PROGRAM, any person who appears at any SDNY courthouse must complete a questionnaire. Only those individuals who meet the entry requirements established by the questionnaire will be permitted entry. Additionally, any person who appears at any SDNY courthouse must comply with Standing Order M10-468 (21-MC-164), which further pertains to courthouse entry. SO ORDERED. ( Initial Conference set for 5/2/2022 at 11:00 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni.) (Signed by Judge Valerie E. Caproni on 4/21/2022) (tg) (Entered: 04/21/2022) |
| 04/22/2022 | 38 | ORDER: IT IS HEREBY ORDERED that counsel for the parties must attend the conference in person. Any interested members of the public may attend the conference in person or remotely, by dialing 1-888-363-4749, using the access code 3121171, and the security code 0871. Recording or rebroadcasting the proceeding is strictly prohibited by law. IT IS FURTHER ORDERED that by no later than Wednesday, April 27, 2022, the parties must inform the Court how many counsel and client representatives (if any) will be attending the conference in person. Each side will be allowed four representatives at counsel table, with additional seating for the parties available in surrounding chairs and the gallery. IT IS FURTHER ORDERED that per the SDNY COVID-19 COURTHOUSE ENTRY PROGRAM, any person who appears at any SDNY courthouse must complete a questionnaire. Only those individuals who meet the entry requirements established by the questionnaire will be permitted entry. Additionally, any person who appears at any SDNY courthouse must comply with Standing Order M10-468 (21-MC-164), which further |

J.A. 10

| | | pertains to courthouse entry. SO ORDERED. (Signed by Judge Valerie E. Caproni on 4/22/2022) (tg) (Entered: 04/22/2022) |
|---|---|---|
| 04/27/2022 | 39 | LETTER addressed to Judge Valerie E. Caproni from David E. Gottlieb dated April 27, 2022 re: Counsel Attendants for Initial Pretrial Conference. Document filed by Brian Flores, Ray Horton, Steve Wilks..(Gottlieb, David) (Entered: 04/27/2022) |
| 04/27/2022 | 40 | LETTER addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated April 27, 2022 re: Initial Pretrial Conference Attendees. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., John Doe Teams 1 through 26, Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 04/27/2022) |
| 04/28/2022 | 41 | NOTICE OF APPEARANCE by Maia Usui on behalf of Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Usui, Maia) (Entered: 04/28/2022) |
| 04/29/2022 | 42 | NOTICE OF APPEARANCE by Johnson Lassiter Atkinson on behalf of Brian Flores, Ray Horton, Steve Wilks..(Atkinson, Johnson) (Entered: 04/29/2022) |
| 05/02/2022 | | Minute Entry for proceedings held before Judge Valerie E. Caproni: Initial Pretrial Conference held on 5/2/2022. Attorneys Douglas Wigdor, David Gottlieb, John Elefterakis and Johnson Atkinson present for the plaintiff. Attorneys Loretta Lynch, Brad Karp, Brette Tannenbaum and Maia Usui present for the defendants. Court Reporter Alena Lynch present. (anc) (Entered: 05/02/2022) |
| 05/02/2022 | 43 | ORDER: IT IS HEREBY ORDERED that, for the reasons stated at the conference, Defendants' motion to compel arbitration is due no later than Tuesday, June 21, 2022, Plaintiffs' response in opposition is due no later than Friday, July 22, 2022, and Defendants' reply in support is due no later than Friday, August 5, 2022. The parties' briefs are subject to the default page limits: 25 pages for the opening and response briefs and 10 pages for the reply brief. If any of Plaintiffs' claims remain in the litigation following the Court's resolution of the motion, Defendants will be given the opportunity to file a motion to dismiss pursuant to Rule 12 of the Federal Rules of Civil Procedure. IT IS FURTHER ORDERED that if, upon reviewing Defendants' motion to compel arbitration, Plaintiffs still seek motion-related discovery, they must meet and confer with Defendants to determine whether the parties can resolve the issue without court intervention. If the parties are unable to resolve the dispute amongst themselves, Plaintiffs may file a letter brief, not to exceed five single-spaced pages, seeking leave to take motion-related discovery. Any such request is due no later than Friday, July 1, 2022. Any response in opposition, limited to five single-spaced pages, is due no later than Friday, July 8, 2022. IT IS FURTHER ORDERED that the entry of a Case Management Plan is adjourned sine die and fact and expert discovery is hereby STAYED. IT IS FURTHER ORDERED that if, at any time, both parties want a settlement conference with the assigned Magistrate Judge or a referral to the Court-annexed mediation program, they may submit a joint letter requesting a referral. SO ORDERED. ( Motions due by 6/21/2022., Responses due by 7/22/2022, Replies due by 8/5/2022.) (Signed by Judge Valerie E. Caproni on 5/2/2022) (tg) (Entered: 05/02/2022) |
| 05/13/2022 | 44 | TRANSCRIPT of Proceedings re: conference held on 5/2/2022 before Judge Valerie E. Caproni. Court Reporter/Transcriber: Alena Lynch, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/3/2022. Redacted Transcript Deadline |

| | | |
|---|---|---|
| | | set for 6/13/2022. Release of Transcript Restriction set for 8/11/2022..(Moya, Goretti) (Entered: 05/13/2022) |
| 05/13/2022 | 45 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a conference proceeding held on 5/2/2022 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 05/13/2022) |
| 06/21/2022 | 46 | LETTER MOTION to Seal addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated June 21, 2022. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 06/21/2022) |
| 06/21/2022 | 47 | MOTION to Compel Arbitration *and Stay Further Proceedings*. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 06/21/2022) |
| 06/21/2022 | 48 | MEMORANDUM OF LAW in Support re: 47 MOTION to Compel Arbitration *and Stay Further Proceedings*. . Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 06/21/2022) |
| 06/21/2022 | 49 | DECLARATION of Dolores F. DiBella in Support re: 47 MOTION to Compel Arbitration *and Stay Further Proceedings*.. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League. (Attachments: # 1 Exhibit 1 (NFL Constitution and Bylaws), # 2 Exhibit 2 (Redacted Flores-Dolphins Agreement Excerpt), # 3 Exhibit 3 (Redacted Flores-Patriots Agreement Excerpt), # 4 Exhibit 4 (Redacted Flores-Steelers Agreement Excerpt), # 5 Exhibit 5 (Redacted Wilks-Cardinals Agreement Excerpt), # 6 Exhibit 6 (Redacted Wilks-Panthers Agreement Excerpt), # 7 Exhibit 7 (Redacted Horton-Titans Agreement Excerpt)).(Lynch, Loretta) (Entered: 06/21/2022) |
| 06/21/2022 | 50 | ***SELECTED PARTIES***DECLARATION of Dolores F. DiBella in Support re: 47 MOTION to Compel Arbitration *and Stay Further Proceedings*.. Document filed by Arizona Cardinals Football Club LLC, New York Football Giants, Inc., The National Football League, Tennessee Titans Entertainment, Inc., Miami Dolphins, Ltd., Houston NFL Holdings, L.P., Denver Broncos, Brian Flores, Ray Horton, John Doe Teams 1 through 26, Steve Wilks. (Attachments: # 1 Exhibit 1 (NFL Constitution and Bylaws), # 2 Exhibit 2 (Flores-Dolphins Agreement Excerpt), # 3 Exhibit 3 (Flores-Patriots Agreement Excerpt), # 4 Exhibit 4 (Flores-Steelers Agreement Excerpt), # 5 Exhibit 5 (Wilks-Cardinals Agreement Excerpt), # 6 Exhibit 6 (Wilks-Panthers Agreement Excerpt), # 7 Exhibit 7 (Horton-Titans Agreement Excerpt))Motion or Order to File Under Seal: 46 . (Lynch, Loretta) (Entered: 06/21/2022) |
| 06/22/2022 | 51 | ORDER with respect to 46 Letter Motion to Seal. Plaintiffs must respond not later than Monday, June 27, 2022 why Defendants should not be permitted to file Exhibits 2 through 7 under seal. SO ORDERED. (Signed by Judge Valerie E. Caproni on 6/22/2022) (tg) (Entered: 06/22/2022) |
| 06/22/2022 | | Set/Reset Deadlines: Responses due by 6/27/2022 (tg) (Entered: 06/22/2022) |

| 06/27/2022 | [52](#) | LETTER RESPONSE in Opposition to Motion addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated June 27, 2022 re: [46](#) LETTER MOTION to Seal addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated June 21, 2022. . Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 06/27/2022) |
|---|---|---|
| 06/29/2022 | [53](#) | ORDER granting [46](#) Letter Motion to Seal. Application GRANTED. The Court finds that employment and financial information unrelated to Defendants' arbitration agreement with Plaintiffs have a limited bearing on whether the Motion to Compel Arbitration and Stay Further Proceedings should be granted. Accordingly, the presumption of access established by Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110 (2d Cir. 2006) is accorded less weight, as access to the redacted information is not necessary to preserve the interested public's ability to monitor judicial decisionmaking. See id. at 119 ("[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." Id. (alteration in original)). In addition, the Court finds that the privacy interests of unnamed parties included in the documents are substantial and weigh against the presumption of access. See id. at 120 (listing factors to be weighed against the presumption of access, including "the privacy interests of those resisting disclosure" (citing United States v. Amodeo, 71 F.3d 1044, 1049 (2d. Cir. 1995)). SO ORDERED. (Signed by Judge Valerie E. Caproni on 6/29/2022) (tg) (Entered: 06/29/2022) |
| 07/01/2022 | [54](#) | LETTER MOTION for Discovery addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated July 1, 2022. Document filed by Brian Flores, Ray Horton, Steve Wilks. (Attachments: # [1](#) Exhibit A (6/24/22 Correspondence from D. Wigdor to L. Lynch), # [2](#) Exhibit B (6/27/22 Correspondence from L. Lynch to D. Wigdor), # [3](#) Exhibit C (Transcript of 5/2/22 Conference), # [4](#) Exhibit D (Representative Article re R. Goodell Compensation), # [5](#) Exhibit E (NFL Statement On Brian Flores' Suit)).(Wigdor, Douglas) (Entered: 07/01/2022) |
| 07/08/2022 | [55](#) | LETTER RESPONSE in Opposition to Motion addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated July 8, 2022 re: [54](#) LETTER MOTION for Discovery addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated July 1, 2022. . Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 07/08/2022) |
| 07/18/2022 | [56](#) | LETTER addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated July 18, 2022 re: Request For Adjournment Sine Die of Opposition Deadline. Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 07/18/2022) |
| 07/18/2022 | [57](#) | ORDER with respect to [47](#) Motion to Compel Arbitration; with respect to [54](#) Letter Motion for Discovery. IT IS HEREBY ORDERED that all briefing deadlines for the motion to compel arbitration are adjourned sine die until Plaintiff's request for motion-related discovery has been decided. IT IS FURTHER ORDERED that the Clerk of Court is respectfully directed to close the open motion at docket entry 56. SO ORDERED. (Signed by Judge Valerie E. Caproni on 7/18/2022) (tg) (Entered: 07/18/2022) |
| 08/04/2022 | [58](#) | OPINION AND ORDER re: [54](#) LETTER MOTION for Discovery addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated July 1, 2022. filed by Brian Flores, Ray Horton, Steve Wilks. For the foregoing reasons, Plaintiffs' motion for discovery is DENIED. Plaintiffs' response to the motion to compel arbitration must be filed no later than Friday, August 19, 2022. Defendants' reply brief must be filed no later than Friday, |

| | | |
|---|---|---|
| | | August 26, 2022. ( Responses due by 8/19/2022, Replies due by 8/26/2022.) (Signed by Judge Valerie E. Caproni on 8/4/2022) (ate) (Entered: 08/04/2022) |
| 08/09/2022 | 59 | LETTER MOTION for Extension of Time to File Response/Reply as to 47 MOTION to Compel Arbitration *and Stay Further Proceedings*. addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated August 9, 2022. Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 08/09/2022) |
| 08/09/2022 | 60 | ORDER granting 59 Letter Motion for Extension of Time to File Response/Reply re 59 LETTER MOTION for Extension of Time to File Response/Reply as to 47 MOTION to Compel Arbitration *and Stay Further Proceedings*. addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated August 9, 2022. Application GRANTED. SO ORDERED. (Signed by Judge Valerie E. Caproni on 8/9/2022) Responses due by 8/31/2022 Replies due by 9/16/2022. (ks) (Entered: 08/09/2022) |
| 08/29/2022 | 61 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate Fin Associates, LLC, Other Affiliate Fin 2016, LLC for Miami Dolphins, Ltd.; Corporate Parent Broncos Holdings, LLC for Denver Broncos; Corporate Parent KSA Industries, Inc. for Tennessee Titans Entertainment, Inc.. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 08/29/2022) |
| 08/31/2022 | 62 | MEMORANDUM OF LAW in Opposition re: 47 MOTION to Compel Arbitration *and Stay Further Proceedings*. . Document filed by Brian Flores, Ray Horton, Steve Wilks.. (Wigdor, Douglas) (Entered: 08/31/2022) |
| 08/31/2022 | 63 | DECLARATION of Douglas H. Wigdor in Opposition re: 47 MOTION to Compel Arbitration *and Stay Further Proceedings*.. Document filed by Brian Flores, Ray Horton, Steve Wilks. (Attachments: # 1 Exhibit A - Amended Complaint, # 2 Exhibit B - NFL Statement on Brian Flores' Lawsuit, # 3 Exhibit C - Representative Article re R. Goodell, # 4 Exhibit D - Representative Article re R. Goodell, # 5 Exhibit E - Representative Article re R. Goodell, # 6 Exhibit F - Representative Article re R. Goodell, # 7 Exhibit G - Gruden v. NFL Transcript and Order, # 8 Exhibit H - Nostalgic Partners, LLC v. Yankees Order, # 9 Exhibit I - Nostalgic Partners, LLC v. Yankees Transcript, # 10 Exhibit J - McMullen Arbitration Agreement, # 11 Exhibit K - JAMS Comprehensive Arbitration Rules and Procedures, # 12 Exhibit L - JAMS Employment Arbitration Rules and Procedures, # 13 Exhibit M - JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness).(Wigdor, Douglas) (Entered: 08/31/2022) |
| 09/16/2022 | 64 | REPLY to Response to Motion re: 47 MOTION to Compel Arbitration *and Stay Further Proceedings*. . Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 09/16/2022) |
| 09/26/2022 | 65 | LETTER MOTION for Leave to File Sur-Reply in Further Opposition to Defendants' Motion to Compel Arbitration addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated September 26, 2022. Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 09/26/2022) |
| 09/26/2022 | 66 | ORDER granting 65 Letter Motion for Leave to File Document. Application GRANTED. Plaintiffs' sur-reply, not to exceed ten double-spaced pages, is due no later than October 7, 2022. SO ORDERED. (Signed by Judge Valerie E. Caproni on 9/26/2022) (tg) (Entered: 09/26/2022) |
| 09/26/2022 | | Set/Reset Deadlines: Surreplies due by 10/7/2022. (tg) (Entered: 09/26/2022) |

Case 23-1185, Document 139, 08/30/2024, 3632080, Page23 of 277

| Date | Doc # | Description |
|---|---|---|
| 10/07/2022 | 67 | REPLY MEMORANDUM OF LAW in Opposition re: 47 MOTION to Compel Arbitration *and Stay Further Proceedings*. *Sur-Reply*. Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 10/07/2022) |
| 10/14/2022 | 68 | LETTER addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated October 14, 2022 re: New Authority Relevant to Motion to Compel Arbitration. Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 10/14/2022) |
| 10/20/2022 | 69 | LETTER addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated October 20, 2022 re: Response to ECF No. 68. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 10/20/2022) |
| 02/01/2023 | 70 | ORDER with respect to 47 Motion to Compel Arbitration. IT IS HEREBY ORDERED that by no later than February 9, 2023, Defendants must submit a supplemental brief regarding the impact of the delegation clause on the pending motion to compel arbitration. Plaintiffs' response is due by February 16, 2023. The parties' submissions must not exceed five double-spaced pages. IT IS FURTHER ORDERED that Defendants must file complete copies of the contracts attached as exhibits to the DiBella Declaration at docket entries 49 and 50 by no later than February 6, 2023. Pursuant to the Court's order at docket entry 53, Defendants may file redacted versions of the exhibits on the public docket, but the Defendants must file complete, unredacted versions of the contracts with the Court pursuant to Rule 5 the Undersigned's Individual Practices. SO ORDERED. (Signed by Judge Valerie E. Caproni on 2/1/2023) (tg) (Entered: 02/01/2023) |
| 02/01/2023 | | Set/Reset Deadlines: Motions due by 2/9/2023. Responses due by 2/16/2023 (tg) (Entered: 02/01/2023) |
| 02/03/2023 | 71 | LETTER addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated February 3, 2023 re: Filing of Declaration and Exhibits. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 02/03/2023) |
| 02/03/2023 | 72 | DECLARATION of Dolores F. DiBella in Support re: 47 MOTION to Compel Arbitration *and Stay Further Proceedings*.. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League. (Attachments: # 1 Exhibit 1 - NFL Constitution and Bylaws, # 2 Exhibit 2 - Redacted Flores-Dolphins Agreement, # 3 Exhibit 3 - Redacted Flores-Patriots Agreement, # 4 Exhibit 4 - Redacted Flores-Steelers Agreement, # 5 Exhibit 5 - Redacted Wilks-Cardinals Agreement, # 6 Exhibit 6 - Redacted Wilks-Panthers Agreement, # 7 Exhibit 7 - Redacted Horton-Titans Agreement).(Lynch, Loretta) (Entered: 02/03/2023) |
| 02/03/2023 | 73 | ***SELECTED PARTIES***DECLARATION of Dolores F. DiBella in Support re: 47 MOTION to Compel Arbitration *and Stay Further Proceedings*.. Document filed by Arizona Cardinals Football Club LLC, New York Football Giants, Inc., The National Football League, Tennessee Titans Entertainment, Inc., Miami Dolphins, Ltd., Houston NFL Holdings, L.P., Denver Broncos, Brian Flores, Ray Horton, Steve Wilks. (Attachments: # 1 Exhibit 1 - NFL Constitution and Bylaws, # 2 Exhibit 2 - Flores-Dolphins Agreement, # 3 Exhibit 3 - Flores-Patriots Agreement, # 4 Exhibit 4 - Flores-Steelers Agreement, # 5 Exhibit 5 - Wilks-Cardinals Agreement, # 6 Exhibit 6 - Wilks-Panthers Agreement, # 7 Exhibit 7 - Horton-Titans Agreement)Motion or Order to File Under Seal: 70 .(Lynch, Loretta) (Entered: 02/03/2023) |

| 02/09/2023 | 74 | SUPPLEMENTAL RESPONSE re: 70 Order on Motion to Compel Arbitration,,, *(Supplemental Brief of Defendants in Response to the Court's Order dated February 1, 2023)*. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 02/09/2023) |
|---|---|---|
| 02/16/2023 | 75 | SUPPLEMENTAL RESPONSE re: 74 Response, . Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 02/16/2023) |
| 03/01/2023 | 76 | OPINION AND ORDER re: 47 MOTION to Compel Arbitration *and Stay Further Proceedings*. filed by The National Football League, Tennessee Titans Entertainment, Inc., Denver Broncos, Arizona Cardinals Football Club LLC, Houston NFL Holdings, L.P., New York Football Giants, Inc., Miami Dolphins, Ltd.. For the foregoing reasons, Defendants' motion to compel arbitration is GRANTED except that it is DENIED as to Brian Flores's claims against the Denver Broncos, New York Giants, and the Houston Texans, and his related claims against the NFL. Defendants' request to stay the case is DENIED as to Flores's claims that may proceed to litigation and is GRANTED as to all of the claims that must be arbitrated. The Clerk of Court is respectfully directed to terminate the open motion at docket entry 47. The parties are ordered to appear for a pretrial conference on Friday, March 24, 2023, at 10:00 A.M. in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, 10007. By March 16, 2023, the parties must submit a joint letter regarding the status of the case, including: a. a statement of all existing deadlines, due dates, and/or cut-off dates; b. a statement describing the status of any settlement discussions and whether the parties would like a settlement conference; c. a statement of the anticipated length of trial and whether the case is to be tried to a jury; d. a statement regarding the anticipated schedule of arbitration; e. any contemplated motions; f. a proposed schedule for discovery, which must comply with the guidance set forth in the Court's model Civil Case Management Plan and Scheduling Order, available on the Court's website; g. any other issue that the parties would like to address at the pretrial conference; and h. any other information that the parties believe may assist the Court in advancing the case to settlement or trial. SO ORDERED. ( Pretrial Conference set for 3/24/2023 at 10:00 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni.) (Signed by Judge Valerie E. Caproni on 3/1/2023) (tg) (Entered: 03/01/2023) |
| 03/03/2023 | 77 | JOINT LETTER MOTION to Adjourn Conference addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated March 3, 2023. Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 03/03/2023) |
| 03/03/2023 | 78 | ORDER granting 77 Letter Motion to Adjourn Conference. Application GRANTED. The March 24, 2023, conference is adjourned until Friday, April 7, 2023, at 10:00 A.M. in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, 10007. The parties' pre-conference submissions are due on March 30, 2023. SO ORDERED. Pretrial Conference set for 4/7/2023 at 10:00 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni. (Signed by Judge Valerie E. Caproni on 3/3/2023) (tg) (Entered: 03/03/2023) |
| 03/14/2023 | 79 | MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,, . Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 03/14/2023) |
| 03/14/2023 | 80 | MEMORANDUM OF LAW in Support re: 79 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,, . . Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 03/14/2023) |

| 03/15/2023 | 81 | MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,, . Document filed by Denver Broncos, Houston NFL Holdings, L.P., New York Football Giants, Inc., The National Football League..(Lynch, Loretta) (Entered: 03/15/2023) |
| 03/15/2023 | 82 | MEMORANDUM OF LAW in Support re: 81 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,, . . Document filed by Denver Broncos, Houston NFL Holdings, L.P., New York Football Giants, Inc., The National Football League..(Lynch, Loretta) (Entered: 03/15/2023) |
| 03/20/2023 | 83 | JOINT LETTER MOTION for Extension of Time *of the briefing deadlines for motions for partial reconsideration and to adjourn the pretrial conference* addressed to Judge Valerie E. Caproni from Loretta Lynch dated March 20, 2023. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 03/20/2023) |
| 03/20/2023 | 84 | ORDER granting 83 Letter Motion for Extension of Time. The parties' request to adjourn the conference scheduled for April 7, 2023, is GRANTED. Defendants must file their opposition to Plaintiffs' motion for reconsideration in a brief not to exceed fifteen double-spaced pages by Friday, March 31, 2023. Plaintiffs' consolidated opposition to Defendants' motion for reconsideration and reply to Defendants' opposition to Plaintiffs' motion for reconsideration is due by Friday, April 7, 2023, in a brief not to exceed twenty-five double-spaced pages. Defendants' reply brief is due by Friday, April 14, 2023, in a brief not to exceed ten double-spaced pages. SO ORDERED. (Signed by Judge Valerie E. Caproni on 3/20/2023) (tg) (Entered: 03/20/2023) |
| 03/20/2023 | | Set/Reset Deadlines: Responses due by 4/7/2023 Replies due by 4/14/2023. (tg) (Entered: 03/20/2023) |
| 03/21/2023 | 85 | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILER ERROR -(SEE #86)** MOTION for Leave to File Brief of Amici Curiae . Document filed by Amici Curiae Law Professors. (Attachments: # 1 Exhibit A - Proposed Brief of Amici Curiae, # 2 Exhibit B- Proposed Order).(Mintzer, Kevin) Modified on 3/23/2023 (kj). (Entered: 03/21/2023) |
| 03/21/2023 | 86 | MOTION for Leave to File Brief of Amici Curiae . Document filed by Amici Curiae Law Professors. (Attachments: # 1 Exhibit A - Proposed Brief of Amici Curiae (corrected), # 2 Exhibit B - Proposed Order).(Mintzer, Kevin) (Entered: 03/21/2023) |
| 03/28/2023 | 87 | ORDER GRANTING MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF OF LAW PROFESSORS IN SUPPORT OF PLAINTIFFS' MOTION FOR RECONSIDERATION granting 86 Motion for Leave to File Document. Before the Court is the motion for leave to file the amici curiae brief of law professors in support of Plaintiffs' motion for reconsideration. Having reviewed the proposed brief and considered the motion, it is hereby ORDERED that the motion for leave to file the amici curiae brief is GRANTED. IT IS SO ORDERED. (Signed by Judge Valerie E. Caproni on 3/27/2023) (tg) (Entered: 03/28/2023) |
| 03/29/2023 | 88 | MEMORANDUM OF LAW in Support re: 79 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,,, . *Filed with Leave of the Court (Dkt. No. 87)*. Document filed by Amici Curiae Law Professors..(Mintzer, Kevin) (Entered: 03/29/2023) |
| 03/31/2023 | 89 | MEMORANDUM OF LAW in Opposition re: 79 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,,, . . Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 03/31/2023) |

| 04/04/2023 | 90 | LETTER MOTION for Extension of Time to File Response/Reply as to 84 Order on Motion for Extension of Time,,, addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated April 4, 2023. Document filed by Brian Flores, Ray Horton, Steve Wilks.. (Wigdor, Douglas) (Entered: 04/04/2023) |
|---|---|---|
| 04/04/2023 | 91 | ORDER granting 90 Letter Motion for Extension of Time to File Response/Reply re 90 LETTER MOTION for Extension of Time to File Response/Reply as to 84 Order on Motion for Extension of Time,,, addressed to Judge Valerie E. Caproni from Douglas H. Wigdor dated April 4, 2023. Application GRANTED. Plaintiffs' consolidated opposition and reply brief is due on April 11, 2023. Defendants' reply brief is due on April 21, 2023. SO ORDERED. Responses due by 4/11/2023 Replies due by 4/21/2023.. (Signed by Judge Valerie E. Caproni on 4/4/2023) (tg) (Entered: 04/04/2023) |
| 04/11/2023 | 92 | LETTER MOTION for Leave to File Declaration of Michael J. Willemin addressed to Judge Valerie E. Caproni from Michael J. Willemin dated April 11, 2023. Document filed by Brian Flores, Ray Horton, Steve Wilks. (Attachments: # 1 Exhibit 1 - Declaration of Michael J. Willemin encl. Exhibits).(Willemin, Michael) (Entered: 04/11/2023) |
| 04/11/2023 | 93 | MEMORANDUM OF LAW in Opposition re: 81 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,,, . . Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 04/11/2023) |
| 04/12/2023 | 94 | ORDER granting 92 Letter Motion for Leave to File Document. Application GRANTED. Defendants' request to submit the signed version of the Flores-Steelers Agreement, Defs. Mem., Dkt. 82 at 13, is also GRANTED. SO ORDERED. (Signed by Judge Valerie E. Caproni on 4/12/2023) (tg) (Entered: 04/12/2023) |
| 04/12/2023 | 95 | DECLARATION of Michael J. Willemin in Opposition re: 81 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,,, .. Document filed by Brian Flores, Ray Horton, Steve Wilks. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Willemin, Michael) (Entered: 04/12/2023) |
| 04/13/2023 | 96 | LETTER addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated April 13, 2023 re: Declaration of Andrew A. Smith. Document filed by Denver Broncos, Houston NFL Holdings, L.P., New York Football Giants, Inc., The National Football League.. (Lynch, Loretta) (Entered: 04/13/2023) |
| 04/13/2023 | 97 | DECLARATION of Andrew A. Smith in Support re: 81 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,,, .. Document filed by Denver Broncos, Houston NFL Holdings, L.P., New York Football Giants, Inc., The National Football League. (Attachments: # 1 Exhibit A (Flores-Steelers Agreement) (REDACTED)).(Lynch, Loretta) (Entered: 04/13/2023) |
| 04/13/2023 | 98 | ***SELECTED PARTIES***DECLARATION of Andrew A. Smith in Support re: 81 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,,, .. Document filed by New York Football Giants, Inc., The National Football League, Houston NFL Holdings, L.P., Denver Broncos, Brian Flores, Ray Horton, Steve Wilks. (Attachments: # 1 Exhibit A (Flores-Steelers Agreement))Motion or Order to File Under Seal: 53 .(Lynch, Loretta) (Entered: 04/13/2023) |
| 04/21/2023 | 99 | REPLY MEMORANDUM OF LAW in Support re: 81 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,,, . . Document filed by Denver Broncos, Houston NFL Holdings, L.P., New York Football Giants, Inc., The National Football League..(Lynch, Loretta) (Entered: 04/21/2023) |
| 07/11/2023 | 100 | ENDORSED LETTER addressed to The Court from Dr. Jaquel Pitts, Ph.D. dated 7/8/2023 re: Order on Pitts Motion to Intervene. ENDORSEMENT: Application DENIED. Mr. Pitts has not adequately pled sufficient, non-conclusory facts to establish |

| | | |
|---|---|---|
| | | that he has an interest in the subject of this lawsuit, a statutory right to intervene, or a common claim or defense with the parties as required by Federal Rule of Civil Procedure 24. See, e.g., Floyd v. City of New York, 802 F.R.D. 69, 83 (S.D.N.Y. 2014). The Court will file the confidential medical information submitted by Mr. Pitts under seal. SO ORDERED. (Signed by Judge Valerie E. Caproni on 7/11/2023) (tg) (Entered: 07/11/2023) |
| 07/11/2023 | | ***DELETED DOCUMENT. Deleted document number 101 Notice of appeal. The document was incorrectly filed in this case. (nd) (Entered: 07/14/2023) |
| 07/11/2023 | 101 | NOTICE OF INTERLOCUTORY APPEAL from 100 Endorsed Letter. Document filed by Dr. Jaquel Pitts, Ph.D. (Attachments: # 1 Exhibit Order being appealed, # 2 Exhibit complaint, # 3 Exhibit letter, # 4 Exhibit degree, # 5 Exhibit resume, # 6 Exhibit certificates).(nd) (Entered: 07/14/2023) |
| 07/11/2023 | | Appeal Fee Due: for 101 Notice of Interlocutory Appeal by Dr. Jaquel Pitts, Ph.D. $505.00 Appeal fee due by 7/25/2023..(nd) (Entered: 07/14/2023) |
| 07/14/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 101 Notice of Interlocutory Appeal,..(nd) (Entered: 07/14/2023) |
| 07/14/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 101 Notice of Interlocutory Appeal by Dr. Jaquel Pitts, Ph.D. were transmitted to the U.S. Court of Appeals..(nd) (Entered: 07/14/2023) |
| 07/24/2023 | 106 | APPLICATION FOR THE COURT TO REQUEST PRO BONO COUNSEL. Document filed by Dr.Jaquel Jerai Pitts, PhD.(sc) (Entered: 07/28/2023) |
| 07/25/2023 | 102 | OPINION AND ORDER re: 81 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings, . filed by The National Football League, Denver Broncos, Houston NFL Holdings, L.P., New York Football Giants, Inc., 79 MOTION for Reconsideration re; 76 Memorandum & Opinion, Set Hearings, . filed by Brian Flores, Ray Horton, Steve Wilks., For the foregoing reasons, both Plaintiffs' and Defendants' motions for reconsideration are DENIED. The Clerk of Court is respectfully directed to terminate the open motions at docket entries 79 and 81. The parties are ordered to appear for a pretrial conference on Friday, August 4, 2023, at 10:00 A.M. in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, 10007. By July 27, 2023, the parties must submit a joint letter, the contents of which are described on pages 29 and 30 of the Arbitration Opinion. (Pretrial Conference set for 8/4/2023 at 10:00 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni.) (Signed by Judge Valerie E. Caproni on 7/25/2023) (rro) (Entered: 07/25/2023) |
| 07/25/2023 | 103 | NOTICE OF APPEARANCE by Marjorie Mesidor on behalf of Brian Flores, Ray Horton, Steve Wilks..(Mesidor, Marjorie) (Entered: 07/25/2023) |
| 07/26/2023 | 104 | JOINT LETTER MOTION for Extension of Time *of the deadline for the parties' joint letter and to adjourn the pretrial conference* addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated July 26, 2023. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 07/26/2023) |
| 07/27/2023 | 105 | ORDER granting 104 Letter Motion for Extension of Time. Application GRANTED. The status conference in this matter will be held on Wednesday, August 30, 2023, at 10:00 A.M. in Courtroom 443 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, NY 10007. The parties' joint letter is due August 22, 2023. SO ORDERED. (Signed by Judge Valerie E. Caproni on 7/27/2023) (rro) (Entered: 07/27/2023) |

Case 23-1185, Document 139, 08/26/2024, 3632080, Page28 of 277

| 07/27/2023 | | Set/Reset Hearings: Status Conference set for 8/30/2023 at 10:00 AM in Courtroom 443, 40 Centre Street, New York, NY 10007 before Judge Valerie E. Caproni. (rro) (Entered: 07/27/2023) |
|---|---|---|
| 07/31/2023 | 107 | ORDER terminating 106 Application for the Court to Request Counsel. Because Mr. Pitts has appealed the Court's decision to deny his motion to intervene, the Court no longer has jurisdiction over this matter. The Clerk of Court is respectfully directed to transmit a copy of Mr. Pitt's application to the Second Circuit and to note the transmission on the docket, and to CLOSE the open motion at Dkt. 106. The Clerk of Court is further directed to mail a copy of the endorsed order to Jacquel Pitts, 421 Broadway Ave #24, San Diego, CA 92101, and to note the mailing on the docket. Mr. Pitts is advised that all communications with the Court should be made by filing a letter. If Mr. Pitts has difficulty doing so, the Court advises him to consult the websites for the Southern District of New York and the Second Circuit for guidance on filing materials pro se. The Court is unable to act on communications or filings sent directly to the Chambers email address. SO ORDERED.. (Signed by Judge Valerie E. Caproni on 7/31/2023) (kv) Transmission to Appeals Clerk. Transmission to Docket Assistant Clerk for processing. (Entered: 07/31/2023) |
| 07/31/2023 | 108 | NOTICE OF INTERLOCUTORY APPEAL from 100 Endorsed Letter, Jaquel Pitts. Form D-P is due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit Motion for IFP, # 2 Exhibit Order).(km) (Entered: 08/02/2023) |
| 07/31/2023 | 109 | MOTION for Leave to Appeal in forma pauperis. Document filed by Jaquel Pitts.(km) (Entered: 08/02/2023) |
| 08/01/2023 | | Supplemental ROA Sent to USCA (Electronic File). Certified Supplemental Indexed record on Appeal Electronic Files for 105 Order on Motion for Extension of Time, 104 JOINT LETTER MOTION for Extension of Time *of the deadline for the parties' joint letter and to adjourn the pretrial conference* addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated July 26, 2023. filed by The National Football League, Tennessee Titans Entertainment, Inc., Denver Broncos, Arizona Cardinals Football Club LLC, Houston NFL Holdings, L.P., New York Football Giants, Inc., Miami Dolphins, 107 Order on Application for the Court to Request Counsel, 106 APPLICATION for the Court to Request Counsel., 102 Memorandum & Opinion, Set Deadlines/Hearings, 103 Notice of Appearance filed by Brian Flores, Ray Horton, Steve Wilks were transmitted to the U.S. Court of Appeals. (tp) (Entered: 08/01/2023) |
| 08/01/2023 | | Mailed a copy of 107 Order on Application for the Court to Request Counsel, to Jacquel Pitts, 421 Broadway Ave #24, San Diego, CA 92101..(nb) (Entered: 08/01/2023) |
| 08/02/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 108 Notice of Interlocutory Appeal. (km) (Entered: 08/02/2023) |
| 08/02/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 108 Notice of Interlocutory Appeal were transmitted to the U.S. Court of Appeals. (km) (Entered: 08/02/2023) |
| 08/02/2023 | 110 | MEMO ENDORSEMENT terminating 109 Motion for Leave to Appeal in forma pauperis. ENDORSEMENT: The Clerk of Court is respectfully directed to transmit a copy of the application at Dkt. 109 to the Second Circuit and to note the transmission on the docket. The Clerk of Court is further directed to terminate the open motion at Dkt. 109. SO ORDERED. (Signed by Judge Valerie E. Caproni on 8/2/2023) (tg) Transmission to Appeals Clerk. (Entered: 08/03/2023) |
| 08/03/2023 | | Supplemental ROA Sent to USCA (Electronic File). Certified Supplemental Indexed record on Appeal Electronic Files for 109 MOTION for Leave to Appeal in forma |

**J.A. 20**

| | | |
|---|---|---|
| | | pauperis., [110] Order on Motion for Leave to Appeal in forma pauperis, were transmitted to the U.S. Court of Appeals. (tp) (Entered: 08/03/2023) |
| 08/14/2023 | 111 | MOTION, Re: for Extension of Time to File Notice of Appeal.Document filed by Jaquel J. Pitts.(sc) (Entered: 08/15/2023) |
| 08/15/2023 | 112 | MEMO ENDORSEMENT denying as moot [111] Motion for Extension of Time. ENDORSEMENT: Application DENIED as moot. Mr. Pitts has already filed a notice of appeal of the Court's order denying his motion to intervene in this case. Dkt. 108. Accordingly, Mr. Pitts' motion to intervene is now with the Second Circuit. To the extent that Mr. Pitts seeks an extension of any deadlines set by the Second Circuit, he must make any such application to the Second Circuit. The Clerk of Court is respectfully directed to terminate the open motion at Dkt. 111. The Clerk of Court is further directed to mail a copy of the endorsed order to Jacquel Pitts, 1439 N. Highland Ave #216, Los Angeles, CA, 90028, and to note the mailing on the docket. SO ORDERED. (Signed by Judge Valerie E. Caproni on 8/15/2023) (tg) Transmission to Docket Assistant Clerk for processing. (Entered: 08/15/2023) |
| 08/16/2023 | | Mailed a copy of [112] Order on Motion for Extension of Time,,, to Jacquel Pitts, 421 Broadway Ave #24, San Diego, CA 92101. (ta) (Entered: 08/16/2023) |
| 08/21/2023 | 113 | NOTICE OF INTERLOCUTORY APPEAL from [76] Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,,,, [102] Memorandum & Opinion, Set Deadlines/Hearings,,,,,,,,. Document filed by Denver Broncos, Houston NFL Holdings, L.P., New York Football Giants, Inc., The National Football League. Filing fee $ 505.00, receipt number ANYSDC-28177372. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Lynch, Loretta) (Entered: 08/21/2023) |
| 08/21/2023 | 114 | LETTER addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated August 21, 2023 re: Coinbase v. Bielski. Document filed by Denver Broncos, Houston NFL Holdings, L.P., New York Football Giants, Inc., The National Football League. (Attachments: # 1 Exhibit - Coinbase decision).(Lynch, Loretta) (Entered: 08/21/2023) |
| 08/21/2023 | 115 | MEMO ENDORSEMENT on re: [114] Letter filed by The National Football League, Denver Broncos, Houston NFL Holdings, L.P., New York Football Giants, Inc. ENDORSEMENT: Application GRANTED. The August 30, 2023, conference is CANCELLED, and all deadlines are STAYED. The Clerk of Court is respectfully directed to STAY the case. SO ORDERED. (Signed by Judge Valerie E. Caproni on 8/21/2023) (ama) (Entered: 08/22/2023) |
| 08/21/2023 | | Case Stayed (ama) (Entered: 08/22/2023) |
| 08/22/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: [113] Notice of Interlocutory Appeal,..(nd) (Entered: 08/22/2023) |
| 08/22/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for [113] Notice of Interlocutory Appeal, filed by The National Football League, Denver Broncos, Houston NFL Holdings, L.P., New York Football Giants, Inc. were transmitted to the U.S. Court of Appeals..(nd) (Entered: 08/22/2023) |
| 08/29/2023 | 116 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 08/29/2023) |
| 08/29/2023 | 117 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 08/29/2023) |
| 08/29/2023 | 118 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 08/29/2023) |
| 09/05/2023 | 119 | MOTION for Certificate of Appealability *Pursuant to 28 U.S.C. 1292(b)*. Document filed by Brian Flores, Ray Horton, Steve Wilks..(Gottlieb, David) (Entered: 09/05/2023) |

| 09/05/2023 | 120 | MEMORANDUM OF LAW in Support re: 119 MOTION for Certificate of Appealability *Pursuant to 28 U.S.C. 1292(b)*. . Document filed by Brian Flores, Ray Horton, Steve Wilks..(Gottlieb, David) (Entered: 09/05/2023) |
| --- | --- | --- |
| 09/05/2023 | 121 | DECLARATION of David E. Gottlieb in Support re: 119 MOTION for Certificate of Appealability *Pursuant to 28 U.S.C. 1292(b)*.. Document filed by Brian Flores, Ray Horton, Steve Wilks. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E).(Gottlieb, David) (Entered: 09/05/2023) |
| 09/05/2023 | 122 | NOTICE OF CROSS APPEAL from 76 Memorandum & Opinion, Set Hearings,,,,,,,,,,,,,,,,,, 102 Memorandum & Opinion, Set Deadlines/Hearings,,,,,,,,. Document filed by Brian Flores, Ray Horton, Steve Wilks. Filing fee $ 505.00, receipt number ANYSDC-28241544. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Gottlieb, David) (Entered: 09/05/2023) |
| 09/06/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 122 Notice of Cross Appeal.(km) (Entered: 09/06/2023) |
| 09/06/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 122 Notice of Cross Appeal, filed by Brian Flores, Ray Horton, Steve Wilks were transmitted to the U.S. Court of Appeals.(km) (Entered: 09/06/2023) |
| 09/06/2023 | 123 | ORDER: IT IS HEREBY ORDERED that Defendants' opposition to Plaintiffs' motion for a certificate of appealability, including their position on the jurisdictional effect of Plaintiffs' appeal on the pending motion for a certificate of appealability, is due not later than September 19, 2023. Plaintiffs' reply is due by September 26, 2023. SO ORDERED. ( Replies due by 9/26/2023, Responses due by 9/19/2023) (Signed by Judge Valerie E. Caproni on 9/6/2023) (tg) (Entered: 09/06/2023) |
| 09/08/2023 | 124 | JOINT LETTER MOTION for Extension of Time to File Response/Reply as to 123 Order, Set Deadlines,, addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated September 8, 2023. Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 09/08/2023) |
| 09/11/2023 | 125 | ORDER granting 124 Letter Motion for Extension of Time to File Response/Reply re 124 JOINT LETTER MOTION for Extension of Time to File Response/Reply as to 123 Order, Set Deadlines,, addressed to Judge Valerie E. Caproni from Loretta E. Lynch dated September 8, 2023., 119 MOTION for Certificate of Appealability *Pursuant to 28 U.S.C. 1292(b)*. The parties' proposed briefing schedule is APPROVED. SO ORDERED. Responses due by 10/5/2023 Replies due by 10/20/2023. (Signed by Judge Valerie E. Caproni on 9/11/2023) (tg) (Entered: 09/11/2023) |
| 10/05/2023 | 126 | MEMORANDUM OF LAW in Opposition re: 119 MOTION for Certificate of Appealability *Pursuant to 28 U.S.C. 1292(b)*. . Document filed by Arizona Cardinals Football Club LLC, Denver Broncos, Houston NFL Holdings, L.P., Miami Dolphins, Ltd., New York Football Giants, Inc., Tennessee Titans Entertainment, Inc., The National Football League..(Lynch, Loretta) (Entered: 10/05/2023) |
| 10/20/2023 | 127 | REPLY MEMORANDUM OF LAW in Support re: 119 MOTION for Certificate of Appealability *Pursuant to 28 U.S.C. 1292(b)*. . Document filed by Brian Flores, Ray Horton, Steve Wilks..(Wigdor, Douglas) (Entered: 10/20/2023) |
| 12/06/2023 | 128 | MANDATE of USCA (Certified Copy) as to 101 Notice of Interlocutory Appeal. USCA Case Number 23-1027. Ordered that the appeal is DISMISSED.. Catherine O'Hagan |

| | | Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 12/6/2023..(nd) (Entered: 12/06/2023) |
|---|---|---|
| 01/04/2024 | [129](#) | OPINION AND ORDER re: [119](#) MOTION for Certificate of Appealability *Pursuant to 28 U.S.C. 1292(b)*. filed by Brian Flores, Ray Horton, Steve Wilks. For the foregoing reasons, Plaintiffs' motion to certify the Issues for Appeal to the Second Circuit is DENIED. The Clerk of Court is respectfully directed to close the open motion at Docket Entry 119. SO ORDERED. (Signed by Judge Valerie E. Caproni on 1/4/2024) (ks) (Entered: 01/04/2024) |
| 04/05/2024 | [130](#) | MOTION for Marjorie Mesidor to Withdraw as Attorney . Document filed by Brian Flores, Ray Horton, Steve Wilks..(Mesidor, Marjorie) (Entered: 04/05/2024) |
| 04/05/2024 | [131](#) | MEMO ENDORSEMENT granting [130](#) Motion to Withdraw as Attorney. ENDORSEMENT: Application GRANTED. SO ORDERED. Attorney Marjorie Mesidor terminated. (Signed by Judge Valerie E. Caproni on 4/5/2024) (tg) (Entered: 04/05/2024) |
| 05/02/2024 | [132](#) | MANDATE of USCA (Certified Copy) as to [122](#) Notice of Cross Appeal, filed by Brian Flores, Ray Horton, Steve Wilks. USCA Case Number 23-1225 (Con). Defendants-Appellants-Cross-Appellees move to dismiss the cross-appeal docketed under 23- 1225 for lack of appellate jurisdiction. Upon due consideration, it is hereby ORDERED that the motion is GRANTED and the cross-appeal is DISMISSED. See Ogunkoya v. Monaghan, 913 F.3d 64, 72 (2d Cir. 2019) (discussing pendent appellate jurisdiction); Myers v. Hertz Corp., 624 F.3d 537, 552-53 (2d Cir. 2010) (same).. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 5/2/2024..(nd) (Entered: 05/02/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/21/2024 10:31:02 | | |
| **PACER Login:** | pw0001MAO | **Client Code:** | 004263-00421-09176 |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00871-VEC |
| **Billable Pages:** | 22 | **Cost:** | 2.20 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- X
BRIAN FLORES, as a Class Representative, on　　:
behalf of himself and all others similarly situated,　:　　Civil Action No.
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiff,　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　v.　　　　　　　　　　　　　　:　　**CLASS ACTION COMPLAINT**
　　　　　　　　　　　　　　　　　　　　　　:
THE NATIONAL FOOTBALL LEAGUE; NEW　:
YORK FOOTBALL GIANTS, INC.; MIAMI　　　:
DOLPHINS, LTD.; DENVER BRONCOS; and　　:　　**Jury Trial Demanded**
JOHN DOE TEAMS 1 through 29,　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendants.　　　　　:
-------------------------------------------------------------- X

**"Sorry – I fucked this up.　I double checked and misread the text.　I think they are naming Brian Daboll.　I'm sorry about that.　BB."**

- Bill Belichick informing Plaintiff Brian Flores, three days *before* his interview with the New York Giants that Brian Daboll had *already* been selected for the job.

**"Morals cannot be legislated, but behavior can be regulated.　The law cannot make an employer love me, but it can keep him from refusing to hire me because of the color of my skin."**

- Dr. Martin Luther King, Jr.

## PRELIMINARY STATEMENT

1.　　As this Class Action Complaint is filed on the first day of Black History Month, we honor the brave leaders that fought so hard to help break down racial barriers of injustice.　Martin Luther King Jr., Harriet Tubman, Rosa Parks, Frederick Douglass, Jackie Robinson and Mamie Till, to name only a few.

2.　　Unfortunately, however, there is so much more to be done.　While racial barriers have been eroded in many areas, Defendant the National Football League ("NFL" or the "League") lives in a time of the past.　As described throughout this Class Action Complaint, the

NFL remains rife with racism, particularly when it comes to the hiring and retention of Black Head Coaches, Coordinators and General Managers. Over the years, the NFL and its 32-member organizations (the "Teams") have been given every chance to do the right thing. Rules have been implemented, promises made—but nothing has changed. In fact, the racial discrimination has only been made worse by the NFL's disingenuous commitment to social equity.

3. As such, in the face of the risks associated with combating racism and injustice, and in particular standing up to organizations as powerful as the NFL and its Teams, Mr. Flores has determined that the only way to effectuate real change is through the Courts, where the NFL's conduct can be judged by a jury of Mr. Flores' peers. A judgment that is long overdue.

4. In certain critical ways, the NFL is racially segregated and is managed much like a plantation. Its 32 owners—none of whom are Black—profit substantially from the labor of NFL players, 70% of whom are Black. The owners watch the games from atop NFL stadiums in their luxury boxes, while their majority-Black workforce put their bodies on the line every Sunday, taking vicious hits and suffering debilitating injuries to their bodies and their brains while the NFL and its owners reap billions of dollars.

5. Many players desire to coach for their post-playing careers. Others desire to work their way into management-level positions at one of the NFL's 32 Teams. Unfortunately, for Black individuals, that is easier said than done.

- Only 1 of the NFL's 32 teams (3%) employs a Black Head Coach;

- Only 4 of the NFL's 32 teams (12%) employ a Black Offensive Coordinator;

- Only 11 of the NFL's 32 teams (34%) employ a Black Defensive Coordinator;

J.A. 25

- Only 8 of the NFL's 32 teams (25%) employ a Black Special Teams Coordinator;

- Only 3 of the NFL's 32 teams (9%) employ a Black Quarterback Coach; and

- Only 6 of the NFL's 32 teams (19%) employ a Black General Manager.

6.      These numbers come from a pool of players that is approximately 70% Black. This is not by chance. Rather, the statistics above and those described throughout this Complaint are the result of race discrimination.

7.      The NFL has effectively conceded this point. Troy Vincent, the NFL Executive Vice President of Football Operations, recently stated with regard to Black Head Coaches:

> There is a double standard, and we've seen that . . . And you talk about the appetite for what's acceptable. Let's just go back to . . . Coach Dungy was let go in Tampa Bay after a winning season. . . Coach Wilks, just a few years prior, was let go after one year . . . Coach Caldwell was fired after a winning season in Detroit . . . It is part of the larger challenges that we have. But when you just look over time, it's over-indexing for men of color. These men have been fired after a winning season. How do you explain that? There is a double standard. I don't think that that is something that we should shy away from. But that is all part of some of the things that we need to fix in the system. We want to hold everyone to why does one, let's say, get the benefit of the doubt to be able to build or take bumps and bruises in this process of getting a franchise turned around when others are not afforded that latitude? . . . [W]e've seen that in history at the [professional] level.[1]

8.      Similarly, Jonathan Beane, the NFL's Senior Vice President and Chief Diversity & Inclusion Officer, stated:

> Any criticism we get for lack of representation at the GM and head coach positions, we deserve. We see that we're not where we want to be. We have to do much better. We're focusing on all roles at

---

[1]      See Maske, Mark, "Senior NFL Official: 'Double Standard for Black coaches when it comes to keeping jobs'", *The Washington Post*, (Jan. 11, 2022), available at:
https://www.washingtonpost.com/sports/2022/01/11/black-nfl-coaches-firings-troy-vincent/.

the league, and all these roles are key roles . . . But certainly at the top of the house, general manager and head coach, that's the responsibility of the NFL to make sure that we are representing our current fan base and we're representing those that are in the league today. And if you look at it right now, we're grossly underrepresented.[2]

9.      Perhaps worst of all, in connection with its distribution of settlement monies to retirees who suffer from traumatic brain injury, the NFL insisted on applying so-called "race-norms."  Put simply, the NFL took the position that white people simply have better baseline cognitive function than Black people.  This is the very definition of racism—the assumption that someone is not as smart as another person because of the color of his or her skin.  It also perhaps explains why the NFL and its Teams are so loath to hire Black Head Coaches, Coordinators and General Managers ("GMs"), just as for years the League discriminated against Black quarterbacks.

10.      These are literal admissions of liability and fault on the part of the NFL and its owners, and yet no meaningful remedial action has been taken to remedy this recognized discrimination.

11.      Even when Black candidates get hired for Head Coaching positions, a rarity, they are discriminated against in connection with the terms and conditions of their employment and compensation and terminated even as far less successful white Head Coaches are retained.  Moreover, Black Head Coaches are far less likely than white Head Coaches to receive second chances even as white Head Coaches are routinely hired by Teams even after they fail elsewhere.

12.      It has been nearly 20 years since the NFL implemented the Rooney Rule, purportedly to try to combat the utter lack of Black Head Coaches in the NFL.  As first

---

[2]      See "NFL Executives Want, Expect More Black Coaches To Be Hired", *The Associated Press*, (Jan. 15, 2022), available at: https://pittsburgh.cbslocal.com/2022/01/15/nfl-executives-want-expect-more-black-coaches-to-be-hired/.

J.A. 27

implemented, the Rooney Rule required NFL Teams to interview at least one Black person in connection with any Head Coach vacancy. The Rooney Rule has since been expanded to cover General Manager and other front office positions, as well as Assistant Head Coach and Coordinator positions. Moreover, as it relates to Head Coach positions, teams are now required to interview two minority coaching candidates, at least one of whom must be interviewed in person.

13.     The Rooney Rule may have been well intentioned, although it is hard to attribute benevolence to the NFL given the complete lack of action that it has taken post-Rooney Rule to remedy discrimination that it admits exists. However, well intentioned or not, what is clear is that the Rooney Rule is not working. It is not working because the numbers of Black Head Coaches, Coordinators and Quarterback Coaches are not even close to being reflective of the number of Black athletes on the field. The Rooney Rule is also not working because management is not doing the interviews in good-faith, and it therefore creates a stigma that interviews of Black candidates are only being done to comply with the Rooney Rule rather than in recognition of the talents that the Black candidates possess.

14.     In January 2022, Mr. Flores, who spent three years as the Head Coach of Defendant Miami Dolphins, Ltd. (the "Dolphins" or "Miami"), found himself without a job. He was fired by the Dolphins after leading the team to its first back-to-back winning seasons since 2003. The purported basis for his termination was alleged poor collaboration. In reality, the writing had been on the wall since Mr. Flores' first season as Head Coach of the Dolphins, when he refused his owner's directive to "tank" for the first pick in the draft. Indeed, during the 2019 season, Miami's owner, Stephen Ross, told Mr. Flores that he would pay him $100,000 for every

J.A. 28

loss, and the team's General Manager, Chris Grier, told Mr. Flores that "Steve" was "mad" that

Mr. Flores' success in winning games that year was "compromising [the team's] draft position."

15.     After the end of the 2019 season, Mr. Ross began to pressure Mr. Flores to recruit

a prominent quarterback in violation of League tampering rules.  Mr. Flores repeatedly refused to

comply with these improper directives.  Undeterred, in the winter of 2020, Mr. Ross invited Mr.

Flores onto a yacht for lunch.  Shortly after he arrived, Mr. Ross told Mr. Flores that the

prominent quarterback was "conveniently" arriving at the marina.  Obviously, Mr. Ross had

attempted to "set up" a purportedly impromptu meeting between Mr. Flores and the prominent

quarterback.  Mr. Flores refused the meeting and left the yacht immediately.  After the incident,

Mr. Flores was treated with disdain and held out as someone who was noncompliant and difficult

to work with.

16.     From that point forward, Mr. Flores was ostracized and ultimately he was fired.

He was subsequently defamed throughout the media and the League as he was labeled by the

Dolphins brass as someone who was difficult to work with.  This is reflective of an all too

familiar "angry black man" stigma that is often casted upon Black men who are strong in their

morals and convictions while white men are coined as passionate for those very same attributes.

17.     Thus, last week, Defendant New York Football Giants, Inc. (the "Giants" or

"New York Giants") had an opportunity to move a step in the right direction, if even only one.

The Giants had the chance to hire Mr. Flores, an eminently qualified Black man, to be the first

Black Head Coach in the Giants' nearly 100-year history.

18.     Instead, the New York Giants made the decision to hire Brian Daboll—and

disclosed that decision to third parties—during a time when the Giants were scheduled to still

interview Mr. Flores and when Mr. Flores was deceptively led to believe he actually had a chance at this job.

19. Thus, on Wednesday, January 26, 2022, Mr. Flores was forced to sit through a dinner with Joe Schoen, the Giant's new General Manager, knowing that the Giants had already selected Mr. Daboll. Much worse, on Thursday, January 27, 2022, Mr. Flores had to give an extensive interview for a job that he already knew he would not get—an interview that was held for no reason other than for the Giants to demonstrate falsely to the League Commissioner Roger Goodell and the public at large that it was in compliance with the Rooney Rule.

20. The Giants would likely have gotten away with this most insidious form of discrimination if New England Patriots Coach Bill Belichick had not mistakenly disclosed it to Mr. Flores in the below text messages.

 

7

21.     Incredibly, this was not Mr. Flores' first sham interview that was held only in an
effort to comply with the Rooney Rule.  Indeed, in 2019 Mr. Flores was scheduled to interview
with the Denver Broncos.  However, the Broncos' then-General Manager, John Elway, President
and Chief Executive Officer Joe Ellis and others, showed up an hour late to the interview.  They
looked completely disheveled, and it was obvious that they had drinking heavily the night before.
It was clear from the substance of the interview that Mr. Flores was interviewed only because of
the Rooney Rule, and that the Broncos never had any intention to consider him as a legitimate
candidate for the job.  Shortly thereafter, Vic Fangio, a white man, was hired to be the Head
Coach of the Broncos.

22.     Having discovered what the Giants and the rest of the NFL had hoped to keep in
the dark, Mr. Flores now brings this Class Action Complaint to shine a light on the racial
injustices that take place inside the NFL and to effectuate real change for the future.

23.     Among the other relief sought, Mr. Flores seeks the following injunctive relief:

    i.    Increase the influence of Black individuals in hiring and termination
decisions for General Manager, Head Coach and Offensive and Defensive
Coordinator positions;

        a.    Ensure diversity of ownership by creating and funding a committee
dedicated to sourcing Black investors to take majority ownership
stakes in NFL Teams;

        b.    Ensure diversity of decision-making by permitting select Black
players and coaches to participate in the interviewing process for
General Manager, Head Coach and Offensive and Defensive
Coordinator positions;

    ii.    Increase the objectivity of hiring and termination decisions for General
Manager, Head Coach and Offensive and Defensive Coordinator
positions;

J.A. 31

a.      Require NFL Teams to reduce to writing the rationale for hiring and termination decisions, including a full explanation of the basis for any subjective influences (*e.g.*, trust, personality, interview performance, *etc.*);

b.      Require NFL Teams to consider side-by-side comparisons of objective criteria, such as past performance, experience and objective qualifications;

iii.    Increase the number of Black Offensive and Defensive Coordinators;

a.      Create and fund a training program for lower-level Black coaches who demonstrate an aptitude for coaching and an interest in advancing to a Coordinator position;

iv.    Incentivize the hiring and retention of Black General Managers, Head Coaches and Offensive and Defensive Coordinators through monetary, draft and/or other compensation such as additional salary cap space; and

v.    Complete transparency with respect to pay for all General Managers, Head Coaches and Offensive and Defensive Coordinators.

24.    Defendants' conduct has violated Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), the New Jersey Law Against Discrimination, ("NJLAD"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq*. ("NYCHRL").

## ADMINISTRATIVE PROCEDURES

25.    Plaintiff will file a Charge of Discrimination with the Equal Employment Opportunity Commission, an administrative pre-requisite to filing an action under Title VII of the Civil Rights Act of 1964 ("Title VII") and will amend this action to include claims under Title VII at the appropriate time.

26.    Pursuant to NYCHRL § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department,

J.A. 32

Office of the Corporation Counsel within 10 days of its filing, thereby satisfying the notice requirements of this action.

27.     Plaintiff has complied with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

28.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under § 1981.  The Court has supplemental jurisdiction over Plaintiff's related state and local law claims pursuant to 28 U.S.C. § 1367(a).

29.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including certain of the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

30.     Plaintiff Brian Flores is a Black man and the former Head Coach of the Miami Dolphins.  Mr. Flores was not only denied the Head Coach position of the New York Giants but was humiliated in the process as the New York Giants subjected him to a sham interview in an attempt to appear to provide a Black candidate with a legitimate chance at obtaining the job.

31.     Defendant the National Football League is a trade association made up of 32 professional football teams and with a principal place of business located at 345 Park Avenue, New York, NY 10154.

32.     Defendant New York Football Giants, Inc. is a corporation that owns and operates the New York Giants professional football team.  New York Football Giants, Inc. is headquartered at 1925 Giants Drive, East Rutherford, NJ 07073.

33.     Defendant Miami Dolphins, Ltd. is a corporation that owns and operates the Miami Dolphins professional football team.  Miami Dolphins, Ltd. is headquartered at 346 Don Shula Drive, Miami Gardens, FL 33056.

34.     Defendant Denver Broncos, former corporate name PDB Sports, Ltd., is a corporation that owns and operates the Denver Broncos professional football team.  The Denver Broncos are headquartered at 13655 Broncos Parkway, Englewood, Colorado 80112.

35.     Defendants John Doe Teams 1 through 29 are intended to identify NFL teams who have engaged in discriminatory conduct towards the Members of the Proposed Class, including potentially the Arizona Cardinals, Atlanta Falcons, Baltimore Ravens, Buffalo Bills, Carolina Panthers, Chicago Bears, Cincinnati Bengals, Cleveland Browns, Dallas Cowboys, Detroit Lions, Green Bay Packers, Houston Texans, Indianapolis Colts, Jacksonville Jaguars, Kansas City Chiefs, Las Vegas Raiders, Los Angeles Chargers, Los Angeles Rams, Minnesota Vikings, New England Patriots, New Orleans Saints, New York Jets, Philadelphia Eagles, Pittsburgh Steelers, San Francisco 49ers, Seattle Seahawks, Tampa Bay Buccaneers, Tennessee Titans and/or the Washington Football Team.

## FACTUAL ALLEGATIONS

## I.     HISTORY OF RACE DISCRIMINATION IN THE NFL

36.     The NFL has a tortured and unacceptable history with race relations that requires immediate focus in the first instance.  The League remains mired in a culture that lacks inclusivity and where a barrier to entry still exists today for Black professionals in leadership.

37.     The first iteration of the NFL[3] began in 1920, and it was rife with racism.

---

[3]     The NFL was originally known as the American Professional Football Conference, then the American Professional Football Association, before being renamed to the NFL in 1922.

11

38.     From 1920 through 1926, a total of only nine Black players were permitted into the League.  At that time, the only reason Black players were permitted at all was because the then-existing teams had difficulty filling out their rosters in the League's early days.

39.     Heading into the 1927 season, all five of the remaining Black players at the time left the League and, from 1927 to 1933, only a handful of Black players were permitted to participate.  Indeed, during that time frame there was no more than one Black player in the League per year.

40.     In 1933, the League had only two Black players, but they left at the end of the year, leaving the NFL with none.  At this point, the NFL was reportedly financially viable and no longer needed Black players to fill vacant positions.

41.     This led to one of the most despicable moments in the history of professional sports in the United States:  it is widely accepted that the NFL used the absence of Black players as an opportunity to impose a "gentleman's agreement" to ban Black players entirely.

42.     This initiative was led by the Washington Football Team's owner George Preston Marshall.[4]  The League's other founding owners—including but not limited to, Tim Mara of the New York Giants—appear to have colluded and cooperated in this widespread racial ban.

43.     It was not until 1946 that Black players re-entered professional football.

44.     However, the reentry of Black players into the League was not the result of introspection and a commitment to equality.  Rather, when the Cleveland Rams moved to Los Angeles, the publicly funded playing venue, the Los Angeles Coliseum, forced the Rams to integrate at least one Black player in order to comply with the Supreme Court's decision in *Plessy v. Ferguson* that banned segregation in places of public accommodation.

---

[4]     See Moore, Louis, "The NFL and a History of Black Protest", *African American Intellectual History Society*, (Sept. 12, 2018) (citing "Kenny to get Tryout with National League," *Los Angeles Tribune,* (Jan. 19, 1946)), available at: https://www.aaihs.org/the-nfl-and-a-history-of-black-protest/#fn-42670-3.

45. In fact, it was reported that during a meeting between local officials, community activists and the Rams' General Manager Charles F. Walsh, Mr. Walsh admitted to the unwritten racist "gentlemen's agreement" of barring Black players.

46. As it would happen, the Rams ultimately signed two Black players for the 1946 season, but two more years would go by before any other team would sign a Black player.

47. As of 1950, fewer than half of the NFL's ten teams had signed a Black player and it was not until more than a decade later that the Washington Football Team signed its first Black player.

48. In 1959, 13 years later after the start of integration, only 12 percent of the League's players were Black.

49. Even as integration slowly progressed, the stain of racism persisted. Teams reportedly put unwritten quotas on how many Black players could be signed, and often teams would stack Black players at the same position so that they would be eliminated as a matter of competition and roster cuts. It was also reported that Black players received less compensation than their white counterparts.

50. The NFL only engaged in genuine full-scale racial integration when it became economically necessary due to outrage and protests from writers and fans, the emergence of the rival and more racially progressive leagues (such as the All-America Football Conference ("AAFC") and American Football League ("AFL")) and the success of numerous minority athletes in college football.[5]

---

[5] See "The Reintegration of the NFL." *NFL Football Operations*, accessed Feb. 1, 2022 available at: https://operations.nfl.com/inside-football-ops/players-legends/evolution-of-the-nfl-player/the-reintegration-of-the-nfl/.

J.A. 36

51.     Of course, integration was hardly the end of Black struggle in the NFL—untold forms of discrimination still followed Black players from team-to-team, city-to-city, stadium-to-stadium and hotel-to-hotel.  In fact, though the NFL had integrated 23 years earlier, when Washington's owner, Mr. Marshall, died in 1969, he abhorrently stipulated that his estate be used to establish the Redskins Foundation, on the condition that it was barred from spending money for "any purpose which supports or employs the principle of racial integration in any form."[6]

52.     The NFL has profited immensely from the racial integration of its players. Initially considered a second-tier sport, the NFL has thrived as an integrated League over the last 75 years.

53.     While the NFL was forced to racially integrate its players to generate these immense profits, it was not forced to do so in other areas—so it did not.

54.     It took approximately *20 years* for the League to hire its first black official (Burl Toler).

55.     It is widely known by even casual NFL fans that it took until at least the 1980s—approximately *40 years* after integration—for teams to genuinely accept Black players at the quarterback position (*i.e.* Warren Moon and Randall Cunningham).[7]

56.     It took *43 years* for the first Black Head Coach to be hired (Art Shell).

---

[6]     See Coates, Ta-Nehisi, "A History of Segregation in the NFL", *The Atlantic*, (Nov. 17, 2011), available at: https://www.theatlantic.com/entertainment/archive/2011/11/a-history-of-segregation-in-the-nfl/248625/

[7]     The blatant racial stereotyping of Black quarterbacks in terms of the way they have been treated and described must be noted.  Empirical studies show that "Black quarterbacks tend to be praised for their athleticism and criticized for a lack of intelligence. Meanwhile, white quarterbacks are often praised for their intelligence and criticized for a lack of athleticism."  See Mercurio, Eugenio, and Filak, Vincent, "Roughing the Passer: The Framing of Black and White Quarterbacks Prior to the NFL Draft." *Howard Journal of Communications* 21, no. 1 (2010): 56–71. https://doi.org/10.1080/10646170903501328.  The Wonderlic test, used by NFL teams to gauge intelligence of pre-draft players has been harshly criticized for being discriminatory.  See *e.g.* Hazell, Ricardo A., "NFL Draft Wonderlic leaks Reek of Racism and Classism," *The Shadow League* (April 25, 2017); Stromberg, Joseph, "Reminder: The NFL's Wonderlic Aptitude Test is Totally Worthless," *Vox* (May 8, 2014).

57.     It took **54 years** for an NFL team to hire a Black General Manager (Ozzie Newsome).

58.     Now, **76 years** following integration, there has never been a Black Commissioner and there has never been a Black majority owner of an NFL team.

59.     For a League and its team owners who have profited immensely off the talent of Black players, the NFL has never fully acknowledged its history of racism or taken appropriate steps to address its racial disparities.  As a Black sportswriter once wrote:

> [P]ersons, corporations or business almost always forget the people or incidents that made them big . . . [the NFL] took all the aid the colored American could give and then as soon as it became 'big league,' promptly put a bar up against the very backbone of its existence."[8]

60.     Case in point:  Mr. Marshall, in many ways the personification of the NFL's deep-seeded institutional racism, is enshrined in the NFL Hall of Fame—and his contributions are lauded by the Hall of Fame's website, with only a passing reference to the fact that he "endured his share of criticism for not integrating his team until being forced to do so in 1962."[9]  That is, the NFL does not even acknowledge, much less condemn, Mr. Marshall's role in the League's history with racism.  Rather, it only notes that he received criticism from others.

## II.      THE NFL'S ONGOING PROBLEMS WITH RACE

61.     History shows that the NFL is synonymous with ownership resistance to anti-racist protest—and that continues to the present day.

---

[8]     See Halley Harding, "So What?" *Los Angeles Tribune*, (Feb. 7, 1941) (as cited in Moore, "The NFL and a History of Black Protest").

[9]     See "George Preston Marshall: Pro Football Hall of Fame Official Site." *PFHOF* (Accessed January 27, 2022), available at: https://www.profootballhof.com/players/george-preston-marshall/.  For his part, Tim Mara's Hall of Fame entry does not include any reference to New York's complicity with the NFL's racist segregationist policies.  See Tim Mara: Pro Football Hall of Fame Official Site." *PFHOF* (Accessed January 27, 2022), available at: https://www.profootballhof.com/players/tim-mara/.

J.A. 38

A.    **Discrimination Against Colin Kaepernick**

62.    As has been well documented, during the 2016 NFL season, Colin Kaepernick protested societal racial injustice by kneeling during the national anthem.

63.    Following the 2016-17 season—a season in which over the course of 11 games started he had 16 touchdowns against only four interceptions, 468 rushing yards and a passer rating of 90.7—no NFL team would offer him a job, even as a backup.

64.    To even a casual observer it was clear that Mr. Kaepernick was more than qualified for a roster spot in the NFL.

65.    Seahawks Head Coach Pete Carroll explained the Seahawks' rationale for not bringing him in: "**He's a *starter* in this league**. And we have a starter. But **he's a *starter* in this league,** and I can't imagine that someone won't give him a chance to play."[10]

66.    The New York Giants gave Mr. Kaepernick no consideration and suggested that it was because the team feared backlash from the fans if it signed Mr. Kaepernick—a statement that journalists understandably labeled "dangerous."[11]

67.    In an August 2017 article titled, "Colin Kaepernick is Not Supposed to Be Unemployed," the statistics website FiveThirtyEight stated, "It's obvious Kaepernick is being frozen out for his political opinions," that "[n]o above-average quarterback has been unemployed

---

[10]    See Kapadia, Sheil, "Pete Carroll on Colin Kaepernick: Not doing anything yet, but 'he's a starter in this league'", *ESPN.com*, (Jun. 2, 2017), available at: https://www.espn.com/nfl/story/_/id/19523162/pete-carroll-says-seattle-seahawks-not-signing-colin-kaepernick.

[11]    See Biderman, Chris, "Why Giants Owner John Mara's Statement on Colin Kaepernick is dangerous", *USA Today*, (May 29, 2017), available at: https://ninerswire.usatoday.com/2017/05/29/why-giants-owner-john-maras-statement-on-colin-kaepernick-is-dangerous/.  This was a particularly outrageous position to take given that the Giants had just signed a white Kicker, Josh Brown, after he was arrested for domestic violence and kept him off the team after he was suspended for the same misconduct.  It took the murder of George Floyd and the related nationwide protests for you to publicly convey your support for players who choose to kneel during the Anthem

nearly as long as Kaepernick" and "[i]t's easy to lose sight of the reality that good quarterbacks often never even reach free agency, let alone remain unsigned for so long."[12]

68.     Mr. Kaepernick's protests received a variety of reactions—both positive and negative—with then-President Donald J. Trump siding against him and calling on the nearly all-white NFL owners to "fire" players who protest during the national anthem.  President Trump referred a player who protested (clearly referring to Mr. Kaepernick) as "that Son of a Bitch."

69.     In an October 2017 meeting among owners, players and League executives to address racial injustice protests by players, NFL owners effectively endorsed President Trump's opinion that a player who protests racial injustice is a "Son of a Bitch" and a stated an unwillingness to act contrary to Trump's directives.[13]

70.     As time went on, still no team would sign Mr. Kaepernick for any role, starter or backup, despite the fact that he clearly deserved such a role based on merit, skill and experience. While some owners gave lip service to solidarity with Black players, NFL owners still collectively refused to employ Mr. Kaepernick following his racial justice protests.

71.     During these years, many teams—including the New York Giants—could have used his services as a clear roster upgrade.  But he remained blackballed.

72.     Against the backdrop of the League's history, this conduct remains an appalling example of the League's continued problems with race.

---

[12]     See Wagner, Kyle, "Colin Kaepernick is Not Supposed To Be Unemployed", *FiveThirtyEight*, (Aug. 9, 2017), available at: https://fivethirtyeight.com/features/colin-kaepernick-is-not-supposed-to-be-unemployed/.

[13]     See McCann, Michael, "The Leaked October Tapes and the Kaepernick Collusion Case", *Sports Illustrated*, (Apr. 25, 2018), available at: https://www.si.com/nfl/2018/04/25/leaked-tapes-nfl-owners-players-october-meeting-kaepernick-collusion-case-donald-trump.

J.A. 40

**B.  Acquiescence to Discrimination by Head Coach John Gruden**

73.     John Gruden, the 30-year NFL insider and three-time Head Coach, is the embodiment of the NFL's acquiescence to racism.

74.     In October 2021, it was disclosed that between 2011 and 2018, Mr. Gruden exchanged a slew of emails containing racist, misogynistic and homophobic slurs to Washington Football Team's then-General Manager Bruce Allen.

75.     Mr. Gruden remarked that DeMaurice Smith, the NFL Players' Association Executive Director, had "lips the size of Michelin tires."

76.     Mr. Gruden also stated that players who protested the national anthem to protest racial inequality should be "fired."

77.     Mr. Smith responded to reports of these emails saying, "Racism like this comes from the fact that I'm at the same table as they are and they don't think someone who looks like me belongs."[14]

78.     As stated, Mr. Gruden's emails also contained a slew of additional offensive conduct.  The emails referred to Mr. Goodell as a "faggot" and a "clueless anti football pussy," and said Mr. Goodell should not have pressured the Rams to draft "queers" (referring to the drafting of Michael Sam, the first openly gay player drafted by an NFL team in 2014), something which the Rams coach has denied.  Mr. Gruden also called then United States Vice President Joe Biden a "nervous clueless pussy."[15]

---

[14]     See "Raiders, NFL condemn Jon Gruden for using racial trope in 2011 email to describe NFLPA Executive Director DeMaurice Smith", *NFL.com*, (Oct. 8, 2021), available at: https://www.nfl.com/news/raiders-nfl-condemn-jon-gruden-for-using-racial-trope-in-2011-email-to-describe-#:~:text=%22Racism%20like%20this%20comes%20from,not%20let%20it%20define%20me.%22.

[15]     See Belson, Ken and Rosman, Katherine, "Raiders Coach Resigns After Homophobic and Misogynistic Emails", *New York Times*, (Oct. 11, 2021), available at: https://www.nytimes.com/2021/10/11/sports/football/what-did-jon-gruden-say.html.

79.     Mr. Gruden and Mr. Allen also exchanged emails with other members of the Washington Football Team staff with photos of topless women, including two team cheerleaders.

80.     In one email from 2015 that includes several football insiders including Mr. Allen, Gruden asked Mr. Allen to tell Bryan Glazer (part of the family which owns the Tampa Bay Buccaneers) to perform oral sex on him.

81.     Mr. Gruden also mocked Caitlyn Jenner, a transgender former Olympic athlete.

82.     It simply cannot be a surprise to NFL executives, insiders and team owners—who have collectively spent the last three decades in the proximity of Mr. Gruden—that this is who Mr. Gruden is and that these are the beliefs he harbors.

83.     Nonetheless, Mr. Gruden remained an inner-circle candidate for virtually every Head Coach position over the 10-year period that followed his departure from the Tampa Bay Buccaneers in 2008.

84.     Ultimately, in 2018, Mr. Gruden received the largest contract in history for an NFL Head Coach, when the Las Vegas Raiders signed him to a 10-year, $100 million deal.

85.     The Raiders' hiring of Mr. Gruden occurred in close succession with the Raiders' firing of General Manager Reggie McKenzie, one of the few Black General Managers in the League.

86.     Under Mr. McKenzie, the Raiders had the highest percentage of Black players at 82.3%, and he won the NFL Executive of the Year Award in 2016 after compiling a 12-4 record.

87.     Only two years later, Mr. McKenzie was fired and replaced by Mike Mayock, a white candidate.  Under all-white leadership (Owner, General Manager and Head Coach), the

19

percentage of Black players on the Raiders decreased every year that followed.  By 2021, the percentage of Black players on the Raiders roster dropped to 67.2%.

88.     Though Mr. Gruden is no longer employed by the Raiders, it has been reported that the NFL was well aware of Mr. Gruden's offensive emails for several months and took no action.[16]

89.     When the news of Mr. Gruden's racist emails finally surfaced, rather than an unequivocal rebuke and a for-cause termination, the Raiders allowed him to graciously resign and claim that it was due to his desire not to be a distraction.

90.     Mr. Gruden even had the gall to blame the NFL and Mr. Goodell, claiming that they were responsible—not him for his own actions—for his termination.[17]

C.     **The NFL's Concussion Settlement Discriminated Against Black Players**

91.     In 2011, retired NFL players began filing personal injury actions in courts around the country seeking damages or relief in the form of medical monitoring.  Some of these actions were filed on behalf of a class, some for small groups of former players and others for individuals (collectively, the "Concussion Lawsuits").

92.     As alleged in the Concussion Lawsuits, the NFL for decades was aware of the evidence and the risks associated with repetitive traumatic brain injuries, but nevertheless "ignored, minimized, disputed, and actively suppressed broader awareness of the link between subconcussive and concussive injuries in football and the chronic neuro-cognitive damage, illnesses, and decline suffered by former players."

---

[16]     See Beaton, Andrew, "How the NFL Learned Months Ago of the Offensive Emails that Cost Jon Gruden His Job", *The Wall Street Journal*, (Oct. 12, 2021), available at: https://www.wsj.com/articles/jon-gruden-emails-investigation-washington-football-team-11634079234.

[17]     See Whelan, Catherine, "Jon Gruden Sues NFL for Allegedly Leaking Emails that Led to his Resignation", *NPR*, (Nov. 13, 2021), available at: https://www.npr.org/2021/11/13/1055574569/jon-gruden-sues-nfl-for-allegedly-leaking-emails-that-led-to-his-resignation.

J.A. 43

93.     The NFL was also alleged to have "failed to warn [players] and/or impose safety regulations governing this health and safety problem" and "produced industry-funded, biased, and falsified research that claimed that concussive and sub-concussive head impacts in football do not present serious, life-altering risks."

94.     The Concussion Lawsuits identified a number of retired NFL players who were diagnosed with traumatic brain injury ("TBI") following their playing career, and sought money damages for injury and death, as well as medical treatment for retired players diagnosed with TBI.

95.     Ultimately, the claims were consolidated and settled in 2014.  Under the settlement agreement, a former player who has a "Qualifying Diagnosis" is eligible for monetary benefits.  A diagnosis is "Qualifying" primarily—but not exclusively—if rendered by physicians approved by the NFL or in conjunction with the NFL's Baseline Assessment Program ("BAP").  The BAP is intended both to identify symptoms of eligible conditions and to collect data for comparison to later testing, to establish any subsequent decline in a retired player's cognitive functioning.

96.     Claims for monetary awards are first reviewed by a Claims Administrator.  In the first instance, any appeals of the Claims Administrator's determinations are heard by an Appeals Advisory Panel.  Any appeals from the Appeals Advisory Panel are brought to the court that entered the settlement agreement.

97.     According to a lawsuit filed by former Black NFL players Kevin Henry and Najeh Davenport, as well as media reports, the NFL began regularly insisting that physicians use "race-norms" in determining whether a retiree had suffered cognitive impairment (the "Race-

J.A. 44

Norming Lawsuit"). When Black retirees were deemed to be cognitively impaired, the NFL

regularly appealed such determinations if race-norming was not used.

98.     As alleged in the Race-Norming Lawsuit, "the National Football League . . . [has]

been avoiding paying head-injury claims under the Settlement Agreement based on a formula for

identifying qualifying diagnoses that explicitly and deliberately discriminates on the basis of

race. When being evaluated for the Qualifying Diagnoses of Neurocognitive Impairment, Black

former players are automatically assumed (through a statistical manipulation called 'race-

norming') to have started with worse cognitive functioning than white former players. As a

result, if a Black former player and a white former player receive the exact same raw scores on a

battery of tests designed to measure their current cognitive functioning, the Black player is

presumed to have suffered less impairment, and he is therefore less likely to qualify for

compensation."

99.     Put another way, the NFL insisted that white people simply have better cognitive

function than Black people. Thus, if a Black person was found to be cognitively impaired, the

NFL would often not accept that diagnosis unless the physician gave adequate consideration to

the possibility that Black people simply do not function cognitively as well as white people.

This is the very definition of racism—the assumption that someone is not as smart as another

person because of the color of his or her skin.

### D.      The NFL's Attempt to Pander During Widespread, Societal Racial Protests

100.    In June 2020, following protests over George Floyd's murder and other instances

of racially charged violence, Roger Goodell publicly apologized for the League's previous

response to player protests saying, "we were wrong for not listening to NFL players earlier."[18]

---

[18]     See "Roger Goodell: NFL 'wrong' for not listening to protesting players earlier", *NFL.com*, (Jun. 5, 2020),
available at: https://www.nfl.com/news/roger-goodell-nfl-wrong-for-not-listening-to-protesting-players-earlier.

J.A. 45

101.    Goodell further "encourage[d] all to speak out and peacefully protest" and said, "[w]ithout black players, there would be no National Football League and the protests around the country are emblematic of the centuries of silence, inequality and oppression of black players, coaches, fans and staff." Id.

102.    Despite the blatant collusion against him, Mr. Goodell declared in a publicly released video that "Black Lives Matter" and announced that the NFL desired to work with Mr. Kaepernick in the creation and distribution of a $250 million foundation for social justice initiative.[19]

103.    These remarks and actions—emblematic of the phrase "too little too late"—were largely ridiculed by the public as hypocritical and an obvious attempt to pander to growing public sentiment against racial injustice.  Racial discrimination requires real and meaningful attention—not mere soundbites when it is in the League's financial interest.

## III.    LACK OF BLACK COACHES AND THE FAILURE OF THE ROONEY RULE

104.    Troy Vincent, a Black, Hall of Fame former cornerback, and current NFL Executive Vice President of Football Operations, recently stated with regard to the treatment of Black Head Coaches in the NFL:

> There is a double standard, and we've seen that . . . And you talk about the appetite for what's acceptable.  Let's just go back to . . . Coach Dungy was let go in Tampa Bay after a winning season. . . Coach Wilks, just a few years prior, was let go after one year . . . Coach Caldwell was fired after a winning season in Detroit . . . It is part of the larger challenges that we have.  But when you just look over time, it's over-indexing for men of color.  These men have been fired after a winning season.  How do you explain that? There is a double standard.  I don't think that that is something that

---

[19]    See Battista, Judy, "NFL commits $250M over 10-year period to combat systemic racism", *NFL.com*, (Jun. 11, 2020), available at: https://www.nfl.com/news/nfl-commits-250m-over-10-year-period-to-combat-systemic-racism.

J.A. 46

we should shy away from. But that is all part of some of the things that we need to fix in the system. We want to hold everyone to why does one, let's say, get the benefit of the doubt to be able to build or take bumps and bruises in this process of getting a franchise turned around when others are not afforded that latitude? . . . [W]e've seen that in history at the [professional] level.[20]

105. Mr. Vincent's common-sense analysis of the NFL's predicament with respect to the lack of Black Head Coaches hits the nail on the head: "There is a double standard." This double standard has led to a consistent dearth of Black Head Coaches despite an abundance of highly qualified candidates. For Black Head Coaches who are hired, retention of the job is routinely more difficult than for white counterparts.

106. Historically, Head Coach positions were closed to Black candidates until Art Shell broke this color barrier in 1989. Still, Mr. Shell was only one of five Black Head coaches between then and 2003. As one sportswriter noted, "In 2003, NFL franchise owners had to be prodded to seriously consider Black candidates to coach their teams. They were willing to sign Black players [to] make them money while risking their health. They were reluctant to let them lead their teams after they were done playing."[21] This was a reference to what is commonly known as the "Rooney Rule."

107. By way of brief background, in 2002, Johnnie L. Cochran Jr., civil rights attorney Cyrus Mehri and labor economist Dr. Janice Madden together produced a detailed report on the NFL's head-coaching hiring practices entitled "Black Coaches in the National Football League: Superior Performance, Inferior Opportunities." The report analyzed the NFL's hiring and firing practices over the previous 15 seasons, and the statistics showed evidence of discrimination,

---

[20] See Maske, Mark, "Senior NFL Official: 'Double Standard for Black coaches when it comes to keeping jobs", *The Washington Post*, (Jan. 11, 2022), available at: https://www.washingtonpost.com/sports/2022/01/11/black-nfl-coaches-firings-troy-vincent/.

[21] See Cunningham, Michael, "Here we go again: NFL still has 'double standard' with Black coaches," *The Atlanta Journal Constitution*, (Jan. 14, 2022), available at: https://www.ajc.com/sports/mike-check-blog/here-we-go-again-nfl-still-has-double-standard-with-black-coaches/2L7DTCGPCFBIHBUVRGHDGPX2UA/.

J.A. 47

including that Black Head Coach candidates were less likely to be hired and that Black Head Coaches were more likely to be fired.

108.    Due to the public sentiment gathering to address this problem, on October 31, 2002, the NFL appointed a "Committee on Workplace Diversity," headed by Pittsburgh Steelers' President Dan Rooney, to study the issue further. On December 20, 2002, this committee issued its recommendations, including that NFL teams make a commitment to interview minority candidates for every Head Coach job opening (with limited exceptions). In December 2002, the owners approved this recommendation.

109.    Since its passage, the Rooney Rule has been amended several times in an effort to strengthen its impact on diversity and inclusion, or to at least appear to do that. It now applies to General Manager and other front office positions, as well as Assistant Head Coach and Coordinator positions. Moreover, teams are now required to interview two minority Head Coach candidates, and at least one in person. However, the Rooney Rule has failed to yield any meaningful change to an institution so fully steeped in discriminatory practices.

110.    In the 20 years since the Rooney Rule was passed, only 15 Head Coaching positions have been filled by Black Candidates. During that time, there have been approximately 129 Head Coaching vacancies. Thus only 11% of Head Coach positions have been filled by Black candidates—in a league where 70% of players are Black. With few exceptions, the Black candidates who have obtained Head Coach positions have been on a "short leash" and lasted for extremely short periods, while white candidates have much lengthier opportunities to prove their worth. In addition, upon information and belief, in general Black coaches at all levels are paid less than similarly qualified white coaches.

111. Indeed, not a single one of the 10 Black Head Coaches hired since 2012 still holds his Head Coach job today. In contrast, approximately 25% of white Head Coaches hired during the same time frame remain employed as a Head Coach. Moreover, since 2012, Black Head Coaches have been fired in an average of 2.5 years, whereas (accounting for Head Coaches that are expected to return next year) white Head Coaches have averaged nearly 3.5 years on the job. Put another way, white Head Coaches are afforded an entire additional year to establish themselves relative to Black Head Coaches.

112. Moreover, since 1978, only 16 winning teams have fired their head coach (3%). Even though Black men only held a small fraction of the Head Coach positions during that time, an astounding 25% (four of the 16) of the Head Coaches fired after a winning season were Black. This statistic is even more remarkable given that there have only ever been 17 Black Head Coaches who have coached a full season, and four of them (23.5%) were fired after a winning season. In contrast, only 6.9% of white coaches were fired after a winning season (12 out of 174). Thus, Black Head Coaches are 3.5 times more likely to be fired even when successful.

113. Moreover, unsuccessful white Head Coaches routinely get second and third chances in critical positions, including as a Head Coach or Offensive or Defensive Coordinator. Indeed, according to a 2021 NFL Diversity and Inclusion report, since 1963, 116 white individuals have been hired as a Head Coach or Coordinator after an initial Head Coach opportunity, whereas only 21 individuals of color have received the same second chances.[22] The same report noted that only one person of color has received three Head Coaching opportunities, whereas 15 white men have received three Head Coaching opportunities (two of the 15 received four opportunities). Id.

---

[22] See Harrison, C.K. and Bukstein, S., "Occupational Mobility Patterns in the National Football League" (Volume X), (2021), available at: https://operations.nfl.com/media/4989/nfl-occupational-mobility-report-volume-x-february-2021.pdf.

114.     Thus, while the Rooney Rule was and remains well-intentioned, its effectiveness requires NFL teams to take it seriously, and not treat it as a formality that must be endured simply to formalize the pre-determined hiring of a white coach.  Moreover, it requires that teams provide Black Head Coaches a fair and legitimate chance—a chance commensurate with the circumstances and comparable to the chances given to white Head Coaches—to thrive.

115.     But that has not happened.  As a result, following the recent terminations of Mr. Flores and David Culley, former Head Coach of the Houston Texans, there is currently only one Black Head Coach out of 32 NFL teams.  The following photo array speaks for itself.



J.A. 50

116. At the time the Rooney Rule was instituted, almost twenty years ago, there were three Black Head Coaches. There is now only one. That marks a complete lack of improvement, and in fact, a move backwards in the wrong direction.

117. As was recently well-put by sportswriter Jemele Hill,

> [M]ost NFL owners have been white men, and they have seldom been willing to let African Americans or Latinos call plays—either on the field or from the sidelines. This is no different from when franchises presumed that black players weren't smart enough to play quarterback and lacked leadership skills to command men. The league's paltry record of hiring minority head coaches comes from the same mind-set. And its primary effort to address the problem has been a failure, because a policy can't compensate for ignorance . . . If the NFL wants to create an equitable system for minority head coaches, the owners can't rely on a rule to create institutional change.[23]

118. Ms. Hill continued, "NFL owners must recognize that their lazy stereotypes of black male leadership have created this embarrassing problem. In time, we'll see whether they have the courage to fix it." As has been evidenced by The New York Giants' Head Coach search and treatment of Mr. Flores—the NFL and its teams clearly do not.

## IV. RACIAL DISPARITIES EXTEND TO COORDINATOR AND GENERAL MANAGER POSITIONS

119. Racial disparities also exist in the hiring and retention at Coordinator positions as well. Offensive and Defensive Coordinators are significantly over-represented by white candidates and under-represented by Black candidates. These positions are very often filled by a pool of former players, approximately 70% of whom are Black.

---

[23] See Hill, Jemele, "NFL Owners Have a Problem With Coaches of Color," *The Atlantic* (Jan. 11, 2020), available at: https://www.theatlantic.com/ideas/archive/2020/01/nfl-owners-have-problem-coaches-color/604771/. Unfortunately, NFL owners have, by and large, failed to recognize even the existence of these stereotypes, much less found the courage to eradicate them.

J.A. 51

120.    Currently, there are only four Black Offensive Coordinators in the 32-team League (12.5 percent), and 11 Black Defensive Coordinators (34 percent).[24]

121.    This is significant given that, according to the NFL's Diversity & Inclusion Report covering 2012 through 2021 (published in February 2021),[25] teams focus on Coordinators, and in particular Offensive Coordinators, when it comes to considering candidates for Head Coach positions.  During the period studied, approximately 80% of Head Coach hires were previously Coordinators.

122.    According to the study, 31 out of 62 Head Coach positions were filled by Offensive Coordinators (where Black professionals are the most under-represented) while 18 Head Coach positions were filled by Defensive Coordinators.  Moreover, only three out of 32 teams have a Black Quarterbacks Coach, which is the position that most often leads to an Offensive Coordinator opportunity.  This figure is not entirely surprising given the NFL's history of racism when it comes to the quarterback position.

123.    This shows that not only are the NFL's Head Coaches predominantly white, but that the pipeline feeding this racial disparity is fraught with discrimination.  This is indicative of the structural discrimination that pervades NFL teams and likely ensures that this problem will remain.  In sum, NFL teams are more willing to hire Black professionals into positions they deem to be less important and less likely to lead to Head Coach positions.

---

[24]    In addition, only eight of 32 Special Teams Coordinators are Black (25%).

[25]    See Harrison, C.K. and Bukstein, S., "Occupational Mobility Patterns in the National Football League" (Volume X), (2021), available at: https://operations.nfl.com/media/4989/nfl-occupational-mobility-report-volume-x-february-2021.pdf.

124.    The same discriminatory practices are apparent when it comes to the hiring of General Managers.  Currently, out of 32 teams, there are only six Black General Managers (18.75%) against 26 white General Managers.[26]  See below:



---

[26]    These are as follows: Chris Grier, Miami Dolphins; Andrew Berry, Cleveland Browns; Martin Mayhew, Washington Football Team; Brad Holmes, Detroit Lions; Terry Fontenot, Atlanta Falcons and Kwesi Adofo Mensah, Minnesota Vikings.

125.    According to the NFL's Diversity & Inclusion Report, from 2012 through 2021 there were 37 General Managers vacancies and only six were filled by Black candidates (16 percent). 20 NFL teams have never had a Black General Manager.

126.    The NFL's inability to achieve racial diversity at the Head Coach positions stems from the both the pipeline flowing up as well as the decision makers at the top. The lack of representation of Black General Managers doubtlessly leads to the lack of Black Head Coaches.

127.    It stands to reason that, whether explicit or implicit, white decisionmakers tend to favor white candidates for significant positions, as numerous studies suggest there is same-race bias in decision-making. Organizational studies have shown that people are most likely to hire others of the same race and that bias among decision makers can affect the diversity of the entire organization. This helps explain the structural problems that lead to a lack of Black professionals in both Head Coaching and in the pipeline at Coordinator positions.[27]

---

[27]    See, e.g., Goldberg, Caren B, "Relational Demography and Similarity-Attraction in Interview Assessments and Subsequent Offer Decisions: Are we Missing Something," *George Washington University* (Dec. 1, 2005); Bertrand, M., & Mullainathan, S., "Are Emily and Greg more employable than Lakisha and Jamal? A field experiment on labor market discrimination.", *The American Economic Review, 94*(4), 991-1013, (2004) Retrieved February 1, 2022 from https://proxy.library.upenn.edu/login?url=https://www.proquest.com/scholarly-journals/are-emily-greg-more-employable-than-lakisha-jamal/docview/233023724/se-2; Johnson, S. K., Hekman, D. R., & Chan, E. T., "If there's only one woman in your candidate pool, there's statistically no chance she'll be hired", *Harvard Business Review*, (Apr. 26, 2016), Retrieved February 1, 2022, from https://hbr.org/2016/04/if-theres-only-one-woman-in-your-candidate-pool-theres-statistically-no-chance-shell-be-hired.

J.A. 54

128. To that end, the NFL has no Black owners:



J.A. 55



129.   Owners are ultimately responsible for leading the entire organization, establishing

an inclusive culture and deciding who to hire and retain in front office leadership positions such

General Managers.  The lack of any Black voices in ownership clearly has led to a dearth of

opportunities for Black General Managers, which has—in turn—undermined racial inclusion in

the NFL for more than 100 years.

J.A. 56

## V.     NOTABLE RECENT EXAMPLES OF DISCRIMINATORY CONDUCT

### A.     Brian Flores

#### i.     Background on Brian Flores

130.    Mr. Flores, the son of Honduran immigrants, grew up in the housing projects in Brownsville, Brooklyn, New York.  Mr. Flores managed to navigate and avoid the perils of drugs, gangs and violence in one of the city's toughest neighborhoods and grew to love his home neighborhood and city.  As it was put by a childhood friend, "Brownsville is the trenches . . . and Brian was like a rose growing out of the concrete."[28]

131.    Mr. Flores excelled academically and began playing football.  After a successful high school and college playing career, Mr. Flores was hired as a scout by the New England Patriots and, in 2008, transitioned to a coaching position.  Mr. Flores received multiple promotions, and, during his tenure, the Patriots appeared in five Super Bowls, winning three of them.  In the last of these Super Bowls, when Mr. Flores called the Patriots' defensive plays, the Patriots held the Los Angeles Rams to three points, tied for the fewest ever in a Super Bowl.

132.    In 2019, on the heels of his outstanding performance with the Patriots, Mr. Flores was offered the Miami Dolphins Head Coach position.  By all accounts, Mr. Flores did a fantastic job in three seasons from 2019-2021.  In his first year, Miami's gutted roster won five games despite many experts predicting an 0-16 season and one of the worst teams in NFL history.

133.    The Dolphins owner, Stephen Ross, was unhappy with this performance not because it was under-performing.  To the contrary, Mr. Ross wanted the Mr. Flores to "tank" the season to put the team in position to secure the first pick in the draft.  Indeed, during the 2019

---

[28]     See O'Connor, Ian, "The Patriots' next coaching star? His odds were incredibly long", *ESPN.com*, (Mar. 7, 2018), available at: https://www.espn.com/nfl/story/_/id/22262842/brian-flores-new-england-patriots-next-coaching-star-emerge-bill-belichick-tree.

season, Mr. Ross told Mr. Flores that he would pay him $100,000 for each game lost that year. Then, when the Dolphins started winning games, due in no small part to Mr. Flores' coaching, Mr. Flores was told by the team's General Manager, Chris Grier, that "Steve" was "mad" that Mr. Flores' success in winning games that year was "compromising [the team's] draft position."

134. After the end of the 2019 season, Mr. Ross began to pressure Mr. Flores to recruit a prominent quarterback in violation of League tampering rules. Mr. Flores repeatedly refused to comply with these improper directives. Undeterred, in the winter of 2020, Mr. Ross invited Mr. Flores onto a yacht for lunch. Shortly after he arrived, Mr. Ross told Mr. Flores that the prominent quarterback was "conveniently" arriving at the marina. Obviously, Mr. Ross had attempted to "set up" a purportedly impromptu meeting between Mr. Flores and the prominent quarterback. Mr. Flores refused the meeting and left the yacht immediately. After the incident, Mr. Flores was treated with disdain and held out as someone who was noncompliant and difficult to work with.

135. Over the remaining year and a half of Mr. Flores tenure at the helm of the Miami Dolphins, he was routinely made to feel uncomfortable based upon his decision not tank in order to secure the top pick in the 2019 draft. Upon information and belief, no white Head Coach has ever been subjected to such ridicule over winning and holding the spirt of the game in such high regard. In fact, Mr. Flores was ultimately terminated and subsequently defamed throughout the media and the League as he was labeled by the Dolphins brass as someone who was difficult to work with. This is reflective of an all too familiar "angry black man" stigma that is often casted upon Black men who are strong in their morals and convictions while white men are coined as passionate.

136.    The following year, in 2020, despite this discriminatory treatment, the Dolphins improbably won 10 games, narrowly missing the playoffs, and Mr. Flores was mentioned as a potential coach of the year candidate.  In 2021, Miami again finished with a winning record, and fans, pundits and experts all agree the team played extraordinarily hard for Mr. Flores. Nonetheless, Mr. Flores was terminated just three years into his five-year contract with the Dolphins.  He was told that he was being terminated for "poor collaboration," which itself has discriminatory undertones.

137.    Mr. Flores' only failure to collaborate was his refusal to tank the 2019 season as had been requested by Mr. Ross.  When he refused, and then over-performed and led the team to winning records in two consecutive seasons with a roster few experts predicted could do so—he was fired.

138.    Mr. Flores was discharged from his duties as the Dolphins Head Coach on January 10, 2022.  Countless current and former players, executives and media analysts expressed their dismay at Mr. Flores' termination,[29] and he immediately became one of the top Head Coach candidates on the market.

**ii.      The New York Giants Subject Mr. Flores to a Sham Interview**

139.    It is against this backdrop that the Giants should have considered Mr. Flores as a highly regarded candidate for the Head Coach position, and, for nearly two weeks, it at least publicly appeared that the Giants viewed Mr. Flores as a desirable option.

140.    Indeed, on January 11, 2022, the day that the Giants terminated Head Coach Joe Judge, Mr. Flores received a text message from Tim McDonnell, the Giants' Co-Director of Player Personnel.  The two spoke *via* telephone and, according to Mr. McDonnell, the Giants,

---

[29]      See Cwik, Chris, "Dolphins players, rest of NFL react to Brian Flores getting fired: ' I'm sick'", *Yahoo!* Sports, (Jan. 10, 2022), available at: https://sports.yahoo.com/dolphins-players-rest-of-nfl-react-to-brian-flores-getting-fired-im-sick-170451689.html.

and owner John Mara, were extremely interested in hiring him for the team's vacant Head Coach position.

141.    Later that day, after the two texted about potential General Manager and Assistant Coach/Coordinator candidates, Mr. McDonnell let Mr. Flores know that Mr. Mara would be reaching out directly to him to express his interest.  Mr. Flores let Mr. McDonnell know that the Giants Head Coach position would be his "dream job."[30]

142.    The following day, on January 12, 2022, Mr. Mara and Mr. Flores had a positive conversation about his candidacy for the Head Coach position.  This was followed up with a Zoom meeting on Tuesday, January 18, 2022.

143.    On the morning of Sunday, January 23, 2022, Mr. Schoen, who had recently been announced as the Giants' new General Manager (beating out multiple Black candidates for the job), began the process of scheduling an interview with Mr. Flores.

144.    The same day in the mid-afternoon, Mr. McDonnell told Mr. Flores that he hoped that Mr. Flores would "come in and win the fng job."

145.    On Monday, January 24, 2022, Mr. Schoen finalized Mr. Flores' interview date for January 27, 2022.

146.    Unfortunately, just hours later Mr. Flores learned that the Giants' continued courtship was nothing more than a discriminatory façade designed to show false compliance with the Rooney Rule.

147.    Indeed, on January 24, 2022, at 2:30 p.m., Mr. Flores received a text message from New England Patriots Head Coach, Bill Belichick—clearly an insider and privy to non-

---

[30]    Ironically, during their January 11, 2022 text exchange, Mr. McDonnell also suggested that if Mr. Flores were hired as the Giants Head Coach, Brian Daboll might be interested in leaving Buffalo to serve as his Offensive Coordinator ("Heard Daboll isn't happy with Sean [McDermott] in Buffalo . . . might be able to get out if he doesn't get a head job… thoughts?").

public information from direct sources.  The ensuing text messages from Mr. Belichick to Mr.

Flores speak for themselves:

 

148.    Clearly, by midday Monday, January 24, 2022, the Giants had already decided to

hire Mr. Daboll and communicated the decision to third-parties, including to Mr. Belichick.

149.    But for Mr. Belichick's error, Mr. Flores never would have known of this fact.[31]

This revelation not only impugns and viciously exposes the sham process to which Mr. Flores

was subjected but also stands to indict the Giants' organizational hiring practices in general.

---

[31]    Other third parties have also confirmed that the interview of Mr. Flores was a sham.  *See*, *e.g.*, Randazzo, Jimmy, "I Was Told on Monday Brian Daboll Will Get the Job. I Don't Care Who Was Right or Who Was First I Just Want Him to Be the next Head Coach," *Twitter*, (Jan. 28, 2022), available at:

150.    It is impossible to put into words the emotions Mr. Flores felt upon learning that not only would he not be getting the Giants Head Coach job—the job of his dreams—but, more importantly, that he was not even being given serious consideration for the position but being treated as a box to "check off" due to his race.

151.    Mr. Flores spent Monday evening, Tuesday and Wednesday (including a dinner with Mr. Schoen) knowing that he was walking into Thursday's interview with no chance to become the Giants Head Coach.  While he would spend countless hours preparing to put his best step forward, the white men across the table from him saw and heard only one thing: a formality that had to be observed in order to name Mr. Daboll the Head Coach.

### iii.    The Giants' Treatment of Mr. Flores is Consistent with Its Past

152.    The Giants in particular have an ominous history when it comes to race relations, and, in particular, when it comes to hiring Black Head Coaches.

153.    The Giants have never hired a Black Head Coach—Mr. Flores would have been the Team's first.  This is a near unbelievable fact given that the Giants have been in existence for nearly 100 years and have now hired 22 Head Coaches.  It is made even worse given that approximately 70% of the players in the NFL are Black, and the Organization sits in the nexus of the New York/New Jersey community, which prides itself on diversity and inclusion.

154.    Year after year, the Giants have interviewed Black candidates for open Head Coach positions—likely due only to the requirements of the Rooney Rule—without ever hiring one.

155.    In 2004, the Giants hired Tom Coughlin after interviewing Romeo Crennel (who would go on to receive Head Coach positions with the Cleveland Browns, Kansas City Chiefs

---

https://twitter.com/JimmyRandazzo/status/1487168987725185025; Esiason, Boomer, "[Brian Daboll] was offered the job earlier in the week but had to wait for the Giants to complete the formal interviewing process," CBS Sports Minute, (Jan. 31, 2022), available at: https://www.audacy.com/podcasts/cbs-sports-minute-818.

J.A. 62

and Houston Texans) and Lovie Smith (who would go on to receive a Head Coach position with the Chicago Bears, who he took to the Super Bowl in 2006, and Tampa Bay Buccaneers).

156.    After Tom Coughlin left the organization in 2016, the Giants hired Ben McAdoo after interviewing Teryl Austin, the highly qualified Black Defensive Coordinator of the Detroit Lions.

157.    When Mr. McAdoo was terminated after just two years, the Giants hired Pat Shurmur after interviewing Steve Wilks and Eric Studesville, two highly qualified Black candidates.

158.    After Mr. Shurmur was fired just two years later, the Giants passed over Eric Bieniemy, who many considered to be the best Head Coach prospect on the market, as well as Kris Richard, and instead hired Joe Judge,[32] who himself was fired after just two years.

159.    More to the point, only once since the passage of the Rooney Rule have the Giants even interviewed more than the minimum number of Black candidates for Head Coach, and it is not for a lack of qualified candidates.  This demonstrates that the Giants interview Black candidates because of the NFL's mandate and for no other reason.

### iv.    Prior Sham Interview With the Denver Broncos

160.    Incredibly, this was not Mr. Flores' first sham interview that was held only in an effort to comply with the Rooney Rule.  Indeed, in 2019 Mr. Flores was scheduled to interview with the Denver Broncos.  However, the Broncos' then-General Manager, John Elway, President and Chief Executive Officer, Mr. Ellis, and others, showed up an hour late to the interview.  They looked completely disheveled, and it was obvious that they had drinking heavily the night

---

[32]    The Giants' willingness to hire Mr. Judge, but not Mr. Flores, is a particular affront to racial equality when comparing their relative qualifications.  See Hill, Jemele, "NFL Owners Have a Problem with Coaches of Color", *The Atlantic*, (Jan 11, 2020), available at: https://www.theatlantic.com/ideas/archive/2020/01/nfl-owners-have-problem-coaches-color/604771/ (explaining that Mr. Flores had to have far greater qualifications than Mr. Judge before finally receiving a Head Coach position with the Miami Dolphins).

before.  It was clear from the substance of the interview that Mr. Flores was interviewed only because of the Rooney Rule, and that the Bronco's never had any intention to consider him as a legitimate candidate for the job.  Shortly thereafter, Vic Fangio, a White man, was hired to be the Head Coach of the Broncos.

161.    Sadly, while the Rooney Rule was meant to lift the NFL from its history of insidious "gentlemen's agreements," segregation and racism, the Giants' actions towards Mr. Flores fit that history all too well.

**B.**     **The Hiring of Steve Mariucci**

162.    In 2003, soon after the Rooney Rule was adopted, the Detroit Lions were looking for a Head Coach, and team president Matt Millen made it clear that the team expected to hire Steve Mariucci.

163.    Likely because the Lions' intention to hire Mr. Mariucci was made so well known, five minority coaching candidates, including Dennis Green (who had a 97-62 record as the Head Coach of the Minnesota Vikings for 10 seasons), understandably turned down interviews.

164.    Similar to the Giants with Mr. Flores, the Lions were looking to interview Black candidates not because of any genuine intent to give any of them a fair shot at the job.  It was only an attempt to engage in false compliance with the Rooney Rule.

165.    The NFL determined that the Rooney Rule had been violated and fined the team a paltry $200,000.

**C.**     **Jim Caldwell Fired After Winning Seasons and Replaced by White Coaches**

166.    In 2009, Jim Caldwell was hired as the Indianapolis Colts Head Coach.

41

167.    The team went 14-2 in his first year and made it to the Super Bowl, followed by a 10-6 record and the AFC South division title for a second year in a row—a total record of 27-8 over his first two seasons.

168.    The following year Colts lost their starting quarterback—Peyton Manning, around whom the entire team had been built – and the team fell to 2-14.

169.    Despite his past success and the justifiable reasons for this poor record in one season out of three, Mr. Caldwell was fired.

170.    In 2014, the Detroit Lions hired Mr. Caldwell.

171.    In his first year the team went 11-5, a four-game improvement from the previous year.  The Lions fell to 7-9 in 2015 but rebounded to 9-7 in 2016 and made it to the playoffs.  The Lions were 9-7 again in 2017 but missed the playoffs.  Thus, Mr. Caldwell had three winning seasons in four years—for one of the historically worst franchises in the NFL.

172.    He had an aggregate record of 36-28, a winning percentage of .563—the best winning percentage of any Lions Head Coach since the 1950s.  The Lions also had two playoff berths in four seasons, as compared to one playoff appearance in the previous 14 seasons.

173.    Nonetheless, Mr. Caldwell was fired the day after his fourth season.

174.    The Lions have gone 17-46 since his departure with only white Head Coaches, including no playoff appearances and no season with any greater than six wins.

175.    In the more than three years since losing the Lions job, Mr. Caldwell has not received any further opportunities as a Head Coach, despite numerous openings and interviewing no fewer than five times for different positions.

42

### D.     **"Double Standard" Treatment of Steve Wilks**

176.     In 2018, the Arizona Cardinals hired Steve Wilks, a longtime NFL coach for several franchises.  He led the team to a disappointing 3-13 record in his first season.

177.     However, it was his first season, and he was not given any time to develop the team or culture and he was stuck with numerous burdens not of his own making—he had a rookie quarterback in Josh Rosen (9th pick), the team GM (Steve Keim) was suspended for five weeks following a DUI during training camp and the Cardinals had numerous injuries to key players.  Mr. Keim, a white GM, kept his job, but Mr. Wilks was fired.

178.     The next Head Coach, Kliff Kingsbury, went 5-10 in his first year with Kyler Murray as a rookie quarterback (first pick), and he retained his job and was given time to improve.

### E.     **Discriminatory Treatment David Culley**

179.     David Culley has been a collegiate and NFL coach for more than 45 years, including 27 years in the NFL.

180.     Despite his reputation and success, Mr. Culley was never hired into an Offensive or Defensive Coordinator position.

181.     However, in January 2021, the Houston Texans hired Mr. Culley to be Head Coach, though it was widely considered to be one of the most difficult situations for a first year Head Coach in memory.

182.     The previous season, the Texans went 4-12 despite having Pro Bowl quarterback Deshaun Watson start every game, throw 33 touchdowns against only seven interceptions and end with a passer rating of 112.4.

J.A. 66

183.    However, Mr. Watson was unavailable to play due to allegations of sexual misconduct and Mr. Culley was forced to start Davis Mills, a rookie third round draft pick at quarterback.  The team had also lost its top two players in recent years, J.J. Watt and DeAndre Hopkins.

184.    Mr. Culley's prospects for success were near impossible, but Mr. Culley managed to coach the team to the same record as the team had its previous season.

185.    Immediately after the season ended, the Texans fired Mr. Culley without explanation other than vague "philosophical differences"—which begs the question why he was hired just one year earlier in the first place.

186.    Even the Texans GM acknowledged that, "a change after one season is unusual."

**F.**     **No Opportunities Provided to Kris Richard**

187.    Kris Richard has been a collegiate and NFL coach for more than 10 years.

188.    He boasts an impressive resume, including being instrumental in the formation of the Seattle Seahawks "Legion of Boom," as both a Secondary Coach and Defensive Coordinator, in the mid-2010s.

189.    He was also very successful as a Defensive Assistant for the Dallas Cowboys and New Orleans Saints.

190.    Mr. Richard had five Head Coach interviews during the 2018 and 2019 hiring cycles and received no offers.

191.    Meanwhile, six white Head Coaches were hired in 2018 and another six were hired in 2019.

192.    Mr. Richard was reportedly not interviewed at all during the 2020 cycle, and it seems now that he is being considered only for Defensive Coordinator positions.

### G.     Teryl Austin Never Given a Chance

193.     Teryl Austin has been a collegiate and NFL coach for more 30 years.

194.     After success with the Seahawks, Ravens and Lions, Mr. Austin was interviewed for no fewer than 10 open Head Coach positions.  He was rejected for each one.

195.     Following the 2016 hiring cycle, Mr. Austin stated that only two of the four interviews he engaged in that year felt like "legitimate interviews" where he had a "legitimate shot at the job."  He was asked in a follow-up question whether his saying two of the job interviews were "legitimate," meant he believed the other two were "Rooney Rule interviews." Austin said: "Take it however you want."

### H.     Eric Bieniemy Cannot Get a Head Coach Job

196.     Eric Bieniemy has been a highly successful NFL coach for almost 12 years and has yet to be offered a Head Coach position despite more than 70 vacancies during that time.

197.     In high school, Mr. Bieniemy was a second team All-American and went on to play at the University of Colorado.  In 1990, his senior year, he was the nation's second leading rusher with 1,628 years and 17 touchdowns, and he finished third in Heisman Award voting.

198.     Mr. Bieniemy was drafted in the second round of the NFL draft and played in the League for nine seasons, until 1999.

199.     After going back to college to complete his degree, Mr. Bieniemy then took jobs as the Running Back Coach at Colorado for two years and at UCLA for three years.

200.     In 2005, following a 9-2 season concluding with a win in the Sun Bowl, Mr. Bieniemy accepted a position as Running Back Coach for the Minnesota Vikings.

201.     During his tenure, the team's lead back, Adrian Peterson, led the NFC in rushing in 2007 and 2008.

202.     In 2010, Mr. Bieniemy was named the Vikings' Assistant Head Coach for the offense.

203.     In 2011, Mr. Bieniemy returned to Colorado as Offensive Coordinator, only to return to the NFL two years later as the Running Back Coach for Kansas City Chiefs.

204.     In 2018, Mr. Bieniemy was promoted to Offensive Coordinator.  In Mr. Bieniemy's first season as Offensive Coordinator, the Chiefs were first in the NFL in yards per game and scored the third-most points in a season in NFL history.  Chiefs quarterback Patrick Mahomes became only the second quarterback in NFL history, along with Peyton Manning to throw for 5,000 yards and 50 touchdowns in a season.

205.     In 2018, the Chiefs advanced to the AFC Championship Game where they lost to the Tom Brady-led New England Patriots.

206.     In 2019, Mr. Bieniemy won his first Super Bowl when the Chiefs.  In 2020 and 2021, Mr. Bieniemy again helped lead the Chiefs to the AFC Championship Game and, in 2020, the Super Bowl.

207.     Without question, Mr. Bieniemy has the pedigree, track record and reputation to make him a sought-after Head Coach.  However, despite being interviewed for approximately 20 vacant positions over the last five years, no team has extended Mr. Bieniemy an offer.

208.     During this time, numerous white candidates who are clearly less qualified have taken over the Head Coach duties for numerous NFL teams.

## RULE 23 CLASS ACTION ALLEGATIONS

**I.  CLASS DEFINITION**

209.    This is a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23,

brought by Plaintiff on behalf of a Proposed Class of similarly situated employees.  The

Proposed Class (subject to future revision as may be necessary), is defined as follows:

> **All Black Head Coach, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, and Black candidates for those positions during the applicable statute of limitations period**

210.    The unlawful conduct suffered by Plaintiff and the members of the Proposed

Class, includes, but is not limited to:

- Members of the Proposed Class have been discriminatorily denied positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers;

- Members of the Proposed Class have been discriminatorily subjected to sham and illegitimate interviews;

- Members of the Proposed Class have been subjected to discriminatory retention practices and/or termination decisions;

- Members of the Proposed Class have been subjected to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to professional reputation; and

- Members of the Proposed Class have been subjected to unequal compensation relative to their white peers.

211.    Upon information and belief, the Proposed Class contains more than 40 members

during the applicable limitations period.

J.A. 70

212.    Plaintiff and the Proposed Class have standing to seek such relief because of the adverse effects that Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

213.    The patterns, practices and/or policies described in this Complaint demonstrate that discrimination is not unusual at the NFL; rather, it is part and parcel to the League's standard operating patterns, practices and/or policies.

## II.    NUMEROSITY AND IMPRACTICALITY OF JOINDER

214.    The members of the Proposed Class are sufficiently numerous to make joinder of their claims impracticable.

215.    The exact number of Proposed Class members is unknown because such information is in the exclusive control of Defendants and requires discovery.

216.    Upon information and belief, there are more than 40 current, former and prospective members of the Proposed Class who have been subjected to the discriminatory conduct described herein.

217.    Although precise determination of the number of Proposed Class members is immeasurable at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.    COMMON QUESTIONS OF LAW AND FACT

218.    The claims alleged on behalf of Plaintiff and the Proposed Class raise questions of law and fact common to all Plaintiff and Proposed Class members.  Among these questions are:

> a.    Whether members of the Proposed Class have been denied positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, and whether race and/or color played motivating factor in those decisions;

    b.      Whether members of the Proposed Class have been discriminatorily subjected to sham and illegitimate interviews due in whole or part to their race and/or color;

    c.      Whether members of the Proposed Class have been subjected to discriminatory retention practices and/or termination decisions in whole or part due to race and/or color;

    d.      Whether members of the Proposed Class have been subjected to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to professional reputation, due in whole or part to race and/or color;

    e.      Whether members of the Proposed Class have been subjected to unequal compensation relative to their white peers, and whether this is due in whole or part to race and/or color;

    f.      Whether the NFL is complicit, has participated in, and/or has aided and abetted the NFL teams in the discriminatory treatment of the members of the Proposed Class;

    g.      Whether the NFL and/or the NFL teams collectively engage in discriminatory practices towards the members of the Proposed Class; and

    h.      Whether the NFL and/or the NFL teams engage in conduct that has a discriminatory impact on the members of the Proposed Class.

219.    Thus, the common question requirement of FRCP 23(a) is satisfied.

## IV.    **TYPICALITY OF CLAIMS AND RELIEF SOUGHT**

220.    Plaintiff is a member of the Proposed Class he seeks to represent.

221.    The claims of Plaintiff are typical of the claims of the Proposed Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendants, and are based on the legal theory that these patterns, practices and/or policies violate legal rights.

222.    Plaintiff and the members of the Proposed Class all allege that they each are the victims of unlawful adverse employment decisions and/or treatment based on race and/or color.

223.    The relief that Plaintiff seeks as a result Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Class.

224.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

225.    The interests of Plaintiff are co-extensive with those of the Proposed Class he seeks to represent in the instant case.

226.    Plaintiff is willing and able to represent the Proposed Class fairly and vigorously as they pursue their similar individual claims.

227.    Plaintiff has retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

228.    The combined interests, experience and resources of Plaintiff and his counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)(1)

229.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

230.    Specifically, all evidence of Defendants' patterns, practices and/or policies and the issue of whether they are in violation of the law would be exchanged and litigated repeatedly.

231.     Accordingly, certification of the Proposed Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the Proposed Class and Defendants.

232.     By filing this Complaint, Plaintiff is preserving the rights of Proposed Class members with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

## VII.     REQUIREMENTS OF RULE 23(b)(2)

233.     Defendants have acted on grounds, described herein, generally applicable to Plaintiff and the members of the Proposed Class, by adopting and following systemic patterns, practices and/or policies that are discriminatory towards the Proposed Class.

234.     These discriminatory acts are fostered by Defendants' standard patterns, practices and/or policies, are not sporadic or isolated, and support the request for final injunctive and declaratory relief with respect to Plaintiff and the Proposed Class as a whole.

235.     Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination based on race and/or color committed against the Proposed Class.

236.     Declaratory and injunctive relief are the factual and legal predicates for Plaintiff and the Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination.

237.     Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

## VIII.   REQUIREMENTS OF RULE 23(b)(3)

238.   The common issues of fact and law affecting Plaintiff's claims and those of the Proposed Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

239.   A class action is superior to other available means for the fair and efficient adjudication of Plaintiff's claims and the claims of the Proposed Class.

240.   The cost of proving Defendants' pattern and practice of discrimination makes it impracticable for the members of the Proposed Class to pursue their claims individually.

241.   The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of the Proposed Class, as well as the common questions of law and fact described above.

### FIRST CAUSE OF ACTION
**(Discrimination under Section 1981)**
***On Behalf of Plaintiff and the Proposed Class***
*As to all Defendants*

242.   Plaintiff, on behalf of himself and the Proposed Class, hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

243.   As described above, Defendants have discriminated against Plaintiff and the Proposed Class on the basis of race and/or color in violation of Section 1981 by (i) discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii) discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting Proposed Class members to disparate terms and conditions of employment, including but not

limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed

Class members to unequal compensation relative to their white peers.

244.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to

prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually

participated in and aided and abetted the discriminatory conduct of the other Defendants.

245.    As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of Section 1981, Plaintiff and the Proposed Class have suffered, and continue to

suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which

they are entitled to an award of damages.

246.    Defendants' unlawful discriminatory actions constitute reckless, malicious,

willful and wanton violations of Section 1981 for which Plaintiff and the Proposed Class are

entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Discrimination under NYSHRL)**
***On Behalf of Plaintiff and the Proposed Class***
*As to all Defendants*

247.    Plaintiff, on behalf of himself and the Proposed Class, hereby repeats, reiterates

and re-alleges each and every previous allegation as if fully set forth herein.

248.    As described above, Defendants have discriminated against Plaintiff and the

Proposed Class on the basis of race and/or color in violation of the NYSHRL by (i)

discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and

Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii)

discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed

Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting

Proposed Class members to disparate terms and conditions of employment, including but not

53

limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed

Class members to unequal compensation relative to their white peers.

249.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to

prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually

participated in and aided and abetted the discriminatory conduct of the other Defendants.

250.    As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of NYSHRL, Plaintiff and the Proposed Class have suffered, and continue to suffer,

economic damages, loss of opportunity, loss of reputation and mental anguish for which they are

entitled to an award of damages.

251.    Defendants' unlawful discriminatory actions constitute reckless, malicious,

willful and wanton violations of NYSHRL for which Plaintiff and the Proposed Class are entitled

to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Discrimination under NYCHRL)**
***On Behalf of Plaintiff and the Proposed Class***
*As to all Defendants*

252.    Plaintiff, on behalf of himself and the Proposed Class, hereby repeats, reiterates

and re-alleges each and every previous allegation as if fully set forth herein.

253.    As described above, Defendants have discriminated against Plaintiff and the

Proposed Class on the basis of race and/or color in violation of the NYCHRL by (i)

discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and

Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii)

discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed

Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting

Proposed Class members to disparate terms and conditions of employment, including but not

limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed

Class members to unequal compensation relative to their white peers.

254.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to

prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually

participated in and aided and abetted the discriminatory conduct of the other Defendants.

255.    As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of NYCHRL, Plaintiff and the Proposed Class have suffered, and continue to suffer,

economic damages, loss of opportunity, loss of reputation and mental anguish for which they are

entitled to an award of damages.

256.    Defendants' unlawful discriminatory actions constitute reckless, malicious,

willful and wanton violations of NYCHRL for which Plaintiff and the Proposed Class are

entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Discrimination under NJLAD)**
***On Behalf of Plaintiff and the Proposed Class***
*As to Defendant The New York Giants*

257.    Plaintiff, on behalf of himself and the Proposed Class, hereby repeats, reiterates

and re-alleges each and every previous allegation as if fully set forth herein.

258.    As described above, Defendants have discriminated against Plaintiff and the

Proposed Class on the basis of race and/or color in violation of the NJLAD by (i)

discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and

Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii)

discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed

Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting

Proposed Class members to disparate terms and conditions of employment, including but not

55

limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed Class members to unequal compensation relative to their white peers.

259.     Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

260.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NJLAD, Plaintiff and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

261.     Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NJLAD for which Plaintiff and the Proposed Class are entitled to an award of punitive damages.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enters judgment in his favor and against the Defendants for the following relief:

A.     A declaratory judgment that the actions, conduct and practices of the Defendants complained of herein violate the laws of the United States and the State and City of New York, and the State of New Jersey;

B.     An award of injunctive relief necessary to cure Defendants' discriminatory policies and practices;

C.     Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

D.      An award of damages to Plaintiff and the Proposed Class and against the Defendants, in an amount to be determined at trial, to compensate them for all monetary and/or economic damages;

E.      An award of damages to Plaintiff and the Proposed Class and against the Defendants, in an amount to be determined at trial, to compensate them for all non-monetary and/or compensatory damages, including, but not limited to, loss of reputation, loss of opportunity and mental anguish;

F.      An award of punitive damages to Plaintiff and the Proposed Class and against the Defendants in an amount to be determined at trial;

G.      Pre- and post-judgment interest on all amounts due;

H.      An award of Plaintiff and the Proposed Class's reasonable attorneys' fees and costs; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff and the Proposed Class hereby demand a trial by jury.

Dated: February 1, 2022
      New York, New York

                         Respectfully submitted,

                         **WIGDOR LLP**

By: _____
                         Douglas H. Wigdor
                         Michael J. Willemin
                         David E. Gottlieb

                         85 Fifth Avenue
                         New York, NY 10003
                         Telephone: (212) 257-6800
                         Facsimile: (212) 257-6845
                         dwigdor@wigdorlaw.com
                         mwillemin@wigdorlaw.com
                         dgottlieb@wigdorlaw.com

                         *Counsel for Plaintiff and*
                         *Putative Class Counsel*

                             - and -

                         **ELEFTERAKIS, ELEFTERAKIS & PANEK**

By: _____
                         John Elefterakis
                         Nicholas Elefterakis
                         Raymond Panek

                         80 Pine Street, 38th Floor
                         New York, New York 10005
                         Telephone: 212-532-1116
                         Facsimile: 212 532-1176

J.A. 81

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

BRIAN FLORES, STEVE WILKS and RAY   :
HORTON, as Class Representatives, on behalf of  :   Civil Action No.: 22-cv-00871 (VEC)
themselves and all others similarly situated,   :
   :
                 Plaintiffs,   :   **FIRST AMENDED**
   :   **CLASS ACTION COMPLAINT**
       v.   :
   :
THE NATIONAL FOOTBALL LEAGUE; NEW  :
YORK FOOTBALL GIANTS, INC. d/b/a NEW  :   **Jury Trial Demanded**
YORK GIANTS; MIAMI DOLPHINS, LTD.   :
d/b/a MIAMI DOLPHINS; DENVER BRONCOS :
FOOTBALL CLUB d/b/a DENVER BRONCOS;  :
HOUSTON NFL HOLDINGS, L.P. d/b/a   :
HOUSTON TEXANS; ARIZONA CARDINALS  :
FOOTBALL CLUB LLC d/b/a ARIZONA   :
CARDINALS; TENNESSEE TITANS   :
ENTERTAINMENT, INC. d/b/a TENNESSEE  :
TITANS and JOHN DOE TEAMS 1 through 26,  :
   :
               Defendants.   :

-------------------------------------------------------------- X

> **"Morals cannot be legislated, but behavior can be regulated. The law cannot make an employer love me, but it can keep him from refusing to hire me because of the color of my skin."**
>
> ▪   Dr. Martin Luther King, Jr.

## PRELIMINARY STATEMENT

1.    On February 1, 2022, Coach Brian Flores—who is now joined by Coach Steve Wilks and Coach Ray Horton—filed this class action lawsuit against the National Football League ("NFL" or the "League") and its member teams. The suit alleged, and continues to allege, systemic racial discrimination in the hiring, retention and termination of NFL coaches and executives.

2.      Mr. Flores' courage to step forward and speak out about this long-standing, undeniable issue—visible and obvious to everyone—was widely applauded by players, coaches, journalists, public figures and the general population.

3.      In contrast to this outpouring of support, however, the NFL fell back on its tried-and-true playbook and reflexively, within mere hours of the lawsuit being filed and without initiating any investigation whatsoever, issued a statement declaring that the allegations were "without merit."[1]

4.      This class action lawsuit was and remains long overdue.  The NFL—left to its own devices to police itself—has continually failed to address the massive imbalance and underrepresentation of Black coaches and executives.

5.      The reality is, that contrary to its contention that this lawsuit is "without merit," even the NFL, in unguarded moments or in response to public pressure, has begrudgingly acknowledged the decades-long problem of systemic discrimination.

6.      The Rooney Rule—which, among other terms, requires NFL teams to interview minority candidates—was implemented in 2002 and is itself an acknowledgement of the NFL's institutional failure to embrace racial diversity on its own.  When the Rooney Rule went into effect, the NFL had only three Black Head Coaches.  Approximately 20 years later when this lawsuit was filed, and after several amendments to purportedly "strengthen" the Rooney Rule, the NFL had only one Black Head Coach.  The Rooney Rule may have been well intentioned, but it is not working.

---

[1]      See e.g. Selbe, *Nick, NFL Calls Brian Flores's Lawsuit Alleging Racist Hiring "Without Merit" in Statement*, SPORTS ILLUSTRATED, (Feb. 1, 2022), https://www.si.com/nfl/2022/02/01/nfl-releases-statement-brian-flores-lawsuit-racist-hiring-practices.

7.      To that end, Troy Vincent, the NFL's own Executive Vice President of Football Operations, publicly admitted just weeks before this lawsuit was filed, that for Black candidates, "there is a double standard.  I don't think that that is something that we should shy away from.  But that is all part of some of the things that we need to fix in the system."[2]

8.      Now is time for the NFL to show a genuine understanding of these issues and allow for the system to be fixed without standing in the way.  This cannot be fixed through a series of platitudes or empty promises, or with a variety of "committees" that have no legitimate power or authority.

9.      Critical to effectuating that systemic change is outside oversight and accountability.  Unfortunately, however, the NFL continues to refuse to acknowledge the need for oversight and accountability to create change.  Indeed, the NFL remains determined to continue its failed efforts self-regulation.  Notably, over the last two years, during a time when Black Head Coaches fell to only one at the start of this off-season, Commissioner Goodell was reportedly paid $128 million for his services to the League.[3]

10.      Mr. Goodell is obviously completely beholden to the team owners who pay him this enormous compensation.  Mr. Goodell is not independent, unbiased or impartial—qualities essential for someone meant to ensure that Black candidates have equal opportunities and that team owners do not engage in employment decisions that have an obviously discriminatory

---

[2]      See e.g. Maske, Mark, *Senior NFL official: "Double standard" for Black coaches when it comes to keeping jobs*, WASHINGTON POST, (Jan. 11, 2022), https://www.washingtonpost.com/sports/2022/01/11/black-nfl-coaches-firings-troy-vincent/.

[3]      See e.g. Bailey, Analis, *Report: Roger Goodell received staggering salary package over past two years: $128 million*, USA TODAY, (Oct. 29, 2021), https://www.usatoday.com/story/sports/nfl/2021/10/29/roger-goodell-received-128-million-salary-over-two-years/6191205001/.

J.A. 84

impact.  Mr. Goodell has the power to take real action, but his inaction and mere lip-service to these issues shows that he is unwilling to exercise that judgment and responsibility appropriately.

11.     Case in point, since the filing of this action, Mr. Flores and his legal team has publicly and privately invited the NFL to engage with him in a dialogue, together with the aid of a neutral third-party mediator, to discuss a path forward in which the NFL can make meaningful and lasting change—with oversight and accountability—to ensure that Black and other minority candidates for coaching and executive positions are given an equal opportunity for success and advancement.  The League responded by only agreeing to speak to Mr. Flores on its own terms – likely a public relations stunt just so the NFL could say the League sat down and spoke to him – and without any independent third-party.

12.     This should not have been a controversial request.  In fact, in a press conference before the Super Bowl, NFL Commissioner Roger Goodell specifically said, "To me, it's more important for us to sort of listen to Coach [Flores], understand the points he and other coaches are going through, what our clubs are going through, what feedback they have, and also again, re-evaluate everything we're doing."[4]

13.     However, contrary to these well-sounding platitudes, the NFL and Mr. Goodell have rejected Mr. Flores' request to engage in a structured and meaningful dialogue to ensure that any resolution to the problem of systemic discrimination comes with actual change and outside oversight and accountability.  Instead, the NFL has only offered to meet with Mr. Flores

---

[4]     See Sullivan, Tyler *Super Bowl 2022: NFL Commissioner Roger Goodell addresses Washington Investigation, Brian Flores Lawsuit, more,* CBS SPORTS, (Feb. 11, 2022), https://www.cbssports.com/nfl/news/super-bowl-2022-nfl-commissioner-roger-goodell-addresses-washington-investigation-brian-flores-lawsuit-more/.

J.A. 85

without any structure in place to ensure it will be a meaningful use of everyone's time rather than a public relations move for the NFL.

14.     Instead, the NFL, in an obvious public relations stunt, created its own "diversity advisory committee."  This committee, which has only six members, has on it two practicing lawyers, both of whom make a living defending employers against claims of discrimination. One of those lawyers even defended McDonalds against race discrimination claims as co-counsel to Loretta Lynch, Esq., the attorney that the NFL has hired to defend itself in this action.  There is not one person on the committee that has spent their career representing victims of discrimination.  Moreover, this committee has absolutely no power or authority—it is simply going to make private recommendations to the NFL.  Clearly, the "diversity advisory committee" does not in any way demonstrate a true commitment to change, oversight and accountability.

15.     In addition, the Miami Dolphins ("Miami" or the "Dolphins") has sought to silence Mr. Flores by attempting to push his claims against that team into arbitration—a secretive, closed-door proceeding outside the public view.  Mr. Flores and the legal team have publicly and in written correspondence called on Commissioner Goodell to voluntarily agree not to invoke arbitration and to confirm that all of Mr. Flores' claims will be allowed to proceed in open court.  Neither Mr. Goodell nor his legal team have even responded to this request, despite the fact that Congress just recently acknowledged the ills of forced arbitration when it passed the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act, which prohibits the use of mandatory arbitration in sexual harassment and sexual assault cases.

16.     What is worse, since the filing of this action Mr. Flores has been the subject of blatant retaliation by the NFL, the Houston Texans ("Houston" or the "Texans") and the Dolphins.

17.     Specifically, as described in more detail below, the Texans retaliated against Mr. Flores by removing him for consideration for its Head Coach vacancy due to his decision to file this action and speak publicly about systemic discrimination in the NFL.

18.     Moreover, the Dolphins have retaliated against Mr. Flores by refusing to comply with its obligations under his employment contract with the team (the "Flores Employment Agreement") and asserting baseless claims against him, including that he should be obligated to return to the Dolphins wages paid to him—wages it claims were conditioned on him not suing the Dolphins even though no such condition was ever expressed to Mr. Flores let alone agreed upon.

19.     Mr. Wilks has also taken the courageous step forward to oppose the NFL's systemic discrimination.  As described in more detail below, in 2018, Mr. Wilks was discriminated against by the Arizona Cardinals ("Arizona" or the "Cardinals") in a manner consistent with the experiences of many Black coaches.  Mr. Wilks was hired as a "bridge coach" and was not given any meaningful chance to succeed.  He was unfairly and discriminatorily fired after just one season—a season in which he was: (i) without a General Manager ("GM"), Steve Keim, during the critical time of the pre-season (Mr. Keim had been suspended for a DUI conviction); and (ii) stuck with an unready rookie quarterback drafted by the GM contrary to Mr. Wilks' suggestion.

20.     Mr. Wilks coached the team and acted with integrity even though dealt a difficult hand with the Cardinals that year.  But he was fired after one year.  Mr. Keim, in contrast, who clearly had personal responsibility for the team's performance, and who had engaged in fireable conduct, remained.  What is more, when Mr. Wilks was fired, he had three years and a club option remaining on his contract—a substantial amount of compensation remained owed.  Yet

J.A. 87

the Cardinals still chose to move on from him even though they still had to pay those amounts. Mr. Keim, at the time, had one year remaining on his contract, and it would have been a logical time to let him go rather than have him continue as a "lame duck" GM for the following year. Incredibly, the Cardinals gave Mr. Keim a four-year extension when Mr. Wilks was fired.[5]

21.     Mr. Wilks was replaced by a white coach, Kliff Kingsbury, who had no prior NFL coaching experience and was coming off of multiple losing seasons as a Head Coach at Texas Tech University.  Mr. Kingsbury, armed with quarterback Kyler Murray, has been given a much longer leash than Mr. Wilks and, to his credit, has succeeded.  That said, Mr. Wilks, given the same opportunity afforded to Mr. Kingsbury, surely would have succeeded as well.

22.     Mr. Flores and Mr. Wilks are joined by Mr. Horton.  Mr. Horton was a long time NFL coach and Defensive Coordinator when he was interviewed for the Tennessee Titans ("Tennessee" or the "Titans") Head Coach position in January 2016.

23.     This turned out to be a completely sham interview done only to comply with the Rooney Rule and to demonstrate an appearance of equal opportunity and a false willingness to consider a minority candidate for the position.

24.     The Titans' all-white ownership and management ultimately hired Mike Mularkey, a white candidate, for the Head Coach position.  Years later, in 2020, Mr. Mularkey admitted in a podcast interview that the Titans,

> [T]old me I was going to be the head coach in 2016, before they went through the Rooney rule.  And so I sat there knowing I was the head coach in 2016, as they went through this fake hiring process knowing, knowing a lot of the coaches that they were interviewing, knowing how much they prepared to go through those interviews, knowing that everything they could do and they had no chance to get that job. And actually, the GM Jon Robinson, he was in an

---

[5]     During the course of this litigation, additional and telling evidence will come forward demonstrating disparate treatment of Mr. Keim compared to Mr. Wilks.

interview with me.  He had no idea why he is interviewing me, that I have a job already.  I regret it, cause I pride myself and my kids first to do the right thing, and I always said that to the players. And here I am the head guy not doing it, and I regretted it since then.  It was the wrong thing to do. I am sorry I did that, but it was not the way to do that.  Should have been interviewed like everybody else and got hired cause of the interview not early on.[6]

25.  Upon information and belief, given that Mr. Mularkey's remarks and admissions have been publicly available since 2020, the NFL has been aware of them but has not done any investigation into the Titans' discriminatory conduct and/or failure to comply with the Rooney Rule.  This shows, yet again, that the NFL is either incapable or unwilling to address the issue of racial discrimination on its own.

26.  Defendants' conduct has violated Plaintiffs' rights under Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), the New Jersey Law Against Discrimination, ("NJLAD"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq*. ("NYCHRL") and the Florida Private Whistleblower Statute § 448-102 ("FPWBS").  The Dolphins conduct described herein also constitutes a breach of the Flores Employment Agreement.

## PROPOSALS FOR CHANGE

27.  Plaintiffs propose the following actions be taken to make meaningful and lasting change within the NFL and to create a future with equal opportunity for Black candidates:

1.  **Appointment of an Independent Monitor**.  An independent monitor should be appointed who will have oversight and authority to enforce and ensure compliance with all the mechanisms set forth below.

---

[6]  See Stealers Realm, *28 Mike Mularkey Enters the Realm/Steelers Realm S2-E28-55*, YOUTUBE, (Oct. 21, 2020), https://www.youtube.com/watch?v=whsIgoNKxEE at 25:02.

2.  **Promote Black Ownership**.  Increase the influence of Black individuals in hiring and termination decisions by taking steps to promote Black ownership of NFL teams.  Steps that can be taken include: (i) creating and funding a committee dedicated to sourcing Black investors to take majority ownership stakes in NFL teams; (ii) revise requirements related to financing the purchase of NFL teams to the extent that such requirements act as an impediment (issue to be studied) to the sale of NFL teams to a majority Black investor or ownership group; (iii) ensure diversity of decision-making by permitting select Black players and coaches to participate in the interviewing process for applicable positions.

3.  **Increased Transparency in Hiring and Terminations**.  The League should be committed to increased transparency in hiring and termination decisions.  Measures that would further this transparency include: (i) appointment of a special hiring committee, and require teams to have a committee member present at all applicable interviews, (ii) require teams to document the criteria for the applicable open positions, (iii) for both hiring and termination decisions, require teams to document the rationale for each person considered in the process, including a full explanation of the basis for any subjective influences (*e.g.*, trust, personality, interview performance, *etc.*), (iv) require teams to consider side-by-side comparisons of objective criteria (such as past performance, experience, *etc.*); (v) require semi-annual written performance reviews for all applicable positions, and (vi) all communications regarding the hiring and termination of applicable positions shall be considered public records.

4.  **Meaningful Incentives**:  Incentivize the hiring and retention of Black candidates through monetary, compensation and/or further draft picks, including but not limited to, additional salary cap space for making diverse hires.

J.A. 90

5. **Increased Visibility for Black Assistant Coaches**.  Increase the level of visibility and interaction between, on the one hand, Black assistant coaches and executives, and, on the other hand, NFL team owners.  Hold multiple coach/executive/owner conferences each year, similar to the annual Owners' Meetings, during which the NFL team owners will meaningfully interact with Black assistant coaches and executives.

6. **Increased Pipeline for Black Coaches**.  Teams should be required to have either a Black QB Coach or Assistant QB Coach to ensure a pipeline of experienced candidates for Offensive Coordinator and Head Coach positions.

7. **Uniform Contracts**.  Ensure language and non-monetary term uniformity with respect to coaching contracts (*e.g.*, all Head Coach contracts are the same, all Offensive Coordinator contracts are the same, *etc.*).  The independent monitor will confer with employee-side lawyers, management-side lawyers and special coaches committee with respect to the uniformity of the terms.

8. **Ban Forced Arbitration.**  Ban forced arbitration for claims of discrimination or retaliation brought against the NFL or its teams by coaches or executives, and provisions that would require a coach or executive to waive any claims of discrimination or retaliation in order to receive his or her severance.

## ADMINISTRATIVE PROCEDURES

28.     Mr. Flores will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), an administrative pre-requisite to filing an action under Title VII of the Civil Rights Act of 1964 ("Title VII") and will amend this action to include claims under Title VII at the appropriate time.  Mr. Wilks and Mr. Horton will file information with the EEOC in support of Mr. Flores' EEOC charge.

29. Pursuant to NYCHRL § 8-502, Plaintiffs will serve a copy of this First Amended Class Action Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within 10 days of its filing, thereby satisfying the notice requirements of this action.

30. Plaintiffs have complied with any and all other prerequisites to filing this action.

## JURISDICTION AND VENUE

31. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiffs' rights under § 1981. The Court has supplemental jurisdiction over Plaintiffs' related state and local law claims pursuant to 28 U.S.C. § 1367(a).

32. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including certain of the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

33. Plaintiff Brian Flores is a Black man and resident of the State of Florida.

34. Plaintiff Steve Wilks is a Black man and a resident of the State of North Carolina.

35. Plaintiff Ray Horton is a Black man and resident of the State of Arizona.

36. Defendant the National Football League is a trade association made up of 32 professional football teams and with a principal place of business located at 345 Park Avenue, New York, NY 10154. At all relevant times, the National Football League was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

37. Defendant New York Football Giants, Inc. is a corporation that owns and operates the New York Giants professional football team. New York Football Giants, Inc. is headquartered at 1925 Giants Drive, East Rutherford, NJ 07073. At all relevant times, the New

J.A. 92

York Giants was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

38.     Defendant Miami Dolphins, Ltd. is a corporation that owns and operates the Miami Dolphins professional football team.  Miami Dolphins, Ltd. is headquartered at 346 Don Shula Drive, Miami Gardens, FL 33056.  At all relevant times, the National Football League was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

39.     Defendant Denver Broncos, former corporate name PDB Sports, Ltd., is a corporation that owns and operates the Denver Broncos professional football team.  The Denver Broncos are headquartered at 13655 Broncos Parkway, Englewood, Colorado 80112.  At all relevant times, the Denver Broncos was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

40.     Defendant Houston NFL Holdings, L.P. is a corporation that owns and operates the Houston Texans professional football team.  The Houston Texans is headquartered at Two NRG Park, Houston, Texas 77054.  At all relevant times, the Houston Texans was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

41.     Defendant Arizona Cardinals Football Club LLC is a corporation that owns and operates the Arizona Cardinals professional football team.  The Arizona Cardinals is headquartered at 8701 South Hardy Drive, Tempe, Arizona, 85284.  At all relevant times, the Arizona Cardinals was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

42.     Defendant Tennessee Titans Entertainment, Inc. is a corporation that owns and operates the Tennessee Titans professional football team.  The Tennessee Titans is headquartered at 460 Great Circle Road, Nashville, Tennessee 37228.  At all relevant times, the Tennessee

J.A. 93

Titans was an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

43. Defendants John Doe Teams 1 through 26 are intended to identify NFL teams who have engaged in discriminatory conduct towards the Members of the Proposed Class, including potentially the Atlanta Falcons, Baltimore Ravens, Buffalo Bills, Carolina Panthers, Chicago Bears, Cincinnati Bengals, Cleveland Browns, Dallas Cowboys, Detroit Lions, Green Bay Packers, Indianapolis Colts, Jacksonville Jaguars, Kansas City Chiefs, Las Vegas Raiders, Los Angeles Chargers, Los Angeles Rams, Minnesota Vikings, New England Patriots, New Orleans Saints, New York Jets, Philadelphia Eagles, Pittsburgh Steelers, San Francisco 49ers, Seattle Seahawks, Tampa Bay Buccaneers, and/or the Washington Commanders. At all relevant times, John Doe Teams 1 through 26 were an employer and/or prospective employer of Plaintiffs and the members of the Proposed Class.

## FACTUAL ALLEGATIONS

## I. HISTORY OF RACE DISCRIMINATION IN THE NFL

44. The NFL has a tortured and unacceptable history with race relations that requires immediate focus in the first instance. The League remains mired in a culture that lacks inclusivity and where a barrier to entry still exists today for Black professionals in leadership.

45. The first iteration of the NFL[7] began in 1920, and it was rife with racism.

46. From 1920 through 1926, a total of only nine Black players were permitted into the League. At that time, the only reason Black players were permitted at all was because the then-existing teams had difficulty filling out their rosters in the League's early days.

---

[7] The NFL was originally known as the American Professional Football Conference, then the American Professional Football Association, before being renamed to the NFL in 1922.

J.A. 94

47.     Heading into the 1927 season, all five of the remaining Black players at the time left the League and, from 1927 to 1933, only a handful of Black players were permitted to participate.  Indeed, during that time frame there was no more than one Black player in the League per year.

48.     In 1933, the League had only two Black players, but they left at the end of the year, leaving the NFL with none.  At this point, the NFL was reportedly financially viable and no longer needed Black players to fill vacant positions.

49.     This led to one of the most despicable moments in the history of professional sports in the United States:  it is widely accepted that the NFL used the absence of Black players as an opportunity to impose a "gentleman's agreement" to ban Black players entirely.

50.     This initiative was led by the Washington Commander's ("Washington" or the "Commanders") owner George Preston Marshall.[8]  The League's other founding owners— including, but not limited to, Tim Mara of the New York Giants (the "Giants")—appear to have colluded and cooperated in this widespread racial ban.

51.     It was not until 1946 that Black players re-entered professional football.

52.     However, the reentry of Black players into the League was not the result of introspection and a commitment to equality.  Rather, when the Cleveland Rams moved to Los Angeles, the publicly funded playing venue, the Los Angeles Coliseum, forced the Rams to integrate at least one Black player because the alternative—the creation of a segregated, "separate but equal" venue for Black players—was too costly.

---

[8]     See Moore, Louis, *The NFL and a History of Black Protest*, AFRICAN AMERICAN INTELLECTUAL HISTORY SOCIETY, (Sept. 12, 2018) (citing *Kenny to get Tryout with National League*, LOS ANGELES TRIBUNE, (Jan. 19, 1946)), https://www.aaihs.org/the-nfl-and-a-history-of-black-protest/#fn-42670-3.

53.     In fact, it was reported that during a meeting between local officials, community activists and the Rams' General Manager Charles F. Walsh, Mr. Walsh admitted to the unwritten racist "gentlemen's agreement" of barring Black players.

54.     As it would happen, the Rams ultimately signed two Black players for the 1946 season, but two more years would go by before any other team would sign a Black player.

55.     As of 1950, fewer than half of the NFL's ten teams had signed a Black player, and it was not until more than a decade later that the Commanders signed its first Black player.

56.     In 1959, 13 years later after the start of integration, only 12% of the League's players were Black.

57.     Even as integration slowly progressed, the stain of racism persisted.  Teams reportedly put unwritten quotas on how many Black players could be signed, and often teams would stack Black players at the same position so that they would be eliminated as a matter of competition and roster cuts.  It was also reported that Black players received less compensation than their white counterparts.

58.      The NFL only engaged in genuine full-scale racial integration when it became economically necessary due to outrage and protests from writers and fans, the emergence of the rival and more racially progressive leagues (such as the All-America Football Conference ("AAFC") and American Football League ("AFL")) and the success of numerous minority athletes in college football.[9]

59.     Of course, integration was hardly the end of Black struggle in the NFL—untold forms of discrimination still followed Black players from team-to-team, city-to-city, stadium-to-

---

[9]     See *The Reintegration of the NFL*, NFL FOOTBALL OPERATIONS, https://operations.nfl.com/inside-football-ops/players-legends/evolution-of-the-nfl-player/the-reintegration-of-the-nfl/ (last visited April 5, 2022).

stadium and hotel-to-hotel.  In fact, though the NFL had integrated 23 years earlier, when the

Commander's owner, Mr. Marshall, died in 1969, he abhorrently stipulated that his estate be

used to establish the Redskins Foundation, on the condition that it was barred from spending

money for "any purpose which supports or employs the principle of racial integration in any

form."[10]

   60.  The NFL has profited immensely from the racial integration of its players.

Initially considered a second-tier sport, the NFL has thrived as an integrated League over the last

75 years.  While the NFL was forced to racially integrate its players to generate these immense

profits, it was not forced to do so in other areas—so it did not:

- It took approximately *20 years* for the League to hire its first black official (Burl Toler).

- It is widely known by even casual NFL fans that it took until at least the 1980s—approximately *40 years* after integration—for teams to genuinely accept Black players at the quarterback position (*i.e.*, Warren Moon and Randall Cunningham).[11]

- It took *43 years* for the first Black Head Coach to be hired (Art Shell).

---

[10] See Coates, Ta-Nehisi, *A History of Segregation in the NFL*, THE ATLANTIC, (Nov. 17, 2011), https://www.theatlantic.com/entertainment/archive/2011/11/a-history-of-segregation-in-the-nfl/248625/.

[11] The blatant racial stereotyping of Black quarterbacks in terms of the way they have been treated and described must be noted.  Empirical studies show that "Black quarterbacks tend to be praised for their athleticism and criticized for a lack of intelligence. Meanwhile, white quarterbacks are often praised for their intelligence and criticized for a lack of athleticism."  See Mercurio, Eugenio, and Filak, Vincent, *Roughing the Passer: The Framing of Black and White Quarterbacks Prior to the NFL Draft.*, HOWARD JOURNAL OF COMMUNICATIONS, 21, no. 1 (Jan. 26, 2010), https://doi.org/10.1080/10646170903501328.  The Wonderlic test, used by NFL teams to gauge intelligence of pre-draft players has been harshly criticized for being discriminatory.  See e.g. Hazell, Ricardo A., *NFL Draft Wonderlic leaks Reek of Racism and Classism*, THE SHADOW LEAGUE, (April 25, 2017), https://theshadowleague.com/nfl-draft-wonderlic-leaks-reek-of-racism-and-classism/; Stromberg, Joseph, *Reminder: The NFL's Wonderlic Aptitude Test is Totally Worthless*, VOX, (May 8, 2014), https://www.vox.com/2014/5/8/5694518/why-the-nfls-wonderlic-aptitude-test-is-totally-worthless.

- It took **54 years** for an NFL team to hire a Black General Manager (Ozzie Newsome).

- Now, **76 years** following integration, there has never been a Black Commissioner and there has never been a Black majority owner of an NFL team.

61.     For a League and its team owners who have profited immensely off the talent of Black players, the NFL has never fully acknowledged its history of racism or taken appropriate steps to address its racial disparities.  As a Black sportswriter once wrote:

> [P]ersons, corporations or business almost always forget the people or incidents that made them big . . . [the NFL] took all the aid the colored American could give and then as soon as it became 'big league,' promptly put a bar up against the very backbone of its existence."[12]

62.     Case in point:  Mr. Marshall, in many ways the personification of the NFL's deep-seeded institutional racism, is enshrined in the NFL Hall of Fame, and his contributions are lauded by the Hall of Fame's website, with only a passing reference to the fact that he "endured his share of criticism for not integrating his team until being forced to do so in 1962."[13]  That is, the NFL does not even acknowledge, much less condemn, Mr. Marshall's role in the League's history with racism.  Rather, it only notes that he received criticism from others.

## II.     THE NFL'S ONGOING PROBLEMS WITH RACE

63.     History shows that the NFL is synonymous with ownership resistance to anti-racist protest—and that continues to the present day.

---

[12]     See Halley Harding, *So What?*, LOS ANGELES TRIBUNE, (Feb. 7, 1941), (as cited in Moore, *The NFL and a History of Black Protest*).

[13]     See *George Preston Marshall: Pro Football Hall of Fame Official Site*, PFHOF, https://www.profootballhof.com/players/george-preston-marshall/ (last visited April 5, 2022).

A. **Discrimination Against Colin Kaepernick**

64.     As has been well documented, during the 2016 NFL season, Colin Kaepernick protested societal racial injustice by kneeling during the national anthem.

65.     Following the 2016-17 season—a season in which, over the course of the 11 games he started, he had 16 touchdowns against only four interceptions, 468 rushing yards and a passer rating of 90.7—no NFL team would offer him a job, even as a backup.

66.     To even a casual observer it was clear that Mr. Kaepernick was more than qualified for a roster spot in the NFL.

67.     Seattle Seahawks ("Seattle" or the "Seahawks") Head Coach Pete Carroll explained the Seahawks' rationale for not bringing him in: "**He's a *starter* in this league**. And we have a starter. But **he's a *starter* in this league,** and I can't imagine that someone won't give him a chance to play."[14]

68.     The Giants gave Mr. Kaepernick no consideration and suggested that it was because the team feared backlash from the fans if it signed Mr. Kaepernick—a statement that journalists understandably labeled "dangerous." [15]

69.     In an August 2017 article titled, "Colin Kaepernick is Not Supposed to Be Unemployed," the statistics website FiveThirtyEight stated, "It's obvious Kaepernick is being

---

[14]     See Kapadia, Sheil, *Pete Carroll on Colin Kaepernick: Not doing anything yet, but "he's a starter in this league"*, ESPN.COM, (Jun. 2, 2017), https://www.espn.com/nfl/story/_/id/19523162/pete-carroll-says-seattle-seahawks-not-signing-colin-kaepernick.

[15]     See Biderman, Chris, *Why Giants Owner John Mara's Statement on Colin Kaepernick is dangerous*, USA TODAY, (May 29, 2017), https://ninerswire.usatoday.com/2017/05/29/why-giants-owner-john-maras-statement-on-colin-kaepernick-is-dangerous/.  This was a particularly outrageous position to take given that the Giants had just signed a white Kicker, Josh Brown, after he was arrested for domestic violence and kept him off the team after he was suspended for the same misconduct.  It took the murder of George Floyd and the related nationwide protests for Mr. Goodell to publicly convey his support for players who choose to kneel during the Anthem.

frozen out for his political opinions," that "[n]o above-average quarterback has been unemployed nearly as long as Kaepernick" and "[i]t's easy to lose sight of the reality that good quarterbacks often never even reach free agency, let alone remain unsigned for so long."[16]

70.     Mr. Kaepernick's protests received a variety of reactions—both positive and negative—with then-President Donald J. Trump siding against him and calling on the nearly all-white NFL owners to "fire" players who protest during the national anthem.  President Trump referred to a player who protested (clearly Mr. Kaepernick) as "that Son of a Bitch."

71.     In an October 2017 meeting among owners, players and League executives to address racial injustice protests by players, NFL owners effectively endorsed President Trump's opinion that a player who protests racial injustice is a "Son of a Bitch" and a stated an unwillingness to act contrary to Trump's directives.[17]

72.     As time went on, still no team would sign Mr. Kaepernick for any role, starter or backup, despite the fact that he clearly deserved such a role based on merit, skill and experience. While some owners gave lip service to solidarity with Black players, NFL owners still collectively refused to employ Mr. Kaepernick following his racial justice protests.

73.     During these years, many teams—including the Giants—could have used his services as a clear roster upgrade.  But he remained blackballed.

74.     Against the backdrop of the League's history, this conduct remains an appalling example of the League's continued problems with race.

---

[16]     <u>See</u> Wagner, Kyle, *Colin Kaepernick is Not Supposed To Be Unemployed*, FIVETHIRTYEIGHT, (Aug. 9, 2017), available at: https://fivethirtyeight.com/features/colin-kaepernick-is-not-supposed-to-be-unemployed/.

[17]     <u>See</u> McCann, Michael, *The Leaked October Tapes and the Kaepernick Collusion Case*, SPORTS ILLUSTRATED, (Apr. 25, 2018), https://www.si.com/nfl/2018/04/25/leaked-tapes-nfl-owners-players-october-meeting-kaepernick-collusion-case-donald-trump.

J.A. 100

### B.    Acquiescence to Discrimination by Head Coach John Gruden

75.    John Gruden, the 30-year NFL insider and three-time Head Coach, is the embodiment of the NFL's acquiescence to racism.

76.    In October 2021, it was disclosed that between 2011 and 2018, Mr. Gruden exchanged a slew of emails containing racist, misogynistic and homophobic slurs to the Commanders' then-General Manager Bruce Allen.

77.    Mr. Gruden remarked that DeMaurice Smith, the NFL Players' Association Executive Director, had "lips the size of Michelin tires."

78.    Mr. Gruden also stated that players who protested the national anthem to protest racial inequality should be "fired."

79.    Mr. Smith responded to reports of these emails saying, "Racism like this comes from the fact that I'm at the same table as they are and they don't think someone who looks like me belongs."[18]

80.    As stated, Mr. Gruden's emails also contained a slew of additional offensive conduct.  The emails referred to Mr. Goodell as a "faggot" and a "clueless anti football pussy," and said Mr. Goodell should not have pressured the Rams to draft "queers" (referring to the drafting of Michael Sam, the first openly gay player drafted by an NFL team in 2014), something

---

[18]    See *Raiders, NFL condemn Jon Gruden for using racial trope in 2011 email to describe NFLPA Executive Director DeMaurice Smith*, NFL.COM, (Oct. 8, 2021), https://www.nfl.com/news/raiders-nfl-condemn-jon-gruden-for-using-racial-trope-in-2011-email-to-describe-#:~:text=%22Racism%20like%20this%20comes%20from,not%20let%20it%20define%20me.%22.

which the Rams coach has denied.  Mr. Gruden also called then United States Vice President Joe

Biden a "nervous clueless pussy."[19]

81.     Mr. Gruden and Mr. Allen also exchanged emails with other members of the

Commanders staff with photos of topless women, including two team cheerleaders.

82.     In one email from 2015 that includes several football insiders including Mr.

Allen, Gruden asked Mr. Allen to tell Bryan Glazer (part of the family which owns the Tampa

Bay Buccaneers ("Tampa Bay" or the "Buccaneers") to perform oral sex on him.

83.     Mr. Gruden also mocked Caitlyn Jenner, a transgender former Olympic athlete.

84.     It simply cannot be a surprise to NFL executives, insiders and team owners—who

have collectively spent the last three decades in the proximity of Mr. Gruden—that this is who

Mr. Gruden is and that these are the beliefs he harbors.

85.     Nonetheless, Mr. Gruden remained an inner-circle candidate for virtually every

Head Coach position over the 10-year period that followed his departure from Tampa Bay in

2008.

86.     Ultimately, in 2018, Mr. Gruden received the largest contract in history for an

NFL Head Coach, when the Las Vegas Raiders signed him to a 10-year, $100 million deal.

87.     The Raiders' hiring of Mr. Gruden occurred in close succession with the

Raiders' firing of General Manager Reggie McKenzie, one of the few Black General

Managers in the League.

---

[19]     See Belson, Ken and Rosman, Katherine, *Raiders Coach Resigns After Homophobic and Misogynistic Emails*, NEW YORK TIMES, (Oct. 11, 2021), https://www.nytimes.com/2021/10/11/sports/football/what-did-jon-gruden-say.html.

J.A. 102

88.     Under Mr. McKenzie, the Raiders had the highest percentage of Black players at 82.3%, and he won the NFL Executive of the Year Award in 2016 after compiling a 12-4 record.

89.     Only two years later, Mr. McKenzie was fired and replaced by Mike Mayock, a white candidate.  Under all-white leadership (Owner, General Manager and Head Coach), the percentage of Black players on the Raiders decreased every year that followed.  By 2021, the percentage of Black players on the Raiders roster dropped to 67.2%.

90.     Though Mr. Gruden is no longer employed by the Raiders, it has been reported that the NFL was well aware of Mr. Gruden's offensive emails for several months and took no action.[20]

91.     When the news of Mr. Gruden's racist emails finally surfaced, rather than an unequivocal rebuke and a for-cause termination, the Raiders allowed him to graciously resign and claim that it was due to his desire not to be a distraction.

92.     Mr. Gruden even had the gall to blame the NFL and Mr. Goodell, claiming that they were responsible—not him for his own actions—for his termination.[21]

C.     **The NFL's Concussion Settlement Discriminated Against Black Players**

93.     In 2011, retired NFL players began filing personal injury actions in courts around the country seeking damages or relief in the form of medical monitoring.  Some of these actions

---

[20]     See Beaton, Andrew, *How the NFL Learned Months Ago of the Offensive Emails that Cost Jon Gruden His Job*, THE WALL STREET JOURNAL, (Oct. 12, 2021), https://www.wsj.com/articles/jon-gruden-emails-investigation-washington-football-team-11634079234.

[21]     See Whelan, Catherine, *Jon Gruden Sues NFL for Allegedly Leaking Emails that Led to his Resignation*, NPR, (Nov. 13, 2021), https://www.npr.org/2021/11/13/1055574569/jon-gruden-sues-nfl-for-allegedly-leaking-emails-that-led-to-his-resignation.

were filed on behalf of a class, some for small groups of former players and others for individuals (collectively, the "Concussion Lawsuits").

94. As alleged in the Concussion Lawsuits, the NFL for decades was aware of the evidence and the risks associated with repetitive traumatic brain injuries, but nevertheless "ignored, minimized, disputed, and actively suppressed broader awareness of the link between subconcussive and concussive injuries in football and the chronic neuro-cognitive damage, illnesses, and decline suffered by former players."

95. The NFL was also alleged to have "failed to warn [players] and/or impose safety regulations governing this health and safety problem" and "produced industry-funded, biased, and falsified research that claimed that concussive and sub-concussive head impacts in football do not present serious, life-altering risks."

96. The Concussion Lawsuits identified a number of retired NFL players who were diagnosed with traumatic brain injury ("TBI") following their playing career, and sought money damages for injury and death, as well as medical treatment for retired players diagnosed with TBI.

97. Ultimately, the claims were consolidated and settled in 2014. Under the settlement agreement, a former player who has a "Qualifying Diagnosis" is eligible for monetary benefits. A diagnosis is "Qualifying" primarily—but not exclusively—if rendered by physicians approved by the NFL or in conjunction with the NFL's Baseline Assessment Program ("BAP"). The BAP is intended both to identify symptoms of eligible conditions and to collect data for comparison to later testing, to establish any subsequent decline in a retired player's cognitive functioning.

J.A. 104

98.     Claims for monetary awards are first reviewed by a Claims Administrator.  In the first instance, any appeals of the Claims Administrator's determinations are heard by an Appeals Advisory Panel.  Any appeals from the Appeals Advisory Panel are brought to the court that entered the settlement agreement.

99.     According to a lawsuit filed by former Black NFL players Kevin Henry and Najeh Davenport, as well as media reports, the NFL began regularly insisting that physicians use "race-norms" in determining whether a retiree had suffered cognitive impairment (the "Race-Norming Lawsuit").  When Black retirees were deemed to be cognitively impaired, the NFL regularly appealed such determinations if race-norming was not used.

100.     As alleged in the Race-Norming Lawsuit, "the National Football League . . . [has] been avoiding paying head-injury claims under the Settlement Agreement based on a formula for identifying qualifying diagnoses that explicitly and deliberately discriminates on the basis of race.  When being evaluated for the Qualifying Diagnoses of Neurocognitive Impairment, Black former players are automatically assumed (through a statistical manipulation called 'race-norming') to have started with worse cognitive functioning than white former players.  As a result, if a Black former player and a white former player receive the exact same raw scores on a battery of tests designed to measure their current cognitive functioning, the Black player is presumed to have suffered less impairment, and he is therefore less likely to qualify for compensation."

101.     Put another way, the NFL insisted that white people simply have better cognitive function than Black people.  Thus, if a Black person was found to be cognitively impaired, the NFL would often not accept that diagnosis unless the physician gave adequate consideration to the possibility that Black people simply do not function cognitively as well as white people.

This is the very definition of racism—the assumption that someone is not as smart as another person because of the color of his or her skin.

**D.**     **The NFL's Attempt to Pander During Widespread, Societal Racial Protests**

102.    In June 2020, following protests over George Floyd's murder and other instances of racially charged violence, Roger Goodell publicly apologized for the League's previous response to player protests saying, "we were wrong for not listening to NFL players earlier."[22]

103.    Goodell further "encourage[d] all to speak out and peacefully protest" and said, "[w]ithout black players, there would be no National Football League and the protests around the country are emblematic of the centuries of silence, inequality and oppression of black players, coaches, fans and staff."  Id.

104.    Despite the blatant collusion against Mr. Kaepernick, Mr. Goodell declared in a publicly released video that "Black Lives Matter" and announced that the NFL desired to work with Mr. Kaepernick in the creation and distribution of a $250 million foundation for social justice initiative.[23]

105.    These remarks and actions—emblematic of the phrase "too little too late"—were largely ridiculed by the public as hypocritical and an obvious attempt to pander to growing public sentiment against racial injustice.  Racial discrimination requires real and meaningful attention—not mere soundbites when it is in the League's financial interest.

---

[22]     See Roger Goodell: *NFL "wrong" for not listening to protesting players earlier*, NFL.COM, (Jun. 5, 2020), https://www.nfl.com/news/roger-goodell-nfl-wrong-for-not-listening-to-protesting-players-earlier.

[23]     See Battista, Judy, *NFL commits $250M over 10-year period to combat systemic racism*, NFL.COM, (Jun. 11, 2020), https://www.nfl.com/news/nfl-commits-250m-over-10-year-period-to-combat-systemic-racism.

J.A. 106

**E.**     **The NFL's Attempt to Pander Following the Filing of this Lawsuit**

106.     The filing of this lawsuit on February 1, 2022, provided yet another moment of public outcry for the League to step up—but it has not.

107.     After Mr. Flores filed this action, the League quickly rejected his claims as being "without merit" without having conducted any investigation whatsoever. After its response was roundly criticized as being tone deaf and blind to the obvious racial injustice that exists in the NFL, the League took a step back and promised to hire "outside experts" to evaluate the NFL's diversity, equity and inclusion policies.

108.     It took almost two full months for the NFL to roll out its "diversity advisory committee." This committee, which has only six members, has on it two practicing lawyers, both of whom make a living defending employers against claims of discrimination. One of those lawyers even defended McDonalds against race discrimination claims as co-counsel to Loretta Lynch, Esq., the attorney that the NFL has hired to defend itself in this action. There is not one person on the committee that has spent their career representing victims of discrimination.

109.     Clearly, the "diversity advisory committee" does not in any way demonstrate a true commitment to change, oversight and accountability. Instead, it is an obvious public relations stunt designed to insulate the NFL from further criticism.

110.     The fact that the "diversity advisory committee" is nothing more than a public relations ploy is illustrated by the NFL's response to Mr. Flores' public and private invitations to the NFL to engage with him in a dialogue, together with the aid of a neutral third-party mediator, to discuss a path forward in which the NFL can make meaningful and lasting change—with oversight and accountability—to ensure that Black and other minority candidates for coaching and executive positions are given an equal opportunity for success and advancement.

111.    This should not have been a controversial request.  In fact, in a press conference before the Super Bowl, NFL Commissioner Roger Goodell specifically said, "To me, it's more important for us to sort of listen to Coach [Flores], understand the points he and other coaches are going through, what our clubs are going through, what feedback they have, and also again, re-evaluate everything we're doing."

112.    However, contrary to these well-sounding platitudes, the NFL and Mr. Goodell have rejected Mr. Flores' request to engage in a structured and meaningful dialogue to ensure that any resolution to the problem of systemic discrimination comes with actual change and outside oversight and accountability.

## III.    DISPARATE AND ADVERSE IMPACT OF NFL'S PRACTICES

113.    Troy Vincent, a Black, Hall of Fame former cornerback, and current NFL Executive Vice President of Football Operations, recently stated with regard to the treatment of Black Head Coaches in the NFL:

> There is a double standard, and we've seen that . . . And you talk about the appetite for what's acceptable.  Let's just go back to . . . Coach Dungy was let go in Tampa Bay after a winning season. . . Coach Wilks, just a few years prior, was let go after one year . . . Coach Caldwell was fired after a winning season in Detroit . . . It is part of the larger challenges that we have.  But when you just look over time, it's over-indexing for men of color.  These men have been fired after a winning season.  How do you explain that?  There is a double standard.  I don't think that that is something that we should shy away from.  But that is all part of some of the things that we need to fix in the system. We want to hold everyone to why does one, let's say, get the benefit of the doubt to be able to build or take bumps and bruises in this process of getting a franchise turned around when others are not afforded that latitude? . . . [W]e've seen that in history at the [professional] level.[24]

---

[24]    See Maske, Mark, *Senior NFL Official: "Double Standard for Black coaches when it comes to keeping jobs"*, THE WASHINGTON POST, (Jan. 11, 2022), https://www.washingtonpost.com/sports/2022/01/11/black-nfl-coaches-firings-troy-vincent/.

114.    Mr. Vincent's common-sense analysis of the NFL's predicament with respect to the lack of Black Head Coaches hits the nail on the head: "There is a double standard."  This double standard has led to a consistent dearth of Black Head Coaches despite an abundance of highly qualified candidates.  For Black Head Coaches who are hired, retention of the job is routinely more difficult than for white counterparts.

115.    However, the issue is not limited to direct disparate treatment of Black coaches and candidates.  Rather, the NFL's policies, practices and process also have disparate impact even when neutral on their face.  To that end, while Commissioner Goodell has not admitted that the League engages in intentional discrimination, he has acknowledged that even though NFL has "adopted numerous policies and programs" to combat discrimination, that the NFL "must acknowledge that particularly with respect to head coaches, the results have been unacceptable." Mr. Goodell has also admitted the NFL has problems with "results" in regard to the racial composition of Head Coaches and needs to make changes to policies and practices so "real and tangible results will be achieved." [25]

116.    Historically, Head Coach positions were closed to Black candidates until Art Shell broke this color barrier in 1989.  Still, Coach Shell was only one of five Black Head coaches between then and the passage of the Rooney Rule.  At the end of the 2002 season, the NFL had only 3 Black Head Coaches out of 32 teams.  As one sportswriter noted, "NFL franchise owners had to be prodded to seriously consider Black candidates to coach their teams. They were willing to sign Black players [to] make them money while risking their health. They

---

[25]    See Goodell, Roger, *Memorandum: Our Commitment to Diversity, Equity and Inclusion*, TWITTER, (Feb. 5, 2022),
https://twitter.com/adamschefter/status/1489985648853405703?lang=en.

were reluctant to let them lead their teams after they were done playing."[26]  This was a reference to what is commonly known as the "Rooney Rule."

117.    In 2002, Johnnie L. Cochran Jr., civil rights attorney Cyrus Mehri and labor economist Dr. Janice Madden together produced a detailed report on the NFL's Head Coaching hiring practices titled "Black Coaches in the National Football League: Superior Performance, Inferior Opportunities."  The report analyzed the NFL's hiring and firing practices over the previous 15 seasons, and the findings showed statistically significant evidence that Black Head Coach candidates were less likely to be hired and more likely to be fired than white coaches.

118.    Due to the public sentiment gathering to address this problem, on October 31, 2002, the NFL appointed a "Committee on Workplace Diversity," headed by Pittsburgh Steelers' President Dan Rooney, to study the issue further.  On December 20, 2002, this committee issued its recommendations, including that NFL teams make a commitment to interview minority candidates for every Head Coach job opening (with limited exceptions).  In December 2002, the owners approved this recommendation.

119.    Since its passage, the Rooney Rule has been amended several times in an effort to strengthen its impact on diversity and inclusion, or to at least appear to do that.  It now applies to General Manager and other front office positions, as well as Assistant Head Coach and Coordinator positions.  Moreover, teams are now required to interview two minority Head Coach candidates, and at least one in-person.  However, the Rooney Rule has failed to yield any meaningful change to an NFL institution so fully steeped in discriminatory practices.

---

[26]    See Cunningham, Michael, *Here we go again: NFL still has "double standard" with Black coaches*, THE ATLANTA JOURNAL CONSTITUTION, (Jan. 14, 2022), https://www.ajc.com/sports/mike-check-blog/here-we-go-again-nfl-still-has-double-standard-with-black-coaches/2L7DTCGPCFBIHBUVRGHDGPX2UA/.

120.     NFL teams use a discretionary, subjective hiring practice when selecting Head Coaches, which has led to the disparate and discriminatory outcomes Commissioner Goodell has admitted are unacceptable.  While teams may apply various objective metrics in the decision-making process (such as years of experience in coaching, success in coaching positions as measured by various statistics, previous experience in Head Coach or Coordinator positions, whether a family member was previously a Head Coach, *etc.*), and must comply with NFL rules in connection with the practices (such as the Rooney Rule), the overall process is by its very nature subjective and discretionary and cannot be separated into independent or isolated parts.  It was this unfettered, unchecked and discretionary process that led to the Rooney Rule in the first place—but the discriminatory impact of these policies, practices and processes remains.

121.     As of the filing of the original Complaint, in the 20 years since the Rooney Rule was passed, only 15 Head Coaching positions had been filled by Black Candidates.  During that time, there had been approximately 129 Head Coaching vacancies.  Thus only 11% of Head Coach positions had been filled by Black candidates—in a league where 70% of players are Black.  With few exceptions, the Black candidates who have obtained Head Coach positions have been on a "short leash" and lasted for extremely short periods, while white candidates have had much lengthier opportunities to prove their worth.  In addition, upon information and belief, in general Black coaches at all levels are paid less than similarly qualified white coaches.

122.     Indeed, not a single one of the 10 Black Head Coaches hired since 2012 still holds his Head Coach job today.  In contrast, approximately 25% of white Head Coaches hired during the same time frame remain employed as a Head Coach.  Moreover, since 2012, Black Head Coaches have been fired in an average of 2.5 years, whereas (accounting for Head Coaches that are expected to return next year) white Head Coaches have averaged nearly 3.5 years on the job.

123.    Put another way, white Head Coaches are afforded an entire additional year to establish themselves relative to Black Head Coaches.  Thus, not only does the NFL employ policies, practices and process that have a discriminatory impact in the hiring of Black Head Coaches, but the same unfettered, unchecked and discretionary decision-making results in a disparate impact with respect to Head Coach retention.

124.    Moreover, since 1978, only 16 winning teams have fired their head coach (3%).  Even though Black coaches only held a small fraction of the Head Coach positions during that time, an astounding 25% (four of the 16) of the Head Coaches fired after a winning season were Black.  This statistic is even more remarkable given that there have only ever been 17 Black Head Coaches who have coached a full season, and four of them (23.5%) were fired after a winning season.  In contrast, only 6.9% of white coaches were fired after a winning season (12 out of 174).  Thus, Black Head Coaches are 3.5 times more likely to be fired even when successful.

125.    White Head Coaches routinely get second and third chances in critical positions, including as a Head Coach or Offensive or Defensive Coordinator.  Indeed, according to a 2021 NFL Diversity and Inclusion report, since 1963, 116 white individuals were hired as a Head Coach or Coordinator after an initial Head Coach opportunity, whereas only 21 individuals of color have received the same second chances.[27]  The same report noted that only one person of color has received three Head Coaching opportunities, whereas 15 white men have received three Head Coaching opportunities (two of the 15 received four opportunities).  Id.

---

[27]    See Harrison, C.K. and Bukstein, S., *Occupational Mobility Patterns in the National Football League, Vol. X*, NATIONAL FOOTBALL LEAGUE, (Feb. 2021), https://operations.nfl.com/media/4989/nfl-occupational-mobility-report-volume-x-february-2021.pdf.

J.A. 112

126.     Thus, while the Rooney Rule was and remains well-intentioned, its effectiveness requires NFL teams to take it seriously, and not treat it as a formality that must be endured simply to formalize the pre-determined hiring of a white coach.  It requires that teams provide Black Head Coaches a fair and legitimate chance—a chance commensurate with the circumstances and comparable to the chances given to white Head Coaches—to thrive.  This can only be achieved with oversight in the hiring and firing process and other meaningful change.

127.     But that has not happened.  Following the recent terminations of Mr. Flores and David Culley, former Head Coach of the Texans, at the time the lawsuit was filed there was only one Black Head Coach out of 32 NFL teams.

128.    The following photo array speaks for itself.



129.    As mentioned above, at the time the Rooney Rule was instituted, almost 20 years

ago, there were 3 Black Head Coaches.  That marks a complete lack of improvement, and in fact,

a move backwards in the wrong direction.  The fact that NFL teams may have taken notice of

this issue and hired a few minority Head Coaches *after* Mr. Flores filed this lawsuit only

demonstrates the NFL's completely *reactive* approach to this issue when it negatively impacts the public relations efforts of the League.

130.  As was recently well-put by sportswriter Jemele Hill,

> [M]ost NFL owners have been white men, and they have seldom been willing to let African Americans or Latinos call plays—either on the field or from the sidelines. This is no different from when franchises presumed that black players weren't smart enough to play quarterback and lacked leadership skills to command men. The league's paltry record of hiring minority head coaches comes from the same mind-set. And its primary effort to address the problem has been a failure, because a policy can't compensate for ignorance . . . If the NFL wants to create an equitable system for minority head coaches, the owners can't rely on a rule to create institutional change.[28]

131.  Ms. Hill continued, "NFL owners must recognize that their lazy stereotypes of black male leadership have created this embarrassing problem.  In time, we'll see whether they have the courage to fix it."  As has been evidenced by The New York Giants' Head Coach search and treatment of Mr. Flores—the NFL and its teams clearly do not.

132.  To avoid any doubt, the lack of Black Head Coaches in the NFL is not a mere "anecdotal" problem.  Statistically, it is extremely improbably that a fair and legitimately neutral hiring processes would have led to the admittedly "unacceptable" and disparate results across the NFL.  The Miami Herald recently published data regarding the Head Coach interviewees and hires between 2015 and February 1, 2022, when this lawsuit was filed.[29]  The results:

---

[28]  See Hill, Jemele, *NFL Owners Have a Problem With Coaches of Color*, THE ATLANTIC, (Jan. 11, 2020), https://www.theatlantic.com/ideas/archive/2020/01/nfl-owners-have-a-problem-coaches-color/604771/.  Unfortunately, NFL owners have, by and large, failed to recognize even the existence of these stereotypes, much less found the courage to eradicate them.

[29]  See Blaskey, Sarah and Rosmery Izaguirre, *White Interviewees had 3x better odds of being hired as NFL head coaches, new data show*, MIAMI HERALD, (Mar. 4, 2022), https://www.miamiherald.com/sports/nfl/article258302943.html.

51 Head Coaches hired, 7 identify as Black (13.7%), and 111 Head Coaches interviewed, 29 of which identify as Black (26.1%).

133.    Thus, based on the interview pool and the percentage of Black candidates in that pool, a completely neutral process would predict an outcome of 13 Black candidates being hired. A race-neutral process would have yielded 6 additional Black Head Coach hires.  Statistically, the probability of 7 or fewer candidates being hired (which is what happened) during these hiring cycles is 0.5%, or 2.58 standard deviations.[30]

134.    However, the above analysis considers solely the open jobs and the entire pool of unique individuals who interviewed for those jobs.  Another, method of analysis would be to look at the unique candidates by year.  That is, re-counting the same person who is interviewed for each year in which the person interviews.  Under this approach, 7 candidates were hires out of 60 Black candidates; a race-neutral process would expect 16.  The probability is 0.1%, or 3.09 standard deviations, that 7 or fewer Black candidates would have been selected by mere chance.

135.    Finally, one can look at each specific job opening and the candidates who interviewed for each (thus counting candidates multiple times even in the same year if they interviewed for multiple positions).  In total, for the 51 Head Coach positions, there were 327 interview appearances, and 106 interviews were granted to Black candidates (32.4%).  A race

---

[30]    The Second Circuit has recognized that standard deviations of more than two units can be used as evidence of discrimination because of the low likelihood that such disparities have resulted from chance.  See Malave v. Potter, 320 F.3d 321, 327 (2d Cir. 2003) ("[a statistical significance of two standard errors or more is] sufficient to warrant an inference of discrimination.") (quotation omitted); Waisome v. Port Auth. of New York & New Jersey, 948 F.2d 1370, 1376 (2d Cir. 1991)  ("finding of two or three standard deviations …[is] highly probative of discriminatory treatment"); Guardians Assoc. of New York City Police Dep't, Inc. v. Civil Serv. Comm., 630 F.2d 79, 86 (2d Cir. 1980) ("[I]n cases involving large samples, 'if the difference between the expected value … and the observed number is greater than two or three standard deviations,' a prima facie case is established.") (citation omitted).

neutral process would have led to an expected result of 18 Black Head Coach hires when analyzed in this manner. Under this analysis, the probability of 7 or fewer candidates being hired is 0.03%, or 3.42 standard deviations. The following table reflects these three analyses.

| Table 1 Mulpools Analysis of NFL Head Coach Selections, 2015-2022 Black Candidates | | | |
|---|---|---|---|
| | Per Candidate | Per Candidate/Year | Per Interview |
| | (1) | (2) | (3) |
| Expected Number of Selections | 13.3 | 16 | 18 |
| Actual Number of Selections | 7 | 7 | 7 |
| Expected Additional Selections | 6.3 | 9 | 11 |
| Probability (converted to 2 tail) | 0.005 | 0.001 | 0.0003 |
| Standard Deviation Equivalents | 2.58 | 3.09 | 3.42 |
| Total Black Candidates | 29 | 60 | 106 |

136.     Even when looking at a variety of variables that could have impacted the Head Coach selections that are independent of race—including age (a proxy for experience), years in the NFL as a Head Coach or Coordinator, the Win-Loss record of the team the candidate was most recently affiliated with, the Elo score[31] of the team the candidate was most recently affiliated with, and the Simple Rating System ("SRS")[32] score of the team the candidate was most recently affiliated with—none of these non-racial factors has had any statistically

---

[31]     Elo is a statistical formula which grades team skill level using the final scores and locations of each game. An explanation of Elo ratings can be found at: Paine, Neil, *NFL Elo Ratings Are Back!*, FIVETHIRTYEIGHT, (Sept. 10, 2015), https://fivethirtyeight.com/features/nfl-elo-ratings-are-back/.

[32]     For a primer on SRS, see *A very simple ranking system*, PROFOOTBALLREFERENCE.COM, (May 8, 2006), https://www.pro-football-reference.com/blog/index4837.html?p=37&__hstc=213859787.73125663f23707173cd55249a72 3585f.1648760587980.1648760587980.1648760587980.1&__hssc=213859787.1.164876058798 0&__hsfp=748233975.

significant impact on the selection of Head Coaches according to this data. This only further confirms that the disparate impact is the result of the candidate's race.

137. A statistical analysis was also performed by FiveThirtyEight.com ("FiveThirtyEight") looking only at the 2021-22 hiring cycle which reached the same conclusion.[33] FiveThirtyEight looked at the reported "finalists" for each of nine open Head Coach positions (25 total candidates, of which 9 were selected) and collected information on their race, age, coaching background, experience and statistical measures of team performance. FiveThirtyEight opined that, "If hiring NFL coaches were truly an objective process, we might expect the head-coaching candidates who were hired to have superior resumes to those who were not selected, in at least some quantifiable sense." However, FiveThirtyEight found that when looking at all the factors, "the most statistically significant difference between the groups [hired versus not hired] *by far* was race." (emphasis in original). During this coaching cycle, 53.8% of white candidates were hired whereas only 16.7% of non-white candidates were hired— "a difference that is very unlikely to have happened solely due to chance."

138. The same FiveThirtyEight article also found that Mr. Flores and other Black Head Coaches already hired into a position are held to an unreasonably high bar and have to be "miracle workers" to hold on to their jobs. FiveThirtyEight found Mr. Flores' termination from the Dolphins to be extremely suspect given that the team achieved a higher Elo score at the end of the year than at the beginning of the year (*i.e.*, the team improved) despite the fact that the team got negative performance play at the quarterback position.

---

[33]     See Pain, Neil, *NFL Teams Are Making Brian Flores's Case For Him*, FIVETHIRTYEIGHT, (Feb. 17, 2022), https://fivethirtyeight.com/features/nfl-teams-are-making-brian-floress-case-for-him/.

J.A. 118

139.    In the last 30 years, only four Head Coaches have been fired under such circumstances, and three of them are Black (75%).

|  |  |  |  |  |  | TEAM ELO | | |
| YEAR | TEAM | COACH | WIN % | STARTING QB | QB ELO | PRE | FINAL | DEPARTURE |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **2021** | **MIA** | **Flores** | **.529** | **Tagovailoa** | -11.3 | 1532 | 1557 | **Fired** |
| 2017 | TEN | Mularkey | .556 | Mariota | -3.2 | 1460 | 1491 | Mutual |
| 2014 | BUF | Marrone | .563 | Orton | -14.5 | 1456 | 1549 | Resigned |
| **2012** | **CHI** | **Smith** | **.625** | **Cutler** | -57.1 | 1505 | 1546 | **Fired** |
| **2008** | **NYJ** | **Mangini** | **.563** | **Favre** | -10.4 | 1442 | 1472 | **Fired** |
| 2000 | DET | Ross | .563 | Batch | -72.5 | 1466 | 1512 | Resigned |
| **1994** | **OAK** | **Shell** | **.563** | **Hostetler** | -18.5 | 1516 | 1530 | **Fired** |

140.    The same discriminatory pattern holds when looking at Head Coaches fired after just one season—*i.e.*, not even given a legitimate chance to succeed.  From 2003 through the end of the 2021 season, the NFL has had 127 different new Head Coach jobs/tenures (one coach can count for multiple tenures).  Of these 127 positions, 22 Black candidates have been hired (17.3%).  However, of the 14 Head Coaches during this time frame who have been fired after one season, 5 have been Black (35.7%).  Looked at another way, of the 22 Black Head Coaches hired since 2003, 22.7% have fired after only one year.  In contrast, of the 103 white Head Coaches hired, 11 have been fired after one year (10.6%).

141.    That is, the same non-minority decision makers engaging in the same form unfettered, unchecked and discretionary decision-making with result to Head Coach firing and retention also leads to a disparate impact.

142.    Even further to the same point, the same unfettered, unchecked and discretionary processes are used to hire Coordinators, Quarterback Coaches and General Managers.  And

38

accordingly, nearly identical racial disparities exist there as well, notwithstanding that the Rooney Rule has been expanded to apply to those roles.

143.    Offensive and Defensive Coordinators are significantly over-represented by white candidates and under-represented by Black candidates.  These positions are very often filled by a pool of former players, approximately 70% of whom are Black.

144.    As of the filing of this action, there were only four Black Offensive Coordinators in the 32-team League (12.5%), and 11 Black Defensive Coordinators (34%).[34]

145.    This is significant given that, according to the NFL's Diversity & Inclusion Report covering 2012 through 2021 (published in February 2021),[35] teams focus on Coordinators, and in particular Offensive Coordinators, when it comes to considering candidates for Head Coach positions.  During the period studied, approximately 80% of Head Coach hires were previously Coordinators.

146.    According to the study, 31 out of 62 Head Coach positions were filled by Offensive Coordinators (where Black professionals are the most under-represented) while 18 Head Coach positions were filled by Defensive Coordinators.  Moreover, only three out of 32 teams had a Black Quarterbacks Coach, which is the position that most often leads to an Offensive Coordinator opportunity.

147.    This shows that not only are the NFL's Head Coaches predominantly white, but that the pipeline feeding this racial disparity is fraught with discrimination.  This is indicative of the structural discrimination that pervades NFL teams and likely ensures that this problem will

---

[34]    In addition, only eight of 32 Special Teams Coordinators are Black (25%).
[35]    See Harrison, C.K. and Bukstein, S., *supra* fn. 27.

remain.  In sum, NFL teams are more willing to hire Black professionals into positions they deem to be less important and less likely to lead to Head Coach positions.

148.    The same discriminatory practices are apparent when it comes to the hiring of General Managers.  When this lawsuit was filed, out of 32 teams, there were only 7 Black General Managers (18.75%) against 26 white General Managers.[36]

---

[36]     These are as follows: Chris Grier, Dolphins; Andrew Berry, Cleveland Browns; Martin Mayhew, Washington Commanders; Brad Holmes, Detroit Lions; Terry Fontenot, Atlanta Falcons; Kwesi Adofo Mensah, Minnesota Vikings; Ryan Poles, Chicago Bears.

149.    See below:



150.    According to the NFL's Diversity & Inclusion Report, from 2012 through 2021 there were 37 General Managers vacancies and only six were filled by Black candidates (16%). 20 NFL teams have never had a Black General Manager.

151.    The NFL's inability to achieve racial diversity at the Head Coach positions stems from both the pipeline flowing up as well as the decision makers at the top.  The lack of representation of Black General Managers doubtlessly leads to the lack of Black Head Coaches.

152.    It stands to reason that, whether explicit or implicit, white decisionmakers tend to favor white candidates for significant positions, as numerous studies suggest there is same-race bias and impact in decision-making.

153.    Organizational studies have shown that people are most likely to hire others of the same race and that bias among decision makers can affect the diversity of the entire organization. This helps explain the structural problems that lead to a lack of Black professionals in both Head Coaching and in the pipeline at Coordinator positions.[37]

---

[37]    See e.g. Goldberg, Caren B, Relational Demography and Similarity-Attraction in Interview Assessments and Subsequent Offer Decisions: Are we Missing Something," *George Washington University* (Dec. 1, 2005); Bertrand, M., & Mullainathan, S., "Are Emily and Greg more employable than Lakisha and Jamal? A field experiment on labor market discrimination.", *The American Economic Review*, 94(4), 991-1013, (2004), Retrieved February 1, 2022 from https://proxy.library.upenn.edu/login?url=https://www.proquest.com/scholarly-journals/are-emily-greg-more-employable-than-lakisha-jamal/docview/233023724/se-2; Johnson, S. K., Hekman, D. R., & Chan, E. T., "If there's only one woman in your candidate pool, there's statistically no chance she'll be hired", *Harvard Business Review*, (Apr. 26, 2016), Retrieved February 1, 2022, from https://hbr.org/2016/04/if-theres-only-one-woman-in-your-candidate-pool-theres-statistically-no-chance-shell-be-hired.

154.    To that end, the NFL has no Black owners:





155.     Owners are ultimately responsible for leading the entire organization, establishing an inclusive culture and deciding who to hire and retain in front office leadership positions such General Managers.  The lack of any Black voices in ownership clearly has led to a dearth of opportunities for Black General Managers, which has—in turn—has undermined racial inclusion in the NFL for more than 100 years.

J.A. 125

IV.    **FACTUAL ALLEGATIONS OF THE NAMED PLAINTIFFS**

A.    **Claims By Brian Flores**

i.    **Background on Brian Flores**

156.    Mr. Flores, the son of Honduran immigrants, grew up in the housing projects in Brownsville, Brooklyn, New York.  Mr. Flores managed to navigate and avoid the perils of drugs, gangs and violence in one of the city's toughest neighborhoods and grew to love his home neighborhood and city.  As it was put by a childhood friend, "Brownsville is the trenches . . . and Brian was like a rose growing out of the concrete."[38]

157.    Mr. Flores excelled academically and began playing football.  After a successful high school and college playing career, Mr. Flores was hired as a scout by the New England Patriots and, in 2008, transitioned to a coaching position.  Mr. Flores received multiple promotions, and, during his tenure, the Patriots appeared in five Super Bowls, winning three of them.  In the last of these Super Bowls, when Mr. Flores called the Patriots' defensive plays, the Patriots held the Los Angeles Rams to three points, tied for the fewest ever in a Super Bowl.

ii.    **Discrimination by the Dolphins**

158.    In 2019, on the heels of his outstanding performance with the Patriots, Mr. Flores was offered the Dolphins Head Coach position.

159.    By all accounts, Mr. Flores did a fantastic job in three seasons from 2019-2021.

160.    In his first year, Miami's gutted roster won five games despite many experts predicting an 0-16 season and one of the worst teams in NFL history.

---

[38]    See O'Connor, Ian, *The Patriots' next coaching star? His odds were incredibly long*, ESPN.COM, (Mar. 7, 2018), https://www.espn.com/nfl/story/_/id/22262842/brian-flores-new-england-patriots-next-coaching-star-emerge-bill-belichick-tree.

161.    The Dolphins owner, Stephen Ross, was unhappy with this performance—but not because it was under-performing.  To the contrary, Mr. Ross had wanted Mr. Flores to "tank" the season to put the team in position to secure the first pick in the draft.

162.    Indeed, during the 2019 season, Mr. Ross told Mr. Flores that he would pay him $100,000 for each game lost that year.

163.    This request constitutes a violation of the Sports Bribery Act, and, had Mr. Flores acceded to the request, that too would have constituted a violation of the Sports Bribery Act.

164.    Mr. Flores made it clear in no uncertain terms that he would not agree to lose games on purpose, and that he would try his very best to win every game the Dolphins played.

165.    Nevertheless, when the Dolphins started winning games, due in no small part to Mr. Flores' coaching, Mr. Flores was told by Mr. Grier, that "Steve" was "mad" that Mr. Flores' success in winning games that year was "compromising [the team's] draft position."

166.    Given these reactions and alarming demands to lose games, Mr. Flores memorialized Mr. Ross' desire to have Miami lose games in a December 4, 2019 memorandum that was provided to General Manager, Chris Grier; Chief Executive Officer, Tom Garfinkel; and Senior Vice President of Football and Business Administration, Brandon Shore.  In this letter, Mr. Flores detailed the toxicity that existed within the organization and explained the unreasonable position he was being placed in by the team ownership and upper management.

167.    Over the remainder of Mr. Flores' tenure at the helm of the Dolphins, he was routinely made to feel uncomfortable based upon his decision not to tank in order to secure the top pick in the 2020 draft.  Upon information and belief, no white Head Coach has ever been subjected to such ridicule over winning and holding the spirit of the game in such high regard.

168.    Separately, after the end of the 2019 season, Mr. Ross began to pressure Mr. Flores to recruit a prominent quarterback in violation of League tampering rules.

169.    Mr. Flores repeatedly refused to comply with these improper directives.

170.    Undeterred, in the winter of 2020, Mr. Ross invited Mr. Flores onto a yacht for lunch.  Shortly after he arrived, Mr. Ross told Mr. Flores that the prominent quarterback was "conveniently" arriving at the marina.

171.    Obviously, Mr. Ross had attempted to "set up" a purportedly impromptu meeting between Mr. Flores and the prominent quarterback.

172.    Mr. Flores refused the meeting and left the yacht immediately.

173.    After the incident, Mr. Flores was treated with disdain and held out as someone who was noncompliant and difficult to work with—typical discriminatory stereotypes that are regularly applied to Black people, and not white people.

174.    The following year, in 2020, despite this discriminatory treatment, the Dolphins improbably won 10 games, narrowly missing the playoffs, and Mr. Flores was mentioned as a potential coach of the year candidate.  In 2021, Miami again finished with a winning record, and fans, pundits and experts all agree the team played extraordinarily hard for Mr. Flores.

175.    Nonetheless, Mr. Flores was terminated and subsequently defamed throughout the media and the League, as he was labeled by the Dolphins brass as someone who was difficult to work with.  This is reflective of an all too familiar "angry black man" stigma that is often cast upon Black men who are strong in their morals and convictions while white men are coined as passionate.

176.    Mr. Flores' only failure to collaborate was his refusal to tank the 2019 season and tamper in violation of league rules.  When he refused, and then over-performed and led the team

47

to winning records in two consecutive seasons with a roster few experts predicted could do so— he was fired.

177.    Mr. Flores was discharged from his duties as the Dolphins Head Coach on January 10, 2022.  Countless current and former players, executives and media analysts expressed their dismay at Mr. Flores' termination,[39] and he immediately became one of the top Head Coach candidates on the market.

### iii.    Giants Discriminatory and Sham Interview

178.    It is against this backdrop that the Giants should have considered Mr. Flores as a highly regarded candidate for the Head Coach position, and, for nearly two weeks, it at least publicly appeared that the Giants viewed Mr. Flores as a desirable option.

179.    Indeed, on January 11, 2022, the day that the Giants terminated Head Coach Joe Judge, Mr. Flores received a text message from Tim McDonnell, the Giants' Co-Director of Player Personnel.  The two spoke *via* telephone and, according to Mr. McDonnell, the Giants, and its owner John Mara, were extremely interested in hiring him for the team's vacant Head Coach position.

180.    Later that day, after the two texted about potential General Manager and Assistant Coach/Coordinator candidates, Mr. McDonnell let Mr. Flores know that Mr. Mara would be reaching out directly to him to express his interest.  Mr. Flores let Mr. McDonnell know that the Giants Head Coach position would be his "dream job."[40]

---

[39]    See Cwik, Chris, *Dolphins players, rest of NFL react to Brian Flores getting fired: "I'm sick"*, YAHOO! SPORTS, (Jan. 10, 2022), https://sports.yahoo.com/dolphins-players-rest-of-nfl-react-to-brian-flores-getting-fired-im-sick-170451689.html.

[40]    Ironically, during their January 11, 2022 text exchange, Mr. McDonnell also suggested that if Mr. Flores were hired as the Giants Head Coach, Brian Daboll might be interested in leaving Buffalo to serve as his Offensive Coordinator ("Heard Daboll isn't happy with Sean [McDermott] in Buffalo . . . might be able to get out if he doesn't get a head job… thoughts?").

181.   The following day, on January 12, 2022, Mr. Mara and Mr. Flores had a positive conversation about his candidacy for the Head Coach position.  This was followed up with a Zoom meeting on Tuesday, January 18, 2022.

182.   On the morning of Sunday, January 23, 2022, Mr. Schoen, who had recently been announced as the Giants' new General Manager (beating out multiple Black candidates for the job), began the process of scheduling an interview with Mr. Flores.

183.   The same day in the mid-afternoon, Mr. McDonnell told Mr. Flores that he hoped that Mr. Flores would "come in and win the fng job."

184.   On Monday, January 24, 2022, Mr. Schoen finalized Mr. Flores' interview date for January 27, 2022.

185.   Unfortunately, just hours later Mr. Flores learned that the Giants' continued courtship was nothing more than a discriminatory façade designed to show false compliance with the Rooney Rule.

186.   Indeed, on January 24, 2022, at 2:30 p.m., Mr. Flores received a text message from New England Patriots Head Coach, Bill Belichick—clearly an insider and privy to non-public information from direct sources.

187.    The ensuing text messages from Mr. Belichick to Mr. Flores speak for themselves:

 

188.    Clearly, by midday Monday, January 24, 2022, the Giants had already decided to hire Mr. Daboll and communicated the decision to third-parties, including to Mr. Belichick.

189.    But for Mr. Belichick's error, Mr. Flores never would have known of this fact.[41] This revelation not only impugns and viciously exposes the sham process to which Mr. Flores was subjected but also stands to indict the Giants' organizational hiring practices in general.

---

[41]    Other third parties have also confirmed that the interview of Mr. Flores was a sham.  See e.g. Jimmy Randazzo (@JimmyRandazzo), TWITTER, (Jan. 28, 2022), https://twitter.com/JimmyRandazzo/status/1487168987725185025 ("I Was Told on Monday Brian Daboll Will Get the Job. I Don't Care Who Was Right or Who Was First I Just Want Him

J.A. 131

190.     It is impossible to put into words the emotions Mr. Flores felt upon learning that not only would he not be getting the Giants Head Coach job—the job of his dreams—but, more importantly, that he was not even being given serious consideration for the position but being treated as a box to "check off" due to his race.

191.     Mr. Flores spent Monday evening, Tuesday and Wednesday (including a dinner with Mr. Schoen) knowing that he was walking into Thursday's interview with no chance to become the Giants Head Coach.  While he would spend countless hours preparing to put his best step forward, the white men across the table from him saw and heard only one thing: a formality that had to be observed in order to name Mr. Daboll the Head Coach.

192.     It bears noting that the Giants in particular have an ominous history when it comes to race relations, and, in particular, when it comes to hiring Black Head Coaches.

193.     The Giants have never hired a Black Head Coach; Mr. Flores would have been the team's first.  This is a near unbelievable fact given that the Giants have been in existence for nearly 100 years and have now hired 22 Head Coaches.  It is made even worse given that approximately 70% of the players in the NFL are Black, and the Organization sits in the nexus of the New York/New Jersey community, which prides itself on diversity and inclusion.

194.     Year after year, the Giants have interviewed Black candidates for open Head Coach positions—likely due only to the requirements of the Rooney Rule—without ever hiring one.

195.     In 2004, the Giants hired Tom Coughlin after interviewing: (i) Romeo Crennel (who would go on to receive Head Coach positions with the Cleveland Browns (the "Browns"),

---

to Be the next Head Coach"); Esiason, Boomer, *[Brian Daboll] was offered the job earlier in the week but had to wait for the Giants to complete the formal interviewing process*, CBS SPORTS MINUTE, (Jan. 31, 2022), https://www.audacy.com/podcasts/cbs-sports-minute-818.

Kansas City Chiefs (the "Chiefs") and the Texans); and (ii) Lovie Smith (who would go on to receive a Head Coach position with the Chicago Bears (the "Bears"), who he took to the Super Bowl in 2006, and the Tampa Bay Buccaneers (the "Buccaneers")).

196.    After Tom Coughlin left the organization in 2016, the Giants hired Ben McAdoo after interviewing Teryl Austin, the highly qualified Black Defensive Coordinator of the Detroit Lions ("Detroit" or the "Lions").

197.    When Mr. McAdoo was terminated after just two years, the Giants hired Pat Shurmur after interviewing Steve Wilks and Eric Studesville, two highly qualified Black candidates.

198.    After Mr. Shurmur was fired just two years later, the Giants passed over Eric Bieniemy, who many considered to be the best Head Coach prospect on the market, as well as Kris Richard, and instead hired Joe Judge,[42] who himself was fired after just two years.

199.    More to the point, only once since the passage of the Rooney Rule have the Giants even interviewed more than the minimum number of Black candidates for Head Coach, and it is not for a lack of qualified candidates.  This demonstrates that the Giants interview Black candidates because of the NFL's mandate and for no other reason.

### iv.    Prior Sham Interview with the Denver Broncos

200.    Incredibly, this was not Mr. Flores' first sham interview that was held only in an effort to comply with the Rooney Rule.

---

[42]    The Giants' willingness to hire Mr. Judge, but not Mr. Flores, is a particular affront to racial equality when comparing their relative qualifications.  See Hill, Jemele, *supra* (explaining that Mr. Flores had to have far greater qualifications than Mr. Judge before finally receiving a Head Coach position with the Dolphins).

J.A. 133

201.    Indeed, in 2019 Mr. Flores was scheduled to interview with the Denver Broncos (the "Broncos").

202.    However, the Broncos' then-General Manager, John Elway, President and Chief Executive Officer, Mr. Ellis, and others, showed up an hour late to the interview.

203.    They looked completely disheveled, and it was obvious that they had been drinking heavily the night before.

204.    It was clear from the substance of the interview that Mr. Flores was interviewed only because of the Rooney Rule, and that the Bronco's never had any intention to consider him as a legitimate candidate for the job.

205.    Shortly thereafter, Vic Fangio, a white man, was hired to be the Head Coach of the Broncos.

206.    Sadly, while the Rooney Rule was meant to lift the NFL from its history of insidious "gentlemen's agreements," segregation and racism, the Giants and Broncos' actions towards Mr. Flores fit that history all too well.

**v.      Retaliation Against Mr. Flores Following the Filing of the Lawsuit**

a.      The Texan's Fail to Hire Mr. Flores as the Team's Head Coach Because He Filed this Lawsuit

207.    On January 31, 2022, Mr. Flores interviewed for the Texans job in-person with Cal McNair (Chairman and Chief Executive Officer), Hannah McNair (Mr. McNair's wife), Nick Caserio (General Manager) and Jack Easterby (executive Vice President of Football Operations).

208.    Prior to Mr. Flores filing this lawsuit, in addition to Mr. Flores, the Texans had interviewed Hines Ward, Jonathan Gannon, Kevin O'Connell and Josh McCown, none of whom have any head coaching experience.

53

209.     On February 1, 2022, Mr. Flores filed this lawsuit.  As a courtesy, he gave the Texans advance notice that it would be filed.

210.     In the days following the filing of this suit, two candidates received second interviews by the Texans—Mr. Gannon and Mr. McCown.

211.     On February 4, 2022, it was widely reported that the Texans had narrowed the position to three candidates—Mr. Flores, Mr. Gannon and Mr. McCown.  Mr. Gannon and Mr. McCown are both white and less experienced than Mr. Flores.  Mr. McCown, in particular, has never coached in any capacity in the NFL.

212.     On February 6, 2022, it was announced that Mr. Gannon would no longer be considered for the Texans Head Coach position.[43]  Thus, the Head Coach vacancy was down to Mr. McCown and Mr. Flores.

213.     It is clear that the Texans did not want to hire Mr. Flores to be the team's Head Coach because he had opposed discriminatory conduct within the NFL by the filing of this lawsuit and speaking publicly about the systemic racism in the NFL.

214.     It is also clear that the Texans were rightfully concerned that if it hired Mr. McCown over Mr. Flores, it would bolster Mr. Flores' allegations of systemic discrimination against Black candidates, particularly given that the team had just fired Black Head Coach David Culley after only one season.

---

[43]     See e.g. Thompson, Cole, *Sources: Jonathan Gannon Out of Houston Texans Coach Search; Josh McCown vs. Brian Flores*, SPORTS ILLUSTRATED, (Feb. 6, 2022), https://www.si.com/nfl/texans/news/houston-head-coach-jonathan-gannon-eagles-josh-mccown-brian-flores-nick-caserio#:~:text=The%20Texans%20will%20no%20longer,first%2Dyear%20coach%20David%20Culley.

J.A. 135

215.    As such, later on the very same day that it was announced that the Texans had narrowed its search down to only two candidates, it also was announced that the team had decided to give an initial interview to its own Coach Culley's Defensive Coordinator, Lovie Smith, for the Head Coach position.

216.    On February 8, 2022, the Texans hired Lovie Smith to be the team's Head Coach. Mr. Smith is a two-time previous Head Coach with a career winning record, multiple trips to the playoffs and a Super Bowl appearance with the Bears in 2006.  Mr. Flores applauded the Texans for hiring a Black Head Coach when the announcement was made.  To be clear, Mr. Smith is more than qualified for the role, and it is a positive thing that another Black Head Coach has been hired by an NFL football team.

217.    That said, it is equally problematic that the reason that the Texans did not hire Mr. Flores in the first place was because he filed this lawsuit and opposed systemic racism in the NFL.

218.    Upon information and belief, either the Texans made this retaliatory decision on its own or the NFL—through the Commissioner's office and/or other member teams and/or surrogates from the NFL or its member teams—pressured the Texans not to hire Mr. Flores to be its Head Coach after he filed this lawsuit, or some combination thereof.

> b.    The Dolphins Breach Mr. Flores' Contract and Retaliatorily Attempt to Claw Back Compensation Paid to Him

219.    Pursuant to the Flores Employment Agreement with the Dolphins, upon a termination without cause, he would be entitled to a payout of the remaining two years of his five-year contract (an eight-figure sum), provided that he signed a "general release of claims in favor of the [Dolphins] and [Dolphins' affiliates]."

220.     After the Dolphins terminated Mr. Flores, and in breach of the Flores
Employment Agreement, the team never provided him with a "general release of claims in favor
of the [Dolphins] and [Dolphins' affiliates]."  Instead, the team provided him with a separation
agreement (the "Separation Agreement") that included terms that went far beyond a general
release.

221.     First, the Separation Agreement contained a release of claims against not only the
Dolphins, but also the Dolphins' "affiliates, *and their respective parents, predecessors, related
entities, and their respective officers, directors, insurers, shareholders, agents, attorneys,
employees, successors, assigns, and past, current and future subsidiaries.*" (Emphasis added).
The Dolphins were not entitled to demand that Mr. Flores sign a release that was far broader than
what was set forth in the Flores Employment Agreement.

222.     Second, the Separation Agreement contained confidentiality, non-disparagement,
cooperation, non-solicitation, tax indemnification and arbitration provisions, among many others.
Again, these provisions far exceed a general release of claims, and the Dolphins were not entitled
to present them to Mr. Flores, much less refuse to pay his severance because he refused to agree
to them.

223.     Third, the non-disparagement provision in the Separation Agreement constitutes
an impermissible restraint on Mr. Flores' ability to obtain alternative comparable employment of
his choice, as he would undoubtably need to speak negatively regarding the Dolphins in
explaining his departure from the team, particularly given that the Dolphins had, at the point
when they presented him with the Separation Agreement, already spoken negatively about Mr.
Flores.

224.     Fourth, the Separation Agreement failed to make clear that it does not prevent Mr. Flores from filing a complaint or charge with the Equal Employment Opportunity Commission ("EEOC") or any other governmental agency, including the Department of Justice and/or the Federal Bureau of Investigation.  See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28 (1991) (confirming that a private agreement cannot interfere with a person's right to file a charge with the EEOC); see also https://www.eeoc.gov/policy/docs/waiver.html (stating *inter alia* that, "An employer may not interfere with the protected right of an employee to file a charge"). While the Separation Agreement did state that "nothing in this Agreement prohibits Employee from participating in an investigation or proceeding before any federal, state or local governmental agency," that provision was limited to "participating in an investigation" and does not appear to permit Mr. Flores to file a complaint.  Additionally, as mentioned, the Separation Agreement contains an impermissible non-disparagement provision that would effectively preclude Mr. Flores from being fully forthcoming with the aforementioned agencies or others.

225.     Under these circumstances, the Dolphins failure to pay Mr. Flores the severance to which he was contractually entitled constitutes a breach of the Flores Employment Agreement.

226.     To make matters worse, after this lawsuit was filed, the Dolphins filed a letter with Commissioner Goodell seeking an arbitration over claims that Mr. Flores should be required to return hundreds of thousands of dollars of earned income.  The only reason that the Dolphins filed this request is because Mr. Flores filed this suit and opposed the team's discriminatory conduct.

**B.**      **Discrimination Against Steve Wilks**

**i.**      **Background**

227.     Mr. Wilks has been a college and professional football coach for almost 30 years.

228.    Between 1995 and 2005, Mr. Wilks worked for several Division I colleges, including Notre Dame and Washington.

229.    Starting in 2006, Mr. Wilks started his NFL tenure as a Defensive Backs Coach with the Bears, and the Bears went to the Super Bowl.

230.    Thereafter, between 2009 and 2017, Mr. Wilks was the Defensive Backs Coach for the San Diego Chargers, the Defensive Backs Coach for the Carolina Panthers and the Assistant Head Coach and Defensive Coordinator for the Carolina Panthers.

### ii.    Discrimination by the Cardinals

231.    In 2018, the Cardinals hired Mr. Wilks to be its Head Coach pursuant to an employment contract (the "Wilks Employment Agreement").

232.    Like many situations when Black Head Coaches are hired in the NFL, in retrospect it is clear Mr. Wilks was hired as a "bridge coach."

233.    A "bridge coach" is understood to be a coach who is not given a meaningful opportunity to succeed and is simply "keeping the seat warm" until the team is better positioned to succeed, at which point a new coach is brought in.

234.    True to form, Mr. Wilks was not given nearly the time nor authority to develop the team or culture for the Cardinals—certainly nothing at all commensurate with the time and opportunities afforded to white Head Coaches throughout the League.

235.    Before the 2018 NFL draft, Mr. Wilks inherited a team with no starting quarterback as veteran Carson Palmer had retired.

236.    Heading into the draft, Mr. Wilks urged General Manager Steve Keim to trade up in the draft to select quarterback Josh Allen.  Josh Allen was selected 7th overall and is now a professional bowl player with a 39-21 record as a starting quarterback.

237.    Instead, at Mr. Keim's decision and in contrast to Mr. Wilks' suggestion, the Cardinals traded up to the 10th spot, to draft quarterback Josh Rosen.

238.    Unfortunately, history would reveal this move to be one of the great draft gaffes of all time.  Mr. Rosen was not ready to be a starting quarterback in the NFL and ultimately had an unsuccessful career.  He was cut mid-season by the Atlanta Falcons (the "Falcons") this past year after hardly playing.

239.    After organized team practice activities ("OTAs") in the offseason, before training camp, Mr. Wilks spoke to the team about how to comport themselves heading into the season.  He implored them all to use good judgment, stay out of trouble and to "not be that guy."

240.    Before training camp, on July 4, 2018, Mr. Keim was arrested and later pleaded guilty to driving under the influence of alcohol—a fireable offense showing poor judgment from a team leader.  Michael Bidwell, owner of the Cardinals, spoke to Mr. Wilks and said, in sum and substance, "I guess Steve [Keim] is that guy."

241.    On July 17, 2018, the Cardinals publicly stated that,

> Those who work within the National Football League – particularly those in leadership positions – bear a greater responsibility and are held to a higher standard than simply a legal one and we feel that these measures are reflective of that . . . this behavior is indefensible and completely unacceptable.  While Steve has accepted full accountability and responsibility for his actions, that does not diminish their gravity nor the severity of the consequences that result from them.[44]

---

[44]    See e.g. Urban, Darren, *Steve Keim Suspended Five Weeks, Fined After DUI*, AZCARDINALS.COM, (Jul 17, 2018), https://www.azcardinals.com/news/steve-keim-suspended-five-weeks-fined-after-dui.

242. But Mr. Keim kept his job. The Cardinals fined him $200,000 and he was suspended for five weeks, which had little if any ramification on Mr. Keim's career or tenure with the Cardinals.

243. Mr. Keim's arrest and suspension made an already challenging position for Mr. Wilks even more difficult. Specifically, Mr. Wilks was without a GM to weigh in on personnel decisions and make roster moves during a critical time in the preseason.

244. During these weeks, NFL teams have daily meetings among front office personnel, coaches and scouts to narrow a group of 90 players down to 53. The GM is expected to be a leader in that process. Without a GM, the Cardinals—and consequently Mr. Wilks heading into his first season as Head Coach—were at a severe disadvantage.

245. In August 2018, while Mr. Keim was supposedly suspended and not engaged in his job, star running back David Johnson stated that he was "encouraged" a deal would get done. On September 8, 2019, just after Mr. Keim's suspension was over, the Cardinals announced that Mr. Johnson signed a 3-year, $39 million contract. Clearly the negotiation was ongoing, and there is evidence of Mr. Keim's input and participation during his so-called suspension.

246. On top of everything else, Mr. Wilks was micromanaged and was unable to make personnel decisions related to his staff with the appropriate level of discretion and autonomy.

247. Notwithstanding all of the foregoing, Mr. Wilks did a tremendous job under extremely difficult circumstances.

248. According to the aforementioned executive,

> You never had a shot for success in Arizona. Even though we had minimal talent, the players had a lot of respect and admiration for how you handled the chaos that year. There isn't a human being alive that would ever be able to overcome the pressure and lack of respect that you had to deal with every day from Bidwill . . . To say your season was filled with dysfunction, would come up short. The

truth is that you earned the right to coach an NFL team, you just
showed up at a place that was in complete disarray. I apologize on
behalf of the organization and the league for how you were
scapegoated by the owner that year.

249.    As the season progressed, it was clear that the Cardinals would be in the running

for the first pick in the NFL draft.

250.    In week 13, Mr. Wilks helped lead the team to an upset victory playing on the

road against the Green Bay Packers. After the game, a colleague told Mr. Wilks that he shared

an elevator ride with Mr. Bidwill and Mr. Keim and that they were "pissed" that the Cardinals

won the game; *i.e.*, they were upset because the win might have compromised the Cardinals'

ability to obtain the first pick in the NFL draft.

251.    A few weeks later, in week 15, when the Cardinals were on the road against the

Falcons, a colleague told Mr. Wilks that Mr. Keim was openly discussing replacements for Mr.

Wilks—a humiliating lack of support for a Head Coach mid-season. Mr. Keim did this on

several other occasions, which was completely disrespectful to Mr. Wilks.

252.    On or about December 31, 2018, the Cardinals terminated Mr. Wilks after just

one season.

253.    Though the Cardinals ended up with a 3-13 record in Mr. Wilks' first season, the

team lost four games on walk-off field goals, including in the final game of the season against

the Seahawks. This goes to demonstrate how hard the team's players continued to work and play

hard for Mr. Wilks, many of whom spoke out publicly in support of him.

254.    Notably, the Cardinals ended the season with the top pick in the NFL draft and

had a pathway towards a successful future—the team was set to draft quarterback Mr. Murray

with the first pick. History tells us that, particularly given the circumstances, a white Head

Coach would have been given a second year to build upon the first. But, just like Coach Culley this past year, Mr. Wilks was never given the opportunity for a second year.

255. The Cardinals' treatment of Mr. Wilks stands in stark contrast to its treatment of Mr. Keim. Mr. Keim, who had personally chosen Mr. Rosen as the team's quarterback and had been arrested for a DUI, did not lose his job. To the contrary, he was given bogus discipline for his egregious infractions and then given a contract extension at the end of the year.

256. At the time, many felt Mr. Wilks' termination was unjust.

257. Mr. Wilks had three years and a club option remaining on his contract, and he was terminated notwithstanding the financial commitment still owed to him. In contrast, Mr. Keim's contract was one year away from expiring and it would have been a logical time to move on from an underperforming GM. However, Mr. Keim was given a four-year extension at the same time Mr. Wilks was fired.

258. ESPN published an article titled "When the Cardinals fired Steve Wilks, they fired the wrong guy" which explained all the reasons Mr. Wilks was the wrong "fall guy" even beyond those described above:

> Bidwill need not look further than Keim to figure out why the team struggled in 2018. Keim should've been the one to pack up his office on Monday, not Wilks . . . Keim has largely been the reason the Cardinals started to fall back to earth in 2016 and 2017, and why they crashed in 2018 . . . Before his DUI in July that led to a five-week suspension during training camp, there were a series of bad and head-scratching moves: From trying to underpay Calais Campbell and Tyrann Mathieu to signing veteran offensive lineman after veteran offensive lineman who either got hurt or didn't live up to their expectations, hoping for a quick fix that never came . . . Then there were the draft mistakes. Four of his first-round picks – Josh Rosen, Deone Bucannon, Haason Reddick and Nkemdiche – hardly produced this year. His 2013 first-round pick, Jonathan Cooper, was traded in 2016. Keim's only first-round pick to begin living up to expectations was tackle D.J. Humphries, who's been hampered by injuries for most of his career . . . Keim's absence during training

62

camp left Wilks on an island. Even though Wilks was able to rely on his former coach in Carolina, Ron Rivera, and other head coaches for advice, he didn't have access to his GM during the most important time for any coach, much less a first-time coach.[45]

### iii.    The Cardinals Give a White Head Coach Opportunity to Succeed

259.    Next, the Cardinals hired Mr. Kingsbury, who is white, to be the next Head Coach.  Mr. Kingsbury had no NFL coaching experience whatsoever and had just been fired by Texas Tech after amassing a losing record over six seasons.

260.    Mr. Kingsbury inherited a position where the team had the first pick in a draft with a clear consensus top quarterback to select—Mr. Murray (thus quickly abandoning Mr. Rosen who had been drafted just the year before).  Mr. Kingsbury, with the top pick at quarterback, led the team to a record of 5-10-1 in his first season, only two wins better than Mr. Wilks.

261.    But Mr. Kingsbury was not fired.  He kept his job and was given time to develop the team.  In year two, 2020, Mr. Kingsbury improved the team to 8-8, and to 11-6 and a playoff berth in 2021.  Mr. Wilks was never given close to the same opportunity.

262.    Like many other Black Head Coaches, Mr. Wilks has never been given a second opportunity to become the Head Coach of any other NFL team.

263.    Mr. Wilks is unfortunately not an anomaly or an exception to the rule.  To the contrary, the discriminatory treatment towards Mr. Wilks is just part and parcel to the ongoing pattern and practice of discrimination in the NFL when it comes to the NFL's Head Coach, Coordinator and Executive hiring and employment decisions.

---

[45]    See Weinfuss, Josh, *When the Cardinals fired Steve Wilks, they fired the wrong guy*, ESPN.COM, (Dec. 31, 2018), https://www.espn.com/blog/arizona-cardinals/post/_/id/31247/when-the-cardinals-fired-steve-wilks-they-fired-the-wrong-guy?platform=amp.

C.    **Admitted Discrimination Against Ray Horton**

    i.    **Background**

264.    Mr. Horton has been a professional football coach for almost 30 years since his NFL playing career ended and has an impeccable reputation around the League.

265.    Mr. Horton was a Defensive Backs Coach or Secondary Coach from 1994 through 2010 for the Washington Redskins (1994-1996), Cincinnati Bengals (1997-2001), Detroit Lions (2002-2003) and Pittsburgh Steelers (2004-2010).

266.    In 2011, the Cardinals hired Mr. Horton to be the team's Defensive Coordinator, and he remained in that role through the end of the 2012 season when the Head Coach was terminated.  In 2013, Mr. Horton was the Defensive Coordinator for the Cleveland Browns.  In 2014, Mr. Horton was hired to be the Defensive Coordinator of the Titans, pursuant to an employment contract (the "Horton Employment Agreement") where he remained employed through the end of the 2015 season.

267.    During these years, Mr. Horton was interviewed for several Head Coach vacancies, including the Cardinals, the Browns and Buffalo Bills.  Mr. Horton did not get any of these jobs.

    ii.    **Discrimination and Sham Interview by the Titans**

268.    During 2015 season, the Titans started the year with a 1-6 record and fired the Head Coach midway through the season.  Mike Mularkey, who had been the Titans Tight Ends Coach at the time, was named the Interim Head Coach for the remainder of the season.  The team went 2-7 over the final nine games.

269.    Following the conclusion of the season, the Titans did a series of purported interviews for the Head Coach position.  The Titans interviewed Doug Marrone (then

Jacksonville Jaguars Assistant Head Coach), Mr. Mularkey, Teryl Austin (then the Lions Defensive Coordinator) and Mr. Horton.

270.     Mr. Marrone had been the first interview candidate earlier in the week starting Monday, January 11, 2016.  It was reported that Mr. Mularkey was interviewed by the Titans on Friday, January 15, 2016.  Following Mr. Mularkey's interview, the Titans interviewed Mr. Austin later that same day.

271.     Also, that same day, Friday, January 15, 2016, Mr. Underwood called Mr. Horton—who was home in Phoenix at the time—and asked him to immediately get on a flight to Tennessee to interview for the Head Coach job the next day.

272.     The urgency of the request was, so Mr. Horton was told, due to the fact that Titans owner Amy Adams Strunk's (the controlling owner of the Titans) granddaughter was competing in an equestrian event for which she had to get to Tampa, Florida on Saturday.  Thus, Mr. Horton took a red-eye flight on little notice to interview for the Titans Head Coach position the next day, January 16, 2016.

273.     As Mr. Horton now understands, the rush to interview him was an orchestrated attempt to make it appear that the Titans had complied with the Rooney Rule and otherwise appear to have given an equal opportunity to Black candidates so the team could announce the pre-made decision to hire Mr. Mularkey as Head Coach.

274.     On Saturday, January 16, 2016, Mr. Horton met with Ms. Adams, Kenneth Adams (another Owner), Jon Robinson (General Manager), Steve Underwood (President) and Vin Marino (Vice President of Football Administration).  Every member of this group is white.

275.     The interview was at the Titans practice facility.  Mr. Horton was very familiar with it having been the Defensive Coordinator for two years.  Mr. Horton described numerous

ideas he had which would all help reinforce a positive and hard-working culture—from the football field to the locker room to the parking lot. Mr. Horton described the way he would motivate players and be personally accessible and accountable to the team.

276.    At one point during the interview, Mr. Adams said to Mr. Horton, "We've gotta have you." Others in the meeting nodded their heads in agreement, though not Ms. Adams.

277.    When Mr. Horton was leaving the facility after the conclusion of the interview, he ran into Mr. Mularkey walking into the office. Mr. Horton, of course, knew Mr. Mularkey well having coached with him over the previous two years. However, Mr. Horton thought Mr. Mularkey's presence was odd given that he had been interviewed just the day before and because Mr. Horton had been told that Ms. Adams had to leave in order to fly to Florida.

278.    Later that day, Mr. Underwood called Mr. Horton to let him know that the Titans decided to hire Mr. Mularkey. Mr. Underwood told him that the interview was "outstanding," and everyone was "very impressed."

279.    Years later, on or about October 21, 2020, after Mr. Mularkey was no longer coaching in the NFL, Mr. Mularkey was interviewed for a podcast called Steelers Realm. Mr. Mularkey was asked, "Well Mike if you could turn back the clock where would you—you probably hate these questions—but would there be anything during your coaching career that you might have done differently or changed?"

280.    Mr. Mularkey responded *verbatim*:

> That's a good question. I will tell you guys this, I've always prided myself on doing the right thing in this business and I can't say that's true about everyone in this business. It's a very cutthroat business, and a lot of guys will tell you that. But I allowed myself at one point when I was in Tennessee to get caught up in something I regret, and I still regret it, but the ownership there Amy Adams Strunk and her family came in and told me I was going to be the head coach in 2016, before they went through the Rooney rule. And so I sat there

66

knowing I was the head coach in 2016, as they went through this fake hiring process knowing, knowing a lot of the coaches that they were interviewing, knowing how much they prepared to go through those interviews, knowing that everything they could do and they had no chance to get that job. And actually, the GM Jon Robinson, he was in an interview with me. He had no idea why he is interviewing me, that I have a job already. I regret it, cause I pride myself and my kids first to do the right thing, and I always said that to the players. And here I am the head guy not doing it, and I regretted it since then. It was the wrong thing to do. I am sorry I did that, but it was not the way to do that. Should have been interviewed like everybody else and got hired cause of the interview not early on. So that is probably my biggest regret.

281.    Mr. Mularkey admitted that he knew the job was his before he was interviewed and that the minority candidates interviewed as part of the process were subjected to sham interviews for the Head Coach position in order to comply with the Rooney Rule and/or create an appearance of a non-discriminatory process.

282.    The Titans affirmatively misrepresented to Mr. Horton that he had a legitimate chance at the Head Coach position. The Titans also withheld from Mr. Horton and omitted material information: namely, that the interview was illegitimate and a decision to hire Mr. Mularkey had already been made before Mr. Horton's interview.

283.    The Titans, and Ms. Adams in particular, humiliated and disrespected Mr. Horton by subjecting him to a blatantly sham interview due to his race.

284.    Mr. Horton's interview with the Titans was his last interview for a Head Coach position. Upon information and belief, after having gone through several Head Coach interviews and not getting any position and being close to 60 years old at the time, after the Titan's interview process, Mr. Horton was viewed as a "stale" candidate and was not offered any further Head Coach interviews.

## V.     OTHER NOTABLE RECENT EXAMPLES OF DISCRIMINATORY CONDUCT

### A.     The Hiring of Steve Mariucci

285.     In 2003, soon after the Rooney Rule was adopted, the Lions were looking for a Head Coach, and team president Matt Millen made it clear that the team expected to hire Steve Mariucci.

286.     Likely because the Lions' intention to hire Mr. Mariucci was made so well known, five minority coaching candidates, including Dennis Green (who had a 97-62 record as the Head Coach of the Minnesota Vikings for 10 seasons), understandably turned down interviews.

287.     Similar to the Giants with Mr. Flores, the Lions were looking to interview Black candidates not because of any genuine intent to give any of them a fair shot at the job.  It was only an attempt to engage in false compliance with the Rooney Rule.

288.     The NFL determined that the Rooney Rule had been violated and fined the team a paltry $200,000.

### B.     Jim Caldwell Fired After Winning Seasons and Replaced by White Coaches

289.     In 2009, Jim Caldwell was hired as the Indianapolis Colts (the "Colts") Head Coach.

290.     The team went 14-2 in his first year and made it to the Super Bowl, followed by a 10-6 record and the AFC South division title for a second year in a row—a total record of 27-8 over his first two seasons.

291.     The following year Colts lost starting quarterback Peyton Manning, around whom the entire team had been built, and the team fell to 2-14.

292.    Despite his past success and the justifiable reasons for this poor record in one season out of three, Mr. Caldwell was fired.

293.    In 2014, the Lions hired Mr. Caldwell.

294.    In his first year the team went 11-5, a four-game improvement from the previous year.  The Lions fell to 7-9 in 2015 but rebounded to 9-7 in 2016 and made it to the playoffs. The Lions were 9-7 again in 2017 but missed the playoffs.  Thus, Mr. Caldwell had three winning seasons in four years—for one of the historically worst franchises in the NFL.

295.    He had an aggregate record of 36-28, a winning percentage of .563—the best winning percentage of any Lions Head Coach since the 1950s.  The Lions also had two playoff berths in four seasons, as compared to one playoff appearance in the previous 14 seasons.

296.    Nonetheless, Mr. Caldwell was fired the day after his fourth season.

297.    The Lions have gone 17-46 since his departure with only white Head Coaches, including no playoff appearances and no season with any greater than six wins.

298.    In the more than three years since losing the Lions job, Mr. Caldwell has not received any further opportunities as a Head Coach, despite numerous openings and interviewing no fewer than five times for different positions.

299.    In fact, in 2019, Coach Caldwell interviewed for the New York Jets opening and lost out on the job to Adam Gase, who had two losing seasons in Miami.  He also interviewed that year for the Cardinals opening after Mr. Wilks was fired and lost out on the job to the far less experienced Mr. Kingsbury, who had just been fired in the college ranks.  Both teams clearly hired a Head Coach with an offensive-minded background, just like Mr. Caldwell, though with significantly less experience including at the Head Coach level.  This begs the question why Mr. Caldwell lost out on both these jobs in favor of less experienced white candidates.

69

### C.     Discriminatory Treatment of Mr. Culley

300.    David Culley has been a collegiate and NFL coach for more than 45 years, including 27 years in the NFL.

301.    Despite his reputation and success, Mr. Culley was never hired into an Offensive or Defensive Coordinator position.

302.    However, in January 2021, the Texans hired Mr. Culley to be Head Coach, though it was widely considered to be one of the most difficult situations for a first-year Head Coach in memory.

303.    The previous season, the Texans went 4-12 despite having Pro Bowl quarterback Deshaun Watson start every game, throw 33 touchdowns against only seven interceptions and end with a passer rating of 112.4.

304.    However, Mr. Watson was unavailable to play due to allegations of sexual misconduct, and Mr. Culley was forced to start Davis Mills, a rookie third-round draft pick, at quarterback. The team had also lost its top two players in recent years, J.J. Watt and DeAndre Hopkins.

305.    Mr. Culley's prospects for success were nearly impossible, but Mr. Culley managed to coach the team to the same record as the team had its previous season.

306.    Immediately after the season ended, the Texans fired Mr. Culley without explanation other than vague "philosophical differences"—which begs the question why he was hired just one year earlier in the first place.

307.    Even the Texans GM acknowledged that, "a change after one season is unusual."

### D.     No Opportunities Provided to Kris Richard

308.    Kris Richard has been a collegiate and NFL coach for more than 10 years.

309. He boasts an impressive resume, including being instrumental in the formation of the Seahawks "Legion of Boom," as both a Secondary Coach and Defensive Coordinator, in the mid-2010s.

310. He was also very successful as a Defensive Assistant for the Dallas Cowboys and New Orleans Saints.

311. Mr. Richard had five Head Coach interviews during the 2018 and 2019 hiring cycles and received no offers.

312. Meanwhile, six white Head Coaches were hired in 2018 and another six were hired in 2019.

313. Mr. Richard was reportedly not interviewed at all during the 2020 cycle, and it seems now that he is being considered only for Defensive Coordinator positions.

**E.     Teryl Austin Never Given a Chance**

314. Teryl Austin has been a collegiate and NFL coach for more 30 years.

315. After success with the Seahawks, Baltimore Ravens and Lions, Mr. Austin was interviewed for no fewer than 10 open Head Coach positions.  He was rejected for each one.

316. Following the 2016 hiring cycle, Mr. Austin stated that only two of the four interviews he engaged in that year felt like "legitimate interviews" where he had a "legitimate shot at the job."  He was asked in a follow-up question whether his saying two of the job interviews were "legitimate," meant he believed the other two were "Rooney Rule interviews." Mr. Austin said: "Take it however you want."

317. As noted above, Mr. Austin was interviewed by the Titans for a Head Coach position that had already been promised to Mr. Mularkey.

F.    **Eric Bieniemy Cannot Get a Head Coach Job**

318.    Eric Bieniemy has been a highly successful NFL coach for almost 12 years and has yet to be offered a Head Coach position despite more than 70 vacancies during that time.

319.    In high school, Mr. Bieniemy was a second team All-American and went on to play at the University of Colorado.  In 1990, his senior year, he was the nation's second leading rusher with 1,628 years and 17 touchdowns, and he finished third in Heisman Award voting.

320.    Mr. Bieniemy was drafted in the second round of the NFL draft and played in the League for nine seasons, until 1999.

321.    After going back to college to complete his degree, Mr. Bieniemy then took jobs as the Running Back Coach at Colorado for two years and at UCLA for three years.

322.    In 2005, following a 9-2 season concluding with a win in the Sun Bowl, Mr. Bieniemy accepted a position as Running Back Coach for the Minnesota Vikings (the "Vikings").

323.    During his tenure, the team's lead running back, Adrian Peterson, led the National Football Conference ("NFC") in rushing in 2007 and 2008.

324.    In 2010, Mr. Bieniemy was named the Vikings' Assistant Head Coach for the offense.

325.    In 2011, Mr. Bieniemy returned to Colorado as Offensive Coordinator, only to return to the NFL two years later as the Running Back Coach for the Chiefs.

326.    In 2018, Mr. Bieniemy was promoted to Offensive Coordinator.  In Mr. Bieniemy's first season as Offensive Coordinator, the Chiefs were first in the NFL in yards per game and scored the third-most points in a season in NFL history.  Chiefs quarterback Patrick

Mahomes became only the second quarterback in NFL history, along with Peyton Manning, to throw for 5,000 yards and 50 touchdowns in a season.

327. In 2018, the Chiefs advanced to the American Football Conference ("AFC") Championship Game where they lost to the Tom Brady-led New England Patriots.

328. In 2019, Mr. Bieniemy won his first Super Bowl with the Chiefs. In 2020 and 2021, Mr. Bieniemy again helped lead the Chiefs to the AFC Championship Game and, in 2020, the Super Bowl.

329. Without question, Mr. Bieniemy has the pedigree, track record and reputation to make him a sought-after Head Coach. However, despite being interviewed for approximately 20 vacant positions over the last five years, no team has extended Mr. Bieniemy an offer.

330. During this time, numerous white candidates who are clearly less qualified have taken over the Head Coach duties for numerous NFL teams.

331. Mr. Bieniemy's inability to land a Head Coach job stands in stark contrast to his immediate predecessor Offensive Coordinators serving under Chiefs Head Coach Andy Reid—Doug Pederson and Matt Nagy. Mr. Pederson served as Offensive Coordinator for four years until he obtained the Eagles Head Coach job, and was recently hired by the Jacksonville Jaguars for his second job as a Head Coach. Mr. Nagy served as Mr. Reid's Offensive Coordinator for two years before landing the Chicago Bears Head Coach position. Mr. Bieniemy has been Offensive Coordinator for the Chiefs for four years during which time the team has enjoyed incredible success, going 50-15 and making it to at least the AFC Conference Game each year. However, in contrast to Mr. Pederson and Mr. Nagy, no NFL team has been willing to offer Mr. Bieniemy a Head Coach job.

### G.    GM McKenzie Pushed Out by the Raiders

332.    As mentioned *supra*, the Raiders' 2018 hiring of Mr. Gruden—who is documented to harbor discriminatory animus—occurred in close succession with the Raiders' firing of General Manager, Mr. McKenzie.

333.    Mr. McKenzie was one of the few Black General Managers in the League.  Although Mr. McKenzie was hired into an extraordinarily difficult GM situation in 2012—the Raiders were over the salary cap, without substantial player talent and had traded away numerous top draft picks—within a few years Mr. McKenzie had drafted a franchise quarterback (Derek Carr) and helped lead the team to a 12-4 record and playoff berth by 2016.  After the 2016 season, Mr. McKenzie was named the NFL Executive of the Year by the Pro Football Writers of America.

334.    Only two years later, Raiders ownership made the decision to pay $100 million dollars to John Gruden to bring him in as Head Coach.  This decision was clearly made by ownership, not by Mr. McKenzie.  Within months, in December 2018, Mr. McKenzie was pushed out and fired.

335.    Mr. Gruden quickly replaced Mr. McKenzie with a white candidate, Mike Mayock.  Though Mr. McKenzie was an experienced and award-winning executive, Mr. Maycock had never worked in the front office of any NFL team or any professional or college football team in his career.  Mr. Maycock previously had an approximate 18-year career working in commercial real estate, followed by a tenure working in football broadcasting.

336.    In addition to Mr. Gruden's stated animus towards Black people and his replacement of Mr. McKenzie with a less qualified white candidate, the racial composition of the Raiders' players changed during this time as well.  Under Mr. McKenzie, the Raiders had the

74

highest percentage of Black players at 82.3%. However, under all-white leadership (Owner, General Manager and Head Coach), the percentage of Black players decreased year-over-year. By 2021, the percentage of Black players on the Raiders roster dropped to 67.2%.

## VI. THE NFL IS AN EMPLOYER AND/OR JOINT EMPLOYER AND/OR OSTENSIBLE EMPLOYER

337.     The NFL is an employer, constructive employer, joint employer and/or ostensible employer of all members of the Proposed Class including, without limitation, the Named Plaintiffs.

338.     The NFL directly asserts and exerts control over the terms and conditions of employment of the members of the Proposed Class including the Named Plaintiffs through, *inter alia*, the express terms of their employment contracts; the NFL's Constitution and Bylaws; additional NFL rules, policies, practices and decisions; and the NFL's governing relationship over all the member teams. In effect, the NFL is the consolidated and centralized control of the labor relations over the Proposed Class.

339.     The NFL and the NFL teams have complete interrelation of ownership, management, operations and financial control. Under the NFL Constitution and Bylaws, the NFL exists at the behest of and is completely controlled by the NFL teams. The stated purpose of the NFL is to "promote and foster the business of the League members [teams]."[46]

340.     The NFL Constitution and Bylaws provide that the League has an Executive Committee made up of a representative from each member team. The NFL Executive

---

[46]     See *Constitution and Bylaws of the National Football League*, NATIONAL FOOTBALL LEAGUE, (Feb. 1, 1970 (2006 Rev.), https://www.onlabor.org/wp-content/uploads/2017/04/co_.pdf.

Committee has an array of powers, including, but not limited to, imposing fines on any employee of any NFL team, such as the members of the Proposed Class.

341.    The Commissioner of the NFL serves at the behest and direction of the NFL's member teams.  The NFL member teams determine the appointment and retention of the Commissioner at all times.  The NFL Constitution and Bylaws provide for the Commissioner to assert financial control over the interests of the NFL and enter into contracts on behalf of the member organizations.

342.    Among the Commissioner's powers with respect to the Proposed Class are to resolve disputes between members of the Proposed Class and teams, discipline members of the Proposed Class up to and including fines and termination of employment, cancel the contracts of the Proposed Class members and ban members of the Proposed Class from the NFL.  The Commissioner also has the power to approve or disapprove contracts between teams and members of the Proposed Class.

343.    The NFL through, *inter alia*, its Constitution and Bylaws, dictates numerous aspects of the terms and conditions of employment for the Proposed Class, including eight pages of "Prohibited Conduct" and numerous other obligations contained throughout the Constitution and Bylaws.

344.    The NFL's status as an employer is further clear from the express terms of the employment contracts of the members of the Proposed Class.  The following are representative examples—from Mr. Flores' contract with the Dolphins, Mr. Wilks' contract with the Cardinals and Mr. Horton's contract with the Titans—demonstrating control by the NFL.

345.    Mr. Flores' contract with the Dolphins demonstrates the NFL's control over the terms and conditions of his employment and the NFL's status as an employer:

76

- The Flores Employment Agreement includes a signature line specifically for the NFL Commissioner;

- The Flores Employment Agreement had to be approved by the NFL Commissioner;

- The NFL Commissioner did approve and execute the Flores Employment Agreement;

- The Flores Employment Agreement references the team's membership in the NFL throughout;

- Nothing in the Flores Employment Agreement disclaims that the NFL is an employer;

- The Flores Employment Agreement expressly required Mr. Flores to be bound by NFL "policies, rules and procedures;"

- The Flores Employment Agreement expressly required Mr. Flores to be bound by NFL "hiring practices;"

- The Flores Employment Agreement expressly required Mr. Flores to be bound by NFL "employment practices;"

- The Flores Employment Agreement expressly required Mr. Flores to affirm that he "reviewed, understands and agrees at all times with, and to be bound by, the Constitution, Bylaws and the Rules and Regulations of the NFL;"

- The Flores Employment Agreement expressly states that the NFL Constitution, Bylaws and the Rules and Regulations are expressly made a "part of" the Employment Agreement;

- The Flores Employment Agreement expressly states that "the decisions of the Commissioner of the NFL" are made a "part of" the Flores Employment Agreement;

- The Flores Employment Agreement expressly states that Mr. Flores was contractually obligated to wear clothing on game day as provided and approved by NFL and which typically contain an NFL logo;

- The Flores Employment Agreement expressly states that the team could terminate Mr. Flores' employment for cause if they violate any NFL "rule, regulation, constitutional

J.A. 158

provision or by-law" which "impugns the image of the . . . NFL;"

- The Flores Employment Agreement expressly states that the NFL Commissioner has the authority as arbitrator to determine all disputes involving Mr. Flores' employment;

- The Flores Employment Agreement expressly states that the Flores Employment Agreement was governed by NFL rules and the Commissioner of the NFL.

346. Mr. Wilks' contract with the Cardinals demonstrates the NFL's control over the terms and conditions of his employment and the NFL's status as an employer:

- The Wilks Employment Agreement includes a signature line specifically for the NFL Commissioner;

- The Wilks Employment Agreement was subject to approval by the NFL Commissioner;

- The NFL Commissioner did approve and execute the Wilks Employment Agreement;

- The Wilks Employment Agreement specifically states in the opening preamble that it is an agreement between Mr. Wilks and the Cardinals as "a member of the National Football League" and thereafter references the team's membership in the NFL throughout;

- Nothing in the Wilks Employment Agreement disclaims that the NFL is an employer;

- The Wilks Employment Agreement expressly required Mr. Wilks to "perform duties and responsibilities relating to the Club's business as a member of the NFL;"

- The Wilks Employment Agreement expressly permitted Mr. Wilks to engage in speaking and promotional activities for the NFL without any prior notice or consent of the Cardinals;

- The Wilks Employment Agreement required Mr. Wilks not to disparage or defame the NFL or any of the member teams or their owners;

J.A. 159

- The Wilks Employment Agreement required Mr. Wilks to comport himself on and off the field in a manner that would not reflect adversely upon the NFL;

- The Wilks Employment Agreement expressly states that Mr. Wilks was contractually obligated to wear clothing on game day as provided and approved by NFL and which typically contain an NFL logo;

- The Wilks Employment Agreement required Mr. Wilks to "comply with the policies, standards and/or regulations of the . . . NFL , or the Commissioner of the NFL;"

- The Wilks Employment Agreement required Mr. Wilks to "comply with the directions by the . . . NFL, or the Commissioner of the NFL;"

- The Wilks Employment Agreement required Mr. Wilks to be "comply at all times with, and be bound by, the Constitution and Bylaws and rules and regulations of the NFL;"

- The Wilks Employment Agreement states that Mr. Wilks would be bound by "the decisions of the Commissioner [of the NFL], which decisions shall be final, conclusive and unappealable;"

- The Wilks Employment Agreement states that Mr. Wilks would "not engage in or perform any acts or omissions that are prohibited by the Constitution and Bylaws of the NFL, by the policies, rules and regulations of the NFL . . . or by any decisions of the Commissioner;"

- The Wilks Employment Agreement expressly states that the NFL Commissioner had the authority as arbitrator to determine all disputes involving Mr. Wilks' employment.

347. Mr. Horton's contract with the Titans demonstrates the NFL's control over the terms and conditions of his employment and the NFL's status as an employer:

- The Horton Employment Agreement includes a signature line specifically for the NFL Commissioner;

- The Horton Employment Agreement was subject to approval by the NFL Commissioner;

79

- The NFL Commissioner did approve and execute the Horton Employment Agreement;

- The Horton Employment Agreement specifically states that part of Mr. Horton's job duties was to abide by all "NFL Rules, including without limitation, the Constitution and By-Laws of the NFL; the rules, regulations and policies of the NFL; and the pronouncements, rulings arbitration decisions and directives of the Commissioner of the NFL;"

- The Horton Employment Agreement permitted Mr. Horton to do outside instructional clinics and seminars only so long as such did not violate any NFL rules;

- The Horton Employment Agreement expressly stated that Mr. Horton was contractually obligated to wear clothing on game day as provided and approved by NFL and which typically contain an NFL logo;

- The Horton Employment Agreement required Mr. Horton to "strictly adhere" to all NFL rules;

- The Horton Employment Agreement required Mr. Horton to "conduct [him]self . . . in a manner that reflects positively upon . . . the NFL;"

- The Horton Employment Agreement required Mr. Horton to "acknowledge that public acceptance of . . . the NFL . . . depends in part on perception Titans' employees and their conduct at all times;"

- The Horton Employment Agreement required Mr. Horton to "acknowledge that . . . conformity to NFL [rules] . . . are of great importance to . . . the NFL;"

- The Horton Employment Agreement was subject to termination for violation of NFL rules;

- The Horton Employment Agreement required Mr. Horton to "agree at all times to comply and be bound by all of the provisions of the constitution and By-Laws and Rules and Regulations of the NFL . . . and by the decisions of the Commissioner of the NFL;"

- The Horton Employment Agreement states that under the NFL Constitution and Bylaws, Mr. Horton had an "obligation to communicate openly and candidly with the [Titans CEO];"

- The Horton Employment Agreement states that Mr. Horton could be subject to discipline for violation of the NFL rules;

- The Horton Employment Agreement provided that the NFL could control whether Mr. Horton could seek or entertain alternate employment during the period of his employment with the Titans.

348.    Upon information and belief, all contracts for members of the Proposed Class contain substantially similar provisions to those in the Named Plaintiffs' contracts referenced above demonstrating the NFL's status as employer and control over the terms and conditions of employment.

349.    In fact, pursuant to the NFL's Constitution and Bylaws, the NFL member teams do not even have discretion to deviate or opt-out from the NFL's level of control.  The NFL's Constitution and Bylaws require that such employment contracts be subject to Commissioner approval and that such employees agree to comply with NFL policies, rules and regulations.

350.    As set forth above, the NFL and the Commissioner also exert control over the hiring processes of the individual teams, and the individual teams agree to such control by the NFL, including, but not limited to, the implementation, review and enforcement of the Rooney Rule.

351.    The control that the NFL and the Commissioner exert over the hiring, retention and termination, as well as the ongoing terms and conditions of employment, of Plaintiffs and the members of the Proposed Class is exerted in and from New York City, New York.  The NFL's conduct in that regard has an impact across New York state and city.  As such, Plaintiffs and the members of the Proposed Class were, at all relevant times, employees or prospective

employees within the state and city of New York. Moreover, Plaintiffs and the members of the Proposed Class regularly worked within the state of New York, including, *inter alia*, in connection with interactions with the NFL, as well as football games played in Buffalo, New York.

352. Pursuant to the Rooney Rule, the NFL asserts control over the manner and method with which NFL teams interview for and hire, *inter alia*, Head Coach, Defensive and Offensive Coordinators, Quarterbacks Coaches and General Managers. In addition to the Rooney Rule, the NFL has promulgated additional requirements in connection with the hiring of coaches. By way of example only, the NFL just implemented a requirement that teams must hire at least one minority assistant coach on the offensive side of the football team for the upcoming 2022 NFL season.

353. The NFL teams clearly collude and act in concert with one another as a single enterprise to maintain the status quo. Not only have NFL teams collectively engaged in conduct which has resulted in massive under-representation of Black coaches and executives, but the NFL clearly colluded to ensure that Mr. Kaepernick did not obtain further NFL employment after he protested racial injustice.

354. Furthermore, amid numerous accusations that the NFL engages in systemic discrimination in its hiring, retention and firing practices with respect to coaches and executives, the NFL has not stated to the public or members of the Proposed Class that it is not an employer or that it is not responsible for the hiring, retention and firing decisions of the teams.

355. To the contrary, the NFL has stated that the allegations in this action are "without merit," implying that the NFL is directly aware of team hiring, retention and firing decisions such that it can make such an affirmative and informed statement.

356.     The Named Plaintiffs all reasonably believed that the NFL was their employer together with their respective member team employer.  To the extent the NFL claims that it is not an employer to the members of the Proposed Class, the NFL was and remains negligent in allowing the Proposed Class to maintain such reasonable belief and failing to take appropriate actions to dispel the Proposed Class of that belief.

357.     The NFL knows or should know that the members of the Proposed Class believe themselves to be employed by the NFL and/or jointly employed by the NFL and their respective teams due to, *inter alia*, the reasons set forth above.

## RULE 23 CLASS ACTION ALLEGATIONS

### I.     CLASS DEFINITION

358.     This is a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23, brought by Plaintiffs on behalf of a Proposed Class of similarly situated employees.  The Proposed Class (subject to future revision as may be necessary), is defined as follows:

> **All Black Head Coach, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, and Black candidates for those positions during the applicable statute of limitations period**

359.     The unlawful conduct suffered by Plaintiffs and the members of the Proposed Class includes, but is not limited to, commonly experienced acts of discriminatory disparate treatment and disparate impact:

- Members of the Proposed Class have been discriminatorily denied positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers;

- Members of the Proposed Class have been discriminatorily subjected to sham and illegitimate interviews;

- Members of the Proposed Class have been subjected to discriminatory retention practices and/or termination decisions;

- Members of the Proposed Class have been subjected to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to professional reputation; and

- Members of the Proposed Class have been subjected to unequal compensation relative to their white peers.

360.     Upon information and belief, the Proposed Class contains more than 40 members during the applicable limitations period.

361.     Plaintiffs and the Proposed Class have standing to seek such relief because of the adverse effects that Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

362.     The patterns, practices and/or policies described in this Complaint demonstrate that discrimination is not unusual at the NFL; rather, it is part and parcel to the League's standard operating patterns, practices and/or policies.

## II.     <u>NUMEROSITY AND IMPRACTICALITY OF JOINDER</u>

363.     The members of the Proposed Class are sufficiently numerous to make joinder of their claims impracticable.

364.     The exact number of Proposed Class members is unknown because such information is in the exclusive control of Defendants and requires discovery.

365.     Upon information and belief, there are more than 40 current, former and prospective members of the Proposed Class who have been subjected to the discriminatory conduct described herein.

J.A. 165

366. Although precise determination of the number of Proposed Class members is immeasurable at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.  COMMON QUESTIONS OF LAW AND FACT

367. The claims alleged on behalf of Plaintiffs and the Proposed Class raise questions of law and fact common to all Plaintiffs and Proposed Class members.  Among these questions are:

    a.    Whether members of the Proposed Class have been denied positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, and whether race and/or color played motivating factor in those decisions;

    b.    Whether members of the Proposed Class have been discriminatorily subjected to sham and illegitimate interviews due in whole or part to their race and/or color;

    c.    Whether members of the Proposed Class have been subjected to discriminatory retention practices and/or termination decisions in whole or part due to race and/or color;

    d.    Whether members of the Proposed Class have been subjected to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to professional reputation, due in whole or part to race and/or color;

    e.    Whether members of the Proposed Class have been subjected to unequal compensation relative to their white peers, and whether this is due in whole or part to race and/or color;

    f.    Whether members of the Proposed Class have been victimized by policies and practices of the NFL and its teams that have created a disparate impact with respect to hiring members of the Proposed Class;

g.     Whether members of the Proposed Class have been victimized by policies and practices of the NFL and its teams that have created a disparate impact with respect to the retention of members of the Proposed Class;

h.     Whether members of the Proposed Class have been victimized by policies and practices of the NFL and its teams that have created a disparate impact with respect to the termination of members of the Proposed Class;

i.     Whether the NFL is complicit, has participated in, and/or has aided and abetted the NFL teams in the discriminatory treatment of the members of the Proposed Class;

j.     Whether the NFL and/or the NFL teams collectively engage in discriminatory practices towards the members of the Proposed Class; and

k.     Whether the NFL and/or the NFL teams engage in conduct that has a discriminatory impact on the members of the Proposed Class.

368.    Thus, the common question requirement of FRCP 23(a) is satisfied.

## IV.   TYPICALITY OF CLAIMS AND RELIEF SOUGHT

369.    Plaintiffs are members of the Proposed Class they seek to represent.

370.    The claims of Plaintiffs are typical of the claims of the Proposed Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendants, and are based on the legal theories, including disparate treatment and impact theories, that these patterns, practices and/or policies violate legal rights.

371.    Plaintiffs and the members of the Proposed Class all allege that they each are the victims of unlawful adverse employment decisions and/or treatment based on race and/or color.

372.    The relief that Plaintiffs seek as a result Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Class.

373.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.    ADEQUACY OF REPRESENTATION

374.    The interests of Plaintiffs are co-extensive with those of the Proposed Class they seek to represent in the instant case.

375.    Plaintiffs are willing and able to represent the Proposed Class fairly and vigorously as they pursue their similar individual claims.

376.    Plaintiffs have retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

377.    The combined interests, experience and resources of Plaintiffs and their counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    REQUIREMENTS OF RULE 23(b)(1)

378.    Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

379.    Specifically, all evidence of Defendants' patterns, practices and/or policies and the issue of whether they are in violation of the law would be exchanged and litigated repeatedly.

380.    Accordingly, certification of the Proposed Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Proposed Class and Defendants.

381.    By filing this Complaint, Plaintiffs are preserving the rights of Proposed Class members with respect to the statute of limitations on their claims.  Therefore, not certifying a

J.A. 168

class would substantially impair and/or impede the other members' ability to protect their interests.

## VII.  REQUIREMENTS OF RULE 23(b)(2)

382.    Defendants have acted on grounds, described herein, generally applicable to Plaintiffs and the members of the Proposed Class, by adopting and following systemic patterns, practices and/or policies that are discriminatory toward the Proposed Class.

383.    These discriminatory acts are fostered by Defendants' standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Proposed Class as a whole, including the declaratory and injunctive relief outlined in Section A of the Prayer for Relief.

384.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination based on race and/or color committed against the Proposed Class.

385.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs and the Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination.

386.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

## VIII.  REQUIREMENTS OF RULE 23(b)(3)

387.    The common issues of fact and law affecting Plaintiffs' claims and those of the Proposed Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

388.     A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the Proposed Class.

389.     The cost of proving Defendants' pattern and practice of discrimination makes it impracticable for the members of the Proposed Class to pursue their claims individually.

390.     The class action will not be difficult to manage for reasons, including, but not limited to, the discrete organizational nature of the Proposed Class, as well as the common questions of law and fact described above.

## FIRST CAUSE OF ACTION
### (Disparate Treatment Discrimination under Section 1981)
### *On Behalf of Plaintiffs and the Proposed Class*
*As to all Defendants*

391.     Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

392.     As described above, Defendants have discriminated against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of Section 1981 by (i) discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii) discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting Proposed Class members to disparate terms and conditions of employment, including, but not limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed Class members to unequal compensation relative to their white peers.

393.     Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

89

394. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

395. Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of Section 1981 for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Disparate Treatment Discrimination under NYSHRL)
### *On Behalf of Plaintiffs and the Proposed Class*
*As to all Defendants*

396. Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

397. As described above, Defendants have discriminated against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of the NYSHRL by (i) discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii) discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting Proposed Class members to disparate terms and conditions of employment, including, but not limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed Class members to unequal compensation relative to their white peers.

398. Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color. Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

399. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYSHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

400. Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NYSHRL for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Disparate Impact Discrimination under NYSHRL)**
***On Behalf of Plaintiffs and the Proposed Class***
*As to all Defendants*

401. Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

402. As described above, Defendants have engaged in hiring and retention policies, practices and/or processes which have had a discriminatory impact against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of the NYSHRL. Defendants' conduct which has a discriminatory impact is not a business necessity and other methods exist which will not have a discriminatory effect.

403. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYSHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

404. Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NYSHRL for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Disparate Treatment Discrimination under NYCHRL)**
*On Behalf of Plaintiffs and the Proposed Class*
*As to all Defendants*

405.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

406.    As described above, Defendants have discriminated against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of the NYCHRL by (i) discriminatorily denying Proposed Class members positions as Head Coaches, Offensive and Defensive Coordinators and Quarterbacks Coaches, as well as General Managers, (ii) discriminatorily subjecting them to sham and illegitimate interviews, (iii) subjecting Proposed Class members to discriminatory retention practices and/or termination decisions, (iv) subjecting Proposed Class members to disparate terms and conditions of employment, including, but not limited to, lack of opportunity and harm to professional reputation and (v) subjecting Proposed Class members to unequal compensation relative to their white peers.

407.    Defendants have fostered, condoned, accepted, ratified and/or otherwise failed to prevent or remedy discriminatory conduct due to race and/or color.  Each Defendant has actually participated in and aided and abetted the discriminatory conduct of the other Defendants.

408.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYCHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

409.    Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NYCHRL for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Disparate Impact Discrimination under NYCHRL)
#### *On Behalf of Plaintiffs and the Proposed Class*
*As to all Defendants*

410.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

411.    As described above, Defendants have engaged in hiring and retention policies, practices and/or processes which have had a discriminatory impact against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of the NYCHRL.  Defendants' conduct which has a discriminatory impact is not a business necessity and other methods exist which will not have a discriminatory effect.

412.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYCHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which they are entitled to an award of damages.

413.    Defendants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NYCHRL for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Disparate Treatment Discrimination under NJLAD)
#### *On Behalf of Plaintiff Brian Flores*
*As to Defendant the Giants*

414.    Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

415.    As described above, the Giants have discriminated against Mr. Flores by failing to hire him because of his race and subjecting him to a sham interview process.

416.     As a direct and proximate result of the Giants' unlawful discriminatory conduct in violation of NJLAD, Mr. Flores suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

417.     The Giants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NJLAD for which Mr. Flores is entitled to an award of punitive damages.

### SEVENTH CAUSE OF ACTION
**(Disparate Impact Discrimination under NJLAD)**
***On Behalf of Plaintiff Brian Flores***
*As to Defendant the Giants*

418.     Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

419.     As described above, Defendant NFL and the Giants have engaged in hiring and retention policies, practices and/or processes which have had a discriminatory impact against Mr. Flores on the basis of race and/or color in violation of the NJLAD.  Defendant NFL and the Giants' conduct which has a discriminatory impact is not a business necessity and other methods exist which will not have a discriminatory effect.

420.     As a direct and proximate result of Defendant NFL and the Giants' unlawful discriminatory conduct in violation of NJLAD, Mr. Flores has suffered, and continue to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

421.     Defendant NFL and the Giants' unlawful discriminatory actions constitute reckless, malicious, willful and wanton violations of NJLAD for which Mr. Flores is entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION
### (Retaliation under Section 1981)
### *On Behalf of Plaintiff Brian Flores*
*As to Defendants the Texans and Dolphins*

422.     Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

423.     As described above, the Texans has retaliated against Mr. Flores in violation of Section 1981 by failing to hire him to be the team's Head Coach because he filed this lawsuit and opposed discrimination prohibited under Section 1981.

424.     As described above, the Dolphins has retaliated against Mr. Flores in violation of Section 1981 by filing a demand for arbitration against him in connection with a purported obligation that he repay hundreds of thousands of dollars of earned compensation because he filed this lawsuit and opposed discrimination prohibited under Section 1981.

425.     As a direct and proximate result of the unlawful retaliatory conduct taken by the Texans and Dolphins in violation of Section 1981, Mr. Flores has suffered, and continues to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

426.     The unlawful retaliatory conduct taken by the Texans and Dolphins constitutes reckless, malicious, willful and wanton violations of Section 1981 for which Mr. Flores is entitled to an award of punitive damages.

## NINTH CAUSE OF ACTION
### (Retaliation under the Florida Private Whistleblower Statute)
### *On Behalf of Plaintiff Brian Flores*
*As to Defendant the Dolphins*

427.     Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

**J.A. 176**

428.   As described above, the Dolphins has retaliated against Mr. Flores in violation of the FPWBS by terminating his employment because he objected to, or refused to participate in, any activity, policy or practice of the employer which is in violation of a law, rule or regulation. In this case, the unlawful activity in which Mr. Flores refused to engage—*i.e.*, by refusing to intentionally lose football games—would have constituted a violation of the Sports Bribery Act, among other laws.

429.   As a direct and proximate result of the unlawful retaliatory conduct taken by the Dolphins in violation of the FPWBS, Mr. Flores has suffered, and continues to suffer, economic damages, loss of opportunity, loss of reputation and mental anguish for which he is entitled to an award of damages.

430.   The unlawful retaliatory conduct taken by the Dolphins constitutes reckless, malicious, willful and wanton violations of the FPWBS for which Mr. Flores is entitled to an award of punitive damages.

### TENTH CAUSE OF ACTION
**(Retaliation under the Florida Private Whistleblower Statute)**
***On Behalf of Plaintiff Brian Flores***
*As to Defendant the Dolphins*

431.   Mr. Flores hereby repeats, reiterates and re-alleges each and every previous allegation as if fully set forth herein.

432.   As described above, the Dolphins breached the Flores Employment Agreement by, *inter alia*, failing to pay Mr. Flores the severance to which he is entitled upon a termination without cause and seeking to recoup hundreds of thousands of dollars appropriately paid to Mr. Flores.

433.     As a direct and proximate result of the unlawful conduct taken by the Dolphins in
breach of the Flores Employment Agreement, Mr. Flores has suffered, and continues to suffer,
economic damages for which he is entitled to an award of damages.

434.     The unlawful breach of the Flores Employment Agreement constitutes reckless,
malicious, willful and wanton violations of the law for which Mr. Flores is entitled to an award
of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court issue a declaratory judgment that the
actions, conduct and practices of the Defendants complained of herein violates the federal, state
and local laws asserted herein, and issue the following additional relief:

A.     **Injunctive Relief**

     i.     **Appointment of an Independent Monitor**.  An independent
monitor should be appointed who will have oversight and
authority to enforce and ensure compliance with all the
mechanisms set forth below.

     ii.     **Promote Black Ownership**.  Increase the influence of Black
individuals in hiring and termination decisions by taking steps
to promote Black ownership of NFL teams.  Steps that can be
taken include: (i) creating and funding a committee dedicated
to sourcing Black investors to take majority ownership stakes
in NFL teams; (ii) revise requirements related to financing the
purchase of NFL teams to the extent that such requirements
act as an impediment (issue to be studied) to the sale of NFL
teams to a majority Black investor or ownership group; (iii)
ensure diversity of decision-making by permitting select Black
players and coaches to participate in the interviewing process
for applicable positions.

     iii.     **Increased Transparency in Hiring and Terminations**.  The
League should be committed to increased transparency in
hiring and termination decisions.  Measures that would further
this transparency include: (i) appointment of a special hiring
committee, and require teams to have a committee member
present at all applicable interviews, (ii) require teams to
document the criteria for the applicable open positions, (iii) for

both hiring and termination decisions, require teams to document the rationale for each person considered in the process, including a full explanation of the basis for any subjective influences (*e.g.*, trust, personality, interview performance, *etc.*), (iv) require teams to consider side-by-side comparisons of objective criteria (such as past performance, experience, *etc.*); (v) require semi-annual written performance reviews for all applicable positions, and (vi) all communications regarding the hiring and termination of applicable positions shall be considered public records.

iv.  **Meaningful Incentives**:  Incentivize the hiring and retention of Black candidates through monetary, compensation and/or further draft picks, including but not limited to, additional salary cap space for making diverse hires.

v.  **Increased Visibility for Black Assistant Coaches**.  Increase the level of visibility and interaction between, on the one hand, Black assistant coaches and executives, and, on the other hand, NFL team owners.  Hold multiple coach/executive/owner conferences each year, similar to the annual Owners' Meetings, during which the NFL team owners will meaningfully interact with Black assistant coaches and executives.

vi.  **Increased Pipeline for Black Coaches**.  Teams should be required to have either a Black QB Coach or Assistant QB Coach to ensure a pipeline of experienced candidates for Offensive Coordinator and Head Coach positions.

vii.  **Uniform Contracts**.  Ensure language and non-monetary term uniformity with respect to coaching contracts (*e.g.*, all Head Coach contracts are the same, all Offensive Coordinator contracts are the same, *etc.*).  The independent monitor will confer with employee-side lawyers, management-side lawyers and special coaches committee with respect to the uniformity of the terms.

viii.  **Ban Forced Arbitration.**  Ban forced arbitration for claims of discrimination or retaliation brought against the NFL or its teams by coaches or executives, and provisions that would require a coach or executive to waive any claims of discrimination or retaliation in order to receive his or her severance.

J.A. 179

**B.** **Monetary Relief**

    i.    An award of damages to Plaintiffs and the Proposed Class and against the Defendants, in an amount to be determined at trial, to compensate them for all monetary and/or economic damages;

    ii.    An award of damages to Plaintiffs and the Proposed Class and against the Defendants, in an amount to be determined at trial, to compensate them for all non-monetary and/or compensatory damages, including, but not limited to, loss of reputation, loss of opportunity and mental anguish;

    iii.    An award of punitive and/or liquidated damages to Plaintiffs and the Proposed Class and against the Defendants in an amount to be determined at trial;

    iv.    Pre- and post-judgment interest on all amounts due;

    v.    An award of Plaintiffs and the Proposed Class's reasonable attorneys' fees and costs; and

**C.**    Such other and further relief as the Court may deem just and proper.

J.A. 180

## JURY DEMAND

Plaintiffs and the Proposed Class hereby demand a trial by jury.

Dated: April 7, 2022
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____

  Douglas H. Wigdor
  Michael J. Willemin
  David E. Gottlieb

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
dgottlieb@wigdorlaw.com

*Counsel for Plaintiffs*
*Proposed Counsel for the Proposed Class*

- and -

**ELEFTERAKIS, ELEFTERAKIS & PANEK**

By: _____

  John Elefterakis
  Nicholas Elefterakis
  Raymond Panek
  Johnson Atkinson

80 Pine Street, 38th Floor
New York, New York 10005
Telephone: 212-532-1116
Facsimile: 212 532-1176

*Counsel for Plaintiffs*
*Proposed Counsel for the Proposed Class*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 05/02/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------X
BRIAN FLORES, STEVE WILKS, and RAY        :
HORTON, as Class Representatives, on      :
behalf of themselves and all others similarly :
situated,                                 :
                                          :
                              Plaintiff,  :
                                          :
              -against-                   :
                                          :
THE NATIONAL FOOTBALL LEAGUE; NEW         :
YORK FOOTBALL GIANTS, INC. d/b/a NEW      :
YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a   :        22-CV-0871 (VEC)
MIAMI DOLPHINS; DENVER BRONCOS            :
FOOTBALL CLUB d/b/a DENVER BRONCOS;       :            ORDER
HOUSTON NFL HOLDINGS, L.P. d/b/a          :
HOUSTON TEXANS; ARIZONA CARDINALS         :
FOOTBALL CLUB LLC d/b/a ARIZONA           :
CARDINALS; TENNESSEE TITANS               :
ENTERTAINMENT, INC. d/b/a TENNESSEE,      :
TITANS and JOHN DOE TEAMS 1 through 26,   :
                                          :
                              Defendants. :
------------------------------------------------------------X
```

VALERIE CAPRONI, United States District Judge:

WHEREAS on May 2, 2022, the parties appeared for an initial pretrial conference.

IT IS HEREBY ORDERED that, for the reasons stated at the conference, Defendants'

motion to compel arbitration is due no later than **Tuesday, June 21, 2022**, Plaintiffs' response in

opposition is due no later than **Friday, July 22, 2022**, and Defendants' reply in support is due no

later than **Friday, August 5, 2022**.  The parties' briefs are limited to the default page limits: 25

pages for the opening and response briefs and 10 pages for the reply brief.  If any of Plaintiffs'

claims remain in the litigation following the Court's resolution of the motion, Defendants will be

given the opportunity to file a motion to dismiss pursuant to Rule 12 of the Federal Rules of

Civil Procedure.

IT IS FURTHER ORDERED that if, upon reviewing Defendants' motion to compel arbitration, Plaintiffs still seek motion-related discovery, they must meet and confer with Defendants to determine whether the parties can resolve the issue without court intervention.  If the parties are unable to resolve the dispute amongst themselves, Plaintiffs may file a letter brief, not to exceed five single-spaced pages, seeking leave to take motion-related discovery.  Any such request is due no later than **Friday, July 1, 2022**.  Any response in opposition, limited to five single-spaced pages, is due no later than **Friday, July 8, 2022**.

IT IS FURTHER ORDERED that the entry of a Case Management Plan is adjourned *sine die* and fact and expert discovery is hereby STAYED.

IT IS FURTHER ORDERED that if, at any time, both parties want a settlement conference with the assigned Magistrate Judge or a referral to the Court-annexed mediation program, they may submit a joint letter requesting a referral.

**SO ORDERED.**

**Date:  May 2, 2022**
        **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26, | Civil Action No.: 22-CV-00871 (VEC) |
| Defendants. | |

**NOTICE OF DEFENDANTS' MOTION TO**
**COMPEL ARBITRATION AND STAY FURTHER PROCEEDINGS**

PLEASE TAKE NOTICE that, pursuant to Sections 3 and 4 of the Federal

Arbitration Act, 9 U.S.C. §§ 3–4, Defendants respectfully move this Court for an order

compelling the arbitration of Plaintiffs' claims and staying further proceedings in this

action.  Filed contemporaneously with this notice is a memorandum of law in support of

Defendants' motion and the accompanying declaration of Dolores F. DiBella.  Defendants

submit this motion in accordance with the Court's scheduling order of May 2, 2022 (ECF

No. 43) and without waiver of any other defenses to this action, including objections to the propriety of venue in this District or the Court's personal jurisdiction. *See*, *e.g.*, *Ramasamy* v. *Essar Glob. Ltd.*, 825 F. Supp. 2d 466, 467 n.1 (S.D.N.Y. 2011); *see also Halliburton Energy Servs., Inc.* v. *Ironshore Specialty Ins. Co.*, 921 F.3d 522, 529 n.2 (5th Cir. 2019); *Gerber* v. *Riordan*, 649 F.3d 514, 519 (6th Cir. 2011).

Dated: New York, New York
June 21, 2022

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: /s/ Loretta E. Lynch
Loretta E. Lynch
Brad S. Karp
Lynn B. Bayard
Brette Tannenbaum
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3900
lelynch@paulweiss.com
bkarp@paulweiss.com
lbayard@paulweiss.com
btannenbaum@paulweiss.com

*Attorneys for the National Football League, New York Giants, Miami Dolphins, Denver Broncos, Houston Texans, Arizona Cardinals and Tennessee Titans*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26,<br><br>          Defendants. | Civil Action No.: 22-cv-00871 (VEC) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY FURTHER PROCEEDINGS

## ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................1

BACKGROUND ....................................................................................... 4

    A.    The NFL ....................................................................................... 4

    B.    Plaintiffs ...................................................................................... 5

    C.    Plaintiffs' Arbitration Agreements ........................................ 6

    D.    The Amended Complaint .......................................................... 9

ARGUMENT .......................................................................................... 11

    A.    Plaintiffs Entered Into Multiple Arbitration Agreements ..................................... 12

    B.    Plaintiffs' Claims Fall Within the Scope of Their Enforceable Arbitration Agreements ...................................................................................... 14

        1.    Brian Flores's Claims Against the Miami Dolphins ............................... 15

        2.    Brian Flores's Claims Against the Denver Broncos, New York Giants, and Houston Texans ...................................... 18

        3.    Steve Wilks's Claims Against the Arizona Cardinals ............................. 20

        4.    Ray Horton's Claims Against the Tennessee Titans ................................. 21

        5.    Plaintiffs' Claims Against the NFL ...................................... 21

    C.    Plaintiffs Must Arbitrate Their Claims on an Individual Basis ............................24

CONCLUSION...................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*ACE Cap. Re Overseas Ltd.* v. *Cent. United Life Ins. Co.*,
    307 F.3d 24 (2d Cir. 2002)........................................................14

*Adams* v. *Suozzi*,
    433 F.3d 220 (2d Cir. 2005)......................................................11

*Am. E Grp. LLC* v. *Livewire Ergogenics Inc.*,
    432 F. Supp. 3d 390 (S.D.N.Y. 2020)......................................13

*Am. Needle, Inc.* v. *NFL*,
  560 U.S. 183 (2010) ..................................................................................................4

*AT&T Mobility LLC* v. *Concepcion*,
  563 U.S. 333 (2011) ................................................................................................17

*Brinkman* v. *Buffalo Bills Football Club*,
  433 F. Supp. 699 (W.D.N.Y. 1977) ........................................................................15

*Charles O. Finley & Co.* v. *Kuhn*,
  569 F.2d 527 (7th Cir. 1978) ..................................................................................17

*Choctaw Generation Ltd. P'ship* v. *Am. Home Assur. Co.*,
  271 F.3d 403 (2d Cir. 2001) ...................................................................................22

*Citigroup Inc.* v. *Sayeg*,
  No. 21-cv-10413, 2022 WL 179203 (S.D.N.Y. Jan. 20, 2022) ..............................14

*Citigroup, Inc.* v. *Abu Dhabi Inv. Auth.*,
  776 F.3d 126 (2d Cir. 2015) ...................................................................................12

*Convergen Energy LLC* v. *Brooks*,
  No. 20-cv-3746, 2020 WL 5549039 (S.D.N.Y. Sept. 16, 2020) ............................14

*Cooper* v. *Ruane Cunniff & Goldfarb Inc.*,
  990 F.3d 173 (2d Cir. 2021) ...................................................................................12

*CPR (USA) Inc.* v. *Spray*,
  187 F.3d 245 (2d Cir. 1999)..........................................................................18, 19, 20

*Crouch* v. *NASCAR, Inc.*,
  845 F.2d 397 (2d Cir. 1988) ...................................................................................17

*In re Currency Conversion Fee Antitrust Litig.*,
  265 F. Supp. 2d 385 (S.D.N.Y. 2003).....................................................................20

*Doe* v. *Trump Corp.*,
  6 F.4th 400 (2d Cir. 2021) ...............................................................................21, 22

*Foran* v. *NFL*,
  No. 18-cv-10857, 2019 WL 2408030 (S.D.N.Y. June 7, 2019) .............................15

*GateGuard, Inc.* v. *Goldenberg*,
  No. 20-cv-1609, 2022 WL 452637 (S.D.N.Y. Feb. 15, 2022) ...............................14

*Gaul* v. *Chrysler Fin. Servs. Am. LLC*,
  657 F. App'x 16 (2d Cir. 2016) ..............................................................................14

*Gold* v. *Deutsche Aktiengesellschaft*,
    365 F.3d 144 (2d Cir. 2004).................................................................12, 14

*Hanson* v. *Cable*,
    No. A138208, 2015 WL 1739487 (Cal. Ct. App. Apr. 15, 2015) ...........................15

*Holick* v. *Cellular Sales of N.Y., LLC*,
    802 F.3d 391 (2d Cir. 2015)...................................................................12

*Houston NFL Holding L.P.* v. *Ryans*,
    581 S.W.3d 900 (Tex. App. 2019)............................................................15

*Lamps Plus, Inc.* v. *Varela*,
    139 S. Ct. 1407 (2019).....................................................................24, 25

*Louis Dreyfus Negoce S.A.* v. *Blystad Shipping & Trading Inc.*,
    252 F.3d 218 (2d Cir. 2001)...............................................................15, 21

*Meyer* v. *Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017)................................................................11, 17

*Murray* v. *NFL*,
    No. 94-cv-5971, 1998 WL 205596 (E.D. Pa. Apr. 28, 1998)................................13

*NFL Mgmt. Council* v. *NFL Players Ass'n*,
    820 F.3d 527 (2d Cir. 2016)...................................................................15

*NFL Players Ass'n* v. *NFL Mgmt. Council*,
    523 F. App'x 756 (2d Cir. 2013) ..............................................................11

*Oakland Raiders* v. *NFL*,
    131 Cal. App. 4th 621 (Cal. Ct. App. 2005) ..................................................17

*Pagaduan* v. *Carnival Corp.*,
    709 F. App'x 713 (2d Cir. 2017) ..............................................................14

*Parisi* v. *Goldman, Sachs & Co.*,
    710 F.3d 483 (2d Cir. 2013).............................................................11, 12, 25

*Radovich* v. *NFL*,
    352 U.S. 445 (1957)...........................................................................11

*Ragone* v. *Atl. Video at Manhattan Ctr.*,
    595 F.3d 115 (2d Cir. 2010)............................................................12, 23, 24

*Robinson Brog Leinwand Greene Genovese & Gluck P.C.*
    v. *John M. O'Quinn & Assocs., L.L.P.*, 523 F. App'x 761 (2d Cir. 2013) ...............14

*Rosenbloom* v. *Mecom*,
    478 So. 2d 1375 (La. Ct. App. 1985) ............................................................... 14

*Ross* v. *Am. Exp. Co.*,
    547 F.3d 137 (2d Cir. 2008) .......................................................................... 22

*Rothman* v. *Snyder*,
    No. 20-cv-3290, 2020 WL 7769928 (D. Md. Dec. 30, 2020) ................................. 13

*Schwartz* v. *Sterling Ent. Enters., LLC*,
    No. 21-cv-1084, 2021 WL 4321106 (S.D.N.Y. Sept. 23, 2021) ...................... 12, 14

*Smith/Enron Cogeneration Ltd. P'ship, Inc.* v. *Smith Cogeneration Int'l Inc.*,
    198 F.3d 88 (2d Cir. 1999) .......................................................................... 20, 21

*Sokol Holdings, Inc.* v. *BMB Munai, Inc.*,
    542 F.3d 354 (2d Cir. 2008) .......................................................................... 22

*Spinelli* v. *NFL*,
    903 F.3d 185 (2d Cir. 2018) .......................................................................... 11

*Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*,
    559 U.S. 662 (2010) ...................................................................................... 24

*T. Park Cent., LLC* v. *Bluegreen Vacations Unlimited, Inc.*,
    No. 21-cv-4346, 2021 WL 5826296 (S.D.N.Y. Dec. 7, 2021) ............................... 14

*TradeComet.com LLC* v. *Google, Inc.*,
    435 F. App'x 31 (2d Cir. 2011) ..................................................................... 20

*Viking River Cruises, Inc.* v. *Moriana*,
    No. 20-1573, 2022 WL 2135491 (U.S. June 15, 2022) ........................................ 11

STATUTES

Federal Arbitration Act, 9 U.S.C. §§ 1–16 ....................................... 2, 11, 12, 17

    9 U.S.C. § 2 ................................................................................................... 11

    9 U.S.C. § 3 ................................................................................................... 12

    9 U.S.C. § 4 ................................................................................................... 12

OTHER AUTHORITIES

Michael Baca, *NFL Owners Approve Rooney Rule Applying to Vacant QB Coach
    Positions*, NFL (May 24, 2022, 3:45 PM), https:// www.nfl.com/news/nfl-
    owners-approve-rooney-rule-applying-to-vacant-qb-coach-positions ........................ 5

J.A. 190

Andrew Mason, *Patriots Assistant Brian Flores Interviews with Broncos*, Denver Broncos News (Jan. 5, 2019, 10:03 AM), https://tinyurl.com/floresbroncos ..........................10

*NFL Makes Bold New Steps to Enhance Diversity*, NFL Football Operations (May 19, 2020), https://tinyurl.com/nflnewsteps ................................................................5

*The Rooney Rule*, NFL Football Operations, https://tinyurl.com/nflrooneyrule (last visited May 27, 2022) ...........................................................................................5

Marc Sessler, *Browns Hire Ray Horton as New Defensive Coordinator*, NFL (Jan. 22, 2016, 1:26 AM), www.nfl.com/news/browns-hire-ray-horton-as-new-defensive-coordinator-0ap3000000626246 .............................................................6

Ben Shpigel, *Terribly Good*, N.Y. Times, Feb. 4, 2019, at D1, *revised version available at* https://tinyurl.com/patriotsLIII ...........................................................5

Defendants National Football League ("NFL"); New York Football Giants, Inc.; Miami Dolphins, Ltd.; Denver Broncos Football Club; Houston NFL Holdings, L.P.; Arizona Cardinals Football Club LLC; and Tennessee Titans Entertainment, Inc. respectfully submit this memorandum of law in support of their motion to compel the arbitration of, and stay further proceedings on, all claims alleged in the Amended Complaint ("Complaint") (ECF No. 22).

## PRELIMINARY STATEMENT

The Complaint—founded on allegations of racial discrimination arising out of Plaintiffs' employment and applications for employment with NFL member clubs—belongs in arbitration because Plaintiffs contractually agreed to multiple arbitration provisions that squarely cover their claims.

Plaintiffs Brian Flores, Steve Wilks, and Ray Horton are three Black current or former NFL coaches who have had long coaching careers at several NFL member clubs. During that time, each Plaintiff entered into several employment agreements with their member club employers, each of which contained broad arbitration provisions that require the arbitration of all disputes. Mr. Flores's agreement with defendant Miami Dolphins, for example, states that "all matters in dispute between [Mr. Flores] and the Club, including, without limitation, any dispute arising from the terms of [the agreement], [his] employment with the Club, or otherwise, shall be referred to the Commissioner of the NFL for binding arbitration in accordance with the NFL's Dispute Resolution Procedural Guidelines." It also states that the purpose of this provision "is to ensure that any and all disputes that may arise between the Club and [Mr. Flores] will be resolved through binding, conclusive arbitration as opposed to court or administrative litigation." Mr. Wilks's and Mr. Horton's employment agreements contain similarly broad language, evidencing the parties' intent to arbitrate all disputes, including all "disputes relating to or arising out of discrimination." In addition, each Plaintiff expressly agreed to be bound by the NFL Constitution and Bylaws, which

states that the "Commissioner shall have full, complete, and final jurisdiction and authority to arbitrate," among a broad litany of disputes, any dispute "between any . . . coach . . . and any member club or clubs" and any dispute involving two or more member clubs.

Notwithstanding Plaintiffs' multiple and clear contractual obligations to arbitrate their claims, Plaintiffs filed this federal-court action against the NFL and six of its member clubs, purporting to allege that the clubs discriminated against them on the basis of race when the clubs terminated them or failed to hire them (or both). Specifically, Mr. Flores claims that his termination as the Dolphins head coach was discriminatory and that the club wrongfully withheld his severance compensation; that both the Dolphins and defendant Houston Texans retaliated against him for filing this lawsuit; and that defendants New York Giants and Denver Broncos subjected him to "sham" interviews for head-coaching vacancies to comply with the NFL's "Rooney Rule," a League rule designed to increase diversity in club leadership positions by requiring clubs to interview minority candidates for those positions. Mr. Horton alleges that he was subject to a similar sham interview by defendant Tennessee Titans, and Mr. Wilks alleges that his termination as the head coach of defendant Arizona Cardinals was discriminatory. More broadly, Plaintiffs assert based on the above allegations that the NFL and its member clubs are somehow engaged in racially discriminatory employment practices that result in a disparate impact on the hiring and retention of Black head coaches.

Issues of racial diversity in professional football have long been and still are the focus of numerous diversity, equity, and inclusion initiatives at the NFL and its member clubs. But the substance of Plaintiffs' claims is not properly before the Court, and the facts and law on the question of whether Plaintiffs must arbitrate those claims are clear. Plaintiffs' multiple arbitration agreements preclude them from pursuing their claims in this Court. The Federal Arbitration Act

and settled precedent in this Circuit strongly favor the enforcement of arbitration agreements and require that courts compel arbitration if the agreement is even susceptible to an interpretation that requires arbitration of the alleged claims. Defendants far surpass that standard here.

Plaintiffs' claims fall squarely within the scope of the broad arbitration agreements into which each Plaintiff entered. Mr. Flores's claims against the Dolphins concern his termination and compensation, which are precisely the types of disputes that Mr. Flores indisputably agreed to submit to binding arbitration under his employment agreement with the Dolphins. Mr. Flores's claims against the Broncos, Giants, and Texans also must be arbitrated under the NFL Constitution because they constitute disputes between a coach and a member club. Mr. Wilks's claim that the Cardinals wrongfully terminated him likewise constitutes an arbitrable dispute with his club because it is founded on conduct occurring during his employment as a coach and thus falls under both the express arbitration provisions in his employment agreement and the NFL Constitution. And Mr. Horton was already under contract with the Titans when he interviewed for the club's head-coach position and thus is required to arbitrate his claims under the clear terms of the arbitration agreements in his employment agreement and the NFL Constitution.

Plaintiffs' claims against the NFL also must be arbitrated under Plaintiffs' many arbitration agreements. The NFL is entitled, both expressly and under settled principles of equitable estoppel, to enforce the arbitration provisions to which Plaintiffs agreed, for several reasons. First, the NFL is no stranger to those agreements. Rather, it is the membership association for the member clubs that hired Plaintiffs, and the NFL itself approved and signed those agreements—making arbitration of claims against the NFL fundamentally fair. Second, Plaintiffs' claims against the NFL are wholly derivative of and factually intertwined with their claims against the member clubs whose employment practices and purported violations of NFL rules and policies are the foundation for

such claims.  Finally, the NFL Constitution's arbitration provisions to which Plaintiffs agreed expressly cover claims involving two or more member clubs and claims between any coach and any member club—precisely the case here.

In sum, Plaintiffs' multiple arbitration agreements plainly cover Plaintiffs' claims.  Indeed, courts have compelled many employment disputes—including claims of discrimination among the NFL, its member clubs, and their employees (including coaches)—to arbitration under arbitration agreements containing near identical language.  Accordingly, for the reasons set forth below, the motion to compel arbitration and stay further proceedings should be granted.

## BACKGROUND

### A.    The NFL

The NFL, the world's premier professional football league, is an unincorporated membership association consisting of 32 member clubs.  Am. Compl. ¶ 36; *see Am. Needle, Inc.* v. *NFL*, 560 U.S. 183, 187 (2010).  The operations and structure of the League, and the relationship between the League and the member clubs, their employees, and the players, are governed by the NFL Constitution and Bylaws.  *See* Constitution and Bylaws of the National Football League (rev. ed. 2016) (Ex. 1).  The NFL Constitution also sets forth certain rules governing the conduct of member clubs and their employees.  For example, the NFL Constitution prohibits a member club from "tamper[ing] with a player . . . under contract to . . . another member club" or attempting to "illegally influence the outcome" of the member club's games.  *Id.* art. 9.1(11)–(12).  Pursuant to the NFL Constitution, the Commissioner of the NFL is responsible for administering the day-to-day business affairs of the League and, as detailed below, for adjudicating a broad number of disputes involving the member clubs, their employees, and the League.  *Id.* art. 8.

Diversity, equity, and inclusion are core NFL values.  In furtherance of those values, the NFL has undertaken numerous deliberate initiatives to promote diversity in leadership positions in

the League, including in head-coach positions.  Among others, nearly two decades ago, the NFL implemented the "Rooney Rule" requiring teams to interview minority candidates for any vacant head-coach position.  Am. Compl. ¶ 118.  The NFL has since expanded the Rooney Rule to apply to other leadership positions, including assistant head coach, offensive coordinator, defensive coordinator, special teams coordinator, quarterback coach, general manager, and other front-office positions.  *Id.* ¶¶ 118–19; *see The Rooney Rule*, NFL Football Operations, https://tinyurl.com/nflrooneyrule (last visited June 21, 2022); Michael Baca, *NFL Owners Approve Rooney Rule Applying to Vacant QB Coach Positions*, NFL (May 24, 2022, 3:45 PM), https://www.nfl.com/news/nfl-owners-approve-rooney-rule-applying-to-vacant-qb-coach-positions.  The Rooney Rule now also requires teams to interview at least two minority candidates for any head-coach opening, and at least one such candidate in person.  Am. Compl. ¶ 119.

In recent years, the NFL has also undertaken other broad programs to increase employment and advancement opportunities for diverse candidates.  Those initiatives include a reward of additional draft picks to teams that develop minority coaches and executives; the modification of anti-tampering rules to allow assistant coaches and executives to interview for coordinator or general-manager positions with other member clubs; and the establishment of coaching fellowship programs across all 32 member clubs geared toward minority coaches.  In addition, the NFL maintains two longstanding fellowship programs focused on developing the pipeline for minority coaching and player personnel candidates.  *See NFL Makes Bold New Steps to Enhance Diversity*, NFL Football Operations (May 19, 2020), https://tinyurl.com/nflnewsteps.

### B.    Plaintiffs

Mr. Flores began his NFL coaching career with the New England Patriots in 2008 through February 3, 2019.  *See* Am. Compl. ¶¶ 157–58; Ben Shpigel, *Terribly Good*, N.Y. Times, Feb. 4, 2019, at D1, *revised version available at* https://tinyurl.com/patriotsLIII.  Before Mr. Flores's

contract with the Patriots expired, the Miami Dolphins hired Mr. Flores as their head coach.  *See* Flores-Dolphins Agreement 1 (Ex. 2); Flores-Patriots Agreement ¶ 2 (Ex. 3).  Mr. Flores coached the Dolphins for three seasons and was discharged on January 10, 2022.  *See* Am. Compl. ¶¶ 159, 177.  He began his current position as the senior defensive assistant and linebackers coach of the Pittsburgh Steelers on February 18, 2022.  *See* Flores-Steelers Agreement 1 (Ex. 4).  His contract with the Steelers extends until 2024.  *Id.* ¶ 2.

Mr. Wilks began his NFL coaching career in 2006 and has worked for four different member clubs.  *See* Am. Compl. ¶¶ 229–31.  On January 20, 2018, Mr. Wilks was hired as the head coach of the Arizona Cardinals.  Wilks-Cardinals Agreement 1 (Ex. 5).  He was terminated after one season on December 31, 2018.  Am. Compl. ¶ 252.  Mr. Wilks began his current position as the defensive pass-game coordinator and secondary coach of the Carolina Panthers on February 16, 2022.  Wilks-Panthers Agreement ¶ 2 (Ex. 6).  His contract with the Panthers is still in force.

Mr. Horton had a successful career as an NFL player before transitioning to coaching in 1994.  *See* Am. Compl. ¶¶ 264–65.  He coached for six different NFL member clubs over 20 consecutive seasons before joining the Tennessee Titans as their defensive coordinator on January 20, 2014.  *See id.* ¶ 265; Horton-Titans Agreement 3 (Ex. 7).  Mr. Horton's employment with the Titans ended when he was hired by another NFL member club on January 22, 2016.  *See* Marc Sessler, *Browns Hire Ray Horton as New Defensive Coordinator*, NFL (Jan. 22, 2016, 1:26 AM), www.nfl.com/news/browns-hire-ray-horton-as-new-defensive-coordinator-0ap3000000626246. Mr. Horton is not currently coaching in the NFL.

### C.    Plaintiffs' Arbitration Agreements

Each time that each Plaintiff joined a member club, he entered into an employment agreement that governed his relationship with the club and the NFL and agreed to be bound by the NFL Constitution and to arbitrate a broad category of disputes.

For example, Mr. Flores's employment agreement with the Dolphins provides that "Employee and the Club agree that all matters in dispute between Employee and the Club, including, without limitation, any dispute arising from the terms of this Agreement, Employee's employment with the Club, or otherwise, shall be referred to the Commissioner of the NFL for binding arbitration in accordance with the NFL's Dispute Resolution Procedural Guidelines (attached to this Agreement as Exhibit A)." Flores-Dolphins Agreement ¶ 12.2. To eliminate all doubt, the agreement expressly provides that "Employee and the Club agree that the purpose of this Paragraph 12 and Exhibit A is to ensure that any and all disputes that may arise between the Club and Employee will be resolved through binding, conclusive arbitration as opposed to court or administrative litigation." Flores-Dolphins Agreement ¶ 12.4.

Mr. Wilks's agreement with the Cardinals and Mr. Horton's agreement with the Titans contain similarly broad provisions requiring the "binding arbitration" of "all disputes . . . between" or "all matters in dispute between" Plaintiffs and their employer member club. Wilks-Cardinals Agreement ¶ 10a; Horton-Titans Agreement ¶ 6(a); *see also* Wilks-Cardinals Agreement ¶ 10f (stating that the purpose of the arbitration provisions is to "ensure that any and all disputes that may arise between the [member club] and [the coach] will be resolved through binding, conclusive arbitration as opposed to court or administrative litigation").

All of Plaintiffs' employment agreements set forth procedures—either in the agreements themselves or through express incorporation of the NFL Dispute Resolution Procedural Guidelines—for determining who will arbitrate a dispute arising with the coach. *See* Flores-Patriots Agreement ¶ 17 (incorporating the NFL Dispute Resolution Procedural Guidelines); Flores-Dolphins Agreement ¶ 12.2 & Ex. A (incorporating the Guidelines and attaching them as an exhibit); Flores-Steelers Agreement ¶ 14 (requiring arbitration under the "NFL's arbitration

guidelines"); Wilks-Cardinals Agreement ¶¶ 10b–10e & pp. 14–18 (incorporating provisions directly into the body of the contract and attaching additional procedural guidelines); Wilks-Panthers Agreement ¶ 18 (incorporating provisions directly into the body of the contract); Horton-Titans Agreement 2, 3 (requiring compliance with the "NFL Rules," defined to include "policies of the NFL" and "arbitration decisions and directives of the Commissioner").

Under those provisions, the process for the arbitration depends on whether the dispute is "football-oriented." *See, e.g.*, Flores-Dolphins Agreement, Ex. A, ¶¶ 1.5–1.8. A "football-oriented" dispute is one that "relat[es] to or aris[es] out of the Constitution and Bylaws of the National Football League, or any NFL or Club policies, rules or regulations." *Id.* ¶ 1.5. Every such dispute is "subject to arbitration under th[e] Guidelines" before the Commissioner. *Id.* ¶ 1.6.

Disputes that "could arise between any employer and employee, such as a dispute relating to or arising out of discrimination," are expressly defined by the Guidelines to be "not football oriented." *Id.* ¶ 1.5. Non-football-oriented disputes are still subject to mandatory arbitration, but the Commissioner may refer such disputes "for final, binding, and conclusive arbitration administered by the alternative dispute resolution provider agreed to by the parties, or in the absence of such agreement, by JAMS, Inc. pursuant to its Comprehensive Arbitration Rules and Procedures." *Id.* ¶ 1.7. Where a dispute "raises issues that are both football-oriented and not football-oriented," the dispute is also subject to mandatory arbitration—but in that case the Commissioner may decide all of the issues himself; refer all of the issues to an alternative dispute resolution provider; or bifurcate the proceedings. *Id.* ¶ 1.8. The NFL Commissioner is thus not required to preside over disputes that raise any non-football-related issues.

As the NFL Constitution requires, *see* art. 3.11(D), Plaintiffs also agreed in each of their employment agreements "to comply at all times with, and to be bound by, the NFL Constitution

and ByLaws," which were incorporated by reference into those agreements. Flores-Patriots Agreement ¶ 15; *see* Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Flores-Steelers Agreement ¶ 13; Wilks-Cardinals Agreement ¶ 9a; Wilks-Panthers Agreement ¶ 9g; Horton-Titans Agreement ¶ 6(a). Under Article 8.3 of the NFL Constitution, the NFL Commissioner has "full, complete, and final jurisdiction and authority to arbitrate . . . [a]ny dispute between any . . . coach . . . and any member club or clubs," NFL Const. art. 8.3(B), as well as "[a]ny dispute involving two or more members of the League," *id.* art. 8.3(A). Plaintiffs acknowledged in their agreements that they "read the NFL Constitution and Bylaws . . . and underst[ood] their meaning." Flores-Patriots Agreement ¶ 15; *see* Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Flores-Steelers Agreement ¶ 13; Wilks-Cardinals Agreement ¶ 9(a); Wilks-Panthers Agreement ¶ 9(g); Horton-Titans Agreement ¶ 6(c). The Commissioner approved Plaintiffs' relevant employment agreements (except for Mr. Flores's current agreement with the Steelers, the approval for which is pending). *See* Flores-Patriots Agreement 7; Flores-Dolphins Agreement 11; Flores-Steelers Agreement 7; Wilks-Cardinals Agreement 13; Wilks-Panthers Agreement 13; Horton-Titans Agreement 9.

### D.    The Amended Complaint

Notwithstanding Plaintiffs' contractual commitments to be bound by broad arbitration agreements, Plaintiffs filed suit in this Court, asserting various causes of action for employment discrimination under federal, state, and local law, alleging that one or more of the NFL and the member club defendants discriminated against them on the basis of race in their employment as a head coach, in applying for a head-coaching position, or both. *See* Am. Compl. ¶¶ 391–413.[1]

---

[1] The Complaint pleads the first through fifth causes of action as asserted by all Plaintiffs against all Defendants. *See, e.g.*, Am. Compl. ¶¶ 392, 398, 402. The Complaint, however, contains no factual allegations supporting claims by individual Plaintiffs against member clubs with whom they had no actual or prospective employment relationship. Accordingly, Defendants construe the Complaint as asserting claims by each Plaintiff against only the NFL and the particular member

Specifically, Mr. Flores alleges that the Dolphins discriminated against him while he was employed as the club's head coach and when the club terminated him. *See* Am. Compl. ¶¶ 158–77. He also alleges that the Dolphins retaliated against him for filing this lawsuit by failing to pay him severance allegedly required under his employment agreement and by demanding the return of certain compensation. *See id.* ¶¶ 219–26. In February 2022, the Miami Dolphins invoked their contractual right to submit these disputes to the NFL for arbitration, pursuant to the Flores-Dolphins Agreement. *See id.* ¶¶ 15, 226.

Mr. Flores further alleges that his interviews for head-coaching positions with the Giants on January 27, 2022, *see* Am. Compl. ¶¶ 178–99, and the Broncos on January 5, 2019, *see id.* ¶¶ 200–06; Andrew Mason, *Patriots Assistant Brian Flores Interviews with Broncos*, Denver Broncos News (Jan. 5, 2019, 10:03 AM), https://tinyurl.com/floresbroncos, were shams designed only so that those teams could formally comply with the Rooney Rule. Regarding the Texans, Mr. Flores alleges that the club retaliated against him for filing this lawsuit by hiring another Black candidate to serve as their head coach on February 8, 2022, after Mr. Flores interviewed for the position. *See* Am. Compl. ¶¶ 207–18.

Mr. Wilks alleges that the Cardinals discriminated against him when they discharged him as their head coach on or about December 31, 2018. *See* Am. Compl. ¶¶ 231–63. Mr. Horton alleges that his interview for the Titans head-coaching position on January 16, 2016, was a sham designed to demonstrate formal compliance with the Rooney Rule. *See id.* ¶¶ 268–84.

More broadly, Plaintiffs allege that the "discretionary" and "subjective" employment practices used by 32 different NFL member clubs result in a disparate impact in the hiring and

clubs described in the relevant factual allegations. *See id.* ¶¶ 156–206 (Mr. Flores); *id.* ¶¶ 227–63 (Mr. Wilks); *id.* ¶¶ 268–84 (Mr. Horton).

retention of Black head coaches.  *See* Am. Compl. ¶¶ 120, 123.  Plaintiffs seek class certification, proposing to proceed with a class consisting of every Black head coach, offensive or defensive coordinator, quarterback coach, and general manager, as well as every Black applicant for those positions, in the NFL during the applicable limitations period.  *See id.* ¶ 358.

For the reasons below, Plaintiffs' claims are covered by their many arbitration agreements and should be compelled to arbitration under settled law.

## ARGUMENT

The Federal Arbitration Act provides that a written arbitration agreement involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.[2]  The FAA thus creates an "enforcement mandate, which renders agreements to arbitrate enforceable as a matter of federal law."  *Viking River Cruises, Inc.* v. *Moriana*, No. 20-1573, 2022 WL 2135491, at *6 (U.S. June 15, 2022).  In that way, the FAA reflects "a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts."  *Meyer* v. *Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (internal quotation marks and citations omitted).  The FAA's "preference for enforcing arbitration agreements applies even when the claims at issue are federal statutory claims," including "claims arising under a statute designed to further important social policies."  *Parisi* v. *Goldman, Sachs & Co.*, 710 F.3d 483, 486–87 (2d Cir. 2013).  "[S]tatutory

---

[2]  Plaintiffs' employment and applications for employment with the member club defendants "involv[ed] interstate commerce" for purposes of the FAA.  9 U.S.C. § 2; *see Adams* v. *Suozzi*, 433 F.3d 220, 225 (2d Cir. 2005) (noting that the FAA extends to the "broadest permissible exercise of Congress' Commerce Clause power"); *Radovich* v. *NFL*, 352 U.S. 445, 452 (1957) (recognizing that the NFL engages in a significant "volume of interstate commerce"); *cf. Spinelli* v. *NFL*, 903 F.3d 185, 211 (2d Cir. 2018) (applying federal antitrust laws to the NFL); *NFL Players Ass'n* v. *NFL Mgmt. Council*, 523 F. App'x 756, 760 (2d Cir. 2013) (applying the Labor-Management Relations Act to the NFL).

claims of employment discrimination" can be and routinely are "subject to mandatory arbitration." *Gold* v. *Deutsche Aktiengesellschaft*, 365 F.3d 144, 147 (2d Cir. 2004); *see, e.g.*, *Parisi*, 710 F.3d at 488 (Title VII); *Ragone* v. *Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 117, 120 (2d Cir. 2010) (Title VII, New York State Human Rights Law, and New York City Human Rights Law); *Schwartz* v. *Sterling Ent. Enters., LLC*, No. 21-cv-1084, 2021 WL 4321106, at *1 (S.D.N.Y. Sept. 23, 2021) (42 U.S.C. § 1981, New York State Human Rights Law, and New York City Human Rights Law).

To determine whether a particular dispute is subject to arbitration, courts consider "whether the parties agreed to arbitrate" and "whether the scope of that agreement encompasses the claims at issue." *Cooper* v. *Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021). Once a court is satisfied that an arbitration agreement exists, "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Citigroup, Inc.* v. *Abu Dhabi Inv. Auth.*, 776 F.3d 126, 130 (2d Cir. 2015) (citation omitted). A court should thus compel arbitration and stay further proceedings unless "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015); *see* 9 U.S.C. §§ 3–4.

Defendants easily meet the FAA's standards for compelling arbitration here.

## A. Plaintiffs Entered Into Multiple Arbitration Agreements

Plaintiffs have entered into numerous arbitration agreements covering their claims. As discussed in detail above, *see* pp. 6–8, Mr. Flores, Mr. Wilks, and Mr. Horton agreed to express arbitration provisions in their employment contracts with the Dolphins, Cardinals, and Titans, respectively (and among other member clubs), each of which provides an independent basis to compel arbitration between each Plaintiff and his respective former club. Those agreements require the "binding arbitration" of "all disputes" or "all matters in dispute" between the coach and the member club. Flores-Dolphins Agreement ¶¶ 12.2, 12.4; *see* Wilks-Cardinals Agreement

¶ 10a; Horton-Titans Agreement ¶ 6(a). Mr. Flores's agreement with the Dolphins and Mr. Wilks's agreement with the Cardinals confirm that the "purpose" of those arbitration provisions is to "ensure that any and all disputes that may arise between the [member club] and [the coach] will be resolved through binding, conclusive arbitration as opposed to court or administrative litigation." Flores-Dolphins Agreement ¶ 12.4; Wilks-Cardinals Agreement ¶ 10f. In light of those provisions, there is no question that Plaintiffs formed arbitration agreements in their contracts with the Dolphins, Cardinals, and Titans. *See, e.g.*, *Am. E Grp. LLC* v. *Livewire Ergogenics Inc.*, 432 F. Supp. 3d 390, 398 (S.D.N.Y. 2020) (holding that an engagement letter requiring the arbitration of "any dispute" formed an arbitration agreement between the parties that executed the letter).

Plaintiffs also agreed to comply with the NFL Constitution and Bylaws, which, as noted above, *see* pp. 8–9, were expressly incorporated by reference and provide a basis for compelling arbitration of all claims against all Defendants. *See* Flores-Patriots Agreement ¶ 15; Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Flores-Steelers Agreement ¶ 13; Wilks-Panthers Agreement ¶ 9(g); Wilks-Cardinals Agreement ¶ 9(b); Horton-Titans Agreement ¶ 6(a). And Plaintiffs acknowledged that they had read and understood the NFL Constitution. *See* Flores-Patriots Agreement ¶ 15; Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Flores-Steelers Agreement ¶ 13; Wilks-Cardinals Agreement ¶ 9(a); Wilks-Panthers Agreement ¶ 9(g); Horton-Titans Agreement ¶ 6(c). As set forth above, *see* p. 9, a key component of the NFL Constitution is its arbitration provisions vesting jurisdiction in the Commissioner over a broad list of potential disputes, and there is no viable claim that Plaintiffs did not agree to them. *See Rothman* v. *Snyder*, No. 20-cv-3290, 2020 WL 7769928, at *3 (D. Md. Dec. 30, 2020) (compelling arbitration under NFL Const. art. 8.3(A)); *Murray* v. *NFL*, No. 94-cv-5971, 1998 WL 205596, at *3 & n.4 (E.D. Pa. Apr. 28, 1998)

(acknowledging arbitration under the same provision); *Rosenbloom* v. *Mecom*, 478 So. 2d 1375, 1376 (La. Ct. App. 1985) (confirming arbitration award under NFL Const. art. 8.3(B)); *see also Pagaduan* v. *Carnival Corp.*, 709 F. App'x 713, 717 (2d Cir. 2017) (compelling arbitration under a provision of a "set of industry-wide standard terms and conditions" incorporated by reference into a one-page employment contract); *Gold*, 365 F.3d at 149-150 (compelling arbitration under rules incorporated by reference into an employment agreement); *Schwartz*, 2021 WL 4321106, at *1 (S.D.N.Y. Sept. 23, 2021) (similar).

### B. Plaintiffs' Claims Fall Within the Scope of Their Enforceable Arbitration Agreements

Here, Plaintiffs' multiple arbitration agreements speak in broad terms that easily encompass all of the claims alleged in the Complaint. Plaintiffs' employment contracts expressly require the arbitration of "all disputes" or "all matters in dispute" between coach and club, which "constitutes the paradigm of a broad arbitration agreement." *Convergen Energy LLC* v. *Brooks*, No. 20-cv-3746, 2020 WL 5549039, at *16 (S.D.N.Y. Sept. 16, 2020) (internal quotation marks and citation omitted); *see T. Park Cent., LLC* v. *Bluegreen Vacations Unlimited, Inc.*, No. 21-cv-4346, 2021 WL 5826296, at *5 (S.D.N.Y. Dec. 7, 2021) (collecting additional cases making the same point). In addition, the NFL Constitution requires the arbitration of "any dispute" between a coach and a member club or involving two or more member clubs and thus similarly constitutes a "broad" agreement to arbitrate. *ACE Cap. Re Overseas Ltd.* v. *Cent. United Life Ins. Co.*, 307 F.3d 24, 33 (2d Cir. 2002) (Sotomayor, J.); *see Gaul* v. *Chrysler Fin. Servs. Am. LLC*, 657 F. App'x 16, 17 (2d Cir. 2016); *Robinson Brog Leinwand Greene Genovese & Gluck P.C.* v. *John M. O'Quinn & Assocs., L.L.P.*, 523 F. App'x 761, 764 (2d Cir. 2013); *GateGuard, Inc.* v. *Goldenberg*, No. 20-cv-1609, 2022 WL 452637, at *7 (S.D.N.Y. Feb. 15, 2022); *Citigroup Inc.* v. *Sayeg*, No. 21-cv-10413, 2022 WL 179203, at *6 (S.D.N.Y. Jan. 20, 2022).

Where, as here, parties use such "expansive language in drafting an arbitration clause, presumably they intend all issues that touch matters within the main agreement to be arbitrated." *Louis Dreyfus Negoce S.A.* v. *Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001) (internal quotation marks and citation omitted). Unsurprisingly, courts have consistently affirmed the rights of the NFL and its member clubs to arbitrate under agreements containing similarly broad language. *See Foran* v. *NFL*, No. 18-cv-10857, 2019 WL 2408030, at *3 (S.D.N.Y. June 7, 2019) (granting the NFL's motion to compel Plaintiffs' employment-related claims to arbitration); *Hanson* v. *Cable*, No. A138208, 2015 WL 1739487, at *1 (Cal. Ct. App. Apr. 15, 2015) (affirming order compelling former employee of an NFL member club to arbitrate his claims against the club); *see also NFL Mgmt. Council* v. *NFL Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016) (confirming arbitration award in a case involving an NFL player's game-related conduct); *Brinkman* v. *Buffalo Bills Football Club*, 433 F. Supp. 699, 703–04 (W.D.N.Y. 1977) (holding that former player's claim against a member team was barred by his failure to follow the arbitration procedure set out in his contract); *Houston NFL Holding L.P.* v. *Ryans*, 581 S.W.3d 900, 911 (Tex. App. 2019) (compelling a former NFL player to arbitrate his premises-liability claims against a member club). Arbitration is all the more warranted here because, as explained above, *see* p. 8, the arbitration procedures set forth or incorporated in Plaintiffs' employment agreements expressly contemplate the arbitration of claims "relating to or arising out of discrimination." *E.g.*, Flores-Dolphins Agreement, Ex. A, ¶ 1.5. Accordingly, each of Plaintiffs' claims is arbitrable, for the reasons below.

### 1.      Brian Flores's Claims Against the Miami Dolphins

As set forth above, *see* p. 7, the arbitration provisions in Mr. Flores's employment agreement with Dolphins agreement clearly cover his claims against the Dolphins, which are all directly related to his employment. Those arbitration provisions state that "all matters in dispute"

between Mr. Flores and the club—including "any dispute arising from the terms of th[e] Agreement" or Mr. Flores's "employment with the Club"—"shall" be submitted to the NFL Commissioner for binding arbitration. Flores-Dolphins Agreement ¶ 12.2. The purpose of that language is explicitly to "ensure that any and all disputes that may arise" between Mr. Flores and the Dolphins "will be resolved through binding, conclusive arbitration as opposed to court." *Id.* ¶ 12.4. As Mr. Flores's counsel previously acknowledged, Mr. Flores's arbitration agreement with the Dolphins "cover[s] the claims that are unrelated to the failure-to-hire claims" against other clubs, including "the termination claims by Mr. Flores when he was terminated by the Dolphins." Tr. of May 5, 2022 Conference 8:12–18.

The NFL Constitution also requires the arbitration of Mr. Flores's claims against the Dolphins. Section 8.3(B) broadly requires the arbitration of "any dispute" between a coach and a member club—which this is. *See* NFL Const. art. 8.3(B). And Section 8.3(A) requires the arbitration of "[a]ny dispute" involving two or more member clubs. *See* NFL Const. art. 8.3(A). This action involves claims for employment discrimination by three current or former NFL coaches, including Mr. Flores, against the NFL and six member clubs. Am. Compl. ¶¶ 391–434. Plaintiffs seek relief on a league-wide basis: they demand (among other things) the "[a]ppointment of an Independent Monitor"; the "funding [of] a committee dedicated to sourcing Black investors to take majority ownership stakes in NFL Teams"; the "appointment of a special hiring committee, and requir[ing] teams to have a committee member present at all applicable interviews"; and "additional salary cap space for making diverse hires." Am. Compl. pp. 97–98 (prayer for relief). Thus, this dispute plainly qualifies as a covered dispute under Section 8.3(A) of the Constitution.

In addition, Mr. Flores's claims relate to alleged violations of various internal NFL rules— namely, the Rooney Rule, anti-tampering rules, and rules against intentionally losing games. *See*

Am. Compl. ¶¶ 161–72, 190, 199, 200–06. Courts are particularly hesitant to interfere in such matters, because the internal standards of professional sports leagues "are not necessarily familiar to courts and obviously require some expertise in their application." *Charles O. Finley & Co.* v. *Kuhn*, 569 F.2d 527, 537 (7th Cir. 1978); *see Crouch* v. *NASCAR, Inc.*, 845 F.2d 397, 403 (2d Cir. 1988). In light of the breadth of Plaintiffs' arbitration agreements and the Complaint's spotlight on issues concerning internal NFL governance, the Court should decline to "descend into the dismal swamp of resolving complex matters involving professional football that are best left to the voluntary unincorporated association that is the NFL." *Oakland Raiders* v. *NFL*, 131 Cal. App. 4th 621, 646 (Cal. Ct. App. 2005) (internal quotation marks and citation omitted) (abstaining from exercising jurisdiction over dispute between the NFL and one of its member clubs).

Perhaps recognizing that his claims clearly are arbitrable, in his correspondence with the NFL concerning the Dolphins' demands for arbitration, Mr. Flores asked the NFL Commissioner only to voluntarily decline to enforce the arbitration agreement in Mr. Flores's employment contract—a plea reiterated in the Complaint. *See* Am. Compl. ¶¶ 15, 226. Mr. Flores did not advance any legal or contractual basis for the Commissioner to set aside the bargained-for provisions of an employment agreement between two sophisticated parties. Nor could he, because there is no authority that would permit the Commissioner to do so. To the contrary, an arbitrator who invalidated an arbitration agreement based on the supposed "ills" of arbitration would contravene the FAA's "liberal federal policy favoring arbitration agreements," *Meyer*, 868 F.3d at 73 (citation omitted), and replace it with the historical "hostility to arbitration" that Congress designed the FAA to overcome, *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 339, 342 (2011) (noting that "[t]he FAA was enacted in 1925 in response to widespread judicial hostility to

arbitration agreements" that "manifested itself in a great variety of devices and formulas declaring arbitration against public policy" (internal quotation marks and citation omitted)).

>    **2.    Brian Flores's Claims Against the Denver Broncos, New York Giants, and Houston Texans**

Mr. Flores alleges that the Broncos and Giants discriminated against him by subjecting him to a sham interview and that the Texans retaliated against him for filing this lawsuit. *See* Am. Compl. ¶¶ 178–218. Although Mr. Flores did not enter into an employment agreement with those clubs, his claims against them are arbitrable under the NFL Constitution's broad arbitration provisions. Those provisions plainly encompass Mr. Flores's disputes with the Broncos, Giants, and Texans: Mr. Flores agreed to arbitrate any dispute with "*any* member club," NFL Const. art 8.3(B) (emphasis added)—not merely his employer—and to arbitrate any dispute "involving two or more members of the League," *id.* art. 8.3(A). The NFL Constitution thus requires the arbitration of *all* disputes between a coach and one or more member clubs.

Mr. Flores was bound to comply with those arbitration provisions at all times relevant to his claims against the Broncos, Giants, and Texans. He was under contract with the Patriots when he interviewed with the Broncos on January 5, 2019. *See* Flores-Patriots Agreement ¶ 2. He again agreed to be bound by the NFL Constitution in his employment agreement with the Dolphins, which ended on January 10, 2022. *See* Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Am. Compl. ¶ 177. And he is now bound to the NFL Constitution under his employment agreement with the Steelers, which entered into on February 18, 2022. *See* Flores-Steelers Agreement ¶ 13.

Although Mr. Flores was not employed by an NFL member club when he interviewed for head-coaching positions with the Giants and the Texans, disputes arising after his termination by the Dolphins can still be subject to arbitration under his employment agreement with the club where the dispute "involves facts and occurrences that arose before" his termination. *CPR (USA)*

*Inc.* v. *Spray*, 187 F.3d 245, 255 (2d Cir. 1999) (citing *Litton Fin. Printing Div.* v. *NLRB*, 501 U.S. 190, 206 (1991)).  That is the case here.

As for his claims against the Giants, Mr. Flores alleges (incorrectly) that "the Giants interview Black candidates because of the [Rooney Rule] and for no other reason."  Am. Compl. ¶ 199.  In support of that assertion, Mr. Flores cites the Giants' hiring of Ben McAdoo as their head coach in 2016 and Joe Judge in 2020.  *See id.* ¶¶ 196–98.  Mr. Flores also makes allegations regarding the Giants' interviewing practices "since the passage of the Rooney Rule" in 2003.  *Id.* ¶ 199; *see also id.* ¶ 192 (referring to the Giants' "history when it comes to race relations").  The Complaint thus makes clear that Mr. Flores's claims against the Giants involve conduct that predates the termination of his employment with the Patriots and Dolphins, rendering those claims arbitrable under the NFL Constitution, as incorporated into Mr. Flores's agreements with those clubs.  *See CPR*, 187 F.3d at 255.

As for his claims against the Texans, Mr. Flores alleges that the Texans failed to hire him "because he filed this lawsuit and opposed systemic racism in the NFL."  Am. Compl. ¶ 217.  According to Mr. Flores's own allegations, the systemic racism he purports to identify arose well before February 2022, when the Texans failed to select him to fill their head-coach vacancy.  *See id.* ¶¶ 207–16.  The Complaint contains numerous allegations regarding conduct that occurred while Mr. Flores was employed by the Patriots and Dolphins. *See, e.g.*, *id.* ¶¶ 64–74 (allegations beginning in 2016 regarding Colin Kaepernick); *id.* ¶¶ 293–99 (allegations beginning in 2014 regarding Jim Caldwell); *id.* ¶¶ 311–13 (allegations beginning in 2018 regarding Kris Richard).  Indeed, Mr. Flores's claims against the Broncos and Dolphins, Mr. Wilks's claims against the Cardinals, and Mr. Horton's claims against the Titans all relate to conduct occurring during that timeframe.  *See id.* ¶¶ 177, 201, 252, 274.  Mr. Flores's retaliation claim against the Texans also

"involves facts and occurrences that arose before expiration" of his employment agreements, *CPR*, 187 F.3d at 255, rendering it arbitrable under the NFL Constitution. Mr. Flores's claims against the Broncos, Giants, and Texans are all subject to arbitration.[3]

### 3. Steve Wilks's Claims Against the Arizona Cardinals

Mr. Wilks alleges that he was discriminated against by the Cardinals when he was terminated after one season and not given a meaningful chance during his tenure to succeed as the club's head coach. *See* Am. Compl. ¶¶ 231–62. His claims are plainly arbitrable under his employment agreement with the Cardinals, because they arose "between" him and the Cardinals, concern his employment with the club, and thus clearly touch on issues under his agreement.

Mr. Wilks is also obligated to arbitrate his dispute with the Cardinals under the NFL Constitution, which he agreed to be bound by in connection with his previous employment by the Cardinals and his current employment by the Panthers. *See* Wilks-Cardinals Agreement ¶ 9(a); Wilks-Panthers Agreement ¶ 9(g). As already explained, *see* pp. 16–17, this multi-coach, multi-team dispute seeking league-wide relief clearly qualifies as "[a]ny dispute between any . . . coach . . . and any member club or clubs," NFL Const. art. 8.3(B), as well as "[a]ny dispute involving

---

[3] Mr. Flores's current obligation to comply with the NFL Constitution in connection with his employment with the Steelers also requires him to arbitrate his claims against the Giants and Texans. While the allegations supporting those claims arose before the Steelers agreement, the Second Circuit has repeatedly held that arbitration agreements that lack temporal limitations can apply to conduct that predates the agreement. *See, e.g.*, *Smith/Enron Cogeneration Ltd. P'ship, Inc.* v. *Smith Cogeneration Int'l Inc.*, 198 F.3d 88, 99 (2d Cir. 1999); *TradeComet.com LLC* v. *Google, Inc.*, 435 F. App'x 31, 34–35 (2d Cir. 2011) (compiling additional cases from other courts). If the arbitration agreement "does not contain any temporal limitation, the relevant inquiry is whether [the] claims" fall within the scope of the arbitration agreement, "not when they arose." *Smith/Enron Cogeneration*, 198 F.3d at 99; *see, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 407 (S.D.N.Y. 2003). Here, Mr. Flores's agreement with the Steelers requires him to comply with the NFL Constitution "at all times," including the present day as he pursues the claims alleged in this action. Flores-Steelers Agreement ¶ 13. The NFL Constitution's arbitration provisions themselves similarly lack any temporal limitations.

two or more members of the League," *id.* art. 8.3(A). And while Mr. Wilks's claims predate his current employment agreement with the Panthers, his obligation to comply with the NFL Constitution under that agreement contains no temporal limitation and thus applies to earlier-arising claims. *See Smith/Enron Cogeneration*, 198 F.3d at 99.

### 4. Ray Horton's Claims Against the Tennessee Titans

Mr. Horton alleges that the Titans discriminated against him by subjecting him to a sham interview and failing to promote him to head coach on January 16, 2016. *See* Am. Compl. ¶¶ 268–78. His employment agreement with the Titans was in effect at that time, and it required him to arbitrate "all matters in dispute between [him] and Titans." Horton-Titans Agreement ¶ 6(a). That broad language easily covers his claims, which center on an alleged act of discrimination during his employment with the club. *See Louis Dreyfus*, 252 F.3d at 225. Mr. Horton's obligation to abide by the NFL Constitution in connection with his employment with the Titans also required him to arbitrate his claims here, for reasons previously explained. *See* pp. 16–17, 20–21.

### 5. Plaintiffs' Claims Against the NFL

Plaintiffs' claims against the NFL are also arbitrable under Plaintiffs' employment agreements and the NFL Constitution.

*First*, the NFL is entitled to rely on the arbitration provisions in Plaintiffs' employment agreements. The NFL Commissioner signed and approved those contracts. *See* NFL Const. art. 9.3(A)(1); Flores-Dolphins Agreement 11; Wilks-Cardinals Agreement 13; Horton-Titans Agreement 9. And while the arbitration provisions in those agreements are facially limited to claims between the coach and the club, the Second Circuit has repeatedly held that, under the doctrine of equitable estoppel, a signatory to an arbitration agreement cannot avoid arbitration with a third party where there is a "close relationship" among the parties and the issues in dispute are "intertwined" with the contract containing the arbitration agreement. *See Doe* v. *Trump Corp.*, 6

F.4th 400, 412 (2d Cir. 2021); *Ross* v. *Am. Exp. Co.*, 547 F.3d 137, 146 (2d Cir. 2008); *Choctaw Generation Ltd. P'ship* v. *Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001). The requisite close relationship is present where the "basis of the relationships among the parties" demonstrates that "the promise to arbitrate" by the party opposing arbitration is "reasonably seen . . . as extending not only to" the contractual counterparty but also to a third party that "was, or would predictably become . . . affiliated or associated with [the contractual counterparty] in such a manner as to make it unfair to allow [the party opposing arbitration] to avoid its commitment to arbitrate on the ground that [the third party] was not the very entity with which [the party opposing arbitration] had a contract." *Sokol Holdings, Inc.* v. *BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008).

Under that standard, the NFL is entitled to enforce Plaintiffs' arbitration agreements with their former employers. By the very nature of the NFL as a voluntary membership association, all member clubs in the NFL are associated with one another and with the NFL—as Plaintiffs concede (although their assertion that the NFL acted as their joint employer is incorrect). *See, e.g.*, Am. Compl. ¶¶ 340, 342, 349. Indeed, far from not knowing the NFL "from Adam," *Ross*, 547 F.3d at 146, Plaintiffs were well aware of the associational relationship among member clubs and the NFL when they agreed to arbitrate claims related to their employment as NFL head coaches. After all, Plaintiffs are experienced NFL coaches, and they represented in their employment agreements that they had read the NFL Constitution, which sets forth the relationship between the NFL and its member clubs in detail. *See* Flores-Dolphins Agreement ¶¶ 7.1, 12.1; Wilks-Cardinals Agreement ¶ 9a; Horton-Titans Agreement ¶ 6(c). And as noted, the NFL expressly approved Plaintiffs' contracts.

Plaintiffs' claims against the NFL are also intertwined with, and derivative of, their disputes with the NFL's member clubs. The Complaint does not allege that Plaintiffs experienced

discrimination by the NFL *independent from* the alleged discriminatory employment actions taken by the clubs.  *See* Am. Compl. ¶¶ 158–206, 231–63, 268–84.  Plaintiffs' claims against the NFL are thus derivative of Plaintiffs' "disputes" with the member clubs, requiring the arbitration of claims related to the Dolphins, Cardinals, and Titans under Plaintiffs' employment agreements with those clubs.

The Second Circuit's decision in *Ragone* v. *Atlantic Video at Manhattan Center*, 595 F.3d 115 (2d Cir. 2010), confirms that conclusion.  Plaintiff in *Ragone* was a makeup artist employed by Atlantic Video, a broadcast production company that provided services for ESPN, among other clients.  *Id.* at 118.  Alleging that certain ESPN employees sexually harassed her on set, plaintiff filed a lawsuit asserting employment-discrimination claims against both Atlantic Video and ESPN under Title VII and New York state and local law.  *Id.* at 117, 119.  Atlantic Video and ESPN both moved to compel arbitration under plaintiff's employment agreement with Atlantic Video, which required the arbitration of claims "arising out of [her] employment."  *Id.* at 118.  Plaintiff argued that her claims against ESPN were not arbitrable because ESPN was not a signatory to her employment agreement.  *See id.* at 126.

The Second Circuit disagreed.  *See Ragone*, 595 F.3d at 126–28.  Even though ESPN was not "linked textually" to the arbitration agreement, the Second Circuit reasoned that "it [was] plain" that plaintiff was "hired to provide make-up artistry and other services to ESPN[]" and would "extensively treat with ESPN personnel," demonstrating "the existence of a relationship" that allowed ESPN "to avail itself of the arbitration agreement" between plaintiff and her employer. *Id.* at 127–28.  There was also "no question that the subject matter of the dispute between [plaintiff] and [Atlantic Video]" was "factually intertwined with the dispute between [plaintiff] and ESPN," because it was "the same dispute."  *Id.* at 128.  Plaintiff was thus required to arbitrate her claims

against both the signatory (Atlantic Video) and the third party (ESPN).  *See id.*  So too here, given Plaintiffs' knowledge of the relationship between the NFL and the member clubs and the significant overlap of Plaintiffs' claims against the clubs and the NFL.

*Second*, the NFL Constitution requires the arbitration of all of Plaintiffs' claims against the NFL.  As already explained, *see* pp. 16–17, this case involves disputes between coaches and clubs, *see* NFL Const. art 8.3(B), and the entire dispute involves multiple members of the League, *see id.* art. 8.3(A).  In addition, Plaintiffs allege that Defendants all engaged in "the same unlawful patterns, practices and/or policies" and seek League-wide remedies that every member club and the NFL would be required to implement.  Am. Compl. ¶ 370 & pp. 97–98.  And as noted, *see* p. 17, this case involves allegations that member clubs violated internal NFL rules—matters best reserved for internal League resolution.

As was the case with Plaintiffs' employment agreements, the NFL is entitled to rely on Plaintiffs' obligation to abide by the NFL Constitution.  As already explained, *see* pp. 21–23, the requisite close relationship is present, and Plaintiffs' claims against the NFL are intertwined with— indeed, derivative of—Plaintiffs' claims against the member clubs.  *See id.*  Plaintiffs are thus required to arbitrate their claims against the NFL under the NFL Constitution in addition to their employment agreements with the Dolphins, Cardinals, and Titans.

### C.  Plaintiffs Must Arbitrate Their Claims on an Individual Basis

Not only are Plaintiffs required to proceed with their claims in mandatory arbitration, but they also must proceed on an individual, rather than classwide, basis.  Supreme Court precedent makes clear that, where an arbitration agreement is silent or ambiguous on the availability of class arbitration, "[c]ourts may not infer . . . that parties have consented to arbitrate on a classwide basis."  *Lamps Plus, Inc.* v. *Varela*, 139 S. Ct. 1407, 1419 (2019); *see Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010) ("An implicit agreement to authorize class-

action arbitration . . . is not a term that the arbitrator may infer solely from the fact of the parties'

agreement to arbitrate.").  Because the arbitration agreements at issue here do not authorize class

arbitration, Plaintiffs may only pursue their individual claims in bilateral arbitration.  *See, e.g.*,

*Lamps Plus*, 139 S. Ct. at 1419 (requiring plaintiffs in a putative class action to proceed with

bilateral arbitration); *Parisi*, 710 F.3d at 486–87 (requiring a plaintiff seeking to assert class claims

for employment discrimination to proceed in bilateral arbitration).  Accordingly, Plaintiffs' claims

should be compelled to arbitration, and Plaintiffs cannot proceed on a classwide basis.

## CONCLUSION

The motion to compel arbitration and stay further proceedings should be granted.


Dated: New York, New York
     June 21, 2022

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:  /s/ Loretta E. Lynch
Loretta E. Lynch
Brad S. Karp
Lynn B. Bayard
Brette Tannenbaum
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3900
lelynch@paulweiss.com
bkarp@paulweiss.com
lbayard@paulweiss.com
btannenbaum@paulweiss.com

*Attorneys for the National Football League, New York Giants, Miami Dolphins, Denver Broncos, Houston Texans, Arizona Cardinals, and Tennessee Titans*

# EXHIBIT 4

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made as of the 18th day of February, 2022 (the "Effective Date"), by and between **PITTSBURGH STEELERS LLC** ("Club"), and **Brian Flores** ("Coach"). Collectively, Club and Coach are referred to in this Agreement as the "Parties."

### WITNESSETH:

**WHEREAS,** Club and Coach desire to enter into this Agreement which provides for Coach to serve as Assistant Football Coach in connection with the operation of the professional football team operated by Club as a member of the National Football League ("NFL"); and

**WHEREAS,** Coach represents to Club that he is free to accept employment and has no prior obligation or commitments of any kind or anyone that would in any way hinder or interfere with the performance of his duties for Club; and

**WHEREAS,** Club and Coach agree that this Agreement supersedes and replaces any and all previous agreements (oral or written) between Club and Coach.

**NOW, THEREFORE,** Club and Coach, intending to be legally bound, agree as follows:

1. **Recitals.** The foregoing recitals are true and correct and incorporated herein.

2. **Term.** Subject to the terms and conditions of this Agreement, Club agrees to employ Coach, and Coach accepts such employment, for the two-year period (the "Term") commencing on the Effective Date and, unless sooner terminated in accordance with the provisions of Paragraph 5 below or extended in writing by mutual agreement of the parties, this Agreement shall expire on **February 28, 2024.** For clarification purposes, the Term shall consist of two (2) contract years (each a "Contract Year") defined as follows:

- Contract Year 1: (February 21, 2022 to February 28, 2023)
- Contract Year 2: (March 1, 2023 to February 28, 2024)





4



13.  **NFL Rules**.  Coach agrees to comply at all times with, and to be bound by, the Constitution and By-Laws as well as the Code of Conduct, and the Rules and Regulations of the NFL, in their present form and as the amended from time to time hereafter, which are hereby made a part of this Agreement, and by the decisions of the Commissioner thereof, which decisions shall be final, conclusive and unappealable.  Coach hereby acknowledges that he has read the NFL Constitution and By-Laws as well as the Code of Conduct and the Rules and Regulations, and understands his obligations thereunder.

14.  **Commissioner's Authority to Arbitrate Disputes**.  Coach agrees that all other matters in dispute between Coach and Club, including without limitation any dispute arising under any federal, state or local statute (such as claims alleging violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, or the Pennsylvania Human Relations Act) or arising from the terms of this Agreement, shall be referred to the Commissioner for binding arbitration pursuant to the NFL's arbitration guidelines, and that his decision shall be accepted as final, conclusive and unappealable.  It is further agreed that any award or finding made by the Commissioner as sole arbitrator of any such dispute, shall in all

5

respects be well and faithfully kept and observed and may be imposed by judgment of the appropriate court of the Commonwealth of Pennsylvania pursuant to the applicable laws relating thereto.



6



PITTSBURGH STEELERS LLC

By: _____
　　Arthur J. Rooney, II

_____
Brian Flores

APPROVED:

This ____ day of _____, 20___.

By: _____
　　**Commissioner**
　　**National Football League**

7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26, | Civil Action No.: 22-cv-00871 (VEC) |
| Defendants. | |

**DECLARATION OF DOLORES F. DIBELLA IN SUPPORT OF DEFENDANTS'**
**MOTION TO COMPEL ARBITRATION AND STAY FURTHER PROCEEDINGS**

I, Dolores F. DiBella, declare and state as follows:

1.    I am the Vice President of Legal Affairs for defendant National Football League, 345 Park Avenue, New York, NY 10154. I respectfully submit this declaration in support of Defendants' motion to compel arbitration and stay further proceedings.

2.    Attached as Exhibit 1 to this declaration is a true and correct copy of the Constitution and Bylaws of the NFL, revised as of September 14, 2016.

3.    Attached as Exhibit 2 is a true and correct excerpted copy of an employment agreement between Plaintiff Brian Flores and defendant Miami Dolphins, Ltd., dated February 4, 2019.

4.      Attached as Exhibit 3 is a true and correct excerpted copy of an employment agreement between plaintiff Brian Flores and New England Patriots LLC, dated February 1, 2016.

5.      Attached as Exhibit 4 is a true and correct excerpted copy of an employment agreement between plaintiff Brian Flores and Pittsburgh Steelers LLC, dated February 18, 2022.

6.      Attached as Exhibit 5 is a true and correct excerpted copy of an employment agreement between plaintiff Steve Wilks and defendant Arizona Cardinals Football Club LLC, dated January 22, 2018.

7.      Attached as Exhibit 6 is a true and correct excerpted copy of an employment agreement between plaintiff Steve Wilks and Panthers Football, LLC, dated February 16, 2022.

8.      Attached as Exhibit 7 is a true and correct excerpted copy of an employment agreement between plaintiff Ray Horton and defendant Tennessee Football, Inc., dated January 20, 2014.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 21, 2022 in New York, New York.

_____
Dolores F. DiBella

2

**WIGDOR LLP**

ATTORNEYS AND COUNSELORS AT LAW

85 FIFTH AVENUE
NEW YORK, NY 10003
TEL 212.257.6800
FAX 212.257.6845
WWW.WIGDORLAW.COM

**Douglas H. Wigdor**
dwigdor@wigdorlaw.com

July 1, 2022

**VIA ECF**

The Honorable Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square, Room 240
New York, New York 10007

   Re:  *Flores, et al. v. The National Football League, et al*.; No. 22 Civ. 00871 (VEC)

Dear Judge Caproni,

We, along with Elefterakis, Elefterakis & Panek, represent Plaintiffs and write pursuant to the Court's order dated May 2, 2022 to seek an order compelling Defendants to produce discovery related to the pending motion to compel arbitration (the "Motion").  Dkt. Nos. 43, 47-50. Defendants' Motion is a critical moment in this litigation, as its outcome will determine whether this proceeding will either remain in an open public forum and be decided by a jury of Plaintiffs' peers, or be moved to a private setting with the arbitration forum, procedure and/or merits decided by a biased arbitrator.  Respectfully, for reasons described herein, Defendants' Motion cannot be decided without appropriate discovery.

I.  <u>Standard on a Motion to Compel Arbitration</u>

Courts regularly note that "[i]n a typical motion to compel arbitration, the Court would apply a standard similar to that of a summary judgment motion . . . and *some discovery may be allowable or necessary*." <u>Aleksanian v. Uber Techs. Inc.</u>, 524 F. Supp. 3d 251, 258 (S.D.N.Y. 2021) (emphasis added), <u>recon. denied,</u> No. 19 Civ. 10308 (ALC), 2021 WL 6137095 (S.D.N.Y. Dec. 29, 2021) (citing <u>Lismore v. Societe Generale Energy Corp.</u>, No. 11 Civ. 6705, 2012 WL 3577833, at *1 (S.D.N.Y. Aug. 17, 2012)); <u>see also</u> <u>Ryan v. JPMorgan Chase & Co.</u>, 924 F. Supp. 2d 559, 561 (S.D.N.Y. 2013) (in "motions to compel arbitration . . . the court applies a standard similar to that [of a] motion for summary judgment . . . [and consider if] pleadings, *discovery materials before the Court*, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law") (emphasis added) (citations omitted).

Given the summary judgment standard, it hardly needs to be cited that such standard can only be applied "*after adequate time for discovery*."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (emphasis added).  Therefore, discovery must be permitted on a motion to compel arbitration when it is relevant to the adverse party's defenses.  <u>See</u>, <u>e.g.</u>, <u>L. Enf't Sys., Inc. v. Am. Express Co.</u>, No.



03 Civ. 3371 (DLI)(KAM), 2006 WL 2034435, at *1 (E.D.N.Y. July 17, 2006) (affirming magistrate judge's order compelling motion-related discovery "[b]ecause the discovery at issue is relevant to plaintiffs' defenses against a motion to compel arbitration"); Hudson v. Babilonia, No. 3:14 Civ. 01646 (MPS), 2015 WL 1780879, at *2 (D. Conn. Apr. 20, 2015) (permitting discovery into matters relevant to motion to compel arbitration).

Defendants have moved to compel arbitration and have unilaterally attached to their Motion documents and affidavits—i.e. discovery—that they believe to be operative and that they desire for the Court to consider.  However, Plaintiffs have not had any opportunity to conduct any discovery, much less "adequate discovery," in support of their opposition arguments, and thus are not in a position do to the same.  It would be manifestly unfair for Plaintiffs to be limited with a documentary and discovery record created by Defendants in this Motion of utmost importance to their rights and the public's interest in this matter.  Accordingly, Plaintiffs have requested narrow and appropriate discovery from Defendants.  See Ex. A.  As per the NFL's "standard operating procedures," Defendants have refused to engage in any discovery.  See Ex. B.  The parties met and conferred, and Defendants did not modify this position.

## II.  Discovery Regarding Arbitration Agreements, Policies and Procedures

Defendants argue that Plaintiffs each entered into arbitration agreements with the respective NFL teams named as parties.  Defendants attached to the Motion various employment contracts as well as the NFL Constitution & Bylaws as evidence of such agreements.  Defendants have asked the Court to consider these contracts and nothing else in determining whether Plaintiffs entered into arbitration agreements with the NFL teams and, if so, the terms of any such arbitration agreements.

Plaintiffs have requested that Defendants produce documents regarding Defendants' policies and procedures related to arbitration (see Ex. A at No. 1) and any agreements between Plaintiffs and Defendants that might bear on the issue of arbitration (i.e. any other contracts, employee handbooks and/or onboarding documents) (see id. at No. 2).  The basis for these requests is simple—to the extent other documents exist which cover the topic of arbitration or dispute resolution, those could very likely impact the outcome of this Motion.  For instance, but only as an example, if any Plaintiffs and Defendants entered into any other contract containing a merger/integration clause (i.e. stating that the agreement supersedes all other agreements) or containing any other dispute resolution terms, such documents would likely bear on the enforceability of the arbitration agreements at issue.  As another example, if Defendants provided Plaintiffs with employee handbooks or similar materials describing dispute resolution terms that differ from the employment contracts, such documents also might undermine Defendants' argument as to how the parties agreed to resolve disputes.

Defendants have refused to provide the requested documents, stating that "the issue of arbitrability is one that can be decided based solely on the relevant contractual provisions" and the "discovery you seek is not only premature and wholly irrelevant, it is also unnecessary for Plaintiffs to oppose—or for the Court to resolve—Defendants' pending motion."  See Ex. B.  For the reasons



set forth above, these documents clearly meet the broad relevance standard for discovery under Fed. R. Civ. P. 26(b)(1), particularly given the significance of the issues at stake in the Motion.

### III.     Discovery Regarding Arbitrator Bias

As explained to the Court, Plaintiffs intend to oppose Defendants' Motion, in part, on the basis that any purported arbitration agreement is unenforceable due to NFL Commissioner Roger Goodell's obvious bias and inability to be impartial.  See Ex. C at 6:22-8:6.  Despite Defendants' awareness of this argument, they neither denied such bias nor even addressed the issue in their moving papers, likely aware that doing so would open them up to discovery on that topic.  But Defendants' decision not to address Mr. Goodell's bias does not somehow convert it into a non-issue.

An arbitration agreement can be rendered unenforceable by virtue of its failure to provide for a fair, neutral and impartial forum free from bias.  See, e.g., Hooters of Am., Inc. v. Phillips, 173 F.3d 933, 941 (4th Cir. 1999) ("By promulgating this system of warped rules, Hooters so skewed the process in its favor that Phillips has been denied arbitration in any meaningful sense of the word. To uphold the promulgation of this aberrational scheme under the heading of arbitration would undermine, not advance, the federal policy favoring alternative dispute resolution."); Floss v. Ryan's Family Steak Houses, 211 F.3d 306, 314 (6th Cir. 2000) (refusing to compel arbitration, stating "the neutrality of the forum is far from clear in light of the uncertain relationship between [defendant] and [arbitral provider] . . . in light of [arbitral provider's] role in determining the pool of potential arbitrators, any such bias would render the arbitral forum fundamentally unfair"); McMullen v. Meijer, Inc., 355 F. 3d 485, 494 (6th Cir. 2004) (refusing to compel arbitration where there was "risk of bias inherent" in the arbitrator selection process such that it was "not an effective substitute for a judicial forum"); Walker v. Ryan's Family Steak Houses, 400 F.3d 370, 385 (6th Cir. 2005) (affirming invalidity of arbitration where the forum received substantial income from defendant and defendant was effectively choosing the entire panel; "a court cannot enforce the agreement as to a claim if the specific arbitral forum provided under the agreement does not allow for the effective vindication of that claim."); Cole v. Burns Int'l Sec. Servcs., 105 F. 3d 1465, 1482 (D.C. Cir. 1997) ("At a minimum, statutory rights include both a substantive protection and access to a neutral forum in which to enforce those protections").

Plaintiffs seek discovery on the bias inherent in the NFL's arbitration program which requires that Mr. Goodell act as arbitrator and/or gatekeeper—a bias that prevents Plaintiffs from vindicating their statutory claims under federal and state anti-discrimination laws.  The risk of bias here is already supported by a factual predicate, as set forth at the initial conference.  Specifically, Mr. Goodell is not only a direct employee of the NFL, but also serves at the leisure of the NFL's teams.  Mr. Goodell governs the NFL and is responsible for, *inter alia*, its financial and reputational health.  Mr. Goodell cannot possibly be an impartial arbiter of any aspect of this proceeding, when a decision against the NFL and/or its teams would harm the league both financially and reputationally.  Moreover, the NFL and its teams reportedly paid Mr. Goodell approximately $127.8 million in compensation over the last two years.  See, e.g., Ex. D.  Mr. Goodell has also been and remains directly represented by the NFL's counsel in this matter, Paul,



Weiss, Rifkind, Wharton & Garrison ("Paul Weiss").  Furthermore, the NFL publicly stated, after this action was filed, that Mr. Flores' claims "are without merit."  See Ex. E.  Thus, having already established a substantial predicate of bias, we should not be limited to merely publicly available material that has escaped the NFL's closed circuit of information.  Plaintiffs should be entitled to take legitimate discovery on this issue to properly present this important matter to the Court.

Accordingly, Plaintiffs have requested the following:

- Documents regarding Mr. Goodell's compensation, his dialogue regarding same, and the NFL teams' evaluation of his job.  See Ex. A at Nos. 3, 4 and 5.  These documents will demonstrate Mr. Goodell's extreme personal financial interest in maintaining his position and the level to which he is financially beholden to the NFL and its teams.  These documents will also demonstrate that he negotiates directly with the teams named as Defendants in this action and that he reports directly to those teams given that they assess his performance.

- Documents regarding Mr. Goodell's involvement as an arbitrator in any dispute involving an NFL team, including pleadings and documents related to Mr. Goodell's arbitral rulings, determinations and orders.  See Ex. A at No. 6.  These documents will show, inter alia, the number of times Mr. Goodell has arbitrated matters for the NFL teams, the fairness of the rulings, orders and determinations Mr. Goodell has made in such matters, and the number of times Mr. Goodell has actually issued an award against an NFL team.

- Documents regarding Mr. Goodell's relationships with NFL team executives and/or with defense counsel.  We proposed, as an alternative, for Mr. Goodell to provide a full disclosure describing any such relationships.  See Ex. A at Nos. 7 and 8.  These are commonplace and non-controversial disclosures for a fact finder to provide to avoid the appearance of bias or impropriety.  Defendants have refused to consider this request.  See, e.g., Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S., 492 F.3d 132, 137 (2d Cir. 2007) ("An arbitrator who knows of a material relationship with a party and fails to disclose it meets [the] 'evident partiality' standard: A reasonable person would have to conclude that an arbitrator who failed to disclose under such circumstances was partial to one side.").

- A deposition of Mr. Goodell, limited in scope to the matters at issue in the Motion.  See Ex. A at No. 11.  For the same reasons the documents requested above are relevant, Plaintiffs should be entitled to question Mr. Goodell regarding the above-referenced documents and matters to be able to present to the Court any and all evidence of arbitrator bias.

Plaintiffs are entitled to this arbitration-related discovery which directly bears on issues in the pending Motion.  See, e.g., Nat'l Hockey League Players' Ass'n v. Bettman, No. 93 Civ. 5769 (KMW), 1994 WL 38130, at *2 (S.D.N.Y. Feb. 4, 1994) ("requested discovery that is plainly relevant to colorable claims of arbitral bias or misconduct may properly be granted") (collecting cases); Metro. Delivery Corp. v. Teamsters Loc. Union 769, No. 19-22649 Civ., 2019 WL



3752245, at *2 (S.D. Fla. Aug. 8, 2019) ("If discovery reveals, for example, that the Arbitrator and Defendant had an extensive working relationship and/or business dealings then Plaintiff will have a far more compelling argument that the arbitration award is tainted with bias.")

## IV.    The NFL's Reliance on Arbitration Agreements to Which it is Not Even a Party

The NFL argues that even though it is a not a party to the contracts at issue, it should be able to avail itself of the arbitration agreements to compel arbitration.  The NFL claims that it has a "close relationship" with the NFL teams such that Plaintiffs somehow knowingly agreed that the terms extended to claims against the NFL.  See Dkt. No. 48 at p. 21-24.  Let us be very clear here: the NFL asks the Court to make a factual determination—on the basis of nothing other than the contracts—that, *as a matter of law*, Plaintiffs all intended to arbitrate claims with the NFL when they purportedly agreed to arbitrate claims against the respective NFL teams.

There is a wealth of recent case law in the Second Circuit on the precise issue of when a non-signatory can avail itself of an arbitration agreement.  See, e.g., Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115 (2d Cir. 2010); Sokol Holdings, Inc. v. BMB Munai, Inc., 542 F. 3d 354 (2d Cir. 2008).  Courts will consider whether, *inter alia*, "the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." Ragone, 595 F.3d at 127 (citations omitted).  This does not mean, the Ragone Court explained,

> that whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate . . . [I]n addition to the "intertwined" factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.

Ragone, 595 F.3d at 127 (citing Sokol 542 F.3d at 359).  The Second Circuit has held that any such determination must be "consistent with the basic principle that *one does not give up one's right to court adjudication except by consent* . . . [t]he cases, in other words, are consistent with the black letter rule that the obligation to arbitrate depends on consent." Sokol, 542 F. 3d at 361 (emphasis added).  To that end, it is very clear that such a determination can only be made following "*a careful review of the 'relationship among the parties*,'" and "*we have cautioned that this estoppel inquiry is fact-specific*." JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 177-78 (2d Cir. 2004) (emphasis added) (citations omitted).  A careful, cautioned, fact-specific inquiry cannot be accomplished by accepting arguments as fact—it requires discovery.

Plaintiffs have attempted to engage in this fact-specific inquiry by requesting an exchange of information from Defendants related to this argument.  See Ex. A at No. 10.  Defendants have refused, in contravention of the fact-specific inquiry required by the Second Circuit.



**V.**    <u>**Conclusion**</u>

For the reasons set forth herein, Plaintiffs respectfully request an order compelling Defendants to produce the discovery described above and requested as set forth in Exhibit A.  Also as set forth in Exhibit A, Plaintiffs acknowledge that discovery requires cooperation between the parties and Plaintiffs are ready, willing and able to promptly meet and confer with Defendants to ensure the expeditious completion of the discovery requested herein.

Respectfully submitted,

Douglas H. Wigdor

cc:  All counsel of record (*via* ECF)

Encl.

# Exhibit A

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

85 FIFTH AVENUE
NEW YORK, NY 10003
TEL 212.257.6800
FAX 212.257.6845
WWW.WIGDORLAW.COM

**Douglas H. Wigdor**
dwigdor@wigdorlaw.com

June 24, 2022

**VIA EMAIL**

Loretta E. Lynch, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

> Re:  *Flores v. The National Football League, et al*.; Case No. 22 Civ. 00871 (VEC)

Dear Loretta,

We have reviewed Defendants' motion to compel arbitration (the "Motion") and, as previously advised, certain discovery is necessary for us to properly respond and for the Court to rule on the issues presented.  Accordingly, pursuant to the Court's order dated May 2, 2022, we request the following discovery from all Defendants in an expedited manner:

1.  All documents[1] regarding Defendants' policies and procedures related to arbitration.

2.  All documents regarding any agreements and/or policies between any Plaintiff and any NFL team, including but not limited to all contracts, handbooks and/or onboarding documents.

3.  All documents regarding the NFL Commissioner Roger Goodell's compensation over the last 10 years, including but not limited to employment contracts, addendums and/or extensions, and documents reflecting base, bonuses and/or incentive compensation.

4.  All documents regarding Mr. Goodell's negotiation, requests and/or dialogue related to his compensation over the last 10 years.

5.  All documents related to the NFL teams' evaluation and/or assessment of Mr. Goodell's performance.

6.  All documents regarding Mr. Goodell's involvement as an arbitrator in any dispute involving an NFL member team, including but not limited to, determinations on whether a

---

[1]  The term "documents" as used herein is defined as set forth in Local Civil Rule 26.3.



dispute is "football related," pleadings, orders, discovery-related decisions, motion decisions and/or awards.

7. All documents regarding Mr. Goodell's personal, social and/or professional relationship with any NFL team owners and/or senior executives; or, in the alternative, a full disclosure describing any and all personal, social and/or professional relationships Mr. Goodell has with any NFL team owners and/or senior executives.

8. All documents regarding Mr. Goodell's personal, social and/or professional relationship with any lawyer or law firm representing any Defendants in this action, including but not limited to, Paul, Weiss, Rifkind, Wharton & Garrison LLP and   uinn Emanuel Urquhart & Sullivan, LLP.

9. All documents regarding any statements or communications, by, from, to, with, or between, any NFL senior executive, including, without limitation, Mr. Goodell, regarding (i) any Plaintiff, (ii) the <u>Flores et al.</u> matter, including but not limited to its merits or supposed lack thereof and (iii) the allegations in the Complaint and/or Amended Complaint.

10. All documents regarding, supporting or undermining Defendants' contention that Plaintiffs agreed to arbitrate their clams with the NFL as set forth on pages 21-24 of Defendants' Memorandum of Law in support of the Motion, including but not limited to any and all documents reflecting the overlap, interconnectivity and intertwined operations between the NFL teams and the NFL.

11. A deposition of Mr. Goodell, limited in scope to the matters at issue in the Motion and Plaintiffs' anticipated response.

We anticipate that these requests will involve the search, review and production of certain electronically stored information ("ESI"), including but not limited to emails, text and instant messages, and other electronic data.  We will work cooperatively and expeditiously with you in the formulation of an ESI protocol to address these matters.

Please let us know if Defendants will provide the discovery requested by Monday, June 27, 2022. We are also available to meet and confer at your earliest convenience.

Sincerely,

Douglas H. Wigdor

# Exhibit B

J.A. 234

(212) 373-3118

(212) 492-0118

lelynch@paulweiss.com

June 27, 2022

**Via Email**

Douglas H. Wigdor
Wigdor LLP
85 Fifth Avenue
New York, NY 10003

      Re:     *Flores, et al.* v. *The National Football League, et al.*, No. 22-cv-871-VEC

Dear Doug:

      We write in response to your June 24, 2022 letter.

      In your letter, you set forth several broad requests for discovery, to be conducted on an "expedited" basis, which you believe is necessary in order for Plaintiffs to oppose Defendants' pending motion to compel arbitration.

      We have reviewed your requests and find them to be entirely outside the scope of permissible discovery, particularly on Defendants' motion to compel arbitration. As Judge Caproni noted at our initial pre-trial conference, the issue of arbitrability is one that can be decided based solely on the relevant contractual provisions—all of which have been attached as exhibits to Defendants' motion—and thus requires no discovery to resolve. *See* Initial Pre-Trial Conference Tr. 6:18–21 (May 2, 2022); *see also Nicosia* v. *Amazon.com, Inc*., 834 F.3d 220, 231 (2d Cir. 2016) ("[W]hen it is apparent—on the face of the complaint and documents properly incorporated therein—that claims are subject to

arbitration, a district court may dismiss in favor of arbitration without the delay of [engaging in] discovery."). The discovery you seek is not only premature and wholly irrelevant, it is also unnecessary for Plaintiffs to oppose—or for the Court to resolve—Defendants' pending motion.

Accordingly, we do not intend to produce any documents, or make any witnesses available for deposition, at this time.

We are available to meet and confer regarding your requests if needed. We are currently available on Tuesday before 11:30 a.m. or after 3 p.m., on Wednesday after 10 a.m.; and on Thursday between 10 a.m. and 3:30 p.m.

We reserve all rights.

Sincerely,

/s/ *Loretta E. Lynch*
Loretta E. Lynch

Exhibit C

M52QfloC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BRIAN FLORES, et al.,

4              Plaintiffs

5        v.                          22 Civ. 871 (VEC)
                                         Conference
6   THE NATIONAL FOOTBALL LEAGUE
    et al.
7
               Defendants
8
    ------------------------------x
9                                   New York, N.Y.
                                    May 2, 2022
10                                  11:00 a.m.

11  Before:

12                 HON. VALERIE E. CAPRONI

13                                  District Judge

14                      APPEARANCES

15  WIGDOR LLP
         Attorneys for Plaintiffs
16  DOUGLAS WIGDOR

17  DAVID GOTTLIEB
    - and -
18  ELEFTERAKIS ELEFTERAKIS & PANEK
         Attorneys for Plaintiffs
19  JOHN ELEFTERAKIS
    JOHNSON ATKINSON
20

21  PAUL WEISS RIFKIND WHARTON & GARRISON LLP
         Attorneys for Defendants
22  LORETTA LYNCH
    BRAD KARP
23  BRETTE TANNENBAUM
    MAIA USUI
24

25  ALSO PRESENT:  DOLORES DIBELLA

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**J.A. 238**

M52QfloC

```
 1              (In open court; case called)
 2              DEPUTY CLERK:  Counsel, please state your appearance
 3      for the record.
 4              MR. WIGDOR:  Good morning, your Honor.  Douglas
 5      Wigdor, Wigdor LLP.  And with me, I have my partner David
 6      Gottlieb; John Elefterakis from Elefterakis Elefterakis and
 7      Panek; and his colleague, Johnson Atkinson.
 8              THE COURT:  Good morning, Mr. Wigdor, Mr. Gottlieb,
 9      Mr. Elefterakis, and Mr. Atkinson.  Front table should sit
10      down.
11              MS. LYNCH:  Good morning, your Honor.  For the
12      defendants, Loretta Lynch from the firm of Paul Weiss Rifkind
13      Wharton & and Garrison, along with my partners, Mr. Brad Karp,
14      Ms. Brette Tannenbaum, my associate, Maia Usui.  We also have a
15      client representative, Ms. Delores Dibella, the VP of legal
16      affairs for the league.
17              THE COURT:  Good morning, Ms. Lynch, Mr. Karp,
18      Ms. Tannenbaum and Ms. Usui.  Back table may sit down.
19              The rules of the courtroom are you're allowed to
20      remove your masks when you're speaking.  I would ask that you
21      do that.  It makes it easier for me to understand and for the
22      court reporter to understand.
23              Just as full disclosure, as many of you may know,
24      Ms. Lynch and I were AUSAs together in the U.S. Attorney's
25      Office in Brooklyn many years ago, and we dine together on
```

**J.A. 239**

1   occasion.

2           With that, let me ask, actually, the NFL, or

3   Ms. Lynch, can you just help me a little bit with what is the

4   legal relationship between the NFL and the teams?

5           MS. LYNCH:  Your Honor, the legal relationship is that

6   the league is a trade association and the teams are members of

7   that association.  While the league does set rules and

8   standards for its members to abide by, some of which will be an

9   issue in this case, the teams are separate legal entities.

10  They have separate management structures from the league

11  itself, and they also, for purposes of this case, most

12  relevant, have separate hiring and management decision

13  structures.

14          THE COURT:  Right.  But the NFL signs the contracts.

15          MS. LYNCH:  Ultimately, the contracts are established

16  between an individual in various positions and a team, and then

17  the NFL reviews them to ensure that they do comply with rules

18  in the constitution, but the terms of the agreement are struck

19  between an individual and the relevant team which will

20  ultimately employ them.

21          THE COURT:  I'm taking that for what it's worth, and I

22  recognize that these things are disputed.  I just couldn't

23  quite figure out how these things worked together.

24          Mr. Wigdor, do I read your letter correctly that you

25  have not yet filed a complaint with the EEOC?

1          MR. WIGDOR:  That is correct, your Honor.  We

2     anticipate doing that in the coming week or two, so we

3     obviously don't have our right to sue and have not asserted any

4     Title VII claims at this point.

5          THE COURT:  Understood.  It strikes me, kind of

6     notwithstanding the parties letters and requests for massive

7     amount so pages to do the motion to dismiss that the critical

8     path here, at least the first step of the critical path, is

9     whether your case has to go to arbitration.

10          So I guess my question is:  Why isn't it more

11     efficient to start with that issue as stand-alone issue?  If

12     you stay in federal court, then the defendants can make their

13     standard motion to dismiss.  If you get sent off to

14     arbitration, then all of this is really irrelevant to me, and

15     it's really a matter for the arbitration.

16          Mr. Wigdor.

17          MR. WIGDOR:  Your Honor, on behalf of the plaintiffs,

18     we don't disagree with that contention, your Honor.  In fact,

19     we think that we should be able to have limited discovery on

20     the contemplated motion to compel arbitration.

21          THE COURT:  Tell me about that.

22          MR. WIGDOR:  As your Honor pointed out -- your Honor,

23     may I go to the lectern if that's okay?

24          THE COURT:  If you're more comfortable, that's fine.

25          MR. WIGDOR:  Thank you.

1          So, your Honor, the NFL and its member teams are

2    seeking to adjudicate this matter behind closed doors and in a

3    confidential arbitration proceeding.  And as your Honor knows,

4    arbitration is a creature of contract.  And you can't add terms

5    to an arbitration agreement that do not exist, and you cannot

6    enforce an arbitration agreement where it is unconscionable or

7    where the plaintiffs are unable to vindicate their statutory

8    rights.

9          And if we look at the applicable agreements here --

10   and I don't think your Honor has a copy of those.

11         THE COURT:  I don't think so.  If I do, I certainly

12   haven't looked at it.

13         MR. WIGDOR:  If it's okay with your Honor, I would

14   like to share with you the applicable arbitration agreements

15   and explain to you why ultimately any motion to compel

16   arbitration will be denied in this case; namely, because it is

17   unconscionable, and because it would effectively make the

18   plaintiff's ability to vindicate their statutory rights

19   impossible.  And, more importantly, the easy questions would be

20   that the NFL is not subject to the arbitration agreements, only

21   the club teams, and the arbitration agreements would not cover

22   Mr. Flores's failure-to-hire claims because at the point he was

23   interviewing for positions at the Giants and also with the

24   Broncos and for the Texans, he was not subject to any

25   arbitration clause.  He was not under any contract.

1          If it's okay with your Honor, I would like to just

2     walk you through the arbitration agreements and explain why

3     they are on their face unconscionable and why they would not

4     permit the plaintiffs to effectively pursue their statutory

5     rights.

6          THE COURT:  Here's the thing.  I am not going to

7     decide it orally here.  And, therefore, it strikes me as this

8     is sort of a classic issue where there are contracts and they

9     need to be looked at.  I understand your point, which is he

10    wasn't subject to any kind of a contract for purposes of his

11    failure-to-hire a claim, and that may ultimately mean that

12    those pieces of whatever of your claim don't get arbitrated.

13    But putting that to one side -- so I don't want to hear on the

14    merits.  What I do want to hear is that you seem to think that

15    there is discovery that's relevant -- that will be relevant to

16    a motion to compel arbitration.

17         MR. WIGDOR:  Yes.

18         THE COURT:  And typically motions to compel

19    arbitration are straightforward contract cases where other than

20    the contract that the defendant is relying on, there's no

21    discovery that's appropriate or ordered.

22         MR. WIGDOR:  Well, this is a unique circumstance.

23         THE COURT:  Every case thinks they're unique.

24         MR. WIGDOR:  You have an employment agreement, and you

25    have the NFL constitution and bylaws which are the applicable

M52QfloC

1    documents here.  They call for none other than Commissioner

2    Goodell to be the arbitrator.  And Commissioner Goodell, and

3    the discovery that we would take that we already know, is an

4    employee of the teams.  He earned approximately $120 million

5    over the last two years, salaries paid for by the teams.  He

6    claimed, after we filed the lawsuit, that the claims were

7    without merit, and he is represented by Paul Weiss and has been

8    represented by Paul Weiss in the past.

9         That's what we just know now, but I believe we're

10   entitled to further discovery that would show this

11   unconscionable bias of the arbitrator who is the arbitrator

12   that would be overseeing this case, and in motions to compel

13   arbitration, they are typically looked at in sort of the same

14   context as a summary judgment motion where you have affidavits

15   and you have other evidence, especially on the issue of bias.

16        On the issue of bias or on the issue of effective

17   vindication of rights, both of those issues go beyond the

18   contract because they go to why the contract should not be

19   enforceable and a lot of those things require other materials.

20   Even the things I've listed, I would need to show your Honor

21   the documents to support that what I'm saying is actually true,

22   but I also believe there would be further evidence to show that

23   it would be unconscionable bias, and it would be impossible for

24   the plaintiffs to effectively vindicate their rights if the

25   Commissioner Goodell, given what I've shared just with your

**J.A. 244**

M52QfloC

1   Honor, were to oversee this arbitration process.

2           So, that is the reason why on that issue, putting

3   aside the other issues regarding single employer, putting aside

4   the tolling issues, I agree with your Honor we should tackle

5   this issue first, but I believe that we should be entitled to

6   some limited discovery before they move to compel arbitration.

7           Again, the NFL is not going to be subject to the

8   arbitration clause anyway, neither is the failure to hire a

9   claim, so some piece of this claim is going to be in this

10  court regardless of whether your Honor finds unconscionable

11  bias and/or the inability to effectively vindicate rights.

12          THE COURT:  Okay.  So your view is that the

13  arbitration doesn't cover everything; it only would cover the

14  claims against the teams?

15          MR. WIGDOR:  It would only cover the claims that are

16  unrelated to the failure-to-hire claims.  So it would only

17  cover the termination claims by Mr. Flores when he was

18  terminated by the Dolphins.  It would include the

19  failure-to-promote claim arguably by Mr. Horton, and it would

20  include the termination claim of Mr. Wilks.  Those would be the

21  only claims that I would see would be even arguably subject to

22  the arbitration clause because the other claims, which are the

23  failure-to-hire claims, Mr. Flores was not subject to any

24  arbitration agreement at that point in time.

25          THE COURT:  Okay.  Got it.

1          Ms. Lynch?  The real question -- the question on the

2     table, whoever is arguing, the question on the table is whether

3     I should take this in bite-size pieces and start with the

4     arbitration, recognizing that Mr. Wigdor is going to presumably

5     respond to your motion or to compel arbitration with a request

6     for discovery, which may or may not be granted.

7          MS. LYNCH:  Well, your Honor, I certainly think that

8     in terms of efficiency, you have outlined an incredibly

9     efficient way to begin because it is the defendant's position--

10          THE COURT:  I love efficient ways of proceeding.

11          MS. LYNCH:  That -- it is the defendant's position

12     that all of the matters that have been raised by plaintiffs,

13     and we can see, of course, that they are serious matters, all

14     of them are covered by the relevant arbitration agreements.

15     They're individual ones that each plaintiff has signed

16     specifically with their respective employers, the teams, and

17     those agreements specifically incorporate a portion of the NFL

18     Constitution, which also sets forth in greater detail

19     arbitration proceedings, and, in fact, allows for arbitration

20     of -- not as Mr. Wigdor views it in the limited and somewhat

21     truncated manner that only relate to the failure-to-hire and

22     the claims for Mr. Horton and Mr. Wilks, but in fact does

23     discuss the nature of claims that are here.  In fact, mentions

24     discrimination claims as possibly being subject to arbitration

25     as well, and those are different procedures.

1          THE COURT:  How are you -- I'm sorry to interrupt, but

2     so Mr. Wigdor argues that it's not going to cover, but

3     presumably because there is no contract, failure-to-hire

4     claims.  How does -- what's the defendant's theory on how

5     failure-to-hire is included within the arbitration agreement?

6          MS. LYNCH:  Well, your Honor, we feel that it is, and

7     certainly that will be set forth in our motion.  We do think

8     that the arbitration agreements essentially say that all claims

9     shall be dealt with, and the inclusion and the incorporation of

10    the constitution covers all relevant claims, and that that

11    certainly gives us the jurisdiction for arbitration over those

12    claims.  Of course, that will be up to the Court to decide once

13    you see the papers.

14          But more to the point, your Honor, nothing in those

15    issues calls for premotion discovery.  Nothing in the issues,

16    as elucidated by Mr. Wigdor or the questions as raised by the

17    Court, require additional discovery from the defendants on any

18    of the points that have been raised in order to decide these

19    issues.  It is our position that the contracts themselves and

20    the arguments that will be made will be clear.  They will be

21    provided to Mr. Wigdor.  I believe he has some.  We're happy to

22    provide others, if he does not have the ones -- if, you know,

23    he wants to provide us information as to what else he might

24    require, and we think that this is, as the Court has noted, a

25    contract issue.  The issue is, is there a valid agreement to

1  arbitrate?  Does it in fact cover the types of claims that are

2  here?  And that will be decided from those literal papers.

3       THE COURT:  So here is what I'm prepared to do:  I'm

4  prepared to set a schedule on just the motion to compel.

5       Mr. Wigdor, after you see the defendant's motion to

6  compel arbitration, if you still are of the view that some

7  level of discovery is necessary in order to adequately respond

8  to that, meet and confer with the defendants.  If the parties

9  agree on some amount of limited discovery, that's great.  If

10  you can't agree, you can write a letter to me no more than five

11  single-spaced pages explaining to me why you need discovery and

12  why you need to adjourn your time to respond to the motion.  At

13  that point I will give the defendant time to respond to that,

14  and will decide that.

15       But otherwise here's your schedule, assuming the

16  plaintiff decides that in fact the motion to compel arbitration

17  is not a motion where you are either likely to either need or

18  get discovery.  So the defendant's motion to compel is due

19  June 21.  That is the date that you are otherwise going to file

20  the mega motion for those associates back at the camp that have

21  been working on everything else.  So sorry.  On the other hand,

22  they get their May and June reprieve.  That's limited to the

23  standard 25 pages for a motion.  You don't need 50 pages on

24  that.  The plaintiff's response will be due July 22; again,

25  standard 25 pages.  The defendant's reply is due August 5,

M52QfloC

1    standard size.

2           I'm not going to enter a case management plan until

3    that has decided.  So no discovery will go forward at this

4    point.  There just doesn't seem to be any point until we know

5    where we're going to be litigating this case.

6           I realize that this is probably a non-starter, but I

7    always ask parties every time they're in front of me whether

8    they are interested in a referral for a settlement conference.

9    This sort of seems like the kind of dispute that might benefit

10   from the parties talking to each other about settling it.  I

11   recognize it's very early in the process, but nevertheless.

12          Any interest in a settlement conference, Mr. Wigdor?

13          MR. WIGDOR:  As we put in a letter to the Court, we've

14   always been interested in talking about a way of making the NFL

15   a place that actually represents Black players exactly as the

16   coaches, so if part of those discussions are part of monetary

17   and non-monetary resolutions, we would be more than happy to

18   meet with your Honor, a magistrate judge, or anybody else.

19          THE COURT:  Ms. Lynch.

20          MS. LYNCH:  Your Honor, you also expressed the league

21   is focused also on important on the important issues and has in

22   fact begun to take steps there.  We have invited Mr. Wigdor and

23   his clients to participate in those discussions with the league

24   on specific issues that could in fact, in our view, greatly

25   advance the causes that are important to both sides.  To date

**J.A. 249**

1    they've declined to do so.  We respect that view on their part.

2    We hope that they will reconsider, but to date they've declined

3    to meet with us.  So at this point, we don't see that

4    settlement conferences would be useful.

5            MR. WIGDOR:  Can I just be clear on that, your Honor?

6    Which is that just the distinction that Ms. Lynch made might

7    not have been caught by your Honor, which is that we were

8    unwilling to meet without the assistance of a neutral, an

9    experienced magistrate judge or district court judge or a

10   mediator.  We felt that a neutral would be very important in

11   the process in discussing, so we're ready and prepared to do

12   that.  We're not prepared to meet with Commissioner Goodell who

13   might even be overseeing this arbitration and then have him

14   decide what he wants to do.

15           THE COURT:  Got it.  So NFL is not interested in

16   meeting with a neutral, I take it?

17           MS. LYNCH:  We feel that our arbitration process will

18   set up a neutral process, your Honor.

19           THE COURT:  I read that as a no.  Fine.

20           Again, I will be asking you the same question every

21   time I see you.  I will tell you again this strikes me as a

22   case that could benefit from settlement, but that's -- if

23   you're not ready for that at this point, you're not ready for

24   that at this point.

25           Anything further from the plaintiff?

M52QfloC

1          MR. WIGDOR:  No, your Honor.  I just want to thank
2    your Honor for having us in court.  This is my first time back.
3          THE COURT:  Welcome back to court.  I bet this is the
4    first time most of you have been back in a courtroom.
5          MR. WIGDOR:  It's very nice to be here, and I
6    appreciate it.
7          THE COURT:  It's wonderful.  I love having you back.
8    The courtrooms are secure.  We've got really good ventilation.
9          Anything further from the defendants?
10          MS. LYNCH:  Nothing further, only to echo Mr. Wigdor's
11    thanks to the Court.
12          THE COURT:  Glad to see you all in courtrooms.  Come
13    back many times.
14          (Adjourned)
15
16
17
18
19
20
21
22
23
24
25

# Exhibit D

Case 1:22-1260871-VEC  Doc-6339E5F24Ph Filed 07/05/22m Page 327/3

# Roger Goodell's astronomical pay revealed: NFL commissioner topped $125 million over past two years combined

🌐 **cbssports.com**/nfl/news/roger-goodells-astronomical-pay-revealed-nfl-commissioner-topped-125-million-over-past-two-years-combined/

John Breech



The pay of NFL commissioner Roger Goodell has been a closely guarded secret over the past six years, but it appears part of that secret has finally leaked out.

According to the *New York Times*, Goodell has pulled in nearly $130 million over the past two years combined. Goodell's pay was revealed during the NFL owners meeting on Wednesday. During the session, a slide was shown that showed Goodell's pay and multiple sources in the room told the *Times* what the exact number was.

Overall, Goodell earned $63,900,050 per year in each of the past two years, which means his pay was $127.8 million for fiscal years 2019-20 and 2020-21. One note about Goodell's pay is that it's mostly made up of bonuses with more than 90% of his earnings coming from bonus money. His pay was extra high over the past two years because he helped the NFL pull off two monstrous negotiations that helped cement the future of the league. First, he got

a new CBA signed in March 2020. One year later, he lined the NFL's pockets by getting the networks to agree to a new media deal that will pay out a total of $113 billion between now and 2033.

Before this week, the amount of money that Goodell had been paid had basically been a mystery over the past six years. The NFL used to hold tax-exempt status, which means anyone could look up Goodell's salary using public records. However, the league dropped the status in 2015 and since then, the NFL hasn't had to release any numbers related to Goodell's pay.

Goodell has been the NFL's commissioner since 2006 and although it's not clear what his pay was between 2016 and 2018, the Action Network estimates that he has made a total of $375 million during his 15-year career as commissioner, which is an average of $25 million per year. In 2015, the last year where his salary was a matter of public record, Goodell pulled in $32 million.

The commissioner's salary might draw the ire of some employees working in the league office if only because his astronomical pay is being revealed less than 18 months after the NFL asked hundreds of employees to take a pay cut. Back in April 2020, the league sent out a memo noting that Goodell was going to take a zero dollar salary due to the pandemic, but that gesture might ring hollow to league employees who now know that he made $63.9 million in a year where they were asked to take a pay cut that ranged from 5% to 15%.

Goodell is currently working under a five-year contract that runs through 2023 season.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS    NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

WRITER'S DIRECT DIAL NUMBER

(212) 373-3118

WRITER'S DIRECT FACSIMILE

(212) 492-0118

WRITER'S DIRECT E-MAIL ADDRESS

lelynch@paulweiss.com

July 8, 2022

**VIA ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

>     *Flores, et al.* v. *The National Football League, et al.*, No. 22-cv-871-VEC

Dear Judge Caproni:

Pursuant to the Court's Order dated May 2, 2022 (Dkt. 43), Defendants write to oppose Plaintiffs' July 1, 2022 letter motion (Dkt. 54) seeking to compel discovery in connection with Defendants' pending motion to compel arbitration. The requested discovery is both unnecessary for Plaintiffs to oppose, or this Court to resolve, Defendants' motion, and contrary to the law and practice of this Court. Accordingly, Plaintiffs' motion should be denied.

As a threshold matter, the legal question raised by Defendants' pending motion—whether this dispute should be compelled to arbitration—is a simple matter of contract interpretation, which, under Second Circuit law, should be resolved by answering just two questions: first, "whether the parties agreed to arbitrate," and second, "whether the scope of that agreement encompasses the claims at issue." *Cooper* v. *Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) (citation omitted). As this Court has already noted, this means that motions to compel arbitration are "typically . . . straightforward contract cases where[,] other than the contract that the defendant is relying on, there's no discovery that's appropriate or ordered." (Pls.' Ex. C at 6:18–21); *see Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) ("[W]hen it is apparent—on the face of the complaint and the documents properly incorporated therein—that claims are subject to arbitration, a district court may dismiss in favor of arbitration without the delay of [engaging in] discovery."). Accordingly, courts within this district regularly grant motions to compel arbitration without any discovery. *See, e.g.*, *Republic of Kazakhstan* v. *Chapman*, No. 21-

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

cv-3507, 2022 WL 420357, at *9 (S.D.N.Y. Feb. 10, 2022); *In re Generali COVID-19 Travel Ins. Litig.*, No. 20-md-2968, 2021 WL 6052127, at *9 (S.D.N.Y. Dec. 21, 2021); *Peiran Zheng* v. *Live Auctioneers LLC*, No. 20-cv-9744, 2021 WL 2043562, at *7 (S.D.N.Y. May 21, 2021).

As Defendants' brief in support of their motion to compel arbitration makes clear, that is the case here. Defendants' motion solely rests on, and thus can be resolved solely based on, the arbitration provisions contained in Plaintiffs' employment agreements and the NFL Constitution and Bylaws expressly incorporated into each of those agreements. To that end, Defendants have shown that the plain language of those provisions—which mandate the arbitration of "all disputes" or "all matters in dispute" between any coach and any member club, as well as any disputes concerning multiple members of the league—clearly establish that (i) the parties here "agreed to arbitrate," and (ii) Plaintiffs' claims fall within the scope of those agreements. *Cooper*, 990 F.3d at 179. (*See* Dkt. 48 at 12–24.) Thus, to resolve the issue, the Court need only interpret those provisions.

Accordingly, because each of these agreements was not only attached as an exhibit to Defendants' motion (Dkt. 49), but also incorporated by reference into Plaintiffs' Amended Complaint (*see* Am. Compl. ¶¶ 343–48)—in fact, Defendants even shared copies of some of these agreements with Plaintiffs as a courtesy in April 2022, months before their motion was filed—no discovery is necessary or appropriate. Indeed, courts have consistently compelled arbitration based solely on their interpretation of similar provisions in other NFL contracts. *See Foran* v. *NFL*, No. 18-cv-10857, 2019 WL 2408030, at *3 (S.D.N.Y. June 7, 2019); *Hanson* v. *Cable*, No. A138208, 2015 WL 1739487, at *1, 5–6 (Cal. Ct. App. Apr. 15, 2015).

Nowhere in their motion do Plaintiffs articulate any legitimate basis for deviating from the law of this District and this Circuit. Nor do they offer any legal authority in support of their position. It is not enough to merely assert, as Plaintiffs do, that their requested discovery is purportedly "relevant" to the broader dispute. (Dkt. 54 at 1–2.) That is insufficient to entitle an opposing party to discovery in connection with a motion to compel, especially where, as here, the existence or validity of the arbitration agreement is not in dispute.[1]

Indeed, Plaintiffs expressly acknowledge in their Amended Complaint that they entered into employment agreements with various member clubs. (*See* Am. Compl. ¶¶

---

[1] In the rare circumstances where "limited discovery" *is* allowed on a motion to compel arbitration, the requesting party must first adduce "reliable evidence" disputing a fact that is dispositive of the threshold question of arbitrability, such as the very existence of an agreement to arbitrate. *Moton* v. *Maplebear Inc.*, No. 15-cv-8879, 2016 WL 616343, at *4 (S.D.N.Y. Feb. 9, 2016); *cf. Ahmad* v. *Day*, No. 20-cv-4507, 2021 U.S. Dist. LEXIS 32401, at *3–6 (granting limited discovery into the metadata of the arbitration agreement in response to plaintiff's contention that his signature was falsified, and denying all other discovery requests). Plaintiffs have failed to do so here because they cannot do so.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3

343–48.)  And the relevant agreements were each signed by one of the Plaintiffs.  (*See* Dkt. 49-2 at 11; Dkt. 49-3 at 7; Dkt. 49-4 at 7; Dkt. 49-5 at 13; Dkt. 49-6 at 13; Dkt. 49-7 at 9.)  As discussed further below, Plaintiffs seek to avoid the settled law on interpreting and enforcing arbitration agreements by relying solely on unfounded, hypothetical attacks on Defendants' arguments in support of their discovery requests, none of which—even baldly asserted—would affect the threshold question of arbitrability.

In short, Plaintiffs have failed, contrary to this Court's express instruction, to explain why any of their requested discovery is "*necessary* in order to adequately respond" to Defendants' motion to compel arbitration.  (Pls.' Ex. C at 11:7 (emphasis added).)  For that reason, and the more specific reasons below, each of Plaintiffs' discovery requests should be denied.

## I.   Discovery Into Other "Arbitration Agreements, Policies and Procedures" Is Unnecessary

Plaintiffs' first category of discovery requests is for (i) "[a]ll documents regarding Defendants' policies and procedures related to arbitration," and (ii) "[a]ll documents regarding any agreements and/or policies between any Plaintiff and any NFL team, including but not limited to all contracts, handbooks and/or onboarding documents."  (Pls.' Ex. A at Request Nos. 1–2.)

None of these documents is in any way necessary to resolve Defendants' motion to compel arbitration.  The "policies and procedures" that may apply *if* this case is compelled to arbitration—which are, in any event, already set forth in the agreements and dispute resolution procedures attached to Defendants' motion (*see* Dkt. 49-2 at 12–16; Dkt. 49-5 at Ex. A)—have no bearing on *whether* the case is arbitrable in the first instance.  *See Wework Cos.* v. *Zoumer*, No. 16-cv-457, 2016 WL 1337280, at *5 (S.D.N.Y. Apr. 5, 2016) (granting motion to compel arbitration and noting that "[t]he lack of specific terms governing the arbitration's procedure does not invalidate the agreement").

Nor is it enough for Plaintiffs to merely speculate that there *may* be other documents or agreements that could "impact the outcome" of Defendants' motion (Dkt. 54 at 2), particularly when they have failed to identify any specific agreement, policy, handbook, or other document applicable to Plaintiffs—of which Plaintiffs would naturally have to be aware—that could bear in any way on the issue of arbitrability.  The law does not permit Plaintiffs to simply "avoid arbitration" based only on "the unsubstantiated hope that discovery may turn up something."  *Olsen* v. *Charter Commc'ns, Inc.*, Nos. 18-cv-3388, 18-cv-4972, 2019 WL 3779190, at *6 n.7 (S.D.N.Y. Aug. 9, 2019).  If that were the standard, courts would have to permit full-fledged discovery before *any* motion to compel arbitration could be resolved.

Accordingly, these requests should be denied.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

4

## II.    Discovery Into Arbitrator Bias Is Unnecessary

Plaintiffs next seek a significant amount of discovery relating to Commissioner Goodell's supposed "bias" as an arbitrator, including "[a]ll documents" regarding his compensation; evaluations of his performance; past disputes where he sat as an arbitrator; his relationships with NFL owners, executives, and the attorneys in this action; and communications concerning this case, the underlying claims, or any Plaintiff.  (*See* Pls.' Ex. A at Request Nos. 3–9, 11.)

Again, such discovery—overbroad even for merits discovery—has no bearing on the issues before this Court on a motion to compel arbitration.  Under the Federal Arbitration Act, arbitrator bias—that is, "evident partiality or corruption in the arbitrators"—is a basis for "overturn[ing] arbitration decisions" that have already been made.  *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) (quoting 9 U.S.C. § 10(b)) (rejecting claim of arbitrator bias on motion to compel).  Accordingly, it is well settled that "[t]he determination of arbitrator bias is best raised on a petition to *vacate* the arbitration award," not on a motion to compel arbitration in the first instance.  *Corp. Printing Co.* v. *N.Y. Typographical Union No. 6*, 601 F. Supp. 323, 328 (S.D.N.Y. 1984) (emphasis added).  Plaintiffs do not, because they cannot, cite a single case where discovery into supposed arbitrator "bias" was permitted in connection with a motion to compel arbitration.  And in fact, the three cases that Plaintiffs cite in support of "bias"-related discovery all arise in the context of motions to vacate an arbitration award.  *See Applied Indus. Materials Corp.* v. *Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 136 (2d Cir. 2007); *Nat'l Hockey League Players' Ass'n* v. *Bettman*, No. 93-cv-5769, 1994 WL 38130, at *1 (S.D.N.Y. Feb. 4, 1994); *Metropolitan Delivery Corp.* v. *Teamsters Local Union 769*, No. 19-cv-22649, 2019 WL 3752245, at *1 (S.D. Fl. Aug. 8, 2019).[2]

As a result, any discovery into Commissioner Goodell's supposed "bias" is wholly unnecessary and, at the very least, entirely premature.  In any event, as noted in Defendants' motion, the relevant agreements and dispute resolution procedures contemplate that certain disputes may be referred to an alternative dispute resolution provider under appropriate circumstances.  (Dkt. 48 at 8.)

Nor have Plaintiffs articulated any reason why Commissioner Goodell would be biased here and why that supposed "bias" would render the arbitration agreements here invalid.  As the Second Circuit has held, "arbitration is a matter of contract, and

---

[2] The cases that Plaintiffs cite for the proposition that an arbitral forum must be fair also do not support their argument that discovery into arbitrator "bias" is appropriate.  (*See* Dkt. 54 at 3.)  In none of those cases was discovery ordered on the issue of supposed "bias."  Rather, any motion-related discovery was limited to whether the plaintiff's agreement to arbitrate was coerced or otherwise fraudulently induced. *See Hooters of America, Inc.* v. *Phillips*, 39 F. Supp. 2d 582, 591–593 (D.S.C. 1998).  As discussed above, discovery into the validity of an arbitration agreement is generally allowed only when reliable, contrary evidence is offered, which Plaintiffs have not done here.  *See Moton,* 2016 WL 616343, at *4 (S.D.N.Y. Feb. 9, 2016).  And in one of the cited cases, the motion to compel arbitration was *granted* without engaging in discovery.  *See Cole* v. *Burns Int'l Sec. Servs.,* 105 F.3d 1465, 1488, 1490 (D.C. Cir. 1997).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

5

consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen." *Nat'l Football League Mgmt. Council* v. *Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016). Here, "the parties contracted" in multiple employment agreements "to specifically allow the Commissioner to sit as the arbitrator" in disputes arising between coaches and clubs. *Id.* "Had the parties wished to restrict the Commissioner's authority, they could have fashioned a different agreement"— but they did not. *Id.* Plaintiffs' unsupported assertions of bias thus provide no grounds for setting aside these agreements, much less for seeking discovery at this stage.

These requests should also be denied.

### III.  Discovery Into the Relationship Between the NFL and Clubs Is Unnecessary

Plaintiffs' third category of discovery requests is for "[a]ll documents regarding, supporting or undermining Defendants' contention that Plaintiffs agreed to arbitrate their claims with the NFL . . . including but not limited to any and all documents reflecting the overlap, interconnectivity and intertwined operations between the NFL teams and the NFL." (Pls.' Ex. A. at Request No. 10.) In support of those requests, Plaintiffs argue that the issue of whether Plaintiffs agreed to arbitrate their claims against the NFL is a factual one that entitles them to discovery. (Dkt. 54 at 5.)

Plaintiffs' third attempt to manufacture a factual issue warranting discovery fails. As Defendants explain in their motion, the NFL is entitled, under the doctrine of equitable estoppel, to rely on the arbitration provisions in Plaintiffs' employment agreements by virtue of the "close relationship" between the NFL and its clubs. (Dkt. 48 at 21–24.) That close relationship stems from the NFL's nature as a voluntary membership association and is set forth explicitly in the NFL Constitution, which was attached to Defendants' motion, and the allegations of the Amended Complaint itself. (*See id.* at 22; Am. Compl. ¶¶ 337–57.)

Plaintiffs nowhere explain why the legal question of whether the NFL Constitution compels arbitration of their claims against the NFL requires any discovery to resolve. In fact, in each of the cases cited by Plaintiffs on this point, the court was able to adjudicate the claims of equitable estoppel based solely on the pleadings, without any discovery. *See Sokol Holdings, Inc.* v. *BMB Munai, Inc.*, 542 F.3d 354, 357 (2d Cir. 2008); *JLM Industries, Inc.* v. *Stolt-Nielson SA*, 387 F.3d 163, 178 (2d Cir. 2004); *Ragone* v. *Atlantic Video at Manhattan Ctr.*, No. 07-cv-6084, 2008 WL 4058480, at *9–10 (S.D.N.Y. Aug. 29, 2008), *aff'd*, 595 F.3d 115 (2d Cir. 2010). The same result should follow here. Indeed, Plaintiffs have never disputed the existence of this relationship until making this letter motion; there is no discovery needed into it for purposes of resolving Defendants' motion to compel.

\*\*\*

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

6

For these reasons, Defendants respectfully request that the Court deny Plaintiffs' motion to compel discovery in its entirety.

Respectfully submitted,

<u>/s/ Loretta E. Lynch</u>
Loretta E. Lynch

cc:      Counsel of Record (via ECF)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/04/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

BRIAN FLORES, STEVE WILKS, and RAY   :
HORTON, as Class Representatives, on   :
behalf of themselves and all others similarly   :
situated,   :
  :
               Plaintiff,   :
  :
      -against-   :
  :
THE NATIONAL FOOTBALL LEAGUE; NEW   :
YORK FOOTBALL GIANTS, INC. d/b/a NEW   :
YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a   :          22-CV-0871 (VEC)
MIAMI DOLPHINS; DENVER BRONCOS   :
FOOTBALL CLUB d/b/a DENVER BRONCOS;   :       OPINION AND ORDER
HOUSTON NFL HOLDINGS, L.P. d/b/a   :
HOUSTON TEXANS; ARIZONA CARDINALS   :
FOOTBALL CLUB LLC d/b/a ARIZONA   :
CARDINALS; TENNESSEE TITANS   :
ENTERTAINMENT, INC. d/b/a TENNESSEE,   :
TITANS and JOHN DOE TEAMS 1 through 26,   :
  :
            Defendants.   :

-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      Three individuals who have been coaches in the National Football League ("NFL") have

sued the NFL and several of its teams for discrimination in violation of 42 U.S.C. § 1981, the

New York State Human Rights Law, the New York City Human Rights Law, and the New

Jersey Law Against Discrimination. Am. Compl., Dkt. 22. Defendants moved to compel

arbitration and to stay the current proceedings. Mot. to Compel Arbitration, Dkt. 47. Plaintiffs

moved for discovery in advance of their anticipated response to the motion to compel arbitration,

Mot. for Discovery, Dkt. 54, and Defendants opposed the motion, Defs. Resp., Dkt 55. For the

reasons stated below, Plaintiffs' motion for discovery is DENIED.

## BACKGROUND

Plaintiffs Brian Flores, Steve Wilks, and Ray Horton are coaches in the NFL. Each of them have allegedly experienced "systemic racial discrimination" in the course of their employment relationship with the NFL. Am. Compl., Dkt. 22 ¶ 1. On February 1, 2022, Mr. Flores filed this putative class action alleging that the NFL discriminates against minority coaches, including by interviewing them for head coaching positions solely to fulfill the "Rooney Rule," an internal requirement to interview minority candidates for select leadership positions, without intending to hire them. *Id.* at ¶¶ 44–112, 118–19, 178–206. Mr. Flores further alleges that the NFL retaliated against him for bringing this lawsuit. *Id.* at ¶¶ 207–26. In an amended complaint filed on April 7, 2022, Plaintiffs Steve Wilks and Ray Horton brought additional claims of discrimination. Mr. Wilks alleges that he "was not given any meaningful chance to succeed" as a coach for the Arizona Cardinals and was "discriminatorily fired." *Id.* at ¶ 19. Mr. Horton alleges that, like Mr. Flores, he was only offered head coach interviews to comply with the Rooney Rule and was never actually considered as a candidate for head coach. *Id.* at ¶¶ 22–25, 267.

On June 21, 2022, Defendants moved to compel arbitration and to stay the current proceedings based on arbitration agreements contained in Plaintiffs' employment contracts and in the NFL's constitution, which was referenced in those contracts. Mot. to Compel Arb., Dkt. 47; Defs. Mem. of Law, Dkt. 48 at 6–9. On July 1, 2022, Plaintiffs moved for discovery on the motion to compel arbitration, seeking documents concerning the parties' agreement to arbitrate and applicable arbitration policies, the arbitrator's relationship with the NFL and his history of arbitration rulings, as well as the NFL's relationship with NFL teams. Mot. for Discovery, Dkt. 54. On July 8, 2022, Defendants opposed Plaintiffs' motion for discovery. Defs. Resp., Dkt. 55.

## LEGAL STANDARD

Although the Court evaluates a motion to compel arbitration under a "standard similar to that of a summary judgment action," *Aleksanian v. Uber Techs. Inc.*, 524 F. Supp. 3d 251, 258 (S.D.N.Y. 2021), the standards for evaluating discovery requests in the context of a motion for summary judgment and a motion to compel arbitration are not similar.  While the Court evaluates the motion to compel arbitration in the context of any "discovery materials before the Court," *Ryan v. JPMorgan Chase & Co.*, 924 F. Supp. 2d 559, 562 (S.D.N.Y. Feb. 21, 2013), the Court does not compel the production of discovery materials as freely as it may when deciding a motion for summary judgment.  In the face of a motion for summary judgment, the plaintiff is almost always entitled to discovery before summary judgment can be granted against it.  *See Hellstrom v. U.S. Dep't of Veterans Affs.*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.").  In contrast, given the "strong federal policy favoring arbitration as an alternative means of dispute resolution," *Ross v. Am. Express Co.*, 547 F.3d 137, 142 (2d Cir. 2008) (internal quotation omitted), courts do not grant discovery requests related to a motion to compel arbitration as a matter of course.

An agreement to arbitrate is binding on the parties unless the agreement is invalid under state contract law.  *See Ciago v. Ameriquest Mortg. Co.*, 295 F. Supp. 2d 324, 328 (S.D.N.Y. 2003).  Thus, on a motion to compel arbitration, the Court's analysis is generally limited to determining whether there is a valid agreement to arbitrate, whether one party has failed to perform its duties under that agreement, and whether the agreement, properly interpreted, encompasses the dispute at hand.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011) (citing 9 U.S.C. §§ 2–4).  This inquiry is not, however, as crabbed as Defendants suggest.  *See* Def. Opp., Dkt. 55 at 1.  Once the parties establish that they agreed to arbitrate, courts must

also determine whether there are any valid "grounds as exist at law or in equity for the revocation of any contract," including unconscionability, that affect the arbitration agreement. 9 U.S.C. § 2 (2020); *see also Ciago*, 295 F. Supp. 2d at 328 (noting the availability of unconscionability as a defense against a motion to compel arbitration).

Accordingly, in the Second Circuit, discovery on a motion to compel arbitration is appropriate "when the party opposing arbitration 'comes forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound' by the arbitration agreement, even though on the face of the pleadings it appears that it did." *Morton v. Maplebear*, 2016 WL 616343, at *4 (S.D.N.Y. Feb. 9, 2016) (quoting *Guidotti v. Legal Helpers Debt Resol*., LLC, 716 F.3d 764, 774 (3d Cir. 2013)) (cleaned up); *see also AMC Ent. v. Entretenimineto GM de Mex. S.A. de C.V.*, 555 F. App'x 12, 14 (2d Cir. 2014).

## DISCUSSION

Plaintiffs have failed to carry their burden of offering "facts or evidence to place the validity of the [a]greement to arbitrate in issue" in their motion for discovery. *Morton*, 2016 WL 616343, at *5. Plaintiffs do not dispute that they agreed to be bound by the arbitration agreement contained in their employment agreements. Nor do Plaintiffs allege any grounds on which this Court may find their agreement to be invalid. Instead, Plaintiffs seek "agreements between Plaintiffs and Defendants that might bear on the issue or arbitration" in part to determine whether any subsequent contract invalidated their agreement to arbitrate. Mot. for Discovery, Dkt. 54 at 2. Because Plaintiffs should know whether they entered into any other contracts or agreements that would affect their agreement to arbitrate,[1] the Court can only assume that they are attempting to embark on an impermissible fishing expedition. *See Olsen v. Charter Comms.,*

---

[1] In their Opposition, Defendants note that they provided copies of several of these agreements to Plaintiffs in April 2022. Opp., Dkt. 55 at 2.

*Inc.*, 2019 WL 3779190, at \*6–7 (S.D.N.Y. Aug. 9, 2019) (courts cannot delay ruling on a motion to arbitrate based on conclusory statements that one party's consent was deficient).

In support of their argument that discovery is necessary for the Court to evaluate Defendants' motion to compel arbitration, Plaintiffs cite a string of non-binding caselaw from beyond the Second Circuit. In those cases, the rules of arbitration were so obviously lopsided that discovery would not have been required to demonstrate that the arbitration agreement was unconscionable. *See Ciago*, 295 F. Supp. 2d at 329–30. The first in this line of cases is *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999), in which Hooters "promulgat[ed] so many biased rules" — including rules enabling it to dictate the membership of the arbitral panel — that arbitration became "a sham system unworthy even of the name of arbitration." *Id.* at 940; *see also Beletsis v. Credit Suisse First Bos., Corp.,* 2002 WL 2031610, at \*6 (S.D.N.Y. Sept. 4, 2002) ("an overabundance of invalid provisions can void an entire agreement" (citing *Hooters*, 173 F.3d at 940)). The Fourth Circuit itself, however, limited *Hooters* to the facts of that case, where one party bore the sole responsibility of setting the arbitration rules and so baldly manipulated the rules in its favor that it "completely failed in performing its contractual duty" to provide a fair arbitration forum. *Hooters*, 173 F.3d at 940.

The Sixth Circuit decisions that Plaintiffs cite similarly declined to grant an employer's motion to compel arbitration because the arbitration rules were so skewed that they were void. In both cases, which involved employee arbitration agreements with Ryan's Family Steak Houses, Inc., the Sixth Circuit invalidated an arbitration agreement in which the employer had complete control over the arbitration rules, to the point that it could unilaterally alter the arbitration rules and appoint its own employees to arbitrate the claim. *See Floss v. Ryan's Fam. Steak Houses*, 211 F.3d 306, 313 n.7, 315–16 (6th Cir. 2000); *Walker v. Ryan's Fam. Steak Houses*, 400 F.3d 370, 378, 386 (6th Cir. 2005) (citing *Floss*, 211 F.3d at 314). In *McMullen v.*

*Meijer*, 355 F.3d 485 (6th Cir. 2004), the Sixth Circuit similarly found that the parties'

arbitration agreement did not allow an employee to effectively vindicate her claims.  In that case,

the arbitration agreement gave the employer "unilateral control over the pool of potential

arbitrators;" the Court voided that portion of the agreement.  *Id.* at 492 (citing *Floss*, 211 F.3d at

310; *Hooters*, 173 F.3d at 938); *see also id.* at 491 (holding that failure to provide an arbitral

forum in which a claim may be effectively vindicated voids the agreement as a matter of contract

law).

   Without the type of clear substantive or procedural bias baked into the arbitration

agreement that was present in the *Hooters* line of cases, courts "decline to indulge the

presumption that the parties and arbitral body conducting a proceeding will be unable or

unwilling to retain competent, conscientious, and impartial arbitrators."  *Gilmer v.*

*Interstate/Johnson Lane Corp.*, 500 U.S. 20, 30 (1991) (quoting *Mitsubishi Motors Corp. v.*

*Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 634 (1985)).  Moreover, the Federal Arbitration

Act (FAA) already contemplates a route through which parties can seek judicial protection

against arbitrator bias; courts can "overturn arbitration decisions 'where there was evident

partiality or corruption in the arbitrators.'"  *Id.* at 31 (quoting 9 U.S.C. § 10(b)); *see also id.* at 21

(noting that fair arbitration rules "protect against biased panels"); *Cole v. Burns Int'l Sec. Servs.*,

105 F.3d 1465, 1482 (D.C. Cir. 1997) (same).  Plaintiffs may well be able to argue that the

proposed arbitrator is so biased against them that the motion to compel arbitration should not be

granted, but they do not need discovery to do so.

   Plaintiffs also seek to compel the NFL to produce any "contract[s] . . . containing …

dispute resolution terms," Mot. for Discovery, Dkt. 54 at 2, presumably so that they can

determine whether the arbitration rules demonstrate the type of bias present in the *Hooters* line

of cases; Plaintiffs should know whether they entered into any such agreements.  Plaintiffs'

remaining discovery requests relating to arbitrator bias, including their request for documents

regarding Mr. Goodell's history of arbitration decisions and his relationship with the NFL, do not

bear on the issue of whether the arbitration agreement is contractually valid.

Plaintiffs do not cite a single case in which the court ordered discovery focused on the

dealings and rulings of an individual arbitrator in the context of a motion to compel arbitration.[2]

Instead, the cases upon which Plaintiffs rely concern challenges to arbitration decisions. *See,*

*e.g.*, *Nat'l Hockey League Players' Assoc. v. Bettman*, 1994 WL 38130, at *3 (S.D.N.Y. Feb. 4,

1994) (affording plaintiffs the opportunity for discovery regarding arbitral bias on a motion for

summary judgment after arbitration had concluded); *Applied Indus. Materials Corp. v. Ovalar*

*Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 138 (2d Cir. 2007) (discussing impact of

arbitrators' failure to disclose conflicts of interest on a motion to set aside an arbitration award);

*Metro. Delivery Corp. v. Teamsters Loc. Union 769,* 2019 WL 3752245, at *1 (S.D. Fla. Aug. 8,

2019) (permitting discovery regarding bias in a motion to set aside an arbitration award)*.* The

parties in those cases all sought relief under the FAA's failsafe provision that allows courts to set

aside arbitration awards rendered by biased arbitrators; they do not support Plaintiffs' claim that

they are entitled to discovery in order to establish that they can avoid arbitration altogether

because they fear the arbitrator is biased.

Plaintiff's final ground for seeking discovery — the fact that the NFL was not a direct

party to the arbitration agreement — does not go to whether Plaintiffs' "intend[ed] to be bound

by the arbitration agreement." *Morton*, 2016 WL 616343, at *4. While Plaintiffs correctly note

that they must have actually consented to release their right to adjudicate claims against the NFL

---

[2]     The parties appeared to have exchanged discovery regarding the arbitrator's prior rulings at the trial court
level in *McMullen v. Meijer, Inc.*, No. 2:99-cv-71206 (E.D. Mich. Oct. 26, 2004).  *See id.* Dkt. 12 at 12-13.
Notably, the Sixth Circuit did not rely on that evidence in either of its opinions in the case.  *See McMullen v. Meijer,*
*Inc.*, 355 F.3d 485 (6th Cir. 2004); *McMullen v. Meijer, Inc.*, 166 F. App'x 164 (6th Cir. 2006).

in court, Mot. for Discovery, Dkt. 54 at 5, they do not dispute that their agreement to arbitrate covered all disputes falling within the scope of their arbitration agreement, whether that may also include claims against the NFL.  Plaintiffs argue that discovery is necessary because the Court must consider the "relationship among the parties" as one factor in determining whether the NFL, a non-signatory to the arbitration agreements, can enforce those agreements.  Mot. for Discovery, Dkt. 54 at 5 (quoting *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126–27 (2d Cir. 2010)).  In evaluating whether the NFL may compel arbitration pursuant to arbitration agreements to which it is not itself a party, the Court must determine whether the NFL teams were, "or would predictably become, with [Plaintiffs'] knowledge and consent, affiliated or associated with [the NFL] in such a manner as to make it unfair to allow [Plaintiffs] to avoid [their] commitment to arbitrate on the ground that [the NFL] was not the very entity with which [Plaintiffs] had a contract."  *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008) (collecting cases).  Given the high-level nature of this inquiry, courts generally decide this question based on the pleadings alone.  *See, e.g.*, *Ragone v. Atl. Video at Manhattan Ctr.*, 2008 WL 4058480, at *9 (S.D.N.Y. Aug. 29, 2008), *aff'd*, 595 F.3d 115 (2d Cir. 2010).  Plaintiffs' requested discovery of "[a]ll documents regarding, supporting or undermining Defendants' contention that Plaintiffs agreed to arbitrate their claims with the NFL" is not required, nor would it be useful, for the Court to evaluate whether the NFL may appropriately compel Plaintiffs to arbitrate the present dispute.  Mot. for Discovery Ex. A., Dkt. 54-1 ¶3.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for discovery is DENIED. Plaintiffs' response to the motion to compel arbitration must be filed no later than **Friday, August 19, 2022**. Defendants' reply brief must be filed no later than **Friday, August 26, 2022**.

**SO ORDERED.**

Date: **August 4, 2022**
**New York, New York**

_____
**VALERIE CAPRONI**
**United States District Judge**