# 23-1185

## In the United States Court of Appeals for the Second Circuit

BRIAN FLORES, AS A CLASS REPRESENTATIVE,
ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,
PLAINTIFFS-APPELLEES,

STEVE WILKS, RAY HORTON, PLAINTIFFS

*v.*

NEW YORK FOOTBALL GIANTS, INC.; HOUSTON NFL HOLDINGS, L.P., DBA
HOUSTON TEXANS; DENVER BRONCOS; NATIONAL FOOTBALL LEAGUE,
DEFENDANTS-APPELLANTS,

JOHN DOE TEAMS 1 THROUGH 29; JOHN DOE TEAMS 1 THROUGH 26;
MIAMI DOLPHINS, LTD.; ARIZONA CARDINALS FOOTBALL CLUB LLC,
DBA ARIZONA CARDINALS; TENNESSEE TITANS
ENTERTAINMENT, INC., DBA TENNESSEE TITANS, DEFENDANTS

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 22-871)*
*(THE HONORABLE VALERIE E. CAPRONI, J.)*

**JOINT APPENDIX**
**VOLUME 5 OF 6 (PAGES J.A. 949 – J.A. 1177)**

DOUGLAS H. WIGDOR
WIGDOR, LLP
*85 Fifth Avenue, 5th Floor*
*New York, New York, 10003*
*(212) 257-6800*
*dwigdor@wigdorlaw.com*

KANNON K. SHANMUGAM
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*kshanmugam@paulweiss.com*

# TABLE OF CONTENTS

Page

## Volume 1

List of district-court docket entries .................................................................J.A. 1

Class Action Complaint,
    D.Ct. Dkt. 1 (Feb. 1, 2022) .....................................................................J.A. 24

First Amended Class Action Complaint,
    D.Ct. Dkt. 22 (Apr. 7, 2022) ...................................................................J.A. 82

Order Regarding Briefing Schedule on Motion To Compel Arbitration,
    D.Ct. Dkt. 43 (May 2, 2022) ................................................................J.A. 182

Notice of Defendants' Motion To Compel Arbitration and Stay Further
    Proceedings,
    D.Ct. Dkt. 47 (June 21, 2022)..............................................................J.A. 184

Memorandum of Law in Support of Defendants' Motion To Compel
    Arbitration and Stay Further Proceedings,
    D.Ct. Dkt. 48 (June 21, 2022)..............................................................J.A. 186

Flores-Steelers Agreement (Redacted),
    D.Ct. Dkt. 49-4 (June 21, 2022) ..........................................................J.A. 217

Declaration of Dolores F. DiBella,
    D.Ct. Dkt. 50 (June 21, 2022)[*] ...........................................................J.A. 223

Letter from Douglas H. Wigdor to Judge Valerie E. Caproni,
    D.Ct. Dkt. 54 (July 1, 2022) ................................................................J.A. 225

Letter from Douglas H. Wigdor to Loretta E. Lynch,
    D.Ct. Dkt. 54-1 (July 1, 2022) .............................................................J.A. 231

Letter from Loretta E. Lynch to Douglas H. Wigdor,
    D.Ct. Dkt. 54-2 (July 1, 2022) .............................................................J.A. 234

Transcript in *Flores, et al.*, v. *The National Football League, et al.*,
    Civ. No. 22-871 (S.D.N.Y. May 2, 2022),
    D.Ct. Dkt. 54-3 (July 1, 2022) .............................................................J.A. 237

John Breech, *Roger Goodell's Astronomical Pay Revealed: NFL Commissioner Topped $125 Million Over Past Two Years Combined*, CBS Sports (June 29, 2022),
D.Ct. Dkt. 54-4 (July 1, 2022) ................................................J.A. 252

Letter from Loretta E. Lynch to Judge Valerie E. Caproni,
D.Ct. Dkt. 55 (July 8, 2022) ....................................................J.A. 255

Opinion and Order Denying Discovery,
D.Ct. Dkt. 58 (August 4, 2022) ...............................................J.A. 261

## Volume 2

Memorandum of Law in Opposition to Defendants' Motion To Compel Arbitration and Stay Further Proceedings,
D.Ct. Dkt. 62 (Aug. 31, 2022).................................................J.A. 270

Declaration of Douglas H. Wigdor,
D.Ct. Dkt. 63 (Aug. 31, 2022).................................................J.A. 301

NFL Communications, *NFL Statement on Brian Flores' Suit*,
D.Ct. Dkt. 63-2 (Aug. 31, 2022)..............................................J.A. 305

Ken Belson, *Roger Goodell's Pay for Two Years Reached Nearly $128 Million*, N.Y. Times (Oct. 29, 2021)
D.Ct. Dkt. 63-3 (Aug. 31, 2022)..............................................J.A. 307

Derek Saul, *NFL's Roger Goodell Reportedly Makes $63.9 Million Per Year — Here's How That Compares To Other Top Execs and Sports Commissioners*, Forbes (Oct. 29, 2021)
D.Ct. Dkt. 63-4 (Aug. 31, 2022)..............................................J.A. 311

Ben Fischer and John Ourand, *More Time for Goodell?*, Sports Business Journal (Feb. 21, 2022)
D.Ct. Dkt. 63-5 (Aug. 31, 2022)..............................................J.A. 315

Patrik Walker, *Roger Goodell Negotiating Contract Extension To Remain NFL Commissioner for Foreseeable Future, Per Report*, CBS Sports (Feb. 18, 2022)
D.Ct. Dkt. 63-6 (Aug. 31, 2022)..............................................J.A. 320

ii

Transcript in *Gruden* v. *The National Football League*, No. A-21-
    844043-B (Nev. Dist. Ct., Clark Cty. May 25, 2022),
    D.Ct. Dkt. 63-7 (Aug. 31, 2022)...................................................J.A. 323

Order in *Nostalgic Partners, LLC* v. *New York Yankees
    Partnership, et al.*, No. 656724/2020 (N.Y. Sup. Ct. Dec. 17, 2021),
    D.Ct. Dkt. 63-8 (Aug. 31, 2022)...................................................J.A. 375

Transcript in *Nostalgic Partners, LLC* v. *New York Yankees
    Partnership, et al.*, No. 656724/2020 (N.Y. Sup. Ct. Dec. 17, 2021),
    D.Ct. Dkt. 63-9 (Aug. 31, 2022)...................................................J.A. 378

Arbitration Agreement in *McMullen* v. *Meijer, Inc.*, Civ. No. 99-71206
    (E.D. Mich. Aug. 16, 2004),
    D.Ct. Dkt. 63-10 (Aug. 31, 2022).................................................J.A. 411

JAMS Comprehensive Arbitration Rules & Procedures,
    D.Ct. Dkt. 63-11 (Aug. 31, 2022).................................................J.A. 420

JAMS Employment Arbitration Rules & Procedures,
    D.Ct. Dkt. 63-12 (Aug. 31, 2022).................................................J.A. 445

JAMS Policy on Employment Arbitration Minimum Standards of
    Procedural Fairness,
    D.Ct. Dkt. 63-13 (Aug. 31, 2022).................................................J.A. 466

Plaintiff's Sur-Reply in Further Opposition to Defendants' Motion To
    Compel Arbitration and Stay Further Proceedings,
    D.Ct. Dkt. 67 (Oct. 7, 2022).........................................................J.A. 471

Order To Submit Supplemental Briefing,
    D.Ct. Dkt. 70 (Feb. 1, 2023).........................................................J.A. 486

Letter from Loretta E. Lynch to Judge Valerie E. Caproni,
    D.Ct. Dkt. 71 (Feb. 3, 2023).........................................................J.A. 488

## Volume 3

Flores-Dolphins Agreement (Redacted),
    D.Ct. Dkt. 72-2 (Feb. 3, 2023)..................................................J.A. 489

Flores-Patriots Agreement (Redacted),
    D.Ct. Dkt. 72-3 (Feb. 3, 2023)..................................................J.A. 506

Flores-Steelers Agreement (Redacted),
    D.Ct. Dkt. 72-4 (Feb. 3, 2023)..................................................J.A. 515

Wilks-Cardinals Agreement (Redacted),
    D.Ct. Dkt. 72-5 (Feb. 3, 2023)..................................................J.A. 523

Wilks-Panthers Agreement (Redacted),
    D.Ct. Dkt. 72-6 (Feb. 3, 2023)..................................................J.A. 542

Horton-Titans Agreement (Redacted),
    D.Ct. Dkt. 72-7 (Feb. 3, 2023)..................................................J.A. 558

Declaration of Dolores F. DiBella,
    D.Ct. Dkt. 73 (Feb. 2, 2023)[*]................................................J.A. 568

Constitution and Bylaws of the National Football League,
    D.Ct. Dkt. 73-1 (Feb. 2, 2023)[*].............................................J.A. 571

## Volume 4

Constitution and Bylaws of the National Football League (continued),
    D.Ct. Dkt. 73-1 (Feb. 2, 2023)[*].............................................J.A. 705

## Volume 5

Constitution and Bylaws of the National Football League (continued),
    D.Ct. Dkt. 73-1 (Feb. 2, 2023)[*].............................................J.A. 949

Plaintiffs' Notice of Motion for Partial Reconsideration,
    D.Ct. Dkt. 79 (Mar. 14, 2023)................................................J.A. 1020

Plaintiffs' Memorandum of Law in Support of Motion for Partial
    Reconsideration,
    D.Ct. Dkt. 80 (Mar. 14, 2023)................................................J.A. 1022

Defendants' Notice of Motion for Partial Reconsideration,
    D.Ct. Dkt. 81 (Mar. 15, 2023) .................................................................J.A. 1043

Defendants' Memorandum of Law in Support of Motion for Partial
    Reconsideration,
    D.Ct. Dkt. 82 (Mar. 15, 2023) .................................................................J.A. 1045

Defendants' Opposition to Plaintiffs' Motion for Partial
    Reconsideration,
    D.Ct. Dkt. 89 (Mar. 31, 2023).................................................................J.A. 1068

Letter from Michael J. Willemin to Judge Valerie E. Caproni,
    D.Ct. Dkt. 92 (Apr. 11, 2023) .................................................................J.A. 1086

Declaration of Michael J. Willemin,
    D.Ct. Dkt. 92-1 (Apr. 11, 2023)..............................................................J.A. 1088

Plaintiffs' Opposition to Defendants' Motion for Partial
    Reconsideration,
    D.Ct. Dkt. 93 (Apr. 11, 2023) .................................................................J.A. 1098

Order Granting Leave for Additional Filings,
    D.Ct. Dkt. 94 (Apr. 12, 2023) .................................................................J.A. 1130

Declaration of Michael J. Willemin,
    D.Ct. Dkt. 95 (Apr. 12, 2023) .................................................................J.A. 1132

Email from John Elefterakis to Omar Khan,
    D.Ct. Dkt. 95-1 (Apr. 12, 2023)..............................................................J.A. 1134

Letter from Douglas H. Wigdor to Roger Goodell,
    D.Ct. Dkt. 95-2 (Apr. 12, 2023)..............................................................J.A. 1137

Letter from Loretta E. Lynch to Judge Valerie E. Caproni,
    D.Ct. Dkt. 96 (Apr. 13, 2023) .................................................................J.A. 1141

Flores-Steelers Agreement (Redacted),
    D.Ct. Dkt. 97-1 (Apr. 13, 2023)..............................................................J.A. 1142

Declaration of Andrew A. Smith,
D.Ct. Dkt. 98 (Apr. 13, 2023)[*] ................................................................J.A. 1150

Defendants' Reply Brief in Support of Motion for Partial
Reconsideration,
D.Ct. Dkt. 99 (Apr. 21, 2023) ...............................................................J.A. 1152

Defendants' Notice of Interlocutory Appeal,
D.Ct. Dkt. 113 (Aug. 21, 2023)...............................................................J.A. 1166

Opinion and Order Denying Motion to Certify Interlocutory Appeal,
D.Ct. Dkt. 129 (Jan. 4, 2024)...............................................................J.A. 1168

## Volume 6 (Sealed)

Flores-Steelers Agreement,
D.Ct. Dkt. 50-4 (June 21, 2022) ...........................................................J.A. 1178

Flores-Dolphins Agreement,
D.Ct. Dkt. 73-2 (Feb. 3, 2023).............................................................J.A. 1184

Flores-Patriots Agreement,
D.Ct. Dkt. 73-3 (Feb. 3, 2023).............................................................J.A. 1201

Flores-Steelers Agreement,
D.Ct. Dkt. 73-4 (Feb. 3, 2023).............................................................J.A. 1210

Wilks-Cardinals Agreement,
D.Ct. Dkt. 73-5 (Feb. 3, 2023).............................................................J.A. 1218

Wilks-Panthers Agreement,
D.Ct. Dkt. 73-6 (Feb. 3, 2023).............................................................J.A. 1237

Horton-Titans Agreement,
D.Ct. Dkt. 73-7 (Feb. 3, 2023).............................................................J.A. 1253

---

[*] These docket entries are not publicly accessible on the district court docket, but the documents at issue were never sealed by the district court and were filed publicly at other docket entries. *See* D. Ct. Dkt. 53, at 1-3; D. Ct. Dkt. 70, at 1-2; D. Ct. Dkt. 96, at 1; *see also* D. Ct. Dkts. 49, 72, 72-1 & 97.

Flores-Steelers Agreement,
    D.Ct. Dkt. 98-1 (Apr. 13, 2023) ................................................................J.A. 1263

## 2013 RESOLUTION BV-1

*Whereas*, pursuant to 2011 Resolution BV-1, the League retains exclusive worldwide control to license and otherwise use League Marks and individual Club Marks in respect of licensing, advertising, product or service placement, sponsorships and promotional agreements relating to commercial identification on the sidelines or playing field or otherwise subject to television exposure during NFL games;

*Whereas*, the League's sponsorship and sideline exposure agreement with Motorola for the telecommunications hardware category expired in March of 2012, which agreement (i) required Motorola to provide coaches' headsets and various other game day communication equipment to the Clubs, (ii) provided Motorola the exclusive right in its category to expose its brand on the sidelines of all NFL games (e.g., on the coaches' headsets, sideline communications carts and various related equipment), and (iii) granted to Motorola the right to use League Marks[1] and individual Club Marks[2] to promote telecommunications hardware, including both mobile phones and tablets;

*Whereas*, since early 2011, the League Office has been exploring a more strategic technology partnership model with a broad array of potential sponsors in the telecommunications hardware and related technology categories, that would better position the League to address important initiatives, including in-game technology opportunities and improving the game day experience in the stadium;

*Whereas*, the League Office has regularly briefed the Business Ventures Committee on the status of these efforts and the likely timing for securing a new sideline technology partner, and anticipates that a new agreement likely will be concluded in the coming weeks; and

*Whereas*, in order to maintain maximum leverage in this important sponsorship category while League staff works to conclude a new agreement, clubs should refrain from entering into any new sponsorship agreements with third parties regarding the use of Club Marks in connection with the marketing or promotion of telecommunications hardware products (including, without limitation, mobile phones and tablet computing devices).

It is hereby *Resolved*, that NFL Ventures, L.P. or an appropriate affiliate may conclude an agreement for a new League-wide strategic sideline technology partnership, provided that the entry into such agreement shall be subject to the prior approval of the Business Ventures Committee in its capacity as the NFL Ventures Board of Directors. Such agreement may include sideline exposure and sponsorship rights, including exclusive rights to individual Club Marks within the telecommunications hardware and related categories (including, without limitation, mobile phones and tablet computing devices);

Further *Resolved*, that clubs may not enter into any new sponsorship agreements with third parties regarding the use of Club Marks in connection with the marketing or promotion of telecommunications hardware products (including,

**J.A. 949**

without limitation, mobile phones and tablet computing devices) absent further action by the Business Ventures Committee.

## 2013 RESOLUTION FC-3

*Whereas*, the membership approved 2011 Resolution G-2 to allow for the creation of a strategic investment fund (the "Fund") to make investments in sports, entertainment, media, enabling technologies, or other areas of strategic importance to the League and the member clubs; and

*Whereas*, 2011 Resolution G-2 authorized the Commissioner to make all necessary and advisable arrangements to launch the Fund; and

*Whereas*, the Commissioner, following consultation with the Finance Committee, has determined that the League will work and co-invest in the Fund with a partner, a leading private equity firm ("Partner Firm"); and

*Whereas*, the Partner Firm will bring to the Fund capital, substantial deal flow, infrastructure, and experience in deal execution and portfolio company management; and

*Whereas*, all portfolio investments and material operational decisions relating to the Fund will be governed jointly by the Partner Firm and League office representatives appointed by the Commissioner ("League Representatives"); and

*Whereas*, the Fund is expected to focus primarily on investments in traditional and digital media business with a target size significantly larger than the typical expected investment size contemplated when 2011 Resolution G-2 was approved by the membership, and the Fund will often need to make investment decisions on an expedited basis;

*Whereas*, the membership believes that in order to maximize opportunities in the most effective and efficient way under the Fund, the requirement under 2011 Resolution G-2 that investments over $5 million be approved by the membership should be eliminated.

*Be it Resolved*, that 2011 Resolution G-2 be hereby amended by deleting the third numbered paragraph in its entirety and that the remainder of 2011 Resolution G-2 shall remain in full force and effect; and

*Further Resolved*, that the League Representatives shall have the authority to approve any investment in the Fund, in accordance with the procedures more fully described in the presentations to the membership.

## 2013 RESOLUTION FC-7

*Whereas*, in connection with the funding of stadium construction projects from the late 1990s through the late-2000s, the membership approved debt ceiling waivers that generally extended fifteen years from the opening of the applicable club's new or renovated stadium; and

*Whereas*, the membership recognizes (1) the need for many of these clubs that received such fifteen-year debt ceiling waivers to fund additional stadium investments and the increasing costs associated with such investments; (2) that more recent debt ceiling waivers have typically been approved for twenty-five seasons from the opening of a new or renovated stadium; and (3) debt market conditions which would likely allow for favorable long-term re-financings.

*Whereas*, many clubs that received such debt ceiling waivers (a) will have a significant "bullet" payment due at the expiration of the debt waiver because the waivers were not tied to a specific amortization schedule and/or the underlying loans had a maturity date extending beyond the expiration of the applicable debt ceiling waiver; and (b) were required to enter into floating-to-fixed rate swaps in connection with their stadium borrowings, some of which are now "out of the money", and would likely require a significant payment to terminate if the club were to repay or re-finance the debt in advance of the expiration of such swap; and

*Whereas*, permitting (i) a limited extension of such stadium debt ceiling waivers and (ii) the financing of swap termination payments resulting from a re-financing related to such an extension, in conjunction with the concurrent imposition of an approved amortization schedule, would benefit both the affected clubs and the League by stabilizing club economics through the avoidance of large bullet repayment obligations and/or large swap termination payments while providing for increased certainty with respect to the mandatory repayment of debt in excess of the debt ceiling.

Be it *Resolved*, that each club that was granted a stadium debt waiver between 1997 and 2007 that extended for fifteen years from the opening of the club's new or renovated stadium be, and hereby is, subject to meeting the conditions of this resolution, granted a temporary and limited debt ceiling waiver extension for up to ten additional seasons beyond the currently scheduled expiration of each such club's current debt ceiling waiver such that such club, its affiliated stadium company and any of its affiliates holding football-related assets shall come into compliance with the generally applicable League debt ceiling no later than the end of the twenty- fifth season of operations at the applicable stadium (such compliance (and such club's compliance with other League rules) to be determined on a consolidated basis for such club, its affiliated stadium company and all its affiliates that hold football-related assets); and

Further *Resolved*, that the principal amount that may be re-financed by any such club can be no more than the sum of the then current principal amount of the applicable stadium loan outstanding as of the date of such refinancing (and in any event no more than the current outstanding principal amount of such stadium

**J.A. 952**

loan as of the date hereof) plus an amount equal to the amount of any swap termination fee incurred as a result of the re-financing; and

Further *Resolved*, the maturity date of, and the amortization schedule (which shall be mortgage-style or straight line unless another schedule is approved by the Finance Committee) for, any debt being re-financed in connection with the extension of such a debt waiver shall be approved by the Commissioner, who may consult with the Finance Committee in his discretion; and

Further *Resolved*, that any clubs to which the foregoing extension applies may only enter into interest rate swaps in connection with any re-financings if such interest rate swaps are approved by the Finance Committee; and

Further *Resolved*, that the membership does not contemplate any further extensions of the debt ceiling waivers that are permitted to be extended as a result of this resolution; and

Further *Resolved*, that the approvals granted hereby shall be conditioned upon (1) any such re-financing of a loan that is not in compliance with the League's stadium financing guidelines shall be subject to monitoring on a periodic basis by the Finance Committee and the club shall provide information reasonably requested by the Commissioner or Finance Committee to permit such monitoring (provided that nothing herein shall be deemed to modify requirements relating to any financings entered into pursuant to a new debt ceiling waiver, all of which shall be subject to the League's stadium financing guidelines); (2) any such re-financing being in compliance with all other League policies; (3) delivery to the Commissioner of any documents the Commissioner and/or the Finance Committee deems necessary or advisable to substantiate the terms, conditions and arrangements of any proposed debt re-financings otherwise permitted by this resolution, in form and substance acceptable to the Commissioner; and (4) entry by the club, lenders, and any other parties deemed necessary or advisable by the Commissioner and/or the Finance Committee into any required consent letters in connection with a re-financing, in form and substance acceptable to the Commissioner and/or the Finance Committee evidencing the terms and conditions on which such approvals have been granted, with the Commissioner to execute and deliver such consent letters on behalf of the League.

## 2013 RESOLUTION FC-9

WHEREAS, Clubs have generally been unable in recent months to secure reasonable choices in coverage options and reasonable premiums for workers' compensation insurance;

WHEREAS, working with the Management Council and the League office, The Sports and Entertainment Practice of Willis, a prominent workers' compensation broker and consultant for many Clubs, has negotiated with Berkley Specialty Underwriting ("Berkley") a proposed five-year group workers' compensation program (the "Program");

WHEREAS, the Program would provide more favorable premiums and stable coverage than Clubs have been able to achieve in individual negotiations and include defined coverage for head trauma-related workers' compensation claims;

WHEREAS, Berkley has insisted, as a condition of offering the Program, that (a) participation be mandatory for all Clubs except the Bengals, Browns, Lions and Seahawks, who are insured through their respective state insurance programs; (b) that the League provide assurance that it will, if necessary, arrange to pay (through funds withheld from any late paying Club's national revenues or otherwise) any past due premiums or other workers' compensation bills relating to properly administered claims that arise after the commencement of this Program and within its duration; (c) that Clubs implement certain best practices in claims handling and risk management;

WHEREAS, the Program provides for a League deductible reimbursement for claims directly related to head trauma that will be assessed equally on participating Clubs, beginning when and if such claims are filed and;

WHEREAS, ratification of the Program would be beneficial to all Clubs that participate in the Program; it is hereby

RESOLVED, participation in the Program shall be mandatory for all Clubs that are not legally required to purchase insurance from their states and that do not have similar favorable state insurance arrangement (currently all Clubs other than the Bengals, Browns, Lions and Seahawks) and the League office is authorized to and shall take all appropriate steps to implement the Program.

**J.A. 954**

## 2014 RESOLUTION BC-1

*Whereas*, since 2012, NFL Enterprises LLC d/b/a NFL Network has carried thirteen (13) live NFL regular season games; and

*Whereas*, live NFL regular season games are a valuable programming asset of NFL Network;

*Whereas*, 2011 Resolution BC-3 authorized the Commissioner, in consultation with the Broadcasting Committee, to commit up to thirteen (13) live NFL regular season games to NFL Network through the 2022 season as part of a new or extended distribution agreement;

*Whereas*, the League has entered into long term extensions of its telecast agreements with ESPN, CBS, FOX and NBC and such agreements provide flexibility to commit additional games to other telecasters;

*Whereas*, the ability to negotiate favorable distribution arrangements with cable, satellite, and other distributors will be significantly enhanced by NFL Network's ability to offer additional live NFL regular season games and an increasing viewership base for the NFL Network;

*Whereas*, the NFL and the NFL Network, for itself and as agent for the member clubs, have negotiated a two-year agreement with CBS (covering the 2014-2015 season and, at NFL Network's option, the 2015-2016 season) pursuant to which NFL Network would grant CBS, among other things, each of (i) the right and obligation to produce, for distribution on NFL Network, fourteen (14) Thursday night live regular season game telecasts and two (2) Saturday live regular season game telecasts and (ii) a sublicense to distribute on CBS, alongside NFL Network, the eight (8) Thursday night games in Weeks 2 through 9 (or, at NFL Network's option, the seven (7) Thursday games in Weeks 2 through 8 along with one (1) Saturday game);

*Whereas*, this agreement will increase the revenues, the viewership base, and the profile of NFL Network;

*Whereas*, the Broadcasting Committee and the Chairman of the Business Ventures Committee have recommended commitment of an additional three (3) live NFL regular season games to NFL Network through the 2022 season;

*Whereas*, the Broadcasting Committee and the Chairman of the Business Ventures Committee have reviewed the terms of the proposed agreement between NFL Network and CBS and have unanimously recommended ratification thereof;

*Whereas*, the membership now desires to (i) increase the number of live NFL regular season games that the Commissioner, in consultation with the Broadcasting Committee and as agent of the member clubs, may commit to NFL Network and (ii) ratify and approve the proposed agreement with CBS.

**J.A. 955**

*It Is Hereby Resolved*, that the Commissioner, in consultation with the Broadcasting Committee and as agent of the member clubs, shall be authorized to commit up to sixteen (16) live NFL regular season games to NFL Network through the 2022 season as part of a new or extended distribution agreement; and

*Further Resolved*, that NFL Network's agreement with CBS relating to Thursday and Saturday games in the 2014 and 2015 seasons is hereby ratified and approved.

**2014 RESOLUTION BC-2**

*Whereas*, certain agreements between NFL Enterprises and DirecTV, including those for carriage of NFL Network and NFL Sunday Ticket by DirecTV, are scheduled to expire following the 2014 season; and

*Whereas*, the Commissioner and the Broadcasting Committee have engaged in a diligent and thorough study of the marketplace and consideration of alternatives that would best serve the interests of clubs and fans; and

*Whereas*, the Broadcasting Committee and staff have reported to the membership on their assessment of the marketplace, the attractiveness of NFL Sunday Ticket and NFL Network, and the carriage opportunities and alternatives available for both; and

*Whereas*, there is a substantial prospect that developments in the next several months, including activity relating to possible mergers, acquisitions or restructurings, may present additional opportunities for the Member Clubs with respect to NFL Sunday Ticket and NFL Network; be it

*Resolved*, that the Member Clubs hereby delegate to the Commissioner and the Broadcasting Committee authority to negotiate and conclude binding agreements on behalf of NFL Ventures, L.P. or an appropriate affiliate for the carriage of NFL Network and NFL Sunday Ticket and related matters, and be it further

*Resolved*, that nothing in this resolution shall require the Commissioner and the Broadcasting Committee to conclude such agreements pursuant to this delegation of authority, and they shall do so only if they determine, in the exercise of their business judgment, that the conclusion of one or more such agreements is in the best interest of the league; and be it further

*Resolved*, that this delegation of authority shall expire at the date and time on which the Fall League Meeting is called to order unless otherwise extended or modified by action of the Member Clubs.

## 2014 RESOLUTION BV-1

WHEREAS, pursuant to 2011 Resolution BV-1, the League retains exclusive worldwide control to license and otherwise use League Marks and individual Club Marks in respect of licensing, advertising, product or service placement, sponsorships and promotional agreements relating to commercial identification on the sidelines or playing field or otherwise subject to television exposure during NFL games;

WHEREAS, the League's sponsorship and sideline exposure agreement with Motorola for the telecommunications hardware category expired in March of 2012, which agreement (i) required Motorola to provide coaches' headsets and various other game day communication equipment to the clubs, (ii) provided Motorola the exclusive right in its category to expose its brand on the sidelines of all NFL games (e.g., on the coaches' headsets, sideline communications carts and various related equipment), and (iii) granted to Motorola the right to use League Marks and individual Club Marks to promote telecommunications hardware, including both mobile phones and tablets;

WHEREAS, since early 2011, the League Office has been exploring a more strategic technology partnership model with a broad array of potential sponsors in the telecommunications hardware and related technology categories, that would better position the League to address important initiatives, including in-game technology opportunities and improving the game day experience in the stadium;

WHEREAS, pursuant to 2013 Resolution BV-1 the League was authorized to enter into a sponsorship and sideline exposure agreement with sideline technology partner Microsoft for telecommunications hardware consisting of tablets and operating systems and clubs were precluded from entering into any new sponsorship agreements with third parties regarding the use of Club Marks in connection with the marketing or promotion of telecommunications hardware products (including, without limitation, mobile phones) absent further action by the Business Ventures Committee;

WHEREAS, the League Office has regularly briefed the Business Ventures Committee on the status of its on-going efforts to secure additional sideline technology sponsors in the telecommunications hardware and related technology categories;

WHEREAS, the League Office has been negotiating a sponsorship and sideline exposure agreement with Bose for professional and consumer audio components including headsets and headphones (collectively, "Headsets") to begin April 1, 2014 which agreement (i) requires Bose to provide Headsets for use by the NFL in connection with the playing of NFL games (including, without limitation, on-field coaching headsets, coaching booth headsets, and instant replay headsets), (ii) provides Bose the exclusive right in its category to expose its brand on the sidelines of all NFL games (e.g., on the coaches' Headsets and various

related equipment), and (iii) grants to Bose the right to use League Marks[1] and individual Club Marks[2] to promote Headsets;

WHEREAS, the Business Ventures Committee directed the League Office to finalize the sponsorship and sideline exposure agreement with Bose, subject to the approval of membership;

IT IS HEREBY RESOLVED, that NFL Ventures, L.P. or an appropriate affiliate may conclude an agreement with Bose for sideline exposure and sponsorship rights, including exclusive rights to individual Club Marks within the Headset category and related categories on terms generally consistent with those described in the presentation to membership.

---

[1] **League Marks** shall mean all trademarks owned by the League entities, including without limitation, NFL, the NFL Shield design, Super Bowl, Pro Bowl, NFL Kickoff, NFL Playoffs in their present form or as may be adopted in the future.

[2] **Club Marks** shall mean all trademarks owned by a Member Club, including without limitation, the names, nicknames, logos, colors, slogans, symbols, or any other identifying indicia in their present form or as may be adopted in the future, subject to certain limitations in Home Marketing Areas where the applicable Member Club has an existing sponsorship agreement in the headphone category.

**J.A. 959**

**2014 RESOLUTION BV-2**
(As Amended)

*Whereas*, pursuant to 2014 Resolution BC-1, the League recently launched the new Thursday Night Football live game broadcast package on CBS;

*Whereas*, Thursday Night Football continues to be one of the League's key strategic initiatives for the 2014 season and beyond;

*Whereas*, League staff have engaged a large cross-section of the League's business partners to help build excitement around and value in the Thursday Night Football franchise;

*Whereas*, League staff and NIKE have jointly developed an opportunity to create for each club, in collaboration with and subject to the approval of the clubs and the League Office, at no cost to the clubs, an innovative uniform design (potentially utilizing existing uniform elements) to be worn during participation in Thursday Night Football games (the "Thursday Night Football Uniform") and intended to promote the Thursday Night Football franchise in a consistent manner across all clubs and also to provide incremental opportunity for the clubs and their fans;

*Whereas*, the Business Ventures Committee has reviewed and unanimously approved the Thursday Night Football Uniform program;

*Whereas*, League membership has been presented with an overview of the Thursday Night Football Uniform program including sample illustrations of preliminary uniform design options;

*Resolved* that beginning with the 2016 season and continuing until otherwise determined by the Commissioner in consultation with the Business Ventures Committee, each club shall be required to exclusively utilize its respective Thursday Night Football Uniform when participating in Thursday Night Football games, subject to Article XIX, Section 19.9(B) of the Constitution and Bylaws of the National Football League in the event that the colors of the participating clubs' Thursday Night Football Uniforms for any Thursday Night Football games conflict; and

*Further Resolved* that each club will have the opportunity to consult with Nike and the League Office in the development of and approve the design of its respective Thursday Night Football Uniform, provided that, in order to ensure a consistent and cohesive program, the final design must remain generally consistent with design options included in the presentation to membership, and shall be subject to the final approval of the Commissioner in consultation with the Competition Committee.

## 2014 RESOLUTION DM-1

*Whereas*, pursuant to 2007 Resolution DM-1, the Member Clubs modified the operating framework of the NFL Internet Network as established by 2000 Resolution JC-1 and extended by 2001 Resolution JC-1 and 2004 Resolution BV-4; and

*Whereas*, distribution and consumption of content via the Internet has become increasingly popular among fans and consumers of sports-related content; and

*Whereas*, numerous sports and entertainment properties have expanded the types and amounts of content that they make available via the Internet; and

*Whereas*, as part of its efforts to reach and engage fans through new delivery platforms and to enhance the value of its media assets, the League intends to launch NFL Now, a new all-digital video network complimentary to the NFL Internet Network and consisting of NFL and Member Club content; and

*Whereas*, it is expected that NFL Now will serve as a vehicle for both Member Clubs and the League to reach and engage fans globally by offering their content as part of a deeper, richer and more robust experience; and

*Whereas*, 2007 Resolution DM-1 established that the Member Clubs would be required to produce certain minimum levels (including quantity and quality) of content and the League, after consultation with the Digital Media Committee, has previously communicated such minimum levels of video content production to the Member Clubs (the "Club Content Requirements").

*It Is Hereby Resolved*, that, beginning no later than July 1, 2014, (i) each Club shall make available to NFL Ventures, L.P. ("Ventures"), for additional distribution by Ventures or one or more of its subsidiaries as part of NFL Now and related or successor products, the level of Club-produced video content required to meet the Club Content Requirements and any additional Club video content as elected to be provided by the Club, and (ii) each Club shall be responsible for securing all consents, if any, that are necessary to enable Ventures or one or more of its subsidiaries to effectuate such additional distribution; and

Further Resolved, that, in consideration for the content made available by the Clubs to NFL Now pursuant hereto, each Club will receive and be permitted to sell certain NFL Now advertising inventory associated with its Club Content, under terms as determined by the League in consultation with the Digital Media Committee, which may be revised from time to time.

**2014 RESOLUTION FC-4**

*Whereas*, 2012 Resolution JC-1 authorized, for the 2012 and 2013 seasons, modifications to certain policies that relate to the ticket manifest that lists all tickets available for sale at a member club's stadium for the upcoming season;

*Whereas*, these modifications permitted, for the 2012 and 2013 seasons, member clubs to (a) submit a "base" ticket manifest for purposes of determining whether a game is sold out pursuant to the blackout policy; and (b) at the same time, submit a list of additional general admission tickets not included in the "base" ticket manifest that may be sold for some or all games that season (the "Incremental GA Tickets"), subject to certain conditions, including an increase in the amount of visiting team share ("VTS") owed for sales of Incremental GA Tickets; and

*Whereas*, the membership believes that these modifications have produced beneficial results for the League and for fans interested in attending regular season NFL games, and that an extension of the modifications for an additional five-season period would advance League and fan interests.

Be it *Resolved*, that the modifications to certain policies reflected in 2012 Resolution JC-1, as well as the other provisions of that Resolution, shall be continued for a period of five additional years, *i.e.*, through the 2018 season.

## 2014 RESOLUTION FC-5

*Whereas*, League policies emphasize the importance of maximizing home attendance for all games, including postseason games;

*Whereas*, full stadiums for postseason games enhance the value of the League's entertainment product and enable participating clubs to mitigate their postseason expenses; and

*Whereas*, clubs often do not know until very late in the regular season or thereafter whether they will host any postseason games; Be it

*Resolved*, that every club shall offer its season ticket members the opportunity to reserve tickets for any postseason game that it may host;

*Further Resolved*, that season ticket members shall not be charged for the cost of postseason home game tickets until the club is certain to host the associated postseason game, unless the season ticket member elects to be charged sooner; and

*Further Resolved*, that the Commissioner's office shall collect and communicate best practices and other recommendations to implement this Resolution to maximize efficiency and convenience for fans.

## 2014 RESOLUTION G-2

Whereas*,* the Commissioner is charged with responsibility under the Constitution and Bylaws to address conduct detrimental to the integrity of and public confidence in the National Football League and to impose discipline, if such a violation is proved, to address and deter such violations;

Whereas, the Commissioner has promulgated a Personal Conduct Policy, which applies to all employees of the League and its members clubs, to address certain categories of prohibited conduct;

Whereas, the integrity of and public confidence in the NFL may be undermined by permitting a player charged with, or faced with credible evidence of having committed, acts of violence or abuse to represent the league and his club on the field prior to the resolution of that charge under the Personal Conduct Policy;

Whereas, in such unusual circumstances, a period of paid administrative leave would afford the league an opportunity to investigate such charges, enable the player to focus on defending such charges, and obviate the adverse impact to the league, the club, and other players of permitting the charged player to represent the league and the club on the field until the matter is resolved;

Whereas, Article 17.14(A) of the Constitution and Bylaws creates the Exemption List;

It is hereby RESOLVED that the membership endorses the Personal Conduct Policy that the Commissioner has developed and implemented pursuant to his "conduct detrimental" authority under the Constitution and Bylaws;

It is hereby RESOLVED that Article 17.14(A) of the Constitution and Bylaws is hereby amended to add the following as subparagraph 6:

This is to confirm that the Commissioner may make use of the Exempt List in aid of his jurisdiction to address conduct detrimental, specifically violations of the Personal Conduct Policy that are under investigation. If a player is formally charged with a crime of violence or other conduct that poses a genuine danger to the safety or well-being of another person, or if a player is suspected on the basis of credible evidence of having committed such a crime but further investigation is required, then in such unusual circumstances, the Commissioner may place a player on the Exempt List until the matter is resolved under the Personal Conduct Policy.

It is further RESOLVED that the Commissioner and League staff are directed to take steps, including discussions with the Players Association if such discussions are necessary, to implement the foregoing amendment to the Constitution and Bylaws in a manner consistent with the Collective Bargaining Agreement.

**2014 RESOLUTION IC-1**

*Whereas*, 2011 Resolution IC-1 authorized the League Office (the "League") to schedule regular season games in the United Kingdom (the "U.K. Games") beginning with the 2012 season and continuing through the 2016 season;

*Whereas*, pursuant to 2011 Resolution IC-1, the Jacksonville Jaguars volunteered to play one (1) home game in the U.K. in each of the 2013, 2014, 2015 and 2016 seasons, and no other member clubs volunteered to participate as a home team under the "club opportunity" revenue model described in 2011 Resolution IC-1;

*Whereas*, the member clubs believe that increasing the number of U.K. Games played each season has, and will continue to, contribute to the strength and development of the NFL's brand and popularity outside the United States; and

*Whereas*, in order for the League to schedule and execute the number of U.K. Games that are contemplated for the 2015 and 2016 seasons, and any subsequent seasons for which the League may be authorized to schedule U.K. Games, it is necessary to establish criteria by which the home teams will be selected for the U.K. Games to be played in such seasons.

*It is Hereby Resolved*, that the League shall continue to request member clubs to volunteer to play as a home team in the U.K. Games and the League will select the home teams for the U.K. Games from member clubs volunteering, subject to scheduling availability and other criteria the League may deem in the NFL's best interest. Any member clubs that volunteer and are selected as the home team for a U.K. Game will receive a One Million Dollar ($1,000,000) incentive bonus, in addition to the game fee described in the last paragraph of 2006 Resolution BV-1.

*Be It Further Resolved*, that, in the event that an insufficient number of member clubs volunteer and are scheduled to play as the home team in the U.K. Games, the League may select member clubs to play as the home team in the U.K. Games based on the following order of selection (provided that no member club may be selected to play as a home team in a U.K. Game pursuant to the following criteria during the club's first two seasons playing in a new or substantially renovated  (total renovation costs in excess of $200,000,000) home stadium):

1.  Any member club that will be playing its regular season home games in a temporary facility (which, for the avoidance of doubt, shall mean a facility other than its home stadium), excluding any member club occupying a temporary facility as of the adoption of this resolution solely for the length of such occupancy, and excluding any occupancy of a temporary facility occurring as a result of a force majeure event or similar circumstance, may be selected to play one (1) home game in the U.K. in each of the regular seasons during which it is scheduled to play in such temporary facility. Any member club selected to play as a home team in a U.K. Game under this criteria will receive a One Million Dollar ($1,000,000) incentive bonus, in

**J.A. 965**

addition to the game fee described in the last paragraph of 2006 Resolution BV-1.

2. Beginning with the bid process for Super Bowl LIII (to be played in 2019), if a member club's (or member clubs') home stadium and/or home market is awarded a Super Bowl, the League may select such member club(s) to play as a home team in a U.K. Game once within five years of the award; provided that no member club will be selected more than once every five years on the basis of this criterion. Any member club selected to play as the home team in a U.K. Game under this criterion will receive a One Million Dollar ($1,000,000) incentive bonus, in addition to the game fee described in the last paragraph of 2006 Resolution BV-1. Beginning with the bid process for Super Bowl LIII (to be played in 2019), member clubs wishing to submit a bid to host a Super Bowl game will be required, as a condition to being permitted to submit a bid, to secure the right to play a home game outside their home stadium under their applicable stadium lease agreements (or otherwise) if awarded a Super Bowl.

*Be It Further Resolved*, that the scheduling parameters set forth in 2011 Resolution IC-1 will apply to any member clubs selected to play as a home team in a U.K. Game pursuant to this Resolution.

*Be It Further Resolved*, that member clubs selected to play as a home team in the U.K. Games pursuant to this Resolution will receive the game fee described in the last paragraph of 2006 Resolution BV-1 and will not, for the avoidance of doubt, be participating pursuant to the "club opportunity" revenue model described in 2011 Resolution IC-1.

*Be It Further Resolved*, that the International Committee is delegated the authority to establish policies and procedures relating to the subject matter of this Resolution including, but not limited to, the parameters of the participation of the home teams in U.K Games.

## 2014 RESOLUTION JC-4

*Whereas,* the loans made by the League to certain clubs in connection with the stadium construction support program established by 1999 Resolution G-3, as extended by 2003 Resolution JC-1 (the "G-3 Program"), generally required each G-3 Program participating club (collectively, the "G-3 Clubs") to guaranty some portion of its projected club seat premium VTS during the first fifteen seasons of operations in the G-3 Club's new or renovated stadium (collectively, the "G-3 Guarantees"), and to pay any shortfall in such G-3 Guaranty following such 15th season;

*Whereas*, seven G-3 Clubs currently project shortfalls in their G-3 Guarantees following the 15th season of operations in their new or renovated stadium (each a "G-3 Guaranty Shortfall") in the amounts set forth in the presentations to the Finance and Stadium Committees and to membership;

*Whereas*, certain G-3 Clubs had opt-in rights to a successor stadium program, subject to certain conditions, but for numerous reasons, a successor stadium funding program (established pursuant to 2011 Resolution G-4 (the "G-4 Program")) was not approved by the membership until after the opt-in rights expired;

*Whereas*, the G-4 Program, among other things, allows recipient clubs to receive a waiver for Incremental Gate VTS (as defined in 2011 Resolution G-4), in addition to club seat premium VTS, and to apply the waived funds during the first fifteen seasons of operations in the new or renovated stadium, towards repayment of "First Tranche" G-4 loans; and

*Whereas*, given numerous factors, including the ones cited above, the membership believes it would be equitable to allow Incremental Gate VTS amounts to be utilized as a funding source (on the terms set forth below, and as more specifically described in the presentations to the Finance and Stadium Committees in advance of, and to membership at, the December 2014 League meeting) by all of the G-3 Clubs projecting a G-3 Guaranty Shortfall other than the Dallas Cowboys (the remaining six G-3 Clubs, the "Shortfall G-3 Clubs"), including those Shortfall G-3 Clubs that did not have the benefit of an opt-in clause, with such amounts to be paid to the League and applied to repay the League's G-3 debt (which would effectively reduce the amount of the Shortfall G-3 Clubs' potential G-3 Guaranty Shortfall payments due).

Be it *Resolved that*:

1. Each Shortfall G-3 Club shall be permitted to include the following revenues, in addition to club seat premium VTS revenues, as sources to be applied against its G-3 Guaranty, and such amounts shall be paid to the League and applied to repay the League's G-3 debt:
   a. Commencing in 2014, gate VTS in an amount equal to actual Incremental Gate VTS (measured retroactively, season-by-season) during the seasons that the Shortfall G-3 Club's new or renovated stadium has been in operation prior to 2014. Such amounts will be applied in equal amounts on a straight-

**J.A. 967**

line basis for the lesser of five seasons or the number of remaining seasons until its G-3 Guaranty Shortfall payment is due (through the 15th season in its new or renovated stadium) (e.g., the New York Giants and Jets would each be permitted to apply gate VTS for each of the 2014 through 2018 seasons in an amount equal to 20% of the nominal sum of Incremental Gate VTS of the Giants or Jets (as applicable) for the 2010, the 2011, the 2012 and the 2013 seasons); and

    b.    Commencing in 2014, for each season through the season its G-3 Guaranty Shortfall payment is due, Incremental Gate VTS for such season.

2.     Each Shortfall G-3 Club's gate VTS and Incremental Gate VTS shall be paid to the League and applied to repay the League's G-3 debt in accordance with paragraph 1 above only to the extent required to reduce such Shortfall G-3 Club's projected G-3 Guaranty Shortfall to zero.

3.     During each season commencing in 2014 and through the season in which a G-3 Guaranty Shortfall payment is due from a Shortfall G-3 Club, such Shortfall G-3 Club's total amount of actual Incremental Gate VTS and club seat premium VTS for such season will be measured against the total projection of those amounts for such season pursuant to the projections previously submitted by the Shortfall G-3 Club to the League office in 2014. To the extent there is a shortfall in any such season (a "Season Shortfall") and the Shortfall G-3 Club is projected to have a G-3 Guaranty Shortfall payment due at the end of its G-3 Guaranty term, then the Shortfall G-3 Club shall pay the amount of the Season Shortfall at the end of the season in which the Season Shortfall occurs.

4.     If a Shortfall G-3 Club has a G-3 Guaranty Shortfall payment due at the end of the term of its G-3 Guaranty (after the application of the gate VTS and Incremental Gate VTS as contemplated by paragraphs 1 and 2 above and any Season Shortfall payments as contemplated by paragraph 3 above), then the Shortfall G-3 Club shall pay to the League the amount of its G-3 Guaranty Shortfall at such time (a Shortfall G-3 Club may request a debt ceiling waiver at such time, but approval of any such debt waiver will be in the membership's sole discretion).

5.     No Shortfall G-3 Club shall be permitted to voluntarily prepay any projected G-3 Guaranty Shortfall resulting from a shortfall in actual club seat premium VTS and Incremental Gate VTS results compared to projections relating to the 2014 or later seasons, except as contemplated in paragraph 3 above.

6.     The forward rate used to calculate the amount of the G-3 Guaranty Shortfall for each Shortfall G-3 Club shall be adjusted from 7% or 8%, as applicable, to the League's actual cost of borrowings related

**J.A. 968**

to the G-3 Program as determined by the League at the time the G-3 Guaranty Shortfall payment is due from the Shortfall G-3 Club. For the avoidance of doubt, the discount rate applied to each Shortfall G-3 Club's actual and projected annual club seat premium VTS, Incremental Gate VTS, and gate VTS amounts which are applied against its G-3 Guaranty shall remain unchanged (7% or 8%, as applicable).

7. Other than any surplus or deficit of the G-3 Program relating to the League's actual cost of borrowings and reconciled pursuant to paragraph 6 above, any surplus or deficit in the G-3 Program existing following the 2024 season shall continue to be shared equally by all NFL clubs.

8. Consistent with general treatment under the G-4 Program, the sharing waiver on PSL VTS approved by the membership in connection with the Dallas Cowboys' stadium project shall no longer be limited to the maximum amount of PSLs that the NFLPA agreed would be eligible for salary cap credits and exclusions attributable to such project, but such waiver shall continue to be subject to all other requirements applicable to PSL waivers (e.g., all PSL proceeds must be used solely and entirely to fund the original stadium construction (including through retirement of stadium debt)).

9. The terms and conditions of the approvals hereunder with respect to each Shortfall G-3 Club, shall be evidenced by an agreement or agreements with such Club, its controlling owner, and other relevant parties, in form and substance acceptable to the Commissioner and with such additional specific terms and conditions as the Commissioner may deem necessary or appropriate, and the Commissioner shall execute and deliver such agreements on behalf of the League.

## 2014 RESOLUTION MC-3

*Whereas*, some Member Clubs have purchased insurance coverage for the accidental death of one or more of their Players;

*Whereas*, the terms of such policies vary with respect to covered individuals, the definition of "accident events," sums insured, maximum benefits, deductibles, exclusions and premiums;

*Whereas*, other Member Clubs currently have no insurance of any kind in this category of risk;

*Whereas*, the loss of contracted NFL Players, Principal Owners and Head Coaches, as well as those Club Executives, Assistant Coaches and NFL League Executives who earn in excess of $1.0 million in annual compensation is an insurable interest of all Member Clubs and the NFL;

*Whereas*, the purchase of a League-wide policy insuring against such risks will result in substantial savings to Member Clubs and the NFL;

*Whereas*, the purchase of such League-wide policy would serve to supplement existing Club policies and would provide accidental death insurance to the remainder of the League's currently uninsured Member Clubs;

*Resolved*, that the Membership authorizes the League to purchase a League-wide policy insuring all Member Clubs and the NFL against the accidental death of the Covered Individuals described above on a 24-hour, worldwide basis;

*Further Resolved*, that the term of such policy shall be thirty-nine months consisting of an initial fifteen-month policy period and two subsequent twelve-month policy periods, with coverage commencing on January 1, 2015 and expiring on March 31, 2018;

*Further Resolved*, that the Sum Insured and the Deductible under such policy shall be as follows:

*In the event five (5) or more Covered Individuals perish in a single occurrence a Lump Sum Benefit is payable based on a $10,000,000 sub-limit per Player; $10,000,000 sub-limit per Principal Owner and Head Coach; $5,000,000 sub-limit per NFL Team Executive, Assistant Coach and NFL League Executive earning in excess of $1,000,000 in annual compensation.*

*If ten (10) or more Covered Individuals perish in a single occurrence, a Lump Sum Benefit of $150,000,000 is payable. The Maximum Benefit Payable is $150,000,000 per Policy Period.*

## 2015 RESOLUTION BC-1

*Whereas*, 2014 Resolution BC-1 authorized the Commissioner, in consultation with the Broadcasting Committee and as agent of the member clubs, to commit up to sixteen (16) live NFL regular season games to NFL Enterprises LLC d/b/a NFL Network through the 2022 season as part of a new or extended distribution agreement;

*Whereas*, 2014 Resolution BC-1 also ratified and approved an agreement between NFL Network and CBS relating to a package of Thursday and Saturday regular season games during the 2014 season and, at NFL Network's option, the 2015 season;

*Whereas*, during the 2014 season and pursuant to such agreement between NFL Network and CBS, NFL Network carried sixteen (16) live NFL regular season games produced by CBS of which eight (8) such games were sublicensed to CBS to be distributed on CBS alongside NFL Network;

*Whereas*, in lieu of exercising the option for the 2015 season, the NFL and NFL Network, on their own behalf and as agents for the member clubs, have negotiated a new two- year agreement with CBS (covering the 2015 season and, at NFL Network's option, the 2016 season) pursuant to which NFL Network would, among other things, grant CBS each of (i) the right and obligation to produce, for distribution on NFL Network, fourteen (14) Thursday night live regular season game telecasts and two (2) Saturday live regular season game telecasts and (ii) a sublicense to distribute on CBS, alongside NFL Network, the eight (8) Thursday night games in Weeks 2 through 9;

*Whereas*, the proposed agreement is expected to have a positive impact on the revenues, viewership base and overall profile of NFL Network;

*Whereas*, the Broadcasting Committee has reviewed the terms of the proposed agreement between NFL Network and CBS and has unanimously recommended ratification thereof; and

*Whereas*, the membership now desires to ratify and approve the proposed agreement with CBS.

*It Is Hereby Resolved*, that NFL Network's agreement with CBS relating to Thursday and Saturday games in the 2015 and 2016 seasons is hereby ratified and approved.

**2015 RESOLUTION BC-2**

*Whereas*, the League has announced that each of the three International Series regular season games to be played in London during the 2015 season will kick off at approximately 9:30 a.m. New York time;

*Whereas*, the League's existing Sunday afternoon television agreements with CBS and FOX afford the League flexibility to distribute one or more of such International Series games through an alternate partner and/or delivery platform;

*Whereas*, the media landscape continues to shift toward digital platforms and consumption of content via the Internet has become increasingly popular among fans and consumers of sports;

*Whereas*, the League and its Member Clubs have recognized an ongoing need to reach and engage fans through new delivery platforms in order to enhance the long-term value of the live distribution rights for NFL games and other League media assets; and

*Whereas*, the League and its Member Clubs have further agreed that beginning to test the viability of the Internet as a high-quality distribution platform for live NFL games will provide valuable strategic benefits and learnings;

*It Is Hereby Resolved*, that the Commissioner, in consultation with the Broadcasting Committee, shall be authorized to negotiate and execute an agreement contemplating Internet distribution of one International Series game to be played in London during the 2015 season.

**2015 RESOLUTION FC-2**

*Whereas*, League policies emphasize the importance of maximizing home attendance for all games, including postseason games;

*Whereas*, full stadiums for postseason games enhance the value of the League's entertainment product and enable participating clubs to mitigate their postseason expenses;

*Whereas*, the membership approved 2014 Resolution FC-5 to require, among other things, that every club offer its season ticket members the opportunity to reserve tickets for any postseason game that it may host; and

*Whereas*, this requirement would best serve the aforementioned League interests as well as the convenience of clubs and fans if fulfilled prior to the start of the regular season;

Be it *Resolved*, that 2014 Resolution FC-5 be, and hereby is, amended by replacing the fourth paragraph in its entirety with the following paragraph:

Be it *Resolved*, that every club shall, prior to its first game of each regular season, offer its season ticket members the opportunity to reserve tickets for any postseason game that it may host in that season;

*Further Resolved*, that the remainder of 2014 Resolution FC-5 shall remain unchanged and in full force and effect;

*Further Resolved*, that a club may not charge any season ticket member who reserved postseason tickets prior to the club's first game of the regular season in excess of its season ticket member, regular season ticket prices for any Wild Card game that the club hosts that season; and

Further *Resolved*, that the Finance Committee is and remains authorized to establish policies relating to administrative and other matters in respect of such ticket policies (and similar ticket policies), including for purposes of implementing this Resolution, which it shall periodically present to the membership for discussion.

## 2015 RESOLUTION FC-3 &
## MARCH 2015 ACTION OF THE DIRECTORS OF NFL VENTURES, INC.
## AND CONSENT OF THE PARTNERS OF NFL VENTURES, L.P.

*Whereas*, the clubs desire to delegate to the Finance Committee and to the NFL Management Council's Executive Committee (the "CEC") the authority to convert each of the League and the NFL Management Council, respectively, from a tax-exempt, not-for-profit entity to a taxable, for-profit entity, and to take such actions incidental thereto as the Finance Committee or the CEC, as applicable, deems appropriate;

*Whereas*, the loans advanced by the League to clubs participating in the stadium construction support program (the "G-3 Clubs") established by 1999 Resolution G-3, as extended by 2003 Resolution JC-1 (the "G-3 Program") are currently forgiven, if certain conditions are met, on a straight-line annual basis over 15 years following the completion of the applicable stadium project;

*Whereas*, as a result of, among other things, differences between the amortization schedules of the League's G-3 Program debt and the loans advanced by the League to the G-3 Clubs, the forgiveness feature included in the loans advanced by the League to the G-3 Clubs, and the timing of payments that will be made under the club seat premium visiting team share ("VTS") guarantees of the G-3 Clubs, the outstanding principal balance of the debt incurred by the League to fund the G-3 Program exceeds the sum of the outstanding principal balance of the loans advanced by the League to the G-3 Clubs and the cash held in League reserves for repayment of the League's G-3 debt; and

*Whereas*, in order to balance the League's assets and liabilities relating to the G-3 Program and to maintain that balance going forward, the League desires to approve certain of the resolutions set forth herein.

Be it *Resolved*:

1.  That the League and each club hereby delegates to the Finance Committee and to the CEC the authority, in its discretion, to convert each of the League and the NFL Management Council, respectively, from a tax-exempt, not-for-profit entity to a taxable, for-profit entity at any time after March 31, 2015, and to take (and authorize the Commissioner to take) any such actions on behalf of the League and/or NFL Management Council, as applicable, and to enter into (and authorize the Commissioner to enter into) any such documents or agreements (including, without limitation, amendments to the League's Constitution and Bylaws and/or to the NFL Management Council's Articles of Association and By-Laws, with each club hereby consenting to any such amendment as so approved by the Finance Committee and/or the CEC, and waiving any requirement for any further vote, consent or approval of the clubs in respect thereof, whether under the League's Constitution and Bylaws or the NFL Management Council's Articles of Association and Bylaws or otherwise), as the Finance Committee or the CEC, as applicable, deems necessary or appropriate in furtherance of such conversion;

**J.A. 974**

2. That NFL Ventures, L.P. ("NFL Ventures") is hereby authorized and directed to draw up to $300 million under its existing debt facilities (the "Draw Amount"), with such draw to be made on or prior to March 31, 2015 and with the final Draw Amount to be determined by the Commissioner;

3. That NFL Ventures is hereby authorized and directed to make a distribution on or prior to March 31, 2015, in an aggregate amount equal to the Draw Amount, to the limited partners of record of NFL Ventures as of such date, with such distribution to be made pro rata to each such limited partner;

4. That each club shall pay to the League, with such funds to be received by the League on or prior to March 31, 2015, a League assessment in an amount up to $9.375 million per club, with the amount of such assessment to be determined by the Commissioner (and with the aggregate amount of such assessments not to exceed the Draw Amount);

5. That the League shall use the funds so received to prepay, on or prior to March 31, 2015, such amount of the League's G-3 debt (and to pay any related swap termination costs and prepayment penalties) so that, following such prepayment, the outstanding principal amount of the League's G-3 debt shall equal the outstanding principal amount of the G-3 Program debt advanced by the League to the G-3 Clubs after taking into account forgiveness granted on March 31, 2015, with the specific tranches of the League's G-3 debt to be so prepaid to be determined by the Commissioner;

6. That the Board of Directors of NFL Ventures, Inc. hereby delegates to the G-4 Finance Committee of NFL Ventures the authority, in its discretion, to authorize NFL Ventures to incur additional indebtedness which will be used to refinance the draws made on the existing NFL Ventures credit lines pursuant to the resolutions contained in Paragraph 2 above, and to authorize the officers of NFL Ventures to enter into such documents and agreements as may be necessary or appropriate in connection therewith (and the clubs hereby authorize the Commissioner to provide League guarantees of any such indebtedness so incurred by NFL Ventures, on such terms as the Commissioner may deem appropriate); and

7. In order to implement the foregoing resolutions, the G-3 Program will be revised, and related matters are approved, all as set forth on Exhibit A attached hereto.

EXHIBIT A

G-3 Program and Other Approvals

1.  The loans advanced by the League to the G-3 Clubs under the G-3 Program shall, effective as of April 1, 2015, no longer be eligible for forgiveness, and each G-3 Club shall, on or prior to March 31, 2015, enter into an amendment to its G-3 credit agreement and related agreements acceptable to the Commissioner evidencing its obligation to repay principal and interest on its remaining G-3 debt commencing April 1, 2015, with the amount to be repaid each year to be equal to the amount that would otherwise have been forgiven in such year under the G-3 Program prior to such amendment; and, furthermore, the interest rate on each such loan will be restated to provide for interest to accrue annually at the Applicable Federal Rate in effect on the accrual date plus 50 basis points;

2.  Subject to each G-3 Club entering into such agreements, each such G-3 Club shall have a waiver from its obligation to share club seat premium VTS and, only to the extent required, gate VTS in an aggregate amount each year (commencing April 1, 2015) equal to the principal and interest owing on its G-3 debt for such year (for clarity, a G-3 Club shall be required to pay club seat premium VTS and gate VTS in excess of the amount of such principal and interest to an NFL agency account as designated by the Commissioner or his designee);

4.  The Finance Committee shall have the authority, on a G-3 Club-by-G-3 Club basis, and with the agreement of the relevant G-3 Club, to implement more limited or otherwise modified waivers and other amendments to the relevant G-3 Club's G-3 credit agreement and related guarantees and other agreements, and to approve modifications to VTS obligations and/or the allocation of club versus stadium company revenue streams for a G-3 Club and any related lease amendments, in each case if determined by the Finance Committee to be necessary or appropriate to implement the intent of the these resolutions and with the goal of providing the clubs with overall economics with respect to the G-3 Program that are equivalent to those in effect prior to the implementation of these resolutions, on a tax-efficient basis;

5.  Except as contemplated by the foregoing resolutions, the other obligations of the G-3 Clubs shall be unaffected by the foregoing resolutions and amendments and, accordingly, all adjacency guarantees and VTS payment guarantees shall remain in full force and effect (subject, in the case of the VTS payment guarantees, to the terms of 2014 Resolution JC-4); and

6.  Each G-3 Club is hereby granted a debt ceiling waiver in the amount of the G-3 Program debt owing from such club.

## 2015 RESOLUTION FC-4
### (As Amended)

*Whereas*, the League has maintained policies regarding ownership of member clubs, which rules are designed to foster a range of important League interests;

*Whereas*, 1985 Resolution FC-7, as amended by 1996 Resolutions FC-5 and FC-6 and as supplemented by 1998 Resolution FC-10, (a) requires that a single Principal Owner hold at least a 30% equity interest in, and possess total voting control over, a member club, and (b) limits the total number of individual owners of a member club and governs when a family trust or family company can count as a single "person" for such purposes;

*Whereas*, 2004 Resolution FC-1A, as modified by 2009 Resolution FC-12, allows Principal Owners, in certain circumstances and subject to certain conditions, to hold individually a minimum of a 10% beneficial interest, and to aggregate the Principal Owner's individual interest with those of immediate family members to reach the required 30% equity interest in the member club;

*Whereas*, League ownership policies have been designed to support orderly inter-generational succession planning, as evidenced by the above Resolutions and 2011 Resolution FC-3, among others;

*Whereas*, the membership believes that it is advisable to take further steps to facilitate responsible succession planning and inter-generational transfers by (a) reducing from 10% to 5% the minimum interest that must be held by a Principal Owner who otherwise satisfies the League rules relating to minimum equity ownership, including as further described in this Resolution, (b) permitting a controlling interest in a member club to be owned by an irrevocable family trust ("IFT") subject to certain conditions, and (c) making certain other changes to ownership policies as provided in this Resolution;

*Whereas*, in light of the succession planning policies which have been adopted by the membership with respect to Principal Owners, the membership believes it is advisable to provide more flexibility to count multiple immediate family members of the Principal Owner as a single "person" for purposes of determining the number of owners of a member club;

*Whereas*, because a member club's succession plan affects both the interests of the individual member club and the League, the membership believes it advisable to add further requirements to the succession planning process to ensure that (a) member clubs have given adequate consideration to this important matter and have formulated succession plans that comport with League rules; (b) member clubs have identified plans designed to avoid conflict and uncertainty that can be detrimental to the League and potentially disruptive to a member club's operations; and (c) member clubs communicate these plans to the League; and

*Whereas*, the membership reaffirms its belief in current ownership policies such as the requirement that, other than with respect to the changes

**J.A. 977**

expressly contained in this Resolution, the Principal Owner have full operating control over the member club and full authority to act on behalf of the member club as a member of the League.

Be it *Resolved*, that:

1. A Principal Owner will continue to be deemed to meet minimum equity requirements in a member club if all of the conditions of 2004 Resolution FC-1A, as modified by 2009 Resolution FC-12, are met, provided that:

   a. The references to ten percent (10%) in Paragraphs 2, 5 and 6 of 2004 Resolution FC-1A, as modified by 2009 Resolution FC-12, shall be further modified to refer instead to five percent (5%);

   b. The references to "immediate family members" in 2004 Resolution FC-1A and 2009 Resolution FC-12 (but, for clarity, except as expressly provided below in this Resolution, in no other provisions of the Constitution or other League Resolutions) shall be modified to include the "immediate family members" (as defined in Article 3.5(C) of the Constitution) of the Principal Owner who first implements the succession planning transaction that reduces his or her interest in the member club to a lower percentage pursuant to this Resolution in order to enable the successor Principal Owners to meet the requirement that such Principal Owner and his or her immediate family have an aggregate beneficial interest in the equity of the member club of at least 30% which is held through the applicable family company or family trust; and

   c. All other terms and conditions of 2004 Resolution FC-1A, as modified by 2009 Resolution FC-12, shall remain unchanged.

2. Principal Owners who have owned a club for at least ten years may, subject to the terms of this Resolution, transfer the controlling interest in the club to an IFT for the benefit of his or her family members and through which the Principal Owner shall continue to be required to maintain total voting control of the member club (as contemplated by 1985 Resolution FC-7, as amended by 1996 Resolutions FC-5 and FC-6 and as supplemented by 1998 Resolution FC-10, as the same may hereafter be revised, amended and/or supplemented) and the requisite minimum equity in the member club, in each case as documented in form and substance satisfactory to, and approved in advance by, the Commissioner, except that:

   a. If a Principal Owner owns and controls a member club through an IFT, then distributions from the IFT to its beneficiaries may be controlled by an independent person or persons so long as the Principal Owner has the sole power to appoint and remove the independent person(s).

   b. The appointment and removal of a Principal Owner may be determined collectively by multiple family members, provided that (i) all other requirements of this Resolution and League policies are met, (ii) the

**J.A. 978**

member club and its owners have agreements, satisfactory to, and approved in advance by, the Commissioner, intended to avoid deadlocks and disputes, and (iii) no such appointment and no such removal may occur without the prior approval of not less than three-fourths of the member clubs.

3.  Any IFT to which a Principal Owner wishes to transfer a members club's controlling interest shall also be subject to the conditions and requirements set forth in Exhibit A, which conditions and requirements must be satisfied (as evidenced by a League consent letter) prior to any such transfer taking place.

4.  For purposes of determining the total number of persons who own a direct or indirect interest in a member club, the following shall count as a single "person":

    a.  An IFT that owns a controlling interest in a member club if such IFT (a) meets the requirements of this Resolution and all other League policies and (b) has beneficiaries that consist solely of immediate family members (as defined in Article 3.5(C) of the Constitution) of the Principal Owner who initially created such IFT in accordance with this Resolution and other League rules; and

    b.  Immediate family members (as defined in Article 3.5(C) of the Constitution without taking into account the modifications referenced in Paragraph 1.b. above) of the then-current Principal Owner of a member club together with such then-current Principal Owner, even if such immediate family members own equity interests in the member club through different entities.

5.  Each member club shall be required to submit an ownership succession plan certified by the member club and its Principal Owner by June 30, 2015 and must re-certify its plan annually by each June 30 thereafter, in accordance with the requirements set forth in Exhibit B.

6.  All provisions of the NFL Constitution and, except as specifically amended hereby, all currently effective NFL Resolutions and policies relating to ownership, shall remain in full force and effect.

7.  Nothing in this Resolution shall affect the validity of any existing Resolution approving the ownership arrangement of a member club.

EXHIBIT A
IFT Requirements

1. Trust/other agreements:

   a. All agreements and amendments are subject to prior League review and approval; agreements and amendments must be submitted sufficiently in advance to provide ample time for review and comment.

   b. Trust must be formed in an appropriate jurisdiction, in the Commissioner's discretion.

   c. Trust/other agreements must include:

      i. Appropriate waivers of heightened trustee duties (e.g., fiduciary, income production, diversification of assets, conflicts of interests).

      ii. Strong dispute resolution mechanism, such as final, binding, exclusive waivers of conflict and penalties for frivolous or unsuccessful challenges.

      iii. Rights designed to give the Principal Owner the maximum amount of control possible, consistent with League rules, including the power to transfer a minimum 30% equity interest in the member club and control to a new owner if the Principal Owner desires to transfer control.

      iv. Appropriate restrictions to limit dissemination of confidential and otherwise sensitive member club and League information.

      v. Other provisions as the Commissioner or Finance Committee deems necessary or advisable on a case-by-case basis.

2. League consent letter:

   a. In addition to terms customarily included in the League consent letter (e.g., owners/beneficiaries acknowledge that they are bound by the terms of the Constitution and Bylaws and other League agreements), the consent letter must include the following provisions:

      i. All owners agree/acknowledge the Principal Owner's rights and powers, and the Commissioner's dispute resolution authority.

      ii. Without limitation of existing consent letter requirements and provisions, waivers, releases, indemnities and covenants not to sue in favor of League which are designed to address issues relating to such IFT and/or its beneficiaries.

**J.A. 980**

b. In the Commissioner's discretion, some or all beneficiaries of the IFT may be required to execute the consent letter.

c. Member club/owners must acknowledge that the League is not providing legal or tax advice on particular ownership structures, etc.

3. Other:

a. IFT may be required to act as a guarantor, in addition to the Principal Owner, if the League requires a Principal Owner guarantee (e.g., G-4).

b. The Principal Owner/member club may be required to provide assurances that future capital needs of the member club can be met.

c. In the Commissioner's sole discretion, the Commissioner may exercise the exclusive authority to resolve any intra-club ownership dispute, and the Commissioner's decision shall be final, binding and non-appealable.

EXHIBIT B
Succession Plan Requirements

1. Each member club/Principal Owner must submit a succession plan to the League office by June 30, 2015 and must re-certify its plan annually by each June 30 thereafter.

   a. If a member club proposes changes to its plan, then the new proposal must be submitted promptly for review.

2. Each succession plan must name a specific individual as the planned successor Principal Owner of the member club. The plan should confirm that the Principal Owner's succession arrangements and that the resulting ownership structure would meet all League rules, including Principal Owner minimum equity and control requirements. Therefore, submissions should contain, at a minimum, the following information, as applicable:

   a. A representation from the member club and Principal Owner that there are no known impediments (whether relating to the member club's ownership structure, potential estate or other transfer taxes, issues relating to the successor's background or otherwise) to such successor meeting all League rules.

   b. If such proposed successor is currently a minor or younger than the threshold age at which the succession plan would vest the proposed successor with control, a detailed description of an interim plan, compliant with League rules, that would be implemented if the proposed successor Principal Owner is still a minor or below such threshold age at the time that control passes.

   c. If the current Principal Owner's succession plan is to sell the member club, the submission should provide a description of who would control the sales process, its expected timing, and how the sales process would work, together with a description of how the member club would be managed and a certification from the member club and its Principal Owner that the ownership structure would comply with League rules during the sales process.

3. A Committee (either the Finance Committee or another newly-formed Committee) will review and provide feedback to each member club regarding the member club's succession plan.

   a. The League will perform due diligence on any proposed named successor if such person has not previously been subject to a League background check.

   b. The feedback from the Committee is intended to identify any apparent deficiencies in the member club's plan (structural or with the proposed successor owner) and will provide an opportunity for the member club to address the Committee's concerns.

**J.A. 982**

c. The review of a plan and feedback by the Committee, however, does not constitute approval of such plan or indicate that the proposed successor Principal Owner and related ownership structure comply with League policies or can or will ultimately be approved. A successor Principal Owner, and any resulting new ownership structure, will need to obtain the Commissioner, Committee and/or membership approvals required by League rules at the time of such transfer of control.

d. Such succession plan will be maintained in confidence by the League office and its advisors and any Committee that reviews the plans.

4. The Commissioner shall have the authority to impose penalties for non-compliance with this policy (e.g., for failure to submit a plan, or for plans that lack all necessary information satisfactory to the Commissioner and the Committee).

**2015 RESOLUTION FC-5**

*Whereas*, the Finance Committee has reviewed the League's current debt limit in light of numerous economic factors and conditions;

Be it *Resolved*, that effective immediately, the amount of debt which each member club may incur (as defined and described in 1988 Resolution FC-3) shall be raised from the current $200 million to $250 million;

Further *Resolved*, that all provisions of the NFL Constitution and all other rules and policies regarding member club debt (including without limitation debt of the principal or controlling owner (or secured by his interest in his club) and all indebtedness incurred in connection with an acquisition of a member club or controlling interest therein) shall, except as specifically amended hereby, remain in full force and effect.

**2015 RESOLUTION G-3**

Amend the Anti-Tampering Policy to reflect the following (new language underlined):

*NFL Players*. No club, nor any person employed by or otherwise affiliated with a club, is permitted to tamper with a player who is under contract to or whose exclusive negotiating rights are held by another club.

Notwithstanding the foregoing, during the period that begins ~~three~~ two calendar days prior to the expiration of NFL Player Contracts, clubs are permitted to contact the certified agents of players who will be Unrestricted Free Agents at the end of the current League Year and enter into contract negotiations with them. A contract, however, cannot be executed with a new club, or submitted to the League office, until after the beginning of the new League Year. During this ~~three~~ two-day period, a prospective Unrestricted Free Agent cannot visit a club (other than his current club) at its permanent facility or at any other location, and no direct contact is permitted between the player and any employee or representative of a club (other than his current club).

## 2015 RESOLUTION IC-1

*Whereas*, 2006 Resolution BV-1 authorized the League Office (the "League") to schedule regular season games in the United Kingdom (the "International Games") beginning with the 2007 season and continuing through the 2011 season pursuant to the financial model described therein (the "2006 Model");

*Whereas*, 2011 Resolution IC-1 extended the ability for the League to schedule International Games through the 2016 season on terms to be endorsed by the Commissioner and approved by the International Committee as part of the League's international business plan, and also established an additional model to provide incentives for clubs that volunteer to be the home team for an International Game in multiple consecutive seasons (the "2011 Model");

*Whereas*, 2014 Resolution IC-1 established criteria pursuant to which the League may select member clubs to participate as the home team in each of the International Games in the event a sufficient number of member clubs do not volunteer to participate as a home team, and clarified the parameters under which clubs shall participate in the International Games;

*Whereas*, the member clubs believe that increasing the number of International Games played each season has, and will continue to, contribute to the strength and development of the NFL's brand and popularity outside the United States;

*Whereas*, in order for the League to effectively plan and develop infrastructure in the United Kingdom to support an expanded number of International Games, the ability of the League to schedule International Games should be extended significantly beyond the 2016 season; and

*Whereas*, the member clubs believe that expanding the territories in which the League is able to schedule NFL regular season games beyond the United Kingdom will further contribute to the strength and development of the NFL's brand and popularity outside the United States.

Be it *Resolved*, that the League may continue to schedule International Games through the 2025 season pursuant to the parameters set forth in 2006 Resolution BV-1, 2011 Resolution IC-1 and 2014 Resolution IC-1 (collectively, the "International Games Resolutions"), provided that a member club will not be obligated to participate in an International Game as a visiting team more than once in a season.

Be it *Further Resolved*, that the number of International Games to be scheduled each season and the member clubs selected to participate in the International Games shall continue to be determined by the League in consultation with the International Committee pursuant to the parameters set forth in the International Games Resolutions.

Be it *Further Resolved*, that the League may schedule one or more International Games each season in international territories other than the United

**J.A. 986**

Kingdom subject to the approval of both the Competition Committee and the International Committee.

## 2015 RESOLUTION JC-1

*Whereas*, the Broadcast and Finance Committees recommend the suspension of the blackout policy for the 2015 season in order to study the impact of such a suspension on ticket sales and other League interests; and

*Whereas*, 2014 Resolution FC-4 extended, through the 2018 season, the provisions of 2012 Resolution JC-1, which modified certain policies related to the ticket manifest used to determine whether a game is sold out for purposes of the blackout policy;

Be it *Resolved*, that the blackout policy and 2014 Resolution FC-4 be, and hereby are, suspended for the 2015 season;

Further *Resolved*, that for the 2015 regular season, (a) all member clubs must contribute for each home game a 34% visiting team share ("VTS", which shall be calculated in accordance with existing League policies, including the discounted ticket policy, using prices in the club's 2015 ticket manifest as of July 15) equal to at least 85% of the general admission tickets (with no exclusion for Incremental GA Tickets) ("General Admission Tickets"); and (b) any member club that sells 85% or more of the General Admission Tickets for any game must contribute for that game a 34% VTS for those tickets;

Further *Resolved*, that for purposes of this Resolution, complimentary General Admission Tickets provided by a member club in a manner consistent with existing League policy shall be considered "sold" General Admission Tickets;

Further *Resolved*, that for the 2015 regular season, any member club selling less than 85% of the General Admission Tickets for any game may determine at its discretion for such game which unsold General Admission Tickets it will contribute VTS for to reach the 85% threshold;

Further *Resolved*, that this Resolution does not modify any other ticket-related policies, including the treatment of obstructed view seats, standing room tickets, club seats, and suite seats identified in a club manifest;

Further *Resolved*, that the Finance Committee is and remains authorized to establish policies relating to administrative and other matters in respect of such ticket policies (and similar ticket policies); and

Further *Resolved*, that a three-fourths vote of the membership shall be required to extend beyond the 2015 season the suspension of the blackout policy and/or 2014 Resolution FC-4 approved hereunder.

## 2015 RESOLUTION JC-4

*Whereas*, the media landscape continues to shift toward digital platforms and consumption of content on such platforms has become increasingly popular among consumers and NFL fans;

*Whereas*, the League and its Member Clubs have recognized an ongoing need to effectively reach and engage fans – including younger fans – through the digital platforms such fans are using to regularly consume content;

*Whereas*, the League and its Member Clubs can best realize the full potential of such platforms with respect to audio content, including audio broadcasts of NFL games, by structuring and entering into an effective partnership in connection with the licensing and distribution of such audio content;

*Whereas*, in furtherance of such objectives NFL Enterprises on behalf of the League has negotiated an agreement with TuneIn, Inc. for the distribution of game audio broadcasts and other NFL-themed audio programming as part of the TuneIn digital audio service for the 2015, 2016 and 2017 NFL seasons, with an option for NFL Enterprises to extend for an additional three (3) NFL seasons thereafter, in exchange for a cash rights fee and equity grants from TuneIn to NFL Enterprises for the benefit of the Member Clubs;

*Whereas*, the Broadcasting and Digital Media Committees have reviewed the terms of the proposed agreement with TuneIn and unanimously recommended ratification thereof; and

*Whereas*, the membership now desires to ratify and approve the proposed agreement with TuneIn.

*It is Hereby Resolved*, that the League's proposed agreement with TuneIn is hereby approved on the terms presented to membership and that, following the initial term of such agreement, the Broadcast and Digital Media Committees shall be delegated authority to approve the exercise of NFL Enterprises' above-referenced extension option.

**2015 RESOLUTION JC-5**

Whereas, the League, through NFL Enterprises LLC, has had a long-term agreement in place with Sirius XM Satellite Radio to make club radio broadcasts of all NFL games as well as other NFL-related audio content available to subscribers of Sirius XM satellite radio service; and

Whereas, the League's current agreement with Sirius XM is scheduled to expire after the end of the 2015-16 NFL season; and

Whereas, the League has entered into discussions with Sirius XM and negotiated a proposed renewal agreement pursuant to which Sirius XM's satellite radio and other rights would be extended for an additional six (6) NFL seasons (*i.e.*, through the 2021-22 NFL season); and

Whereas, the Broadcasting and Digital Media Committees have reviewed the terms of such proposed agreement and unanimously recommended ratification thereof; and

Whereas, the membership now desires to ratify and approve the proposed agreement with Sirius XM.

It is hereby resolved, that the League's new agreement with Sirius XM with respect to the 2016-2021 NFL seasons is ratified and approved.

## 2015 RESOLUTION MC-1

*Whereas*, certain drafted players have suffered injuries resulting in their permanent total disability or accidental death prior to reporting to their initial pre-season training camp; and

*Whereas*, certain drafted players selected in rounds one through three of the draft have suffered injuries resulting in their temporary total disability prior to reporting to their initial preseason training camp, which have caused them to miss all or part of their first regular season; and

*Whereas*, the loss of the drafted player and draft choice is an insurable interest of the Club; and

*Whereas*, the NFL has purchased a League-wide Offseason Draft Choice Asset Value Policy to cover the loss of services of: (i) all drafted players, including compensatory draft selections, due to permanent total disability or accidental death; and (ii) players selected in rounds one through three of the draft, including compensatory draft selections, due to temporary total disability; and

*Whereas*, the NFL's purchase of such policy results in lower premium costs for Member Clubs, and

*Whereas*, the insurance policy purchased was renewed in 2011 for a three-year term and extended for an additional year in 2012, such that the policy is scheduled to expire April 1, 2015; it is therefore

*Resolved*, that the Membership authorize the existing NFL Offseason Draft Choice Asset Value Policy to be renewed for a three-year term, with coverage beginning from the time of binding.

## 2015 RESOLUTION MC-2

*Whereas*, certain NFL players have experienced both on-field and off-field catastrophic injury, defined as: paraplegia, quadriplegia, hemiplegia, monoplegia, total severance of limb(s) or total loss of sight in one eye or total loss of sight in both eyes; and

*Whereas*, the NFL has purchased a League-wide catastrophic loss insurance policy to cover NFL players at all times for both on-field and off-field catastrophic injury, thereby resulting in lower costs for Member Clubs; and

*Whereas*, recoveries under the policy enable Member Clubs to provide discretionary financial assistance to such players; and

*Whereas*, the insurance policy purchased was renewed in 2011 for a three-year term and extended for an additional year in 2012, such that the policy is scheduled to expire on April 1, 2015; it is therefore

*Resolved*, that the Membership authorize the existing NFL Catastrophic Loss Policy to be renewed for a three-year term, with coverage beginning from the time of binding.

## 2016 RESOLUTION BC-1

*Whereas*, 2006 Resolution BC-1 established certain policies in connection with "flexible scheduling" and prime time appearances; and

*Whereas*, the Broadcasting Committee has reviewed such policies and unanimously recommended that 2006 Resolution BC-1 be modified such that the Commissioner and League Office may elect to "flex" any game into the Sunday night broadcast package during the final week of the regular season for the purposes of maximizing viewership and fan engagement.

*It Is Hereby Resolved,* that 2006 Resolution BC-1 (regarding Prime Time appearance limits) shall be amended and restated and attached hereto.

**2006 RESOLUTION BC-1**

**(Amended and Restated)**

*Resolved,* that in the preparation of the official NFL regular season schedule and administration of the "flexible scheduling" system for Sunday games to be telecast on CBS, Fox and NBC, the Commissioner and League Office will apply the following policies:

1.  Each club will, with proper notice, switch Sunday regular season games between 1:00 P.M. and approximately 4:25 P.M. (Eastern Time), and in flexible scheduling weeks (generally weeks 11-17 of each season) to approximately 8:30 P.M. (Eastern Time), to accommodate television broadcasting patterns;

2.  The following scheduling provisions will apply to the scheduling of the League's Sunday Night Prime Time broadcast television package:

    a.  Maximum of three *scheduled* (i.e., Week 1-10) appearances per club, inclusive of the Thursday night opener;

    b.  With respect to such *scheduled* appearances:

        i.   If a club is scheduled three times, such club may not be scheduled with all of those games at home, or all such games away, without its prior permission.

        ii.  If a club is scheduled twice, both games may be scheduled away, or one may be scheduled at home and one away; and

        iii. If a club is scheduled once, such game may be home or away;

3.  In addition to such *scheduled* Sunday night broadcast appearances, all clubs may have games "flexed" into the Sunday night broadcast package and scheduled in other prime time television packages, subject to the following:

        i.   Prior to the final week of the applicable NFL regular season, no club may, as a result of such "flexing" and scheduling in other prime time television packages, appear more than six times in Prime Time television packages;

        ii.  Prior to the final week of the applicable NFL regular season, no more than three clubs may appear six times in prime time television packages;

        iii. Prior to the final week of the applicable NFL regular season, no club may appear in the Sunday night broadcast

**J.A. 994**

package more than four times, and only three clubs may appear in such package four times;

4. No club will be required to make more than one appearance per season in games scheduled on dates other than Saturday, Sunday or Monday if, as a result of such scheduled appearance, such club will have fewer than five days available for preparation time prior to such games.

## 2016 RESOLUTION BV- 1

*Whereas,* ecommerce has evolved into an increasingly important channel for the sale of NFL licensed products to NFL fans, who seek efficient, convenient and timely access to a broad selection of authentic NFL licensed products across a range of metrics, including style, price and quality;

*Whereas*, Fanatics, Inc. has operated the League's official ecommerce site, NFLShop.com, since April 1, 2006 under an existing agreement that will expire on March 31, 2017;

*Whereas,* over the last two years, in close consultation with the Ecommerce Sub-Committee of the Business Ventures Committee (the "Sub-Committee"), the League Office has conducted a comprehensive analysis of the League's ecommerce business and numerous alternative business models, including through the use of a third-party consultant and discussions with full-service ecommerce providers as well as various financial, technology, and logistics providers;

*Whereas,* the League Office and the Sub-Committee concluded from this analysis that continuing to outsource the operation of NFLShop.com to a top-tier, full-service ecommerce provider on appropriate terms designed to enhance the availability, variety and quality of authentic NFL licensed products, optimize service and convenience for NFL fans, provide innovative consumer products in a timely way in response to consumer demand, protect the NFL brand, and support the League's efforts to combat unauthorized use of its intellectual property, represents the most attractive business model;

*Whereas,* the League Office identified Fanatics, Inc. and one other retailer as the two best potential partners to operate NFLShop.com after the expiration of NFL Properties' current agreement with Fanatics, Inc. and fully negotiated comprehensive agreements with both;

*Whereas,* both potential deals were presented to the Business Ventures Committee, which unanimously selected and approved the deal with Fanatics, Inc.;

*Whereas,* the proposed deal with Fanatics, Inc. will potentially extend beyond the current effective term of 2011 Resolution BV-1 (Commercial Master Agreement) and is therefore subject to the approval of membership;

*Whereas*, the membership now desires to ratify and approve the proposed agreement between NFL Properties LLC and Fanatics, Inc.

*It is Hereby Resolved*, that the proposed agreement between NFL Properties LLC and Fanatics, Inc. is hereby approved on the terms presented to membership.

## 2016 RESOLUTION BV-2

*Whereas*, 1998 Resolution SB-5 established the allocation of game tickets for each Super Bowl game beginning with Super Bowl XXXVI;

*Whereas*, the two participating clubs each year have limited time to prepare for their participation in the Super Bowl game and to address the significant travel, player and fan support, and other logistical issues associated with such participation;

*Whereas*, to help address many of these fan-related needs, as well as to offset the incremental expenses associated with Super Bowl participation, the participating clubs typically enter into short-term travel sponsorship deals with ticket travel package re-sellers during the two-week period between the AFC and NFC Championship games and the Super Bowl game;

*Whereas*, such deals risk damage to the NFL brand by providing fans who purchase the resulting Super Bowl travel packages with an experience that is inconsistent with the quality and expectations associated with the NFL;

*Whereas*, the League Office has developed an opportunity pursuant to which a greater number of tickets can be made available for purchase by fans on a year-round basis within high-quality and unique Super Bowl travel packages that will result in more positive and consistent fan experiences and interactions with the Super Bowl game and the NFL brand, as well as greater efficiencies due the multi-year nature of the arrangement and resulting opportunity for fans to purchase Super Bowl travel packages much further in advance of the Super Bowl game;

It is hereby *Resolved* that, for Super Bowl LI and beyond, (i) the allocation of Super Bowl game tickets to each of the two participating clubs shall be reduced by 3,000 tickets, (ii) the Super Bowl reimbursement amount paid by the League Office to each of the two participating clubs shall be increased by $5.5MM for Super Bowl LI, with such incremental reimbursement amount increasing by 3% for each subsequent Super Bowl game, (iii) the allocation of Super Bowl game tickets to each member club other than the two participating clubs and the host club shall be increased by 33, and (iv) the allocation of Super Bowl game tickets to the League Office shall be reduced by 957.

**2016 RESOLUTION FC-2**

*Whereas*, the Rams franchise (the "Club") received approval to relocate its home territory from St. Louis to Los Angeles and construct a new stadium at Hollywood Park in Inglewood, California pursuant to 2016 Resolutions G-1 and G-2A (the "Relocation Resolutions");

*Whereas*, the Relocation Resolutions require, among other terms and conditions, that the Club must obtain membership approval of (i) a lease for the stadium in which the team will play in any season before its permanent stadium facility is available and (ii) any other lease agreements and intra-company agreements, in each case no later than the conclusion of the 2016 Annual Meeting;

*Whereas*, prior to the opening of the new stadium, the Club is expected to play the 2016-2018 seasons at the Los Angeles Coliseum pursuant to a venue agreement between the Club and the University of Southern California (the "Venue Agreement");

*Whereas,* the financial terms of the Venue Agreement have been submitted for Executive Committee approval, as required by 1988 Resolution FC-5 and the Relocation Resolutions; and

*Whereas,* the Finance Committee recommends revising the requirement in the Relocation Resolutions to allow the Club to submit lease agreements, other than the Venue Agreement, and intra-company agreements at a later date as reasonably determined by the Commissioner.

Be it *Resolved*, that the financial terms of the Venue Agreement, be, and hereby are, approved subject to the following: (1) nothing in this Resolution shall be interpreted as, and such approval does not constitute, a waiver or otherwise supersede the Club's obligation to comply with the NFL Constitution and Bylaws and all NFL rules, and (2) the Club must submit to the League office final, executed documentation substantiating the terms, conditions, and arrangements presented to the Finance Committee and satisfactory to the Commissioner;

Further *Resolved,* that the requirement in the Relocation Resolutions that the Club obtain approval of any lease agreements and intra-company agreements no later than the conclusion of the 2016 Annual Meeting be, and hereby is, revised to allow the Club to obtain approval of such agreements, other than the Venue Agreement, at a later date to be reasonably determined by the Commissioner;

Further *Resolved*, that the terms and conditions of the approvals granted hereby may, in the Commissioner's discretion, be evidenced by agreements with all relevant parties acceptable in form and substance to the Commissioner, and that the Commissioner shall execute and deliver such agreements on behalf of the League, which shall contain such additional specific terms and conditions as the Commissioner may deem necessary or appropriate.

## 2016 RESOLUTION G-2A

*Whereas,* the Oakland Raiders seek approval pursuant to Section 4.3 of the NFL Constitution and Bylaws to relocate the club's home territory from Oakland to Los Angeles, beginning with the 2016 season; and

*Whereas,* the San Diego Chargers seek approval pursuant to Section 4.3 of the NFL Constitution and Bylaws to relocate the club's home territory from San Diego to Los Angeles, beginning with the 2016 season; and

*Whereas,* the Raiders and Chargers propose jointly to construct a new, state-of-the-art stadium in Carson, California, which would be shared by the two clubs; and

*Whereas,* the St. Louis Rams seek approval pursuant to Section 4.3 of the NFL Constitution and Bylaws to relocate the club's home territory from St. Louis to Los Angeles, beginning with the 2016 season; and

*Whereas,* the Rams propose to construct a new, state-of-the-art stadium in Inglewood, California, at a site known as Hollywood Park, which stadium would be suitable for use by two NFL clubs; and

*Whereas,* the relocation proposals have been evaluated by the Commissioner per the Policy and Procedures on Proposed Franchise Relocations, and the Commissioner has submitted a report to the membership as contemplated by the Procedures; and

*Whereas,* multiple league committees have undertaken a comprehensive evaluation of the possible relocation of one or more teams to Los Angeles and the membership has approved terms and conditions that apply to any approved relocation; and

*Whereas,* the resumption of NFL operations in Los Angeles would serve a wide range of important league interests if done successfully and in accordance with the approved terms and conditions; and

*Whereas,* given the unique and special circumstances presented, the membership believes that it is appropriate to provide, on a non-precedential basis, additional league financial support for stadium projects in the current home market of any club that sought permission, but was not approved to relocate for the 2016 season.

*Be It Resolved* that the member clubs hereby approve, subject to the terms and conditions set forth in 2016 Resolution G-1, the following relocation proposal, effective for the 2016 NFL season.

1. That the proposed relocation of the Rams' home territory from St. Louis to

Los Angeles and the proposed construction of a new stadium at Hollywood Park are approved, with the new stadium at Hollywood Park to be constructed on a basis that permits two NFL teams to operate on an equal basis with respect to scheduling, access to facilities, and agreed-upon and approved financial terms generally consistent with the options presented to the member clubs on January 12, 2016, and with the member clubs having the right to determine the identity of the second team that will play in the stadium and the time at which it will begin play in the stadium;

2. That the Chargers are approved to relocate the club's home territory from San Diego to Los Angeles and granted an option to accept the second team opportunity at Hollywood Park subject to the following terms:

   (A) The option shall expire on January 15, 2017, unless a referendum to approve public financing for a new stadium in San Diego is approved prior to November 15, 2016, in which case the Los Angeles Opportunities Committee may, at the Chargers' request, extend the option up to January 15, 2018. In any year in which the Chargers have the option to relocate and accept the second team opportunity at Hollywood Park, the club must exercise those options no later than the conclusion of the Annual Meeting in that year, or when the option to accept the second team opportunity expires.

   (B) If the Chargers unequivocally reject the option or enter into a binding and approved stadium agreement in San Diego or another community prior to the date on which the option would otherwise expire, the option shall expire as of the date that the option is rejected or that the binding agreement is approved by the membership;

3. That the Raiders are granted a conditional option to accept the second team opportunity at Hollywood Park, effective on the day that the option granted to the Chargers expires, and extending for a period of one year or sooner if the Raiders unequivocally reject the option or enter into a binding and approved stadium agreement in Oakland or another community at an earlier date. This option must be exercised no later than the conclusion of the Annual Meeting in any year in which the Raiders have the option to accept the second team opportunity at Hollywood Park.

4. The membership will make available, in addition to any other stadium financing support provided under the G-4 program, an additional $100 million in league financial support to each of the Raiders and Chargers for a new stadium in each of their respective current home markets, provided that a binding stadium agreement is made and approved by the member clubs no later than January 15, 2017, subject to being extended by the Finance and Stadium Committees.

5. The Rams will not engage in the sale of PSLs, premium seats (including luxury suites), stadium naming or cornerstone rights, or the equivalent of any of these products, prior to February 15, 2017, unless (a) a binding and approved agreement has been reached with a second team; or (b) the Finance, Stadium and Los Angeles Opportunities committees have jointly determined to extend the period past February 15, 2017 for up to 90 days; or (c) all options granted by this Resolution shall have expired prior to that date.

6. The Commissioner, in consultation with the Finance and Stadium Committees, shall have authority to interpret and implement this resolution.

## 2016 RESOLUTION IC-1

***Whereas,*** 2015 Resolution IC-1 authorized the League Office (the "League") to schedule regular season games in the United Kingdom ("UK Games") through the 2025 season pursuant to the parameters set forth in 2006 Resolution BV-1, 2011 Resolution IC-1 and 2014 Resolution IC-1, including the scheduling parameters set forth in 2011 Resolution IC-1;

***Whereas,*** the member clubs believe that increasing the number of UK Games played each season has, and will continue to, contribute to the strength and development of the NFL's brand and popularity outside the United States; and

***Whereas,*** in order to facilitate scheduling multiple UK Games each season, and based on the experience of the member clubs that have participated in UK Games, the member clubs believe that modifying the scheduling parameters applicable to UK Games as currently set forth in 2011 Resolution IC-1 is necessary and desirable.

Be it ***Resolved,*** that the following scheduling parameters shall apply to UK Games commencing with the 2016 season:

**Scheduling Parameters Applicable to Participating Member Clubs in the AFC West and NFC West Divisions:**

- Participating teams will have a choice of a home or away market game the week before the UK Game. Teams must notify the League of their choice no later than February 1st.
- Unless a participating team requests otherwise, participating teams will have a bye week scheduled the week immediately following the UK Game. Requests to not have a bye week scheduled the week immediately following a UK Game must be made no later than February 1st and will not entitle the requesting team to any preferential treatment in the scheduling of that team's bye week.

**Scheduling Parameters Applicable to Participating Member Clubs in the AFC East, AFC North, AFC South, NFC East, NFC North, or NFC South Divisions:**

- Participating teams may be scheduled to play home or away the week prior to the UK Game at the discretion of the League.
- If a participating team is scheduled to play away the week prior to the UK Game, then:
  - Such away game will not be a Sunday evening or Monday evening game;
  - Such away game will not be in a city located more than a 2-hour flight from the team's home city; and
  - Such away game will not be in Florida during the month of September, or in Denver, Colorado.

**J.A. 1004**

- Unless a participating team requests otherwise, participating teams will have a bye week scheduled the week immediately following the UK Game. Requests to not have a bye week scheduled the week immediately following a UK Game must be made no later than February 1st and will not entitle the requesting team to any preferential treatment in the scheduling of that team's bye week.

**Scheduling Parameters Applicable to All Participating Member Clubs:**

- Member clubs participating as a home team in a UK Game will have the option of designating one (1) regularly scheduled home game that will not be eligible as a UK Game.
- Divisional match-ups will not be eligible as a UK Game without the consent of both participating teams.
- Visiting teams will be required to participate in UK Games in accordance with the NFL schedule, provided that, as set forth in 2015 Resolution IC-1, a member club will not be obligated to participate in a UK Game as a visiting team more than once in a season.

**J.A. 1005**

**2016 RESOLUTION JC-1**

*Whereas,* 2015 Resolution JC-1 suspended the blackout policy and 2014 Resolution FC-4 for the 2015 season in order to study the impact of such a suspension on ticket sales and other League interests;

*Whereas*, the Broadcasting Committee and Finance Committee recommend the extension of 2015 Resolution JC-1 in order to further study the impact of such suspension; and

*Whereas,* 2015 Resolution JC-1 requires a three-fourths vote of the membership to extend the suspension of the blackout policy and/or 2014 Resolution FC-4 approved thereunder beyond the 2015 season;

Be it *Resolved*, that the suspension of the blackout policy and 2014 Resolution FC-4 reflected in 2015 Resolution JC-1, as well as the other provisions of 2015 Resolution JC-1 (including the supplemental VTS requirement for regular season games) be, and hereby are, continued for the 2016 season.

## 2016 RESOLUTION JC-5

*Whereas*, 2015 Resolution BC-1 ratified and approved an agreement between the League and CBS relating to a package of Thursday and Saturday regular season games during the 2015-16 season and, at the League's option, the 2016-17 season;

*Whereas,* in lieu of exercising such option for the 2016 season, the League, as agent for the member clubs, has negotiated new two-year agreements (covering the 2016 season and the 2017 season) with each of CBS and NBC, pursuant to which the League respectively would grant to CBS and NBC, among other things, the right and obligation (i) to produce, for distribution on CBS or NBC (as applicable), five (5) Thursday night live regular season game telecasts (subject to a League option to "put" an additional live regular season game telecast to NBC) and (ii) to collectively produce, for national distribution exclusively on NFL Network, an aggregate of eight (8) live regular season game telecasts (or, in the event that League exercises its above-referenced "put" option, seven (7) live regular season game telecasts);

*Whereas,* in each of such agreements with CBS and NBC, the League also has retained the right to simulcast on NFL Network and via digital distributor(s) each live regular season game telecast distributed on CBS or NBC (as applicable) pursuant to such agreements;

*Whereas*, the proposed agreements with CBS and NBC, and any such related agreement(s) with digital distributor(s), will increase the revenues, viewership base, and profile of the League's *Thursday Night Football* franchise and of NFL Network;

*Whereas*, the Broadcasting Committee and Digital Media Committee have reviewed the terms of the proposed agreements between the League and each of CBS and NBC and have unanimously recommended ratification thereof, and also have reviewed and endorsed the status of ongoing negotiations between the League and various digital distributors; and

*Whereas,* the membership now desires to ratify and approve the proposed agreements with CBS and NBC and to approve the completion by the Commissioner and the League Office of related agreement(s) with one or more such digital distributor(s).

*It Is Hereby Resolved,* that the League's new agreements with CBS and NBC relating to certain games in the 2016 and 2017 seasons are hereby ratified and approved; and

*Further Resolved*, that the Commissioner and League Office are hereby authorized to complete and execute agreement(s) relating to such games with one or more digital distributor(s).

## 2016 COMPETITION COMMITTEE POSITION PAPER
## ON ANTI-TAMPERING POLICY

Below is the Competition Committee's position paper on the Anti-Tampering Policy, presented at the March 2016 Annual meeting of the League:

### Anti-Tampering Policy – Commissioner Discipline

At the Commissioner's request, the Competition Committee discussed the types and levels of discipline that should be assessed by the Commissioner for violations of the Anti-Tampering Policy. The Committee reviewed the relevant provisions of the Constitution and Bylaws concerning tampering violations to determine if those provisions should be incorporated into the Anti-Tampering Policy for clarity and consistency. The Anti-Tampering Policy is consistently updated with respect to player and non-player personnel, and the Committee believes it should be the prevailing policy document for all matters relating to tampering. The Committee also reviewed the general guidance that it has provided regarding discipline for violations of competitive rules. It regards tampering as a serious competitive violation and therefore believes that discipline should be sufficient to deter future violations, and in appropriate cases, compensate the offended club.

After careful consideration, the Committee recommends the following, with the understanding that the Commissioner is granted broad authority under Section 8.13 of the Constitution and Bylaws and nothing in this position is meant to limit that authority in any way:

1. The disciplinary section of the Anti-Tampering Policy will be revised as follows to include language from Section 8.13 (A)(3) of the Constitution and Bylaws that refers to the broad disciplinary powers of the Commissioner.

> **Discipline.** Any violation of this Anti-Tampering Policy will subject the involved club and/or person to severe disciplinary action by the Commissioner. In such cases, the Commissioner may award or transfer selection choices and/or deprive the offending club of a selection choice or choices, and/or

may fine or suspend with or without pay the offending club and/or any involved individuals as appropriate. The League office will promulgate to all clubs the details of any penalties imposed for tampering.

2. In assessing discipline, the Commissioner may consider as relevant factors whether the club that committed the violation did or did not secure the services of the player or other employee. If a club is found to be in violation of the Anti-Tampering Policy and that club acquires the player (or non-player employee), the Commissioner should consider in imposing discipline on the offending club the fact that the club is receiving the services of that individual for multiple years.

3. The Commissioner may award compensation to the offended club if it certifies a complaint that initiates an investigation against the offending club(s).

4. If the offending club can clearly prove to the Commissioner that the act constituting the violation of the Policy was unintentional, the Commissioner may consider that as a mitigating factor with respect to any discipline imposed on the club or individuals.

5. Clubs are reminded of the following provision in the Policy on Integrity of the Game & Enforcement of League Rules:

Duty to Investigate and Cooperate - Actual or suspected violations will be thoroughly and promptly investigated. Any club identifying a violation is required promptly to report the violation, and give its full support and cooperation in any investigation. Failure to cooperate in an investigation shall be considered conduct detrimental to the League and will subject the offending club and responsible individual(s) to appropriate discipline.

The fact that a club self-reports a violation of the Anti-Tampering Policy should be considered a mitigating factor with respect to any discipline imposed on the club or individuals. Conversely, if a club fails to cooperate and give its full support to an investigation, that should be considered an aggravating factor.

**J.A. 1009**

— A —

ADVERTISING
Lottery and off-track betting, 1993-1

AMERICAN BOWL, 1990-2, 1991-2

ANTI-TAMPERING POLICY, 1998-13, 2000-1, 2001-3, 2004-15, 2004-16, 2007-8, 2007-9, 2007-10, 2008-5, 2012-9, 2015-15, 2016-16

ARENA FOOTBALL LEAGUE, 2002-1

ASSESSMENTS, 1982-1

AUDIT REPORT, 1985-1

— B —

BLACKOUT POLICY, 2015-18, 2016-14

BROADCASTING
Advertising/sponsorships, 1993-1, 1998-2, 2003-1
Club cooperation, 1998-2, 2006-3, 2006-8, 2014-7
DIRECTV Contract, see DIRECTV CONTRACT
Flex Scheduling, 2006-1, 2016-1
Game day operations, 1998-2, 2002-8
*Hard Knocks*/HBO, 2013-1
Internet Distribution, 2015-2
Network contracts, 1998-1, 2004-2, 2005-2, 2005-3, 2009-2, 2011-1 2011-2, 2011-3, 2014-1, 2014- 2, 2015-1, 2016-15
NFL Network, 2003-1, 2010-6, 2011-3, 2014-1, 2014-3, 2015-1, 2016-15
NFL Now, 2014-7
Preseason games, 1984-1, 1994-1, 1998-6, 1998-8, 2010-1
Radio, 1994-1, 2010-5, 2015-19, 2015-20
Schedule, see GAME SCHEDULE
Sirius XM Radio Contract, see SIRIUS XM SATELLITE RADIO CONTRACT
Stadium signage, 2002-8
Telecommunications, 2013-3, 2014-4
Wireless distribution, 2008-7, 2010-4

**J.A. 1010**

— C —

CATASTROPHIC LOSS PROGRAM, 2002-10, 2005-10, 2008-9, 2011-25,
2012-14, 2015-22

CLAIMS AGAINST LEAGUE, 1997-3

CLUB CONTRACTS
Preseason games, 1994-1
Preseason television, 1984-3, 1994-1
Radio, 1994-1

CLUB DEBT
Debt limit, see DEBT LIMIT
Definition, 1988-2

CLUB DELINQUENT ACCOUNTS, 1982-1, 1984-2

CLUB MARKS, see TRADEMARKS

CLUB REPORTING
Audit report, 1985-1, 2004-14
Debt limit, 1996-1
Financial statements/budget, 1990-1, 2004-14
Ownership, 1983-2
Super Bowl game ticket distribution, 1989-1

CLUB SEAT PREMIUMS
Inclusion in gross receipts, 1987-1, 1995-1, 2008-1
Pooling, 1995-1, 1995-4
Stadium financing, 1999-2, 2003-7, 2011-16, 2012-4, 2012-7,
2014-13
Waiver criteria, 1994-3

COACHES' PENSION PLAN, 1983-1

COLLECTIVE BARGAINING AGREEMENT, 2008-10, 2011-26

COMMISSIONER
Approval of uniform changes, 2002-3
Authority over affiliate operations, 1990-3
Authority to appoint Management Council Executive Committee Chairman
(2007-12)
Authority to assess club for legal fees and expenses, 1997-3
Authority over Exempt List, 2014-10
Preseason Scheduling Authority, 1991-1, 2001-7

CONTROLLING OWNER REQUIREMENTS, see OWNERSHIP POLICIES

**J.A. 1011**

CORPORATE OWNERSHIP, 1996-3

CREDIT FACILITY, 2002-2

CROSS-OWNERSHIP, 1997-1, 2004-13

CROWD NOISE, 2002-6

— D —

DEBT LIMIT, 1988-2, 1996-1, 1998-9, 1998-11, 2001-1, 2012-3, 2015-14
   Waiver, 1999-1, 2005-6, 2013-6

DEFERRED COMPENSATION, 1988-1, 1993-3

DIGITAL MEDIA CONTENT, 2015-2, 2015-19, 2016-15
   NFL Now, 2014-7

DIRECTV CONTRACT, 2003-1, 2004-1, 2009-1

DRAFT
   Draft choice asset value policy, 2005-11, 2011-24, 2012-13, 2015-21

DRAFT ELIGIBILITY, 1990-4

— E —

E-COMMERCE, 2016-4

ELIGIBILITY, 1990-4

EMPLOYEE BENEFITS
   Accidental Death Policy, 2014-16
   Medical insurance, 1997-4
   Retirement Plans, 2009-7, 2010-2
   Workers' Compensation, 2013-8

EXECUTIVE SESSION MEETINGS, 1984-4

EXPANSION, 1995-1, 1996-5, 1996-6, 1999-1, 2016-8

— F —

FANTASY FOOTBALL, 2012-2

FINANCIAL REPORTING, 1990-1, 2004-14

FINANCING
Stadium, 1999-2, 2003-7, 2011-16, 2012-4, 2012-7, 2014-13

FUND INVESTMENT COMMITTEE, 2011-14, 2013-5

— G —

G-3 STADIUM FINANCING PROGRAM, 1999-2, 2003-7, 2014-11

G-4 STADIUM FINANCING PROGRAM, 2011-16, 2012-4, 2012-7

GAMBLING
Lottery advertising, 1993-1, 2009-3

GAME SCHEDULE
General, 1998-5, 2000-4, 2006-1, 2009-10, 2016-1
International games, 1990-2, 2006-6, 2011-22, 2014-11, 2015-16, 2016-12
Preseason games, 1991-1, 1998-6, 2001-2, 2001-7, 2006-5

GROSS GATE RECEIPTS
Calculation, 1987-1, 1987-3, 1995-1, 2001-2, 2012-11, 2014-8, 2015-18, 2016-14
Postseason, 1987-2

— H —

HALL OF FAME GAME, 1998-7

HEADSETS, 2014-4

**J.A. 1013**

— I —

IN-STADIUM GIVEAWAYS, 1985-3

INSURANCE
    Accidental Death Policy, 2014-16
    Draft choice asset value policy, 2005-11, 2011-24, 2012-13, 2015-21
    Workers' Compensation, 2013-8

INTEREST ON CLUB DELINQUENT ACCOUNTS, 1984-2

INTERNATIONAL
    American Bowl, 1991-2
    Business objectives, 1993-7
    Funding, 1998-10
    Game scheduling and administration, 1990-2, 2006-6, 2008-6, 2011-22,
        2012-10, 2014-11, 2015-16, 2016-12
    NFL Europe, 2003-6
    Television revenue, 1998-10, 2007-4
    United Kingdom, 2011-22, 2014-11, 2015-2, 2015-16, 2016-12


INTERNET NETWORK, 2001-8, 2004-3, 2006-8, 2007-3, 2010-1, 2011-4,
    2014-7
    Wireless distribution, 2005-4, 2008-7, 2010-4


— L —

LEAGUE MARKS, see TRADEMARKS

LEAGUE TAX STATUS, 2015-4

LEAGUE-WIDE CREDIT FACILITY, 2002-2

LEASES, see STADIUM LEASES

LEGAL FEES, 1997-3

LICENSING OF TRADEMARKS, see TRADEMARKS

LIMITED LIABILITY COMPANIES
    Ownership requirements, 1998-12

LIMITED PARTNERSHIPS
    Ownership requirements, 1985-2, 1996-2

**J.A. 1014**

LITIGATION EXPENSES, 1997-3

LOCATION-BASED ENTERTAINMENT VENTURE, 1997-5

LOS ANGELES FRANCHISE, 1995-1, 2016-1, 2016-6, 2016-7


— M —

MANAGEMENT COUNCIL, 1990-3, 2007-12, 2015-4

MEETINGS
   Executive Session, 1984-4

MONDAY NIGHT FOOTBALL, 1998-5


— N —

NETWORK TELEVISION CONTRACTS, 1998-1, 2004-2, 2005-2, 2005-3,
   2009-2, 2010-6, 2011-1, 2011-2, 2011-3, 2014-1,
   2014-3, 2015-1, 2016-15

NFL ATTRACTIONS, 1997-5

NFL ENTERPRISES, see NFL VENTURES

NFL EUROPE, 2003-6

NFL FILMS, 1990-3, 2013-1

NFL INTERNET NETWORK, see INTERNET NETWORK

NFL NETWORK, 2010-6, 2011-3, 2014-1, 2014-3, 2015-1, 2016-15

NFL NOW, 2014-7

NFLSHOP.COM, 2016-4

NFL TICKET EXCHANGE, 2012-1

NFL PROPERTIES, 1990-3
   Reebok Joint Venture, 2000-5, 2001-14
   Fanatics, 2016-4

NFL VENTURES (FORMERLY KNOWN AS NFL ENTERPRISES), 1994-2,
   1998-10, 2012-4, 2013-3, 2014-4

**J.A. 1015**

NON-PLAYER EMPLOYEES, 2010-2

— O —

OFF-TRACK BETTING ORGANIZATIONS
Advertising, 1993-1

OWNERSHIP POLICIES, 1985-2
Acquisition debt, 1998-11, 2001-1, 2012-3, 2015-14
Aggregation of Principal Owner's interests with those of immediate family
members, 2004-11, 2009-9, 2011-12, 2015-7
Corporations, 1996-3
Cross ownership, 1997-1, 2004-13
Family companies/trusts, 1996-2, 1996-3, 1998-12, 2004-11
Limited liability companies, 1998-12
Limited partnerships, 1996-2
Primary purpose requirement, 1993-6, 2005-1
Relocated Franchise, 2016-7, 2016-12
Reporting requirements, 1983-2
Succession Planning, 2011-12

OWNERSHIP REPORT, 1983-2

— P —

PERMANENT SEAT LICENSES (PSLs), 1995-1, 1996-5, 1996-6, 1999-1,
1999-2, 2003-7, 2011-16, 2012-4, 2012-7, 2014-13

PERSONAL CONDUCT POLICY, 2014-10

PLAYER BENEFITS, 1977-1, 1978-1, 2002-10, 2007-11, 2011-25,
2012-14, 2014-16, 2015-22

PLAYER CONDUCT
Personal Conduct Policy, 2014-10
Unsportsmanlike conduct, 2000-3

PLAYER STOCKING PLAN, 1999-1

POOLED REVENUE, see REVENUE SHARING

POSTSEASON
Calculation of gross gate receipts, 1987-2
Game revenue distribution, 1977-1, 1978-1, 1983-1
Season Ticket Holders, 2014-9, 2015-3
Super Bowl game, see SUPER BOWL GAME

**J.A. 1016**

PRACTICE SQUAD, 2004-18, 2005-7, 2006-15

PRESEASON
   American Bowl, 1990-2, 1991-2
   Game contracts, 1994-1, 2001-2
   Nationally televised games, 1998-1
   Payments for nationally televised games, 1998-8
   Scheduling, 1991-1, 1998-6, 2001-2, 2001-7, 2006-5
   Telecast consent, 1984-1
   Television rights contracts, 1984-3, 1994-1, 2003-1, 2010-1

PRIMARY PURPOSE REQUIREMENT, 1993-6
   Club-dedicated networks, 2005-1

PROMOTIONS
   In-stadium giveaways, 1985-3


— R —

RADIO
   Club contracts, 1994-1

REALIGNMENT, 1995-1, 1996-6, 1999-1, 2001-7

REEBOK JOINT VENTURE, 2000-5, 2001-14

RELOCATION,
   Browns/Ravens, 1996-5
   Chargers, 2016-9
   Los Angeles, 2016-7, 2016-9
   Oilers/Titans, 1996-6
   Raiders, 2016-9
   Rams, 1995-1, 2016-9

RELOCATION FEES, 1995-1, 1996-5, 1996-6

REVENUE SHARING, 1995-4, 2001-2, 2006-9, 2007-5, 2011-26


— S —

SATELLITE
   Radio, see SIRIUS XM SATELLITE RADIO CONTRACT
   Television, see DIRECTV CONTRACT

SCHEDULING, see GAME SCHEDULE

**J.A. 1017**

SIDELINES, LEAGUE CONTROL, 2002-8, 2013-3
    Headsets, 2014-4

SIRIUS XM SATELLITE RADIO CONTRACT, 2003-4, 2010-5, 2015-20

STADIUM FINANCING, see G-3 STADIUM FINANCING PROGRAM and
    G-4 STADIUM FINANCING PROGRAM

STADIUM LEASES, 1988-3

STRATEGIC INVESTMENT FUND, 2011-14, 2013-5

STRIKE FUND, 1993-2

SUPER BOWL GAME
    Site selection, 1991-3, 1999-1
    Team ticket report, 1989-1
    Ticket distribution, 1989-1, 1998-14, 2016-6


— T —

TELECOMMUNICATIONS, 2013-3, 2014-4

TELEVISION CONTRACTS, see BROADCASTING

TELEVISION REVENUE
    Distribution, 1977-1, 1983-1
    International, 1998-10, 2007-4, 2011-22, 2015-16
    Preseason, 1998-1, 1998-8
    Relocated franchise, 1995-1

THANKSGIVING GAMES, 1998-5

THURSDAY NIGHT FOOTBALL, 2014-1, 2015-1, 2016-15
    Uniforms, 2014-11

TICKETMASTER AGREEMENT, 2012-1

TICKETS
    Base ticket manifest, 2012-11, 2014-8, 2015-18, 2016-14
    NFL Online Ticket Exchange, 2007-1, 2007-2, 2012-1
    Season Ticket Holders, 2014-9, 2015-3
    Super Bowl game, 1989-1, 1998-14, 2016-6

TRADEMARKS, 2004-3, 2011-4, 2013-3, 2016-4

TRADES FOR CASH, 1982-2, 2001-15

**J.A. 1018**

— U —

UNIFORM DESIGN, 2002-3, 2003-5, 2014-11

UNSPORTSMANLIKE CONDUCT, 2000-3, 2014-10

— V —

VISITING TEAM SHARE
Calculation of gross gate receipts, 1987-1, 1987-3, 1995-4, 2001-2, 2008-3
2012-11, 2014-8, 2015-18, 2016-14
International, 2011-22, 2015-16
Pooling, 1995-4, 2001-2
Postseason, 1987-2
Relocated franchise, 1996-6
Waiver, 1987-1, 1994-3, 1999-1, 1999-2, 2003-4, 2011-16, 2012-4,
2012-7, 2014-13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X

BRIAN FLORES, STEVE WILKS and RAY : 
HORTON, as Class Representatives, on behalf of :
themselves and all others similarly situated, :
  :
                  Plaintiffs, :
  :
      v. :
  :
THE NATIONAL FOOTBALL LEAGUE; NEW :    Civil Action No.: 22-cv-00871 (VEC)
YORK FOOTBALL GIANTS, INC. d/b/a NEW :
YORK GIANTS; MIAMI DOLPHINS, LTD. :
d/b/a MIAMI DOLPHINS; DENVER BRONCOS :
FOOTBALL CLUB d/b/a DENVER BRONCOS; :
HOUSTON NFL HOLDINGS, L.P. d/b/a :
HOUSTON TEXANS; ARIZONA CARDINALS :
FOOTBALL CLUB LLC d/b/a ARIZONA :
CARDINALS; TENNESSEE TITANS :
ENTERTAINMENT, INC. d/b/a TENNESSEE :
TITANS and JOHN DOE TEAMS 1 through 26, :
  :
                  Defendants. :
------------------------------------------------------------- X

      **PLEASE TAKE NOTICE** that upon the accompanying memorandum of law, through

their undersigned counsel, Plaintiffs Brian Flores, Steve Wilks and Ray Horton will move this

court, at the United States District Court, Southern District of New York, located at 40 Foley

Square, New York, NY 10007 before the Honorable Valerie Caproni, to respectfully request an

order pursuant to Federal Rule of Civil Procedure 60(b) and/or Local Rule for the Southern

District of New York 6.3, granting reconsideration of the aspects of the Court's March 1, 2023

Opinion and Order which compelled arbitration of certain claims, and granting such other and

further relief as this Court deems just and proper.

Dated: March 14, 2023
      New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____

    Douglas H. Wigdor
    Michael J. Willemin
    David E. Gottlieb

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
dgottlieb@wigdorlaw.com

*Counsel for Plaintiffs*

- and -

**ELEFTERAKIS, ELEFTERAKIS & PANEK**

By: _____/s/_____

    John Elefterakis
    Nicholas Elefterakis
    Raymond Panek
    Johnson Atkinson

80 Pine Street, 38th Floor
New York, New York 10005
Telephone: 212-532-1116
Facsimile: 212 -532-1176

*Counsel for Plaintiffs*

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X
BRIAN FLORES, STEVE WILKS and RAY     :
HORTON, as Class Representatives, on behalf of  :
themselves and all others similarly situated,     :
                                               :
                    Plaintiffs,     :
                                               :
       v.                                  :
                                               :
THE NATIONAL FOOTBALL LEAGUE; NEW  :    Civil Action No.: 22-cv-00871 (VEC)
YORK FOOTBALL GIANTS, INC. d/b/a NEW  :
YORK GIANTS; MIAMI DOLPHINS, LTD.    :
d/b/a MIAMI DOLPHINS; DENVER BRONCOS :
FOOTBALL CLUB d/b/a DENVER BRONCOS; :
HOUSTON NFL HOLDINGS, L.P. d/b/a     :
HOUSTON TEXANS; ARIZONA CARDINALS  :
FOOTBALL CLUB LLC d/b/a ARIZONA    :
CARDINALS; TENNESSEE TITANS       :
ENTERTAINMENT, INC. d/b/a TENNESSEE  :
TITANS and JOHN DOE TEAMS 1 through 26,  :
                                               :
                    Defendants.   :
------------------------------------------------------------- X

**PLAINTIFFS' MOTION FOR RECONSIDERATION OF ASPECTS OF THE COURT'S**
**MARCH 1, 2023 ORDER PARTIALLY GRANTING DEFENDANTS' MOTION TO**
**COMPEL ARBITRATION**

**WIGDOR LLP**                **ELEFTERAKIS, ELEFTERAKIS & PANEK**

Douglas H. Wigdor              John Elefterakis
Michael J. Willemin             Nicholas Elefterakis
David E. Gottlieb               Raymond Panek
                               Johnson Atkinson

85 Fifth Avenue
New York, NY 10003            80 Pine Street, 38th Floor
Telephone: (212) 257-6800      New York, New York 10005
Facsimile: (212) 257-6845       Telephone: (212) 532-1116
dwigdor@wigdorlaw.com        Facsimile: (212) 532-1176
mwillemin@wigdorlaw.com
dgottlieb@wigdorlaw.com        *Counsel for Plaintiffs*

*Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................. ii

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ........................................................................................................2

I.      LEGAL STANDARDS ..............................................................................2

II.     THE COURT SHOULD RECONSIDER ITS DETERMINATION THAT THE UNCONSCIONABILITY DOCTRINE DOES NOT APPLY WHERE PARTIES AGREE TO MANIFESTLY UNJUST TERMS FOR ARBITRATION ...........................3

        A.     The Court Overlooked that The Unconscionability Doctrine Makes *Irrelevant* Whether the Parties "Agreed to" Manifestly Unjust Terms ...................................3

        B.     The Court Respectfully Overlooked Aspects of the Decision in *Nat'l Football League Mgmt. Council* Which Make it Wholly Distinguishable............................3

        C.     The Court Respectfully Overlooked Aspects of the Decision in *Gilmer* Which Make it Wholly Distinguishable ..............................................................7

        D.     The Court Respectfully Overlooked Aspects of the Decision in *Garcia* Which Make it Wholly Distinguishable ..............................................................8

        E.     The Court Overlooked the Fact that the Arbitration Agreements in this Matter Give Defendants *More* Control Over the Arbitration Selection Process, Thereby Rendering them *More* Unconscionable, than the Agreements Invalidated in *Hooters, McMullen, Walker* and *Pokorny* ......................................11

III.    THE COURT SHOULD RECONSIDER ITS DETERMINATION THAT THE ARBITRATION AGREEMENTS AT ISSUE DO NOT VIOLATE THE EFFECTIVE VINDICATION DOCTRINE.....................................................14

IV.    FAILURE TO RECONSIDER THE COURT'S ORDER WILL RESULT IN MANIFEST INJUSTICE............................................................................15

CONCLUSION...................................................................................................17

# TABLE OF AUTHORITIES

**Cases**     Page(s)

Am. Exp. Co. v. Italian Colors Rest.,
    570 U.S. 228 (2013) .................................................................................................. 14

Cole v. Burns Intern. Sec. Services,
    105 F. 3d 1465 (D.C. Cir. 1997) .............................................................................. 15

Cross & Brown Co. v. Nelson,
    4 A.D.2d 501 (1st Dep't 1957) ................................................................................ 13

Delta Mine Holding Co. v. AFC Coal Properties,
    280 F.3d 815 (8th Cir. 2001) .................................................................................... 5

FL-Carrollwood Care, LLC v. Gordon,
    72 So. 3d 162 (Fla. 2d D.C.A. 2011) ...................................................................... 3

Floss v. Ryan's Fam. Steak Houses, Inc.,
    211 F.3d 306 (6th Cir. 2000) .................................................................................... 15

Garcia v. Church of Scientology Flag Service Organization, Inc.,
    No. 18-13452, 2021 WL 5074465 (11th Cir. Nov. 2, 2021) ........................... 8, 9, 10

Gilmer v. Interstate/Johnson Lane Corp.,
    500 U.S. 20 (1991) .............................................................................................. 7, 8

Hooters of America Inc. v. Phillips,
    173 F. 3d 933 (4th Cir. 1999) .................................................................................. 11

McCarthy v. Manson,
    714 F.2d 234 (2d Cir. 1983) ..................................................................................... 2

McMullen v. Meijer, Inc.,
    355 F.3d 485 (6th Cir. 2004) .................................................................................... 11

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,
    473 U.S. 614 (1985) ................................................................................................. 14

Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n,
    820 F.3d 527 (2d Cir. 2016) ............................................................................ 3, 4, 6, 7

Pokorny v. Quixtar, Inc.,
    601 F. 3d 987 (9th Cir. 2010) .................................................................................. 12

J.A. 1024

Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,
    393 U.S. 440 (1969) ............................................................................................ 10

Shrader v. CSX Transp., Inc.,
    70 F.3d 255 (2d Cir. 1995) ................................................................................... 2

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,
    182 F.R.D. 97 ....................................................................................................... 2

United States v. Del Villar,
    No. 20-CR-295 (VEC), 2021 WL 5180048 (S.D.N.Y. Nov. 7, 2021) ............... 2, 14

Van Buskirk v. United Grp. of Cos., Inc.,
    935 F.3d 49 (2d Cir. 2019) ................................................................................... 2

Walker v. Ryan's Family Steak Houses,
    400 F.3d 370 (6th Cir. 2005) ............................................................................... 12, 13

Winfrey v. Simmons Foods, Inc.,
    495 F.3d 549 (8th Cir. 2007) ............................................................................... 3, 4, 5

Other Authorities

Rule 59 of the Federal Rules of Civil Procedure ..................................................... 2

Local Rule 6.3 ........................................................................................................... 2

J.A. 1025

Plaintiffs Brian Flores, Steve Wilks and Ray Horton, by and through counsel, respectfully move the Court to reconsider aspects of the Court's Opinion and Order dated March 1, 2023 (the "Order"), which partially granted Defendants' Motion to Compel Arbitration.

## PRELIMINARY STATEMENT

We respectfully implore the Court to reconsider aspects of the Order which partially granted Defendants' Motion to Compel Arbitration as it is the first and only decision that holds that a defendant-employer can require its employees to arbitrate statutory discrimination claims in front of an obviously biased senior executive under the premise that the parties "agreed to" use such arbitrator. The Order respectfully overlooks (i) that the unconscionability doctrine precludes the enforcement of manifestly unfair agreements even where the parties "agreed to" the unconscionable terms in the first instance, (ii) that the caselaw stating that "the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen" arises in the context of completely inapposite collectively bargained labor disputes with party arbitrators, and (iii) the effective vindication doctrine requires access to a forum in which statutory claims can be legitimately pursued. Furthermore, the broad implications of the Order would completely upend an extensive and well-developed body of case law requiring that arbitration be a reasonable replacement for a judicial forum—the Order will give employers a complete "green light" to insert completely biased arbitrators (including the employer's own executives) into arbitration agreements with judicial assurance that the unconscionability doctrine will not apply. Respectfully, the Court should apply the law to ensure that employees are protected from this egregious abuse by employers of arbitration agreements.

J.A. 1026

## ARGUMENT

### I. LEGAL STANDARDS

"The standards governing motions to alter or amend judgment pursuant to Rule 59(e) [of the Federal Rules of Civil Procedure] and motions for reconsideration or reargument pursuant to Local Rule 6.3 are the same." Henderson v. Metropolitan Bank & Trust Co., 502 F.Supp.2d 372, 375 (S.D.N.Y. 2007). Local Civil Rule 6.3 allows the Court to correct errors of law or fact, and whether to grant a motion for reconsideration is within the "'sound discretion of a district court judge.'" U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., 182 F.R.D. 97, 100 (S.D.N.Y. 1998) (quoting McCarthy v. Manson, 714 F.2d 234, 237 (2d Cir.1983)).

A motion for reconsideration is properly granted if the movant identifies "data that the court overlooked" that would "alter the conclusion reached by the court." United States v. Del Villar, No. 20-CR-295 (VEC), 2021 WL 5180048, at *1 (S.D.N.Y. Nov. 7, 2021) (citing Van Buskirk v. United Grp. of Cos., Inc., 935 F.3d 49, 54 (2d Cir. 2019) (quotation omitted)). While the standard is not met merely by rearguing points the Court has already considered and rejected, reconsideration is justified where there is a "need to correct a clear error or prevent manifest injustice." Id. (citations omitted). In other words, courts consider matters "that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995).

Plaintiffs respectfully submit that the Order overlooked matters that would reasonably be expected to alter its decision and, the decision will result in manifest injustice if it is not reconsidered and reversed.

## II. THE COURT SHOULD RECONSIDER ITS DETERMINATION THAT THE UNCONSCIONABILITY DOCTRINE DOES NOT APPLY WHERE PARTIES AGREE TO MANIFESTLY UNJUST TERMS FOR ARBITRATION[1]

### A. The Court Overlooked that The Unconscionability Doctrine Makes *Irrelevant* Whether the Parties "Agreed to" Manifestly Unjust Terms

The Court found that the Arbitration Agreements at issue are not unconscionable because "the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen," citing Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n, 820 F.3d 527, 548 (2d Cir. 2016), which in turn cited the Eighth Circuit's decision in Winfrey v. Simmons Foods, Inc., 495 F.3d 549, 551 (8th Cir. 2007). For the reasons explained below, those decisions are inapplicable and distinguishable here for reasons, respectfully, the Court overlooked. However, the proposition that a party must be held to a term that it agreed to is completely at odds with the entire doctrine of unconscionability. The unconscionability doctrine *requires* that a court *not enforce* and find the *absence of an agreement* when a contractual term is "so outrageously unfair as to shock the judicial conscience." FL-Carrollwood Care, LLC v. Gordon, 72 So. 3d 162, 165 (Fla. 2d D.C.A. 2011) (Florida standard, similar in each applicable jurisdiction as previously cited). The Court respectfully overlooked that the unconscionability doctrine trumps any supposed arbitration "agreement" and that the applicable case law supports this conclusion.

### B. The Court Respectfully Overlooked Aspects of the Decision in *Nat'l Football League Mgmt. Council* Which Make it Wholly Distinguishable

The Court's Order acknowledged that the arbitration agreements at issue "create[ ] a risk of biased adjudication" and that "the NFL statement on the day the case was filed is worrisome."

---

[1]    Plaintiffs' motion for reconsideration includes the aspect of the Order which delegated to arbitration the issue of arbitrability as to Plaintiff Steve Wilks' claims against the Arizona Cardinals, which respectfully overlooked the same issues related to unconscionability as the underlying arbitration agreements.

3

Dkt. No. 76 at p. 23.  Nevertheless, citing the decision in <u>Nat'l Football League Mgmt. Council</u>, 820 F.3d at 548, the Court granted aspects of Defendants' motion to compel arbitration on the basis that "the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen."  Dkt. No. 76 at p. 22.  However, this language from <u>Nat'l Football League Mgmt. Council</u> is not controlling in this matter, nor is it even persuasive, for the following reasons that were overlooked by the Court.

First, in support of its contention that "the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen," the Second Circuit relied on the Eighth Circuit's decision in <u>Winfrey v. Simmons Foods, Inc.</u>, 495 F.3d 549 (8th Cir. 2007).  The facts in <u>Winfrey</u>, from which the language at issue derives, are not even remotely similar to those presented herein.  Unlike the matter at bar, the arbitration agreement in <u>Winfrey</u> was the result of collective bargaining and it provided, as many labor arbitrations do, that each party would select one arbitrator—*i.e.*, a "party-arbitrator"—and that the two party-arbitrators would then jointly select a third neutral arbitrator, which, of course, would render impartial the panel overall.  495 F.3d at 550-551.  After losing the arbitration, the <u>Winfrey</u> plaintiffs sought vacatur on the basis that the defendants' party arbitrator was biased.  <u>Id.</u>[2]

The district court denied the motion, and the Eighth Circuit agreed, holding that "[w]here an agreement entitles the **parties** to select interested arbitrators, 'evident partiality' cannot serve as a basis for vacating an award under § 10(a)(2) absent a showing of prejudice."  <u>Id.</u> (emphasis added).  In other words, it was the specific nature of the arbitration agreement at issue—one that

---

[2]  Of note, in <u>Winfrey</u> the defendants' complaint was in part that the plaintiffs' party-arbitrator had failed to make required disclosures.  <u>Id.</u> at 552.  In this case, Mr. Goodell is not required to make *any* disclosures, which runs directly contrary to the processes set forth in the rules of every legitimate provider of arbitration services.

4

permitted **both** parties to select a biased arbitrator—that led to the court's conclusion.  Indeed, when read in context, the language relied upon by the Court is plainly inapplicable here:

> As we have observed in a previous case, the "parties to an arbitration choose their method of dispute resolution, and can ask no more impartiality than inheres in the method they have chosen." *Delta Mine Holding Co. v. AFC Coal Properties,* 280 F.3d 815, 821 (8th Cir. 2001) (internal quotations marks and citation omitted)[3], *cert. denied,* 537 U.S. 817, 123 S. Ct. 87, 154 L.Ed.2d 23 (2002).  "[W]here the parties have expressly agreed to select partial party **arbitrators**, the award should be confirmed unless the objecting party proves that the arbitrator's partiality prejudicially affected the award."

Id. at 551 (emphasis added).  All that Winfrey stands for is the unremarkable proposition that when **both** parties have the opportunity to select biased arbitrators, **who in turn select a third party to inject impartiality into the process**—that those party arbitrators are permitted to be biased without rending the process unconscionable.

Here, there is no collectively bargained arbitration process and the process employed lacks any concept of neutrality and fairness.  In effect, contrary to Winfrey, here only **one party, the NFL**, has a "party-arbitrator"—Plaintiffs have no reciprocal "party arbitrator" and there is no neutral arbitrator balancing out the agreed upon partiality.  Moreover, the sole party-arbitrator has already said the claims are without merit, has no disclosure obligations, has no obligation to permit discovery, and is not subject to any other procedural safeguards.  Furthermore, Mr. Goodell has hired and is currently represented by the same attorneys representing Defendants in this matter and in any potential arbitration.

As such, the decision relied on in Nat'l Football League Mgmt. Council further demonstrates that the language relied upon by the Court in partially granting Defendants' motion should have had no bearing on this case.

---

[3]     The decision in Delta Mine also involved party arbitrators.

Second, like Winfrey, the arbitration agreement at issue in Nat'l Football League Mgmt. Council was the result of collective bargaining between the NFL Players Association and the NFL. 820 F.3d at 548. This fact is critical because, unlike in the matter at bar, the arbitration agreements in Nat'l Football League Mgmt. Council and Winfrey were heavily negotiated rather than being forced upon an individual as a term and condition of employment. To that end, immediately following the language cited by this Court, the Nat'l Football League Mgmt. Council decision reads:

> [T]he parties contracted in the CBA to specifically allow the Commissioner to sit as the arbitrator in all disputes brought pursuant to Article 46, Section 1(a). They did so knowing full well that the Commissioner had the sole power of determining what constitutes "conduct detrimental," and thus knowing that the Commissioner would have a stake both in the underlying discipline and in every arbitration brought pursuant to Section 1(a). **Had the parties wished to restrict the Commissioner's authority, they could have fashioned a different agreement.**

820 F.3d at 548 (emphasis added).

In contrast to the collective bargaining agreement at issue in Nat'l Football League Mgmt. Council, the arbitration agreements proffered to Plaintiffs were "take it or leave it" agreements that no Plaintiff had the ability to negotiate or modify. Put another way, this case is distinguishable from Nat'l Football League Mgmt. Council because Plaintiffs could not have "fashioned a different agreement." Adding to the problem, there are literally only 32 NFL Head Coach positions available and they are all held by a single monopolistic organization. Accordingly, even assuming that Plaintiffs had any power to negotiate the arbitration provisions at issue—and they did not—Plaintiffs' respective bargaining power was negligible at best. As such, the circumstances involved in Nat'l Football League Mgmt. Council are inapposite to those herein.

6

Third, the decision in Nat'l Football League Mgmt. Council is also fundamentally inapposite to the facts of this case because that decision involved player discipline, whereas this matter involves the federal statutory rights. It is normal for an employer (or an agent of an employer) to make decisions concerning employee discipline. Indeed, employers and agents of employers make countless disciplinary decisions in connection with a variety of matters across the country on a daily basis. In contrast, an employer is never the arbiter of whether it has violated an employee's rights under statutory law. That decision is for the courts or a neutral arbitrator to decide, and it shocks the conscious to put in the hands of an employer the power to determine (with little recourse for the employee) whether it has violated the anti-discrimination laws.

### C. The Court Respectfully Overlooked Aspects of the Decision in *Gilmer* Which Make it Wholly Distinguishable

The Court's also respectfully overlooked aspects of the decision in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 30 (1991) for the proposition that "Courts must avoid presupposing that the selected arbitrator will not serve as a conscientious and impartial arbitrator." Dkt. No. 76 at p. 23. Respectfully, the Court overlooked crucial facts in the Gilmer case that make it readily distinguishable from the matter at bar.

Gilmer involved an arbitration agreement which had a process by which the parties would mutually select a panel of **neutral** arbitrators. 500 U.S. at 30. Indeed, the Court specifically noted that the "NYSE arbitration rules, which [were] applicable to the dispute in [Gilmer], **provide protections against biased panels.**" Id. (emphasis added). Those protections included (i) a process to challenge prospective arbitrators through the use of preemptory challenges, as well as unlimited challenges for cause, and (ii) substantial arbitral disclosures, including their employment histories, backgrounds and "any circumstances which might

7

preclude [them] from rendering an objective and impartial determination." It was for these reasons the Court stated, "[w]e decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators." Id. 500 U.S. at 30. Thus, this line in Gilmer stands for the unremarkable proposition that where there is a reasonable, neutral process, courts should not intervene and make presuppositions regarding potential arbitrator bias.

But that is not even remotely the case here. The process dictated by the NFL's arbitration agreements is at complete odds with the terms in Gilmer. The NFL imposes as arbitrator its own biased Commissioner who has already stated that the matter is "without merit," serves only at the leisure of the NFL team owners, has been paid and stands still to be paid hundreds of millions of dollars if he remains employed, and is even personally represented by the same counsel as the NFL and teams in this litigation. Furthermore, none of the procedural safeguards mentioned in Gilmer exist here.

For these reasons, which respectfully were not addressed, the Court's reference to and reliance on Gilmer overlooked critical aspects of that decision. Respectfully, Plaintiffs do not ask the Court to presuppose that a neutral arbitrator may harbor bias as in Gilmer, but to the contrary, to find that what the NFL is attempting to do—fully undermine the anti-discrimination laws by having its own Commissioner act as arbitrator—completely shocks the conscience and should not be permitted.

### D. The Court Respectfully Overlooked Aspects of the Decision in *Garcia* Which Make it Wholly Distinguishable

The Court also respectfully miscited Garcia v. Church of Scientology Flag Service Organization, Inc., No. 18-13452, 2021 WL 5074465, at *12 (11th Cir. Nov. 2, 2021). Specifically, the Court stated that the Garcia court found that an arbitration agreement was

8

enforceable despite the fact that the "lead arbitrator" made "various comments . . . reflecting bias in favor of the church." Dkt. No. 76 at p. 26. However, that is not what <u>Garcia</u> held.

There were two holdings in <u>Garcia</u>: (i) that the lower court did not err in compelling arbitration; and (ii) that the lower court did not err in vacating the arbitrator's decision. Respectfully, the Court's Order conflates the two holdings.

With respect to the latter holding—which is irrelevant given the procedural posture of this case—the <u>Garcia</u> court refused to vacate the arbitration award after noting that "[j]udicial review of an arbitration award 'is among the narrowest known to the law'" and determining that the plaintiffs could not establish "evident partiality." <u>Garcia</u>, 2021 WL 5074465, at *10-11. This was largely because, as in <u>Nat'l Football League Mgmt. Council</u>, the arbitration procedure at issue provided for party arbitrators who were expected to demonstrate bias. <u>Id.</u> Accordingly, the court determined that nothing untoward—*i.e.*, no *improper* bias—had been demonstrated during the arbitration that would warrant vacatur.

As to the holding on the motion to compel arbitration—the holding that would be relevant to this case if it were applicable—the <u>Garcia</u> court did not even consider the effect of arbitrator bias because it found that the dispute at issue was one that concerned religious doctrines and that "[t]he Supreme Court has made clear that the First Amendment forbids civil courts to decide legal disputes involving churches by "resolving underlying controversies over religious doctrine." 2021 WL 5074465, at * 9. The decision goes on:

> Based on these well-established precedents, the district court correctly ruled that the First Amendment prevented it from entertaining the argument that Scientology doctrine rendered the arbitration agreements substantively unconscionable. Although the Garcias presented evidence to support their interpretation of Scientology doctrine, the International Justice Chief offered a conflicting interpretation. The First Amendment barred the district court from resolving this underlying controversy about church

9

doctrine. *See Presbyterian Church*, 393 U.S. at 449. To do so would have required it to decide whether the Garcias or the Justice Chief "more correctly perceived the commands of [the Scientology religion]."

Id. Accordingly, the Garcia court did not bless a biased process in compelling arbitration. Rather, it held that the First Amendment barred the court from assessing substantive unconscionability. Id. It should also be noted that this determination was made only after the court held an evidentiary hearing on the motion to compel arbitration, whereas in this case Plaintiffs were not afforded discovery. Id.

Even putting aside the First Amendment issue, the arbitration agreement in Garcia provided a far more impartial forum than those at issue herein. In Garcia, while the arbitration agreement required the parties to select arbitrators that were in good standing with the church, it provided each party with an opportunity to select an arbitrator (whom, together, would appoint a third neutral arbitrator). Id. at * 2. Moreover, there is no indication that the arbitrators in Garcia (who were eventually selected by the district court from a list of 500 potential arbitrators) were being paid anything by the church, much less tens of millions of dollars. Nor did the agreement in that case require the parties to arbitrate before an arbitrator who had already deemed the claims to be without merit.

Finally, because the underlying claims involved interpretations of religious doctrine, and not alleged violations of the antidiscrimination law, it intuitively makes sense that the arbitrators would be individuals who are familiar with and ostensibly faithfully live by such doctrine. In the same way, it is not necessarily inherently problematic that Mr. Goodell would decide issues related to player discipline. But it is another matter entirely to say that a biased arbitrator can determine violations of the antidiscrimination laws.

Accordingly, for a myriad of reasons, the Garcia case is irrelevant.

10

**E. The Court Overlooked the Fact that the Arbitration Agreements in this Matter Give Defendants *More* Control Over the Arbitration Selection Process, Thereby Rendering them *More* Unconscionable, than the <u>Agreements Invalidated in *Hooters*, *McMullen*, *Walker* and *Pokorny*</u>**

Having overlooked critical distinctions between this matter and the cases relied upon in the Order, we respectfully submit that the Court correspondingly did not give adequate weight and/or overlooked aspects of the litany of analogous persuasive authority cited by Plaintiffs. Indeed, while the Court did draw distinctions between Plaintiffs' caselaw and the facts of this case, we respectfully submit that it overlooked the fact that those distinctions cut in favor, and not against, Plaintiffs' position herein.

First, the Court distinguished <u>Hooters of America Inc. v. Phillips</u>, 173 F. 3d 933 (4th Cir. 1999) and <u>McMullen v. Meijer, Inc.</u>, 355 F.3d 485 (6th Cir. 2004) on the basis that the arbitration agreements in those cases gave the employers full discretion over the pool of potential arbitrators, whereas here Defendants have no discretion as all parties are required to arbitrate before Mr. Goodell. Dkt. No. 76 at p. 25. However, that distinction, respectfully, ignores various critical facts that demonstrate that the agreements at issue in this case are even more unconscionable than those at issue in <u>Hooters</u> and <u>McMullen</u>.

To begin, the suggestion that the NFL is somehow in a worse position than the employers in <u>Hooters</u> and <u>McMullen</u> because it is somehow "stuck" with Mr. Goodell overlooks the fact that it is Defendants' take-it-or-leave-it agreements that include the NFL's Commissioner as the arbitrator. Plaintiffs are not better off—they are in a far worse position—than the plaintiffs in <u>Hooters</u> and <u>McMullen</u>. In those cases, the plaintiffs were at least involved in the arbitrator selection process, even if the potential arbitrators were initially identified by their employers. The plaintiffs could still select the best out of a group of theoretically employer-friendly arbitrators, rather than being stuck with an arbitrator who has been paid tens of millions of

J.A. 1036

dollars by the employer and has already declared that the claims at issue were without merit. Given that Hooters and McMullen invalidated the arbitration agreements at issue, it necessarily follows that those courts also would have invalidated Plaintiffs' arbitration agreements. We respectfully submit that this Court reconsider its Order and do the same.

Second, the Court's comments with respect to Pokorny v. Quixtar, Inc., 601 F. 3d 987, 1002-3 (9th Cir. 2010) similarly suggest that the arbitration agreements at issue herein provide a more biased forum than those at issue in that case. In the Order, the Court acknowledged that the plaintiffs could select between: (i) a list of neutral JAMS arbitrators who had attended a defendant-led orientation who would be paid at a fixed rate, or (ii) select from a list of neutral JAMS arbitrators who had not attended a defendant-led orientation and who would be paid at the arbitrator's presumably higher published rate. While it is true that financial pressure might make it more likely that the plaintiffs would select the arbitrators who had attended a defendant-led orientation, the plaintiffs in Pokorny at least had a choice. The mere pressure to choose an arbitrator who had attended a defendant-led orientation—which, in any event, does not inherently give rise to any serious risk of bias—is nowhere near as problematic as being forced to arbitrate claims in front of an inherently biased arbitrator.

Third, the Court's analysis of Walker v. Ryan's Family Steak Houses, 400 F.3d 370 (6th Cir. 2005) also supports Plaintiffs' position. As the Court noted (Dkt. No. 76 at p. 26), the Walker court invalidated an arbitration agreement where the "arbitrator-selection process itself [was] fundamentally unfair." However, in Walker, the arbitrator process, while unusual, at least created the possibility of a neutral panel. See Dkt. No. 62 at p. 12. Here, there is no process at all. Instead, the unfairness is baked right into the arbitration agreement itself, as it required, up front and in take-it-or-leave it fashion, for Plaintiffs to submit all disputes to the NFL's chief

J.A. 1037

executive.  As in Hooters, McMullen and Pokorny, the plaintiffs in Walker were at least involved in the arbitration process and were in a far better position to mitigate bias than Plaintiffs are here.

Finally, the Court dismissed various other persuasive authority on the grounds that they were decided based on inapplicable state law.  See Dkt. No 76 at p. 25, n. 25 (citing, *inter alia*, Nostalgic Partners LLC v. New York Yankees P'ship, No. 656724/2020, at 2 (N.Y. Sup. Ct. Dec. 17, 2021); Gruden v. The Nat'l Football League, et al., No. A-21-844043-B, at 13-14 (Nev. Dist. Ct. Clark Cty. Oct. 12, 2022).  While these cases may have been decided under alternate state law, the standards for unconscionability are similar in each jurisdiction and Court did not distinguish those state law principles from those applicable here.  Moreover, for the reasons cited above, none of the cases cited by the Court in support of its Order are any more controlling— though they are far less persuasive—than Nostalgic and Gruden, both of which are squarely on point and hold that it is unconscionable to require an employee to arbitrate claims before the employer's chief executive.  See Nostalgic, Dkt. No. 108 at p. 2 ("Based on the appearance of impropriety, the Commissioner of Major League Baseball should not arbitrate a dispute of claims that are asserted against Major League Baseball."); Gruden, Dkt. No. 52 at p. 30 ("the enforcement of the arbitration would be unconscionable both procedurally, as well as substantive[ly]").

Moreover, Nostalgic and Gruden are consistent with other persuasive and longstanding authority.  See, e.g., Cross & Brown Co. v. Nelson, 4 A.D.2d 501, 503 (1st Dep't 1957) ("What we do hold is that no party to a contract, or someone so identified with the party as to be in fact, even though not in name, the party, can be designated as an arbitrator to decide disputes under it.  Apart from outraging public policy, such an agreement is illusory; for while in form it provides for arbitration, in substance it yields the power to an adverse party to decide disputes under the

13

contract . . . Unless we close our eyes to realities, the agreement here becomes, not a contract to arbitrate, but an engagement to capitulate").

In sum, Plaintiffs respectfully submit that the Court overlooked matters that should "alter the conclusion reached by the court." Del Villar, 2021 WL 5180048, at *1. This is particularly true because, as explained below, a failure to reconsider and reverse the aspects of the Order that granted Defendants' motion to compel arbitration would unquestionably result in manifest injustice, have wide ranging and negative consequences for employees across the country, undermine the very principles of the FAA and, perhaps most importantly, drive a stake through the ability of employees to vindicate their rights under federal antidiscrimination laws.

## III.  THE COURT SHOULD RECONSIDER ITS DETERMINATION THAT THE ARBITRATION AGREEMENTS AT ISSUE DO NOT VIOLATE THE EFFECTIVE VINDICATION DOCTRINE

The effective vindication doctrine exists to protect the Congressional intent underlying the rights afforded to individuals by federal statutes. See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 (1985) ("**so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum**, the statute will continue to serve both its remedial and deterrent function") (emphasis added); Am. Exp. Co. v. Italian Colors Rest., 570 U.S. 228, 235 (2013) ("[I]n Mitsubishi Motors, . . . we expressed a willingness to invalidate, on 'public policy' grounds, arbitration agreements that 'operate . . . as a prospective waiver of a party's *right to pursue* statutory remedies.'") (emphasis added).

While the Court did consider the effective vindication doctrine, the Order just as quickly disregarded its import due to the limited successful judicial application of the doctrine. Respectfully, the Court's decision overlooked the fact that there is no caselaw holding that the effective vindication doctrine *only* applies when an arbitral forum forbids the assertion of

statutory claims or imposes costs which make pursuit of claims impracticable.  To the contrary, the effective vindication doctrine is intended to cover any situation in which an arbitration agreement prevents individuals from effectively vindicating statutory rights.

The case law is clear, and it is self-evident, that the provision of a neutral forum is an obligatory component of being able to effectively vindicate one's rights.  See e.g. Cole v. Burns Intern. Sec. Services, 105 F. 3d 1465, 1482 (D.C. Cir. 1997) ("an employee cannot be required . . . to waive access to a neutral forum in which statutory employment discrimination claims may be heard"; "statutory rights include both a substantive protection and access to a neutral forum in which to enforce those protections"); Floss v. Ryan's Fam. Steak Houses, Inc., 211 F.3d 306, 314 (6th Cir. 2000) (expressing "serious reservations" that a forum lacking in neutrality could permit effective vindication of rights).  Respectfully, the Court overlooked the statement of law by the Cole court and instead focused on the fact that the arbitration there did provide for a neutral forum—the American Arbitration Association.  Similarly, in stating that Floss was decided on alternative grounds, the Court overlooked that the alternative grounds upon which it was decided was that of unconscionability—effectively a state contract law corollary to the effective vindication doctrine.

Respectfully, the Court should reconsider the Order as it overlooked these aspects of the case law and did not fully address or apply the effective vindication of rights doctrine to the matter at bar.

## IV.    FAILURE TO RECONSIDER THE COURT'S ORDER WILL RESULT IN MANIFEST INJUSTICE

Respectfully, the Court's Order will upend decades of jurisprudence which have sought to uphold the enforcement of arbitration agreements but also protect the rights of employees from employer abuse and overreaching.  To ensure the integrity of arbitration, neutrality of the

J.A. 1040

arbitrator is of paramount importance. Numerous courts have held—as previously cited—that while arbitration agreements are enforceable, they must have basic indicia of fairness and resemble a reasonable substitute for a judicial forum. However, the Court's Order gives employers *carte blanche* to include terms, no matter how unfair or unconscionable, with assurance that those terms will be enforced because of the extreme expansion of the phrase "the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen." Employers across the country, in reliance on the Order, could now appoint their own CEOs or another clearly biased person as arbitrator. Employers could do away with neutral arbitral selection processes, mandatory arbitral conflict disclosures, required discovery or numerous other procedural safeguards typically included in arbitration agreements to ensure they will be enforced. The result will be the eroding of employee rights in a way that Congress never intended when the FAA was passed and the Supreme Court never envisioned in Gilmer and its progeny.

**CONCLUSION**

For the reasons set forth herein, Plaintiffs respectfully request the Court's reconsideration

and reversal of the Order, and for such other and further relief deemed just and proper.

Dated: March 14, 2023
     New York, New York            Respectfully submitted,

**WIGDOR LLP**

By: _____
    Douglas H. Wigdor
    Michael J. Willemin
    David E. Gottlieb
85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
dgottlieb@wigdorlaw.com
*Counsel for Plaintiffs*

- and -

**ELEFTERAKIS, ELEFTERAKIS & PANEK**

By: _____/s/_____
    John Elefterakis
    Nicholas Elefterakis
    Raymond Panek
    Johnson Atkinson

80 Pine Street, 38th Floor
New York, New York 10005
Telephone: 212-532-1116
Facsimile: 212 -532-1176
*Counsel for Plaintiffs*

J.A. 1042

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26,<br><br>               Defendants. | Civil Action No.: 22-cv-00871 (VEC) |

**NOTICE OF MOTION BY DEFENDANTS THE NATIONAL FOOTBALL LEAGUE, THE DENVER BRONCOS, THE HOUSTON TEXANS, AND THE NEW YORK GIANTS FOR PARTIAL RECONSIDERATION OF THE COURT'S MARCH 1, 2023 ORDER ON DEFENDANTS' MOTION TO COMPEL ARBITRATION**

PLEASE TAKE NOTICE that, upon the accompanying memorandum of law and all other papers and proceedings in this matter, defendants the National Football League, the Denver Broncos, the Houston Texans, and the New York Giants (together, the "Moving Defendants") will move this Court, before the Honorable Valerie Caproni, United States District Judge for the Southern District of New York, at the United States Courthouse, 40 Foley Square, New York, NY 10007, on a date and time to be determined by the Court, for an order pursuant to Local Civil Rule

6.3 granting Moving Defendants' Motion for Partial Reconsideration of the Court's March 1, 2023

Order (Dkt. 76) on Defendants' Motion to Compel Arbitration (Dkt. 47).

Dated: New York, New York
      March 15, 2023

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: */s/ Loretta E. Lynch*
Loretta E. Lynch
Brad S. Karp
Lynn B. Bayard
Brette Tannenbaum
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3900
lelynch@paulweiss.com
bkarp@paulweiss.com
lbayard@paulweiss.com
btannenbaum@paulweiss.com

*Attorneys for the National Football League, Denver Broncos, Houston Texans, and New York Giants*

J.A. 1044

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26, <br><br> Defendants. | Civil Action No.: 22-cv-00871 (VEC) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DEFENDANTS**
**THE NATIONAL FOOTBALL LEAGUE, THE DENVER BRONCOS,**
**THE HOUSTON TEXANS, AND THE NEW YORK GIANTS FOR PARTIAL**
**RECONSIDERATION OF THE COURT'S MARCH 1, 2023 ORDER ON**
**DEFENDANTS' MOTION TO COMPEL ARBITRATION**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................ 3

I.    Mr. Flores's Agreement to Arbitrate Under the NFL Constitution Is Enforceable
and Compels Arbitration of Mr. Flores's Claims Against the Broncos ............................ 3

    A.    Mr. Flores's Agreement to Arbitrate Under the NFL Constitution Is Not
"Illusory" and Unenforceable Under Massachusetts Law ...................................... 4

    B.    In the Alternative, the Unilateral Modification Provision Should Be
Severed from the Arbitration Agreement ................................................................ 8

    C.    Any Contrary Interpretation of Massachusetts Law Would Be Preempted
by the Federal Arbitration Act ............................................................................... 10

II.    The Flores-Steelers Agreement Is Valid and Compels Arbitration of Mr. Flores's
Claims Against the Giants and the Texans ........................................................................ 12

    A.    The Flores-Steelers Agreement Is Valid and Binding Upon the Parties ............... 13

    B.    The Flores-Steelers Agreement Requires Arbitration of the Claims Against
the Giants and the Texans ...................................................................................... 15

CONCLUSION ..................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AT&T Mobility LLC* v. *Concepcion*,
    563 U.S. 333 (2011) ...................................................................................................10, 11

*Bekele* v. *Lyft, Inc.*
    918 F.3d 181 (1st Cir. 2019) ...............................................................................................6, 9

*Buttrick* v. *Intercity Alarms, LLC*,
    2010 WL 2609364 (Mass. App. Ct. July 1, 2010) ....................................................................5

*Carey* v. *24 Hour Fitness, USA, Inc.*,
    669 F.3d 202 (5th Cir. 2012) ...............................................................................................11

*Crump* v. *MetaSource Acquisitions, LLC*,
    373 F. Supp.3d 540 (E.D. Pa. 2019) ....................................................................................17

*Daniels* v. *Raymours Furniture Co.*,
    2014 WL 1338151 (D. Mass. Mar. 31, 2014) ..........................................................................8

*Doe 1* v. *Darden Restaurants, Inc.*,
    2022 WL 265949 (M.D. Pa. Jan. 27, 2022) ..........................................................................17

*Domenichetti* v. *Salter School, LLC*,
    2013 WL 1748402 (D. Mass. Apr. 19, 2013) .....................................................................6, 11

*Douglas* v. *Johnson Real Estate Investors, LLC*,
    470 F. App'x 823 (11th Cir. 2012) ...................................................................................6, 11

*Eiess* v. *USAA Fed. Savings Bank*,
    404 F. Supp. 3d 1240 (N.D. Cal. 2019) ...............................................................................11

*Emmanuel* v. *Handy Techs., Inc.*,
    442 F. Supp. 3d 385 (D. Mass. 2020), *aff'd*, 992 F.3d 1 (1st Cir. 2021) ...................................9

*Fawcett* v. *Citizens Bank, N.A.*,
    297 F. Supp. 3d 213 (D. Mass. 2018) ....................................................................................6

*Ferguson* v. *Host Intern., Inc.*,
    757 N.E.2d 267 (Mass. App. Ct. 2001) ..................................................................................6

*Gilbert* v. *Dell Technologies, Inc.*,
    415 F. Supp. 3d 389 (S.D.N.Y. 2019) ...........................................................................7, 9, 10

*Jackson* v. *Action for Boston Community Development, Inc.*,
    525 N.E.2d 411 (Mass. 1988) ........................................................................5, 10

*John Conti Co.* v. *Donovan*,
    57 A.2d 872 (Pa. 1948) ........................................................................14

*Joule, Inc.* v *Simmons*,
    2011 WL 7090714 (Mass. Sup. Ct. Dec. 5, 2011) ....................................9

*LeMaitre* v. *Mass. Turnpike Auth.*,
    876 N.E.2d 888 (Mass. App. Ct. 2007), *aff'd*, 897 N.E.2d 1218 (Mass. 2008) ........................6

*Machado* v. *System4, LLC*,
    28 N.E.3d 401 (Mass. 2015) ........................................................................7, 9

*Masoner* v. *Education Management Corp.*,
    18 F. Supp. 3d 652 (W.D. Pa. 2014) ........................................................15

*McDermott* v. *Party City Corp.*,
    11 F. Supp. 2d 612 (E.D. Pa. 1998) ........................................................14

*McNamara* v. *S.I. Logistics, Inc.*,
    2018 WL 6573125 (D. Mass. Dec. 13, 2018) ........................................8, 11

*Miller* v. *Cotter*,
    863 N.E.2d 537 (Mass. 2007) ........................................................................10

*National Federation of the Blind* v. *Container Store, Inc.*,
    2016 WL 4027711 (D. Mass. July 27, 2016), *aff'd*, 904 F.3d 70 (1st Cir. 2018) ..............6, 11

*O'Brien* v. *New England Telephone & Telegraph Co.*,
    664 N.E.2d 843 (Mass. 1996) ........................................................5, 7, 10, 11

*Phoenix Light SF Ltd.* v. *Bank of N.Y. Mellon*,
    2020 WL 2765044 (S.D.N.Y. May 28, 2020) ........................................3

*Quilloin* v. *Tenet HealthSystem Philadelphia, Inc.*,
    673 F.3d 221 (3d Cir. 2012) ........................................................................17

*Ragone* v. *Atl. Video at Manhattan Ctr.*,
    595 F.3d 115 (2d Cir. 2010) ........................................................................9

*Salley* v. *Option One Mortg. Corp.*,
    925 A.2d 115 (Pa. 2007) ........................................................................17

*Scott* v. *Educ. Mgmt. Corp.*,
    2015 WL 12912386 (W.D. Pa Mar. 11, 2015), *vacated on other grounds*, 662
    F. App'x 126 (3d Cir. 2016) ........................................................................16

*Smith/Enron Cogeneration Ltd. P'ship, Inc.* v. *Smith Cogeneration Int'l, Inc.*,
 198 F.3d 88 (2d Cir. 1999) ........................................................................16

*Spinetti* v. *Serv. Corp. Intern.*,
 324 F.3d 212 (3d Cir. 2003) ......................................................................17

*Tr. Under Deed of Ott*, 271 A.3d 409 (Pa. Super. Ct. 2021) .........................14

*TradeComet.com LLC* v. *Google, Inc.*,
 435 F. App'x 31 (2d Cir. 2011) .................................................................16

**STATUTES**

Federal Arbitration Act ..........................................................................2, 10

**OTHER AUTHORITIES**

8 Corbin on Contracts § 40.4 (2022) ..........................................................14

*In re Nat'l Football League Players' Concussion Injury Litig.*,
 No. 2:12-md-02323 (E.D. Pa. Oct. 16, 2018), ECF No. 10306-1 ...............4

Local Civil Rule 6.3 ..................................................................................1, 18

Restatement (Second) Contracts § 225 .......................................................14

## PRELIMINARY STATEMENT

Pursuant to Local Civil Rule 6.3, Defendants the National Football League, the Denver Broncos, the Houston Texans, and the New York Giants (together, the "Moving Defendants") respectfully move this Court to reconsider limited aspects of its March 1, 2023, Order, Dkt. 76, ruling on Defendants' motion to compel arbitration of Plaintiffs' claims. The Court properly ordered that Brian Flores's claims against the Dolphins, Steve Wilks's claims against the Cardinals, and Ray Horton's claims against the Titans, as well as Plaintiffs' related claims against the NFL, should be compelled to arbitration. Moving Defendants ask that the Court reconsider two distinct aspects of its decision with respect to Mr. Flores's remaining claims against the Broncos, the Giants, and the Texans (and his related claims against the NFL). We do not bring this motion lightly. We do so only because we believe that the Court inadvertently overlooked important controlling authorities on two separate issues that were not previously briefed by the parties, leading to two clear errors of law that, if corrected, might reasonably be expected to alter the Court's conclusion.

*First*, the Court erred in ruling that Mr. Flores's agreement to arbitrate under the NFL Constitution—which requires arbitration of his claims against the Broncos—is "illusory and unenforceable" because, under his contract with the Patriots, the NFL and its clubs have the unilateral ability to modify the terms of the NFL Constitution. Dkt. 76 at 21–22. Putting aside the uncontroverted fact that no modification was made to the relevant arbitration provisions, the Court incorrectly applied Massachusetts law, which governs Mr. Flores's contract with the Patriots, and which does not, in fact, hold that a unilateral modification provision necessarily renders an arbitration agreement unenforceable. The state court decision on which the Court relied does not so hold, and, in fact, has been expressly clarified by Massachusetts' highest court to permit the enforcement of contracts with such provisions. Even if that provision were somehow problematic,

the appropriate remedy under Massachusetts law would be to sever that provision and otherwise enforce the parties' valid agreement to arbitrate. Indeed, any contrary interpretation of Massachusetts law with respect to arbitration agreements would run afoul of, and be preempted by, the Federal Arbitration Act, which mandates that arbitration agreements be placed on equal footing with all other contracts.

*Second*, the Court erred in ruling that Mr. Flores's agreement with the Steelers—which requires arbitration of his claims against the Giants and the Texans—was not valid or binding because the version submitted to the Court did not bear the Commissioner's signature. There is again no dispute that the Commissioner has approved that agreement, although a Commissioner-signed version was not provided at the time Defendants filed their motion to compel arbitration. But even if the Commissioner had not approved the agreement, the Court overlooked controlling authority that would not preclude the formation of a valid and binding employment contract, especially where, as here, the parties indisputably started performing under the contract upon execution. To the extent the Commissioner's approval or signature was a condition precedent to the parties' obligations, any such condition was waived or excused given that the Steelers plainly did, in fact, employ Mr. Flores as a coach as soon as the contract was entered into and for a full season. There was no suggestion that the contract was not valid or that either Mr. Flores or the Steelers did not fully perform under that contract. Mr. Flores's arbitration agreement with the Steelers is thus valid. Because the Court reached a different conclusion, it did not reach the issue of whether the Flores-Steelers agreement requires arbitration of Mr. Flores's claims against the Giants and the Texans. Under Pennsylvania law, which governs the contract, Mr. Flores's broad agreement to arbitrate applies retroactively to those claims, and should be enforced.

For these reasons, Moving Defendants respectfully request that the Court reconsider these

two limited aspects of its decision and enforce Mr. Flores's agreements with the Patriots and Steelers by compelling arbitration of his remaining claims.

## ARGUMENT

A district court may grant relief on a motion for reconsideration in order "to correct a clear error or prevent manifest injustice." *Phoenix Light SF Ltd.* v. *Bank of N.Y. Mellon*, 2020 WL 2765044, at *1 (S.D.N.Y. May 28, 2020) (citing *Kolel Beth Yechiel Mechil of Tartikov, Inc.* v. *YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)). A motion for reconsideration should be granted where the movant "can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Id.* (citing *Shrader* v. *CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).

Moving Defendants recognize that this is a strict standard. We do not bring this motion in an attempt to re-litigate issues the parties have already briefed and which the Court has already carefully considered and ruled on. Rather, we seek only to call the Court's attention to two distinct issues on which we believe the Court, without the benefit of the parties' briefing, overlooked certain controlling authorities that dictate a different conclusion with respect to Mr. Flores's remaining claims.

## I. MR. FLORES'S AGREEMENT TO ARBITRATE UNDER THE NFL CONSTITUTION IS ENFORCEABLE AND COMPELS ARBITRATION OF MR. FLORES'S CLAIMS AGAINST THE BRONCOS

The Court erred in ruling that Mr. Flores's agreement to arbitrate under the NFL Constitution, contained in his employment contract with the Patriots, was "illusory" and therefore unenforceable. That agreement should be enforced and requires arbitration of Mr. Flores's claims against the Broncos, as well as his related claims against the NFL.

The Court correctly found that Mr. Flores's claims against the Broncos fell "plainly" within the scope of his agreement to arbitrate under the NFL Constitution. Dkt. 76 at 10. But the Court

nevertheless declined to enforce the plain terms of that agreement, concluding instead that it was unenforceable because, under the terms of Mr. Flores's contract with the Patriots and the NFL Constitution itself, "[t]he NFL and its member clubs have the unilateral ability to modify the terms of the NFL Constitution." *Id*. at 21–22. The Court held that these unilateral modification rights rendered Mr. Flores's agreement to arbitrate under the NFL Constitution "illusory" and therefore unenforceable under Massachusetts law, which governs Mr. Flores's contract with the Patriots pursuant to its choice-of-law provision. Flores-Patriots Agreement ¶ 21.

In so holding, the Court relied on grounds that no party had briefed: although Plaintiffs' laundry list of grounds to challenge the arbitration agreements as "unconscionable" included a passing reference to the fact that Plaintiffs were bound to comply with the NFL Constitution "as it may be amended," Dkt. 62 at 9, nowhere did Plaintiffs argue that Mr. Flores's agreement to arbitrate under the NFL Constitution was, for that reason, "illusory" and unenforceable under Massachusetts law. Nor was there any suggestion that the NFL or its clubs ever exercised their right to modify the arbitration provisions of the NFL Constitution (and in fact, it is a matter of public record that those arbitration provisions have remained unchanged throughout the relevant time period).[1] As a result of Plaintiffs' silence on this issue, and without the benefit of briefing from the parties, the Court was led to an erroneous conclusion that should now be reconsidered.

### A. Mr. Flores's Agreement to Arbitrate Under the NFL Constitution Is Not "Illusory" and Unenforceable Under Massachusetts Law

The Court's sole basis for declining to enforce Mr. Flores's agreement to arbitrate under

---

[1] For example, the version of the NFL Constitution that was in effect at the time Mr. Flores entered into his contract with the Patriots has arbitration provisions that are identical to the current version. *See* Declaration of Dennis L. Curran, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323 (E.D. Pa. Oct. 16, 2018), ECF No. 10306-1 (attaching NFL Constitution, revised as of June 1, 2010, as exhibit).

the NFL Constitution was its finding that, under Massachusetts law, an arbitration agreement with unilateral modification provisions is "illusory" and therefore unenforceable. Dkt. 76 at 21–22.

This is a misstatement of Massachusetts law. Indeed, Moving Defendants are aware of no Massachusetts state court decision that holds that such provisions necessarily render an arbitration agreement "illusory" and unenforceable. Plaintiffs identified no such authority and none of the cases cited by the Court stand for that proposition.

The sole Massachusetts state court decision cited by the Court for this proposition, *Jackson* v. *Action for Boston Community Development, Inc*., 525 N.E.2d 411 (Mass. 1988), does not hold that a unilateral modification provision renders any agreement—let alone an arbitration agreement—unenforceable. In *Jackson*, the Massachusetts Supreme Judicial Court held that a non-negotiable employee manual did not constitute an implied contract because, among other factors, the employer retained the right to unilaterally modify its terms. *Id*. at 415. In *O'Brien* v. *New England Telephone & Telegraph Co*., 664 N.E.2d 843, 847 (Mass. 1996), the Massachusetts Supreme Judicial Court expressly clarified its prior holding in *Jackson*, acknowledging that some of its language "has led to confusion" among several courts. *Id*. at 847. The *O'Brien* court clarified that unilateral modification rights are just one of many factors to be considered when determining the existence of a contract, and do not automatically render any such contract "illusory." *Id*. at 848. The court specifically declined to state a bright-line rule "defin[ing] the extent to which [an employer] may . . . reserve its right to change or withdraw a manual," *id*. at 849, and further recognized that even where an employer reserves such rights, an employee may, by continuing employment, enter into an enforceable contract. *Id*. at 848. Since *O'Brien*, Massachusetts appellate courts repeatedly have confirmed that "the right to make unilateral modifications" does not "preclude[] the formation of an enforceable contract." *Buttrick* v. *Intercity Alarms, LLC*, 2010

WL 2609364, at *2 (Mass. App. Ct. July 1, 2010).[2] *Jackson* thus does not support the Court's ruling on this issue.

The two other decisions cited by the Court are federal court decisions purporting to apply Massachusetts law. Dkt. 76 at 22. One of those decisions, *Fawcett* v. *Citizens Bank, N.A.*, 297 F. Supp. 3d 213, 221 (D. Mass. 2018), notes only in dicta that other federal courts have rejected arbitration agreements with unilateral modification provisions as "illusory" and unenforceable under Massachusetts law. But as the court in *Fawcett* expressly notes, those federal courts relied on *Jackson* for their understanding of Massachusetts law, *id.*, and each of those decisions appears to have misinterpreted *Jackson* as a categorical repudiation of unilateral modification provisions, without acknowledging that Massachusetts' highest court has since expressly clarified that it is not.[3] The other decision cited by the Court, *Bekele* v. *Lyft, Inc.*, 918 F.3d 181, 189–90 (1st Cir.

---

[2] *See LeMaitre* v. *Mass. Turnpike Auth.*, 876 N.E.2d 888, 893 (Mass. App. Ct. 2007), *aff'd*, 897 N.E.2d 1218 (Mass. 2008) ("The mere fact that [an employer] can make unilateral changes to a personnel manual would not, standing alone," preclude enforceable contract); *Ferguson* v. *Host Intern., Inc.*, 757 N.E.2d 267, 271 (Mass. App. Ct. 2001) (rejecting argument that unilateral modification provision precluded enforceable agreement and noting that, while that argument "might have been tenable under language in *Jackson*," that "decision was quite explicitly clarified by the later decision of *O'Brien*").

[3] The court in *Fawcett* cited three decisions purporting to apply Massachusetts law: In *Douglas* v. *Johnson Real Estate Investors, LLC*, 470 F. App'x 823, 825–26 (11th Cir. 2012), the Eleventh Circuit, in an unpublished decision, relied exclusively on *Jackson* for its understanding of Massachusetts law on this issue. In *Domenichetti* v. *Salter School, LLC*, 2013 WL 1748402, at *5–7 (D. Mass. Apr. 19, 2013)—a highly distinguishable case involving a non-negotiable employee manual that the parties conceded was "not a contract"—the federal district court relied, in turn, on *Douglas*, and federal court decisions applying out-of-state law, as well as *Jackson*. And finally, in *National Federation of the Blind* v. *Container Store, Inc.*, 2016 WL 4027711, at *12–13 (D. Mass. July 27, 2016), *aff'd*, 904 F.3d 70, 80 n.13 (1st Cir. 2018)—another distinguishable case involving non-negotiable customer terms of use—a magistrate judge relied, in turn, on *Domenichetti* and *Douglas*, as well as decisions applying Texas law (and the First Circuit, in affirming, applied only Texas law). In short, it appears that every decision suggesting that Massachusetts law prohibits arbitration agreements with

2019), is even less apposite. There, the First Circuit did not have to consider the import of unilateral modification rights because the agreement at issue was not, in fact, subject to unilateral modification. *Id.* Nowhere in that decision did the First Circuit hold—or find that Massachusetts law requires a finding—that unilateral modification rights render an arbitration agreement "illusory."

In short, the Court's application of Massachusetts law was premised on a state court decision that has invited significant "confusion" across several courts, *O'Brien*, 664 N.E.2d at 847, and on other decisions that either perpetuated that confusion or are simply inapposite. Correctly understood, Massachusetts law, which "expresses a strong public policy favoring arbitration," *Machado* v. *System4, LLC*, 28 N.E.3d 401, 407 (Mass. 2015) (citation omitted), in fact provides no grounds for setting aside any aspect of Mr. Flores's agreement to arbitrate, regardless of a unilateral modification right that has not been exercised.

That is particularly true here, where there is no dispute that sophisticated parties, negotiating at arm's length, did, in fact, enter into multiple enforceable employment contracts. In this context, a unilateral modification provision does not raise the same concerns implicated in *Jackson*, and does not void an otherwise enforceable agreement to arbitrate. A recent decision from another court in this District—correctly applying Massachusetts law to a nearly identical situation—is instructive: In *Gilbert* v. *Dell Technologies, Inc.*, 415 F. Supp. 3d 389, 393–95 (S.D.N.Y. 2019), the court granted an employer's motion to compel arbitration of discrimination claims based on an employment agreement (governed by Massachusetts law) that incorporated the employer's arbitration policy. The employee argued that, because the employment agreement gave

---

unilateral modification provisions can be traced back to *Jackson*, which as discussed above does not so hold.

the employer the right to amend the arbitration policy "from time to time . . . in its discretion," this rendered the arbitration agreement "illusory." *Id.* at 394, 398. The court rejected this argument. The court acknowledged the federal court decisions suggesting that "[u]nder Massachusetts law, an agreement to arbitrate can be illusory if the agreement can be modified unilaterally by one party,"[4] but ultimately concluded, correctly, that the employee's "continued employment provided consideration for the agreement she signed" and that the arbitration agreement was thus enforceable. *Id.* at 398; *see Daniels* v. *Raymours Furniture Co.*, 2014 WL 1338151, at *6 (D. Mass. Mar. 31, 2014) (compelling arbitration of discrimination claims under Massachusetts law and rejecting argument "that there was not a contract because [employer] reserved the right to unilaterally modify . . . terms").

Here too, Massachusetts law requires enforcement of all aspects of Mr. Flores's arbitration agreement with the Patriots. The fact that the NFL and its member clubs have the right to amend the NFL Constitution—their own governing document—does not render that agreement "illusory," especially where, as the Court has correctly found, Mr. Flores "expressly agreed to abide by the NFL Constitution," Dkt. 76 at 9, *see* Flores-Patriots Agreement ¶ 15, and continued to be employed by the Patriots for years under those very terms. Dkt. 22 ¶¶ 157–58.

### B. In the Alternative, the Unilateral Modification Provision Should Be Severed from the Arbitration Agreement

Further, even if there were some basis to challenge the unilateral modification provision here, Mr. Flores's agreement to arbitrate under the NFL Constitution should still be enforced, because that provision can easily be severed from the agreement.

---

[4] The court cited to *McNamara* v. *S.I. Logistics, Inc.*, 2018 WL 6573125, at *3 (D. Mass. Dec. 13, 2018), which, like several other federal courts, mistakenly relied on *Jackson* and other cases, discussed at n.3, *supra*, for its erroneous conclusion that such agreements are "illusory" under Massachusetts law.

Under Massachusetts law, challenges to unilateral modification provisions in arbitration agreements are analyzed not as an issue of "illusoriness" but rather as a potential basis for unconscionability. *See Gilbert*, 415 F. Supp. 3d at 398–99; *Joule, Inc.* v *Simmons*, 2011 WL 7090714, at *4–5 (Mass. Sup. Ct. Dec. 5, 2011); *cf. Bekele*, 918 F.3d at 189–90.[5] In this case, the unilateral modification provision is not unconscionable. Massachusetts law requires a plaintiff to show *both* procedural and substantive unconscionability in order to avoid an agreement, *see Machado*, 28 N.E.3d at 414, and here, there is nothing that suggests any procedural unconscionability in the arm's-length negotiations between Mr. Flores—an experienced, sophisticated, well-compensated coach—and the Patriots. Dkt. 64 at 3–4. *See Gilbert*, 415 F. Supp. 3d at 399 ("It is not unconscionable to require the plaintiff to arbitrate in accordance with the terms of the arbitration policy that the plaintiff agreed to and which the defendant seeks to enforce without any changes.").

Even if the unilateral modification provision here were unconscionable in some respect (and it is not), "the appropriate remedy" would be "to sever the improper provision of the arbitration agreement, rather than void the entire agreement," and otherwise enforce the arbitration agreement according to its unmodified terms. *Ragone* v. *Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 124–25 (2d Cir. 2010) (citation omitted); *see Machado*, 28 N.E.3d at 415–16. That is exactly how courts applying Massachusetts law have approached unilateral modification provisions in arbitration agreements, noting that even if those provisions were unconscionable, they could easily be severed so as to otherwise preserve the parties' bargain. *See Emmanuel* v. *Handy Techs., Inc.*,

---

[5] That is also how Plaintiffs themselves framed the analysis in their cursory briefing on the issue, arguing that the "references to the Constitution" in Plaintiffs' employment contracts "suffer[] from the same unconscionability" as the contracts themselves, including because the contracts "require Plaintiffs to comply with the Constitution as it may be amended." Dkt. 62 at 9.

442 F. Supp. 3d 385, 394 (D. Mass. 2020), *aff'd*, 992 F.3d 1 (1st Cir. 2021) ("If the Court deemed the Unilateral Modification Clause unconscionable, . . . it could simply sever the offending provision and enforce the remainder of the . . . arbitration provision."); *Gilbert*, 415 F. Supp. 3d at 399 ("[I]f the [unilateral modification] provision of the arbitration agreement . . . were invalid, it could be severed from the remainder of the contract."). In this case, severance of the unilateral modification provision is especially straightforward, because the terms of the parties' arbitration agreement have never been amended, and would remain exactly the same as those to which Mr. Flores expressly agreed to be bound.

### C. Any Contrary Interpretation of Massachusetts Law Would Be Preempted by the Federal Arbitration Act

As the foregoing authorities make clear, enforcement of Mr. Flores's agreement to arbitrate under the NFL Constitution is consistent with, and required by, Massachusetts law. It is also required by the FAA. Any contrary interpretation of Massachusetts law—"singling out" arbitration agreements "for suspect status" based on unilateral modification rights—would run afoul of the FAA's basic mandate to place arbitration agreements "on the same footing" as other contracts, and therefore would be preempted by that statute. *Miller* v. *Cotter*, 863 N.E.2d 537, 543 (Mass. 2007) (citation omitted); *see AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 339 (2011).

While the FAA recognizes the availability of state-law contract defenses to arbitration agreements, the statute squarely preempts any state-law rule that specifically disfavors arbitration, as well as "generally applicable" defenses that are "applied in a fashion that disfavors arbitration." *Concepcion*, 563 U.S. at 341. As described above, Massachusetts state courts have applied principles of "illusoriness" to contracts generally—not to arbitration agreements specifically—and considered whether unilateral modification provisions may render a contract as a whole "illusory." *See Jackson*, 525 N.E.2d at 415; *O'Brien*, 664 N.E.2d at 848. As also described above, some

federal courts have not only misinterpreted those state-law principles, but also applied them in a targeted fashion to arbitration provisions within broader contracts. By doing so, these courts have imposed a unique burden on arbitration provisions, essentially requiring mutuality within those arbitration provisions themselves, without considering whether there might be sufficient mutuality of consideration across the *broader* contract—in this case, an employment contract that provided Mr. Flores with substantial compensation and other benefits—to support enforcement. *See Douglas*, 470 F. App'x at 825–26; *McNamara*, 2018 WL 6573125, at *3. The perverse implication of these decisions, taken together, is that, although any other contract with a unilateral modification provision is not necessarily "illusory," and can still be enforced, *O'Brien*, 664 N.E.2d at 848, an *arbitration agreement* with such provisions is treated differently, and must be set aside.

Even if correct (and it is not), such an interpretation of Massachusetts law plainly would "disfavor[] arbitration" and thus violate the FAA. *Concepcion*, 563 U.S. at 341. Indeed, at least one federal court has held that a Texas state-law rule nearly identical to the Court's articulation of Massachusetts law here—refusing to enforce arbitration agreements with unilateral modification provisions as "illusory"—is preempted by the FAA because it "expressly address[es] only the issue of 'whether arbitration agreements are illusory,' rather than whether *all* contracts that contain unilateral modification provisions . . . are illusory," thus "singl[ing] out arbitration for special treatment." *Eiess* v. *USAA Fed. Savings Bank*, 404 F. Supp. 3d 1240, 1256 (N.D. Cal. 2019) (citation omitted). Notably, the rule that was deemed preempted in *Eiess* is the same Texas state-law rule that many federal courts misapplying Massachusetts law on this issue have also relied on.[6] Thus, even if Massachusetts law could be interpreted to set forth a similar rule (and it should

---

[6] *See Domenichetti*, 2013 WL 1748402, at *5–6 (relying on *Carey* v. *24 Hour Fitness, USA, Inc*., 669 F.3d 202 (5th Cir. 2012)); *Nat'l Fed. of the Blind*, 2016 WL 4027711, at *11–12 (same).

not be), that rule would likewise be preempted by the FAA and would not allow Mr. Flores to avoid his agreement to arbitrate.

For these reasons, Moving Defendants respectfully urge the Court to reconsider its decision not to enforce Mr. Flores's agreement, in his contract with the Patriots, to arbitrate under the NFL Constitution. Left to stand, the decision would perpetuate a misinterpretation of Massachusetts law that runs counter not only to controlling state-law authorities, but also to the basic mandate of the FAA. The unilateral modification provision here provides no grounds for setting aside the arbitration agreement—even if it were somehow unconscionable, it could easily be severed—and Mr. Flores's claims against the Broncos (and his related claims against the NFL) should accordingly be compelled to arbitration.

## II.  THE FLORES-STEELERS AGREEMENT IS VALID AND COMPELS ARBITRATION OF MR. FLORES'S CLAIMS AGAINST THE GIANTS AND THE TEXANS

The Court mistakenly held that Mr. Flores's agreement with the Steelers was invalid because there was no evidence before the Court that the Commissioner had approved it. Dkt. 76 at 9, 13–14. In so holding, the Court again relied on grounds that no party had briefed: nowhere did Plaintiffs argue that Mr. Flores had not, in fact, entered into a valid employment agreement with the Steelers, under which the parties commenced performance immediately upon execution and continued to fully perform until Mr. Flores left the Steelers for a new position with the Minnesota Vikings. Without the benefit of any briefing on this issue, the Court overlooked key principles of contract law establishing that, regardless of whether the Commissioner approved it, the Flores-Steelers agreement was valid and binding because of the parties' mutual performance and should be enforced on that basis. Had the Court properly so concluded, it would have found that the agreement compels arbitration of Mr. Flores's claims against the Giants and the Texans, as well as his related claims against the NFL. Under Pennsylvania law, which governs Mr. Flores's

contract with the Steelers, Flores-Steelers Agreement ¶ 20, the broad terms of the arbitration agreement—unlimited in temporal scope—apply retroactively to those claims, and here, too, the unilateral modification provision provides no basis for avoiding enforcement.

### A. The Flores-Steelers Agreement Is Valid and Binding Upon the Parties

In declining to enforce the Flores-Steelers agreement, the Court cited a provision stating that the agreement "shall become valid and binding upon each party only when and if it shall be approved by the Commissioner of the NFL." *Id*. ¶ 12. The version of the agreement submitted to the Court did not bear the Commissioner's signature, because at the time Defendants filed their motion to compel arbitration, a Commissioner-signed version had not yet been received. The Court held that for that reason Defendants had "failed to establish that Mr. Flores entered into a valid arbitration agreement when he was hired by the Steelers." Dkt. 76 at 13.

While Defendants regret not having supplemented the record with a Commissioner-signed version of the agreement (which Moving Defendants now ask, with the Court's leave, to submit through a supplemental declaration confirming the contract's validity),[7] the Commissioner's signature is not, in fact, necessary to establish that the parties entered into a valid and binding agreement, especially where the parties indisputably performed immediately upon execution according to its terms.

Under Pennsylvania law, "[a]n agreement is a valid and binding contract if: the parties

---

[7]  A Commissioner-signed version of the Flores-Steelers agreement was received shortly after Defendants filed their motion to compel arbitration on June 21, 2022. When the Court instructed Defendants on February 1, 2023, to "file complete copies of the contracts attached as exhibits to the DiBella Declaration at docket entries 49 and 50," Dkt. 70, Defendants understood the Court to be asking for the same versions that were attached to that declaration (including the version of the Steelers agreement that still lacked the Commissioner's signature). Defendants regret and apologize for not having substituted a Commissioner-signed version of the Steelers agreement at that time.

have manifested an intent to be bound by the agreement's terms; the terms are sufficiently definite; and there was consideration." *Tr. Under Deed of Ott*, 271 A.3d 409, 416 (Pa. Super. Ct. 2021) (citation omitted). None of those elements are disputed here. (And surely, had the Steelers sought to disclaim their obligations under this employment contract, for example by withholding Mr. Flores's salary payments, or refusing to provide him with benefits under the contract, Mr. Flores would not have taken the position that there was never a valid agreement because the Commissioner never signed it.)

At most, the provision requiring the Commissioner's approval establishes a condition precedent to the parties' obligations to perform under the agreement, which was waived and excused when Mr. Flores performed, and accepted performance from the Steelers, under that very same agreement. *See McDermott* v. *Party City Corp*., 11 F. Supp. 2d 612, 620–22 (E.D. Pa. 1998) (applying Pennsylvania law) (condition precedent requiring bank's approval of agreement was excused and waived where party performed and accepted part performance, including payment of fees); *John Conti Co*. v. *Donovan*, 57 A.2d 872, 874–75 (Pa. 1948) (condition precedent in construction contract requiring architect approval can be "excused, or waived"); *see also* Restatement (Second) Contracts § 225, comment b ("The non-occurrence of a condition may be excused . . . by acceptance of performance in spite of the non-occurrence of the condition."); 8 Corbin on Contracts § 40.4 (2022) (condition to performance can be waived "by continuing to render performance . . . or by continuing to receive further performance"). Thus, even if the Commissioner never approved Mr. Flores's agreement with the Steelers (and he did), settled principles of contract law establish that the parties, through mutual performance, nevertheless entered into a valid and binding agreement.

**B. The Flores-Steelers Agreement Requires Arbitration
of the Claims Against the Giants and the Texans**

Had the Court, with the benefit of the parties' briefing, concluded that Mr. Flores's agreement with the Steelers was valid and binding, it also would have found that the agreement requires arbitration of Mr. Flores's claims against the Giants and the Texans (and his related claims against the NFL). Much like his agreement with the Patriots (and the Dolphins), Mr. Flores's agreement with the Steelers contains a broad arbitration provision and requires Mr. Flores to comply with the NFL Constitution, which authorizes the Commissioner to arbitrate disputes between any coach and any member club. Flores-Steelers Agreement ¶¶ 13–14; NFL Const. art. 8.3(B). Mr. Flores's claims against the Giants and the Texans thus fall squarely within the scope of that agreement.

Mr. Flores's claims against the Giants and the Texans arose in the less than six weeks between when he left the Dolphins, on January 10, 2022, and when he entered a new contract with the Steelers, on February 18, 2022. Dkt. 22 ¶ 177; Flores-Steelers Agreement. In support of his claims against the Giants, Mr. Flores alleges that in the weeks immediately following his termination by the Dolphins, the Giants discriminated against him by subjecting him to a "sham interview" for their head coach position. Dkt. 22 at ¶¶ 178–91. In support of his claims against the Texans, Mr. Flores alleges that during the same hiring cycle, the Texans hired another Black candidate as their head coach in retaliation for his filing this lawsuit. *Id.* ¶¶ 207–18.

Although those claims arose in the weeks in between Mr. Flores's agreement with the Dolphins (which this Court recognized as a valid and enforceable arbitration agreement, Dkt. 76 at 11–13), and his subsequent agreement with the Steelers, they are nevertheless still subject to arbitration under the Steelers agreement. Under Pennsylvania law, an arbitration agreement applies retroactively to past claims, where, as here, the arbitration agreement is broadly worded

and places no limit on its temporal scope.  For example, in *Masoner* v. *Education Management Corp.*, 18 F. Supp. 3d 652, 661 (W.D. Pa. 2014), the court, applying Pennsylvania law, held that a broadly-worded arbitration policy with "no temporal limit" squarely encompassed claims that arose before the agreement's effective date, as well as claims that, like Mr. Flores's claims here, were asserted in a discrimination lawsuit filed before the employee agreed to that policy.  The court reasoned that, while the arbitration policy did "not contain a retroactivity provision," it also "does not *preclude* retroactive application."  *Id* (emphasis in original).  Recognizing, as the Court did here, the presumption that any doubts concerning the scope of arbitrable issues should be resolved "in favor of arbitration," *id.*, Dkt. 76 at 6, the court compelled the employee's claims to arbitration.  *See also Scott* v. *Educ. Mgmt. Corp.*, 2015 WL 12912386, at *5 (W.D. Pa Mar. 11, 2015) (same), *vacated on other grounds*, 662 F. App'x 126, 131 (3d Cir. 2016).  As explained in Defendants' prior briefing, Dkt. 48 at 20 n.3, federal courts applying the laws of other jurisdictions have likewise held, repeatedly, that arbitration agreements lacking temporal limitation can apply retroactively.  *See, e.g.*, *Smith/Enron Cogeneration Ltd. P'ship, Inc.* v. *Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 99 (2d Cir. 1999); *cf. TradeComet.com LLC* v. *Google, Inc.*, 435 F. App'x 31, 34–35 (2d Cir. 2011) (citing cases).

The same result should follow here.  The broad language of the parties' arbitration agreements reflects an unmistakable intent to arbitrate a wide range of disputes, including any disputes between coaches and member clubs.  Consistent with the parties' intent, and with the FAA's mandate to resolve questions as to scope in favor of arbitration, the agreement here can properly be enforced to require arbitration of disputes that arise in the brief period of time when a coach who has just left a position with one club is actively interviewing with others.

Were the Court to find that the Flores-Steelers agreement is valid and binding, and

encompasses Mr. Flores's claims against the Giants and the Texans, there would be no other grounds on which to decline to compel arbitration of those claims. Mr. Flores's agreement with the Steelers is fully enforceable. While it also reserves the right for the NFL and its member clubs to amend their Constitution, Flores-Steelers Agreement ¶ 13, that provides no basis for non-enforcement, for many of the same reasons already discussed with respect to Mr. Flores's agreement with the Patriots. Moving Defendants are aware of no Pennsylvania state court decision holding that a unilateral modification provision necessarily renders an arbitration agreement "illusory" or unenforceable.[8] That provision is not unconscionable under Pennsylvania law, which, like Massachusetts law, requires both procedural and substantive unconscionability, *see Quilloin* v. *Tenet HealthSystem Philadelphia, Inc*., 673 F.3d 221, 230 (3d Cir. 2012) (applying Pennsylvania law); *Salley* v. *Option One Mortg. Corp*., 925 A.2d 115, 119 (Pa. 2007), and even if it were, it could easily be severed. *Spinetti* v. *Serv. Corp. Int'l*, 324 F.3d 212, 219–20 (3d Cir. 2003) (applying Pennsylvania law). Any contrary interpretation of Pennsylvania law would, in any event, be preempted by the FAA. *See* Section I.C, *supra*.

Accordingly, Moving Defendants ask that the Court reconsider its decision not to enforce Mr. Flores's arbitration agreement with the Steelers. Regardless of when the Commissioner

---

[8] While it appears that one federal court has held, purportedly under Pennsylvania law, that the arbitration provisions in an employee manual subject to unilateral modification were illusory and unenforceable, *see Crump* v. *MetaSource Acquisitions, LLC*, 373 F. Supp.3d 540, 544–47 (E.D. Pa. 2019), that case has no bearing here. Aside from arising in the entirely distinguishable context of a non-negotiable employee manual, this court's decision relied on federal court decisions applying out-of-state law, as well as a state court decision evaluating non-compete clauses (which, in stark contrast to arbitration agreements, are disfavored under Pennsylvania law). *Id*. at 545, 548. The court's reasoning that the employee's continued employment did not constitute sufficient consideration for his agreement to arbitrate has also been recognized as "an outlier" and "inconsistent with caselaw." *Doe 1* v. *Darden Restaurants, Inc*., 2022 WL 265949, at *10 (M.D. Pa. Jan. 27, 2022).

approved that agreement, it was valid and binding on the parties, who indisputably performed thereunder. Its broad scope plainly encompasses Mr. Flores's claims against the Giants and the Texans, and there are no grounds to avoid enforcement.

## CONCLUSION

For the reasons discussed above, Moving Defendants respectfully ask this Court to reconsider these limited aspects of its Order, and to compel arbitration of Mr. Flores's remaining claims against the Broncos, the Giants, and the Texans, as well as his related claims against the NFL.

Moving Defendants also request the Court's leave, pursuant to Local Civil Rule 6.3, to file a supplemental declaration submitting for the Court's consideration a Commissioner-approved version of Mr. Flores's agreement with the Steelers, and to do so under seal, for reasons previously briefed. *See* Dkt. 46, 53.

Dated: New York, New York
March 15, 2023

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**

By: */s/ Loretta E. Lynch*
Loretta E. Lynch
Brad S. Karp
Lynn B. Bayard
Brette Tannenbaum
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3900
lelynch@paulweiss.com
bkarp@paulweiss.com
lbayard@paulweiss.com
btannenbaum@paulweiss.com

*Attorneys for the National Football League, Denver
Broncos, Houston Texans, and New York Giants*

J.A. 1067

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26,<br><br>          Defendants. | Civil Action No.: 22-cv-00871 (VEC) |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION OF THE COURT'S MARCH 1, 2023 ORDER ON DEFENDANTS' MOTION TO COMPEL ARBITRATION

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................... 1

LEGAL STANDARD...................................................................................................... 2

ARGUMENT ............................................................................................................... 3

I.    The Court Correctly Held that Plaintiffs' Allegations of Bias Do Not Invalidate the Arbitration Agreements................................................................................. 3

        A.    The Parties' Arbitration Agreements, Including Their Agreements to Designate the Commissioner as Arbitrator, Should Be Enforced.......................... 4

        B.    Plaintiffs' Claims of Bias Are Premature ............................................. 6

        C.    Plaintiffs' Claims of Bias Do Not Render the Arbitration Agreements Unconscionable........................................................................... 7

II.    Plaintiffs Are Not Prevented from Vindicating Their Rights in Arbitration ................... 11

III.    The Court's Decision Is Fully Consistent with Controlling Law and Need Not Be Disturbed................................................................................................. 12

CONCLUSION........................................................................................................... 13

J.A. 1069

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*Anwar* v. *Fairfield Greenwich Ltd.*,
164 F. Supp. 3d 558 (S.D.N.Y. 2016)......................................................................2

*Cole* v. *Burns International Security Services*,
105 F.3d 1465 (D.C. Cir. 1997)............................................................................12

*Delta Mine Holding Co.* v. *AFC Coal Properties*,
280 F.3d 815 (8th Cir. 2001) ..................................................................................5

*Floss* v. *Ryan's Family Steak Houses, Inc.*,
211 F.3d 306 (6th Cir. 2000) ................................................................................12

*Garcia* v. *Church of Scientology Flag Organization, Inc.*,
2021 WL 5074465 (11th Cir. Nov. 2, 2021)........................................................7, 8

*Gilmer* v. *Interstate/Johnson Lane Corp.*,
500 U.S. 20 (1991)..........................................................................................6, 7, 13

*United States ex rel. Grubea* v. *Rosicki, Rosicki & Assocs., P.C.*,
319 F. Supp. 3d 747 (S.D.N.Y. 2018)..............................................................2, 6, 10

*Hooters of America, Inc.* v. *Phillips*,
173 F.3d 933 (4th Cir. 1999) ..................................................................................8

*Kolel Beth Yechiel Mechil of Tartikov, Inc.* v. *YLL Irrevocable Tr.*,
729 F.3d 99 (2d Cir. 2013)......................................................................................2

*McMullen* v. *Meijer, Inc.*,
355 F.3d 485 (6th Cir. 2004) ..................................................................................8

*NFL Management Council* v. *NFL Players Association*,
820 F.3d 527 (2d Cir. 2016)................................................................................4, 5

*Parisi* v. *Goldman, Sachs & Co.*,
710 F.3d 483 (2d Cir. 2013).................................................................................13

*Pokorny* v. *Quixtar, Inc.*,
601 F.3d 987 (9th Cir. 2010) ..................................................................................9

*Walker* v. *Ryan's Family Steak Houses, Inc.*,
400 F.3d 370 (6th Cir. 2005) ............................................................................8, 12

J.A. 1070

*Williams* v. *NFL*,
    582 F.3d 863 (8th Cir. 2009) ...................................................................5

*Winfrey* v. *Simmons Foods, Inc.*,
    495 F.3d 549 (8th Cir. 2007) ..................................................................5

## STATUTES

9 U.S.C. § 10(a)(2)...................................................................................6

## OTHER AUTHORITIES

Local Civil Rule 6.3 ................................................................................2

## PRELIMINARY STATEMENT

The Court correctly ruled that Brian Flores's claims against the Dolphins, Steve Wilks's claims against the Cardinals, and Ray Horton's claims against the Titans, as well as Plaintiffs' related claims against the NFL, should be compelled to arbitration. Still unwilling to abide by their express agreements to arbitrate, Plaintiffs now urge the Court to reconsider those aspects of its decision. Yet Plaintiffs point to no new facts and identify no controlling authority that the Court overlooked. Instead, Plaintiffs rehash the same arguments that they have already made and that this Court already considered and rejected when it decided to enforce Plaintiffs' binding arbitration agreements. Plaintiffs' motion is an improper second bite at the apple, does not satisfy the standard for reconsideration in this Court, and should be denied.

Plaintiffs' first and primary argument—that their arbitration agreements are unenforceable, because they designate the NFL Commissioner as arbitrator—has already been exhaustively briefed, considered, and rejected. The Court, consistent with settled authority, correctly held that where, as here, the parties expressly assented to arbitrate their disputes before the Commissioner, those agreements must be enforced. Plaintiffs' motion identifies no reason for the Court to revisit that conclusion other than their previously made and unsupported claims that the Commissioner will be biased against them. The Court has already rejected those claims as speculative and premature, and insufficient to demonstrate unconscionability. It should do so again here.

Plaintiffs' second, corollary argument—that Plaintiffs cannot effectively vindicate their rights in arbitration—is yet another attempt to relitigate old issues. The Court already squarely rejected that argument, holding that hypothetical arbitrator bias does not bar Plaintiffs from vindicating their rights, and Plaintiffs can cite to no new law or fact that suggests otherwise.

As for Plaintiffs' final argument—that the Court's decision, left to stand, will result in "manifest injustice"—Plaintiffs' conclusory criticisms are wholly unfounded. Unable to identify

any clear error in the Court's reasoning, Plaintiffs instead mischaracterize the Court's decision as an unprecedented ruling that endorses unfair arbitration agreements. Not so. The Court's decision to compel Plaintiffs' claims to arbitration is perfectly consistent with the Federal Arbitration Act and with a long line of controlling precedents that enforce and honor, as here, valid agreements to resolve disputes, including employment disputes, through arbitration. The Court's decision to hold the parties here to their express bargain was correct. Plaintiffs' dissatisfaction with that outcome— and their implicit invitation for this Court to do what Congress has declined to do, by voiding valid agreements to arbitrate employment disputes—is not a legitimate basis for reconsideration.

For these reasons, Plaintiffs' motion is meritless and should be denied.

## LEGAL STANDARD

The standard for granting a motion for reconsideration is settled and strict. Under Local Civil Rule 6.3, reconsideration is appropriate only where the movant identifies "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc*. v. *YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013) (citation omitted). "[M]ere disagreement" with the Court's decision does not suffice. *United States ex rel. Grubea* v. *Rosicki, Rosicki & Assocs., P.C.*, 319 F. Supp. 3d 747, 752 (S.D.N.Y. 2018). Instead, a successful movant must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Id*. at 751 (citation omitted).

As this Court has cautioned, motions for reconsideration are "not designed to allow wasteful repetition of arguments already briefed, considered[,] and decided." *Anwar* v. *Fairfield Greenwich Ltd.*, 164 F. Supp. 3d 558, 560 (S.D.N.Y. 2016). A motion that serves merely as "a vehicle for relitigating old issues, presenting the case under new theories . . . or otherwise taking a second bite at the apple" should be denied. *Grubea*, 319 F. Supp. 3d at 751 (citation omitted).

## ARGUMENT

Plaintiffs' motion falls far short of—and indeed, completely disregards—the strict standard for reconsideration. Unable to identify any new law or facts, Plaintiffs instead reiterate the very same arguments they already advanced multiple times in their opposition brief, sur-reply, and supplemental briefing in response to Defendants' motion to compel arbitration. The Court has already carefully considered and rejected those arguments, and should do so again here.

## I. THE COURT CORRECTLY HELD THAT PLAINTIFFS' ALLEGATIONS OF BIAS DO NOT INVALIDATE THE ARBITRATION AGREEMENTS

The Court correctly found that Mr. Flores's claims against the Dolphins, Mr. Wilks's claims against the Cardinals, and Mr. Horton's claims against the Titans, as well as their related claims against the NFL, all fell within the broad scope of their valid arbitration agreements with those clubs. Dkt. 76 at 11–13, 15–20. In their motion, Plaintiffs do not challenge the validity of those agreements. Nor do they dispute that those agreements properly encompass their claims. Instead, Plaintiffs rely on the same argument they briefed at length in opposition to Defendants' motion to compel arbitration—namely, that those agreements are unenforceable because they designate the NFL Commissioner, who Plaintiffs speculate will be biased against them, as the arbitrator in the first instance. Dkt. 80 at 3–14; Dkt. 62 at 5–15, Dkt. 67 at 1–9, Dkt. 75 at 4–5.

Plaintiffs' efforts to shoehorn this rehash into the reconsideration standard—by claiming that the Court "overlooked" portions of decisions on which it relied, or reasons why those cases are distinguishable from this one—amount to nothing more than second-guessing of the Court's analysis. Far from "overlooking" the issue, the Court expressly considered Plaintiffs' argument and rejected it, properly concluding that "Plaintiffs' concern" about the Commissioner's supposed bias "is insufficient reason not to enforce [their] arbitration agreements." Dkt. 76 at 26. There is no basis (and Plaintiffs certainly identify none) for the Court to revisit that conclusion.

## A. The Parties' Arbitration Agreements, Including Their Agreements to Designate the Commissioner as Arbitrator, Should Be Enforced

In enforcing Plaintiffs' arbitration agreements, the Court correctly applied the basic principle that "arbitration is a matter of contract, and consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen." *Id.* at 22 (citation omitted). Here, where Plaintiffs expressly assented to arbitration before the Commissioner, the Court properly held that Plaintiffs cannot now avoid that bargained-for agreement. *Id.* at 22–26.

The Court's conclusion is fully consistent with controlling law. In particular, the Court appropriately relied on *NFL Management Council* v. *NFL Players Association*, 820 F.3d 527, 548 (2d Cir. 2016), where "the Second Circuit rejected the argument that, as a matter of law, the NFL Commissioner cannot fairly arbitrate claims regarding the NFL's conduct." Dkt. 76 at 22. In that case, as here, the parties specifically contracted to arbitrate claims before the Commissioner, "knowing full well . . . that the Commissioner would have a stake . . . in every arbitration brought." *Id.* (citing *NFL Mgmt. Council*, 820 F.3d at 548). And in that case, as here, the court saw no reason not to enforce that express bargain. *Id.* at 22–23; *NFL Mgmt. Council*, 820 F.3d at 548. Numerous courts have reached the same conclusion and recognized the authority of the NFL Commissioner (or his designee) to arbitrate disputes under agreements like the ones here. *See* Dkt. 64 at 4 & n.3.

In their motion, Plaintiffs argue that the sound reasoning in *NFL Management Council*—a binding Second Circuit decision that squarely addresses an agreement to arbitrate disputes before the NFL Commissioner—is neither "controlling . . . nor . . . persuasive." Dkt. 80 at 4. Yet each of Plaintiffs' renewed attempts to distinguish that decision (which both parties already addressed in their briefing, Dkt. 48 at 15; Dkt. 64 at 4; Dkt. 67 at 2) fails.

Plaintiffs first argue that the decision in *NFL Management Council* is inapposite because it cites to supposedly distinguishable cases involving agreements to arbitrate before panels of

arbitrators, including "party arbitrators" selected separately by each party, as opposed to a single arbitrator jointly designated by the parties. Dkt. 80 at 4–5. That argument fails. As an initial matter, there is no question that the Second Circuit's decision in *NFL Management Council*—the actual decision that this Court relied on—involved an agreement that designated a single arbitrator who was also *the very same arbitrator* the parties mutually agreed to designate here: the NFL Commissioner. 820 F.3d at 548. The Court's reliance on that decision was therefore entirely apt.

As for the decisions cited in *NFL Management Council*, those decisions are not to the contrary, and in fact support this Court's ruling. In *Williams* v. *NFL*, 582 F.3d 863, 885–86 (8th Cir. 2009) (a decision that Plaintiffs conveniently ignore), the Eighth Circuit, relying on the parties' express agreement to arbitrate disputes before "the [NFL] Commissioner or his designee" (as well as the lack of any evidence of partiality), denied a petition to vacate arbitral awards on the ground of bias. And in *Winfrey* v. *Simmons Foods, Inc.*, 495 F.3d 549, 551–53 (8th Cir. 2007), the Eighth Circuit likewise declined to vacate an award rendered by a panel that was selected in accordance with the terms of the parties' contract. Contrary to Plaintiffs' arguments, nowhere in *Winfrey* did the court hold that an arbitration agreement must allow each party to select their own arbitrator.[1] Rather, the decisions cited in *NFL Management Council* all reinforce the basic proposition that parties to an arbitration agreement must adhere to "the method they have chosen," which here indisputably is arbitration before the NFL Commissioner. Dkt. 76 at 22.

Plaintiffs next seek to distinguish *NFL Management Council* by reiterating arguments already made in their prior briefing, Dkt. 67 at 2, contending that the case is "inapposite" because

---

[1] Plaintiffs note that *Winfrey*, in turn, relied on the decision in *Delta Mine Holding Co*. v. *AFC Coal Properties*, 280 F.3d 815 (8th Cir. 2001), which "also involved party arbitrators." Dkt. 80 at 5 n.3. But *Delta Mine* also supports this Court's decision, making clear that parties to an arbitration agreement must adhere to the procedures they have chosen, even where those procedures require arbitration before a potentially "partisan arbitrator[]." 280 F.3d at 821.

it arose in the context of a "heavily negotiated" collective bargaining agreement and did not involve arbitration of federal statutory claims. Dkt. 80 at 6–7. These arguments should be rejected. In particular, Plaintiffs' bald and unsupportable assertion that the agreements here were "forced" on Plaintiffs—all experienced, sophisticated, and well-compensated NFL coaches—without any negotiation, *id*. at 6, are belied by the terms of the employment contracts themselves, which vary widely by plaintiff and by club. As the Court correctly found, Plaintiffs here "agreed to a particular arbitration structure, including a specific arbitrator," Dkt. 76 at 23, and must now abide by those agreements. Further, those agreements apply with full force to Plaintiffs' statutory claims of employment discrimination: not only are such claims arbitrable under longstanding precedents, Dkt. 48 at 11–12, but this Court has also already held, correctly, that these claims in particular fall within the scope of Plaintiffs' broadly-worded arbitration agreements. Dkt. 76 at 11–13, 15–18.

The Court's decision to enforce Plaintiffs' arbitration agreements is consistent with controlling law, and Plaintiffs' "mere disagreement" with that decision is no basis for reconsideration. *Grubea*, 319 F. Supp. 3d at 752.

### B. Plaintiffs' Claims of Bias Are Premature

In rejecting Plaintiffs' bias-based challenges, the Court also correctly held that, consistent with the FAA's broad enforcement mandate, "[c]ourts must avoid presupposing that the [parties'] selected arbitrator will not serve as a conscientious and impartial arbitrator." Dkt. 76 at 23. As the Court noted, the FAA provides a specific remedy for parties who face allegedly biased arbitrators, in the form of judicial review after an arbitral award is entered, 9 U.S.C. § 10(a)(2), and Plaintiffs' speculation as to the Commissioner's ability to fairly arbitrate their claims, "at this early stage" of the proceedings, is thus wholly premature. Dkt. 76 at 23.

In support of this conclusion, the Court properly relied on the Supreme Court's decision in *Gilmer* v. *Interstate/Johnson Lane Corp*., 500 U.S. 20 (1991), a case that both parties cited in their

prior briefing. Dkt. 62 at 5–6; Dkt. 64 at 2. In *Gilmer*, the Supreme Court held that an arbitration agreement was enforceable and applied to statutory discrimination claims, rejecting plaintiff's "speculat[ion]" that the designated arbitrators "will be biased." 500 U.S. at 30. While Plaintiffs seek belatedly to distinguish *Gilmer*, arguing that the arbitrator selection process in that case was different, Dkt. 80 at 7–8, Plaintiffs are unable to explain why the process here—where all parties indisputably agreed and knew, at the time of contracting, that the designated arbitrator of their disputes would be the Commissioner—gives Plaintiffs' allegations of bias any more weight. More to the point, Plaintiffs ignore the key premise underlying the Supreme Court's reasoning in *Gilmer* (and properly applied by this Court), which is that courts should "decline to indulge the presumption" that arbitrators will be biased, especially where the FAA already "protects against bias" through judicial review of arbitral awards. 500 U.S. at 30. As in *Gilmer*, Plaintiffs cannot show that those protections "are inadequate to guard against potential bias." *Id*. Their speculative claims of bias thus remain premature and provide no legitimate ground for reconsideration.

### C. Plaintiffs' Claims of Bias Do Not Render the Arbitration Agreements Unconscionable

The Court also correctly rejected Plaintiffs' argument—now raised multiple times—that "the risk" of bias on the Commissioner's part "renders the arbitration agreements unconscionable." Dkt. 76 at 24–26. In their improper bid to resurrect this failed argument, Plaintiffs once again fail to identify any controlling authority or fact that the Court overlooked.

Plaintiffs first challenge the Court's reading of *Garcia* v. *Church of Scientology Flag Organization, Inc*., 2021 WL 5074465 (11th Cir. Nov. 2, 2021), which the Court properly relied on to conclude that Florida law, which governs Mr. Flores's agreement with the Dolphins, requires that agreement to be enforced. Dkt. 76 at 25–26. In *Garcia*, the Eleventh Circuit upheld an arbitral award, notwithstanding "various comments made by the lead arbitrator reflecting bias in favor" of

defendants. 2021 WL 5074465, at *12. The Eleventh Circuit further held, faced with the same facts, that the agreement to arbitrate was not unconscionable under Florida law, because the plaintiffs there, as here, did not meet their burden to prove both procedural and substantive unconscionability. *Id*. at *9. While Plaintiffs quibble with how the Court characterized these two holdings, and again point to superficial differences in the arbitration procedures at issue, Dkt. 80 at 8–10, *Garcia* fully supports the Court's conclusion. *Garcia* establishes that, where parties have "agreed to a method of arbitration" that arguably contains some risk of "inherent partiality," they "cannot . . . seek to vacate [an] award based on that very partiality," much less refuse to comply with their agreement to arbitrate from the outset. 2021 WL 5074465, at *12.

Plaintiffs next take aim at the Court's analysis of four federal court decisions that Plaintiffs "rel[ied] heavily on" to support their unconscionability challenge. Dkt. 80 at 11–13; Dkt. 76 at 25. Plaintiffs have sought to analogize to those cases multiple times before, first in their unsuccessful motion seeking discovery, Dkt. 54 at 3, then again in their opposition to Defendants' motion to compel arbitration. Dkt. 62 at 11–15. The Court has now considered and rejected those arguments *twice*, correctly finding both times that Plaintiffs' cited cases are "inapposite." Dkt. 76 at 25; *see* Dkt. 58 at 5–6. In *Hooters of America, Inc*. v. *Phillips*, 173 F.3d 933, 939 (4th Cir. 1999), *McMullen* v. *Meijer, Inc*., 355 F.3d 485, 488 (6th Cir. 2004), and *Walker* v. *Ryan's Family Steak Houses, Inc*., 400 F.3d 370, 386 (6th Cir. 2005), the courts declined to enforce arbitration agreements where, among other one-sided terms not present here, one party effectively had "unrestricted control" over the potential pool of arbitrators. *Hooters*, 173 F.3d at 939. As the Court noted, the arbitration agreements here are fundamentally different, in that they "grant Defendants no discretion over the choice of the arbitrator: it must be the NFL Commissioner" in the first instance, as all parties knew at the time of contracting. Dkt. 76 at 25. Indeed, Plaintiffs

themselves acknowledge that here the Commissioner was designated as the arbitrator "up front," and in the express terms of the contracts themselves. Dkt. 80 at 12. *Pokorny* v. *Quixtar, Inc.*, 601 F.3d 987 (9th Cir. 2010), is similarly distinguishable, as the Court noted, because the agreement in that case, unlike here, allowed defendants to "use[] the threat of financial hardship" (in the form of additional fees) to skew the arbitrator selection process in their favor. Dkt. 76 at 25 n.24.

Plaintiffs do not meaningfully engage with the Court's careful analysis distinguishing these cases. Instead, Plaintiffs merely reiterate their presupposition that, because of the Commissioner's alleged bias, the arbitration process here is likely to be "far worse" than what was contemplated in their cited cases. Dkt. 80 at 11–13. This is exactly the kind of unfounded speculation that this Court properly declined to entertain, and Plaintiffs identify no controlling authority—other than the same cases they have repeatedly cited—that compels a ruling otherwise.

Plaintiffs also rehash their prior contention that this Court should follow two non-binding decisions from other jurisdictions in which courts, in circumstances not present here, declined to enforce arbitration agreements designating sports league commissioners as arbitrators. *Id.* at 13–14 (citing *Nostalgic Partners LLC* v. *New York Yankees P'ship*, No. 656724/2020 (N.Y. Sup. Ct. Dec. 17, 2021); *Gruden* v. *NFL*, No. A-21-844043-B (Nev. Dist. Ct. Clark Cty. Oct. 12, 2022)); Dkt. 62 at 10; Dkt. 68.[2] The Court properly declined that invitation, for the simple reason that,

---

[2]    The NFL has appealed the decision in *Gruden*, and proceedings in that matter have been stayed pending resolution of that appeal. In any event, as Defendants have previously explained, Dkt. 69, the Nevada state court's decision in *Gruden* is inapposite because, among many other crucial distinctions, the plaintiff in that case has asserted no claims against any clubs, unlike here, where Plaintiffs have expressly asserted claims against the clubs that employed them and with which they entered into binding arbitration agreements. As for *Nostalgic Partners LLC*, the New York state court's decision in that case arose in a distinguishable context—a dispute between an MLB club and a minor league club—and the matter was settled before an appeal from that decision could be resolved. No. 2022-00539 (N.Y. App. Div. Jan. 19, 2023).

because those cases arose under inapplicable state law, they are "not controlling." Dkt. 76 at 25 n.25. Plaintiffs do not explain how this was error, other than to argue, without any citation to case law, that "the standards for unconscionability are similar in each jurisdiction." Dkt. 80 at 13. Even if that were true, the Court's decision to adhere to controlling precedents rather than follow non-binding, inapplicable state court decisions was plainly proper.

Recognizing that they have failed to demonstrate any substantive unconscionability, Plaintiffs also attempt, belatedly, to pivot to a theory they mentioned only in passing in their prior briefing, asserting repeatedly that their arbitration agreements were "take-it-or-leave-it" contracts that Plaintiffs supposedly had no "power to negotiate." *Id*. at 6, 11–12. These suggestions of procedural unconscionability are not only false—as stated, there is no question that Plaintiffs, each a sophisticated and experienced coach, negotiated these highly lucrative contracts at arm's length—they are also belied by Plaintiffs' prior actions. Until now, Plaintiffs have deliberately avoided advancing or developing arguments based on procedural unconscionability (recognizing, no doubt, that such arguments would stretch credulity).[3] In fact, Plaintiffs effectively conceded that they cannot demonstrate procedural unconscionability by suggesting that this is the "exceptional case[]" where substantive unconscionability alone can suffice. Dkt. 62 at 8 n.6. Plaintiffs' belated efforts to manufacture a showing of procedural unconscionability, now that they have come up short on the substantive prong, is thus, at best, an impermissible bid to "present[] . . . [a] new theor[y]" under the guise of a motion for reconsideration. *Grubea*, 319 F. Supp. 3d at 751 (citation omitted). It is also, in any event, meritless: the applicable state laws require courts

---

[3] In their prior briefing, Plaintiffs suggested only in footnotes, and in wholly cursory fashion, that "Plaintiffs did not negotiate" the arbitration agreements contained in their employment contracts. Dkt. 62 at 18 n.14; *see id*. at 8 n.6; Dkt. 67 at 3 n.2. Plaintiffs have never offered any factual support for this assertion, no doubt recognizing what is already obvious from the face of their employment contracts: that each of those contracts was highly negotiated.

to consider both procedural and substantive unconscionability,[4] and Plaintiffs can show neither.

The arguments raised by Plaintiffs' *amici* are similarly unavailing.  In their brief, *amici* largely duplicate Plaintiffs' laundry list of criticisms against the Commissioner, *compare* Dkt. 88 at 11 *with* Dkt. 62 at 6–8, 14, all of which the Court has already considered and deemed insufficient to set aside these arbitration agreements.  Dkt. 76 at 22–26.

Because Plaintiffs and their *amici* identify nothing that the Court overlooked, there is no reason to reconsider Plaintiffs' unconscionability-based challenges to the arbitration agreements.

## II.   PLAINTIFFS ARE NOT PREVENTED FROM VINDICATING THEIR RIGHTS IN ARBITRATION

In enforcing Plaintiffs' arbitration agreements, the Court appropriately rejected Plaintiffs' corollary and conclusory argument that the Commissioner's "alleged bias would prevent them from effectively vindicating" their statutory rights in arbitration.  *Id*. at 24.  As this Court noted, "[t]he Supreme Court has recognized two types of arbitration agreements" that may be set aside under the effective vindication doctrine:  agreements that "forbid[] the assertion of certain statutory rights," and agreements that impose arbitration fees "so high as to make access to the forum impracticable."  *Id*. (citation omitted).  Because Plaintiffs' allegations of arbitrator bias "fall[] into neither category," the Court properly held—consistent with a long line of controlling precedents confirming that employment disputes involving statutory rights can be arbitrated—that the effective vindication doctrine does not apply.  *Id*.; *see* Dkt. 48 at 11–12 (citing cases).

In their motion, Plaintiffs make another run at this failed argument, relying on two out-of-

---

[4]   Florida and Tennessee law, which govern Mr. Flores's agreement with the Dolphins and Mr. Horton's agreement with the Titans, require courts to weigh both procedural and substantive unconscionability.  Dkt. 64 at 3.  Mr. Wilks's agreement with the Cardinals contains a valid delegation provision which, as the Court correctly held, requires issues of arbitrability— including any potential unconscionability under governing Arizona law—to be determined by an arbitrator.  Dkt. 76 at 15–17.

circuit cases that they already cited in their prior briefing, Dkt. 62 at 12 n.9, 15–16, and which the Court already expressly considered and distinguished.  Dkt. 76 at 24 n.22.  Contrary to Plaintiffs' arguments, neither case establishes that a "neutral" arbitrator is an "obligatory component" under the effective vindication doctrine.  Dkt. 80 at 15.  As the Court correctly noted, the decision in *Cole* v. *Burns International Security Services*, 105 F.3d 1465, 1480–83 (D.C. Cir. 1997), which upheld the validity of an arbitration agreement, nowhere states that "lack of access to a neutral arbitrator [is] dispositive" of whether parties can effectively vindicate their rights in arbitration. Dkt. 76 at 24 n.22.  *Floss* v. *Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 314 (6th Cir. 2000), is similarly inapposite, given that, as this Court noted, the Sixth Circuit "expressly" declined to resolve the issue of effective vindication.  Dkt. 76 at 24 n.22.[5]  Plaintiffs' renewed attempt at this argument thus fails under the strict standard for reconsideration and on the merits.

## III.    THE COURT'S DECISION IS FULLY CONSISTENT WITH CONTROLLING LAW AND NEED NOT BE DISTURBED

Unable to point to any clear error in the Court's decision, Plaintiffs finally assert, in vague and conclusory terms, that the Court should reverse its careful reasoning in order to prevent "manifest injustice."  Dkt. 80 at 15–16.  In support, Plaintiffs mischaracterize the Court's decision as an unprecedented ruling that opens the door to "egregious abuse by employers of arbitration agreements."  *Id*. at 1.  These self-serving criticisms of the Court's decision (which Plaintiffs' *amici* duplicate in their own brief, Dkt. 88 at 12–14) are wholly unfounded.

Indeed, the Court's decision to enforce Plaintiffs' valid and binding arbitration agreements

---

[5]    Contrary to Plaintiffs' arguments, Dkt. 80 at 15, *Floss* also does not support a finding of unconscionability.  The Court has already distinguished the arbitration agreements in *Floss*, which were "identical" to the agreement in *Walker* and effectively gave defendants unilateral control over the pool of potential arbitrators, unlike here, where the parties have jointly designated the Commissioner as arbitrator and Defendants have no such discretion.  Dkt. 76 at 25–26; *Walker*, 400 F.3d at 378–79, 386.

is fully consistent with, and compelled by, controlling law. As the Court properly recognized, the FAA reflects a "liberal federal policy favoring arbitration agreements." Dkt. 76 at 6 (citation omitted). The FAA's "preference for enforcing arbitration agreements applies even when the claims at issue are federal statutory claims," including "claims arising under a statute designed to further important social policies." *Parisi* v. *Goldman, Sachs & Co.*, 710 F.3d 483, 486–87 (2d Cir. 2013). As the Supreme Court and numerous other courts have confirmed (and even Plaintiffs' *amici* acknowledge, Dkt. 88 at 6), statutory claims of employment discrimination can be and routinely are subject to mandatory arbitration. *Gilmer*, 500 U.S. at 26; *see* Dkt. 48 at 11–12. Far from "upend[ing] decades of jurisprudence," Dkt. 80 at 15, the Court's decision is entirely in line with longstanding precedents reaffirming the enforceability of arbitration agreements like the ones Plaintiffs entered into here. Plaintiffs' implicit invitation, echoed by their *amici*, to revisit binding Supreme Court precedent and engage in judicial abrogation of the FAA—overriding the clear intent behind that statute and doing what Congress has declined to do—should be rejected.

In sum, Plaintiffs cannot show, and have not shown, that the Court's decision to enforce the parties' express arbitration agreements is anything but a correct outcome. Importantly, the Court's decision in no way endorses "unfair or unconscionable" arbitration agreements, *id.* at 16, and does not erode any of the valid defenses that parties in other contexts may assert against truly unenforceable or unconscionable arbitration agreements. The Court's decision holds simply that *the agreements here*—where NFL coaches and their employer clubs negotiated at arms' length and mutually and knowingly agreed to arbitrate their disputes before the NFL Commissioner—can and should be enforced. Plaintiffs' and their *amici*'s personal dissatisfaction with that decision does not render it "unjust," and provides no basis for reconsideration.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Dated: New York, New York
March 31, 2023

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**

By:  */s/ Loretta E. Lynch*
Loretta E. Lynch
Brad S. Karp
Lynn B. Bayard
Brette Tannenbaum
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3900
lelynch@paulweiss.com
bkarp@paulweiss.com
lbayard@paulweiss.com
btannenbaum@paulweiss.com

*Attorneys for the National Football League, New York
Giants, Miami Dolphins, Denver Broncos, Houston
Texans, Arizona Cardinals, and Tennessee Titans*

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

85 FIFTH AVENUE
NEW YORK, NY 10003
TEL 212.257.6800
FAX 212.257.6845
WWW.WIGDORLAW.COM

**Mi  a l . Will  i**
mwill_mi_@wigdorlaw.com

April 11, 2023

**VIA ECF**

The Honorable Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square, Room 240
New York, New York 10007

      Re:    *Flores, et al. v. The National Football League, et al.*; No. 22 Civ. 00871 (VEC)

Dear Judge Caproni,

We represent Plaintiffs and respectfully request leave to file two documents in connection with Plaintiffs' opposition to Defendants' motion for reconsideration. These two documents directly pertain to arguments made for the first time in Defendants' motion for reconsideration. The two documents are attached to the proposed Declaration of Michael J. Willemin, which is attached hereto as Exhibit 1. Defendants "do not consent but [ ] otherwise take no position on [this] request."

The first document is an email from Pittsburgh Steelers ("Steelers") General Manager, Omar Khan. The email, which was sent contemporaneously with Mr. Flores' execution of his contract with the Steelers, is an agreement that nothing in that contract, including, of course, any purported agreement to arbitrate contained in the contract, or incorporated by reference, is intended to prejudice Mr. Flores' rights to prosecute his claims in this Court. This is critical, as it directly refutes Defendants' arguments that arbitration provisions contained in, or incorporated by reference into, the Steelers contract, serve to prejudice Mr. Flores by retroactively requiring arbitration of his claims.

The second document is a letter sent by Plaintiffs' counsel to National Football League Commissioner Roger Goodell. The letter was sent in response to a request made by the Miami Dolphins to Mr. Goodell seeking a determination by Mr. Goodell that the claims brought herein are subject to arbitration. The letter evidences the fact that Mr. Flores contemporaneously objected to the arbitration of the claims brought herein when he entered into an employment agreement with the Steelers. This renders this case distinguishable from the decision in <u>Masoner v. Educ. Mgmt. Corp.</u>, 18 F. Supp. 3d 652, 654 (W.D. Pa. 2014), which Defendants cite for the contention that the Steelers contract should apply retroactively.



The Honorable Valerie E. Caproni
April 11, 2023
Page 2

We apologize for the late nature of this request, which is being made contemporaneously with the filing of our opposition to Defendants' motion for reconsideration. Of course, to the extent that the request is denied, we understand that the Court will disregard our references to these two documents, which are contained at pages 16 and 18 of Plaintiffs' memorandum of law.

We thank Your Honor for the Court's time and consideration of this matter.

Respectfully submitted,

Michael J. Willemin

Encl.

cc: All counsel (via ECF)

# Exhibit 1

J.A. 1088

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
BRIAN FLORES, STEVE WILKS and RAY HORTON, as :
Class Representatives, on behalf of themselves and all :
others similarly situated, :          Civil Action No.: 22-cv-00871
:          (VEC)
                                    Plaintiffs, :
:
            v. :
:
:
THE NATIONAL FOOTBALL LEAGUE; NEW YORK :
FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; :
MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; :
DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER :
BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a :
HOUSTON TEXANS; ARIZONA CARDINALS :
FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; :
TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a :
TENNESSEE TITANS and JOHN DOE TEAMS 1 through :
26, :
:
                                    Defendants. :
-------------------------------------------------------------------- X

### DECLARATION OF MICHAEL J. WILLEMIN, ESQ. IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL RECONSIDERATION AND IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION

I, Michael J. Willemin, an attorney at law, duly licensed to practice law before the Courts

of the State of New York, hereby declare the following statements under penalties of perjury:

1.      I am a Partner at the law firm Wigdor LLP, attorneys for Plaintiffs Brian Flores,

Steve Wilks and Ray Horton in the above-captioned matter.  This Declaration is submitted in

connection with Plaintiffs' Opposition to Defendants' motion for partial reconsideration and in

further support of Plaintiffs' motion for partial reconsideration.

2.      Attached hereto as **Exhibit A** is a true and accurate copy of correspondence

between Omar Khan and John Elefterakis, dated February 19, 2022.

**J.A. 1089**

3. Attached hereto as **Exhibit B** is a true and accurate copy of correspondence from

Douglas H. Wigdor to Commissioner Roger Goodell, dated March 9, 2022.

4. I declare that the foregoing is true and correct under penalties of perjury.

Dated: April 11, 2023
New York, New York

By: _____
Michael J. Willemin

2

# Exhibit A



John Elefterakis
Saturday, February 19, 2022 12:52 PM
Khan, Omar <​REDACTED​>
Re: Contract

Omar,

Annexed hereto please find executed agreement. Please send when endorsed on your end.

Thanks.

John Elefterakis
Elefterakis, Elefterakis & Panek

On Feb 19, 2022, at 11:42 AM, Khan, Omar <​REDACTED​> wrote:

John,
Attached is the contract for Coach.
This employment agreement is not intended to infringe in any way on the lawsuit filed
by Coach Flores in February 2022, which is currently pending. The Club and Coach
Flores do not intend for anything in this employment agreement to infringe upon
Coach Flores' right to prosecute the pending lawsuit, and neither does this agreement
infringe upon the rights of the NFL or any party to the lawsuit in asserting any defenses
in the lawsuit.
Thanks,
Omar

**DISCLAIMER FOR ELECTRONIC COMMUNICATIONS NOTICE TO RECIPIENTS:
The information contained in (and attached to) this e-mail is intended only for the personal
and confidential use of the designated recipient(s) named above. This message may be an
attorney/client communication and as such is privileged and confidential. If the reader of this
message is not the intended recipient, you are hereby notified that you have received this
document in error and that any review, dissemination, distribution or copying of this message

is strictly prohibited. If you received this communication in error, please notify us immediately by reply e-mail, and delete the original message (including attachments).

# Exhibit B

J.A. 1094

**WIGDOR LLP**

ATTORNEYS AND COUNSELORS AT LAW

85 FIFTH AVENUE
NEW YORK, NY 10003
TEL 212.257.6800
FAX 212.257.6845
WWW.WIGDORLAW.COM

**Douglas H. Wigdor**
dwigdor@wigdorlaw.com

March 9, 2022

**VIA EMAIL**

Mr. Roger Goodell
Commissioner
National Football League
325 Park Avenue
New York, NY 10154

      Re:    *Flores v. The National Football League, et al*.; Case No. 22 Civ. 00871 (VEC)

Dear Commissioner Goodell,

We, along with Elefterakis, Elefterakis and Panek, represent Brian Flores. We write in response to the letters submitted by the Miami Dolphins, Ltd. ("Miami" or the "Dolphins") on February 17 and 18, 2022 (the "Letters"). Together, the Letters request that you compel arbitration of all disputes between Mr. Flores and the Dolphins, including the claims of race discrimination and other wrongdoing alleged against the Dolphins in *Flores v. The National Football League, et al.*, Civil Action No: 1:22 Civ. 00871(VEC) (the "Federal Action"). For the reasons outlined herein, we request that you reject Miami's request to arbitrate its disputes with Mr. Flores because arbitration—which is conducted behind closed doors and outside the public eye—is contrary to all notions of transparency, accountability and fundamental fairness. If the National Football League ("NFL" or the "League") is truly committed to racial justice and equality, it will not attempt to force Mr. Flores' claims into arbitration.[1]

As you know, Mr. Flores recently filed the Federal Action, in which he alleges systemic race discrimination in the NFL with respect to the hiring, treatment, retention and termination of Black executives, Head Coaches and Coordinators. Miami, one of the Defendants in the Federal Action, is alleged to have engaged in race discrimination in connection with its treatment and termination of Mr. Flores. In addition, the owner of the Dolphins, Stephen Ross, unsuccessfully attempted to bribe Mr. Flores to lose games and engage in tampering, all in violation of, *inter alia*, League rules. This obviously implicates the integrity of the game.

---

[1]      The submission of this letter is without prejudice to Mr. Flores' arguments as to the unenforceability or inapplicability of arbitration as to the claims brought in the Federal Action or otherwise. We submit this letter only with the hope that you and the NFL will just do the right thing and voluntarily permit Mr. Flores' claims against Miami to proceed in Court so that the public can enjoy full access to the proceedings. Legal arguments are only properly made in the context of a motion to compel arbitration in the Federal Action. Miami's decision to seek redress with the Commissioner's office is an inappropriate attempt to circumvent the authority of the Federal Court.



**WIGDOR LLP**
ATTORNEYS AND COUNSELORS AT LAW

The NFL immediately—without any investigation whatsoever, and contrary to a mountain of statistical and anecdotal evidence—declared that Mr. Flores' claims were "without merit." Perhaps reali ing that this assertion was indefensible, you subsequently acknowledged in a letter to the 32 teams that the current lack of diversity with respect to NFL coaches is "unacceptable." In the same letter you vowed to "reevaluate" the League's diversity, equity and inclusion policies. The NFL further stated that it would investigate Mr. Flores' allegations of tampering and attempted tanking.

Then, in the lead up to Superbowl LVI, you were asked whether the NFL's policies and practices require an "overhaul." You said, "You don't take anything off the table. If it requires changes in other areas, you do it." These sentiments are consistent with many other public pronouncements by you and other senior NFL executives that there is a "double standard" in the NFL for Black coaches and executives and that the League is committed to racial justice. Yet, despite these repeated assertions, nothing has changed. In fact, to make matters worse, when we extended an opportunity to you and the NFL to sit down with a truly neutral mediator to discuss and attempt to resolve these matters by entering into a binding agreement to implement meaningful change, accountability and oversight, you rejected that proposal out of hand.[2]

If the League is genuinely interested in eradicating discrimination and ensuring the integrity of the game, the bare minimum that the League can do is reject Miami's request to arbitrate these important claims.

To that end, one thing that we should all be able to agree on is that a fair and just adjudication of Mr. Flores' claims is impossible without transparency. Accountability requires transparency. NFL coaches (and candidates), players and the public at large deserve that transparency. Arbitration is not transparent. Indeed, arbitration is by its very nature a secretive process that takes place behind closed doors and outside of the public eye. The lack of transparency in arbitration only serves to continue the *status uo*—which in this case, is one that you have conceded must be fairly evaluated and potentially overhauled. That cannot happen in arbitration.

In addition to being secret and confidential, it is a well-accepted fact that arbitration presents a barrier to justice for victims of discrimination and other misconduct. Arbitration takes away two of the American justice system's most sacred rights: (i) a public trial; and (ii) a trial by a jury of one's peers. At the same time, arbitration provides the protection of secrecy for perpetrators of discrimination. This double-edged sword perpetuates discrimination and unlawful misbehavior in

---

[2]    The NFL has offered to have a conversation with Mr. Flores to 'hear his ideas.' However, given its refusal to agree to a neutral mediation process, it is obvious that the NFL has extended this "offer" only as a public relations stunt to look good while continuing to reject real change, accountability and oversight. History has demonstrated that when left to its own policing, the NFL will do nothing more than return to business as usual. Indeed, in relation to the Washington Commanders, you were recently quoted as saying, "I do not see a way that a team can do its own investigation of itself." The same is true for the NFL.

J.A. 1096



the workplace and allows corporate entities—such as the NFL and the Dolphins—to carry out discrimination and avoid appropriate accountability.

You said you would not take anything "off the table" in your efforts to create change. Doing away with arbitration so there is public transparency and accountability would be a good first step.

In recognition of the inherent unfairness of arbitration, in February 2022, with rare bipartisan support, the House and Senate passed the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the "Act"). The Act, which was signed into law last week, is a landmark bill that bans companies from forcing victims of sexual harassment and sexual assault to sign away their right to go to court through pre-dispute arbitration agreements. However, this legislation, which is a historic victory for the MeToo movement, does not address race discrimination. That said, legislation to end forced arbitration in all discrimination cases has been proposed, and many companies, including Google, have taken the lead and gotten out ahead of any future legislation by ending forced arbitration altogether, including for race discrimination claims.

Just as Google is a leader in the tech world, the NFL is a leader in the sports, entertainment and media worlds. Its platform is powerful and virtually limitless. People throughout the world—including younger generations of children—look up to the NFL to demonstrate fairness and uphold appropriate ethical standards. This platform carries with it a moral obligation to be at the forefront of social justice movements—which the NFL has claimed to do by placing social justice slogans in end ones and other visible places. That moral obligation must extend beyond mere slogans and into action. The NFL must "walk the walk" and be willing to take actual steps to promote diversity, equality and inclusion—which you have directly said is "critical to our [the NFL's] continued success." It is impossible for the NFL to "walk to walk" while simultaneously forcing claims of race discrimination, and related claims, into arbitration.

As such, we are calling upon you, as the Commissioner, to reject the Dolphins' request for arbitration. We also are hopeful that, upon reading this letter and reflecting further, the Dolphins will reconsider their position and withdraw their arbitration request so that Mr. Flores' claims of race discrimination and other unlawful conduct can be heard in a fair and transparent manner, in front of a judge and a jury of his peers. If the NFL is truly committed to "ending racism," as it has repeatedly claimed, the League will reject Miami's request for arbitration. Race discrimination cannot be eradicated behind closed doors and the integrity of the game depends on transparency.

Regards,

Douglas H. Wigdor

cc:    John Elefterakis, Esq., Jeffrey Pash, Esq. and Myles Pistorius, Esq. (*via* email)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

BRIAN FLORES, STEVE WILKS and RAY    :
HORTON, as Class Representatives, on behalf of  :
themselves and all others similarly situated,    :
       :
         Plaintiffs,     :
       :
     v.       :
       :
THE NATIONAL FOOTBALL LEAGUE; NEW  :    Civil Action No.: 22-cv-00871 (VEC)
YORK FOOTBALL GIANTS, INC. d/b/a NEW  :
YORK GIANTS; MIAMI DOLPHINS, LTD.   :
d/b/a MIAMI DOLPHINS; DENVER BRONCOS :
FOOTBALL CLUB d/b/a DENVER BRONCOS;  :
HOUSTON NFL HOLDINGS, L.P. d/b/a    :
HOUSTON TEXANS; ARIZONA CARDINALS  :
FOOTBALL CLUB LLC d/b/a ARIZONA    :
CARDINALS; TENNESSEE TITANS     :
ENTERTAINMENT, INC. d/b/a TENNESSEE  :
TITANS and JOHN DOE TEAMS 1 through 26,  :
       :
         Defendants.    :

------------------------------------------------------------ X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL RECONSIDERATION AND IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION REGARDING THE COURT'S MARCH 1, 2023 ORDER

**WIGDOR LLP**

Douglas H. Wigdor
Michael J. Willemin
David E. Gottlieb

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
dgottlieb@wigdorlaw.com

*Counsel for Plaintiffs*

**ELEFTERAKIS, ELEFTERAKIS & PANEK**

John Elefterakis
Nicholas Elefterakis
Raymond Panek
Johnson Atkinson

80 Pine Street, 38th Floor
New York, New York 10005
Telephone: (212) 532-1116
Facsimile: (212) 532-1176

*Counsel for Plaintiffs*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .....................................................................................1

I.     DEFENDANTS' MOTION FOR RECONSIDERATION SHOULD BE DENIED ..........2

     A.     The Court Directly Followed Massachusetts Law ....................................................2

          i.     The Arbitration Provision of the NFL Constitution is an Illusory and Unenforceable Agreement under Massachusetts Law .................................2

          ii.     The Unilateral Modification Provision Cannot Be "Severed" ...................11

          iii.     The Court Did Not Engage in Any Unique Application of the Law .........13

     B.     The Flores-Steelers Contract Does Not Require Arbitration of Claims Against the Giants or Texans .......................................................................................14

          i.     The Steelers Agreed that the Flores-Steelers Contract Would Not Impact Mr. Flores' Rights to Prosecute this Action ................................15

          ii.     The Steelers Contract Does Not Apply Retroactively ..............................16

          iii.     The Constitution Is Illusory Under Pennsylvania Law ............................19

II.     PLAINTIFFS' MOTION FOR RECONSIDERATION SHOULD BE GRANTED ........21

CONCLUSION .............................................................................................................25

J.A. 1099

# TABLE OF AUTHORITIES

Cases                                                                                           Page(s)

Am. Fam. Life Assur. Co. of N.Y. v. Baker,
   848 Fed. App'x 11 (2d Cir. 2008) ......................................................................... 12

Bernstein v. W. B. Mfg. Co.,
   238 Mass. 589 (Mass. 1921) ................................................................................ 14

Buttrick v. Intercity Alarms LLC,
   No. 09-P-1594, 2010 WL 2609364 (Mass. App. Ct. July 1, 2010) ....................... 7, 8

Cadrin v. New England Tel. & Tel. Co.,
   828 F. Supp. 120 (D. Mass. 1993) ........................................................................ 5

Crump v. MetaSource Acquisitions, LLC,
   373 F. Supp. 3d 540 (E.D. Pa. 2019) ........................................................ 19, 20, 21

Daniels v. Raymours Furniture Co., Inc.,
   No. 13 Civ. 11551 (MLW), 2014 WL 1338151 (D. Mass 2014) ..................... 7, 9, 10

Domenichetti v. The Salter School, LLC,
   No. 12 Civ. 11311 (FDS), 2013 WL 1748402 (D. Mass. April 19, 2013) ............... 5

Douglas v. Johnson Real Estate Investors, LLC,
   470 Fed. Appx. 823 (11th Cir. 2012) .................................................................... 5

Dumitru v. Princess Cruise Lines, Ltd.,
   732 F. Supp. 2d 328 (S.D.N.Y. 2010) ................................................................. 12

Eiess v. USAA Fed. Savings Bank,
   404 F. Supp. 3d 1240 (N.D. Cal. 2019) ............................................................... 14

Emmanuel v. Handy Techs, Inc.,
   442 F. Supp. 3d 385 (D. Mass 2020) .............................................................. 11, 12

Fawcett v. Citizens Bank, N.A.,
   297 F. Supp. 3d 213 (D. Mass 2018) ............................................................. 2, 3, 6

Ferguson v. Host. Intern. Inc.,
   757 N.E.2d 267 (Mass. App. Ct. 2001) ................................................................ 10

FL-Carrollwood Care, LLC v. Gordon,
   72 So. 3d 162 (Fla. 2d D.C.A. 2011) ................................................................... 23

Foshey v. Home Depot USA, Inc.,
  No. CV 12-11866 (DJC), 2013 WL 12210107 (D. Mass. Aug. 26, 2013) ............................... 12

Garcia v. Church of Scientology Flag Service Organization, Inc.,
  No. 18-13452, 2021 WL 5074465 (11th Cir. Nov. 2, 2021) .................................................... 24

Geisinger Clinic v. Di Cuccio,
  414 Pa.Super. 85, 606 A.2d 509 (1992) ................................................................................. 20

Gilbert nor Joulle, Inc. v. Simmons,
  2011 WL 7090714 (Mass. Sup. Ct. Dec. 5, 2011) .................................................................. 11

Gilbert v. Dell Technologies, Inc.,
  415 F. Supp. 3d 389 (S.D.N.Y. 2019) .............................................................................. 7, 8, 9

Gill v. Richmond Co-op. Ass'n,
  309 Mass. 73 (Mass. 1941) ................................................................................................... 14

Gilmer v. Interstate/Johnson Lane Corp.,
  500 U.S. 20 (1991) ........................................................................................................... 22, 24

Graphic Arts Finishers, Inc. v. Bos. Redevelopment Auth.,
  255 N.E.2d 793 (Mass. 1970) ............................................................................................... 14

Herrera v. Katz,
  532 F. Supp. 2d 644 (S.D.N.Y. 2008) ................................................................................... 12

Hoelzle v. Vensure Emp. Servs., Inc.,
  No. 2:20 Civ. 00473 (KSM), 2022 WL 507481 (E.D. Pa. Feb. 18, 2022) ............................ 21

Hooters of America Inc. v. Phillips,
  173 F. 3d 933 (4th Cir. 1999) ............................................................................................... 24

Jackson v. Action for Boston Comm. Development, Inc.,
  525 N.E. 2d 411 (Mass. 1988) ........................................................................................ passim

Kristian v. Comcast Corp.,
  446 F.3d 25 (1st Cir. 2006) ................................................................................................... 22

LeMaitre v. Mass. Turnpike Auth.,
  876 N.E.2d 888 (Mass. App. Ct. 2007) ................................................................................. 10

Machado v. System4 LLC,
  28 N.E.3d 401 (Mass. 2015) ............................................................................................ 11, 12

J.A. 1101

Maint. Specialties, Inc. v. Gottus,
    455 Pa. 327, 314 A.2d 279 (1974) ........................................................... 20

Masoner v. Educ. Mgmt. Corp.,
    18 F. Supp. 3d 652 (W.D. Pa. 2014)................................................... 17, 18

McMullen v. Meijer, Inc.,
    355 F.3d 485 (6th Cir. 2004) ................................................................ 24

McNamara v. S.I. Logistics, Inc.,
    No. 17 Civ. 12523 (ADB), 2018 WL 6573125 (D. Mass. Dec. 13, 2018) ............................... 6

National Fed. Of the Blind v. The Container Store, Inc.,
    No. 15 Civ. 12984, 2016 WL 4027711 (NMG) ............................................... 5

Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n,
    820 F.3d 527 (2d Cir. 2016)................................................... 21, 22, 23, 24

O'Brien v. New England Telephone & Telegraph Co.,
    664 N.E.2d 843 (Mass. 1996) ............................................... 3, 4, 13, 14

Opals on Ice Lingerie v. Body Lines Inc.,
    320 F.3d 362 (2d Cir. 2003).................................................................. 13

Pearson v. John Hancock Mut. Life Ins. Co.,
    979 F.2d 254 (1st Cir. 1992)................................................................. 5

Pokorny v. Quixtar, Inc.,
    601 F. 3d 987 (9th Cir. 2010) .............................................................. 24

Ragone v. Atlantic Video at Manhattan Center,
    595 F. 3d 115 (2d Cir. 2010)................................................................. 12

SCF Consulting, LLC v. Barrack, Rodos & Bacine,
    644 Pa. 273, 175 A.3d 273 (2017) ........................................................... 20

Scott v. Educ. Mgmt. Corp.,
    662 F. App'x 126 (3d Cir. 2016) ............................................................ 18

Scott v. Educ. Mgmt. Corp.,
    No. 2:14 Civ. 537, 2015 WL 12912386 (W.D. Pa. Mar. 11, 2015)............................ 18

Sutherland v. Ernst & Young LLP,
    847 F. Supp. 2d 528 (S.D.N.Y. 2012)....................................................... 22

J.A. 1102

<u>Williams v. Nat'l Football League,</u>
   582 F.3d 863 (8th Cir. 2009) ................................................................ 24

<u>Winfrey v. Simmons Foods, Inc.,</u>
   495 F.3d 549 (8th Cir. 2007) ................................................... 21, 23

<u>Other Authorities</u>

9 U.S.C. §200............................................................................................. 1

9 U.S.C. § 2............................................................................................... 22

J.A. 1103

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants'

motion for partial reconsideration (Dkt. Nos. 81-82) and in further support of Plaintiffs' motion

for partial reconsideration (Dkt. Nos. 79-80) regarding the Court's March 1, 2023 order partially

granting and partially denying Defendants' motion to compel arbitration (the "Order").

## PRELIMINARY STATEMENT

At the core of this dispute, the NFL literally takes the position that the law does not make

a "neutral arbitrator an obligatory component" of arbitrations, even for statutory discrimination

claims.  See Dkt. No. 89 at 12.  Respectfully, the Court should in the strongest possible terms

disclaim this proposition which threatens to upend Congressional intent with respect to both the

anti-discrimination laws and the Federal Arbitration Act.  We do not ask the Court to treat

arbitration agreements differently than any other contract, nor do we ask the Court to engage in

any policy-based decision.  Rather, Plaintiffs respectfully request nothing other than the Court's

careful review of and adherence to the applicable law which respectfully *requires* reconsideration

of certain aspects of the Court's Order which permit enforcement of unconscionable contracts.

Under the Federal Arbitration Action, 9 U.S.C. §200 *et seq*. ("FAA") and its interpretive

case law, there is no question that unconscionable contracts are unenforceable.  Full stop.  The

Court respectfully overlooked the facts and the law when it broadly held that the doctrine of

unconscionability effectively does not apply here because "the parties to an arbitration can ask

for no more impartiality than inheres the method they have chosen."  Dkt. No. 76 at 22.

Defendants have provided no meaningful rebuttal to Plaintiffs' explanations as to how the Court

respectfully misinterpreted the case law on which the decision relied.

Furthermore, Defendants' motion for reconsideration seeks a misapplication of

Massachusetts law to the NFL Constitution and Flores-Patriots contract, premised in large part

1

on Defendants' blatant misstatement—literally ignoring critical language—in the Court's Order, as well as a failure to meaningfully review the applicable case law dealing with illusory contracts. Finally, perhaps because it is unbeknownst to the NFL, Defendants are wrong that the Flores-Steelers contract (signed after this action was commenced) dictates arbitration of this matter, as the Steelers expressly agreed in writing that the contract would not "infringe upon Coach Flores' right to prosecute the pending lawsuit." Separately, Pennsylvania law nonetheless dictates that the NFL Constitution's arbitration provision is illusory.

For these reasons, and others described below, Plaintiffs respectfully request that the Court grant their motion for reconsideration and deny Defendants' motion.

## I. DEFENDANTS' MOTION FOR RECONSIDERATION SHOULD BE DENIED

### A. The Court Directly Followed Massachusetts Law

#### i. The Arbitration Provision of the NFL Constitution is an Illusory and Unenforceable Agreement under Massachusetts Law

Despite a substantial body of Massachusetts case law confirming that a contract may be deemed illusory and unenforceable where one party unilaterally reserves the right to change terms without notice, Defendants nonetheless argue that the Court "erred" and "overlooked" the law. The Court did not.

The crux of Defendants' argument is that the Court improperly interpreted <u>Fawcett v. Citizens Bank, N.A.</u>, 297 F. Supp. 3d 213, 221 (D. Mass 2018) for the proposition that mere unilateral modification provisions can render a contract illusory. In seeking reconsideration, Defendants conveniently *ignored* the language in this Court's order and in <u>Fawcett</u> which specifies that a unilateral modification provision can render a contract illusory where one side can make such changes ***without notice***. <u>See</u> Dkt. No. 76 at 21 (specifying "without notice"), contrast with, Dkt. No. 82 at 4-5 ("the Court's sole basis for declining to enforce Mr. Flores'

agreement to arbitrate under the NFL Constitution was its finding that, under Massachusetts law, an arbitration agreement with unilateral modification provisions is 'illusory' and therefore unenforceable").  Defendants' glaring failure to acknowledge or address this critical notice aspect of the Order undermines their entire interpretation of the law and request for reconsideration.

Defendants argue that that <u>Fawcett</u> was based on an improper reading of <u>Jackson v. Action for Boston Comm. Development, Inc.</u>, 525 N.E. 2d 411 (Mass. 1988) which was later clarified in <u>O'Brien v. New England Telephone & Telegraph Co.</u>, 664 N.E.2d 843, 846 (Mass. 1996).  But Defendants are simply wrong.  <u>O'Brien</u> did not in any manner reverse or undermine <u>Jackson</u>; rather, it expressly *affirmed* <u>Jackson</u>.  <u>O'Brien</u>, 664 N.E.2d at 847.  For that reason, even post-<u>O'Brien</u>, no fewer than five separate federal district and appellate courts came to the same conclusion as this Court, finding that a unilateral modification provision can render unenforceable a contract under the applicable circumstances—including, *inter alia*, the lack of a notice provision.  Defendants are not entitled to reconsideration when this Court followed the law consistently with numerous other courts.

A review of the development of the case law is instructive here.  In 1988, the <u>Jackson</u> court addressed an employee's claim for breach of contract based on the theory that an employee handbook provided him with contractual rights to be free from discharge absent the employer's compliance with a defined grievance process.  The <u>Jackson</u> court found that no contractual relationship had been established to overcome the employment at-will doctrine, in part because "[i]t is undisputed that the defendant retained the right to modify unilaterally the personnel manual's terms.  This tends to show that any 'offer' made by the defendant in distributing the manual was illusory."  <u>Id.</u> at 415-416.  In reaching its holding, the court noted other factors

J.A. 1106

supporting the illusory nature of the contract, including that the employee handbook was not negotiated or negotiable.  Id.

Eight years later, in 1996, the O'Brien court reaffirmed its decision in Jackson.  O'Brien, 664 N.E.2d at 847 ("Principles stated in the *Jackson* opinion remain sound.").  In *dicta*, the O'Brien court went on to clarify that the "circumstances discussed in the *Jackson* opinion are not a rigid list of prerequisites [to contract formation], but rather explain factors that would make a difference or might make a difference in deciding whether the terms of a personnel manual were at least impliedly part of an employment contract."  Id.  Reiterating the holding in Jackson, the O'Brien court noted that the presence of negotiations over the terms of an employee handbook could be a factor that would "justify the conclusion that more than an at-will employment contract existed" as could be the fact that "the employer retained the right to unilaterally modify the terms of the manual because that made any offer in the manual illusory," among others.  Id. at 847-848.  However, the O'Brien court did not address the issue further given that the employer in that matter "***did not*** explicitly purport to retain the right to unilaterally modify the personnel manual."  Id. at 849 (emphasis added).

The clear mandate from both Jackson and O'Brien is that an employer's reservation of rights to unilaterally modify a contract is a critical factor—even if not completely dispositive— as to whether an employee handbook creates a contract.  However, both Jackson and O'Brien also confirm that other factors and circumstances may be considered in determining whether the parties could "reasonably conclude" that a contract had been created.  O'Brien, 664 N.E.2d at 848.  In this respect, the Court appropriately—and consistent with Massachusetts law— considered not only the NFL Constitution's express reservation of right to unilaterally modify the terms but also Defendants' ability to do so at any time ***without notice***.  In fact, had the Court

considered even further and additional factors present here (described below) it would only further bolster the propriety of that conclusion under the law.

Numerous federal courts interpreting Massachusetts law post-<u>Jackson</u> and post-<u>O'Brien</u> have considered this issue and reached the same conclusion as this Court; namely, that a unilateral modification provision can render a contract illusory. That is particularly the case if, *inter alia*, the unilateral modification provision does not require notice and if the contract is not negotiated. <u>See</u> <u>e.g.</u> <u>Pearson v. John Hancock Mut. Life Ins. Co.</u>, 979 F.2d 254, 256-57 (1st Cir. 1992) (listing factors to be considered post-<u>Jackson</u> in determining contract formation, including whether handbook terms are "unilaterally modifiable, [] negotiated in a particular instance, [or] specially emphasized by the employer . . ."; applying these factors, finding employee handbook not a contract where employer could unilaterally modify the terms "without advance notice" and where there was "no evidence in the record suggesting that [employee and employer] negotiated concerning the contents of the manual"); <u>Cadrin v. New England Tel. & Tel. Co.</u>, 828 F. Supp. 120, 122 (D. Mass. 1993) (employee handbook not a contract where it was subject to unilateral amendment, was not negotiated and no special attention paid to the document by employer other than annual distribution to employees); <u>Douglas v. Johnson Real Estate Investors, LLC</u>, 470 Fed. Appx. 823 (11th Cir. 2012) (arbitration agreement unenforceable where employer could unilaterally modify the terms and employer had no obligation to obtain employee's signature or provide notice); <u>Domenichetti v. The Salter School, LLC</u>, No. 12 Civ. 11311 (FDS), 2013 WL 1748402 (D. Mass. April 19, 2013) (arbitration agreement unenforceable where employer could unilaterally modify the terms without notice); <u>National Fed. Of the Blind v. The Container Store, Inc.</u>, No. 15 Civ. 12984, 2016 WL 4027711 (NMG) (D. Mass. July 27, 2016) (arbitration agreement illusory where the terms were non-negotiable, one party could unilaterally modify

terms and do so without notice, including making the terms retroactive); Fawcett, 297 F. Supp. 3d at 221(arbitration agreement illusory where employer retained right to unilaterally modify terms, could do so without any notice and there was no restriction that such modifications would only apply prospectively); McNamara v. S.I. Logistics, Inc., No. 17 Civ. 12523 (ADB), 2018 WL 6573125, at *4 (D. Mass. Dec. 13, 2018) (arbitration agreement illusory where employer could unilaterally modify, no notice required, and could even have retroactive effect; "As a result, [employer] would be permitted to amend or terminate [the arbitration agreement], even if it had previously received notice of an existing arbitration dispute.").

In the matter at bar, an *abundance* of circumstances discussed in the case law demonstrate the illusory nature of the purported arbitration agreement contained in the NFL Constitution.  First, as already noted by the Court, the NFL Constitution states that the terms therein are subject to unilateral modification.  Second, as also acknowledged by the Court, the NFL Constitution including the arbitration provision can be modified "without notice."  Third, Mr. Flores had no ability to and did not negotiate any of the terms of the NFL Constitution. Fourth, while the Flores-Patriots contract contains a boilerplate provision stating that Mr. Flores has read the terms, there is no evidence that the Patriots or the NFL ever provided him with a copy of the document or that either entity took any affirmative steps to ensure that he was aware of the terms.[1]  Fifth, there is no evidence that the Patriots or the NFL reviewed the terms of the NFL Constitution with him during his employment.  Sixth, there is no express language contained anywhere in the NFL Constitution that the arbitration agreement is a contractual term. Seventh, by its nature, the NFL Constitution is an agreement between the NFL teams and the vast

---

[1]    Counsel represents to the Court that Mr. Flores does not recall ever being provided a copy of the NFL Constitution or being told where or how to access the document.  See Dkt. No. 62 at 9.  In responding to this representation, Defendants have only referred back to the contractual provision.  See Dkt. No. 64 at 7.

majority of terms involve the league management as opposed to being a comprehensive statement of reciprocal obligations between employer and employee, as is the case with employee handbooks.  Eighth, the Flores-Patriots contract does not state, acknowledge or represent that the Patriots agreed to be bound to Mr. Flores with respect to any of the terms of the NFL Constitution.  These circumstances, particularly when considered all together, completely undermine the proposition that the NFL Constitution should be treated—as a matter of law—as a contract.

Defendants rely primarily on three easily distinguishable cases to argue that the Court should not follow the weight of the above-mentioned case law.  See Dkt. No. 82 at 5-8 (citing Buttrick v. Intercity Alarms LLC, No. 09-P-1594, 2010 WL 2609364, at *2 (Mass. App. Ct. July 1, 2010); Gilbert v. Dell Technologies, Inc., 415 F. Supp. 3d 389 (S.D.N.Y. 2019); Daniels v. Raymours Furniture Co., Inc., No. 13 Civ. 11551 (MLW), 2014 WL 1338151 (D. Mass 2014)).  Far from abrogating this Court's Order, these cases only confirm that the Court got it right.

Defendants cite Buttrick, 2010 WL 2609364, at *2, for the unremarkable proposition that "the right to unilateral modifications" does not by itself "preclude the formation of an enforceable contract."  See Dkt. No. 82 at 5.[2]  Buttrick is a post-trial decision in which the court affirmed that an employee handbook created a contract because (i) the employee had signed the handbook on more than one occasion, (ii) it had been distributed to him on four separate occasions, (iii) the employer told the employee it was "very necessary" for him to sign it and was a "big issue," (iv) the employer specifically reviewed the terms of the handbook with the employee," (v) the employee testified that he considered himself and his employer bound by the

---

[2]     While Buttrick does nothing to disturb the Court's Order, Defendants fail to inform the Court that it is an unpublished decision which by its terms "may not fully address the facts of the case or the panel's decisional rationale" and "may be cited for its persuasive value but . . . not as binding precedent."  Id. at *1.

7

terms, (vi) the employee had followed a variety of policies contained within the handbook which were to the employer's benefit, and (vii) the employee raised complaints about the employer's failure to follow certain reciprocal policies.  Id. at *1, n. 2-3.  The Buttrick court found that under the "special attention paid to the manual here," the unilateral modification provision did not undermine contract formation.  Id. at *2.

In contrast to Buttrick, neither the Patriots nor the NFL provided any "special attention" to the NFL Constitution or its arbitration provision sufficient to justify the creation of a contract or overcome the significance of the no-notice unilateral modification provision.  In the matter at bar, the Flores-Patriots contract simply makes a boilerplate reference to the applicability of the NFL Constitution.  Mr. Flores never signed nor was asked to sign the NFL Constitution.  Mr. Flores was never given a copy of the NFL Constitution (despite a contract term falsely stating that one had been provided to him).  Neither the Patriots nor the NFL reviewed the NFL Constitution with Mr. Flores.  Moreover, the nature of the NFL Constitution is entirely different than an employee handbook as it is not presented as a document encompassing reciprocal obligations between an employer and employee.  Under these circumstances, the Court correctly applied Massachusetts law and Buttrick only confirms that.

Defendants' reliance on Gilbert v. Dell Technologies, Inc., 415 F. Supp. 3d 389 (S.D.N.Y. 2019) is further misplaced.  In Gilbert, the court acknowledged that under Massachusetts law, a contract may be illusory if the agreement can be modified unilaterally by one party.  Id. at 398.  There, the court enforced an arbitration agreement under the specific circumstances which included a signed employment contract in which the employee expressly acknowledged that the employer could "in its discretion" amend the arbitration agreement.  Id. at 394.  However, in another provision of the employment contract, the parties agreed that notice and written

8

agreement by the employee was required for any change to the contract.  Id. at 394.  The Gilbert court noted that these were "conflicting provisions" and found that the former provision "suggests" the arbitration agreement could be modified without employee's written agreement. Id. at 398.  In the face of this potential conflict, the court found that a contract existed—but did so only after the employer waived any arguable right to unilaterally amend the arbitration agreement.[3]

Here, in contrast to Gilbert, the Flores-Patriots contract does not include any provision in which Mr. Flores expressly agreed to unilateral modification by the Defendants "in its discretion."  Moreover, the unilateral modification provision in the matter at bar is not only not contained in the signed contract, but it is embedded on in a 447-page document which, again, Mr. Flores never signed, was never presented to him and was never otherwise shown any level of "special attention"—similar to Buttrick—that would justify treating it as a contract.[4]

Further, in Daniels, the court found that a unilateral modification provision contained within an employee handbook did not undermine the creation of an arbitration agreement—but it was clear under the terms that notice of any change to the employee was required.  The handbook contained an express provision stating that, "[c]ontinuing employment after issuance of this Handbook (or any subsequent revision) constitutes the associate's agreement to the rules, policies and procedures contained herein or therein."  Daniels, 2014 WL 1338151, at *4, 6. Though not specifically quoted by the court, in the immediately subsequent sentence of the

---

[3]    Plaintiffs respectfully disagree with the Gilbert court's conclusion which stands alone from every other case interpreting Massachusetts law in that it even arguably permits the enforcement of a contract that can be unilaterally modified without notice.  The Gilbert court was not a Massachusetts state or federal court and, despite the decision being issued in 2019, it did not follow or even cite Jackson or O'Brien.

[4]    Furthermore, Defendants have never agreed to waive any right to unilateral amendment (per the §XXV of NFL Constitution, Defendants would not even be permitted to modify a term through a representation from counsel), even after the Court's order and even after specifically relying on Gilbert.  Even if Defendants had, Gilbert stands easily distinguishable for the reasons set forth above.

handbook, it states that "***New rules, policies, practices and procedures will be communicated***

and updates to this Handbook will be issued from time to time."  Daniels v. Raymours Furniture

Co., Inc., No. 13 Civ. 11551 (MLW), Dkt. No. 9-1 at p. 4 (emphasis added).  Moreover, the

record was clear, as acknowledged by the court, that "[w]hen the Handbook was updated by

incorporating, among other things, the Arbitration Program, [employee] acknowledged having

accessed it and reviewed it" including a provision stating that it was "an essential element of

[employee's] continued employment . . . and is a condition of employment," and continuing his

employment thereafter."  Daniels, 2014 WL 1338151, at *4.  Thus, the Daniels court enforced

the contract because the unilateral modification provision in fact *required* notice, the employer

had a record of compliance with the notice provision and the employee accepted modifications

through continued employment following notice.  Id. at *4-6.

Here, neither the Flores-Patriots contract nor the NFL Constitution contains any express

provision providing for any notice following unilateral modification.  Similarly, neither the

Flores-Patriots contract nor the NFL Constitution expressly state that an employee's continued

employment constitutes an acceptance following notice (which is not required) of unilateral

modification.  Again, the totality of the conduct and circumstances set forth above further

establish the lack of a contractual relationship arising out of the NFL Constitution.[5]

---

[5]    In a footnote, Defendants cite LeMaitre v. Mass. Turnpike Auth., 876 N.E.2d 888, 893 (Mass. App. Ct. 2007) for the general proposition that unilateral modification provisions "standing alone" do not preclude contract formation.  However, in LeMaitre, "it was not expressly stated in the personnel manuals . . . that the [employer] retained the right to alter the [terms] whenever it chose to do so."  The court also found that the employer "regularly distributed the personnel manuals" and employees "were even required to sign for them."  Moreover, the very specific circumstances therein, including that the employer's acknowledgement that certain incentive compensation terms were intended to be relied upon by employees, established the existence of a contract.  Defendants further cite Ferguson v. Host. Intern. Inc., 757 N.E.2d 267, 271 (Mass. App. Ct. 2001) for the same general proposition.  Under the circumstances of Ferguson, the court found that the provisions which could arguably undermine the contract creation—unilateral modification provision and contract disclaimer—were "buried," the "functional equivalent of fine print" and "not likely to attract the employees' attention."  Id. at 272.

10

The law is clear that where a unilateral modification provision is paired with other circumstances, including a lack of notice provision, courts are prudent in finding a contract is illusory—and that finding is unbothered whether the potential contract at issue is an employee handbook, an arbitration agreement, or otherwise. For the foregoing reasons, the Court's order in finding that the arbitration provision in the NFL Constitution is illusory and unenforceable is consistent and in accordance with Massachusetts law and need not be further reconsidered.

### ii. The Unilateral Modification Provision Cannot Be "Severed"

Defendants are incorrect that Massachusetts law requires consideration of unilateral modification provisions under the law of unconscionability and not under an analysis as to whether the contract is illusory. <u>See</u> Dkt. No. 82 at 8-10. This argument is contradicted by the wealth of case law set forth above. Neither <u>Gilbert</u> nor <u>Joulle, Inc. v. Simmons</u>, 2011 WL 7090714 (Mass. Sup. Ct. Dec. 5, 2011) suggest anything other than that such a provision could be a consideration in an unconscionability analysis. For the reasons previously argued, <u>see</u> Dkt. No. 80, Plaintiffs urge the Court to reconsider the aspects of the Order finding that the arbitration agreements at issue are not unconscionable under all applicable federal and state law.

Defendants do not cite any fact, evidence or case law the Court overlooked in finding that the arbitration agreement is unenforceable rather than fashioning an alternate remedy and severing the offending provision. In fact, the Parties already briefed the issue of severing offending provisions in an arbitration agreement in detail. <u>See</u> Dkt. No. 67 at 5, n. 4; Dkt. No. 64 at 6-7. Defendants simply repeated the same arguments already asserted and cited the same case law, only this time also cited two additional Massachusetts cases—<u>Emmanuel v. Handy Techs, Inc.</u>, 442 F. Supp. 3d 385, 394 (D. Mass 2020) <u>aff'd</u> 992 F. 3d 1 (1st Cir. 2021); <u>Machado v. System4 LLC</u>, 28 N.E.3d 401, 415 (Mass. 2015).

11

Under the federal law of arbitrability, in determining whether an unlawful provision can be removed and the remainder of an arbitration agreement enforced, a court must assess whether the parties intended for the contract to operate in that manner—typically, this is accomplished through a severability clause. See e.g. Dumitru v. Princess Cruise Lines, Ltd., 732 F. Supp. 2d 328, 346 (S.D.N.Y. 2010) ("A court 'may not rewrite clear and unambiguous contracts.' However, the presence of a severability clause demonstrates that severance was a contingency contemplated"); Herrera v. Katz, 532 F. Supp. 2d 644, 647 (S.D.N.Y. 2008) (offending provision severed specifically because arbitration agreement contained severability clause); Am. Fam. Life Assur. Co. of N.Y. v. Baker, 848 Fed. App'x 11 (2d Cir. 2008) (same); Ragone v. Atlantic Video at Manhattan Center, 595 F. 3d 115 (2d Cir. 2010) (same).

Massachusetts federal courts, including those cited by Defendants, state the same thing. See e.g. Emmanuel, 442 F. Supp. 3d at 394 (D. Mass 2020) (stating in dicta that an offending provision could be severed from the remainder of the arbitration agreement), but the arbitration agreement at issue clearly had an express severability clause, see Emmanuel v. Handy Techs, Inc., No. 15 Civ. 12914 (NMG) at Dkt. No. 9-4 at §16(f) ("You and Handy agree that if any portion of this section entitled 'Mutual Arbitration Agreement' is found illegal or unenforceable, that portion will be severed and the remainder of this section 16 will be given full force and effect.")); Machado, 28 N.E.3d at 415 ("even if we were to find any of the discussed provisions unconscionable, the franchise agreements contain a severability clause, requiring any unenforceable term to be severed."); Foshey v. Home Depot USA, Inc., No. CV 12-11866 (DJC), 2013 WL 12210107, at *6 (D. Mass. Aug. 26, 2013) (stating that a severability clause "would allow the Court to sever any conflicting sections of the SPA while preserving the viability of the arbitral forum").

Here, the NFL Constitution does not contain any severability provision.  Nor have Defendants argued that it has one.  Even if it were to matter, the Flores-Patriots contract does not have a severance clause.  That alone precludes a severance remedy under applicable law.  But severance would furthermore be functionally impossible here given that the NFL Constitution is not a mere agreement between two parties, but an omnibus document reflecting broad terms ratified by the NFL teams as to how the league should operate.  The unilateral modification provision of §XXV applies to the entire document and describes in substantial detail how terms governing all aspects of the NFL are changed and/or modified.  To sever §XXV would constitute completely rewriting an operative, substantive provision of the NFL Constitution not merely a removal of an arbitration term.  Moreover, for the reasons set forth above, the illusory nature of the arbitration agreement under Massachusetts law is not merely an issue of the unilateral modification provision.  Respectfully, there is no provision in §XXV that the Court can "sever" which would somehow "save" the arbitration agreement and leave the remainder of the NFL Constitution undisturbed.

### iii. The Court Did Not Engage in Any Unique Application of the Law

Defendants incorrectly "conclude" that the Court's adherence to well-settled Massachusetts law would constitute "singling out" arbitration agreements and run afoul of the FAA.  See Dkt. No. 82 at 10-12.  As set forth above, the Court's Order did not treat arbitration agreements any differently from any other contract.  To the contrary, it is *Defendants* who appear to seek special enforcement of an arbitration agreement that goes well beyond the dictates of the applicable Massachusetts case law.  See Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 369 (2d Cir. 2003) (observing that arbitration agreements are "as enforceable as other contracts, ***but not more so***") (emphasis added).  In fact, Jackson and O'Brien, the cases that form the

13

foundational basis for the Court's decision, both involve interpretations of employee handbooks that have no connection with arbitration. Massachusetts courts apply the doctrines of <u>Jackson</u> and <u>O'Brien</u> as ordinary contract principles applicable to all contracts, not merely arbitration agreements. For that reason, Defendants' citation to <u>Eiess v. USAA Fed. Savings Bank</u>, 404 F. Supp. 3d 1240, 1256 (N.D. Cal. 2019) is inapplicable. There is absolutely nothing unique about a court determining that an illusory contract is unenforceable under Massachusetts law. That proposition is supported by more than 100 years of case law with respect to not only employee handbooks and arbitration agreements, but, *inter alia*, real estate contracts, contracts for the purchase of milk, and contracts for the purchase of clothing. <u>See</u> e.g. <u>Graphic Arts Finishers, Inc. v. Bos. Redevelopment Auth.</u>, 255 N.E.2d 793, 796 (Mass. 1970) ("a promise that binds one to do nothing at all is illusory and cannot be consideration"); <u>Gill v. Richmond Co-op. Ass'n</u>, 309 Mass. 73, 80 (Mass. 1941) ("the plaintiffs promised nothing except to buy such milk as they might order. The only measure of their promise was their own will. It was not like a promise to buy such milk as they might need in their business. Since the plaintiffs bound themselves to nothing, the defendant received no consideration for its promise to sell milk, and was not bound to sell any."); <u>Bernstein v. W. B. Mfg. Co.</u>, 238 Mass. 589, 590–91 (Mass. 1921) (contractual language, "This order is given and accepted subject to a limit of credit and determination at any time by us" found to be unenforceable "for want of mutuality of obligation.").

### B. The Flores-Steelers Contract Does Not Require Arbitration of Claims Against the Giants or Texans

According to Defendants, Mr. Goodell failed to sign Mr. Flores' contract with the Steelers until more than four months after he entered into it. <u>See</u> Dkt. No. 82 at p. 13, n. 7. While Defendants contend that Mr. Goodell's signature is a mere formality, the contract plainly states that it "shall become valid and binding upon each party ***only when and if*** it shall be

14

approved by the Commissioner of the NFL." Id. at p. 13. Even assuming, for the sake of argument, that the Commissioner's signature was a condition precedent that could be waived by performance, and that the Steelers and Mr. Flores adhered to their obligations to each other during the course of the contract, it does not follow that Mr. Flores should have to adhere to his obligations to Mr. Goodell and the NFL (i.e., compliance with the arbitration provisions contained in the Constitution), where the party with an interest in such compliance did not timely sign the contract or otherwise indicate its agreement to the terms.

That said, even if Mr. Goodell had timely signed the Steelers contract *and* this Court is willing to permit the Steelers to introduce it into the record at this late stage, none of the arbitration provisions contained in, or incorporated into, the Steelers agreement, apply to Mr. Flores' claims against the Giants or Texans. This is so for three independent reasons.

First, the Steelers have already expressly agreed in writing that the arbitration agreements in that contract would not prejudice his claims before this Court, including those against the Giants and Texans.

Second, the Steelers contract was entered into *after* Mr. Flores' claims against the Giants and Texans arose (and in fact, after they were filed), and does not apply retroactively to those claims.

Third, the NFL Constitution, which is the only arbitration provision that would arguably require Mr. Flores to arbitrate claims against the Giants or Texans, is illusory and unenforceable under Pennsylvania law.

### i. The Steelers Agreed that the Flores-Steelers Contract Would Not Impact Mr. Flores' Rights to Prosecute this Action

Prior to executing the Steelers contract, Mr. Flores needed assurances that the arbitration provisions contained therein would not apply to the claims brought herein. To that end,

15

following negotiations, the Steelers agreed, in writing, that "[t]his employment agreement *is not intended to infringe in any way on the lawsuit filed by Coach Flores in February 2022, which is currently pending. The Club and Coach Flores do not intend for anything in this employment agreement to infringe upon Coach Flores' right to prosecute the pending lawsuit*, and neither does this agreement infringe upon the rights of the NFL or any party to the lawsuit in asserting any defenses in the lawsuit." Proposed Declaration of Michael J. Willemin, Ex. A (emphasis added).[6]

Obviously, to the extent that the Flores-Steelers contract, or anything contained in or incorporated into it, were to require that Mr. Flores' claims against the Giants and Texans be compelled to arbitration, this would constitute an infringement on Mr. Flores' right to prosecute this lawsuit. As such, there is no reasonable way to interpret Mr. Flores' entire agreement with the Steelers in a way that would require him to arbitration claims against the Giants or Texans.[7]

### ii. The Steelers Contract Does Not Apply Retroactively

In their original briefing, Defendants argued that Mr. Flores' contract with the Miami Dolphins (and the related agreement to abide by the NFL Constitution) should apply retroactively to his claims against the Denver Broncos. The Court correctly rejected this argument, holding that the arbitration provisions contained in contracts between NFL teams and Head Coaches, including those contained in the NFL Constitution that are incorporated by reference, do not apply retroactively:

> Defendants also argue that the arbitration agreement in the NFL Constitution, as incorporated into Mr. Flores's 2019 contract with the Miami Dolphins, retroactively applies to Mr. Flores's claims

---

[6]     Contemporaneously with the filing of this omnibus opposition and reply, Plaintiffs have filed a motion for leave to add this email to the record, as its critical nature only became apparent upon reviewing Defendants' motion for reconsideration.

[7]     The reservation of Defendants' right to assert any defenses is irrelevant, as arbitration is not a defense to Mr. Flores' claims.

against the Broncos, which arose before he became the Dolphins' head coach. Defs. Mem. at 18. Courts, however, have "refused to compel arbitration of claims arising from disputes which arose outside of the effective dates of arbitration agreements," unless the agreement expressly includes claims preceding the contract. *Klay v. All Defendants*, 389 F.3d 1191, 1203 (11th Cir. 2004); *see also Jones v. Waffle House, Inc.*, 866 F.3d 1257, 1271 n.1 (11th Cir. 2017) (arbitration agreement that explicitly encompassed past claims could be interpreted to include disputes over plaintiff's "previous attempts at employment."); *Baptist Hosp. of Miami, Inc. v. Media Healthcare Plans, Inc.*, 376 F. Supp. 3d 1298, 1308–10 (S.D. Fla. 2019) (applying Florida law and collecting cases).

See Dkt. No. 76 at 10.

Nonetheless, Defendants advance the exact same retroactivity argument with respect to the applicability of Flores-Steelers contract to his claims against the Giants and Texans. However, just as with Flores-Dolphins contract, Mr. Flores' arbitration agreement with the Steelers makes no reference whatsoever to "claims arising from disputes which arose outside of the effective dates of arbitration agreement." In fact, the Flores-Steelers contract makes clear that it is only "effective" as of February 18, 2022, *after* Mr. Flores' claims against the Giants and Texans arose. Dkt. No. 73-4.

The Pennsylvania cases cited by Defendants are easily distinguishable. In Masoner v. Educ. Mgmt. Corp., 18 F. Supp. 3d 652, 654 (W.D. Pa. 2014), the court held that an employer's broadly worded arbitration agreement applied retroactively *to claims that previously arose while the plaintiff was employed by the employer*. In contrast, when Mr. Flores' claims against the Giants and Texans (and his related claims against the NFL) arose, he was not employed by the NFL or any team. Moreover, the plaintiff in Masoner (who was still employed both at the time the claims arose and when the arbitration policy went into effect), "never asked any questions about the ADR Policy, expressed a desire to reject or challenge the terms of the ADR Policy, indicated that she found the terms of the ADR Policy to be unfair or oppressive, or made any

17

effort to rescind her acceptance of the ADR Policy and its terms." Masoner, 18 F. Supp. 3d at 656.

In stark contrast to Masoner, Mr. Flores had already filed his federal complaint and, shortly thereafter, submitted a letter to the Commissioner indicating his belief that the terms of the NFL's arbitration agreements were not only unfair or oppressive, but also unenforceable. See Dkt. No. 1; Proposed Declaration of Michael J. Willemin, Ex. B.[8]  To that end, prior to accepting employment with the Steelers, Mr. Flores secured a promise from the Steelers that the arbitration agreements in, and incorporated into, that contract, would not prejudice his prosecution of the claims brought herein, including those against the Giants and Texans.

The decision in Scott v. Educ. Mgmt. Corp., No. 2:14 Civ. 537, 2015 WL 12912386, at *5 (W.D. Pa. Mar. 11, 2015), vacated, 662 F. App'x 126 (3d Cir. 2016) is distinguishable for identical reasons.  To begin, the Scott decision simply piggybacked off Masoner, which dealt with the same defendant and same arbitration policy.  Moreover, like in Masoner, but unlike the matter at bar, the Scott plaintiff was employed by the defendant at the time his claims arose. Finally, while Defendants acknowledge that Scott was vacated, they misleadingly suggest that it was vacated "on other grounds."  Not so.  Scott was vacated because the Scott plaintiff, *just like Mr. Flores*, promptly objected to the arbitration policy imposed by his employer.  See Scott v. Educ. Mgmt. Corp., 662 F. App'x 126, 130 (3d Cir. 2016).  Under such circumstances, the Third Circuit held that the plaintiff's continued employment could not serve as evidence of his acceptance of the terms of the arbitration policy.[9]

---

[8]    Contemporaneously with the filing of this omnibus opposition and reply, Plaintiffs have filed a motion for leave to add this document to the record, as its critical nature only became apparent upon reviewing Defendants' motion for reconsideration.

[9]    Defendants' citations to Second Circuit case law have already been briefed, and do not support its position for the reasons described in Plaintiffs' Opposition to Defendants' Motion to Compel Arbitration, Dkt. No. 62 at 20, n. 15.

### iii.    The Constitution Is Illusory Under Pennsylvania Law

Even if the Steelers' promise is not dispositive (it is), ***and*** the contract can be applied retroactively (it cannot), the Steelers contract still does not provide any basis to compel arbitration of claims against the Giants and Texans because: (i) the only arbitration provision that purports to require the arbitration of these claims is contained in the NFL Constitution; and (ii) the NFL Constitution is illusory and unenforceable under Pennsylvania law.

The body of the Steelers' employment agreement only purports to require the arbitration of claims against the Steelers.  As such, the only arguably relevant arbitration provision is the one that is contained in the NFL Constitution.  However, hidden in a footnote, see Dkt. No. 82 at 17, n. 8, Defendants acknowledge that the only case decided under Pennsylvania law that is directly on point held that a contract (in that case an arbitration agreement contained in an employee manual) is illusory and unenforceable when it is subject to unilateral modification. See Crump v. MetaSource Acquisitions, LLC, 373 F. Supp. 3d 540 (E.D. Pa. 2019).

In Crump, the plaintiff filed suit alleging that he was sexually harassed by his supervisor. In response, the defendants moved to compel arbitration, relying on an arbitration provision that was contained in an employee handbook that the plaintiff signed at the outset of his employment. The employee handbook also contained a provision that permitted the employer to unilaterally modify any of the terms of the handbook, with or without notice.  For this reason, the court held that the arbitration agreement contained in the employee handbook was illusory and unenforceable.

The Crump decision is on all fours.  Defendants' attempt to distinguish it as "arising in the entirely distinguishable context of a non-negotiable employee manual" is perplexing.  Indeed, while called a "Constitution," the Constitution *is*, for all intents and purposes, an employee

manual. And, even if it could be described as something different than that, such would

constitute an irrelevant distinction because the Constitution, like the employee manual in Crump,

was a non-negotiable document that Mr. Flores was required to agree to adhere to as a condition

of employment.

Defendants also suggest that the decision in Crump somehow did not rely on

Pennsylvania law because it cited to certain federal cases. This argument is totally disingenuous.

The Crump decision was absolutely based on its interpretation of the relevant Pennsylvania law

regarding the impact of unilateral modification rights on the enforceability of a contract:

> Under Pennsylvania law, "[i]f the promise is entirely optional with
> the promisor, it is said to be illusory and, therefore, lacking
> consideration and unenforceable. The promisor has committed
> him/herself to nothing." *SCF Consulting, LLC v. Barrack, Rodos &*
> *Bacine*, 644 Pa. 273, 175 A.3d 273, 278 (2017) (Dougherty, J.,
> concurring) (quoting *Geisinger Clinic v. Di Cuccio*, 414 Pa.Super.
> 85, 606 A.2d 509, 512 (1992) ); *see also Maint. Specialties, Inc. v.*
> *Gottus*, 455 Pa. 327, 314 A.2d 279, 283 n.6 (1974) (Jones, C.J.,
> concurring) (finding a promise to be illusory where the company's
> obligation was voidable if, in the sole discretion of the company, an
> employee neglected or took action that was detrimental to the
> company's                                                        interests).
> . . .
> In *Blair v. Scott Specialty Gases*, the Third Circuit applied
> Pennsylvania law and articulated a similar rule. 283 F.3d at 604.
> There, an employee handbook included an arbitration provision,
> where the employee acknowledged and agreed to submit disputes to
> arbitration. The employer also reserved the right to modify the terms
> of the handbook through written amendments. The handbook further
> provided that if the employer "makes any material changes, it will
> give [the employee] a copy of them, and by remaining employed by
> [the employer] thereafter [the employee] will be deemed to have
> accepted these changes." *Id.* The Court of Appeals found that the
> employer did not retain "unfettered discretion" to modify the
> handbook, in light of the notice and acceptance provisions.
> Accordingly, the court found that the arbitration agreement was not
> illusory because the employer's "promise to submit to arbitration
> serves          as          consideration." *Id.* at          604          n.3.

Crump v. MetaSource Acquisitions, LLC, 373 F. Supp. 3d 540, 544-45 (E.D. Pa. 2019).

The fact that the court went on to support its conclusions by noting virtual unanimity on the issue in other circuits hardly undercuts the applicability of its decision; rather, it reinforces it. Finally, the determination in <u>Crump</u> that continued employment does not constitute consideration sufficient to overcome the illusory nature of an alleged contract is not an outlier. Rather, it was based on an exhaustive review of cases applying Pennsylvania law to analogous circumstances and has also been followed by other courts. <u>See</u> <u>Hoelzle v. Vensure Emp. Servs., Inc.</u>, No. 2:20 Civ. 00473 (KSM), 2022 WL 507481, at *12 (E.D. Pa. Feb. 18, 2022) (continued employment insufficient consideration to require other party to comply with alleged indemnification agreement).

## II. PLAINTIFFS' MOTION FOR RECONSIDERATION SHOULD BE GRANTED

In Defendants' opposition papers, they give noticeably short shrift to the specific aspects of <u>Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n</u>, 820 F.3d 527, 548 (2d Cir. 2016) and the decision that Court relied on, <u>Winfrey v. Simmons Foods, Inc.</u>, 495 F.3d 549, 551 (8th Cir. 2007), which Plaintiffs identified as having been overlooked by the Court. Rather than address the important specifics of these cases, Defendants simply rely on an out-of-context, generalized principle articulated by the Second Circuit in an easily distinguishable context. Thus, Defendants incorrectly argue that it is somehow a "basic principle" that "the parties to an arbitration can ask for no more impartiality than inheres the method they have chosen." Dkt. No. 89 at 4.

But this is far from a "basic principle." And, that proposition taken out of context—as it respectfully was here—is a wholly unfounded principle that would undercut the truly "basic principle" that unconscionable contracts are unenforceable. Respectfully, the Court applied that sentence from <u>Nat'l Football League Mgmt. Council</u> in a broad manner that is simply

21

inapplicable to the matter at bar.  Nat'l Football League Mgmt. Council involved the proprietary

of a collectively bargained agreement that the NFL commissioner serve as an arbitrator over

disciplinary disputes—and the Second Circuit found that his designation as arbitrator in that

context was enforceable because the parties had agreed to those terms.

However, to interpret Nat'l Football League Mgmt. Council as creating a "basic

principle" which also applies in context of compulsory (rather than collectively bargained)

arbitration of statutory discrimination claims, respectfully, has no foundation in law.  To the

contrary, it amounts to a complete evisceration of the doctrine of unconscionability.  Applied

broadly as a "basic principle," the concept that "the parties to an arbitration can ask for no more

impartiality than inheres the method they have chosen" would completely gut the doctrine of

unconscionability which the FAA never intended to disturb.  See 9 U.S.C. § 2 (providing that

arbitration agreements are "enforceable, save upon such grounds as exist at law or in equity for

the revocation of any contract."); see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20,

24 (1991) ("[FAA's] purpose was to . . . place arbitration agreements upon the same footing as

other contracts"); Sutherland v. Ernst & Young LLP, 847 F. Supp. 2d 528, 540–41 (S.D.N.Y.

2012) (citing Kristian v. Comcast Corp., 446 F.3d 25, 37 (1st Cir. 2006)) (The FAA savings

clause "ensure[s] that the arbitral forum maintains its standing as a legitimate alternative to

traditional litigation in which individuals can vindicate their statutory rights.").

Broad acceptance and application of that sentence would mean that no matter how one-

sided, unfair or illegitimate an arbitration process may be, it would be enforceable because "the

parties to an arbitration can ask for no more impartiality than inheres the method they have

chosen."  But the unconscionability doctrine *requires* that a court *not enforce* and find the

*absence of an agreement* when a contractual term is "so outrageously unfair as to shock the

judicial conscience."  FL-Carrollwood Care, LLC v. Gordon, 72 So. 3d 162, 165 (Fla. 2d D.C.A.

2011).

Here, the parties supposedly "agreed" that the commissioner of the league accused of

discrimination who already said that claims have no merit would act as arbitrator.  It is hard to

imagine a more unfair situation particularly when the matter involves statutory anti-

discrimination rights.  If this is permitted, employers could equally install in an arbitration

agreement that their own lawyers act as arbitrators.  In another, an employer could dictate her

own family members as arbitrators.  The list could go on from there.  The point is that if it is

truly a "basic principle" that "the parties to an arbitration can ask for no more impartiality than

inheres the method they have chosen" (it is not), these formulations of arbitration would all have

to be enforceable, egregious unconscionability notwithstanding.

The express savings clause of the FAA and its interpretive case law make it clear that this

was never what was intended to be permitted by arbitration agreements.  The savings clause

attempts to ensure that by requiring courts to deem unenforceable arbitration agreements that fail

to meet the strictures of basic contract law, among them that an arbitration agreement like any

other contract should not be enforced if it is unconscionable.

The reason the arbitration agreements in Nat'l Football League Mgmt. Council and

Winfrey were enforced is because *in those contexts* the arbitration agreements were *not*

*unconscionable*.  As stated, Nat'l Football League Mgmt. Council involved collectively

bargained disciplinary processes unrelated to statutory rights.  Winfrey, as discussed in

Plaintiffs' moving papers, involved a standard labor arbitration process (also not involving

statutory discrimination claims) which included the use of dual party-appointed arbitrators

together with a neutral third arbitrator.  Thus, in finding that "the parties to an arbitration can ask

J.A. 1126

for no more impartiality than inheres the method they have chosen," the court was simply stating that a party cannot be heard to complain about potential bias in an inherently fair process that he agreed to follow.  Williams v. Nat'l Football League, 582 F.3d 863, 885 (8th Cir. 2009), also cited by Nat'l Football League Mgmt. Council, likewise involved a collectively bargained labor dispute and not compulsory arbitration of statutory discrimination claims.

Defendants also failed to rebut Plaintiffs' argument that the Court misapplied a general holding in Gilmer.  Defendants superficially state that "Plaintiffs are unable to explain why the process here—where all parties indisputably agreed and knew, at the time of contracting, that the designated arbitrator of their disputes was the Commissioner—gives Plaintiffs' allegations any more weight," see Dkt. No. 89 at 7, despite the fact that Plaintiffs have explained in exhaustive detail the bias inherent in the NFL's arbitration process.  Defendants also rely on broad, generalized explanations of Garcia v. Church of Scientology Flag Service Organization, Inc., No. 18-13452, 2021 WL 5074465, at *12 (11th Cir. Nov. 2, 2021), Hooters of America Inc. v. Phillips, 173 F. 3d 933 (4th Cir. 1999), McMullen v. Meijer, Inc., 355 F.3d 485 (6th Cir. 2004) and Pokorny v. Quixtar, Inc., 601 F. 3d 987, 1002-3 (9th Cir. 2010), rather than legitimately engage in a fulsome explanation as to why the NFL's arbitration process is an not *more* unconscionable than those matters.  See Dkt. No. 89 at 7-9.

Finally, as to the effective vindication doctrine, Defendants merely repeated the Court's determination that there are only "two types" of arbitration agreements that can be set aside on this basis—those which forbid certain statutory claims and those which impose prohibitive costs. See Dkt. No. 89 at 11.  Defendants failed to address Plaintiffs' point that there is no case which actually limits the doctrine should be limited to those "two types."  The logical result of Defendants' position is that an arbitration agreement that precludes effective vindication of rights

24

does not run afoul of the effective vindication doctrine unless it falls into one of the categories courts have already considered.  Defendants, with nowhere left to turn, literally argue that the case law does not make "'neutral' arbitrator an 'obligatory component'" under the law.  See Dkt. No. 89 at 12.  The Court should not embrace this position.

In sum, Defendants fail to meaningfully address the matters Plaintiffs have argued the Court respectfully overlooked, and instead ask the Court to apply a sentence from an inapposite case and apply it in a broad manner that would fly in the face of the FAA, basic principles of contract formation, and fundamental fairness.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request an order granting Plaintiffs' motion for partial reconsideration and denying Defendant's motion for partial reconsideration of the Court's March 1, 2023 Order, and for such other and further relief deemed just and proper.

Dated: April 11, 2023
     New York, New York             Respectfully submitted,

**WIGDOR LLP**

By: _____
     Douglas H. Wigdor
     Michael J. Willemin
     David E. Gottlieb

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com
dgottlieb@wigdorlaw.com

*Counsel for Plaintiffs*
*Proposed Counsel for the Proposed Class*

25

- and -

**ELEFTERAKIS, ELEFTERAKIS & PANEK**


By: _____/s/_____
       John Elefterakis
       Nicholas Elefterakis
       Raymond Panek
       Johnson Atkinson

80 Pine Street, 38th Floor
New York, New York 10005
Telephone: 212-532-1116
Facsimile: 212 -532-1176

*Counsel for Plaintiffs*
*Proposed Counsel for the Proposed Class*

J.A. 1129

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

85 FIFTH AVENUE
NEW YORK, NY 10003
TEL 212.257.6800
FAX 212.257.6845
WWW.WIGDORLAW.COM

**Mi a l . Will i**
mwill_mi@wigdorlaw.com

April 11, 2023

**VIA ECF**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 04/12/2023

**MEMO ENDORSED**

The Honorable Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square, Room 240
New York, New York 10007

   Re: *Flores, et al. v. The National Football League, et al.*; No. 22 Civ. 00871 (VEC)

Dear Judge Caproni,

We represent Plaintiffs and respectfully request leave to file two documents in connection with Plaintiffs' opposition to Defendants' motion for reconsideration. These two documents directly pertain to arguments made for the first time in Defendants' motion for reconsideration. The two documents are attached to the proposed Declaration of Michael J. Willemin, which is attached hereto as Exhibit 1. Defendants "do not consent but [ ] otherwise take no position on [this] request."

The first document is an email from Pittsburgh Steelers ("Steelers") General Manager, Omar Khan. The email, which was sent contemporaneously with Mr. Flores' execution of his contract with the Steelers, is an agreement that nothing in that contract, including, of course, any purported agreement to arbitrate contained in the contract, or incorporated by reference, is intended to prejudice Mr. Flores' rights to prosecute his claims in this Court. This is critical, as it directly refutes Defendants' arguments that arbitration provisions contained in, or incorporated by reference into, the Steelers contract, serve to prejudice Mr. Flores by retroactively requiring arbitration of his claims.

The second document is a letter sent by Plaintiffs' counsel to National Football League Commissioner Roger Goodell. The letter was sent in response to a request made by the Miami Dolphins to Mr. Goodell seeking a determination by Mr. Goodell that the claims brought herein are subject to arbitration. The letter evidences the fact that Mr. Flores contemporaneously objected to the arbitration of the claims brought herein when he entered into an employment agreement with the Steelers. This renders this case distinguishable from the decision in <u>Masoner v. Educ. Mgmt. Corp.</u>, 18 F. Supp. 3d 652, 654 (W.D. Pa. 2014), which Defendants cite for the contention that the Steelers contract should apply retroactively.


# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

The Honorable Valerie E. Caproni
April 11, 2023
Page 2

We apologize for the late nature of this request, which is being made contemporaneously with the filing of our opposition to Defendants' motion for reconsideration. Of course, to the extent that the request is denied, we understand that the Court will disregard our references to these two documents, which are contained at pages 16 and 18 of Plaintiffs' memorandum of law.

We thank Your Honor for the Court's time and consideration of this matter.

Respectfully submitted,

Michael J. Willemin

Encl.

cc: All counsel (via ECF)

Application GRANTED. Defendants' request to submit the signed version of the Flores-Steelers Agremeent, Defs. Mem., Dkt. 82 at 13, is also GRANTED.

SO ORDERED.

04/12/2023

HON. VALERIE CAPRONI
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------ X
BRIAN FLORES, STEVE WILKS and RAY HORTON, as  :
Class Representatives, on behalf of themselves and all  :
others similarly situated,  :  Civil Action No.: 22-cv-00871
                                                       :  (VEC)
                       Plaintiffs,  :
                                                       :
             v.  :
                                                           :
THE NATIONAL FOOTBALL LEAGUE; NEW YORK  :
FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS;  :
MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS;  :
DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER  :
BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a  :
HOUSTON TEXANS; ARIZONA CARDINALS  :
FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS;  :
TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a  :
TENNESSEE TITANS and JOHN DOE TEAMS 1 through  :
26,  :
                                                       :
                       Defendants.  :
------------------------------------------------------------------------ X

**DECLARATION OF MICHAEL J. WILLEMIN, ESQ. IN OPPOSITION TO
DEFENDANTS' MOTION FOR PARTIAL RECONSIDERATION AND IN FURTHER
SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL RECONSIDERATION**

I, Michael J. Willemin, an attorney at law, duly licensed to practice law before the Courts

of the State of New York, hereby declare the following statements under penalties of perjury:

1.      I am a Partner at the law firm Wigdor LLP, attorneys for Plaintiffs Brian Flores,

Steve Wilks and Ray Horton in the above-captioned matter.  This Declaration is submitted in

connection with Plaintiffs' Opposition to Defendants' motion for partial reconsideration and in

further support of Plaintiffs' motion for partial reconsideration.

2.      Attached hereto as **Exhibit A** is a true and accurate copy of correspondence

between Omar Khan and John Elefterakis, dated February 19, 2022.

3.      Attached hereto as **Exhibit B** is a true and accurate copy of correspondence from

Douglas H. Wigdor to Commissioner Roger Goodell, dated March 9, 2022.

4.      I declare that the foregoing is true and correct under penalties of perjury.

Dated:  April 12, 2023
        New York, New York

By: _____
        Michael J. Willemin

2

# Exhibit A



John Elefterakis
Saturday, February 19, 2022 12:52 PM
Khan, Omar <REDACTED>
    Re: Contract

Omar,

Annexed hereto please find executed agreement. Please send when endorsed on your end.

Thanks.

John Elefterakis
Elefterakis, Elefterakis & Panek

On Feb 19, 2022, at 11:42 AM, Khan, Omar <REDACTED> wrote:

John,
Attached is the contract for Coach.
This employment agreement is not intended to infringe in any way on the lawsuit filed
by Coach Flores in February 2022, which is currently pending. The Club and Coach
Flores do not intend for anything in this employment agreement to infringe upon
Coach Flores' right to prosecute the pending lawsuit, and neither does this agreement
infringe upon the rights of the NFL or any party to the lawsuit in asserting any defenses
in the lawsuit.
Thanks,
Omar

**DISCLAIMER FOR ELECTRONIC COMMUNICATIONS NOTICE TO RECIPIENTS:
The information contained in (and attached to) this e-mail is intended only for the personal
and confidential use of the designated recipient(s) named above. This message may be an
attorney/client communication and as such is privileged and confidential. If the reader of this
message is not the intended recipient, you are hereby notified that you have received this
document in error and that any review, dissemination, distribution or copying of this message

is strictly prohibited. If you received this communication in error, please notify us immediately by reply e-mail, and delete the original message (including attachments).

# Exhibit B

J.A. 1137

# WIGDOR LLP

ATTORNEYS AND COUNSELORS AT LAW

85 FIFTH AVENUE
NEW YORK, NY 10003
TEL 212.257.6800
FAX 212.257.6845
WWW.WIGDORLAW.COM

**Douglas H. Wigdor**
dwigdor@wigdorlaw.com

March 9, 2022

**<u>VIA EMAIL</u>**

Mr. Roger Goodell
Commissioner
National Football League
325 Park Avenue
New York, NY 10154

   Re:  <u>*Flores v. The National Football League, et al.*</u>; Case No. 22 Civ. 00871 (VEC)

Dear Commissioner Goodell,

We, along with Elefterakis, Elefterakis and Panek, represent Brian Flores.  We write in response to the letters submitted by the Miami Dolphins, Ltd. ("Miami" or the "Dolphins") on February 17 and 18, 2022 (the "Letters").  Together, the Letters request that you compel arbitration of all disputes between Mr. Flores and the Dolphins, including the claims of race discrimination and other wrongdoing alleged against the Dolphins in *Flores v. The National Football League, et al.*, Civil Action No: 1:22 Civ. 00871(VEC) (the "Federal Action").  For the reasons outlined herein, we request that you reject Miami's request to arbitrate its disputes with Mr. Flores because arbitration—which is conducted behind closed doors and outside the public eye—is contrary to all notions of transparency, accountability and fundamental fairness.  If the National Football League ("NFL" or the "League") is truly committed to racial justice and equality, it will not attempt to force Mr. Flores' claims into arbitration.[1]

As you know, Mr. Flores recently filed the Federal Action, in which he alleges systemic race discrimination in the NFL with respect to the hiring, treatment, retention and termination of Black executives, Head Coaches and Coordinators.  Miami, one of the Defendants in the Federal Action, is alleged to have engaged in race discrimination in connection with its treatment and termination of Mr. Flores.  In addition, the owner of the Dolphins, Stephen Ross, unsuccessfully attempted to bribe Mr. Flores to lose games and engage in tampering, all in violation of, *inter alia*, League rules. This obviously implicates the integrity of the game.

---

[1]  The submission of this letter is without prejudice to Mr. Flores' arguments as to the unenforceability or inapplicability of arbitration as to the claims brought in the Federal Action or otherwise.  We submit this letter only with the hope that you and the NFL will just do the right thing and voluntarily permit Mr. Flores' claims against Miami to proceed in Court so that the public can enjoy full access to the proceedings.  Legal arguments are only properly made in the context of a motion to compel arbitration in the Federal Action.  Miami's decision to seek redress with the Commissioner's office is an inappropriate attempt to circumvent the authority of the Federal Court.



The NFL immediately—without any investigation whatsoever, and contrary to a mountain of statistical and anecdotal evidence—declared that Mr. Flores' claims were "without merit." Perhaps realizing that this assertion was indefensible, you subsequently acknowledged in a letter to the 32 teams that the current lack of diversity with respect to NFL coaches is "unacceptable." In the same letter you vowed to "reevaluate" the League's diversity, equity and inclusion policies. The NFL further stated that it would investigate Mr. Flores' allegations of tampering and attempted tanking.

Then, in the lead up to Superbowl LVI, you were asked whether the NFL's policies and practices require an "overhaul." You said, "You don't take anything off the table. If it requires changes in other areas, you do it." These sentiments are consistent with many other public pronouncements by you and other senior NFL executives that there is a "double standard" in the NFL for Black coaches and executives and that the League is committed to racial justice. Yet, despite these repeated assertions, nothing has changed. In fact, to make matters worse, when we extended an opportunity to you and the NFL to sit down with a truly neutral mediator to discuss and attempt to resolve these matters by entering into a binding agreement to implement meaningful change, accountability and oversight, you rejected that proposal out of hand.[2]

If the League is genuinely interested in eradicating discrimination and ensuring the integrity of the game, the bare minimum that the League can do is reject Miami's request to arbitrate these important claims.

To that end, one thing that we should all be able to agree on is that a fair and just adjudication of Mr. Flores' claims is impossible without transparency. Accountability requires transparency. NFL coaches (and candidates), players and the public at large deserve that transparency. Arbitration is not transparent. Indeed, arbitration is by its very nature a secretive process that takes place behind closed doors and outside of the public eye. The lack of transparency in arbitration only serves to continue the *status uo*—which in this case, is one that you have conceded must be fairly evaluated and potentially overhauled. That cannot happen in arbitration.

In addition to being secret and confidential, it is a well-accepted fact that arbitration presents a barrier to justice for victims of discrimination and other misconduct. Arbitration takes away two of the American justice system's most sacred rights: (i) a public trial; and (ii) a trial by a jury of one's peers. At the same time, arbitration provides the protection of secrecy for perpetrators of discrimination. This double-edged sword perpetuates discrimination and unlawful misbehavior in

---

[2] The NFL has offered to have a conversation with Mr. Flores to 'hear his ideas.' However, given its refusal to agree to a neutral mediation process, it is obvious that the NFL has extended this "offer" only as a public relations stunt to look good while continuing to reject real change, accountability and oversight. History has demonstrated that when left to its own policing, the NFL will do nothing more than return to business as usual. Indeed, in relation to the Washington Commanders, you were recently quoted as saying, "I do not see a way that a team can do its own investigation of itself." The same is true for the NFL.



the workplace and allows corporate entities—such as the NFL and the Dolphins—to carry out discrimination and avoid appropriate accountability.

You said you would not take anything "off the table" in your efforts to create change. Doing away with arbitration so there is public transparency and accountability would be a good first step.

In recognition of the inherent unfairness of arbitration, in February 2022, with rare bipartisan support, the House and Senate passed the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 (the "Act"). The Act, which was signed into law last week, is a landmark bill that bans companies from forcing victims of sexual harassment and sexual assault to sign away their right to go to court through pre-dispute arbitration agreements. However, this legislation, which is a historic victory for the MeToo movement, does not address race discrimination. That said, legislation to end forced arbitration in all discrimination cases has been proposed, and many companies, including Google, have taken the lead and gotten out ahead of any future legislation by ending forced arbitration altogether, including for race discrimination claims.

Just as Google is a leader in the tech world, the NFL is a leader in the sports, entertainment and media worlds. Its platform is powerful and virtually limitless. People throughout the world—including younger generations of children—look up to the NFL to demonstrate fairness and uphold appropriate ethical standards. This platform carries with it a moral obligation to be at the forefront of social justice movements—which the NFL has claimed to do by placing social justice slogans in end ones and other visible places. That moral obligation must extend beyond mere slogans and into action. The NFL must "walk the walk" and be willing to take actual steps to promote diversity, equality and inclusion—which you have directly said is "critical to our [the NFL's] continued success." It is impossible for the NFL to "walk to walk" while simultaneously forcing claims of race discrimination, and related claims, into arbitration.

As such, we are calling upon you, as the Commissioner, to reject the Dolphins' request for arbitration. We also are hopeful that, upon reading this letter and reflecting further, the Dolphins will reconsider their position and withdraw their arbitration request so that Mr. Flores' claims of race discrimination and other unlawful conduct can be heard in a fair and transparent manner, in front of a judge and a jury of his peers. If the NFL is truly committed to "ending racism," as it has repeatedly claimed, the League will reject Miami's request for arbitration. Race discrimination cannot be eradicated behind closed doors and the integrity of the game depends on transparency.

Regards,

Douglas H. Wigdor

cc:     John Elefterakis, Esq., Jeffrey Pash, Esq. and Myles Pistorius, Esq. (*via* email)

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS          NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

WRITER'S DIRECT DIAL NUMBER

(212) 373-3118

WRITER'S DIRECT FACSIMILE

(212) 492-0118

WRITER'S DIRECT E-MAIL ADDRESS

lelynch@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

April 13, 2023

**VIA ECF**

The Honorable Valerie E. Caproni
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

     *Flores, et al.* v. *The National Football League, et al.*, No. 22-cv-871-VEC

Dear Judge Caproni:

     Pursuant to the Court's order dated April 12, 2023 (Dkt. 94), Defendants are filing today the Declaration of Andrew A. Smith in support of the motion for partial reconsideration filed by defendants the National Football League, the Denver Broncos, the Houston Texans, and the New York Giants (Dkt. 81). The declaration attaches a Commissioner-approved version of Plaintiff Brian Flores's employment contract with the Pittsburgh Steelers.

     Pursuant to the Court's order dated June 29, 2022 (Dkt. 53), Defendants are filing this contract under seal. Defendants are simultaneously filing a redacted version of this contract on the public docket.

                    Respectfully submitted,

                    */s/ Loretta E. Lynch*
                    Loretta E. Lynch

cc:     Counsel of Record (via ECF)

# Exhibit A

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made as of the 18th day of February, 2022 (the "Effective Date"), by and between **PITTSBURGH STEELERS LLC** ("Club"), and **Brian Flores** ("Coach"). Collectively, Club and Coach are referred to in this Agreement as the "Parties."

### WITNESSETH:

**WHEREAS,** Club and Coach desire to enter into this Agreement which provides for Coach to serve as Assistant Football Coach in connection with the operation of the professional football team operated by Club as a member of the National Football League ("NFL"); and

**WHEREAS,** Coach represents to Club that he is free to accept employment and has no prior obligation or commitments of any kind or anyone that would in any way hinder or interfere with the performance of his duties for Club; and

**WHEREAS,** Club and Coach agree that this Agreement supersedes and replaces any and all previous agreements (oral or written) between Club and Coach.

**NOW, THEREFORE,** Club and Coach, intending to be legally bound, agree as follows:

1.    **Recitals.** The foregoing recitals are true and correct and incorporated herein.

2.    **Term**. Subject to the terms and conditions of this Agreement, Club agrees to employ Coach, and Coach accepts such employment, for the two-year period (the "Term") commencing on the Effective Date and, unless sooner terminated in accordance with the provisions of Paragraph 5 below or extended in writing by mutual agreement of the parties, this Agreement shall expire on **February 28, 2024.** For clarification purposes, the Term shall consist of two (2) contract years (each a "Contract Year") defined as follows:

- Contract Year 1: (February 21, 2022 to February 28, 2023)
- Contract Year 2: (March 1, 2023 to February 28, 2024)





2



3

J.A. 1145



4

J.A. 1146



13.     **NFL Rules**. Coach agrees to comply at all times with, and to be bound by, the Constitution and By-Laws as well as the Code of Conduct, and the Rules and Regulations of the NFL, in their present form and as the amended from time to time hereafter, which are hereby made a part of this Agreement, and by the decisions of the Commissioner thereof, which decisions shall be final, conclusive and unappealable. Coach hereby acknowledges that he has read the NFL Constitution and By-Laws as well as the Code of Conduct and the Rules and Regulations, and understands his obligations thereunder.

14.     **Commissioner's Authority to Arbitrate Disputes**. Coach agrees that all other matters in dispute between Coach and Club, including without limitation any dispute arising under any federal, state or local statute (such as claims alleging violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, or the Pennsylvania Human Relations Act) or arising from the terms of this Agreement, shall be referred to the Commissioner for binding arbitration pursuant to the NFL's arbitration guidelines, and that his decision shall be accepted as final, conclusive and unappealable. It is further agreed that any award or finding made by the Commissioner as sole arbitrator of any such dispute, shall in all

5

respects be well and faithfully kept and observed and may be imposed by judgment of the appropriate court of the Commonwealth of Pennsylvania pursuant to the applicable laws relating thereto.



6



**PITTSBURGH STEELERS LLC**

By: _____
Arthur J. Rooney, II

_____
Brian Flores

**APPROVED:**

This ____ day of ___ June 17, 2022

By: Approved by Commissioner Goodell
Commissioner
National Football League

7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26,<br><br>Defendants. | Civil Action No.: 22-cv-00871 (VEC) |

## DECLARATION OF ANDREW A. SMITH

I, Andrew A. Smith, declare and state as follows:

1.    I am Senior Counsel for defendant the National Football League (the "NFL"). I respectfully submit this declaration in support of the motion for partial reconsideration of the Court's March 1, 2023 order filed by defendants the NFL, the Denver Broncos, the Houston Texans, and the New York Giants.

2.    Attached as Exhibit A to this declaration is a true and correct copy of an employment agreement between plaintiff Brian Flores and Pittsburgh Steelers LLC, effective February 18, 2022, and approved as of that date by NFL Commissioner Roger Goodell on June 17, 2022.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2023 in New York, New York.

_____

Andrew A. Smith

2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN FLORES, STEVE WILKS and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated,<br><br>                     Plaintiffs,<br><br>v.<br><br>THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS and JOHN DOE TEAMS 1 through 26,<br><br>                     Defendants. | Civil Action No.: 22-cv-00871 (VEC) |

**REPLY BRIEF IN SUPPORT OF MOTION BY DEFENDANTS**
**THE NATIONAL FOOTBALL LEAGUE, THE DENVER BRONCOS,**
**THE HOUSTON TEXANS, AND THE NEW YORK GIANTS FOR PARTIAL**
**RECONSIDERATION OF THE COURT'S MARCH 1, 2023 ORDER ON**
**DEFENDANTS' MOTION TO COMPEL ARBITRATION**

# **TABLE OF CONTENTS**

I.  The Court Should Compel the Claims Against the Broncos to Arbitration ....................... 2

    A.  Mr. Flores's Agreement to Arbitrate Is Enforceable Under Massachusetts Law ........................................................................................................................ 2

    B.  In the Alternative, the Unilateral Modification Provision Can Be Severed ........... 5

    C.  Mr. Flores's Misinterpretation of Massachusetts Law Is Preempted By the FAA ...................................................................................................................... 6

II.  The Court Should Compel the Claims Against the Giants and the Texans to Arbitration ...................................................................................................................... 6

    A.  Mr. Flores Agreed to Arbitrate in His Contract with the Steelers ......................... 7

    B.  The Arbitration Agreement Applies Retroactively and Should Be Enforced ......... 8

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T Mobility LLC* v. *Concepcion*,
   563 U.S. 333 (2011)..............................................................................................6

*Cadrin* v. *N.E. Tel. & Tel. Co.*,
   828 F. Supp. 120 (D. Mass. 1993) .......................................................................4

*Crump* v. *MetaSource Acquisitions, LLC*,
   373 F. Supp. 3d 540 (E.D. Pa. 2019) .................................................................10

*Doe 1* v. *Darden Restaurants, Inc.*,
   2022 WL 265949 (M.D. Pa. Jan. 27, 2022)........................................................10

*Ferguson* v. *Host International, Inc.*,
   757 N.E.2d 267 (Mass. App. Ct. 2001) ...............................................................3

*Gilbert* v. *Dell Technologies, Inc.*,
   415 F. Supp. 3d 389 (S.D.N.Y. 2019)...................................................................3

*Jackson* v. *Action for Boston Community Development, Inc.*,
   525 N.E.2d 411 (Mass. 1988) ...........................................................................3, 6

*Masoner* v. *Education Management Corp.*,
   18 F. Supp. 3d 652 (W.D. Pa. 2014)..................................................................8, 9

*Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985).................................................................................................8

*Pearson* v. *John Hancock Mutual Life Insurance Co.*,
   979 F.2d 254 (1st Cir. 1992).................................................................................4

*PPG Indus., Inc.* v. *Webster Auto Parts, Inc.*,
   128 F.3d 103 (2d Cir. 1997)..................................................................................8

*Scott* v. *Education Management Corp.*,
   2015 WL 12912386 (W.D. Pa. Mar. 11, 2015) ...................................................9

*Yocca* v. *Pittsburgh Steelers Sports, Inc.*,
   854 A.2d 425 (Pa. 2004).......................................................................................7

**Statutes**

Federal Arbitration Act ...................................................................................1, 6, 10

Through this motion, Moving Defendants respectfully ask the Court to reconsider limited aspects of its decision on Defendants' motion to compel arbitration. We do so only because we believe that the Court, lacking the benefit of full briefing on certain issues, overlooked important controlling authorities that would lead to a different conclusion. Plaintiff Brian Flores's opposition does not refute those authorities, and only confirms that his remaining claims against the Broncos, the Giants, and the Texans (and his related claims against the NFL) should be compelled to arbitration.

First, our moving brief showed that Mr. Flores's claims against the Broncos should be arbitrated under the terms of the NFL Constitution. Mr. Flores agreed to comply with those terms in his contract with the Patriots, which was in effect when his claims against the Broncos arose. Under governing Massachusetts law, the NFL clubs' right to unilaterally modify their Constitution—which was undisputedly never exercised—is not sufficient to render that agreement "illusory," let alone unenforceable. Critically, Mr. Flores admits as much and points to nothing else that bars enforcement. Instead, Mr. Flores baselessly asserts that the unilateral modification provision cannot be severed from the agreement, even though doing so would be straightforward, a complete solution to his objection, and consistent with the parties' intent. Mr. Flores also fails to reconcile his arguments—that this Court should decline to enforce only the arbitration provisions within his otherwise enforceable employment contract—with the broad mandate of the Federal Arbitration Act.

Second, our moving brief showed that Mr. Flores's claims against the Giants and the Texans should also be arbitrated under the NFL Constitution, which Mr. Flores again agreed to comply with in his contract with the Steelers—a contract that was, in fact, approved by the NFL Commissioner and, in any event, was valid as a result of the parties' indisputable performance

under it.  Again, Mr. Flores does not meaningfully contest that showing.  Nor can he.  Instead, he goes outside the four corners of the contract, attempting to rewrite its express terms by relying on irrelevant extrinsic evidence that only confirms the parties' broad agreement to arbitrate.  Mr. Flores also claims, with no support under Pennsylvania law, that the Steelers agreement does not apply retroactively and that it, too, is rendered "illusory" by its unilateral modification provision.

For these reasons, the motion for partial reconsideration should be granted.

## I.  <u>The Court Should Compel the Claims Against the Broncos to Arbitration</u>

As set forth in our moving brief, Dkt. 82 at 3–12, the Court erred in concluding that Mr. Flores's agreement to arbitrate under the NFL Constitution, incorporated into his contract with the Patriots, is "illusory and unenforceable" because the NFL and its clubs can unilaterally modify the terms of their Constitution.  Each of Mr. Flores's arguments to the contrary is unavailing.

### A.  Mr. Flores's Agreement to Arbitrate Is Enforceable Under Massachusetts Law

Under Massachusetts law, which governs Mr. Flores's contract with the Patriots, the right to unilaterally modify contract terms does not necessarily render an arbitration agreement unenforceable.  *Id*. at 5–8.  Mr. Flores does not cite a single authority to the contrary.  Indeed, he concedes, as he must, that under governing Massachusetts law, a unilateral modification provision is "not . . . dispositive," Dkt. 93 at 4, and "does not by itself 'preclude the formation of an enforceable contract.'"  *Id*. at 7 (citation omitted).  Mr. Flores instead relies on a laundry list of other "circumstances" that, "when considered all together," supposedly render his agreement to arbitrate unenforceable.  *Id*. at 6–7.  But none of those alleged "circumstances," alone or taken together, is sufficient to set aside Mr. Flores's express bargain to arbitrate disputes under the NFL Constitution.

Mr. Flores first argues that the unilateral modification provision here rendered his agreement to arbitrate "illusory" and unenforceable specifically because it permitted modification

"without notice." *Id*. at 4–6.  But courts applying Massachusetts law have rejected that very argument (in decisions already cited in our moving brief):  In *Ferguson* v. *Host International, Inc*., 757 N.E.2d 267, 270–72 (Mass. App. Ct. 2001), the Massachusetts Appeals Court held that a provision reserving the right to unilaterally modify terms, even "without notice," did not preclude the formation of an enforceable contract.  The court squarely rejected the argument that that provision rendered the contract "illusory and unenforceable," noting that while such an argument "might have been tenable under language in *Jackson* v. *Action for Boston Community Dev[elopment], Inc*.," 525 N.E.2d 411 (Mass. 1988)—the sole Massachusetts state court decision cited by the Court on this issue—it was ruled out by subsequent, clarifying case law.  757 N.E.2d at 271.  Similarly, in *Gilbert* v. *Dell Technologies, Inc*., 415 F. Supp. 3d 389, 398–99 (S.D.N.Y. 2019), the court, applying Massachusetts law, held that an arbitration policy that was incorporated into an employment contract—much like the NFL Constitution was incorporated into the Patriots contract here—was enforceable, even though the employer apparently reserved the right to amend the policy "without any written agreement."  While Mr. Flores attempts to distinguish *Gilbert* by arguing that it involved "specific circumstances" where "the employee expressly acknowledged" the employer's modification rights in "a signed employment contract," Dkt. 93 at 8, those are precisely the circumstances presented here:  Mr. Flores signed an employment contract with the Patriots where he expressly agreed to comply with the NFL Constitution "as amended from time to time hereafter."  Flores-Patriots Agreement ¶ 15.  *Gilbert* is thus on all fours with the facts here.[1]

The other "circumstances" that supposedly allow Mr. Flores to now disclaim his agreement

---

[1]  Contrary to Mr. Flores's arguments, there is no need for Defendants here to "waive" their right to amend, because the arbitration provisions of the NFL Constitution have, in fact, never been amended throughout the relevant period, Dkt. 82 at 4 & n.1, and Defendants, as in *Gilbert*, "seek[] to enforce [those provisions] as [they] existed at the time the parties agreed to [them]." 415 F. Supp. 3d at 398.

to arbitrate, Dkt. 93 at 6–7, are equally unavailing. Mr. Flores argues repeatedly, for example, that the agreement to arbitrate is "illusory" because he allegedly never received or reviewed the NFL Constitution. *Id*. at 6, 8–9. But these allegations (based only on attorney say-so, *id*. at 6 n.1) are flatly contradicted by Mr. Flores's contract with the Patriots, in which he expressly acknowledged that he had "read the NFL Constitution . . . and underst[ood] [its] meaning"—as he reaffirmed several more times in his subsequent agreements with other clubs. Flores-Patriots Agreement ¶ 15; *see* Dkt. 48 at 9.

More to the point, none of the "circumstances" Mr. Flores enumerates is sufficient, even when cobbled together, to render the agreement here "illusory" or unenforceable under Massachusetts law. This is because Mr. Flores inappropriately relies on case law arising in the highly distinguishable context of employee manuals, where there is no express contract—only, potentially, an *implied* one—and courts must look to the surrounding circumstances to determine whether the parties did, in fact, intend to enter into an enforceable agreement. Dkt. 93 at 4–6.[2] In *Pearson* v. *John Hancock Mutual Life Insurance Co*., 979 F.2d 254, 257 (1st Cir. 1992), there was no employment contract at all—only a one-sided employee manual that contained no "firm commitments" from the employer, and which the employer in fact unilaterally modified "several times." *See also Cadrin* v. *N.E. Tel. & Tel. Co*., 828 F. Supp. 120, 122 (D. Mass. 1993) (no enforceable contract based on employee manual). Here, in contrast, there is an express employment contract negotiated at arm's length and signed by Mr. Flores—containing an unequivocal promise to arbitrate pursuant to the terms of the NFL Constitution—which clearly imposed binding obligations on both parties, including the Patriots. Further, it is undisputed that

---

[2] The only cases Mr. Flores cites where arbitration agreements were found to be "illusory" and unenforceable under Massachusetts law were based on misapplications of the relevant state law, as explained in our moving brief. Dkt. 82 at 5–6 & n.3, 8 n.4.

the clubs have never exercised their right to amend the arbitration provisions of the NFL Constitution during the relevant period.  Dkt. 82 at 4 & n.1.  Under these facts, "the totality of the conduct and circumstances" that Mr. Flores urges the Court to consider only confirms that there is a valid and enforceable agreement to arbitrate.  Dkt. 93 at 10.

**B.  In the Alternative, the Unilateral Modification Provision Can Be Severed**

As our moving brief showed, and Mr. Flores is unable to contest, even if the unilateral modification provision were somehow problematic (and it is not), it can be severed and the remainder of Mr. Flores's agreement to arbitrate enforced.  Dkt. 82 at 8–10.

In his opposition, Mr. Flores baselessly asserts that severance would be "functionally impossible," requiring a "complete[] rewrit[e]" of the NFL Constitution, and would run counter to the parties' intent.  Dkt. 93 at 11–13.  Not so.  Severance of the unilateral modification provision here is especially straightforward:  Mr. Flores's contract with the Patriots states that he "agrees to comply . . . with . . . the NFL Constitution . . . in [its] present form *and as amended from time to time hereafter*."  Flores-Patriots Agreement ¶ 15 (emphasis added).  Should the Court hold that Mr. Flores need not comply with the NFL Constitution as amended, it may simply strike the italicized language from that sentence and enforce the remainder of the contract exactly as written, including the arbitration agreement, the scope of which would remain completely unaltered.

Severance would also be fully consistent with the parties' intent, because Mr. Flores's claim that the Patriots contract "does not have a severance clause," Dkt. 93 at 13, is patently false.  In fact, paragraph 20 of that contract expressly states that if any provision is found to be unenforceable, such provision will be "severed . . . and shall not affect the . . . enforceability of any other provision of this Agreement, which shall remain in full force and effect to the fullest extent possible."  Flores-Patriots Agreement ¶ 20.  Severance, if needed, is therefore entirely appropriate and is the parties' agreed-to remedy should the unilateral modification provision be

held to be unenforceable.

### C. Mr. Flores's Misinterpretation of Massachusetts Law Is Preempted By the FAA

Finally, Mr. Flores argues that his misreading of Massachusetts law—which would render the arbitration provisions within his employment contract "illusory" and unenforceable based on the unilateral modification provision—does not "run afoul of the FAA" because it is consistent with Massachusetts case law "applicable to all contracts, not merely arbitration agreements." Dkt. 93 at 13–14. These arguments miss the mark. As explained in our moving brief, Massachusetts courts have applied principles of "illusoriness" to contracts as a whole, and not in a targeted fashion to arbitration provisions situated within broader contracts. Dkt. 82 at 10–12. Thus, even if the unilateral modification provision were somehow problematic, the appropriate inquiry under Massachusetts law, consistent with *Jackson* and its progeny, would be whether that renders Mr. Flores's employment contract with the Patriots *as a whole* "illusory" and unenforceable (an assertion that Mr. Flores has never made, presumably because of the many benefits he has already received under that contract). To do as Mr. Flores proposes—and to hold, because of the unilateral modification provision, that the arbitration provisions within that broader employment contract, *in isolation*, are unenforceable—is not only inconsistent with Massachusetts law, but also would plainly "disfavor[] arbitration" in a manner that violates the FAA. *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 341 (2011).

### II. The Court Should Compel the Claims Against the Giants and the Texans to Arbitration

As demonstrated in our moving brief, the Court mistakenly held that Mr. Flores's agreement with the Steelers was invalid because there was no evidence before the Court that the NFL Commissioner had approved it. That agreement is valid: the Commissioner has, in fact, approved the contract—an approved version has now been submitted for the Court's consideration,

Dkt. 97—and even if it had not been, there is no question that under Pennsylvania law the parties formed a valid employment contract because they performed immediately upon execution.  Dkt. 82 at 13–14.  That agreement is also fully enforceable, and requires arbitration of the claims against the Giants and the Texans.  *Id*. at 15–18.

Mr. Flores does not meaningfully contest the validity of his agreement with the Steelers.  And his attempts to avoid enforcement—including by rewriting the plain and unambiguous terms of that agreement through irrelevant extrinsic evidence—fail.

### A.  Mr. Flores Agreed to Arbitrate in His Contract with the Steelers

When Mr. Flores executed his contract with the Steelers, he expressly agreed (as he had several times before) to "comply . . . with . . . the [NFL] Constitution," which requires arbitration of all disputes between coaches and clubs.  Flores-Steelers Agreement ¶ 13; *see* Dkt. 76 at 10.

In an attempt to avoid this express bargained-for provision, Mr. Flores now reaches outside the four corners of the contract by arguing that the parties separately agreed that the arbitration provisions in their contract "would not apply" to this lawsuit.  Dkt. 93 at 15–16.  But as his supposed "evidence" makes clear, that is not true.  Even assuming that Mr. Flores can rely on extrinsic evidence to override the explicit terms of the contract itself—which he cannot, under the contract's integration clause, Flores-Steelers Agreement ¶ 18, or under hornbook principles of contract law[3]—the email he cites merely confirms that the contract "is not intended to infringe in any way" on the parties' rights in this lawsuit, Dkt. 95, Ex. A, and does nothing to alter the scope of their arbitration agreement.  Contrary to his contentions, requiring arbitration of Mr. Flores's

---

[3]  Where, as here, there is a written contract representing the parties' entire agreement, that contract "cannot be added to nor subtracted from by parol evidence" under Pennsylvania law. *Yocca* v. *Pittsburgh Steelers Sports, Inc*., 854 A.2d 425, 436 (Pa. 2004) (citation omitted).  The Steelers contract also makes clear that it cannot be amended "except by a writing signed by both parties hereto"—which the cited email is not.  Flores-Steelers Agreement ¶ 22.

claims—claims he expressly agreed to arbitrate—does not "infringe" upon his right to prosecute those claims, which he can continue to pursue in an arbitral forum (along with his other claims that the Court has already properly compelled to arbitration). *See Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forgo [its] substantive rights . . . ; it only submits to their resolution in an arbitral, rather than a judicial, forum."). And in fact, the email Mr. Flores relies on expressly *preserves* Defendants' right to "assert[] any defense[]," Dkt. 95, Ex. A, which includes "the defense of arbitration." *PPG Indus., Inc.* v. *Webster Auto Parts, Inc.*, 128 F.3d 103, 109 (2d Cir. 1997).

### B. The Arbitration Agreement Applies Retroactively and Should Be Enforced

Mr. Flores next seeks to side-step his binding agreement to arbitrate by arguing that it does not apply retroactively to his claims against the Giants and the Texans, and is also "illusory" because the NFL clubs can unilaterally modify the terms of their Constitution. Dkt. 93 at 16–21. Not only are these arguments non-responsive to Moving Defendants' arguments for reconsideration, but they also have no support in either fact or law.

As explained in our moving brief, the broad language of Mr. Flores's agreement to arbitrate—covering a wide range of disputes, including all disputes between coaches and clubs, with no limit on temporal scope, NFL Const. art. 8.3—properly encompasses his claims against the Giants and the Texans, which arose in the less-than-six-week period when he was between his positions with the Dolphins and the Steelers (during which time Mr. Flores continued to avail himself of the provisions in his contract with the Dolphins by seeking severance payments). Dkt. 82 at 15; Dkt. 22 ¶¶ 220–26. Pennsylvania law, which governs the Steelers contract, supports retroactive application in these circumstances. Dkt. 82 at 15–16.

Mr. Flores fails to distinguish the relevant authorities. In *Masoner* v. *Education Management Corp.*, 18 F. Supp. 3d 652, 661–62 (W.D. Pa. 2014), the court held that an arbitration

policy with "no temporal limit," like the agreement here, squarely encompassed claims that arose prior to the date the plaintiff agreed to the arbitration policy. Mr. Flores seeks to distinguish that case by arguing that here, he had "already filed his federal complaint" when he entered into his contract with the Steelers, and also "objected" to arbitration, weeks later, by sending a letter to the NFL Commissioner asking him to decline to arbitrate his claims against the Dolphins. Dkt. 93 at 18. But in *Masoner*, too, the plaintiff had already filed her discrimination lawsuit *before* she agreed to the arbitration policy at issue; the court nevertheless concluded, given the broad language of that policy, that it applied to her existing lawsuit. 18 F. Supp. 3d at 655–56, 661–62. The same result should follow here. In any event, Mr. Flores cannot rely on his supposed "objections" to override the explicit terms of the contract he signed. While in *Masoner*, the court found it relevant that the employee "never . . . expressed a desire to reject or challenge" the arbitration policy, that was because the policy was not part of a negotiated bilateral contract, and was instead sent unilaterally to employees via email. *Id.* at 655–56. Here, the arbitration agreement was part of a contract that Mr. Flores admits was subject to "negotiations." Dkt. 93 at 15–16. If Mr. Flores wished to "reject" arbitration, he had a straightforward way to do so, which was to simply refuse to sign any contract that required arbitration. He did not do that, and his purported "objections"— raised weeks later, Dkt. 95, Ex. B—do not allow him to avoid his express bargain.[4]

As for Mr. Flores's piggy-back argument that the unilateral modification provision renders his agreement to arbitrate "illusory," Mr. Flores is unable to cite a single Pennsylvania state court

---

[4] For these reasons, Mr. Flores also fails to distinguish *Scott* v. *Education Management Corp.*, 2015 WL 12912386, at *5 (W.D. Pa. Mar. 11, 2015). The Third Circuit vacated that decision only because the employees there refused to assent to the same arbitration policy, which was distributed to all employees "in an automated email," thus precluding the "mutual assent" needed for a valid contract. 662 F. App'x 126, 128, 130–31 (3d Cir. 2016). The Third Circuit did not disturb the lower court's reasoning that, had there been mutual assent (as there indisputably was here), the broad language of the arbitration policy should apply retroactively.

decision requiring that result. He instead relies on a lone federal court decision, *Crump* v. *MetaSource Acquisitions, LLC*, 373 F. Supp. 3d 540 (E.D. Pa. 2019), which is inapposite, as Moving Defendants have already explained, including because it arises in the entirely distinguishable context of a non-negotiable employee manual. Dkt. 82 at 17 n.8. Mr. Flores seeks to elide this important distinction by claiming, in an about-face, that the NFL Constitution "*is . . . an employee manual*," Dkt. 93 at 19–20, despite having just conceded, in the same brief, that "the NFL Constitution is *entirely different* than an employee handbook." *Id.* at 8 (emphasis added). Regardless, there is no dispute that here, Mr. Flores agreed to arbitrate under the NFL Constitution in an arm's-length employment contract that he concedes was subject to "negotiations." *Id.* at 16. Further, *Crump* is not controlling (and even if it were, its interpretation of Pennsylvania law would be preempted by the FAA): in holding that the arbitration agreement there was "illusory" and lacked "sufficient consideration," the federal court relied only on cases that either applied out-of-state law, did not involve arbitration agreements, or addressed agreements *not* subject to unilateral modification. 373 F. Supp. 3d at 544–49. Indeed, the court acknowledged that it was merely "predict[ing] how the Pennsylvania Supreme Court would rule," *id.* at 548, and its decision not to enforce the agreement before it has been criticized as "an outlier." *Doe 1* v. *Darden Restaurants, Inc.*, 2022 WL 265949, at \*10 (M.D. Pa. Jan. 27, 2022). Finally, even if the unilateral modification provision here were somehow problematic, that provision should be severed from the Steelers contract—consistent with its express severability clause, Flores-Steelers Agreement ¶ 19—and the arbitration agreement otherwise enforced according to its unchanged terms. Section I.B, *supra*.

\*\*\*

The motion for partial reconsideration should be granted, and the Court should compel Mr. Flores's remaining claims against the Broncos, the Giants, and the Texans to arbitration.

Dated: New York, New York
April 21, 2023

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**

By: */s/ Loretta E. Lynch*
Loretta E. Lynch
Brad S. Karp
Lynn B. Bayard
Brette Tannenbaum
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Fax: (212) 757-3900
lelynch@paulweiss.com
bkarp@paulweiss.com
lbayard@paulweiss.com
btannenbaum@paulweiss.com

*Attorneys for the National Football League, Denver
Broncos, Houston Texans, and New York Giants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN FLORES, STEVE WILKS, and RAY HORTON, as Class Representatives, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL FOOTBALL LEAGUE; NEW YORK FOOTBALL GIANTS, INC. d/b/a NEW YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a MIAMI DOLPHINS; DENVER BRONCOS FOOTBALL CLUB d/b/a DENVER BRONCOS; HOUSTON NFL HOLDINGS, L.P. d/b/a HOUSTON TEXANS; ARIZONA CARDINALS FOOTBALL CLUB LLC d/b/a ARIZONA CARDINALS; TENNESSEE TITANS ENTERTAINMENT, INC. d/b/a TENNESSEE TITANS; and JOHN DOE TEAMS 1 through 26,<br><br>Defendants. | Civil Action No.: 22-cv-00871 (VEC) |

## NOTICE OF APPEAL

Defendants the National Football League (NFL); New York Football Giants, Inc. (d/b/a the New York Giants); Denver Broncos Football Club (d/b/a the Denver Broncos); and Houston NFL Holdings, L.P. (d/b/a the Houston Texans) appeal to the United States Court of Appeals for the Second Circuit from the portions of this Court's March 1, 2023 order (Dkt. 76) and July 25, 2023 order (Dkt. 102) declining to compel arbitration of plaintiff Brian Flores's claims against the New York Giants, the Denver Broncos, and the Houston Texans, as well as his "related claims" against the NFL, Dkt. 76, at 2. This notice of appeal is limited to those portions of the Court's orders and does not apply to the portions of the Court's orders related to Flores's claims against

defendant Miami Dolphins, Ltd. (d/b/a the Miami Dolphins); plaintiff Steve Wilks's claims against

defendant Arizona Cardinals Football Club LLC (d/b/a the Arizona Cardinals); plaintiff Ray

Horton's claims against defendant Tennessee Titans Entertainment, Inc. (d/b/a Tennessee Titans);

or the related claims filed by Flores, Wilks, and Horton against the NFL.

Dated: New York, New York       **PAUL, WEISS, RIFKIND, WHARTON &**
       August 21, 2023                 **GARRISON LLP**

                       By: /s/ Loretta E. Lynch
                       Loretta E. Lynch
                       Brad S. Karp
                       Lynn B. Bayard
                       Brette Tannenbaum
                       1285 Avenue of the Americas
                       New York, New York 10019-6064
                       Telephone: (212) 373-3000
                       Fax: (212) 757-3900
                       lelynch@paulweiss.com
                       bkarp@paulweiss.com
                       lbayard@paulweiss.com
                       btannenbaum@paulweiss.com

                       *Attorneys for the National Football League, New York*
                       *Giants, Denver Broncos, and Houston Texans*

2

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 01/04/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
BRIAN FLORES, STEVE WILKS, and RAY      :
HORTON, as Class Representatives, on     :
behalf of themselves and all others similarly  :
situated,                                :
                                         :
                          Plaintiffs,    :
                                         :
          -against-                      :
                                         :
THE NATIONAL FOOTBALL LEAGUE; NEW   :
YORK FOOTBALL GIANTS, INC. d/b/a NEW   :
YORK GIANTS; MIAMI DOLPHINS, LTD. d/b/a :       22-CV-0871 (VEC)
MIAMI DOLPHINS; DENVER BRONCOS      :
FOOTBALL CLUB d/b/a DENVER BRONCOS;   :       OPINION AND ORDER
HOUSTON NFL HOLDINGS, L.P. d/b/a      :
HOUSTON TEXANS; ARIZONA CARDINALS   :
FOOTBALL CLUB LLC d/b/a ARIZONA      :
CARDINALS; TENNESSEE TITANS         :
ENTERTAINMENT, INC. d/b/a TENNESSEE,   :
TITANS and JOHN DOE TEAMS 1 through 26,  :
                                         :
                          Defendants.    :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

Plaintiffs, who are current and former coaches for teams in the National Football League

(the "NFL"), have sued the NFL and various member teams for racial discrimination and

retaliation in violation of 42 U.S.C. § 1981 and several state laws. *See* Am. Compl., Dkt. 22. On

March 1, 2023, the Court granted in part and denied in part Defendants' motion to compel

arbitration. *See* Op. & Order, Dkt. 76 (the "Arbitration Opinion"). The Court compelled

arbitration of the claims brought by Ray Horton against the Tennessee Titans, Steve Wilks

against the Arizona Cardinals, and Brian Flores against the Miami Dolphins, as well as all

related claims against the NFL.[1] *Id*. The Court denied the parties' motions for reconsideration

---

[1] The Court denied the motion to compel arbitration of Mr. Flores's claims against the New York Giants, the
Denver Broncos, and the Houston Texans, as well as his related claims against the NFL. *See* Arbitration Opinion,
Dkt. 76.

1

on July 25, 2023.  *See* Op. & Order, Dkt. 102 (the "Reconsideration Opinion").  Defendants

appealed to the Second Circuit those portions of the Arbitration Opinion and the Reconsideration

Opinion (together, the "Opinions") that denied their motion to compel arbitration.  *See* Not. of

Appeal, Dkt. 113.  Plaintiffs both cross-appealed those portions of the Opinions that compelled

arbitration, *see* Not. of Cross-Appeal, Dkt. 122, and filed the instant motion, pursuant to 28

U.S.C. § 1292(b), to certify for appeal certain legal issues that led the Court to compel

arbitration, *see* Not. of Mot., Dkt. 119.  For the following reasons, Plaintiffs' motion is DENIED.

## DISCUSSION[2]

### I.    Legal Standard

Under 28 U.S.C. § 1292(b), a district court may certify for appellate review any

interlocutory order that (1) "involves a controlling question of law," (2) "as to which there is

substantial ground for difference of opinion," and (3) where "an immediate appeal from the order

may materially advance the ultimate termination of the litigation."  That statute creates a narrow

exception to the "basic tenet of federal law" that appellate review should follow final judgment.

*Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996) (citation omitted).  The

Second Circuit has held that interlocutory appeals "must be strictly limited to the precise

conditions stated in the law."  *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir.

1990) (internal quotation marks and citation omitted).

As to the first criterion, a controlling question of law "must [be] a 'pure' question of law

that the reviewing court could decide quickly and cleanly without having to study the record."  *In*

*re Adelphia Commc'ns Corp.*, 333 B.R. 649, 658 (S.D.N.Y. 2005) (quoting *In re Worldcom, Inc.*,

No. M–47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003)).  The question must also

---

[2]    The Court assumes familiarity with the factual background set forth in the Arbitration Opinion.  *See*
Arbitration Opinion at 2–5.

be "controlling," meaning that reversal of the order would "'result in dismissal of the action'"; reversal of the order could "'significantly affect the conduct of the action'"; or the issue on appeal "'has precedential value for a large number of cases.'" *In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 986 F. Supp. 2d 524, 535–36 (S.D.N.Y. 2014) (quoting *Glatt v. Fox Searchlight Pictures Inc.*, No. 11-CV-6784 (WHP), 2013 WL 5405696, at *2 (S.D.N.Y. Sept. 17, 2013)).

As to the second criterion, a "substantial ground for difference of opinion" exists where "'there is conflicting authority on the issue'" or where "'the issue is particularly difficult and of first impression in the Second Circuit.'" *Hometrust Mortg. Co. v. Lehman Bros. Holdings, Inc.*, No. 15-CV-4060 (WHP), 2015 WL 5674899, at *2 (S.D.N.Y. Sept. 25, 2015) (quoting *Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 551 (S.D.N.Y. 2013)).

As to the third criterion, an appeal "advance[s] the ultimate termination of the litigation" if the appeal promises to "'advance the time for trial or shorten the time required for trial.'" *Primavera Familienstifung v. Askin*, 139 F. Supp. 2d 567, 570 (S.D.N.Y. 2001) (quoting *In re Oxford Health Plans, Inc.*, 182 F.R.D. 51, 53 (S.D.N.Y. 1998)).

Even when all three criteria are met, a district court retains "unfettered discretion" to deny leave to appeal for "any reason," including judicial economy. *In re Facebook*, 986 F. Supp. 2d at 530 (quoting *Klinghoffer*, 921 F.2d at 24). As a general rule, interlocutory appeals are "strongly disfavored" in the federal system. *Id.* (internal quotation marks and citation omitted). They should be "strictly reserved for exceptional cases," and they are "especially rare in early stages of litigation." *Id.* at 533; *see also In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996) (discussing the "exceptional" circumstances justifying interlocutory appeal).

3

## II. Plaintiffs Fail to Establish Exceptional Circumstances Warranting Certification for Appellate Review

Plaintiffs request that the Court certify for appeal (1) whether an arbitration agreement that is not the result of collective bargaining is unconscionable and therefore unenforceable if it designates a biased party representative as arbitrator to resolve statutory discrimination claims (the "Unconscionability Issue"); and (2) whether the effective vindication doctrine renders an arbitration agreement unenforceable if it designates a biased party representative as arbitrator to resolve statutory discrimination claims (the "Effective Vindication Issue") (together, the "Issues for Appeal"). *See* Pls. Mem., Dkt. 120, at 3. These issues do not qualify for interlocutory appeal because they do not present controlling questions of law, do not raise a substantial ground for difference of opinion, and would not materially advance this litigation if resolved by the Second Circuit, which Plaintiffs assert has pendant appellate jurisdiction over their cross-appeal.[3]

### A. Pure and Controlling Questions of Law

Plaintiffs assert that the Issues for Appeal involve pure questions of law that can be decided without studying "any substantial record" because this Court decided them without the benefit of discovery. *See* Pls. Mem. at 5. Plaintiffs are misguided.

---

[3] Although the filing of a notice of appeal ordinarily "divests a district court of jurisdiction over the issues presented in the appeal," *Ret. Bd. of the Policemen's Annuity & Benefit Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 159 n.4 (2d Cir. 2014) (citing *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982)), a district court may still take action "in aid of the appeal," *New York v. DHS*, 974 F.3d 210, 215 (2d Cir. 2020) (quoting *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. E. Air Lines, Inc.*, 847 F. 2d 1014, 1017 (2d Cir. 1988)); *see also Hoffenberg v. United States*, No. 00-CV-1686 (RWS), 2004 WL 2338144, at *4 (S.D.N.Y. Oct. 18, 2004) (deciding a plaintiff's motion for interlocutory appeal on the merits even though the plaintiff had already filed a notice of appeal "in aid of the appellate jurisdiction of the Court of Appeals and in the interest of judicial economy"). Moreover, even if the Court lacks jurisdiction to grant Plaintiffs' motion, it may still deny it pursuant to Federal Rule of Civil Procedure 62.1 ("Rule 62.1"). Because the Court denies Plaintiffs' motion for the reasons discussed *infra*, it need not decide whether it would have jurisdiction to grant it. *See Paguirigan v. Prompt Nursing Empl. Agency LLC*, No. 17-CV-1302 (NG) (JO), 2020 WL 239456, at *1 n.1 (E.D.N.Y. Jan. 9, 2020) (denying a motion for interlocutory appeal certification of certain legal issues where the movant had already filed a notice of appeal of the Court's decision including those issues and noting that the Court "need not assess, issue by issue, [its] jurisdiction over [the present] motion" because Rule 62.1 provided "express authority to deny it") (citing Fed. R. Civ. P. 62.1)).

J.A. 1171

As a preliminary matter, Plaintiffs ignore that although discovery was unnecessary for the Court to issue the Opinions, the Court considered allegations in the Amended Complaint, the NFL rules and policies, and Plaintiffs' employment contracts — a substantial factual record — when resolving the parties' motions. *Cf. Dill v. JPMorgan Chase Bank, N.A.*, No. 19-CV-10947 (KPF), 2021 WL 3406192, at *6 (S.D.N.Y. Aug. 4, 2021) (denying plaintiffs' motion for interlocutory appeal of a decision compelling arbitration in part because requiring the Second Circuit to address "the interpretation and enforceability" of an arbitration provision would "'mandate an examination of the entire arbitration agreement'" (quoting *In re Anderson*, 550 B.R. 228, 237 (S.D.N.Y. 2016)).

Plaintiffs' argument also misinterprets the standard for certification. A "pure" question of law is "not synonymous with 'an issue that might be free from a factual contest.'" *In re Belton*, No. 15-CV-1934 (VB), 2016 WL 164620, at *1 n.1 (S.D.N.Y. Jan. 12, 2016) (citation omitted) (denying plaintiffs' motion for interlocutory appeal of a decision compelling arbitration in part because the Court's determination "require[d] a particularized inquiry into the nature of the claim" (internal quotation marks and citation omitted)). Rather, a question of law is only suitable for certification if it raises "an abstract legal issue." *In re Worldcom, Inc.*, 2003 WL 21498904, at *10 (internal quotation marks and citation omitted). Simply "refram[ing] the factual issues in [the] case as questions of law" by "turning them into hypotheticals" is insufficient. *Bishop v. Best Buy, Co. Inc.*, No. 08-CV-8427 (LBS), 2011 WL 4011449, at *13 (S.D.N.Y. Sept. 8, 2011); *see also Goldfarb v. Channel One Russia*, No. 18-CV-8128 (JPC), 2021 WL 1392850, at *10 (S.D.N.Y. Apr. 13, 2021) ("[D]isputes concerning the application of

the law to the specific facts of a case typically are not appropriate for an interlocutory appeal." (citations omitted)).[4]

The Unconscionability Issue does not raise a pure question of law because its resolution would require the Second Circuit to assess whether Plaintiffs' arbitration agreements are unconscionable based on the unique facts of this case, including the NFL Commissioner's role, the NFL Commissioner's statements, the language in Plaintiffs' contracts, and the purported absence of collective bargaining. Far from raising a pure question of law, the Unconscionability Issue would require the Second Circuit to pore over the factual circumstances surrounding distinct arbitration agreements. Such mixed factual and legal analysis is not suitable for interlocutory appeal. *See, e.g.*, *Cuadras v. MetroPCS Wireless, Inc*., No. 09-CV-7897 (CAS), 2011 WL 11084069, at *4 (C.D. Cal. Oct. 11, 2011) (denying plaintiffs' motion for interlocutory appeal of a decision compelling arbitration despite plaintiffs' argument that the agreement was unconscionable because plaintiffs did not advance a pure question of law); *Adler v. Dell, Inc*., No. 08-CV-13170 (GCS), 2009 WL 646885, at *2 (E.D. Mich. Mar. 10, 2009) (same because "fact[-]specific inquiries" regarding the relevant agreement's unconscionability were not pure questions of law).

The Effective Vindication Issue[5] is unsuitable for appeal on similar grounds. Plaintiffs' framing of the issue assumes that the NFL Commissioner is "biased." Reaching that conclusion,

---

[4] Courts, therefore, routinely conclude that pre-discovery opinions raise mixed questions of law and fact rather than pure questions of law suitable for appeal. *See, e.g., SEC v. Bernard L. Madoff Inv. Secs. LLC*, No. 23-CV-992 (AT), 2023 WL 5671544, at *2–3 (S.D.N.Y. Sept. 1, 2023) (denying defendants' motion for interlocutory appeal of a decision denying a pre-discovery motion to dismiss because the court's "routine application of law to the factual allegations in the complaint d[id] not present an issue of pure law" (citations omitted)); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, No. 19-CV-10067 (PAE), 2023 WL 4249356, at *18 (S.D.N.Y. June 29, 2023) (same because the case presented "an application of law to the unique set of facts pled in [the complaint]").

[5] Plaintiffs argue that the NFL Commissioner's alleged bias will prevent them from vindicating their claims in arbitration. The effective vindication doctrine is "a judge-made exception to the [Federal Arbitration Act]" that "finds its origins in the desire to prevent prospective waiver of a party's right to pursue statutory remedies." *Am.*

6

however, and determining the extent of any bias, would require a fact-specific analysis of the

NFL Commissioner's role, the NFL Commissioner's conduct, and the parties' agreements.

Plaintiffs cannot obtain certification by embedding fact-specific assumptions in purported

questions of pure law.  *See Bishop*, 2011 WL 4011449, at *13 (concluding that the plaintiff did

not identify questions of pure law for certification because his proposed questions "depend[ed]

on" factual conclusions that had not been reached by the district court).

For all of those reasons, the Issues for Appeal do not raise pure questions of law for

interlocutory review.[6]

---

*Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235–236 (2013) (internal quotation marks and citation omitted).
The Supreme Court has recognized two types of arbitration agreements to which this doctrine may apply: an
agreement "forbidding the assertion of certain statutory rights" and an agreement imposing arbitration fees "so high
as to make access to the forum impracticable."  *Id.* at 236 (citation omitted).

[6]     Because the Issues for Appeal are not pure questions of law, the Court need not decide whether any pure
questions of law would be sufficiently "controlling" to warrant appeal.  Plaintiffs acknowledge, however, that the
"mere potential reversal of an order compelling arbitration" does not typically satisfy the "controlling" question of
law requirement.  Pls. Mem., Dkt. 120, at 6.

Plaintiffs also assert that the Court should grant their motion because Defendants are already appealing
those portions of the Opinions denying arbitration.  Plaintiffs argue that, under those circumstances, it would be
unfair to prevent Plaintiffs from appealing those portions of the Opinions compelling arbitration.  *See* Pls. Mem. at
7–8.  The Federal Arbitration Act (the "FAA") expressly allows for this asymmetry, however, by only authorizing
interlocutory appeals of orders *denying* arbitration.  *See* 9 U.S.C. § 16.  The FAA thereby "endeavor[s] to promote
appeals from orders barring arbitration and limit appeals from orders directing arbitration."  *Augustea Impb Et
Salvataggi v. Mitsubishi Corp.*, 126 F.3d 95, 98 (2d Cir. 1997) (internal quotation marks and citation omitted); *see
also Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) ("Notably, Congress provided for immediate interlocutory
appeals of orders *denying*—but not of orders *granting*—motions to compel arbitration.").  In any event, Plaintiffs
still have the opportunity to argue in favor of pendant appellate jurisdiction before the Second Circuit.  *See The
Boeing Co. v. Egyptair*, No. 05-5986 (CV), 2007 WL 1315716, at *2–3 (2d Cir. May 7, 2007) (noting that the
Second Circuit may exercise pendant appellate jurisdiction "(a) where an issue is inextricably intertwined with a
question that is the proper subject of an immediate appeal, or (b) where review of a jurisdictionally insufficient issue
is necessary to ensure meaningful review of a jurisdictionally sufficient one" (quoting *U.S. Fidelity & Gar. Co. v.
Braspetro Oil Servs., Co.*, 199 F.3d 94, 97 (2d Cir. 1999)) (summary order).

7

### B. Substantial Ground for Difference of Opinion

Plaintiffs assert that there is substantial ground for difference of opinion regarding the Issues for Appeal because "no definitive case law" by the Supreme Court or the Second Circuit applies, amici objected to the Court's reasoning, and courts in other jurisdictions adopted Plaintiffs' reasoning. *See* Pls. Mem. at 12–16. The Court disagrees.

It is well established that "[s]imply because" a question of law has "not yet been directly addressed by the Supreme Court or the Second Circuit" does not mean that it raises a reasonable ground for difference of opinion. *Williston v. Eggleston*, 410 F. Supp. 2d 274, 277 (S.D.N.Y. 2006) (collecting cases and concluding that interlocutory appeal was inappropriate). In this case, however, the Supreme Court and the Second Circuit *have* issued key decisions on the Issues for Appeal; those decision simply do not align with Plaintiffs' position.

Regarding the Unconscionability Issue, the Second Circuit already rejected the argument that, as a matter of law, the NFL Commissioner cannot fairly arbitrate claims regarding the NFL's conduct. *See* Arbitration Opinion at 22–23 (discussing *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016)); Reconsideration Opinion at 13–14 (same). Plaintiffs have not cited any applicable state law that would require a contrary result. *See* Arbitration Opinion at 16–17, 25–26 (analyzing Arizona, Florida, and Tennessee contract law); Reconsideration Opinion at 15–16. [7]

As for the Effective Vindication Issue, the Supreme Court has not recognized alleged structural bias in arbitration agreements as grounds for applying the effective vindication

---

[7]    Plaintiffs accuse the Court of "relying on out-of-jurisdiction case law" to support its reasoning, and of selectively disregarding out-of-jurisdiction caselaw that favors Plaintiffs. Pls. Mem. at 27. The federal caselaw that the Court cited in support of its decision applied the state laws at issue in this case. *See* Arbitration Opinion at 24–25 (discussing Eleventh and Sixth Circuit cases applying Florida and Tennessee law). The out-of-jurisdiction decisions that the Court summarily disregarded, *see id.* at 25 n.25, are state law decisions that have no bearing on this federal action involving Florida, Tennessee, and Arizona contract law.

8

doctrine.  To the contrary, Justice Kagan warned that the Supreme Court's jurisprudence would enable companies to appoint "obviously biased" arbitrators.  *See* Arbitration Opinion at 24 (discussing *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013)); Reconsideration Opinion at 15 (same).[8]  Moreover, contrary to Plaintiffs' position, federal law does provide protection against biased arbitrators.  It does so, however, by allowing arbitration awards to be overturned upon a showing of "evident partiality or corruption," not by preventing arbitration from the get-go.  *See* Arbitration Opinion at 23 (discussing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991) and 9 U.S.C. § 10(a)(2)); Reconsideration Opinion at 13–14 (same).

For all of those reasons, Plaintiffs have not established substantial ground for difference of opinion regarding the Issues for Appeal.

### C.  Advancing the Ultimate Resolution of the Litigation

Plaintiffs maintain that certifying the Issues for Appeal may materially advance the ultimate termination of this case because, if the Court grants certification and the Second Circuit rules in Plaintiffs' favor, the parties will avoid wasting time in arbitration.  *See* Pls. Mem. at 23–24.  For the reasons discussed *supra*, however, it is more likely that the Second Circuit would affirm the Court's decision or decline to hear the appeal, resulting in "unnecessar[y]" delay. *Murray v. UBS Secs., LLC*, No. 13-CV-5914 (KPF), 2014 WL 1316472, at *7 (S.D.N.Y. Apr. 1,

---

[8]  As Plaintiffs acknowledge, *see* Pls. Mem. at 22–23, the Court already distinguished federal caselaw from other jurisdictions.  *See* Arbitration Opinion at 24 n.22.  The Court also found amici's objections unpersuasive.  *See* Reconsideration Opinion at 14 n.14.

The law journal excerpt Plaintiffs cite in their favor, *see* Michael Conklin et al., *Brian Flores's Employment Discrimination Lawsuit Against the NFL: A Game Changer or Business As Usual?* [hereinafter "Conklin Article"], 29 Jeffrey S. Moorad Sports L. J. 299, 306 (2022) ("Unfortunately for the NFL, case law is clear regarding the essential nature of arbitrator neutrality."), is purportedly justified by a Supreme Court case that even *Plaintiffs* do not reference because it is so far afield.  *See Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 146–48 (1968) (wherein the parties' arbitration agreement required them to select a "neutral" third member of an arbitration panel and one of the parties failed to disclose its "close financial relations" with the purportedly neutral arbitrator; the Supreme Court therefore set aside the arbitration award).  Plaintiffs' decision to cite a law journal article that "call[s] into question" their litigation strategy is also curious.  Conklin Article at 324.

2014); *see also Dill*, 2021 WL 3406192, at *9 (denying plaintiffs' motion for interlocutory appeal of a decision compelling arbitration in part because certification "would be inconsistent with the national policy favoring arbitration, and the Second Circuit's distaste for delaying the arbitral process through appellate review" (internal quotation marks and citations omitted)); *In re Belton*, 2016 WL 164620, at *2 ("Proceeding to arbitration, rather than certifying an interlocutory appeal, is the fastest way for these cases to be decided on the merits.").[9]  Certifying the Issues for Appeal is, therefore, unlikely to materially advance the ultimate resolution of the litigation.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to certify the Issues for Appeal to the Second Circuit is DENIED.  The Clerk of Court is respectfully directed to close the open motion at Docket Entry 119.

**SO ORDERED.**

Date:  **January 4, 2024**
       **New York, NY**

_____
        **VALERIE CAPRONI**
   **United States District Judge**

---

[9]      The cases Plaintiffs cite to the contrary are readily distinguishable.  *See S.A. Mineracao Da Trindade-Samitri*, 579 F. Supp. 1049, 1050–51 (S.D.N.Y. 1984) (wherein the plaintiff raised controlling questions of law about which there was substantial ground for difference of opinion); *In re A2P SMS Antitrust Litig.*, No. 12-CV-2656 (AJN), 2015 WL 876456, at *5 (S.D.N.Y. Mar. 2, 2015) (same and wherein, absent appeal, the arbitration could "only proceed in fits and starts, with successive rounds of motions to vacate or confirm interim arbitration awards"); *Islam v. Lyft*, No. 20-CV-3004 (RA), 2021 WL 2651653, at *5–6 (S.D.N.Y. June 28, 2021) (same and wherein a parallel interlocutory appeal regarding the identical issue was already pending before the Second Circuit).